IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHELSEY GOSSE, CHRISTOPHER DETTORE, AND LORI A. DETTORE, *on their own behalfs and on behalf of other similarly situated persons*,<br><br>    Plaintiff,<br><br>    v.<br><br>TRANSWORLD SYSTEMS, INC.;<br>U.S. BANK, N.A.;<br>RATCHFORD LAW GROUP, P.C.;<br>PORTNOY SCHNECK, L.L.C.;<br>NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4; GSS DATA SERVICES LLC<br><br>    Defendants. | Case No: 3:20-cv-01446-RDM-MCC |

Exhibit A to First Amended Complaint

EFiled:  Jun 15 2018 04:31PM EDT
Transaction ID 62138855
Case No. 2018-0167-JRS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION, GSS DATA SERVICES, INC., TURNSTILE CAPITAL MANAGEMENT, LLC, AND TRANSWORLD SYSTEMS, INC.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>C.A. No.  2018-0167-JRS<br><br><br>**VERIFIED AMENDED COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES** |

**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
302-622-7000
*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE ACTION ................................................................................1

THE PARTIES.................................................................................................6

JURISDICTION AND VENUE ..........................................................................7

FACTUAL BACKGROUND ..............................................................................8

A.    The Structure and Operation of the Trusts .......................................8

B.    The Trusts' Service Providers ...................................................11

      1.    The Master Servicing Agreement ........................................11

      2.    The Indenture ................................................................11

      3.    The Administration Agreement...........................................14

      4.    The Special Servicing Agreement.......................................15

      5.    The Special Subservicing Agreement .................................15

C.    Defendants Improperly Send Defaulted Loans to TSI in Violation of the Governing Documents............................................................21

D.    Defendants Allow the Statute of Limitations on Defaulted Loans to Expire and Refuse to Provide Information Regarding Such Loans .............27

E.    Defendants' Failure to Obtain and Safeguard Documents Impedes the Trusts' Ability to Collect on Defaulted Loans .......................................30

F.    Defendants' Improper Collection Activities Thwart Collections on Defaulted Loans and Expose the Trusts to Liability .....................................37

G.    The Partial Audit of PHEAA.........................................................42

H.    GSS and U.S. Bank Prevent the Trusts' Servicer, Auditor and Lawyers From Being Paid ...................................................................................43

    1.    Failure to Pay the Trusts' Servicer (Odyssey) .....................................43

    2.    Failure to Pay the Trusts' Auditor...................................................46

    3.    Failure to Pay the Trusts' Lawyers .....................................................48

COUNT I:    Breach of Contract (against GSS) ......................................................53

COUNT II:    Tortious Interference with Contract (against GSS) ..........................55

COUNT III:    Breach of Contract (against U.S. Bank) ...........................................56

COUNT IV:    Breach of Duty of Care and to Avoid Conflicts of Interest (against U.S. Bank)................................................................................58

COUNT V:    Breach of Contract (against U.S. Bank) (Alternative Count)...........59

COUNT VI:    Breach of Contract (against Turnstile) ............................................61

COUNT VII:    Injurious Falsehood (against TSI) ....................................................63

Plaintiffs, The National Collegiate Master Student Loan Trust I, The National Collegiate Student Loan Trust 2003-1, The National Collegiate Student Loan Trust 2004-1, The National Collegiate Student Loan Trust 2004-2, The National Collegiate Student Loan Trust 2005-1, The National Collegiate Student Loan Trust 2005-2, The National Collegiate Student Loan Trust 2005-3, The National Collegiate Student Loan Trust 2006-1, The National Collegiate Student Loan Trust 2006-2, The National Collegiate Student Loan Trust 2006-3, The National Collegiate Student Loan Trust 2006-4, The National Collegiate Student Loan Trust 2007-1, The National Collegiate Student Loan Trust 2007-2, The National Collegiate Student Loan Trust 2007-3, The National Collegiate Student Loan Trust 2007-4 (collectively, "Plaintiffs" or "The Trusts"), for their Verified Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank"), GSS Data Services, Inc. ("GSS"), Turnstile Capital Management, LLC ("Turnstile"), and Transworld Systems, Inc. ("TSI"), based on personal knowledge as to themselves and information and belief as to all other matters, allege as follows:

## **NATURE OF THE ACTION**

1.      This case involves egregious breaches of contract and other duties by Defendants that have cost the Plaintiff Trusts billions of dollars and that have

resulted in wrongful and fraudulent foreclosure cases being brought against thousands of borrowers of Student Loans owned by the Trusts.

2.      Plaintiffs are each Delaware statutory Trusts created to acquire pools of Student Loans that had been originated by banks and other financial institutions, provide for the servicing of the loans, and issue Notes backed by the Trust assets. The face amount of all Student Loans held by the Trusts is approximately $15 billion.

3.      In order to help the Trusts fulfill their responsibilities under the Trust Agreements, various entities were hired to perform certain discrete tasks.  At present, Defendant U.S. Bank serves as Indenture Trustee and also Special Servicer; Defendant GSS serves as Administrator; Defendant Turnstile serves as Special Subservicer; and Defendant TSI performs certain collection activities.  In addition, non-party Pennsylvania Higher Education Assistance Agency ("PHEAA") serves as the principal Servicer.

4.      When borrowers fail to make required payments on their loans, Defendants are responsible for pursuing collection, including legal proceedings. For example, TSI was hired to bring collection proceedings, Turnstile as Special Subservicer is responsible for monitoring and supervising the performance by TSI, and U.S. Bank as Special Servicer has control over many of TSI's activities and also is responsible for monitoring the performance of Turnstile and replacing it if it

was deficient or negligent in the performance of its duties.  Defendants have failed miserably to discharge such duties, and in fact have engaged in improper and fraudulent conduct regarding the collection activities.   Lawsuits brought to foreclose on defaulted loans repeatedly have been dismissed because Defendants failed to obtain the documentation necessary to prove the Trusts' ownership of the loans and standing to bring collection proceedings.   Such improper collection practices, and the false and misleading representations that Defendants have made in the course of such lawsuits, have resulted in the Trusts being sued by borrowers and by the Consumer Financial Protection Bureau ("CFPB").

5.     In the course of its investigation, the CFPB found rampant fraudulent and otherwise improper conduct in the collection activities, such as suits being filed against borrowers without all of the notes, assignments and other documents needed to prove standing to foreclose on the loans, and submission of false and misleading affidavits in collection cases.   As a result of such wrongdoing by Defendants, done in the name of the Trusts, the CFPB has sought substantial monetary and equitable relief against the Trusts, and a proposed consent decree has been entered into whereby the Trusts would be required to pay tens of millions of dollars to the CFPB by reason of the improper conduct by the Defendants herein.

6.     As a result of the failures of the Defendants to deal properly with delinquent and defaulted loans, and their active obstruction of efforts by the Trusts

and the Owners of the beneficial interests therein to obtain information concerning such activities, it is estimated the statute of limitations has expired on approximately $1 billion of loans, and approximately another $4 billion have become uncollectible.  Additional loans are continuing to become statute barred, as Defendants continue to fail properly to discharge their duties.

7.      Defendants have no incentive to stop their fraudulent collection activities but rather are highly motivated to perpetuate the status quo.  Defendants have made hundreds of millions of dollars in servicing and other fees and want to continue to feed at the Trusts' trough.  And if borrowers who have been the victims of fraudulent collection cases sue, Defendants enter into settlements whereby the settlements are paid out of Trust assets.

8.      The Trusts have reason to believe that there is fraud in the servicing and administration of all of the loans in the Trusts.  The Owners, through direction to the Owner Trustee and Trust counsel, have been trying to investigate, monitor, and stop the improper activities of each of the Defendants, only to be faced with every maneuver Defendants can employ in order to maintain the current collection scheme under U.S. Bank as Special Servicer.  U.S. Bank as Indenture Trustee continuously mischaracterizes its duties in order to protect the collection scheme orchestrated by U.S. Bank as Special Servicer and all the other Defendants.

9.     The Trusts have attempted to stop and rectify these abuses, but Defendants have obstructed those efforts at every turn.  The Trusts appointed a new servicer, Odyssey Education Resources LLC ("Odyssey"), to deal with newly-defaulted loans, but GSS and U.S. Bank refused to acknowledge such appointment and U.S. Bank filed a lawsuit arguing the appointment was invalid.  The Trusts retained counsel to represent them in that lawsuit, but GSS and U.S. Bank have refused to pay the bills submitted by such counsel.  The Trusts commenced an audit of the primary servicer, PHEAA, but GSS and U.S. Bank refused to pay the bills submitted by the auditor hired by the Trusts to do the audit.  The Trusts' counsel negotiated a consent decree with the CFPB that would put an end to at least some of the servicing abuses committed by Defendants, but Defendants are strenuously opposing such consent decree, and to add insult to injury, GSS and U.S. Bank have refused to pay the bills submitted by that counsel too.

10.     The Trusts seek specific performance of the Governing Documents and other injunctive and equitable remedies arising out of Defendants' substantial breaches, as well as damages to compensate the Trusts for the substantial injuries the Trusts have suffered by reason of Defendants' wrongdoing as described herein.  All of the net proceeds of this case will be deposited into the appropriate collection account to be distributed pursuant to the waterfall set forth in the Indenture.

### THE PARTIES

11.     Plaintiffs are each Delaware statutory trusts with Wilmington Trust Company ("WTC"), a Delaware banking corporation, as their Owner Trustee. WTC has its principal business office at 1100 North Market Street, Wilmington, DE 19890.  On July 20, 2017, WTC resigned as Owner Trustee, but continues to function in that role as no replacement has yet been appointed.

12.     Defendant U.S. Bank is, upon information and belief, a nationally charted bank with its headquarters located at 800 Nicollet Mall, Minneapolis, MN 55402.

13.     Defendant GSS, upon information and belief, is a Massachusetts corporation with a principal business office located at 402 West Broadway, Suite 2000, San Diego, CA 92101.

14.     Defendant Turnstile, upon information and belief, is a Delaware limited liability company with a principal business office located at 402 West Broadway, Suite 2000, San Diego, CA 92101.

15.     Defendant TSI, upon information and belief, is a California corporation with a principal place of business in Ft. Washington, Pennsylvania. TSI is the successor to NCO.

16.     Non-party PHEAA is, upon information and belief, a public corporation, organized under the laws of the Commonwealth of Pennsylvania,

engaged in non-governmental commercial activity throughout the United States, including in Delaware.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 10 *Del. C.* § 341 because Plaintiffs seeks to compel specific performance with contractual obligations and seek other equitable relief.

18.    This Court has personal jurisdiction over Defendants in this action. U.S. Bank as Indenture Trustee and as Special Servicer and GSS as Administrator each contracted with the Trusts to provide, and has provided, services relating to loans to borrowers located in Delaware.  Furthermore, pursuant to the Indenture U.S. Bank has made payments to the Owner Trustee, WTC, in Delaware, and, on information and belief, has made payments to noteholders in Delaware.  As Special Servicer, U.S. Bank has authorized and supervised the bringing of collection lawsuits in Delaware against borrowers in default.  The Administrator has responsibility to, among other things, file tax returns for the Trusts in Delaware. Turnstile is a Delaware limited liability company that has responsibility under the Special Subservicing Agreement to, among other things, provide, and has provided, services relating to loans to borrowers located in Delaware.  TSI has, among other things, provided, services relating to defaulted loans to borrowers located in Delaware.

## FACTUAL BACKGROUND

### A.    The Structure and Operation of the Trusts

19.    Each of the NCSLT Trusts was created as a Delaware statutory trust to acquire pools of Student Loans that had been originated by banks and other financial institutions, provide for the servicing of the loans, and issue Notes backed by the Trust assets.   The Notes are held by various noteholders and traded as securities.    The face amount of all Student Loans held by the Trusts is approximately $15 billion.

20.    Under 12 *Del. C.* § 3801(g), a Delaware statutory trust is "a separate legal entity."   It is a juridical entity that "may sue and be sued."   12 *Del. C.* § 3804(a).

21.    Under the relevant Delaware statute and the Trust Agreements, the Owner Trustee is responsible for managing the Trusts' affairs at the direction of the Owners of the beneficial interest therein.  12 *Del. C.* § 3806(a) provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees.   To the extent provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust.

22.    Implementing this provision, the Trust Agreements provide that the Owner Trustee has all of the "rights, powers and duties set forth herein and in the Statutory Trust Statute."   Trust Agreement § 2.04; *see* § 8.01.  Under § 2.03 of the

Trust Agreements (entitled "Purposes and Powers"), the Trusts have the obligation and power, *inter alia,* "to provide for the administration of the Trust and the servicing of the Student Loans." § 2.03(a)(ii). The Trusts further have the power "[t]o engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith." § 2.03(a)(iii). They also have the power "[t]o engage in such other activities as may be required in connection with the conservation of Trust Property…." § 2.03(a)(iv).

23.   These are owner-directed Trusts. As provided in § 2.03(b)(i) of the Trust Agreements, in conducting the operations of the Trusts, "[t]he Trust will act solely in in its own name," and "the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners…." The Owner Trustee is required "to administer the Trust in the interests of the Owners." § 8.03.

24.   The beneficial interests in Plaintiff The National Collegiate Master Student Loan Trust I are owned by NC Residuals Owners Trust and SL Resid Holdings LLC. The beneficial interests in Plaintiff The National Collegiate Student Loan Trust 2003-1 are owned by NC Owners, LLC ("NC Owners"), Pathmark Associates LLC ("Pathmark") and NC Residuals Owners Trust. The beneficial interests in the remaining Plaintiffs are owned by NC Owners and

Pathmark.  (One or more of NC Owners, Pathmark, NC Residuals Owners Trust and SL Resid Holdings LLC are referred to herein as the "Owners.")

25.    The Owners have the right to "direct or consent to actions of the Owner Trustee and otherwise participate in the management and control of the affairs of the Trusts."  Trust Agreement p. 2 (definition of "Beneficial Interest").

26.    In October 2015, at the request of the Owners, WTC as Owner Trustee retained Chaitman LLP ("Chaitman") to represent the Trusts in litigation matters.  The Chaitman retention letter, which was executed by WTC and approved by the Administrator, provides that Chaitman "will act as Special Counsel for the Trusts managing litigation or other adversarial proceedings arising from or relating to one or more Trusts."  The letter further provides that Chaitman may act "[a]s requested or directed by … the Owners."  It further empowers Chaitman to "select[], engag[e] and manag[e] other law firms to provide" legal services to the Trusts.  Pursuant to such authorization granted by the Owner Trustee on behalf of the Trusts, Chaitman retained several other law firms to bring or defend actions and proceedings on behalf of the Trusts, including Grant & Eisenhofer P.A., McCarter & English, LLP, and DiCello Levitt & Casey LLC.

**B.**     **The Trusts' Service Providers**

27.     In order to preserve the value of the collateral (i.e., the Student Loans), several agreements regarding the servicing and administration of the Student Loans have been entered into.

**1.**     **The Master Servicing Agreement**

28.     The Trusts and PHEAA are parties to the Amended and Restated Private Loan Servicing Agreement between PHEAA and the First Marblehead Corporation ("FMC") (the "Master Servicing Agreement" or "MSA") and a series of Custodial Agreements entered into among Plaintiffs, U.S. Bank in its capacity as Indenture Trustee, and PHEAA.  PHEAA acts as the custodian of the Student Loans and services the Student Loans while they are in repayment and in the early stages of delinquency or default.

**2.**     **The Indenture**

29.     Each of the Trusts executed an Indenture with U.S. Bank as Indenture Trustee.  U.S. Bank executed the Indentures in Massachusetts.  The Indentures are governed by New York law.  The rights and duties of the Indenture Trustee are specified in each Indenture.

30.     The Indentures give the Indenture Trustee certain specified, mostly ministerial, duties, principally to deposit money collected on the Student Loans owned by the Trusts and to pay out money to Noteholders and others according to a specified "waterfall."

31.    The Indentures also provide that in the case of an Event of Default," the Indenture Trustee has certain obligations, such as to notify the Trusts of the default and to request that the Trusts take action to remedy the default.

32.    The Indentures also contain a "Granting Clause" whereby each Trust grants to the Indenture Trustee the Trust's "right, title, and interest" in the Student Loans, the Servicing Agreements and all causes of action and all proceeds in respect thereof.  This provision does not nullify any of the other provisions of the Indentures and does not deprive the Trusts of the right to assert claims against persons or entities who have injured the Trusts by, *inter alia*, breaching their contractual obligations to the Trusts.  The purpose of the Granting Clause is, as set forth therein, "to secure the payment of principal of and/or interest on … the Notes" and "to secure compliance with the provisions of this Indenture, all as provided in this Indenture."

33.    The definition of "Grant" contained in the Indenture makes clear that a "Grant" conveys "rights powers and options (but none of the obligations) of the Granting party."  Indenture Appendix A-16.  Therefore, the Trusts retain all of the obligations that they have under the Trust Agreements and the Indentures.

34.    Among the many obligations that the Trusts retain is the obligation to take various actions to protect the Trusts and enforce the obligations of persons doing business with the Trusts.  For example, § 3.05 of the Indentures provides:

> Protection of Indenture Trust Estate.  The Issuer … will take
> such other action necessary or advisable to:
>
> *       *       *       *
>
> (iii)    enforce any of the Collateral; or
>
> (iv)    preserve and defend title to the Indenture Trust Estate ….

Similarly, § 3.07(d) of the Indentures provides:  "If the Issuer shall have

knowledge of the occurrence of a Servicer Default…, the Issuer shall promptly

notify the Indenture Trustee and the Rating Agencies thereof, and shall specify in

such notice *the action, if any, the Issuer is taking with respect to such default*….

*[T]he Issuer shall take all reasonable steps available to it to enforce its rights*

*under the Basic Documents in respect of such failure*."  (Emphasis added).  Such

provisions would make no sense if the Trusts have been divested of their ability to

assert claims relating to the Student Loans or the servicing agreements.

35.    Furthermore, the Granting Clause does not provide that the grant of

rights to the Indenture Trustee makes the Indenture Trustee the "sole" or

"exclusive" holder of such rights.  This is in stark contrast to other provisions in

the Indenture that use such words where exclusivity is intended.  *See, e.g*.,

Indenture § 6.10(b)(i) (describing rights that "shall be exercised … solely at the

direction of the Indenture Trustee").

36.    To the contrary, the Indenture makes clear that any grant of right to

the Indenture Trustee to bring proceedings is not intended to be exclusive but

rather is cumulative.  Section 5.9 provides:

<u>Rights and Remedies Cumulative</u>.  No right or remedy herein conferred upon or reserved to the Indenture Trustee … is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.

### 3.    The Administration Agreement

37.    The Trusts are parties to Administration Agreements entered into on various dates, by and among each of the Trusts individually, Wilmington Trust Company as Owner Trustee, U.S. Bank as Indenture Trustee, The National Collegiate Funding LLC as the Depositor, and First Marblehead Data Services, Inc. ("FMDS"), GSS's predecessor-in-interest, as the Administrator under each such Administration Agreement.  FMDS, which is a Massachusetts corporation, executed the Administration Agreement in Massachusetts.  The Administration Agreements are governed by New York law.

38.    The Administration Agreements provide the Administrator with certain specified rights and duties, but make clear that ultimate control rests with the Trusts.  Thus, § 1(d)(ii) of the Administration Agreements provides that as to non-ministerial matters, the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf."  It further provides that in the absence of instructions from the Indenture Trustee, in accordance with the Indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement, the Administrator shall not take any action regarding "[t]he initiation

-14-

of any claim or lawsuit by the Issuer … except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer." § 1(d)(i)(B). Such provision plainly recognizes that the Issuer retained the ability to initiate lawsuits.

### 4. <u>The Special Servicing Agreement</u>

39.    A Special Servicing Agreement was entered into on March 1, 2009, by and among First Marblehead Education Resources, Inc. ("FMER") as Special Servicer, U.S. Bank as Back-Up Special Servicer, and each of the Trusts, which named FMER as Special Servicer for delinquent and defaulted Loans and further provided that if FMER were to resign as Special Servicer, U.S. Bank would step in as the Special Servicer.  FMER executed the Special Servicing Agreement in Massachusetts.  The Special Servicing Agreement is governed by New York law.

40.    In March 2009, FMER hired TSI to provide default prevention and collection services in the event that U.S. Bank became Special Servicer, including hiring lawyers to bring collection cases.

### 5. <u>The Special Subservicing Agreement</u>

41.    In March 2009, U.S. Bank made an agreement with Goal Structured Solutions, Inc. ("Goal") that if U.S. Bank were to become Special Servicer, it would hire an affiliate of Goal to act as Special Subservicer.

42.     In 2012, the Administrator was sold to Goal and renamed GSS, and shortly after that sale, FMER resigned as Special Servicer, triggering U.S. Bank's role as back-up Special Servicer.  U.S. Bank, as it had promised Goal, thereupon entered into the Special Subservicing Agreement dated as of September 7, 2012, hiring Turnstile – a wholly-owned subsidiary of Goal – to perform certain responsibilities regarding defaulted and delinquent loans that U.S. Bank was obligated to perform for the benefit of the Trusts pursuant to the Special Servicing Agreement.  The Special Subservicing Agreement is governed by New York law.

43.     Under the Special Subservicing Agreement, Turnstile was, among other things, "responsible for monitoring and supervising the performance by NCO" of its collection activities.   Special Subservicing Agreement ¶ 2.   The Special Subservicing Agreement required Turnstile to "conduct reviews of NCO's performance no less frequently than quarterly" and to meet with NCO on a quarterly basis to discuss with NCO its "post-default collections activities."   *Id.* Turnstile was required to "provide oversight of activities of NCO with regard to account management, litigation assistance and/or settlement strategies."   Special Subservicing Agreement Ex. A ¶ 1.  Turnstile was further required to "instruct Servicers to provide original documents to NCO," "review, monitor and assist NCO in connection with counterclaims naming … any Trust in collection

litigation," and "review all settlement offers for account[s] with judgments entered on them." *Id.* ¶ 5.

44.     The Trusts are the intended beneficiaries of the Special Subservicing Agreement.   Under the Special Subservicing Agreement, Turnstile performs services that U.S. Bank was obligated under the Special Servicing Agreement to perform for the Trusts.  Those services relate to monitoring and supervising actions being taken to collect amounts due on delinquent and defaulted loans owned by the Trusts.  The only reason for any such services is to bring money into the Trusts.  In addition, Turnstile is paid by the Trusts for its services.  U.S. Bank and Turnstile also negotiated and included a clause in the Special Subservicing Agreement for the Trusts' benefit which provides for due diligence reviews of Turnstile's books and records and servicing activities, and the parties included in the clause the obligation of the Trusts to pay for such reviews.

45.     Neither the Trusts nor the Owners approved these arrangements with Turnstile or with TSI.   To the contrary, the Owners specifically informed the Administrator and U.S. Bank that they did not want Turnstile or TSI to perform any services relating to the Trusts.  But the Administrator and U.S. Bank refused to follow the instructions from the Owners.  The Trusts did not hire Turnstile or TSI, neither Turnstile nor TSI acts at the direction of the Trusts, and they do not follow any directions or instructions issued by the Trusts.  To the contrary, as discussed

below, while the Owners and the Trusts have requested that TSI cease filing lawsuits in the name of the Trusts where TSI cannot prove that the Trusts have standing to collect on defaulted loans, TSI has nevertheless continued to file such lawsuits.  The Trusts have no ability to control the activities of TSI regarding its collection activities.  TSI is not and never has been an agent of the Trusts.

46.     To the contrary, TSI is an agent of U.S. Bank as Special Servicer. Under the Special Servicing Agreement, U.S. Bank was responsible for "the enforcement, collection and servicing of Delinquent Loans and Defaulted Loans." This included "[r]etaining counsel on behalf of the applicable Trust (whether directly or through collection agencies) to further pursue enforcement and collection of Delinquent Loans and Defaulted Loans, including through litigation…."   U.S. Bank was responsible for approving TSI's selection of collection attorneys to bring collection lawsuits in Delaware, New York, Massachusetts and elsewhere.  U.S. Bank has direct control over TSI's collection activities, and U.S. Bank's approval is needed before TSI can revise a borrower's payment schedule.

47.     U.S. Bank's duties further included monitoring the performance of Turnstile and replacing it if it was deficient or negligent in performing its duties. As set forth herein, Turnstile's performance of its duties was deficient and

negligent, but U.S. Bank failed to monitor Turnstile's performance and failed to replace Turnstile as Subservicer.

48.     The relationships among the foregoing entities are illustrated in the chart on the following page.



OWNERS
NC Owners
Pathmark
Have the "right to direct" the "actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust." Tr. Agr. § 1.01
OWNER TRUSTEE
Wilmington Trust Co.
Acts "on behalf of the Trust subject to direction by the Owners." Tr. Agr. § 2.03(b)(1)
ISSUER
NCSLT
Trusts
INDENTURE TRUSTEE
U.S. Bank
SERVICER and CUSTODIAN
PHEAA
Must "hold all Original Credit Agreements and related documents." Serv. Agr. § 4.04
ADMINISTRATOR
GSS (Goal affiliate)
As to "non-ministerial" matters, shall not "take any action that the issuer directs the Administrator not to take."
Adm. Agr. § 1(d)(II) (C)
SPECIAL SERVICER
U.S. Bank
Provides "oversight of the activities of subservicers and replaces any subservicer "deemed to be deficient or negligent."
Spec. Serv. Agr. § 2(B)
Oversees the means used by TSI in collecting any account and approves the selection of counsel to bring collection lawsuits
TSI
f/k/a NCO
TSI provides collection services relating to loans in default, including hiring lawyers to bring collection lawsuits.
SPECIAL SUBSERVICER
Turnstile (Goal affiliate)
Is "responsible for monitoring and supervising the performance by" TSI.
Spec. Subserv. Agr. ¶ 2

**C.    Defendants Improperly Send Defaulted Loans to
       TSI in Violation of the Governing Documents**

49.    PHEAA agreed to be legally bound by the MSA, and accordingly, to "provide and perform the [services defined therein] in full compliance with" the terms of the MSA.  The MSA allows for amendments "only by written instrument duly executed by [the Trusts] and [PHEAA]."  The MSA, and in particular, the Servicing Standards it incorporates, have been properly amended numerous times by agreements that were memorialized in the form of letters, and signed by the Trusts, PHEAA, and in some instances, other interested parties.    These amendments, or agreements, are known as "Read and Agreeds."

50.    Two specific Read and Agreeds address PHEAA's ability to distribute borrower-related information to third parties.   The two agreements preclude PHEAA from sending the information to any third parties other than FMER.

51.    The first such Read and Agreed, dated November 5, 2008 ("November 2008 Read and Agreed"), states that for "all questions, inquiries, documents, claim packages of all kinds, or other material relating to [the Loans]," PHEAA shall provide the information "directly to FMER" as Special Servicer. Naturally, FMER was a signatory to the agreement, as was the administrator at the time, FMDS (now GSS), in addition to the Trusts and PHEAA.

52.    The second Read and Agreed directing PHEAA to deal only with FMER is dated July 27, 2009 ("July 2009 Read and Agreed").  In the document, PHEAA agrees to send default notifications to FMER after 180 days of delinquency:  "[d]efault notifications must be submitted to FMER between the 180th and 210th day of delinquency."  Once again, PHEAA, as well as the Trusts' owners, Administrator, and FMER executed the agreement.

53.    Despite these agreements, GSS directed PHEAA to take contrary actions.  GSS's directive, and PHEAA's acquiescence, took place without the consent, and to the detriment, of the Trusts.  On July 20, 2012, GSS informed PHEAA by email that the new Special Servicer was U.S. Bank (succeeding FMER), and that U.S. Bank had an arrangement with TSI pursuant to which TSI would perform many of U.S. Bank's collections responsibilities.  In the email, the Administrator asserted that based on this role-shifting, "NCO will need the borrower data that was previously provided to [the Special Servicer]."  As an endorsement to this proposed change, the Administrator stated that it would provide PHEAA with a "direction letter" to "document this transaction."

54.    The Administrator never provided an appropriate direction letter.  Further, without amendments to the MSA and related agreements, the Administrator's direction could not properly be implemented.  The Administrator is not a party to the MSA and had no authority to amend or supplement the MSA

or related agreements without receiving instructions from the Owner Trustee or the

Owners in accordance to the Trust Agreement and the Administration Agreement.

The Administration Agreement provides that with respect to "non-ministerial"

matters:

> [T[he Administrator … shall not take any action unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or the Owners, in accordance with the Trust Agreement.  For the purpose of the preceding sentence, "non-ministerial matters" shall include, without limitation:
>
> > (A)  The amendment of or any supplement to the Trust Related Agreements

Administration Agreement ¶ I(d)(i).  The Administrator never requested such

instructions, and neither the Owners nor the Owner Trustee ever provided such

instructions to the Administrator.

55.    Indeed, on August 6, 2012, two weeks after the Administrator sent the

above direction to PHEAA, PHEAA responded:  "You also mentioned that the

NCSLT Trusts will be providing a direction letter to AES to document the

transaction."  The Administrator wrote again on August 15, asking PHEAA what

PHEAA might be looking for in such a letter:  "I would like to understand what

you are looking for in the direction letter.  Is this something as simple as the trusts

acknowledging the new special servicing roles and directing [PHEAA] to move

data as appropriate?"  PHEAA replied:  "I believe that would make sense but we

can certainly discuss this further when we setup the call regarding the changes needed to the agreements."

56.    Not only did PHEAA and GSS thus evidence their understanding that amendments to the Servicing Standards required the Trusts' authorization, they then circulated the particular Read and Agreeds that needed to be amended for the GSS email to be effective.  On August 17, 2012, pursuant to a request from GSS for "the existing servicing guidelines," PHEAA sent the Administrator the two Read and Agreeds discussed above.

57.    Fully aware of the need to amend the MSA in order to send defaulted Loans to NCO, the Administrator nevertheless plowed forward without the Trusts' or the Owners' authorization.  Beginning in 2012, as a result of the Administrator's direction, PHEAA began to send TSI all questions, inquiries, documents and claim packages that previously were sent to FMER, including, among others, defaulted loans relating to borrowers in Delaware.

58.    The Administrator's financial motive for persuading PHEAA to send loans and loan-information to TSI is clear.  Goal, through its wholly-owned subsidiary, Turnstile, was positioned to make money overseeing TSI's performance of special servicing responsibilities.  Under the Turnstile agreement, Turnstile was "responsible for monitoring and supervising the performance of NCO," including "reviews of NCO's performance no less frequently than

quarterly." Thus, by diverting loans to NCO, GSS was increasing the fees of Goal's other subsidiary.

59.    Through an Issuer Order dated May 22, 2015 sent by the Owner Trustee on behalf of the Trusts, the Trusts sought to obtain details about these arrangements. The Order directed GSS to provide "any and all correspondence [defined as including emails, letters, and other communication] given to PHEAA whereby (i) PHEAA was directed and instructed to cease providing the so called 'Default Notifications' (as defined in the July 27, 2009 letter from the Administrator to PHEAA) to FMER and (ii) PHEAA was directed and instructed to begin providing [the Default Notifications] to any of U.S. Bank, Turnstile, NCO and GSS Data Services, or any other party not referenced herein."

60.    GSS did not respond and continues to refuse to supply the requested information. However, the Trusts obtained the Administrator's email discussed above through their emergency audit of PHEAA, and thereafter, on behalf of the Trusts, the Owner Trustee sent the Administrator an Issuer Order, dated October 1, 2015, stating that the directives in the email lacked authority, and that for any further action, the Administrator needed to obtain prior written consent of the Trusts:

> [T]o insure full and complete compliance with the Administration Agreement, the undersigned hereby advises and instructs GSS, as Administrator, and all employees, agents and subcontractors working for or acting on behalf of GSS, as follows:

1.  With regards to any duties being performed by the Administrator under Sections l(c) and l(d) of the Administration Agreement, GSS is hereby directed to immediately stop performing those duties and to immediately cease and desist from taking any further actions without the prospective and express written authorization from the Owner Trustee, on behalf of the Trusts, which prospective and express written authorization shall only be considered by the Owner Trustee, on behalf of the Trusts, after the furnishing of the additional information requested pursuant to paragraph 3 below.  For the purposes of this paragraph 1, and to avoid any doubt, the Administrator can no longer rely upon any previous actual or assumed authorization.

2.  GSS is hereby directed to immediately cease and desist from giving any direction to PHEAA and to take no further action with regards to the servicing of defaulted and delinquent loans without the express written consent of the Owner Trustee, on behalf of the Trusts, which prospective and express written consent shall only be considered by the Owner Trustee, on behalf of the Trusts, after the furnishing of the additional information requested pursuant to paragraph 3 below.  For the purposes of this paragraph 2, and to avoid any doubt, the Administrator can no longer rely upon any previous actual or assumed consent.

3.  GSS is hereby directed to provide the Owner Trustee with additional information to include an accurate and complete description of any duties it is currently performing on behalf of the Trusts under [various sections of] the Administration Agreement, accompanied by the corresponding written authorization from the Owners or the Owner Trustee, on behalf of the Trusts ... in accordance with the Administration Agreement.

61.    The additional information sought by the Trusts was never disclosed, and the Trusts never provided the consent described in the Issuer Order. Nevertheless, since that time, PHEAA has transferred over $4.5 billion of defaulted Loans directly to TSI for collection, and it continues to do so to the present date.  System access to private Student Loan data is routinely provided to

this entity and others with which it has contracted to perform collections that neither the Owners nor the Owner Trustee has ever approved as required by the MSA.  A number of lawsuits by borrowers have been brought against the Trusts, the Owners and the Administrator's affiliate alleging improper debt collection activities and raising significant issues as to whether the entities pursing the collections have possession and custody of the Loans and all of the documents needed to collect on the Loans.  The CFPB investigated the very things the Owners want to investigate, and on the basis of its investigation the CFPB filed a federal complaint against the Trusts complaining as to abusive servicing behavior by the certain of the Defendants herein.

> **D.    Defendants Allow the Statute of Limitations on Defaulted Loans to Expire and Refuse to Provide Information Regarding Such Loans**

62.    In February 2013, the Owners' agent, VCG Securities LLC ("VCG"), sent a written request to GSS for information related to loans that had expired past the statute of limitations for collections, and, that would be expiring out of statute in the subsequent twelve months.  GSS responded that it did not have all of the requested information, and forwarded the request to U.S. Bank.  U.S. Bank, in turn, stated that it had subserviced its special servicing duties to TSI, and forwarded the request there.  In truth, at the time of the Trusts' request to GSS, Goal's wholly

owned subsidiary, Turnstile, was overseeing special servicing of the Loans as Special Subservicer, by virtue of its agreement with U.S. Bank.

63.    A month passed with no data disclosures.  The Owners emailed U.S. Bank again, and the next day, March 19, 2013, GSS provided certain data.

64.    The data showed that nearly $100 million in loans had expired past the statute of limitations in the preceding 270 days since U.S. Bank took over as Special Servicer, and another $225 million would be expiring within the subsequent twelve months.

65.    The Owners received additional data in May 2013 that was similarly damning.  The information revealed an expired loan balance of approximately $276 million, and a fast-growing loan balance at risk of expiring out of statute (the total had ballooned to approximately $268 million).

66.    These disclosures, and the need for more layers of detail rather than aggregated information which had been provided to date, prompted the Owners to send a new data request to U.S. Bank on May 10, 2013.  The Owners received no reply and so they wrote again on June 18, 2013.  This time, U.S. Bank did reply, but failed to provide data.  Instead, U.S. Bank indicated that "the request may have to go through the Administrator."

67.    Eventually, in early 2014, the Owners and U.S. Bank had a phone call in which U.S. Bank requested evidence of the amount of loans that had expired

past the collection statute.   Although this request ignored that the Owners themselves had been struggling to gain access to this information, in part due to U.S. Bank's posture that it was not responsible for obtaining or providing the data, the Owners nevertheless, on March 17, 2014, provided U.S. Bank with the information it had gathered.   In the same letter, however, the Owners requested additional information from U.S. Bank regarding defaulted loans, portfolio performance, and loan-level information.

68.   U.S. Bank once again deflected the request.  It sent an April 14, 2014 letter to the Owners which, *inter alia*, (i) referred the Owners to the Administrator, (ii) claimed to have authority only to send information to the Owners if authorized by the Administrator, and (iii) asserted that it would "not be responsible or accountable for performance of [TSI and Turnstile]," the two entities to whom U.S. Bank had farmed out its special servicing responsibilities.

69.   In fact, U.S. Bank as Special Servicer has contractual rights under the Special Subservicing Agreement to demand information from Turnstile and to terminate Turnstile for any failure to perform in any material respect its obligations under that agreement.

70.   The failures of U.S. Bank and Turnstile to fulfill their contractual duties to the Trusts regarding assertion of claims against defaulting borrowers and the monitoring and supervising of such efforts has caused the statute of limitations

to expire on loans of hundreds of millions of dollars, including loans to borrowers in Delaware.  Defendants' failures properly to collect on delinquent and defaulted loans, and their failures to monitor and supervise collection efforts,  continues to the present date, and loans continue to become statute-barred.

### E.     Defendants' Failure to Obtain and Safeguard Documents Impedes the Trusts' Ability to Collect on Defaulted Loans

71.     Defendants have filed, in the name of the Trusts, lawsuits throughout the country seeking to collect on defaulted loans, and are continuing to do so to the present date.   Among other places, such lawsuits have been recently filed in Delaware,[1] New York,[2] and Massachusetts.[3]

---

[1] *See, e.g.*, *NCSLT v. Plummer*, No. CPU4-17-003152 (filed July 25, 2017); *NCSLT v. Cosby*, No. CPU5-17-001090 (filed July 25, 2017); *NCSLT v. Takklai* (filed July 25, 2017); *NCSLT v. Gordon*, No. CPU5-17-001091 (filed July 25, 2017); *NCSLT v. Tineo*, No. CPU4-17-003028 (filed July 25, 2017); *NCSLT v. Morgan*, No. CPU6-16-0011273 (filed Dec. 9, 2016).

[2] *See, e.g.*, *NCSLT 2007-2 v. Singn*, No. 158221/17 (N.Y. Sup. Ct. N.Y. Co. filed Sept. 14, 2017); *NCSLT 2007-4 v. Sasieta*, No. 151612/17 (N.Y. Sup. Ct. N.Y. Co. filed Feb. 20, 2017); *NCSLT 2006-4 v. Joyner*, No. 151531 (N.Y. Sup. Ct. N.Y. Co. filed Feb. 16, 2017); *NCSLT v. Valentin*, No. 156033/16 (N.Y. Sup. Ct. N.Y. Co. filed Aug. 31, 2016).

[3] *See, e.g.*, *NCSLT 2006-4 v. Powley*, 2016 Mass. Super. LEXIS 744 (Mass. Super. Ct. May 12, 2016); *NCSLT 2007-3 v. Durgin*, 2016 Mass. Super. LEXIS 509 (Mass. Super. Ct. May 11, 2016); *NCSLT 2007-2 v. Lewis*, 2016 Mass. Super. LEXIS 719 (Mass. Super. Ct. Apr. 6, 2016); *NCSLT 2006-1 v. Sweda*, 2016 Mass. Super. LEXIS 281 (Mass. Super. Ct. Mar. 17, 2016); *NCSLT 2006-3 v. Matthew*, 2015 Mass. Super. LEXIS 1644 (Mass. Super. Ct. June 9, 2015); *NCSLT 2006-4 v. Laracy*, 2014 Mass. Super. LEXIS 504 (Mass. Super. Ct. Nov. 4, 2014).

72.     Defendants' record keeping failures, however, have impeded the Trusts' ability to collect from borrowers who have defaulted on their loans.

73.     To establish standing and obtain a judgment against a defaulted borrower, the Trusts, who were not the original lenders, must demonstrate their ownership of the loan.

74.     The transaction documents dealt with this as follows.  First, each deal included Pool Supplement agreements, whereby the originator of the loans (called the "Program Lender") "transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the 'Depositor') … each student loan set forth on the attached Schedule 1."  Each Schedule 1 states that the list of loans is "On file with FMC" (i.e., First Marblehead).

75.     Second, there are Deposit and Sale agreements, whereby the Depositor sold to the Trust the loans listed on Schedule 1 to the Pool Supplement agreements.

76.     Defendants, however, have failed to obtain and safeguard the Schedule 1 to each Pool Supplement agreement.  PHEAA has admitted that it does not possess and made no effort to obtain these documents.  In a document request in a related case, the Trusts requested that PHEAA produce "All Pool Supplement Agreements, including all related schedules" in PHEAA's possession, custody or

control.   PHEAA responded that PHEAA "is not aware of any responsive documents."

77.    The Defendants involved in pursuing defaulted loans, including without limitation U.S. Bank as Special Servicer, Turnstile and TSI, have failed to obtain the Schedule 1s and other documents needed to prove ownership of the loans.   Pursuant to § 5b of Exhibit A to the Special Subservicing Agreement, Turnstile is required to "instruct Servicers to provide original documents to" TSI, but it has failed to do so.   As Special Servicer, U.S. Bank has responsibility to take action regarding "the enforcement and collection of Delinquent Loans and Defaulted Loans to maximize the collection of amounts payable of the Student Loans," including without limitation retaining collection agencies and others to prosecute lawsuits against borrowers in default.   Special Servicing Agreement § 2. And U.S. Bank is required to monitor Turnstile's performance and replace Turnstile if Turnstile's performance is deficient, but U.S. Bank has failed to do so.

78.    As a result of the failure to obtain and safeguard the Schedule 1s to the Pool Supplement agreements and other documents relating to the Student Loands, it has become difficult if not impossible properly to foreclose on defaulted loans, including loans to borrowers in Delaware, New York and Massachusetts.

79.    In the course of its investigation, the CFPB found that TSI has filed at least 1,214 collection lawsuits against borrowers even though it lacked the

documentation necessary to prove that the Trusts owned the loans.   In these lawsuits, the CFPB found, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Trusts was lacking.   In at least 208 lawsuits, TSI lacked the promissory note to prove that a debt was owned. These deficiencies, which continue to the present to infect lawsuits brought by TSI, have crippled the Trusts' ability to prevail in attempting to collect on defaulted loans.

80.    For example, in *NCSLT 2006-1, 2007-4 v. Glynn*, 219-2015-CV-00209 (N.H. Super. Ct. 2015), the court dismissed efforts to collect on a defaulted loan, stating:

> The court determines that the evidence presented is insufficient to demonstrate that the plaintiff owns the debt.  As noted above, the 2007 pool supplement assigned certain loans to NCF [National Collegiate Funding, LLC] – namely the loans listed on Schedule 1. However, NCSLT has failed to provide the court with a copy of Schedule 1.  Without Schedule 1, the court cannot determine which loans Bank of America assigned to NCF.  Thus, the court determines that NCSLT has failed to establish it owns Glynn's debt.

81.    In *Nat'l Collegiate Student Loan Trust 2007-4 v. Watson*, 2016 N.Y. Misc. LEXIS 5116 (N.Y. Civ. Ct. Bronx Co. Jan. 7, 2016), Jonathan Boyd, an employee of TSI, testified that "TSI is the designated custodian of records" for the plaintiff Trust and that the loan in question had been assigned to the Trust.  The court dismissed the case, because of a failure "to establish the chain of title from the original lender" to the Trust.  The court stated:

> Mr. Boyd's unsupported testimony that the defendants' loan was part of the assignment from The National Collegiate Funding LLC assigned to the Plaintiff is insufficient based upon the pool supplements listed in Schedule A.  Mr. Boyd did not provide any testimony that identified defendants' Charter One Continuing Education Loan as part of Schedule A of the Deposit and Sale Agreement.

*Id*. at *8.

82.     Similarly, the Ohio Court of Appeals overturned a judgment in favor

of the Trusts because the Trusts

> neglected to include documentation to prove that it is entitled to demand judgment on the note.  Although the record contains reference to the pool agreement and an uncontested affidavit that [defendant borrower] is in default, NCSLT did not include specific documentation to directly link the pool of debts assigned to NCSLT from [the originating bank] to the debt [that the defendant has] incurred and had defaulted upon.

*NCSLT 2005-1 v. Owusu*, 2016 Ohio 259 (Ohio Ct. App., Butler Co., Jan. 25,

2016).

83.     A Louisiana court made a nearly identical ruling, reversing, based on

the Trusts' document deficiencies, a lower court's grant of summary judgment in

favor of the Trusts.  *NCSLT 2003-1 v. Thomas*, 129 So. 3d 1231 (La. App. 2d Cir.

2013).   Again, the court found that "[t]he Pooling Agreement offer[ed] no

description of the loans being assigned by [the originating bank] . . . .  As a result,

genuine issues of material fact exist as to whether plaintiff is the rightful holder of

that loan."  *Id*. at *1234-35.

84.    And in *Nat'l Collegiate Student Loan Trust 2006-1 v. Werner*, No. 169/14 (N.Y. Sup. Ct. Putnam Co. Jan. 28, 2015), the court granted the defendant's motion to dismiss based on its statute of limitations defense and also because there was not "adequate proof of the existence of an assignment" of the loan to the Trust.

85.    While all of these and similar cases were brought in the name of the Trusts, the entities responsible for bringing or supervising the cases were one or more of the Defendants herein responsible for servicing and collecting defaulted loans, namely, U.S. Bank, Turnstile and TSI.  The Trusts did not authorize such suits and had (and have) no control over the conduct of such suits.

86.    As with other servicing deficiencies, the Owners sought information to understand the causes and potential solutions.  On April 26, 2016, on behalf of the Trusts an Issuer Order to be sent by the Owner Trustee to the Administrator seeking, *inter alia*, "[a] list of all Lawsuits [defined as those "described within Section 1(d)(i)(B) of the Administration Agreement"] initiated by or against the Trusts ... that have been resolved by judgment, settlement, compromise or other final disposition over the last three (3) years ...."

87.    The Administrator's letter response came three weeks later, and contained the following admission:

> With respect to your requests ... regarding certain collection litigation under Section 1(d)(i)(B) of the Administration Agreements, by definition, that section relates to 'non-ministerial' matters which the Administrator is under no obligation to take action upon, and

therefore you have requested information that the Administrator does not compile and cannot provide.

88.    The Administrator is correct insofar as the first part of §1(d)(i)(B) does address non-ministerial matters for which the Administrator has no obligation to take action:  "Non-ministerial matters shall include, without limitation . . . (B) The initiation of any claim or lawsuit by the Issuer and the compromise of any action, claim or lawsuit brought by or against the Issuer ...."  Incredibly, however, the Administrator ignored, both in its letter, and as a service provider, the other half of the provision which continues, "except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer…."

89.    As demonstrated by the numerous borrower lawsuits, such as those discussed above, where the Trusts have lost, U.S. Bank, Turnstile and TSI have behaved improperly regarding pursuing defaulted loans, including loans to borrowers in Delaware, New York and Massachusetts, and this wrongdoing continues to the present date.  U.S. Bank and Turnstile are continuing to the present date to breach their obligations to monitor and supervise the collection efforts.

F.      **Defendants' Improper Collection Activities Thwart
        <u>Collections on Defaulted Loans and Expose the Trusts to Liability</u>**

90.     The failures by U.S. Bank, Turnstile and TSI to engage in proper servicing and collection activities, and the failures by U.S. Bank and Turnstile to fulfill their contractual obligations to monitor and supervise servicing and collection activities, have not only thwarted the ability of the Trusts to collect amounts due on defaulted loans, they have exposed the Trusts to claims by borrowers in Delaware, New York, Massachusetts and elsewhere, including class action lawsuits, as well as claims by the CFPB.

91.     In connection with collecting or attempting to collect debt from borrowers, between November 1, 2012 and April 25, 2016, Turnstile and TSI initiated at least 94,046 collections lawsuits in courts across the country.

92.     In support of the lawsuits, employees of Turnstile and TSI submitted affidavits and documents wherein the affiants swore that they had personal knowledge of the records evidencing the loans.  The CFPB has found that, in fact, in numerous instances the affiants lacked personal knowledge of the loan records.

93.     In many affidavits, the affiants stated that "I have reviewed the chain of title records as business records" regarding the relevant account.  The CFPB found that, in fact, the affiants lacked access to deposit and sale agreements, the last link in the chain of assignment transferring loans into the Trusts.  In numerous

instances, affiants did not review the chain of assignment records prior to executing the affidavits.

94.    In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain.  The CFPB found that, in fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan.

95.    On numerous occasions, to address a backlog of Affidavits, employees of Turnstile such as interns and mailroom clerks were instructed to execute Affidavits.

96.    On September 18, 2017, a Consent Order was entered in a CFPB administrative proceeding styled *In the Matter of Transworld Systems, Inc*., No. 2017-CFPB-0018.  TSI stipulated to the entry of such Consent Order.  The Consent Order states that TSI hired law firms to pursue on behalf of the Trusts collections lawsuits regarding defaulted loans.  The Consent Order states that in such lawsuits, false affidavits executed by employees of TSI were submitted.  Such affidavits by TSI employees falsely stated that the affiants had reviewed the Trusts' chain of assignment documentation and that they had personal knowledge of the Trusts' records concerning the loans, although "a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking" and

even though "the promissory note to prove that a Debt was owed did not exist." The Consent Order states that in these collection lawsuits the law firms hired by TSI "could not prove that a Debt was owed to the Trusts, if contested."

97.   By reason of the foregoing improper conduct by Turnstile and TSI, and the failures by Turnstile and U.S. Bank to discharge their contractual duties to supervise and monitor collection activities and lawsuits, numerous lawsuits brought on behalf of the Trusts to collect amounts due on defaulted loans have been dismissed.

98.   In addition, numerous lawsuits have been brought against the Trusts by borrowers because of alleged improper servicing/collection activities and the failures by Turnstile and U.S. Bank to discharge their contractual duties to supervise and monitor collection activities and lawsuits.  For example, *Winne v. NCSLT 2005-1*, No. 16-cv-00229 (D. Me.), is a purported class action by borrowers who claim they are being unlawfully pursued for student loan debts that they do not owe.  The complaint alleges claims under, *inter alia*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*, and the Truth in Lending Act, 15 U.S.C. § 1631, *et. seq.*  While the case asserts claims against the Trusts (as well as the Owners' agent, VCG), in fact all of the collection activities complained of were performed by, or were the responsibility of, various of the Defendants herein, including U.S. Bank as Special Servicer, Turnstile, and TSI.

99.    A similar case asserting claims against the Trusts due to wrongful conduct by TSI is *Eul v. Transworld Sys., Inc.*, No. 15-cv-7755 (N.D. Ill.).  The Trusts sustained damages because the settlement in that case, which was approved by the Court on May 1, 2018, provided, among other things, that the amounts owed by class members (i.e., obligors on the Student Loans) to the Trusts would be reduced and that plaintiffs' counsel would be paid their attorneys' fees and expenses by, on information and belief, the Trusts.  (The Trusts were not consulted concerning the litigation, which was handled and settled by TSI and attorneys hired by TSI.)

100.    Other such lawsuits against the Trusts include, without limitation, *Miller v. Transworld Systems Inc.*, No. 18-cv-0748 (E.D.N.Y.); *Kennedy v. Transworld Sys., Inc.*, No. 16-cv-0033 (N.D. Ga.); *Carden v. NCSLT 2006-4*, No. 16-cv-692 (E.D. Pa.); *Sheld v. NCO Fin. Sys., Inc.*, No. 15-cv-1140 (D. Nev.); *Bartell v. NCSLT 2005-3*, No. 14-cv-4238 (N.D. Cal.); and *Muzac v. Wilmington Trust Co.*, No. BC 607214 (Cal. Super. Ct.).

101.    *Winslow v. Forster & Garbus, LLP*, 2017 U.S. Dist. LEXIS 205113 (E.D.N.Y. Dec. 13, 2017), illustrates some of the false statements that TSI and its agents have made concerning the Trusts in cases brought against borrowers that have put the Trusts in jeopardy.  Counsel retained by TSI filed in the name of NCSLT 2005-3 a case against a borrower in the New York Civil Court.  The

-40-

complaint in that case "falsely identifie[d] the Trust as the original creditor" on the loan. *Id*. at *28. Indeed, the court noted that the lawyers retained by TSI "have filed numerous complaints stating that [the Trusts] 'are the original creditor' and that the Trust 'is authorized to proceed with the action.'" *Id*. at *38. The court held that this "statement that the Trust was the original creditor is a false and misleading statement" and that "this false statement as to the Trust's status as the 'original creditor' is material as a matter of law." *Id*. at *29. The court held: "The statement as to the Trust's 'original creditor' status violates both the FDCPA and Section 349" of the N.Y. Gen. Bus. Law. *Id*. at *54.

102. In addition, as noted above, the CFPB conducted an investigation regarding whether the collections are being sought from persons who do not owe money to the Trusts, or who are being sued in situations where the documentation needed to establish liability is missing and/or false affidavits are being used in the collection proceedings. The CFPB filed a complaint against the Trusts over these activities. *See Consumer Financial Protection Bureau v. The National Collegiate Master Student Loan Trust, et al*., No. 17-cv-1323 (D. Del.). In that proceeding, a Consent Judgment has been agreed to requiring the Trusts to pay millions of dollars and also imposing significant equitable relief against the Trusts. In addition, state regulators, including the Attorney General of the State of New York and the Attorneys General of at least 10 other states, are investigating these

activities, and Defendants' conduct has exposed the Trusts to sanctions from such regulators as well.

103.   The improper lawsuits being brought in the name of the Trusts have also caught the attention of state attorneys general.  For example, on February 27, 2018, the Minnesota Attorney General wrote to the Owners concerning a case that TSI had filed in the name of NCSLT 2007-4 against a borrower in Minnesota state court.   The Attorney General asked for, among other things, documentation reflecting the complete chain of assignment from the loan originator to the Trust, and demanded that all collection activities cease until full and complete verification and documentation of the debt is provided to the borrower.  As the Owners do not have any such documentation nor any ability (without judicial assistance) to stop TSI and its agents from pursuing their improper collection activities, they have been unable to comply.

104.   Because of Defendants' improper servicing and collection activities, the Trusts have been barred from doing business in several states.

### G.      The Partial Audit of PHEAA

105.   After PHEAA continuously failed to cooperate with the Trusts by providing certain information and was in default of various reporting obligations to the Trusts under the MSA, the Trusts invoked the Emergency Audit provision of the MSA, Section 7.10.

106.   The Trusts retained Boston Portfolio Advisors ("BPA") to conduct the Emergency Audit.  The Emergency Audit commenced on September 11, 2015 and continued for less than two days before PHEAA abruptly and without justification terminated it.

107.   Despite PHEAA's failure to cooperate with the Emergency Audit (although it did provide certain additional information for off-site review), the preliminary results of the Emergency Audit show pervasive and material breaches of the servicing requirements of the Governing Documents.

### H.     GSS and U.S. Bank Prevent the Trusts' Servicer, Auditor and Lawyers From Being Paid

108.   After years of fighting for transparency, eventually obtaining information in piecemeal, and all the while suffering massive damages, the Trusts then faced GSS's and U.S. Bank's tandem gamesmanship with respect to payments.  U.S. Bank and GSS worked together to refuse to pay a key servicer hired by the Trusts and the auditor retained by the Trusts to conduct the audits of PHEAA.

### 1.     Failure to Pay the Trusts' Servicer (Odyssey)

109.   To improve the performance of the Loans, the Owners exercised their right to appoint a Servicer to the Trusts.  The Trusts chose Odyssey.  In appointing Odyssey, the Trusts had the objective of improving the poor performance of the deals by, among other things: (1) determining which Loans have a market value

that is lower than the amount of fees that are being paid to service them, and disposing of them in accordance with the Indenture (by doing this, the Trusts benefit by not having to pay Administrator, Indenture Trustee and Servicer Fees on Loans that have no chance of recovery, thus increasing the amount of money available to pay Noteholders); and (2) improving the performance of any Loans that defaulted after the Odyssey engagement by instructing the Servicer, PHEAA, to direct "newly defaulted loans" to Odyssey.

110.   The Trusts' engagement of Odyssey was done in strict adherence to the exclusive rights of the Issuer to hire Servicers under the Governing Documents. On December 30, 2014, pursuant to § 2.03 of each of the Trust Agreements and § 3.07(b) of each of the Indentures, the Issuers of six of the trusts caused the Owner Trustee to engage Odyssey as a "Servicer," as defined in the Indentures, to perform certain services for the Trusts.  A "Servicing Agreement" was executed by and between Odyssey as a Servicer for the Trusts and Wilmington Trust Company as the Owner Trustee for each of the trusts.  Pursuant thereto, in consideration of the services provided, Odyssey is entitled to payment by the Trusts.

111.   Odyssey provided such services, and the Trusts each owe Odyssey for those services.  Odyssey rendered the corresponding bills, which, pursuant to the Administration Agreement, were duly provided to the Administrator, with the

direction that it forward same to the Indenture Trustee, U.S. Bank, so that it will make payment to Odyssey.

112.   Pursuant to Section 1(a)(i)(G) of the Administration Agreement, the Administrator was obligated to follow that direction.   Under that provision, the Administrator "shall take all appropriate action that is the duty of the Issuer to take pursuant to the Trust Related Agreements including, without limitation, ... [p]roviding instructions to the Indenture Trustee as required by Section 8.02(d) of the Indenture."   Section 802(d)(1) of the Indentures provides that the Administrator "shall instruct the Indenture Trustee" to make distributions to pay "Servicing Fees," and further, that "the Indenture Trustee shall comply with such instruction." Thus, under the Administration Agreement, it is the Administrator's duty to instruct the Indenture Trustee to pay the Servicer at the direction of the Issuer.   The Administrator cannot demand further approval or seek further details of the services rendered.   If the Administrator has a question or needs guidance in this regard, it is to seek direction from the Owner Trustee, not the Indenture Trustee.

113.   Notwithstanding the foregoing, the Administrator objected to the bills and took the position that it would not forward the bills to the Indenture Trustee unless extensive information concerning Odyssey was provided.

114.   The Owner Trustee thereupon issued an Issuer Order on behalf of the Trusts on January 20, 2016 directing the Administrator to prepare and transmit all

of the documents necessary to cause the Indenture Trustee to pay the Odyssey bills.  The Administrator did so, but when it transmitted the bills to the Indenture Trustee the Administrator stated that it had concerns about whether Odyssey was properly appointed a servicer.

115.   While under the Indenture, the Indenture Trustee is obligated to pay bills sent to it by the Administrator, the Indenture Trustee has failed and refused to pay Odyssey's bills.

116.   Instead, the Indenture Trustee filed a petition in a Minnesota state court purporting to seek instructions as to whether Odyssey was properly appointed and whether its invoices should be paid.

117.   On April 25, 2018, Magistrate Judge Fallon filed a Report and Recommendation that the Odyssey invoices should be paid.  *See In re NCSLT 2003-1*, 2018 U.S. Dist. LEXIS 75802 (D. Del. Apr. 25, 2018).  Odyssey still has not been paid.

## 2.   Failure to Pay the Trusts' Auditor

118.   As discussed earlier, the Trusts hired BPA to conduct an emergency audit of PHEAA.  The Trusts were authorized to do so by § 9.03(b) of the Trust Agreements, which permits the Owner Trustee to consult with counsel, accountants and other skilled persons.

119.   Concomitantly, the Owner Trustee is entitled to reimbursement. Section 10.01 of the Trust Agreements provides, among other things, that the Owner Trustee "shall be entitled to be reimbursed by the Administrator," and, to the extent not paid by the Administrator, from the Trust Property, for "the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties" under the Trust Agreements and the Trust Related Agreements [as defined therein]."

120.   Section 1(a)(i)(C) of the Administration Agreement states that the Administrator will pay the Owner Trustee its fees and expenses as are set forth in Section 10.01 of the Trust Agreements.  Further, under Section 8.02(d)(l)(i) of the Indentures for the Trusts, the Administrator shall instruct the Indenture Trustee to make distributions from the Trusts' Collection Accounts for the payment of the fees and expenses of the Owner Trustee.

121.   On July 20, 2016, the Owner Trustee issued an Issuer Order on behalf of the Trusts directing the Administrator to prepare and transmit all of the documents necessary to cause the Indenture Trustee to pay the BPA bills.

122.   On August 9, 2016, the Administrator, working hand-in-glove with PHEAA in trying to intimidate BPA, sent an email to the Owner Trustee stating that the Administrator "is not comfortable instructing the Indenture Trustee to pay"

BPA's invoices relating to its work on the Emergency Audit.  The Administrator confirmed this refusal in an August 24, 2016 letter.

123.   This refusal constitutes a violation of the Administration Agreement, pursuant to which the Administrator does not have the discretion to disobey an Issuer Order and refuse to send the auditor's bills to U.S. Bank.

### 3.   Failure to Pay the Trusts' Lawyers

124.   Under the Governing Documents, the procedure for the Trusts' lawyers to be paid is straightforward.  The Owner Trustee sends the bills to the Administrator, who in turn sends bills to the Indenture Trustee for payment.  Upon receipt of the bills, the Indenture Trustee is supposed to pay them on a monthly basis.  The Governing Documents do not give the Administrator discretion to pick and choose which bills it will send, nor do the Governing Documents give the Indenture Trustee discretion as to which bills sent to it by the Administrator it will pay.  *See* Indenture § 8.02(d).

125.   For some period of time, the process worked as intended, i.e., the Owner Trustee sent the bills to the Administrator, the Administrator sent the bills to the Indenture Trustee, and the bills were paid.  However, the process came to a halt in the fall of 2016, when the Administrator and the Indenture Trustee began working in tandem to refuse to pay the Trusts' lawyers and thereby stifle attempts by the Trusts to rectify the servicing failures.  First, the Administrator and the

Indenture Trustee questioned the validity of transactions whereby NC Owners and Pathmark obtained interests in the beneficial ownership of the Trusts, and therefore whether their directions to the Owner Trustee concerning the payment of legal bills (and other matters) are valid.  Pending their satisfaction on this alleged issue, the Administrator refused to send bills to the Indenture Trustee, and the Indenture Trustee refused to pay bills it has received.

126.   There is no merit to the alleged concern regarding the ownership status of NC Owners and Pathmark.  The transfers of beneficial interests to them complied with all applicable rules and provisions of the Governing Documents, and the expressed concerns by U.S. Bank and GSS were merely ploys designed to prevent the Trusts from pursuing its claims against Defendants.  The validity of the transactions involving the transfer of the ownership interests was upheld by Vice Chancellor Slights.  *See* Order in *The Nat'l Collegiate Student Loan Master Trust I v. PHEAA*, No. 12111-VCS (Del. Ch. Nov. 17, 2017).

127.   But the resolution of the ownership issue did not cause the Administrator to resume processing the bills from the Trusts' lawyers.  Instead, the Administrator invented other reasons to refuse to process the bills from the Trusts' lawyers.  The Administrator has taken the position that it will not process bills unless the Owner Trustee sends an issuer order directing the Administrator to do so and making various representations concerning the bills.   Nothing in the

Administration Agreements, the Trust Agreements, or any other relevant agreement contains any such requirement.

128.   In addition, the Administrator and the Indenture Trustee have taken the position that the Trusts' lawyers are not entitled to be paid from the Trusts' assets.   This is inconsistent with the fact that up until the fall of 2016, the Administrator did process for payment the bills of the Trusts' lawyers, and the Indenture Trustee paid them out of Trust assets.   It is also inconsistent with the Trust Agreements, the Administration Agreements, and the Indentures.

129.   As set forth above, by retention letter dated October 12, 2015, the Owner Trustee retained Chaitman LLP as Special Counsel to the Owner Trustee. That engagement letter authorized Chaitman to retain other counsel as needed, and Chaitman has done so.  Section 9.03(b) of the Trust Agreements permits the Owner Trustee to consult with counsel in the exercise or administration of the Trusts. Section 10.01 of the Trust Agreements provides that the Owner Trustee shall be entitled to be reimbursed by the Administrator, and, to the extent not paid by the Administrator, from the Trust property for the reasonable compensation, expenses and disbursements of such agents and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under the Trust Agreements.  Section 1(a)(i)(C) of the Administration Agreements states that the Administrator will pay the Owner Trustee its fees and expenses as are set forth

in Section 10.01 of the Trust Agreements.  Further, under Section 8.02(d)(1)(i) of the Indentures, the Administrator shall instruct the Indenture Trustee to make distributions from the Trusts' Collection Accounts for the payment of the fees and expenses of the Owner Trustee.

130.   In June 2016, on behalf of the Trusts, the Owner Trustee sent an Issuer Order to the Administrator, certifying that the bills submitted by Chaitman and the law firms retained by Chaitman were incurred in the Owner Trustee's capacity as Owner Trustee pursuant to Sections 9.03(b) and 10.01 of the Trust Agreements and are payable under Section 8.02(d)(1)(i) of the Indentures.

131.   The bills submitted by Chaitman and the law firms retained by Chaitman are Owner Trustee expenses and the Administrator and the Indenture Trustee have no valid reason for refusing to process them for payment. Nevertheless, the Administrator has persisted in refusing to process for payment bills from the Trusts' lawyers, including lawyers located in Delaware.

132.   The Administrator's refusal to process bills from lawyers hired by the Trusts stands in stark contrast with the Administrator's conduct with respect to lawyers hired by the Administrator or by TSI to represent the Trusts.   The Administrator and/or TSI have hired law firms to represent the Trusts in lawsuits brought by borrowers against the Trusts, such as those discussed above.   The

Administrator has not objected to the payment of invoices submitted by such lawyers.

133.   The Administrator's willingness to process such lawyers bills is particularly noteworthy because neither the Administrator nor TSI even has the right to hire lawyers to represent the Trusts.  Section 1(d)(ii) of the Administration Agreements provides that the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf."  As discussed above, on October 1, 2015, on behalf of the Trusts the Owner Trustee sent an Issuer Order to the Administrator directing the Administrator to cease performing any non-ministerial duties on behalf of the Trusts.  Hiring counsel to defend the Trusts is clearly a non-ministerial duty, and therefore the Administrator lacks the right to hire such counsel, but the Administrator has wrongfully disobeyed this instruction.

134.   TSI also lacks the right to hire counsel to defend the Trusts.  TSI was hired by the Special Servicer, U.S. Bank, and therefore TSI's rights cannot exceed those of the Special Servicer.  The Special Servicing Agreement does not give the Special Servicer the right to hire counsel to defend the Trusts, and therefore TSI does not possess that right either.

135.   But while refusing to process payment to the lawyers properly hired by the Trusts, the Administrator has continued to process payment for the lawyers improperly hired by the Administrator or TSI to represent the Trusts.

136.   In addition, Defendants have continued improperly to pay out of Trust assets their own lawyers' fees.  The Owners directed GSS to cease processing such bills for payment, but GSS ignored such directions.   As noted above, Section 1(d)(ii) of the Administration Agreements provides that the Administrator shall not "take any action that the Issuer directs the Administrator not to take on its behalf." On December 8, 2017, the Owners, acting on behalf of the Trusts, directed GSS to cease authorizing payments to all counsel other than counsel hired by the Trusts and counsel engaged to bring lawsuits on behalf of the Trusts in the ordinary course of the Trusts' business.  GSS was further directed to furnish the Owners with records of all payments from Trust assets to lawyers or law firms since November 22, 2015.   GSS has refused to comply with these requests and, on information and belief, continues to process such bills for payment, and U.S. Bank as Indenture Trustee continues to pay such bills from lawyers for GSS, U.S. Bank, Turnstile and TSI, including lawyers located in Delaware, out of Trust assets.

## COUNT I
### (Breach of Contract against GSS)

137.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 136 above.

138.   The Administration Agreement constitutes a valid and binding agreement enforceable against GSS by Plaintiffs.

139.   GSS had contractual obligations to provide specified services under the Administration Agreement.

140.   GSS had an additional obligation to fully carry out each and every action necessary to fulfill the Administration Agreement under the covenant of good faith and fair dealing implied in every contract.

141.   Because of GSS's acts and omissions described above, GSS breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

142.   Plaintiffs request an award of specific performance requiring GSS to comply with the Administration Agreement in all material respects, including without limitation:

      a.    requiring GSS to comply with all Issuer Orders directed to GSS by the Owner Trustee or the Owners;

      b.    requiring GSS to provide to the Owners the information that the Trusts have requested with respect to defaulted loans;

      c.    requiring GSS to revoke its direction to PHEAA to send defaulted Student Loans and other Loan-related information to NCO;

      d.    requiring GSS to obtain and provide to the Trusts information regarding lawsuits involving borrowers brought by or against the Trusts;

      e.    requiring GSS to send to U.S. Bank BPA's invoices with instructions to pay same;

      f.    requiring GSS to send to U.S. Bank invoices from the Trusts' lawyers with instructions to pay same;

      g.     requiring GSS to cease attempting to block the Trusts' retention of Odyssey as a servicer;

      h.     requiring GSS to cease processing for payment out of Trust assets bills submitted by lawyers for GSS, U.S. Bank, Turnstile and TSI.

143.   In addition, as a direct, proximate result of GSS's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

144.   Plaintiffs have no adequate remedy at law.

## COUNT II
### (Tortious Interference with Contract against GSS)

145.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 144 above.

146.   The Governing Documents constitute valid and binding agreements enforceable against PHEAA by Plaintiffs.

147.   As Administrator for the Trusts, GSS has at all relevant times known that the Governing Documents constitute valid and binding agreements enforceable against PHEAA by Plaintiffs.

148.   As set forth above, GSS has caused PHEAA to violate its obligations under the MSA and other Governing Documents by, among other things, in bad faith instructing PHEAA to send defaulted Student Loans and other information to NCO.

149.   GSS has no justification for causing PHEAA to breach the MSA and other Governing Documents by, among other things, in bad faith instructing PHEAA to send defaulted Student Loans and other information to NCO.

150.   As a direct, proximate result of GSS's conduct interfering with PHEAA's performance of its agreements, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

<div align="center">

**COUNT III**
**(Breach of Contract against U.S. Bank)**

</div>

151.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 150 above.

152.   The Indenture and the Special Servicing Agreement constitute valid and binding agreements enforceable against U.S. Bank by Plaintiffs.

153.   U.S. Bank had contractual obligations to provide specified services under the Indenture and the Special Servicing Agreement.

154.   U.S. Bank had an additional obligation to fully carry out each and every action necessary to fulfill the Indenture and the Special Servicing Agreement under the covenant of good faith and fair dealing implied in every contract.

155.   The Special Servicing Agreement provides that the Special Servicer, at its discretion shall, *inter alia*, provide "oversight of the activities of Subservicer with regard to account management, litigation assistance, and/or settlement strategies."  It further provides the Special Servicer shall, in its sole judgment,

replace any subservicer who is "deemed to be deficient or negligent in performing the duties outlined in its subservicing agreement with the Special Servicer." U.S. Bank breached the covenant of good faith and fair dealing by failing to exercise any discretion or any judgment whatsoever regarding the activities of the subservicers. There is a gap in the Special Servicing Agreement that may be filled by the covenant of good faith and fair dealing. By leaving these matters to the Special Servicer's discretion and judgment, the Special Servicing Agreement assumed that the Special Servicer would, in fact, exercise such discretion and judgment in good faith. If the parties had thought about the matter, they would have negotiated a provision requiring the Special Servicer to exercise its discretion and judgment in good faith regarding the actions of the subservicers.

156. Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

157. Plaintiffs request an award of specific performance requiring U.S. Bank to comply with the Indenture and the Special Servicing Agreement in all material respects, including without limitation:

a.   requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by Odyssey;

b.   requiring U.S. Bank as Indenture Trustee to pay invoices for legal services rendered by lawyers representing the Trusts;

    c.      requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by BPA;

    d.      requiring U.S. Bank as Indenture Trustee to cease making payments out of Trust assets to lawyers for U.S. Bank, GSS, Turnstile and TSI;

    e.      requiring U.S. Bank as Special Servicer to provide to the Owners the information that the Trusts have requested with respect to defaulted loans;

    f.      requiring U.S. Bank as Special Servicer to perform its supervisory duties over the activities of Turnstile and TSI.

158.   In addition, as a direct, proximate result of U.S. Bank's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

159.   Plaintiffs have no adequate remedy at law.

## COUNT IV
### (Breach of Duty of Care and to Avoid Conflicts of Interest against U.S. Bank)

160.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 159 above.

161.   As Indenture Trustee, U.S. Bank owes Plaintiffs a duty of due care and a duty to avoid conflicts of interests.

162.   Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its obligation of duty care.

163.   In addition, by serving both as Indenture Trustee and as Special Servicer, U.S. Bank has a conflict of interest that has caused it to thwart the Trusts' efforts to take appropriate action in response to the wrongdoing by the Special

Servicer and those entities that it has hired and is supposed to supervise with respect to servicing and collection activities regarding loans in default.

164.   Because of U.S. Bank's failure to exercise due care and its conflicts of interest, U.S. Bank is liable in tort to Plaintiffs.

165.   Plaintiffs request an injunction:

  a.  requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by Odyssey;

  b.  requiring U.S. Bank as Indenture Trustee to pay invoices for legal services rendered by lawyers representing the Trusts;

  c.  requiring U.S. Bank as Indenture Trustee to pay invoices for services rendered by BPA;

166.   In addition, as a direct, proximate result of U.S. Bank's tortious conduct, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

167.   Plaintiffs have no adequate remedy at law.

## COUNT V
### (Breach of Contract against U.S. Bank)
### (Alternative Count)

168.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 167 above.

169.   This Count is pleaded in the alternative in the event that it is determined that by reason of the Granting Clause in the Indenture, the Trusts lack

standing to assert some or all of the claims pleaded herein and that the right and obligation to assert such claims belongs exclusively to the Indenture Trustee.

170.   The Indenture constitutes a valid and binding agreement enforceable against U.S. Bank by Plaintiffs.

171.   U.S. Bank had contractual obligations to provide specified services under the Indenture.

172.   U.S. Bank had an additional obligation to fully carry out each and every action necessary to fulfill the Indenture under the covenant of good faith and fair dealing implied in every contract.

173.   U.S. Bank and GSS have asserted that pursuant to the Granting Clause in the Indenture, the Trusts assigned to U.S. Bank all of the Trusts' rights and obligations to assert claims concerning the matters pleaded herein.

174.   U.S. Bank has failed to sue Turnstile for breach of the Special Subservicing Agreement.   U.S. Bank has failed to sue GSS for breach of the Administration Agreement.   U.S. Bank has failed to sue itself as Indenture Trustee for breach of the Indenture.   U.S. Bank has failed to sue itself as Special Servicer for breach of the Special Servicing Agreement.   U.S. Bank has failed to sue TSI for injurious falsehood.   And U.S. Bank has failed to request the Trusts, pursuant to Section 5.16 of the Indentures, to take such action.

175.   In the event it is determined that U.S. Bank and GSS are correct as to the application of the Granting Clause, then by failing to sue GSS, Turnstile, TSI and U.S. Bank for the wrongdoing described herein, U.S. Bank has breached its contractual obligations under the Indenture.

176.   Because of U.S. Bank's acts and omissions described above, U.S. Bank breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

177.   Plaintiffs request an award of specific performance requiring U.S. Bank to comply with the Indenture in all material respects, including by filing suit against Turnstile, GSS, U.S. Bank and TSI on account of the wrongdoing described herein.

178.   In addition, as a direct, proximate result of U.S. Bank's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

179.   Plaintiffs have no adequate remedy at law.

## COUNT VI
### (Breach of Contract against Turnstile)

180.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 179 above.

181.   The Special Subservicing Agreement constitutes a valid and binding agreement enforceable against Turnstile by Plaintiffs.

182.   Because, among other things, the purpose of the Special Subservicing Agreement was to monitor and supervise the performance by TSI and thereby to recover for the Trusts monies owed to the Trusts with respect to Student Loans, and the Special Subservicing Agreement represents an outsourcing of obligations owed by U.S. Bank to the Trusts pursuant to the Special Servicing Agreement, the Trusts are intended third-party beneficiaries of the Special Subservicing Agreement.

183.   Turnstile had contractual obligations to provide specified services under the Special Subservicing Agreement.

184.   Turnstile had an additional obligation to fully carry out each and every action necessary to fulfill the Special Subservicing Agreement under the covenant of good faith and fair dealing implied in every contract.

185.   Because of Turnstile's acts and omissions described above, Turnstile breached its contractual obligations to Plaintiffs, as well as the implied covenant of good faith and fair dealing.

186.   Plaintiffs request an award of specific performance requiring Turnstile to comply with the Special Subservicing Agreement in all material respects.

187.   In addition, as a direct, proximate result of Turnstile's breaches, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

188.   Plaintiffs have no adequate remedy at law.

## COUNT VII
### (Injurious Falsehood against TSI)

189.   Plaintiffs incorporate by reference, as if set forth fully herein, the averments in paragraphs 1 through 188 above.

190.   TSI has caused to be filed, and continues to cause to be filed, in the name of the Trusts lawsuits against borrowers in default.

191.   In such lawsuits, TSI has knowingly and/or recklessly made false and misleading statements concerning the Trusts and their standing to foreclose on the loans.   In particular, TSI has falsely expressly or impliedly represented that the Trusts are legally entitled to foreclose on the loans and that the Trusts possess all of the notes, assignments and other documents needed to prove standing to foreclose on the loans.   TSI has also falsely represented that the Trusts are the original creditors on the loans.

192.   By reason of such false statements concerning the Trusts and by bringing lawsuits in the name of the Trusts in situations where the Trusts are not legally entitled to foreclose on the loans and where the Trusts do not possess notes, assignments and other documents needed to demonstrate standing to foreclose on loans, TSI has exposed the Trusts to lawsuits from borrowers.

193.   Because of TSI's acts, misrepresentations and omissions described above, TSI is liable to Plaintiffs for the tort of injurious falsehood.

194. Plaintiffs request an injunction requiring TSI to cease filing lawsuits in the name of the Trusts without having proof that the Trusts are legally entitled to foreclose on the loans and possess notes, assignments and other documents needed to demonstrate standing to foreclose on loans.

195. In addition, as a direct, proximate result of TSI's tortious conduct, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

196. Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a) Granting Plaintiffs injunctive relief in the form of an order of specific performance;

b) Enjoining Defendants from bringing or authorizing lawsuits against borrowers until and unless Defendants can demonstrate that the Trusts possess all of the documentation necessary to prove that the Trusts are entitled to collect on the borrowers' loans;

c) Enjoining Defendants from paying into the Collection Account monies received from borrowers unless Defendants can demonstrate that the Trusts possess all of the documentation necessary to prove that the Trusts are entitled to collect on the borrowers' loans;

d) Awarding Plaintiffs damages in an amount to be determined at trial;

e)  Requiring each Defendant to refund to the Trusts all attorneys' fees that

    they have charged to the Trusts;

f)  Awarding Plaintiffs their costs and attorneys' fees incurred in litigating

    this action;

g)  Awarding Plaintiffs prejudgment and post-judgment interest; and

h)  Awarding Plaintiffs such other and further relief as this Court may deem

    just and equitable.

Dated:  June 15, 2018                    Respectfully submitted,

                                         **GRANT & EISENHOFER P.A.**

                                         By ___*/s/ James J. Sabella*___
                                         James J. Sabella (#5124)
                                         Michael T. Manuel (#6055)
                                         123 Justison Street
                                         Wilmington, DE 19801
                                         302-622-7000

                                         *Attorneys for Plaintiffs*