# Exhibit A

**Exhibit A**

422 Fed.Appx. 84
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

THE BOBRICK CORPORATION;
Bobrick Washroom Equipment; The
Hornyak Group, Inc., Appellants

v.

SANTANA PRODUCTS, INC., Santana
Products Liquidating Trust; Michael T. Lynch,
Sr.; Michael T. Lynch Jr.; John A. Carney;
James M. Gavigan; William E. Jackson, Esq.

No. 10–2187.
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) March 21, 2011.
|
Filed: April 6, 2011.

**Synopsis**
**Background:** Toilet-partition manufacturer and its sales
agent brought action against competitor, asserting claims for
statutory tort of wrongful use of civil proceedings and for
common law abuse of process in connection with competitor's
action against manufacturer and agent alleging violations of
Sherman and Lanham Acts. Competitor moved to dismiss.
The United States District Court for the Middle District of
Pennsylvania, Thomas I. Vanaskie, J., 698 F.Supp.2d 479,
granted motion. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Fuentes, Circuit Judge, held
that:

competitor had probable cause for bringing Lanham Act
claim, and

plaintiffs insufficiently alleged that competitor had improper
purpose or was grossly negligent.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*84**  On Appeal from the United States District Court for
the Middle District Of Pennsylvania, District Court No. 07–
cv–  **\*85**  01521, District Judge: The Honorable Thomas I.
Vanaskie.

**Attorneys and Law Firms**

Walter F. Casper, Jr., Esq., Carbondale, PA, Lesli C. Esposito,
Esq., Carl W. Hittinger, Esq., Nicholas T. Solosky, Esq., Dla
Piper, Philadelphia, PA, for Appellants.

Erin A. Brennan, Esq., Karoline Mehalchick, Esq., Joseph A.
O'Brien, Esq., Oliver, Price & Rhodes, Clarks Summit, PA,
Gerald J. Butler, Esq., Scranton, PA, for Santana Products,
Inc., Santana Products Liquidating Trust; Michael T. Lynch,
Sr.; Michael T. Lynch Jr.; John A. Carney; James M. Gavigan;
William E. Jackson, Esq.

Before: FUENTES, SMITH and VAN ANTWERPEN,
Circuit Judges.

OPINION

FUENTES, Circuit Judge.

**\*\*1**  This is the latest installment in a protracted,
arduous, and complicated dispute dating back to 1996.
Bobrick and Bobrick Washroom Equipment, Inc. ("Bobrick")
are California corporations engaged in the business of
manufacturing and selling toilet partitions. Hornyak Group
Inc., is a sales representative for Bobrick in Pennsylvania,
New Jersey, and Delaware. Santana is a Virginia corporation
headquartered in Pennsylvania whose toilet partitions
competed with those of Bobrick. In 1996, Santana brought
an action against Bobrick and Hornyak alleging violations
of state and antitrust law. After that suit was dismissed,
Bobrick and Hornyak filed the complaint in this case, which
alleged that Santana's [1] actions in the underlying antitrust
litigation constituted a common law abuse of process claim
and violated 42 Pa.C.S. § 8351(a), Pennsylvania's wrongful
use of civil proceedings statute. Plaintiffs now appeal from
the District Court's dismissal of their Amended Complaint.
For the reasons set forth in the District Court opinion, we will
affirm. [2]

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

1
    Bobrick and Hornyak named Santana Products, Santana Products Liquidating Trust, Michael T. Lynch, Sr., Michael T. Lynch Jr., John A. Carney, James M. Gavigan and William E. Jackson, Santana's attorney in the underlying action, (collectively "Santana"), as defendants. Michael T. Lynch, Sr., was the owner and operator of Santana during the relevant time period. Lynch, Jr., Carney, and Gavigan were alleged to be part of the group responsible for the underlying litigation.

2
    The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over this final order pursuant to 28 U.S.C. § 1291.

## I.

The underlying facts relating to the original dispute between Bobrick, its sales agents, and Santana are discussed at length in our previous opinion, *see Santana v. Bobrick,* 401 F.3d 123 (3d Cir.2005) ("*Bobrick I* "), and in the District Court's opinion *sub judice, Bobrick v. Santana,* 698 F.Supp.2d 479 (M.D.Pa.2010). Therefore, because we write only for the parties and assume their familiarity with the factual and procedural history of this case, we will set forth only the information necessary for resolution of the issues before us.

In 1996, Santana filed a complaint alleging that Bobrick, Hornyak, and another sales representative, Vogel Sales Company, were informing government architects that Santana's products posed a hazard under the fire safety codes in order to induce the government to specify Bobrick's products for use in its projects. The complaint alleged violations of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and a state law claim of tortious interference with a prospective contract.

  *\*86*  In 2003, following three years of discovery that included 270 subpoenas, the deposition of 200 witnesses, the inspection of over a million pages of documents, and exchanges of 550,000 documents, the District Court issued an eighty-three page decision granting summary judgment in favor of defendants on the Sherman Act and state law claims, but denying summary judgment on the Lanham Act claim. *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.,* 249 F.Supp.2d 463 (M.D.Pa.2003). [3]

3
    *See* 249 F.Supp.2d at 479–92 (discussing application of *Noerr/Pennington* doctrine), 503–15 (summary judgment in favor of defendants on Section 1 claim), 518–20 (summary judgment in favor of defendants on Section 2), 542 (summary judgment in favor of defendants on state law claim of tortious interference).

In *Bobrick I,* we affirmed the grant of summary judgment in favor of the defendants on the Sherman Act, Section 1 claim and the state law claim of tortious interference. [4] 401 F.3d at 131–35, 140–41. However, we concluded that Santana's Lanham Act claim was barred by the doctrine of laches, *id.* at 135–39, and thus refrained from reaching the District Court's decision that Santana's claims were barred by the *Noerr/Pennington* doctrine, *id.* at 130–31. We therefore remanded the Lanham Act claim with instructions for the District Court to dismiss it as barred by the doctrine of laches, effectively terminating the litigation. *Id.* at 141, *cert. denied, Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.,* 546 U.S. 1031, 126 S.Ct. 734, 163 L.Ed.2d 569 (2005).

4
    The parties did not appeal the District Court grant of Bobrick's summary judgment motion on the Sherman Act Section 2 claim.

  **\*\*2**  Our decision in *Bobrick I* led to the next phase of this dispute. [5] On August 17, 2007, Bobrick and Hornyak filed a two-count complaint in the District Court for the Middle District of Pennsylvania against Santana. Count One alleged a violation of the Dragonetti Act, Pennsylvania's statutory tort for wrongful use of civil proceedings, and Count Two alleged a common law abuse of process claim. A Dragonetti Act claim for wrongful use of civil proceedings has five elements, that: (1) the current plaintiff prevailed in the underlying action; (2) the defendants acted in a grossly negligent manner or without probable cause; (3) the defendant had an improper purpose in pursuing the underlying action; (4) the proceedings terminated in favor of the plaintiff; and (5) the plaintiff was harmed. 42 Pa. Cons.Stat. Ann. §§ 8351(a), 8352; *see also McNeil v. Jordan,* 586 Pa. 413, 894 A.2d 1260, 1274–75 (2006). As for Count Two, the Pennsylvania common law tort of abuse of process permits a plaintiff to recover if he can "show that the defendant used legal process against the plaintiff in a way that constituted a perversion of that process and caused harm to the plaintiff." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 304 (3d Cir.2003).

5   As the District Court noted, this Complaint constitutes the third unsuccessful attempt by Bobrick or a Bobrick sales representative to seek fees or other redress for the underlying litigation. *See Santana Prods., Inc. v. Sylvester & Assoc., Ltd.,* No. 98–CV–6721, 2006 U.S. Dist. LEXIS 98045, at *1 (E.D.N.Y. Nov. 8, 2006), *aff'd.,* 279 Fed.Appx. 42 (2d Cir.2008); *Vogel Sales Co. v. Santana Prods., Inc.,* No.2005–CV–5085 (Lackawanna Co., May 23, 2007), *aff'd mem.,* 963 A.2d 581 (Pa.Super.2008) *app. denied,* 973 A.2d 412 (Pa.2009).

On October 18, 2007, Santana and Jackson filed a joint motion to dismiss. On February 26, 2008, the District Court issued an order staying discovery, but permitted the deposition of one additional **\*87** person. Oral argument on the motion to dismiss was held on June 27, 2008.

On March 22, 2010, 698 F.Supp.2d 479, the District Court granted the motion to dismiss. After examining the plain language of the Dragonetti Act, its purpose, and the court cases tackling the issue, the District Court concluded that a Dragonetti Act claim is not made out if there was probable cause for *any* of the claims in the underlying litigation. The court next found that, because probable cause existed for Santana's original Lanham Act claim, Bobrick's Dragonetti Act claim failed as a matter of law. The court also determined that the Amended Complaint did not contain factual claims and contentions showing that defendants were grossly negligent in bringing and continuing to prosecute the 1996 litigation, and thus the alternative grounds for a Dragonetti Act were also lacking. For these reasons, the motion to dismiss Count One was granted. Turning to Count Two, plaintiffs' abuse of process claim, the court concluded that the Amended Complaint did not allege facts from which it could be inferred that Santana's *primary* purpose in bringing the underlying litigation was improper. Thus, Count Two was also dismissed.

## II.

On appeal, Bobrick and Hornyak argue that the District Court erred in its interpretation of the elements of a Dragonetti Act claim; erroneously found that there was probable cause for the Lanham Act claim; and improperly determined that the Amended Complaint did not contain sufficient allegations of "improper purpose" or "gross negligence" to survive a motion

to dismiss. In addition, plaintiffs contend that the stay of discovery was an abuse of discretion.

**\*3** In its detailed and thoughtful opinion, which was partly based on its significant experience with the underlying litigation and its related cases, the District Court explained its reasons for granting Santana's motion to dismiss on the same issues raised on appeal. Since we can add little to the District Court's reasoning, we will affirm the order granting summary judgment substantially for the reasons set forth in the court's thorough opinion. [6] In addition, after reviewing the briefs and the record, we are not persuaded by Bobrick and Hornyak's argument on appeal that the court made improper findings of fact, drew impermissible inferences in favor of Santana, inappropriately relied on other court decisions, or otherwise erroneously applied the Rule 12(b)(6) standard. [7]

6   Therefore, we will also decline appellants' invitation to certify the Dragonetti Act issue to the Pennsylvania Supreme Court.

7   On March 29, 2011, Bobrick and Hornyak submitted a letter pursuant to Rule 28(j) directing our attention to a case recently argued before the Supreme Court, *Fox v. Vice,* 594 F.3d 423 (5th Cir.2010), *cert. granted,* —— U.S. ——, 131 S.Ct. 505, 178 L.Ed.2d 369 (2010). The question in *Fox* is whether a defendant can recover fees under 42 U.S.C. § 1988 for a 42 U.S.C. § 1983 suit that is deemed frivolous, when the state law claims arising out of the same facts and conduct have not been deemed frivolous. *Fox* also raises the question of how those fees should be apportioned. After reviewing *Fox,* we conclude that the issues therein are not applicable to the matter before us. *Fox* involves the interpretation of two federal statutes and does not appear to raise any constitutional issues. In the instant case, we deal solely with issues of state law and the Pennsylvania Dragonetti Act.

## III.

For the reasons above, we will affirm the District Court's grant of Santana and Jackson's motion to dismiss.

**All Citations**

422 Fed.Appx. 84, 2011 WL 1289133

**The Bobrick Corp. v. Santana Products, Inc., 422 Fed.Appx. 84 (2011)**

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Bracken v. County of Allegheny, Not Reported in Fed. Supp. (2017)

2017 WL 498511

2017 WL 498511
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Charles BRACKEN, William Deforte, William
Jackson, and Patrick Jennings, Plaintiffs,

v.

The COUNTY OF ALLEGHENY, William P. Mullen
as Sheriff of Allegheny County, the Allegheny County
Sherriff's Office, Chelsa Wagner as Allegheny County
Controller, the Allegheny County Controller's Office,
Allegheny County District Attorney John Fitzgerald
(In His Official Capacity and as an Individual),
and Allegheny County District Attorney Inspector
Darrel Parker (In His Official Capacity and as an
Individual, Jointly and Severally, Defendants.

Civil Action No. 2:16-cv-171
|
Filed 02/07/2017

**Attorneys and Law Firms**

Lawrence E. Bolind, Jr., Imperial, PA, for Plaintiffs.

John A. Bacharach, Allegheny County Law Department, Lisa
G. Michel, Allegheny County Sheriff's Office Ira Weiss,
Joseph D. Shaulis, Lisa M. Colautti, Weiss Burkardt Kramer,
LLC, Bernard M. Schneider, Brucker, Schneider & Porter,
Pittsburgh, PA, for Defendants.

## MEMORANDUM ORDER

Cynthia Reed Eddy, United States Magistrate Judge [1]

[1] In accordance with 28 U.S.C. § 636(c), all parties
have voluntarily consented to have the undersigned
conduct any and all proceedings in this action.
(ECF Nos. 56-60).

## I. Introduction

**\*1** Four current and/or former Pennsylvania constables
initiated this civil rights action under 42 U.S.C. §§ 1983,
1985, and 1986, and Pennsylvania law against seven
Allegheny County entities and officials: Allegheny County,
the Allegheny County Sheriff's Office; Allegheny County
Sheriff William P. Mullen ("Sheriff Mullen"); Allegheny
County Assistant District Attorney John Fitzgerald ("ADA
Fitzgerald"); Allegheny County District Attorney Inspector
Darryl Parker ("Inspector Parker"); the Allegheny County
Controller's Office; and Allegheny County Controller Chelsa
Wagner ("Controller Wagner"). There are currently four
pending motions to dismiss the Plaintiffs' amended complaint.
(ECF Nos. 28, 30, 32, 35). The parties have submitted
hundreds of pages of legal briefs and documents in connection
with these pending motions, (ECF Nos. 29, 31, 33, 36, 39,
41, 43-48, 51-54), all of which have carefully been reviewed
by the Court. Upon review of the amended complaint and
these filings, the Court agrees with Defendants that the
amended complaint lacks facial plausibility and deserves to be
dismissed for failure to state a claim. However, Plaintiffs will
be given an opportunity to file a second amended complaint.

## II. Legal Standard

"Under Rule 12(b)(6), a motion to dismiss will be granted
only if, accepting all well-pleaded allegations in the complaint
as true and viewing them in the light most favorable to
the plaintiff, a court finds that plaintiff's claims lack facial
plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77,
88 (3d Cir. 2011). "In deciding a Rule 12(b)(6) motion, a court
must consider only the complaint, exhibits attached to the
complaint, matters of public record, as well as undisputedly
authentic documents if the complainant's claims are based
upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230
(3d Cir. 2010). Further, "[i]t is axiomatic that the complaint
may not be amended by the briefs in opposition to a motion
to dismiss." *Commonwealth of Pa. ex rel Zimmerman v.
PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (internal
marks and citation omitted); *see also Frederico v. Home
Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007).

## III. Factual Background

The amended complaint (ECF No. 12) consists of 266
paragraphs and spans over thirty-four pages, but distilled
to its essence, the salient allegations asserted therein are as
follows. At all relevant times, Plaintiffs Charles Bracken
("Constable Bracken"), William DeForte ("Constable
DeForte"), William Jackson ("Constable Jackson"), and
Patrick Jennings ("Constable Jennings") were elected
constables in Pennsylvania. The amended complaint asserts

**Bracken v. County of Allegheny, Not Reported in Fed. Supp. (2017)**

2017 WL 498511

that in Allegheny County, there has been a long history of employees of the Sheriff's Office harboring animosity toward the constables. Said animosity was based, in part, on members of the sheriff's office wanting the exclusive rights to collecting fees associated with serving Allegheny County Family Division bench warrants. Motivated to achieve these exclusive rights at the expense of the constables in Allegheny County, various unnamed officials of the Sheriff's Office influenced ADA Fitzgerald and Inspector Parker to arbitrarily single out a select group of politically unpopular constables, including the Plaintiffs.

 **\*2** Beginning in 2013, Inspector Parker and ADA Fitzgerald began investigating Plaintiffs for the way in which they submitted fee vouchers on family division warrants, specifically with respect to "turn-ins," *i.e.*, a situation where a constable arranges for an individual with an active bench warrant to appear at the family division without taking that individual into physical custody. Inspector Parker and ADA Fitzgerald knew that Plaintiffs' submissions of their fee vouchers on family division warrants were approved by the relevant supervisors, consistent with the practices of the other constables in Allegheny County, and in accordance with longstanding and agreed upon practice in Allegheny County. Plaintiffs contend that these billing practices had been in place since at least 2006 when a purported "contract" was reached between various interested individuals and County entities. According to Plaintiffs, this "contract" was memorialized in a Memo by the director of the family division and later reinforced in a 2012 Constables Handbook. [2] The amended complaint asserts that prior to Inspector Parker and ADA Fitzgerald's investigation, the standard practice for addressing any discrepancies or errors on the fee vouchers submitted by a constable was to strike the voucher and return it to the constable for correction. Inspector Parker and ADA Fitzgerald nonetheless disregarded this standard practice and proceeded with their politically-motivated investigation.

[2]      The Court has reviewed these documents and notes that they do not list any specific fee schedule. Moreover, the amended complaint implies that the fees charged for turn-ins under this "contract" violated the fee schedule set forth in the Pennsylvania Constables Act, 44 Pa. C.S. § 7161.

The Controller's office took the "official stance" that any mistakes made by the constables in submitting fee vouchers were inadvertent and that the constables should not be criminally disciplined. Plaintiffs claim that Controller Wagner

and Sheriff Mullen failed "to oversee, train and prevent their employees from violating" the Plaintiffs' rights. However, there are no facts in the amended complaint supporting the inference that Controller Wagner or Sheriff Mullen had any interactions with, let alone control over, ADA Fitzgerald and Inspector Parker, who are both employed by the Allegheny County District Attorney's Office, a separate entity.

Between late 2013 and the early part of 2014, Inspector Parker and ADA Fitzgerald ordered that each Plaintiff meet with them separately. At every meeting, Inspector Parker and ADA Fitzgerald accused Plaintiffs of improperly submitting fee vouchers relating to turn-ins on family division bench warrants. Inspector Parker and ADA Fitzgerald demanded that each Plaintiff pay a random, arbitrarily calculated "retroactive" amount to resolve the billing discrepancies, but they refused to disclose to Plaintiffs how they calculated said amounts. Inspector Parker and ADA Fitzgerald acknowledged the existence of the "contract," which Plaintiffs claim allowed them to bill for the turn-ins on family division warrants. Nevertheless, Inspector Parker and ADA Fitzgerald threatened that failure to pay the applicable amount would result in Plaintiffs being charged with multiple felonies. Based on fear and intimidation, Constables Bracken and Jennings both paid the respective demanded amounts. Constable Jackson refused to pay the demanded amount, which caused him to be barred from serving any future family division warrants. No criminal proceedings were ever initiated against Constables Bracken, Jennings, and Jackson. Inspector Parker and ADA Fitzgerald charged Constable DeForte with multiple felonies notwithstanding that Constable DeForte "was paid fees allowed to be collected for turn-in warrants in the same fashion the [*sic*] every other constable was historically and customarily allowed as per the terms of the [2006] Memorandum" and was not provided with prior "notice that there was a change in billing policy for turn-in warrant fees charges [*sic*] by constables during the period 2006 through 2013."

### IV. Discussion

After reviewing the amended complaint and Plaintiffs' briefs in opposition to the motions to dismiss, it remains unclear to the Court how many and what types of claims Plaintiffs are attempting to assert under Fourth and Fourteenth Amendments. Some of the Court's confusion is derived from the fact that Plaintiffs inexplicably argue in their briefs in opposition, in conclusory fashion but with great confidence,

Bracken v. County of Allegheny, Not Reported in Fed. Supp. (2017)

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 9 of 219

2017 WL 498511

that they have "clearly" stated claims for legal theories that are not even pled in the amended complaint. [3] Because it is well-established that a pleading may not be amended by a brief in opposition to a motion to dismiss, *Zimmerman*, 836 F.2d at 181, the Court will disregard any arguments made as to legal theories that are not specifically pled in the amended complaint. The bulk of the Court's confusion, however, is derived from the disjointed way in which Plaintiffs organized Count I of their amended complaint, which needlessly runs on for 121 paragraphs and contains several subcategories. It is entitled, "[All Plaintiffs] v. [All Defendants] Due Process, 14[th] Amendment, 4[th] Amendment Prosecution without Probable Cause, §§ 1983, 1985, and 1986." In addition to conflating these several distinct legal theories, it contains numerous ambiguities.

[3]    It is also worth noting that in some of their briefs in opposition, Plaintiffs improperly asserted factual allegations that are not contained in the amended complaint and that, in some instances, flatly contradicted the amended complaint's allegations.

 **\*3** With respect to their Fourteenth Amendment due process claim, Plaintiffs do not specify whether they are attempting to proceed under the procedural or substantive due process clause, or both. Consequently, Defendants, through no fault of their own, have interpreted this claim differently. For example, the Sheriff's Office Defendants argue that this claim should be analyzed under the procedural due process claim and that any attempt by Plaintiffs to assert a substantive due process claim should instead be analyzed under the Fourth Amendment, (ECF No. 31 at 6), while the Controller Defendants argue that this claim is more appropriately analyzed under the substantive due process clause. (ECF No. 33 at 6-7). Plaintiffs amplify the confusion by making the contradictory statements in their briefs that under the Supreme Court case *Board of Regents v. Roth*, 408 U.S. 564 (1972) (which analyzed the *procedural* due process clause), they "clearly have a *substantive* due process claim with respect to fundamental liberty interests." (ECF Nos. 28 at 8, 30 at 8, 48 at 8) (emphasis added). [4]

[4]    To the extent that Plaintiffs are attempting to argue that they have a constitutionally protected liberty interest in their reputation, the Court notes that such a claim is not contained in the amended complaint. The only allegations in the amended complaint concerning harm to reputation

are located in Count III, which is the state law malicious prosecution claim being asserted solely by Constable DeForte. Therefore, the amended complaint does not state a claim under the due process clause based on damage to the Plaintiffs' reputation, and as discussed above, any arguments advanced by Plaintiffs in their briefs in opposition in connection with the same have been disregarded by the Court.

Plaintiffs' Fourth Amendment claim is also ambiguous. It is entitled "prosecution without probable cause," notwithstanding that the amended complaint expressly pleads that three of the four Plaintiffs were not prosecuted. Further, the amended complaint states that the malicious prosecution claim being asserted by Constable DeForte (and not any other Plaintiffs) is being pursued only under state, not federal, law. Nevertheless, in Plaintiffs' briefs in opposition, they inconsistently contend that *all* Plaintiffs have stated a § 1983 malicious prosecution claim. Moreover, it is unclear to the Court whether Constables Bracken and Jennings—the only Plaintiffs who are alleged to have paid the arbitrarily calculated retroactive fee demanded by ADA Fitzgerald and Inspector Parker in order to avoid being falsely prosecuted —are attempting to proceed under the Fourth or Fourteenth Amendment with respect to these allegations. The fact that their Fourth and Fourteenth Amendment claims are contained in the same count undoubtedly lends to this confusion. *See Walker v. Wentz*, 2008 WL 450438, \*5 (M.D. Pa. 2008) ("The use of separate counts becomes increasingly important when a plaintiff files suit against multiple [ ] defendants and alleges various claims against each."). This lack of clarity by Plaintiffs in their amended complaint and legal memoranda renders many of the legal theories therein incomprehensible; as such, the Court will not will not attempt to guess what undeveloped claims Plaintiffs are trying to assert.

Turning to the merits of the discernable federal claims in the amended complaint, the Court agrees with Defendants that all such claims lack facial plausibility. "An individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citation and internal marks and alterations omitted). There are no well-pleaded factual allegations pertaining to any of the Defendants other than ADA Fitzgerald and Inspector Parker. Contrary to Plaintiffs' arguments, Sheriff Mullen and Controller Wagner may not be held liable under § 1983 for constitutional torts committed by their employees or other individuals over which they have no control merely because they are

Bracken v. County of Allegheny, Not Reported in Fed. Supp. (2017)

2017 WL 498511

supervisors. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Santiago v. Warminster Twp.*, 629 F.3d 121, 128-29 (3d Cir. 2010) (describing the two theories of supervisory liability in § 1983 actions). Therefore, absent any factual allegations of personal involvement or wrongdoing, the amended complaint's unadorned conclusory allegation that Sheriff Mullen and Controller Wagner "have the duty and responsibility to oversee, train and prevent their employees from violating statutory law and the rights of individuals guaranteed under the Constitution,"[5] is insufficient to state a claim against these individuals. Nor does the amended complaint contain any factual allegations that the Sheriff's Office, the Controller's Office, or Allegheny County itself had in place any municipal customs or policies that caused their alleged constitutional deprivations. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690, 694 (1978); *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d Cir. 2009) (the plaintiff must "identify a custom or policy, and specify what that custom or policy was"); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (discussing municipal liability in the context of failure to train claims and remarking that a "municipality's culpability is at its most tenuous where a claim turns on a failure to train"). As such, the amended complaint does not state a claim against any of these Defendants under § 1983.

[5]     Am. Compl. at ¶ 14.

**\*4** Regarding Plaintiffs' allegations that ADA Fitzgerald and Inspector Parker violated the due process clause of the Fourteenth Amendment by interfering with Plaintiffs' constitutionally protected interests in serving family division warrants, Plaintiffs have failed to state a claim. Although they do not specify whether they are attempting to proceed under the procedural or substantive due process clause, in order to state a claim under either, it is a precondition that they be deprived of a property or liberty interest. *See Labalokie v. capital Area Intermediate Unit*, 926 F.Supp. 503, 508 (M.D. Pa. 1996). The amended complaint simply fails to include any facts showing that Plaintiffs had a property or liberty interest under the procedural due process clause in continuing to serve family division bench warrants.[6] *See In re act 147 of 1990*, 598 A.2d 985, 986 (Pa. 1991) (under Pennsylvania law, constables are elected officials and are treated as independent contractors; they are not employees of the Commonwealth, the judiciary, the township, or the county in which they work);[7] *Swinehart v. McAnderws*, 221 F.Supp.2d 552, 556-59 (E.D. Pa. 2002), *aff'd* 69 Fed.Appx. 60 (3d Cir. 2003) (constable that received 95% of his assignments from a particular judicial district did not have a property interest

in "any statute, regulation, government policy, or mutually explicit understanding of continued employment" and did not have a liberty interest in receiving specific job assignments from that particular judicial district). Additionally, Plaintiffs have failed to plead a property or liberty interest under the substantive due process clause. *See Gikas v. Washington School Dist.*, 328 F.3d 731, 732-33 (3d Cir. 2003) (not all property interests worthy of procedural due process protection are protected by the concept of substantive due process; rather, a property interest must be "fundamental" under the Constitution to be subject to substantive due process protection); *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 138 (3d Cir. 2000) (university professor's property interest in his tenured professorship was not a protected property interest under the substantive due process clause); *Wrench Transp. Sys., Inc. v. Bradley*, 340 Fed.Appx. 812, 816 (3d Cir. 2009), quoting *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right' ... for substantive due process purposes."); *Mun. Revenue Serv., Inc. v. McBlain*, 347 Fed.Appx. 817, 826-27 (3d Cir. 2009) ("Nor can [plaintiff] establish a fundamental property or liberty interest worthy of substantive due process protection. The ability to compete for municipal contracts is not a fundamental property interest and 'defamatory statements that curtail a plaintiff's business opportunities [do not] suffice to support a substantive due process claim.' ") (internal citations omitted).

[6]     To the extent that Plaintiffs claim that they had a property interest in the fees based on the purported "contract" that was memorialized in the 2006 Memo and the 2012 handbook, the Court finds that the amended complaint does not plead sufficient facts in support of this position.

[7]     *See also Office of Constable v. Dep't of Transp.*, 112 A.3d 678, 682-83 (Pa. Cmwlth. 2015).

The discernable Fourth Amendment claims in the amended complaint must also be dismissed. Although Plaintiffs have labeled this claim "prosecution without probable cause," the Court of Appeals has expressly stated that "prosecution without probable cause is not, in and of itself, a constitutional tort." *Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir. 1998) (citing *Albright v. Oliver*, 510 U.S. 266, 274 (1994)); *DiBella v. Borough of Beachwood*, 407 F.3d 599, 602-03 (3d Cir. 2005). To the extent that Plaintiffs are claiming that their persons were seized for Fourth Amendment purposes when they met with ADA Fitzgerald and Inspector Parker and were coerced to pay a sum of money or face being criminally

2017 WL 498511

charged, the Court finds that these allegations are insufficient to constitute a Fourth Amendment violation. "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Florida v. Bostick*, 501 U.S. 429, 439 (1991) ("[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."). Here, a fair reading of the amended complaint leads to the conclusion that Plaintiffs voluntarily went to the meetings with Inspector Parker and ADA Fitzgerald, and there are no allegations suggesting that Plaintiffs were not free to leave.

Plaintiffs have also failed to state a § 1983 malicious prosecution claim. The elements of a § 1983 malicious prosecution claim are as follows:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

**\*5** *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)) (footnote omitted). Constables Bracken, Jackson, and Jennings have failed to establish the first, second, third, and fifth elements of this claim because the amended complaint specifically alleges that criminal proceedings were never initiated against them.[8] This claim is also deficient with respect to Constable DeForte because there are no allegations that he suffered a deprivation of liberty consistent with the concept of seizure *as a consequence of* the criminal charges—the fifth element of a malicious prosecution claim. Indeed, there are no allegations in the amended complaint that *after* the criminal charges were initiated, Constable DeForte

suffered any deprivation of liberty at all.[9] *DiBella*, 407 F.3d at 603; *Basile v. Twp. of Smith*, 752 F.Supp.2d 643, 660 nn. 18, 19 (W.D. Pa. 2010) (in a § 1983 malicious prosecution claim, "[t]he alleged seizure must occur as a result of the malicious prosecution, and thus, it must occur chronologically after the pressing of charges").

8    *See* Am. Compl. at ¶ 199.

9    The Court notes that Defendants also make strong arguments that Constable DeForte cannot establish the second element: that the proceedings terminated in his favor. However, because all reasonable inferences must be drawn in favor of Constable DeForte and it is unclear from his briefs in opposition whether he disputes that he paid restitution to have his charges dismissed/withdrawn, the Court declines to make this determination at this time.

The Court finds that any other § 1983 claims that Plaintiffs are trying to pursue under the Fourth or Fourteenth Amendments are insufficiently pled, undeveloped, and, therefore, must be dismissed. Consequently, because Plaintiffs have failed to state a claim under the due process clause of the Fourteenth Amendment, the Court must also dismiss their § 1983 claim against Defendants for conspiracy to violate due process. *See Sweetman v. Borough of Norristown, Pa.*, 554 Fed.Appx. 86, 90 (3d Cir. 2014) ("A § 1983 conspiracy claim is viable only if there has been an actual deprivation of a constitutional right.");*Monrea'l v. Lamb*, 2016 WL 278313, \*8 (E.D. Pa. 2016) ("When no constitutional violated has been pleaded, no conspiracy claim can be maintained under § 1983.").

The Court will also dismiss Plaintiffs' § 1985(3) conspiracy claim because Plaintiffs allege no factual allegations in support of their conclusory allegations that a conspiracy occurred, and they fail to allege that as constables, they belong to a protected class. *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ("The language [in § 1985(3)] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); *Farber v. City of Paterson*, 440 F.3d 131, 135, 137 (3d Cir. 2006) (rejecting political affiliation as a protected class and noting that in the Third Circuit, only "African-Americans, women, and the mentally retarded" have been recognized as § 1985(3) classes). Plaintiffs' § 1986 claim will also be dismissed. In addition to being untimely under the applicable one year

Bracken v. County of Allegheny, Not Reported in Fed. Supp. (2017)

2017 WL 498511

statute of limitations, a § 1986 claim cannot be maintained without an underlying violation of § 1985. *Rogin v. Bensalem Twp.,* 616 F.2d 680, 696-97 (3d Cir. 1980). Having determined that all of the federal claims in the amended complaint should be dismissed, the Court declines to exercise supplemental jurisdiction over the state law claims at this time. 28 U.S.C. § 1367(c)(3).

### V. Leave to Amend

Because this is a civil rights case, the Court is required to extend Plaintiffs an opportunity to amend their deficient pleading, irrespective of whether they have requested to do so and irrespective of whether they are counseled, unless it would be futile or inequitable. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251-52 (3d Cir. 2007). Although it is unlikely that many of the deficiencies in the amended complaint can be cured, the Court finds that under the circumstances Plaintiffs should be afforded the chance to amend their pleading. When filing the second amended complaint, Plaintiffs must adhere to the following directives that another member of this Court recently gave to *pro se* plaintiffs:

> **\*6** Plaintiffs must indicate in separate Counts each constitutional right violated or state tort committed, indicating the specific Defendant(s) against whom that claim is asserted, and referencing in separately numbered paragraphs under each count, any factual statements showing that Plaintiffs are entitled to relief.

Plaintiff must also include in each Count the specific relief sought against the Defendant(s) named in that Count.

*Thompson v. Hens-Greco,* 2016 WL 7046959, \*3 (W.D. Pa. 2016), *Report & Recommendation adopted in* 2016 WL 7035067 (W.D. Pa. 2016). Moreover, the Court will not consider any arguments made by Plaintiffs in briefs in opposition about legal theories or allegations that have not been pled in accordance with the directives in the preceding sentence. *See Zimmerman*, 836 F.2d at 181; *Frederico*, 507 F.3d at 201-02. In responding to the second amended complaint, Defendants may reassert any applicable arguments that they have raised in connection with the pending motions.

### VI. Conclusion

**AND NOW**, this 7th day of February, 2017, in accordance with the foregoing, it is hereby **ORDERED** that the four pending motions to dismiss (ECF Nos. 28, 30, 32, 35) are **GRANTED** and that the Amended Complaint (ECF Nos. 12) is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs may file a Second Amended Complaint, consistent with this Memorandum Order, on or before **February 21, 2017**. If Plaintiffs do not file a Second Amended Complaint within this timeframe, all federal claims in the Amended Complaint will be dismissed with prejudice and the state law claims will be dismissed without prejudice, and the case will be marked closed.

### All Citations

Not Reported in Fed. Supp., 2017 WL 498511

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4805321
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

April BROWN, Plaintiff,
v.
PRIORITY HEALTHCARE GROUP, LLC,
and Premier at Susquehanna for Nursing
and Rehabilitation, P.C., Defendant.

Civil No. 1:19-CV-00116-SHR
|
Signed 10/01/2019

**Attorneys and Law Firms**

Christa V. Levko, Jonathan W. Chase, Ruppert Manes
Narahari, Philadelphia, PA, for Plaintiff.

Meghan E. Sandora, Michael R. Miller, Margolis Edelstein,
Philadelphia, PA, for Defendant.

**MEMORANDUM**

SYLVIA H. RAMBO, United States District Judge

 **\*1** Before the court is the motion to dismiss (Doc. 12) filed
by Defendants Priority Healthcare Group, LLC ("Priority")
and Premier at Susquehanna for Nursing and Rehabilitation,
P.C. ("Premier"; collectively, "Defendants").[1] Upon
consideration of Plaintiff April Brown's ("Plaintiff" or "Ms.
Brown") complaint (Doc. 1), the motion to dismiss, Plaintiff's
opposition (Doc. 13), and Defendants' reply (Doc. 15), the
court will grant the motion without prejudice.

---

[1]    The court recognizes Defendants are distinct
       entities who may have differing levels of liability
       from one another. For the purpose of resolving the
       instant motion, however, the court refers to them
       together for simplicity.

**I. Background**

According to her complaint, Ms. Brown is a Licensed
Practitioner Nurse ("LPN") who needs intermittent leave
from work to deal with episodes of her chronic anxiety
and depression. Around June of 2017, Defendants hired
Plaintiff to work as an LPN, at which time she advised

Defendants of her ailments and need for occasional leave.
After working for approximately ten months, Defendants
suspended Plaintiff from work due to her calling out of
work too frequently. One month later, Plaintiff requested
leave under the Family and Medical Leave Act ("FMLA")
from Defendants' human resources department. Defendants
granted her request. Around that time, Ms. Brown's coworkers
began antagonizing her for taking FMLA leave by: mocking
and diminishing her condition; informing her she was
"fuck[ing] the nurses over" by taking time off; insulting her
on Facebook; and accusing her of lying about her condition.
(Doc. 1 ¶ 18.) In response, Plaintiff complained to her
supervisors about her coworkers' behavior, but she was told
to handle the issues on her own. Plaintiff has not alleged any
further insults followed her complaints.

Around August 30, 2018, Defendants suspended Plaintiff for
three days due to her violating company policy by calling
out and requesting FMLA leave less than three hours before
her shifts. Plaintiff alleges her condition caused emergent
symptoms too suddenly for her to provide such advanced
notice, but she does not allege that Defendants knew of this
aspect of her ailments.

Approximately three months later, around November 23,
2018, Plaintiff's supervisors requested a meeting where they
informed her that narcotics were missing from the facility. She
was told she needed to take a drug test and submit a written
report on how she counted narcotics. Ms. Brown indicated
she would do so but wanted to first consult an attorney.
Defendants informed her she would need to take the drug test
immediately. Plaintiff declined and resigned the same day.

On January 18, 2019, Plaintiff sued Defendants under the
FMLA for interference and retaliation, claiming Defendants
constructively discharged her for asserting her FMLA rights.
On April 8, 2019, Defendants filed a motion to dismiss under
Rule 12(b)(6), arguing: (1) by granting Plaintiff's requested
FMLA leave, Defendants did not interfere with her FMLA
rights; (2) her suspension for violating a company call-out
policy, and her negative treatment for refusing an immediate
drug test, did not interfere with her rights nor were they
done in retaliation; (3) the three-month gap between Plaintiff
last requesting FMLA leave and her supposedly being
constructively discharged is too large for the court to infer any
relationship between the two; and (4) Plaintiff cannot have
been constructively discharged by the administration of a drug
test, because, as a matter of law, it is not an intolerable work
condition. (*See generally*, Doc. 12.)

**\*2** On April 26, 2019, Plaintiff responded by arguing: (1) she was withdrawing her interference claim; (2) temporal proximity is not necessary where Plaintiff alleges a pattern of antagonistic treatment; (3) Plaintiff's coworkers harassing her, culminating in her forced drug test, constituted a pattern of antagonistic treatment; (4) Defendants knew her illness rendered her unable to comply with the three-hour call-out policy, yet they punished her anyway; and (5) a reasonable person would have resigned under her circumstances. (*See generally*, Doc. 13.)

On May 2, 2019, Defendants replied arguing: (1) antagonistic comments by Plaintiff's coworkers cannot constitute adverse employment because her coworkers lacked authority over her and did not threaten to discharge her; (2) Plaintiff quit because of her drug test, not her coworkers' treatment, so the lack of temporal proximity proves Plaintiff failed to allege causation; (3) Plaintiff failed to adequately address Defendants' case law stating punishment for violations of company policy cannot constitute adverse employment treatment. (*See generally*, Doc. 15.)

Having been fully briefed, this issue is now ripe before the court.

## II. **Standard of review**

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "When reviewing a 12(b)(6) motion, we 'accept as true all well-pled factual allegations in the complaint and all reasonable inferences that can be drawn from them.' " *Estate of Ginzburg by Ermey v. Electrolux Home Prods., Inc.*, —— F. App'x ——, 2019 WL 4187372, at \*3 (3d Cir. Sept. 4, 2019) (quoting *Taksir v. Vanguard Grp.*, 903 F.3d 95, 96-97 (3d Cir. 2018)). The facts alleged must be "construed in the light most favorable to the plaintiff." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (internal quotations, brackets, and ellipses omitted). But "[t]he court is not required to draw unreasonable inferences" from the facts. 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004).

The Third Circuit has detailed a three-step process to determine whether a complaint meets the pleading standard. *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2014). First, the court

outlines the elements a plaintiff must plead to state a claim for relief. *Id.* at 365. Second, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* Third, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## III. **Discussion**

This court has previously laid out the elements of an FMLA retaliation claim as follows:

> FMLA regulations prohibit an employer from retaliating against an employee for having exercised or attempted to exercise FMLA rights. To succeed on a FMLA retaliation claim, a plaintiff must show that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.

*Kegerise v. Susquehanna Twp. Sch. Dist.*, 325 F. Supp. 3d 564, 583 (M.D. Pa. 2018) (internal citations and quotations omitted). Third Circuit "case law has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Paterson College of N.J*, 260 F.3d 265, 288 (3d Cir. 2001). "The mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)). Instead, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Krouse*, 126 F.3d at 503 (quoting *Robinson*, 120 F.3d at 1302).

**\*3** Here, Plaintiff's allegations can be divided into three possible retaliation scenarios, each of which fails. First, Plaintiff has failed to allege facts from which the court could

infer Defendants' enforcement of its three-hour call-in policy was motivated in part by animus. In-and-of itself, Defendants' requirement that employees request time off more than three hours in advance is not a violation of one's FMLA rights. *See Raimondi v. Wyoming Cty.*, No. 3:14-cv-1918, 2016 WL 2989067, at *11 n.9 (M.D. Pa. May 24, 2016) ("[A]n employer's decision to suspend an employee for violating the employer's call-in policy while on FMLA leave did not abrogate the employee's FMLA rights.") (citing *Callison v. City of Phila.*, 430 F.3d 117, 121 (3d Cir. 2005)). Thus, Plaintiff must allege additional facts to support an inference that Defendants' enforcement of the three-hour rule was done specifically in retaliation to her requesting FMLA leave.

Plaintiff claims she has alleged two supporting facts: (1) that she was suspended specifically in response to requesting FMLA leave; and (2) her employer knew her ailment—the basis for her requesting FMLA leave—precluded her from complying with the policy. This first argument fails because the "denial of a requested accommodation does not by itself constitute retaliation for the request—such reasoning would result in a claim for unlawful retaliation every time a request for accommodation, reasonable or not, is denied." *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp. 3d 585, 593 (E.D. Pa. 2017). This is particularly true here because Plaintiff implicitly pleads that she did fail to comply with the policy. The second argument fails because it is conclusory. Plaintiff does not allege how her depression and anxiety rendered her incapable of calling in three hours in advance of her shifts to request time off, much less how Defendants could have known this. While the court acknowledges such a scenario is possible, Plaintiff has failed to supply sufficient facts from which the court can reason whether it is plausible here. *In re Trokie*, 590 B.R. 663, 669 (Bankr. M.D. Pa. 2018) ("[F]or a complaint to withstand a motion to dismiss, a claim must be more than possible, it must be plausible.").

Second, Plaintiff has failed to allege how being forced to submit to a drug test constituted an act of retaliation. Plaintiff suggests, in her briefing, that this drug test was a pretextual basis for harassing her. But Plaintiff has not pleaded as much, so the court will disregard this theory. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint."). Here, Plaintiff has alleged that the drug test was offered in connection with an investigation into certain missing narcotics. Without explaining how or why the drug test was related to her FMLA leave, the court cannot reasonably infer

the drug test was being offered for any reason other than to carry out the investigation. Further, it is reasonable and commonplace for an employer to request a drug test be carried out immediately; delay could result in the person's body metabolizing any present drugs or enable the person to somehow otherwise obstruct the test. Moreover, Plaintiff has alleged a roughly three-month gap between her last FMLA request and the drug test—an implausible gap in time weighing against the suggestion that the test was administered in retaliation. Considering the facts as alleged, the court cannot reasonably infer the drug test was administered as retaliation for Plaintiff requesting FMLA leave.

Third, Plaintiff's allegation that her coworkers were harassing her is insufficient to hold Defendants liable for an FMLA violation. The court will assume that her coworkers' treatment of her constituted a pattern of antagonism. *Hofferica v. St. Mary Med. Ctr.*, 817 F. Supp. 2d 569, 585 (E.D. Pa. 2011) ("[A] causal link between protected activity and adverse action may be inferred from 'an intervening pattern of antagonism following the protected conduct.' ") (quoting *Peace-Wickham v. Walls*, 409 F. App'x 512, 522 (3d Cir. 2010)). But Plaintiff did not sue her coworkers. She sued her employer. She thus must allege sufficient facts to support vicarious liability. *Walls*, 409 F. App'x at 522 ("Although creating or permitting a hostile work environment can constitute a materially adverse employment action, vicarious liability remains necessary to establish this basis.").

**\*4** To do so, Plaintiff must allege her employer was negligent or reckless in failing to adequately address the hostility. *See id.* at 519. Here, Plaintiff alleged she suffered harassment, reported it to her employer, and that her employer did not adequately address the problem because they simply instructed her to handle it. But Plaintiff's allegation that her employer's response was unhelpful is pleaded in a conclusory fashion. She does not explain why her employer advising her to handle it on her own was insufficient to address the problem. This is particularly true given Plaintiff has not pleaded any harassment persisted after she sought help. As such, she has failed to allege sufficient facts to state a claim for vicarious liability. *See id.* at 523 (failure to show employer "acted in an intentionally ineffective or negligently indifferent manner" meant plaintiff failed to show vicarious liability sufficient to prove a continuously antagonistic work environment).

Thus, because Plaintiff has failed to allege sufficient facts from which the court can infer Defendants retaliated against

her for requesting FMLA leave, Plaintiff's retaliation claim fails as a matter of law.

Finally, even if the court assumed one of these actions was done in retaliation, Plaintiff has not adequately pleaded it precipitated her decision to resign. "Constructive discharge will be found where 'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.' " *Lanza v. Postmaster Gen. of U.S.*, 570 F. App'x 236, 240 (3d Cir. 2014) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). "The harassment inflicted upon the worker must be severe and pervasive, even more so than that required to prove a hostile work environment." *Id.* at 240. "[H]arassment is pervasive when incidents of harassment occur either in concert or with regularity." *Patrick v. Werner Enters.*, 744 F. App'x 765, 768 n.3 (3d Cir. 2018) (internal quotations omitted).

Constructive discharge tends to be a "fact-intensive question," rendering it "inappropriate for the District Court to decide" on "a 12(b)(6) motion." *See Hill v. Borough of Kutztown*, 455 F.3d 225, 232 n.7 (3d Cir. 2006). Plaintiff's problem here, however, is not so much that the court is rejecting a well-pleaded claim that her situation was sufficiently hostile to compel a reasonable person to resign; it is that she has failed to plead any connection between an act of retaliation and her decision to resign. The closest she has come to pleading an act of retaliation comes with the antagonism she suffered from her coworkers. Assuming this

was enough to prove vicarious liability, she has not alleged —other than in a conclusory fashion—that this harassment was pervasive and motivated her to quit. In fact, she has not pleaded she suffered any harassment for four months before she resigned. It is difficult for the court to conceive of a reasonable person finding a bevy of personal attacks so offensive they decide to quit, but not until four months free of further insults. Having failed to allege a causal connection between her allegedly hostile work environment and her resigning, Plaintiff's retaliation claim fails. *See Santiago v. St. Mary Med. Ctr.*, No. 1:15-cv-2212, 2015 WL 6758163, at *7 (E.D. Pa. Nov. 5, 2015) (dismissing retaliation claim on 12(b)(6) because Plaintiff was unable to "plead a casual nexus between [defendants' conduct] and" her "termination").

Nonetheless, additional factual content could potentially remedy some of these errors, so the court will grant Plaintiff leave to replead. *See Shane v. Fauver*, 213 F.3d 113, 115-16 (3d Cir. 2000).

### IV. <u>Conclusion</u>

For the reasons outlined above, the court will grant the motion without prejudice, permitting Plaintiff leave to replead in an attempt to remedy the errors identified in this opinion. An appropriate order will follow.

**All Citations**

Slip Copy, 2019 WL 4805321

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2915759
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

CONSUMER FINANCIAL
PROTECTION BUREAU, Plaintiff,
v.
The NATIONAL COLLEGIATE MASTER
STUDENT TRUST, et al., Defendants.

C.A. No. 17-1323 (MN)
|
Signed 05/31/2020

**Attorneys and Law Firms**

Colin T. Reardon, Gabriel S.H. Hopkins, Jane M.E. Peterson, Stephen C. Jacques, Consumer Financial Protection Bureau, Washington, DC – Attorneys for Plaintiff.

Defendants, The National Collegiate Master Student Trusts, currently unrepresented by counsel.

Jamie L. Brown, Kurt M. Heyman, Melissa N. Donimirski, Heyman Enerio Gattuso & Hirzel LLP, Wilmington, DE; Devon Hercher, Erik W. Haas, George A. LoBiondo, Jared Buszin, Joshua Kipnees, Peter Shakro, Peter W. Tomlinson, Patterson Belknap Webb & Tyler LLP, New York, NY – Attorneys for Ambac Assurance Corporation.

Daniel A. O'Brien, Venable LLP, Wilmington, DE; Allyson B. Baker, Meredith L. Boylan, Sameer P. Sheikh, Katherine M. Wright, Tiffany C. Williams, Venable LLP, Washington, DC – Attorneys for Transworld Systems Inc.

Catherine A. Gaul, Ashby & Geddes, PA, Wilmington, DE; Michael Hanin, Henry B. Brownstein, Uri Itkin, Kasowitz Benson Torres LLP, New York, NY – Attorneys for Objecting Noteholders.

Rebecca L. Butcher, Landis Rath & Cobb LLP, Wilmington, DE; John P. Doherty, William Hao, Alston & Bird LLP, New York, NY – Attorneys for GSS Data Services, Inc.

Stacey A. Scrivani, Stevens & Lee, P.C., Wilmington, DE; Nicholas H. Pennington, Stevens & Lee, P.C., King of Prussia, PA – Attorneys for The Pennsylvania Higher Education Assistance Agency d/b/a American Education Services.

Stephen B. Brauerman, Elizabeth A. Powers, Jayson C. Jowers, Bayard, P.A., Wilmington, DE – Attorneys for Wilmington Trust Company.

John W. Shaw, Jeffrey T. Castellano, David M. Fry, Shaw Keller LLP, Wilmington, DE; Stephen H. Meyer, Sullivan & Cromwell, LLP, Washington, DC; Matthew A. Martel, Joseph B. Sconyers, Keith M. Kollmeyer, Jones Day, Boston, MA – Attorneys for U.S. Bank National Association.

## MEMORANDUM OPINION

NOREIKA, U.S. DISTRICT JUDGE

**\*1** Before the Court is a motion to approve a Proposed Consent Judgment ("PCJ") in the instant litigation between the Consumer Financial Protection Bureau ("CFPB," "the Bureau," or "Plaintiff") and fifteen Delaware statutory trusts, called the National Collegiate Student Loan Trusts (collectively, "the Trusts" or "Defendants"). (D.I. 3). The motion is opposed by a number of intervening parties – Ambac Assurance Corporation ("Ambac"), Transworld Systems Inc. ("TSI"), Objecting Noteholders ("Noteholders"), GSS Data Services, Inc. ("GSS"), the Pennsylvania Higher Education Assistance Agency d/b/a American Education Services ("PHEAA"), Wilmington Trust Company ("WTC"), and U.S. Bank National Association ("U.S. Bank") (collectively, "the Intervenors"). (D.I. 226). Consideration of the motion was bifurcated into two phases and the CFPB and Intervenors have thus far submitted briefing on two Threshold Issues – whether the law firm of McCarter & English ("McCarter") lacked authority to sign the PCJ on behalf of the Trusts and whether, authority aside, it was improper for McCarter to enter into the PCJ. For the reasons discussed below, the Court finds that McCarter lacked authority to execute the PCJ on behalf of the Trusts under the Trust Related Agreements and applicable law, and therefore denies Plaintiff's motion to approve the Proposed Consent Judgment.

## I. BACKGROUND

The Trusts were created between 2001 and 2007 pursuant to the Delaware Statutory Trust Act, 12 Del. Code § 3801-26 ("DSTA"), to acquire private student loans, collect payments from borrowers, and distribute gains to the holders of notes. *CFPB v. Nat'l Collegiate Master Student Trust, No.* 17-cv-1323 (MN), 2018 WL 5095666, at *1

(D. Del. Oct. 19, 2018); (*see also D.I.* 228, Ex. 1 (The National Collegiate Student Loan Trust 2006-4 Trust Agreement ("Trust Agreement")) § 2.03(a), 2.05).[1] The Trusts have no employees or internal management and rely on certain trust-related agreements to provide their operating structure. *CFPB v. Nat'l Collegiate Master Student Trust*, 2018 WL 5095666, at *1. These agreements include trust agreements, administration agreements, servicing agreements, and indentures (collectively, "Trust Related Agreements") and provide a structure that includes an Owner Trustee, Administrator, Indenture Trustee, Primary Servicer, Special Servicer, and Sub-servicers. (*Id.*).

[1] The Court follows the parties' convention that unqualified references to the various Trust Related Agreements are to those versions from the National Collegiate Student Loan Trust 2006-4, attached as Exhibit 1 to the Intervenors' brief. (*See* D.I. 226 at 1 n.1; D.I. 259 at 3 n.3). Unless otherwise noted, the cited text in the 2006-4 agreements is substantially identical to the corresponding text in each of the other agreements. (*Id.*).

WTC is the Owner Trustee of the Trusts.[2] (*Id.*). In this role, WTC acts pursuant to the authority granted to it under the Trust Related Agreements and can be directed by the equity owners of the Trusts ("the Owners")[3] or the Administrator. (*Id.*). Should a conflict arise between a directive by the Owners and the terms of the Trust Related Agreements, the Trust Related Agreements control. (*Id.*). Ambac is an insurance company that has provided financial guarantee insurance with respect to securities in certain of the Trusts. (*Id.* at *2).[4]

[2] On July 20, 2017, WTC gave notice of its resignation as Owner Trustee. (D.I. 236, Ex. 72). WTC subsequently filed a motion before the Delaware Court of Chancery to effect its resignation. (*See* D.I. 226 at 23). The Chancery Court granted the motion but directed WTC to continue serving as Owner Trustee until a successor was appointed. (*Id.*; *see also* D.I. 228, Ex. 1 at § 12.01(a) (stating Owner Trustee resignation is only effective upon acceptance of appointment by successor)).

[3] The current Owners are NC Owners, LLC and Pathmark Associates, LLC. (D.I. 226 at 6; D.I.

259 at 3). Donald Uderitz is a principle of VCG Securities LLC ("VCG") which controls NC Owners LLC. (D.I. 226 at 6; D.I. 259 at 10 n.6). Jorge Rodriguez-Lugo is an employee of VCG, who, along with Uderitz, directed McCarter, purportedly on behalf of the Trusts. (D.I. 226 at 6 n.7).

[4] The roles and responsibilities of the other Intervenors are not relevant here, but the Court has described them previously. *See, e.g.*, *CFPB v. Nat'l Collegiate Master Student Trust*, 2018 WL 5095666, at *1-2.

**\*2** McCarter is a law firm that was retained to represent the Trusts. In November 2015, WTC, as the Owner Trustee and at the direction of the Owners, purportedly retained Chaitman LLP to represent the Trusts in certain matters. (*See* D.I. 226 at 12-13; D.I. 259 at 4). The engagement letter states that Chaitman would "act as Special Counsel for the Trusts managing litigation or other adversarial proceedings arising from or relating to one or more Trusts by (i) providing legal services in connection with such matters, and/or (ii) on behalf of the Trusts, selecting, engaging and managing other law firms to provide such Services, at the discretion of Chaitman." (D.I. 232, Ex. 27 at 1). The engagement letter also states that "[a]s requested or directed by WTC or the Owners, Chaitman provide [sic] legal services in connection with any litigation, regulatory proceeding, inquiry or investigation arising from or relating to one or more Trusts." (*Id.*). Chaitman subsequently engaged McCarter to represent the Trusts for a subset of those matters.[5] (*See* D.I. 226 at 13; D.I. 259 at 4).

[5] The parties debate whether Chaitman was properly retained as well as the scope of the firm's engagement, including whether the firm was empowered to engage McCarter for the matters that it purportedly did. (*See, e.g.*, D.I. 226 at 28-30; D.I. 259 at 9-15).

On September 18, 2017, following an investigation, the CFPB brought this action against the Trusts "to obtain permanent injunctive relief, restitution, refunds, disgorgement, damages, civil money penalties, and other appropriate relief for Defendants' violations of Federal consumer financial law in connection with Defendants' servicing and collection of private student loan debt." (D.I. 1 ¶ 1). The same day, the CFPB filed a motion for approval of the PCJ. (D.I. 3-1). The

PCJ was signed by the CFPB and attorneys from McCarter, purportedly on behalf of the Trusts. (*Id.*).

McCarter signed the PCJ at the direction of the Owners. (*See* D.I. 226 at 25; D.I. 235, Ex. 56; D.I. 236, Ex. 78). The Owners, however, had initially directed the Owner Trustee, WTC, to execute the PCJ. (*See* D.I. 235, Ex. 58). WTC resisted this instruction on advice of counsel that the direction appeared to be invalid under the Trust Related Agreements.[6] (*See id.*).

[6]     WTC submitted its resignation as Owner Trustee shortly thereafter. (*See* D.I. 226 at 23).

After the CFPB filed its motion to enter the PCJ, the Intervenors moved to intervene. (*See* D.I. 4, 9, 11, 12, 20, 31, 33, 35).[7] The Court granted those applications (*see* D.I. 95), and bifurcated consideration of the CFPB's motion into two phases. (*See* D.I. 99). The Court set two "Threshold Issues" for discovery and briefing in Phase One:

1. Whether the law firm of McCarter & English had the authority to execute the [PCJ] on behalf of the Defendants under the Trust Related Agreements and applicable law; and

2. Whether – authority aside – it was improper or (in violation of Trust Related Agreements) for McCarter & English to enter into the [PCJ].

(*Id.*). Thereafter, the parties engaged in discovery relating to the Threshold Issues. On March 12, 2020, the Intervenors submitted their answering brief addressing the Threshold Issues. (*See* D.I. 226). On April 30, 2020, the CFPB filed its reply. (*See* D.I. 259).[8]

[7]     Running concurrently with this litigation is a consolidated state-court action considering various similar and overlapping issues. *See, e.g.*, *In Re Nat'l Collegiate Student Loan Trusts Litig.*, C.A. No. 12111-VCS (Del. Ch.).

[8]     The Defendant Trusts have not submitted briefing on this issue. On July 10, 2018, the Trusts' counsel of record, McCarter & English moved to withdraw. (D.I. 79). That motion was granted by the Court, (*see* D.I. 80), and the Trusts remain unrepresented in this matter.

## II. LEGAL STANDARD

As noted, the Trusts are organized under the DSTA (12 Del. Code § 3801-26). (*See* D.I. 228, Ex. 1 at § 2.05). Additionally, the Trust Agreement states that it "shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity, and performance." (D.I. 228, Ex. 1 at § 14.10).

**\*3** Although the DSTA "grant[s] business trusts broad freedom in establishing their internal governance mechanisms," *Nakahara v. NS 1991 Am.* Trust, 739 A.2d 770, 782 (Del. Ch. 1998); *accord* 12 Del. Ch. § 3825(b), it provides a series of defaults that apply unless the governing instrument of the statutory trust provide otherwise. *See generally* 12 Del. Ch. § 3806; *cf. Cargill, Inc. v. JWH Special Circumstance, LLC*, 959 A.2d 1096, 1111-13 (Del Ch. 2008) (recognizing DSTA § 3806(c) does not proscribe a blank slate, but merely allows parties "free[dom] in the governing instrument" to modify preexisting requirements). Relevant here, § 3806(a) of the DSTA says:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees.

Although anyone – including a beneficial owner – may be named a trustee or be empowered to direct the trustee(s) or other persons in the management of such a trust, unless "otherwise provided in the governing instrument ..., neither the power to direct a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such person to be a trustee." DSTA § 3806(a).

## III. DISCUSSION

### A. Whether McCarter Had the Authority to Execute the PCJ on Behalf of the Trusts Under the Trust Related Agreements and Applicable Law.

The CFPB argues that McCarter had authority to sign the PCJ because "under clear contractual authority, the Trusts' Owners directed the hiring of Chaitman LLP" which "in turn engaged McCarter to represent the Trusts with respect to"

the CFPB investigation; "and the only Trust Party authorized to decide whether to settle the Bureau's claims, the Owners, directed McCarter to execute the PCJ." (D.I. 259 at 2).

The CFPB relies on three sections of the Trust Agreement for the "clear contractual authority" asserted – §§ 2.03(b)(i), 4.01(b)(i) and 9.03(b). (*See id.* at 3-4, 9-18). According to the CFPB, "[r]ead in conjunction ... these provisions make plain that it is the Owners – and only the Owners – that may direct a properly appointed agent of the Trusts to settle claims against the Trusts." (*Id.* at 17). As discussed below, the Court disagrees.

Pursuant to DSTA § 3806(a), unless the Trust Related Agreements provide otherwise, the Trusts are "managed by or under the direction of" their trustee(s) and neither the power to direct such trustee(s) or other persons nor the exercise of such power by any person(s) (including the beneficial owner(s)) causes such person(s) to be a trustee, *i.e.* to assume the powers and responsibilities of a trustee. Under the Trust Related Agreements, the Owners' consent is required to settle claims against the Trusts, but the Owner Trustee is the entity through which the Trusts act and the only entity through which the Trusts may be bound to the PCJ. Here, the relevant trustee is the Owner Trustee, *i.e.*, WTC. (*See* D.I. 228, Ex. 1 at § 2.04). WTC exercised its power under the Trust Related Agreements to resist the Owners' instruction to execute the PCJ. And WTC never delegated – to the extent it could – its power to execute the PCJ to McCarter or the Owners in WTC's stead. As such, McCarter lacked the necessary authority to execute the PCJ on behalf of the Trusts when it did so at the Owners' direction.

    1. <u>The Contractual Provisions Cited Do Not</u>
       <u>Allow the Owners to Direct McCarter to</u>
       <u>Execute the PCJ on Behalf of the Trusts.</u>

The Court will address each of the contractual provisions addressed by the CFPB in turn.

    a. Section 2.03(b)(i).

**\*4** Section 2.03(b)(i) provides:

  b) Until the Indenture is discharged, the operations of the Trust shall be conducted in accordance with the following standards:

    (i) the Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement.

(D.I. 228. Ex. 1, § 2.03(b)(i)).

As the language makes clear, § 2.03(b)(i) is circumscribed by the phrases "as provided herein" and "such action shall not be in violation of the terms of this Agreement." As a result, pursuant to § 2.03(b)(i), the Owner Trustee and other agents selected in accordance with the Trust Agreement are subject to direction by the Owners only to the extent the Trust Agreement provides the Owners the power to direct them. Thus, § 2.03(b)(i) does not on its own confer the Owners the power to direct WTC or an agent of the Trust to take a particular action. And thus, unless other passages in the Trust Related Agreements alter the structure effected by § 3806(a) of the DSTA and provide a mechanism for the Owners to direct the Owner Trustee and other agents of the Trusts, they lack such power. Thus, the Court looks to the other contractual provisions cited by the CFPB.

    b. Section 4.01 (b)(i).

Section 4.01(b)(i) provides:

  b) Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding:

    (i) Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust, except for claims or lawsuits initiated in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust;

(D.I. 228. Ex. 1, § 4.01(b)(i)).

As such, this provision prohibits the Owner Trustee from "compromis[ing] any claim or lawsuit" unless "it receives prior written approval from all the Owners for so long as

any of the Notes are outstanding." [9] Thus, § 4.01(b)(i) does two things – 1) it restricts the Owner Trustee's ability to settle litigation like that at issue here by requiring written instruction from the Owners and 2) it imposes an unanimity requirement on the Owners to settle such litigation. [10] Neither of these restrictions, however, empowers the Owners to supplant the Owner Trustee's role in directing and managing the Trusts. Although the first restriction limits the Owner Trustee's ability to control the Trusts unilaterally and empowers the Owners to direct the Owner Trustee to settle litigation, it does not empower the Owners or other agents of the Trusts to execute such instructions, *i.e.*, to assume the powers and responsibilities of the Owner Trustee to manage and direct the Trusts.

9      Based on their arguments, the parties appear to agree that settling or "compromising" this suit via entering the PCJ is a non-ministerial matter to which § 4.01(b)(i) applies. (*See, e.g.*, D.I. 226 at 25-28; D.I. 259 at 16-18). The Court concurs.

10      Unless expressly provided in the Trust Agreement, "any action which may be taken or consent or instructions which may be given by the Owners under" the Trust Agreement only require an 85% super-majority of the Owners to agree. (*See* D.I. 228, Ex. 1 at § 4.03).

**\*5** This conclusion is supported by the Owner Trustee's right under the Trust Agreement to refuse instruction from the Owners in a variety of situations. Section 4.02(a) states that the "Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action ... is contrary to the terms hereof or of any document contemplated hereby to which the Trust or Owner Trustee is a party or is otherwise contrary to law ...." (D.I. 228, Ex. 1 at § 4.02(a) (original emphasis); *see also id.* § 4.02(b) ("No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.")). [11] No recourse, aside perhaps from removing the existing Owner Trustee and appointing another in the hopes of obtaining a different perspective on the propriety of their instruction, (*see* D.I. 228, Ex. 1 at §

12.01(a)), is afforded to the Owners when the Owner Trustee acts in accordance with those powers.

11      Additionally, testimony from a McCarter attorney who signed the PCJ and the Owners' representatives indicate that the Owners have, at least historically, acted through directives to the Owner Trustee. (D.I. 229, Ex. 10 (Deposition of Jorge Rodriguez-Lugo) at 80:20-24 ("It's the way it works in the trust, right? The owners direct through the owner trustee."); D.I. 230, Ex. 16 (Deposition of Donald Uderitz) at 58:7-17 ("[W]hen the owners want to give direction, it has done so through Wilmington [Trust] who is currently the owner trustee."); D.I. 233, Ex. 33 (Deposition of James Kosch, a McCarter attorney for the Trusts) at 180:3 – 181:9 (noting that nothing in Trust Agreement expressly allows Owners to sign on behalf of the Trusts); *id.* at 219:22 – 220:6 (noting Trust Agreement at least "generally says" "the owners direct the owner trustee, and if the owner trustee can follow directions, it then executes on them")). The CFPB has cited no previous instance where the Owners deviated from that practice.

c. Section 9.03(b).

Section 9.03(b) provides:

b) In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with

reasonable care and employed by
it, and the Owner Trustee shall
not be liable for anything done,
suffered or omitted in good faith
by it in accordance with the advice
or opinion of any such counsel,
accountants or other skilled persons.

(D.I. 228. Ex. 1, § 9.03(b)).

This section, thus, authorizes the Owner Trustee to act
through agents and attorneys on behalf of the Trusts. It does
not, however, dictate that the agents or attorneys enlisted by
the Owner Trustee assume all powers and responsibilities of
the Owner Trustee upon being engaged, nor does that section
refer to the Owners, let alone empower them to instruct agents
or attorneys enlisted by the Owner Trustee. Rather, § 9.03(b)
indicates that the scope of power and responsibility afforded
to any agent or attorney enlisted by the Owner Trustee on
behalf of the Trusts is dictated by the "agreements entered into
with ... them." (*Id.*).

Here, it is undisputed that WTC has not executed the
PCJ and that it invoked Trust Agreement § 4.02 when
instructed to do so by the Owners. (*See* D.I. 235, Ex. 58 at
3-4 (WTC responding, via counsel, to Owners' instruction
to execute PCJ by invoking Trust Agreement § 4.02(b)
and stating, *inter alia*, "[u]pon initial review, ... it would
appear that the proposed CFPB Consent Order could impose
obligations on the Trusts that are contrary to the express
terms of the Indentures.")). Additionally, the evidence does
not indicate that the scope of McCarter's engagement included
the gatekeeping aspect of the Owner Trustee's role or the
power to receive instructions directly from the Owners. [12]
Chaitman's engagement letter, for example, specifically
authorizes Chaitman to act on instructions from the Owners.
(D.I. 232, Ex. 27 at 1 ("As requested or directed by
WTC or the Owners, Chaitman [will] provide legal services
in connection with any litigation, regulatory proceeding,
inquiry, or investigation arising from or relating to one or
more Trusts.")). [13] Even assuming that language would be
sufficient to empower an agent to execute the PCJ at the
Owners' instruction notwithstanding the Owner Trustee's
refusal, the McCarter engagement letter (D.I. 233, Ex. 34)
lacks such a specific directive and the CFPB has pointed to
no evidence indicating that the scope of McCarter's work was
expanded to permit such direction. [14]

[12] The Court assumes without deciding that the
Owner Trustee could delegate such powers.

[13] The Court assumes without deciding that Chaitman
was empowered to engage McCarter for the
CFPB matter and to embrace the full scope of
responsibilities in its engagement letter (including
the power to receive instruction directly from the
Owners).

[14] The scope of McCarter's work was later
purportedly expanded – via email – to include "the
NORA inquiry from CFPB." (*See* D.I. 260, Ex. H
at 64:12 − 65:25). Those emails, however, have
not been presented to the Court and the testimony
submitted to substantiate their existence does not
indicate whether McCarter was empowered to
receive instruction directly from the Owners. (*See*
D.I. 259 at 16 (citing D.I. 260, Ex. H at 64:12 −
65:25; *id.*, Ex. I at 67:14-18)).

**\*6** Thus, despite the freedom to do so, the parties did not
alter the default standards created by § 3806(a) of the DSTA.
Although unanimous consent of the Owners is required to
"compromise" this case, the Owner Trustee remains the party
through whom suits of this nature must be compromised. As
neither McCarter nor the Owners were empowered via the
Owner Trustee to fill that role and the Owner Trustee has not
executed or authorized the execution of the PCJ, McCarter
could not do so in its stead.

2. McCarter Lacked Authority to Execute the PCJ on Behalf
of the "Master Trust" Because Ambac Did Not Consent.

With respect to one of the fifteen Trusts, the "Master Trust,"
McCarter lacked authority to sign the PCJ for an additional
reason – Intervenor Ambac, the Note Insurer for that trust, did
not provide McCarter with prior written approval. The CFPB
admits as much, stating that "[i]t appears that McCarter lacked
authority to sign on behalf of one of the fifteen trusts: The
National Collegiate Master Student Loan Trust I (the 'Master
Trust')." (D.I. 259 at 2 n.2). As the CFPB explains:

The Master Trust's Trust Agreement has language that does
not appear in the other fourteen Trusts' Trust Agreements.
That language requires that not just the Owners, but also
the Note Insurer (here, Intervenor Ambac), give written
approval to execute a settlement agreement in matters like

the one brought by the Bureau. *See* D.I. 230, [Ex. 15] – Master Trust Agreement § 4.01(b)(i) (Owner Trustee has no authority to "compromise any claim or lawsuit brought by or against the Trust" "unless it receives prior written approval from all the Owners *and the Note Insurer*")…. Ambac's approval does not appear to have been given in this case.

(*Id.*) (original emphasis).

The Court agrees. Pursuant to the terms of the Master Trust Agreement, Ambac's written approval is required to authorize any compromise of the CFPB's claims against the Master Trust. No evidence has been presented indicating that Ambac approved the PCJ in writing. For this additional reason, McCarter lacked authority to sign the PCJ on behalf of the Master Trust. As this language is unique to the Master Trust, however, and no party has argued that removal of one of the Trusts from the PCJ would affect the settlement more broadly, this finding does not impact the Court's analysis of McCarter's authorization, or lack thereof, with respect to the other Trusts.

\* \* \*

Based on the foregoing, the Court finds that the law firm of McCarter & English did not have the the authority to execute the PCJ on behalf of the Defendants under the Trust Related

Agreements and applicable law. As such, the Court does not address the other arguments raised by the parties regarding this Threshold Issue.

### B. Whether – Authority Aside – It Was Improper or in Violation of Trust Related Agreements for McCarter to Enter the PCJ on Behalf of the Trusts.

Having determined that McCarter lacked authority to execute the PCJ on behalf of the Trusts, the Court agrees with the CFPB that there is no need to resolve the second Threshold Issue. (*See* D.I. 98 at 3 (CFPB arguing against consideration of any but first Threshold Issue in Phase One, including second Threshold Issue, because such "additional issues … only arise if McCarter & English had the authority to execute the PCJ on behalf of the Trusts")).

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to satisfy the Threshold Issues. Plaintiff's motion to approve the PCJ is therefore DENIED. An appropriate order will follow.

**All Citations**

Slip Copy, 2020 WL 2915759

---

**End of Document**            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 27 of 219

Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

2018 WL 1095760
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Houston (1st Dist.).

Ladanta D. FOSTER, Appellant

v.

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007–4, Appellee

NO. 01–17–00253–CV
|
Opinion issued March 1, 2018

**On Appeal from the 412th District Court, Brazoria County, Texas, Trial Court Case No. 84872–CV**

**Attorneys and Law Firms**

Ranald Calili and James B. Heston, for Ladanta D. Foster.

Michael Scott, Robbie Malone and Eugene Xerxes Martin IV, for National Collegiate Student Loan Trust 2007–4.

Panel consists of Chief Justice Radack and Justices Massengale and Brown.

**MEMORANDUM OPINION**

Sherry Radack, Chief Justice

 **\*1** Appellant, Ladanta D. Foster, appeals the trial court's judgment, entered after a bench trial, in favor of appellee, National Collegiate Student Loan Trust 2007–4 ("the Trust"), in its suit against Foster for breach of a student loan agreement. In two issues, Foster challenges the legal and factual sufficiency of the evidence and contends that the trial court erred in admitting evidence.

We suggest a remittitur of damages. Conditioned on the suggestion of remittitur, we affirm the trial court's judgment.

**Background**

In its original petition, the Trust [1] alleged that, in 2007, Foster, a student at Texas Southern University, obtained a student loan from JPMorgan Chase Bank, N.A. ("Chase"). Prior to Foster's first payment date, and at a time while the loan was still in good standing, the note was assigned to the Trust. The Trust, as owner and holder of the note, asserted that Foster had defaulted by not paying as agreed. On December 9, 2015, the Trust sent Foster a letter demanding payment in full, however, Foster did not comply. Subsequently, the Trust brought a breach-of-contract claim against Foster, seeking damages of $45,277.02. Foster answered, generally denying the allegations, filed a verified denial, and asserted various affirmative defenses.

[1]
　　We note that, ordinarily, a trust cannot sue in its own name; rather, a representative must assert claims on behalf of the trust. *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006). Here, however, the Trust is a "Delaware Statutory Trust." A statutory trust is formed by the filing of a note, commonly referred to as a certificate of trust, in a public office pursuant to a statute. TEX. BUS. & COM. CODE ANN. § 9.102; *see, e.g.*, Uniform Statutory Trust Entity Act § 201 (2009); Delaware Statutory Trust Act, DEL. CODE ANN. tit. 12, § 3801 et seq. A statutory trust is a juridical entity, separate from its trustee and beneficial owners, that may sue and be sued, own property, and transact business in its own name. TEX. BUS. & COM. CODE ANN. § 9.102.

At trial, although no witnesses were called, the Trust moved to admit into evidence, as "Exhibit 1," the "Business Records Affidavit" of Dudley Turner, a Legal Case Manager for Transworld Systems Inc. ("TSI"), who testified, in pertinent part, as follows:

　1. I am employed by [TSI], the subservicer for [the Trust] pertaining to the educational loan forming the subject matter of this action.

　2. TSI has been contracted to perform the duties of the Subservicer for [the Trust] by U.S. Bank, National Association, the Special Servicer of [the Trust]. TSI, as the Subservicer of the [Trust], is the designated custodian of records for [Foster's] educational loan. Additionally, TSI maintains the dedicated system of record for electronic transactions pertaining to [Foster's] educational loan, including, but not necessarily limited to, payments, credits, interest accrual and any other

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 28 of 219

Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

transactions that could impact [Foster's] educational loan....

3. .... As an employee of TSI, I am duly authorized by [the Trust] and U.S. Bank, National Association to make the representations contained in this Affidavit.

*2 4. I have access and training on the system of record utilized by TSI to enter and maintain loan account records and documentation concerning [Foster's] educational loan for [the Trust].

5. I am familiar with the process by which TSI receives prior account records, including origination records from the time the loan was requested and/or disbursed to [Foster] and/or the student's school on their behalf.

6. As custodian of records it is TSI's regularly-conducted business practice to incorporate prior loan records and/or documentation into TSI's business records.

7. I am further competent and authorized to testify regarding this educational loan through personal knowledge of the business records maintained by TSI as custodian of records, including electronic data provided to TSI related to [Foster's] educational loan, and the business records attached to this Affidavit.

8. This lawsuit concerns an unpaid loan owed by [Foster] to [the Trust]. Specifically, [Foster] entered into an educational loan agreement at [Foster's] special instance and request. A loan was extended for [Foster] to use pursuant to the terms of the loan agreements. [Foster] has failed, refused, and/or neglected to pay the balance pursuant to the agreed terms.

9. Educational loan records are created, compiled and recorded as part of regularly conducted business activity at or near the time of the event and from information transmitted from a person with personal knowledge of said event and a business duty to report it, or from information transmitted by a person with personal knowledge of the accounts or events described within the business record. Such records are created, kept, maintained, and relied upon in the course of ordinary and regularly conducted business activity.

10. I have reviewed the educational loan records described in this affidavit regarding account number xxxxx7063–004–PHEA. No payment has been received on this account. After all payments, credits and offsets have

been applied, [Foster] owes the principal sum of $45,277.02, together with accrued interest in the amount of $6,179.73, totaling the sum of $51,456.75 as of 11/30/2016. Attached hereto and incorporated within are 31 pages of [the Trust's] business records further described below.

11. Attached hereto and incorporated herein as Exhibits "B" through "G" are 31 pages of [the Trust's] business records. These records are created, compiled and recorded as part of regularly conducted business activity at or near the time of the event and from information transmitted from a person with personal knowledge or said event and a business duty to report it, or from information transmitted by a person with personal knowledge of the account or events described within the business record. Such records are created, kept, maintained, and relied upon in the course of ordinary and regularly conducted business activity ....

....

13. [Foster] opened an educational loan with [Chase] and funds were disbursed on 5/31/2007. [Foster's] educational loan was then transferred, sold and assigned to National Collegiate Funding LLC, who in turn transferred, sold and assigned [Foster's] educational loan to [the Trust] on 9/20/2007 for valuable consideration, in the course of the securitization process. [Foster's] educational loan was in good standing and not in default on 9/20/2007.

*3 To his affidavit, Turner attached 31 pages of documents, as follows:

Exhibit A is a November 13, 2014 letter from U.S. Bank, as special servicer for the Trust, "confirm[ing]" that TSI is the "dedicated records custodian with respect to all student loans owned by [the Trust]" and is "fully authorized to execute affidavits regarding account documents" and to "provide testimony on behalf of [the Trust]."

Exhibit B is a "Credit Agreement" signed by Foster and a "Note Disclosure Statement." The Credit Agreement, dated May 23, 2007, states that Foster applied for an educational loan of $25,000.00 from Chase. The Note Disclosure Statement reflects that a loan amount of $25,000.00 was disbursed to Foster, or on her behalf, and that she agreed to make 240 monthly payments of $381.45, beginning on July 12, 2009.

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 29 of 219

Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

Exhibit C contains a "Pool Supplement," "Loan Transfer Schedule," and "Deposit & Sale Agreement," pertaining to Chase's assignment of loans through an intermediary to the Trust.

Exhibit D is a "Loan Financial Activity Report," which reflects the monthly balance and interest accrued on Foster's loan, that she did not make any payments, and a final "Principal Balance" of $43,560.51. Exhibit E is a "Deferment/Forbearance Summary," showing Foster's deferment and forbearance periods. Exhibit F is a "Repayment Schedule." Exhibit G is a "Loan Payment History Report."

Foster objected to the admission of the evidence, and the trial court overruled the objection and admitted the evidence, as follows:

THE COURT: .... Any objection to this business records affidavit?

[Foster]: *Well, the only objection I will make, Your Honor, is that the affiant [Turner] asserts that he is the custodian of records for [TSI] whereas the Plaintiff is [the Trust]. So we would like to see how those are interrelated, if he is representing—if he's custodian of [TSI] what relationship does that bear to [the Trust]? In looking at the affidavit I'm not entirely sure if that's clear. If [the Trust's] counsel wants to point [to] something I may be missing out or that the Court may not see and present any evidence to that. Otherwise, we object to the entire submission of evidence as hearsay.*

THE COURT: Well, of course that's what business records affidavit filed the requisite period of time [sic], it allows hearsay evidence. It's an exception to the hearsay rule.

....

Now what connection does [TSI] have to this transaction?

[The Trust]: Your Honor, TSI, as you can see from the affidavit, is both [the Trust's] designated custodian of records and they also create and maintain the records pertaining to the loan. Proof and confirmation of TSI's capacity as sub servicer can actually be found in Exhibit A which starts on page 7. Actually it just is page 7. As you'll see, there is a letter from U.S. Bank who is the indentured trustee for National Collegiate Student Loan Trust which is a matter of public record and they state

that [TSI] is also the record custodian with respect to all student loan accounts ....

[Foster]: We would like to see that entered as an exhibit if we could please, just to establish the standing issue. If U.S. Bank is bringing this lawsuit.

**\*4** THE COURT: Okay.

....

Why don't you do them as Exhibit 2 and 2–A?

[The Trust]: All right. I will do that. So, Your Honor, [the Trust] would like to introduce Exhibit 2 which is the full indenture which is on file with the U.S. Securities and Exchange Commission. Exhibit 2–A as requested is a copy of the excerpt of both the trust agreement and the indenture with highlights that show that U.S. Bank is the indentured trustee for [the Trust].

....

THE COURT: Okay. So you've [Foster] had previous access to this at some point?

[Foster]: I haven't seen it, Your Honor. That doesn't mean it wasn't provided.

THE COURT: I understand. Exhibit 2 and 2–A are admitted. And based upon 2 and 2–A your objection to [the Trust's] *Exhibit 1 is overruled and [the Trust's] Exhibit 1 is admitted.*

[The Trust]: Thank you, Your Honor. Your Honor, if counsel is not going to offer any evidence I would ask they state that fact for the record and then rest.

[Foster]: We do not have any contrary evidence at this time, Your Honor. So we do rest.

(Emphasis added.)

The trial court then rendered a judgment in favor of the Trust on its breach-of-contract claim, awarding it damages against Foster in the amount of $45,277.02, plus interest and costs. The trial court denied Foster's request for findings of fact and conclusions of law as untimely filed and denied her motion for new trial.

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 30 of 219

Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

## Admission of Evidence

In her first issue, Foster argues that the trial court erred in overruling her hearsay objection and admitting Exhibit 1 under the business-records exception to the hearsay rule because the business-record affiant, Turner, is "not properly qualified to testify as custodian of records." Foster also asserts that the "attached documentary exhibits do not meet the definition of business records." She asserts that the trial court's error resulted in an improper judgment because the Trust did not offer any other evidence to support its breach-of-contract claim.

### A. Standard of Review

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it rules without regard to guiding rules or principles, and we must uphold a trial court's evidentiary ruling if it is supported on any legitimate basis. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *Id.*; *see also* TEX. R. APP. P. 44.1; *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). In determining whether the excluded evidence resulted in the rendition of an improper judgment, we review the entire record. *Interstate Northborough P'ship*, 66 S.W.3d at 220. A successful challenge to a trial court's evidentiary ruling ordinarily requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Id.* We will not reverse a judgment on the basis of erroneously excluded evidence if the evidence is cumulative and not controlling on a material issue dispositive to the case. *Id.*

 **\*5** Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted and is inadmissible unless a statute or rule of exception applies. TEX. R. EVID. 801(d), 802. The proponent of hearsay has the burden to show that the testimony fits within an exception to the general rule. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004).

Under the business-records exception, evidence that is otherwise inadmissible as hearsay may be admissible if the proponent of the evidence demonstrates that (1) the record was made at or near the time of the event by, or from information transmitted by, someone with knowledge; (2) the record was kept in the regular course of a regularly conducted business activity; and (3) making the record was a regular practice of that activity. TEX. R. EVID. 803(6); *see In re E.A.K.*, 192 S.W.3d 133, 141 (Tex. App.–Houston [14th Dist.] 2006, pet. denied). These prerequisites to admissibility may be shown by the testimony of the custodian or other qualified witness or by an affidavit that complies with Rule 902(10). TEX. R. EVID. 803(6)(D), 902(10).

Rule 902(10) provides that certain items of evidence are self-authenticating and require no extrinsic evidence of authenticity in order to be admitted, including:

> Business Records Accompanied by Affidavit. The original or a copy of a record that meets the requirements of Rule 803(6) or (7), if the record is accompanied by an affidavit that complies with subparagraph (B) of this rule and any other requirements of law ....

TEX. R. EVID. 902(10). Subparagraph (B) provides a sample form of a sufficient affidavit, which enumerates the elements of Rule 803(6), discussed above. *Id.*

### B. Business–Records Affidavit

Turner, in his affidavit, testified that TSI is the subservicer of the Trust and is the designated custodian of records for Foster's educational loan. Turner states that he is an employee of TSI and is authorized by the Trust to testify regarding Foster's educational loan. Turner stated that he has personal knowledge of the business records maintained by TSI as custodian of records, including electronic data provided to TSI related to Foster's loan, and the business records attached to his affidavit. The loan records are created, compiled, and recorded as part of regularly conducted business activity, at or near the time of the event and from information transmitted from a person with personal knowledge of said event and a business duty to report it, or from information transmitted by a person with personal knowledge of the accounts or events described within the business record. *See* TEX. R. EVID. 803(6). He also stated that such records are created, kept,

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 31 of 219

Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

maintained, and relied upon in the course of ordinary and regularly conducted business activity. *See id.*

Further, Turner testified that it is TSI's regularly-conducted business practice to incorporate prior loan records and documentation into TSI's business records, and he is familiar with the process by which TSI receives prior account records, including origination records from the time that loans are requested and disbursed. *See Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 240–41 (Tex. App.–Houston [1st Dist.] 2010, no pet.).

With respect to the attached business records, Turner testified that Exhibit A is a "true and correct copy of confirmation of TSI's capacity as Subservicer." Exhibit B is a "true copy of the underlying Credit Agreement/Promissory Note and Note Disclosure Statement" pertaining to Foster's Loan. Exhibit C is a "true and correct copy" of the agreement through which Foster's loan was sold to the Trust, and the exhibit contains a redacted copy of the Schedule of transferred loans referenced within the Pool Supplement. Exhibit D is a "true copy of the Loan Financial Activity demonstrating the loan balance from disbursement to charge off." Exhibits E is a "true copy of the Deferment/Forbearance Summary." Exhibit F is a "true copy of the Repayment Schedule" associated with Foster's loan. Finally, Exhibit G is a "true copy of the Loan Payment History Report," which demonstrates the damages.

**\*6** Foster argues that Turner, as a "Legal Case Manager," is not a qualified sponsor of the documents as business-records because he did not testify as the corporate representative of the Trust and did not claim to be a custodian of records. Rather, Turner describes TSI as the subservicer of the Trust. Foster argues that a corporate entity, as opposed to a natural person, cannot qualify as a custodian of records in the context of a business records affidavit because an affidavit must be sworn to by a natural person and the affiant must represent that the facts disclosed therein are true and within the his personal knowledge.

Rule 803(6) does not, however, require that the witness laying the predicate for admission of a document be the creator of the document or even an employee of the same company as the creator. *In re E.A.K.*, 192 S.W.3d at 142; *see* TEX. R. EVID. 803(6). The witness need not have personal knowledge of the information recorded in the document, but need only have knowledge of how the records were prepared, as Turner testified. *In re E.A.K.*, 192 S.W.3d at 142. Rule 902(10) reflects an intent to allow the admission of an organization's

business records without requiring testimony from all of the organization's employees who have personal knowledge of the content of the records. *Kaldis v. U.S. Bank Nat. Ass'n*, 14–11–00607–CV, 2012 WL 3229135, at \*3 & n.1 (Tex. App.–Houston [14th Dist.] Aug. 9, 2012, pet. dism'd w.o.j.) (mem. op.).

We conclude that Turner's affidavit complies with Rule 902(10)(B). *See id.*; *see also* TEX. R. EVID. 803(6), 902(10)(B). Thus, the Trust's business records are self-authenticating and require no extrinsic evidence of authenticity to be admitted. *See* TEX. R. EVID. 902.

## C. Business Records

With respect to the business records attached to Turner's affidavit, Foster, on appeal, argues that "several of the records/documents at issue" and the "various loan origination and loan transfer documents" were not admissible under the business records exception because those documents were not generated by TSI. She asserts that Exhibit A, the Subservicer Certification, is "suspect" and has numerous "trustworthiness issues," i.e., it is not on letterhead, it is not addressed to TSI, it contains names that do not match the names on the governing documents, it conflicts with the indenture, and it is not notarized. She also asserts that "[a]uthentication is an issue with respect to several components of Exhibit 1, including all documents offered for chain-of-title purposes." She also complains about the admission of the "Numerical Data Exhibits" and "Data Box Exhibit" in Exhibit 1 as "not properly authenticated" and "did not satisfy the multiple requirements applicable to business records." The record does not reflect, however, that Foster raised any of these points in the trial court.

To preserve a complaint for appellate review, a party must state an objection clearly and with sufficient specificity to make the trial court aware of the particular grounds for the complaint. TEX. R. APP. P. 33.1(a); *McKinney v. Nat'l Union Fire Ins. Co.*, 772 S.W.2d 72, 74 (Tex. 1989). A specific objection is one that enables the trial court to understand the precise grounds so as to make an informed ruling and affords the offering party an opportunity to remedy the defect, if possible. *McKinney*, 772 S.W.2d at 74.

As discussed above, the record shows that Foster made a general hearsay objection. "[A] general hearsay objection does not preserve for appeal a challenge to a proper predicate's being made to admit business records." *Rogers v. Dep't of Family & Protective Servs.*, 175 S.W.3d 370, 376 (Tex. App.–

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 32 of 219

Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (holding general hearsay objection did not preserve for appeal challenge to predicate being made to admit business records and declining to address propriety of admitting file); *Clark v. Walker–Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex. App.–Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that objection to personal knowledge of sponsoring witness to assert business records exception to hearsay rule did not preserve error asserted on appeal that invoices were not generated at or near the time of the transaction and that appellee failed to lay the proper predicate for introduction of a summary of business records); *see, e.g., In re N.C.M.*, 66 S.W.3d 417, 420 (Tex. App.–Tyler 2001, no pet.) (holding that general hearsay objection to business records was insufficient to inform trial court of specific grounds of objection or to preserve error).

**\*7** We hold that the trial court did not err in admitting the business-records affidavit.

We overrule the portion of Foster's first issue in which she challenges the affidavit. Foster has waived the remaining portions of her first issue.

### Sufficiency of the Evidence

In her second issue, Foster asserts that the Trust lacks standing to assert its breach-of-contract claim, and she challenges the legal and factual sufficiency of the evidence to support the Trust's claim as to both liability and damages.

#### A. *Standing*

Foster first argues that the evidence does not support that the Trust has standing to assert its breach-of-contract claim.

"Standing is implicit in the concept of subject matter jurisdiction," which is never presumed, cannot be waived, and may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–46 (Tex. 1993); *Brown v. Mesa Distribs., Inc.*, 414 S.W.3d 279, 284 (Tex. App.–Houston [1st Dist.] 2013, no pet.). Whether the trial court has subject matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Without a breach of a legal right belonging to himself, a plaintiff has no standing to litigate. *See Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976).

To establish its standing to assert a breach of contract cause of action, a party must prove its privity to the agreement, or that it is a third-party beneficiary. *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 738 (Tex. App.–Dallas 2007, pet. denied). For standing purposes, privity is established if the plaintiff proves that the defendant was a party to an enforceable contract with either the plaintiff or a third party who assigned its cause of action to the plaintiff. *Id.* An assignee "stands in the shoes of his assignor." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 920 (Tex. 2010); *see Bosch v. Frost Nat'l Bank*, No. 01–14–00191–CV, 2015 WL 4463666, at \*3 (Tex. App.–Houston [1st Dist.] July 21, 2015, no pet.) (mem. op.) ("It is well-settled that the assignee steps into the shoes of the assignor and may assert the same rights as the assignor.").

The record shows that on May 23, 2007, Foster signed a Credit Agreement, requesting from Chase an "Education One" undergraduate loan in the amount of $25,000.00. The Pool Supplement, dated September 20, 2007, shows that Chase transferred, sold, and assigned to National Collegiate Funding LLC each of the "Transferred Bank One Loans" referenced in the attached note and transferred each note and all records and rights relating thereto. The parties agreed that National Collegiate Funding LLC would "in turn ... sell the Transferred Bank One Loans" to a purchaser trust. The Deposit and Sale Agreement, also dated September 20, 2007, shows that National Collegiate Funding LLC sold, and the Trust purchased, "the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on Schedule A." Schedule A references the Pool Supplement: "[Chase] (successor to Bank One, N.A.) dated September 20, 2007, for loans that were originated under ... Education One Loan Program ...." A document attached to the Pool Supplement lists a loan originated by Chase, under the "Education One" loan program, in the amount of $25,000.00, disbursed on May 31, 2007 to, or on behalf of, Foster, who is identified by the last four digits of her social security number.

**\*8** This evidence shows that Foster was a party to a contract with Chase that was later assigned to the Trust. Thus, the Trust, as an assignee, "stands in the shoes of" Chase with respect to Foster's loan and has standing to assert its breach-of-contract claim. *See Sw. Bell Tel. Co.*, 308 S.W.3d at 920; *Bosch*, 2015 WL 4463666, at \*3.

#### B. *Breach of Contract*

In a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 33 of 219

Foster v. National Collegiate Student Loan Trust 2007-4, Not Reported in S.W. Rptr....

2018 WL 1095760

all findings of fact necessary to support it. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011). When, as here, a reporter's record has been filed, the implied findings are not conclusive, and a party may challenge both the legal and factual sufficiency of the evidence supporting those findings. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When legal- and factual-sufficiency issues are raised, the applicable standards of review are the same as those applied to review jury findings. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989). We affirm the trial court's judgment if it can be upheld on any theory finding support in the evidence. *Rosemond*, 331 S.W.3d at 767.

When a party challenges the legal sufficiency of an adverse finding on which she did not have the burden of proof, she must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). We will sustain a legal-sufficiency or no-evidence challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822.

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal, effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then factfinders must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

In conducting a factual-sufficiency review, we consider, weigh, and examine all of the evidence that supports or contradicts the factfinder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

**\*9** "To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach." *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.–Houston [14th Dist.] 2008, no pet.). The elements of a valid contract are: (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex. App.–Houston [1st Dist.] 2005, pet. denied). When an offer prescribes the manner of acceptance, compliance with those terms is required to create a contract. *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995). If one party signs a contract, the other party may accept by his acts, conduct, or acquiescence to the terms, making it binding on both parties. *Jones v. Citibank (S.D.), N.A.*, 235 S.W.3d 333, 339 (Tex. App.–Fort Worth, no pet.). To be enforceable, a contract must be sufficiently certain to enable a court to determine the rights and responsibilities of the parties. *Williams v. Unifund CCR Partners Assignee of Citibank*, 264 S.W.3d 231, 236 (Tex. App.–Houston [1st Dist.] 2008, no pet.) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ).

Here, the record shows that on May 23, 2007, Foster signed a "Credit Agreement," requesting from Chase an undergraduate loan in the amount of $25,000.00, for the 2007–2008 academic year at Texas Southern University. The Credit Agreement states, in pertinent part:

A. Promise to Pay.

I promise to pay to your order, upon the terms and conditions of this Credit Agreement, the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent that it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan ..., interest on any unpaid interest

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 34 of 219
Foster v. National Collegiate Student Loan Trust 2007–4, Not Reported in S.W. Rptr....

2018 WL 1095760

added to the Principal Sum, and other charges set forth herein.

B. Loan; Disclosure Statement:

1. By signing this Credit Agreement and submitting it to you [Chase], I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested ....

2. If you agree to make a loan to me, you will mail me the disbursement check ... and a statement disclosing certain information about the loan in accordance with the federal Truth–in–Lending Act ("Disclosure Statement"). You have the right to disburse my Disbursement Check through an agent .... [T]he Disclosure Statement is part of this Credit Agreement. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. My endorsement of the Disbursement Check or allowing the loan proceeds to be sued by or on behalf of the student Borrower without objection will acknowledge receipt of the disclosure statement and my agreement to be legally bound by this Credit Agreement.

3. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan....

The Credit Agreement also addresses deferment periods, terms of repayment, interest, and default, and acceleration.

Pursuant to the Note Disclosure Statement, Chase, on May 31, 2007, disbursed to Foster, or on her behalf, a loan in the amount of $25,000.00. The terms include an origination fee of $2,624.31, interest at 13.016 percent, and 240 payments of $381.34, due on the 12th of each month, beginning on July 12, 2009. As discussed above, Chase subsequently assigned the loan to the Trust.

The Loan Financial Activity record shows the monthly balance and interest accrued and that Foster did not make any payments on the loan. The final "Principal Balance" on November 20, 2013 was $43,560.51. Foster offered no evidence that she made any payments on the loan.

**\*10** The evidence shows that a valid contract between the Trust and Foster, pursuant to which Chase loaned to Foster $25,000.00, on the terms stated, and Foster agreed to repay the loan on the terms stated. The evidence further shows that

Foster breached the terms of the contract by not paying the loan as agreed, and the Trust sustained damages as a result of Foster's breach. *See West*, 264 S.W.3d at 446.

Foster argues that the evidence is insufficient to show a valid contract because, although the Credit Agreement contains a promise, the promise is qualified as follows: "I promise to pay to your order, upon the terms and conditions of this Credit Agreement, the principal sum of the Loan Amount Requested shown on the first page of the Credit Agreement, to the extent it is advanced to me or paid on my behalf...." Foster asserts that her promise to pay is "contingent" upon the loan being approved and, because Chase had not yet acted on her application, there could not yet have been a meeting of the minds on the essential terms of the contract, including the amount of the loan and the cost-of-credit terms. She asserts that, although the terms do appear on the Note Disclosure Statement, it is dated May 31, 2007, which is one week after May 23, 2007, the date that the Credit Agreement was signed. She asserts that, although she did sign the Credit Agreement, this, without more, is insufficient to constitute a binding contract.

As discussed above, the Credit Agreement and Note Disclosure Statement, taken together, evidence the essential terms of the loan, including the amount of the loan, and Foster's assent to the terms. Foster's argument overlooks "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). Courts may construe all the documents as if they were part of a single, unified instrument. *Id.*

Foster next argues that the evidence is insufficient to show that Chase disbursed the loan funds because there is not a cancelled check in evidence. As discussed above, the evidence shows that Chase disbursed $25,000.00 on Foster's behalf. To the extent that Foster claims a failure of consideration, such is an affirmative defense that is waived if not pled. *See* TEX. R. APP. P. 33.1; TEX. R. CIV. P. 94 (providing that "failure of consideration" constitutes affirmative defense that must be specifically pleaded). Because Foster did not plead an affirmative defense of failure of consideration, the issue is waived. *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 48

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 35 of 219

Foster v. National Collegiate Student Loan Trust 2007-4, Not Reported in S.W. Rptr....

2018 WL 1095760

(Tex. App.–Houston [1st Dist.] 2008, no pet.) (holding that affirmative defenses not affirmatively pled are waived).

We conclude that there is some evidence to support the trial court's conclusion that Foster breached the student loan agreement and that the Trust suffered damages as a result of the breach. *See Croucher*, 660 S.W.2d at 58 (party challenging legal sufficiency of adverse finding on which she did not have the burden of proof must demonstrate that "no evidence" supports adverse finding); *see also City of Keller*, 168 S.W.3d at 827. We further conclude that the trial court's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Pool*, 715 S.W.2d at 635. Accordingly, we hold that legally and factually sufficient evidence supports the trial court's finding as to Foster's liability.

**C. *Amount of Damages***

**\*11**  Foster further argues that the evidence is insufficient to support the amount of damages awarded because (1) there is no evidence of the Trust's calculation of interest on the loan and (2) there is no evidence that the Trust provided Foster notice of its intent to accelerate the debt or of its actual acceleration of the debt. She asserts that, without evidence of a valid acceleration, the Trust can collect only her past due payments, and she requests a remittitur.

**1. *Interest***

Foster asserts that there is no evidence or insufficient evidence of the Trust's calculation of interest during the term of the loan. In support of her argument, Foster relies on *Williams*. In *Williams*, this Court noted that the material terms of a contract must be agreed upon before a court can enforce the contract, and the interest rate is a material term. 264 S.W.3d at 236; *see T.O. Stanley Boot*, 847 S.W.2d at 221 (holding that interest rate is material term in context of contract to loan money). There, the plaintiff did not produce the parties' actual agreement or any other document establishing the agreed upon terms, including the applicable interest rate or the method for determining the finance charges. *Williams*, 264 S.W.3d at 236. Further, the interest rates in the statements provided by the plaintiff were inconsistent, varying from 5 percent to 22.4 percent, and there was no evidence as to how it calculated the interest rates and finance charges. *Id.*

Here, as discussed above, the evidence includes the Credit Agreement, which, at paragraph D, discusses in detail how interest on Foster's loan was to be calculated throughout the term of the loan and provides for capitalization of interest during deferment. Paragraph I also provides for capitalization of interest and fees upon default. The Note Disclosure Statement states an annual percentage rate of 13.016 percent, with a variable rate, based on the one-month London Interbank Offered Rate, or "LIBOR," index, published in the "Money Rates" section of the Wall Street Journal (Eastern Edition) on the first business day of the preceding calendar month. The Loan Financial Activity report lists the amount of "Interest Accrued" each month on Foster's loan, through November 20, 2013. Foster provides no authority for her assertion that the Trust was required to support its claim with calculations supporting each month's interest computation over the life of the loan.

**2. *Acceleration***

With respect to her assertion that there is no evidence of acceleration, the Disclosure Statement reflects that the Foster agreed to pay the loan over a period of 20 years, beginning in July 2009. The Credit Agreement states that, in the event of a default on the loan, the Trust "will have the right to give [Foster] notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to [the Trust] under the terms of th[e] Credit Agreement are due and payable at once."

"Where the holder of a promissory note has the option to accelerate maturity of the note upon the maker's default, equity demands notice be given of the intent to exercise the option." *Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982). "The accelerated maturity of a note, which is initially contemplated to extend over a period of months or years, is an extremely harsh remedy." *Allen Sales & Servicenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex. 1975). A creditor "must give the debtor an opportunity to pay the past due installments before acceleration of the entire indebtedness; therefore, demand for payment of past due installments must be made before exercising the option to accelerate." *Williamson v. Dunlap*, 693 S.W.2d 373, 374 (Tex. 1985). The note holder must also notify the maker both of its intent to accelerate and of the acceleration. *Ogden*, 640 S.W.2d at 233–34.

**\*12**  There is no evidence in the record before us that the Trust provided Foster with either of the required notices. *See id.* When acceleration is invalid, the plaintiff is entitled to judgment against the defendant only "for past due installments plus accumulated interest as provided in the note." *Williamson*, 693 S.W.2d at 374.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 36 of 219

Foster v. National Collegiate Student Loan Trust 2007-4, Not Reported in S.W. Rptr....

2018 WL 1095760

Foster requests that this Court

> reform the judgment to an amount commensurate with the sum of missed installment payments through the date suit was filed, or enter an order providing for remittitur as an alternative vehicle to accomplish a proper adjustment of the amount of contract damages supported by the record as having been caused by breach of contractural duties.

Foster asserts that the sum of all monthly payments due, beginning on July 12, 2009, as stated in the Note Disclosure Statement, through the date of the filing of suit, January 21, 2016, is $30,134,55.[2]

[2] Calculated as $381.45 monthly for 79 months.

A court of appeals may suggest a remittitur when there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009); *see* TEX. R. APP. P. 46.3. If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial. *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 124.

As set out above, the record contains some evidence that breach-of-contract damages exist, but, without evidence of notice of acceleration, the evidence does not support the full amount awarded by the trial court. The evidence does, however, allow us to determine a lesser award. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877–78, 880 (Tex. 2010) (holding that evidence was legally insufficient to support amount of lost profit damages awarded by trial court, but that there was "legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty," and remanding case to court of appeals

to consider suggestion of remittitur). Based on the record, the evidence is legally and factually sufficient to support a lesser damages finding of $30,134.55, which represents the sum of all monthly payments due, beginning on July 12, 2009, as stated in the Note Disclosure Statement, through the filing of suit, on January 21, 2016. *See PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 513 (Tex. App.–Houston [14th Dist.] 2016, no pet.) (suggesting remittitur to "the highest amount of actual damages supported by the evidence"). Although Foster suggests that an offset is necessary for "any payments made" or other credits, we note that, not only does the record reflect that she did not make any payments on the loan, she did not plead for an offset. *See Zuniga v. Velasquez*, 274 S.W.3d 770, 774 (Tex. App.–San Antonio 2008, no pet.) (holding that "[t]he right of offset is an affirmative defense which must be pleaded and proved by the party asserting it" or it is waived); *see also* TEX. R. APP. P. 94.

We hold that although there is legally and factually sufficient evidence that Foster breached the loan contract, the evidence is legally and factually insufficient to support the full amount of actual damages awarded.

### Conclusion

**\*13** We conclude that the evidence is insufficient to support the trial court's award of actual damages in the amount of $45,277.02, but the evidence is sufficient to support an award of actual damages in the amount of $30,134.55. Thus, we suggest a remittitur of the actual damages award to $30,134.55. In accordance with Rule 46.3 of the Texas Rules of Appellate Procedure, if the Trust files with this Court, within fifteen days of the date of this opinion, a remittitur to that amount, the trial court's judgment on damages will be modified and affirmed. *See* TEX. R. APP. P. 46.3. If the suggested remittitur is not timely filed, the trial court's judgment will be reversed and the cause will be remanded for a new trial on liability and damages. *See Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 152 (Tex. 2012) (holding that if party rejects remittitur, court of appeals must remand for new trial on liability and damages).

### All Citations

Not Reported in S.W. Rptr., 2018 WL 1095760

**End of Document**     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

27 Fed.Appx. 94
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

GENESIS BIO–
PHARMACEUTICALS, INC., Appellant,
v.
CHIRON CORPORATION; Behringwerke
A.G.; Chiron Behringwerke Gmbh & Co.;
Biological And Popular Culture, Inc.;
Chiron Behring GMBH & Co.; Hoechst A.G.,
Genesis Bio–Pharmaceuticals, Inc.,
v.
Chiron Corporation; Behringwerke A.G.;
Chiron Behringwerke GMBH & Co.;
Biological and Popular Culture, Inc.; Chiron
Behring GMBH & Co.; Hoechst A.G.,
Chiron Corporation; Chiron
Behring GMBH & Co., Appellants.

Nos. 00–2981, 00–2983.
|
Argued Nov. 26, 2001.
|
Jan. 10, 2002.

**Synopsis**
Distributor of pharmaceutical products brought action alleging that manufacturer breached an oral agreement for the distribution of a rabies vaccine. The United States District Court for the District of New Jersey, Katharine S. Hayden, J., dismissed complaint. Distributor appealed. The Court of Appeals, Fuentes, Circuit Judge, held that: (1) court could assert attributional jurisdiction over subsidiary, and (2) parol evidence rule barred distributor's effort to introduce evidence outside of agreement.

Affirmed.

**Procedural Posture(s):** On Appeal.

*95 On Appeal from the United States District Court for the District of New Jersey, District Court Judge: The Honorable Katharine S. Hayden, (D.C. Civil No. 98–02445).

**Attorneys and Law Firms**

W. Michael Garner, Esq., (Argued), Cheryl A. Stanton, Esq. Dady & Garner, Minneapolis, MN, for Appellant/Cross–Appellee, Genesis Bio Pharmaceuticals, Inc.

Robert C. Epstein, Esq. (Argued) Jacqueline Greenberg, Esq. Porzio, Bromberg & Newman, Morristown, NJ, for Appellees/Cross–Appellants, Chiron Corporation and Chiron Behring GMBH & Co.

Before ROTH, FUENTES and WEIS, Circuit Judges.

*96 MEMORANDUM OPINION

FUENTES, Circuit Judge.

**1 In this matter, plaintiff Genesis Bio–Pharmaceuticals, Inc. ("Genesis"), a New Jersey-based distributor of pharmaceutical products alleges that defendants Chiron Corporation ("Chiron"), a California company and Chiron Behring, a German company, breached an oral agreement for the distribution of a rabies vaccine in the United States. Genesis claims that the oral agreement was made between itself and Hoechst A.G ("Hoechst"), at a meeting in Frankfurt, Germany and that, at the time the agreement was made, Chiron, a joint venturer with Chiron Behring, had authorized Hoechst to act in its behalf.

Following a series of motions, the District Court, among other decisions: (1) dismissed the complaint against Hoechst for lack of personal jurisdiction, (2) denied Chiron Behring's motion to dismiss for lack of personal jurisdiction, and, (3) dismissed the complaint against Chiron and Chiron Behring, holding that the Parol Evidence Rule barred Genesis' claims. The parties cross-appeal. Discerning no error, we will affirm the rulings of the District Court.

I.

The relevant facts are as follows. Hoechst, a German health care company, is the manufacturer of RabAvert, a rabies vaccine. Sometime between 1989 and 1990, Genesis began to perform marketing consulting work for Hoechst, for

the purpose of becoming the exclusive U.S. distributor of RabAvert.

In February, 1996, Hoechst entered into a joint venture agreement with Chiron. As part of this agreement, Hoechst transferred its entire vaccine business, including the right to produce and distribute RabAvert, to "Chiron Behring," the joint venture entity. Chiron Behring was incorporated and located in Germany. The joint venture agreement gave Chiron ultimate decision-making power with regard to all business decisions concerning the distribution of RabAvert. Shortly thereafter, Hoechst informed Genesis that Chiron was taking over the distribution of RabAvert in the U.S. At this time, Genesis began to demand compensation for its consulting services.

On April 30, 1996, Genesis' president Jerrold Grossman met with representatives from Chiron to discuss a potential distributor relationship. No agreement was reached at this meeting.

On June 27, 1996, Grossman and Genesis' attorney met with Hoechst executives and attorneys in Frankfurt, Germany and reached a settlement agreement (the "Settlement Agreement"). The parties agreed that, among other things;

a) Hoechst would pay $380,000 to Genesis to release Hoechst from "any and all claims which Genesis has ... relating in any way to any and all relationships between the Parties [to the Settlement Agreement], for all time in which the Parties have had a relationship."

b) Hoechst would use "reasonable and diligent efforts ... to assist Genesis in 'negotiating and concluding' an agreement with Chiron and the Joint Venture [Chiron Behring] for the distribution by Genesis of ... RabAvert, in the U.S. on terms that are outlined in the annexed memoranda from Chiron to [Hoechst] ... (with the understanding that Chiron has strategic leadership of the joint venture [Chiron Behring] )," and that,

**2** c) "[t]his Agreement contains the entire agreement of the parties with respect to the subject matter hereof, and all prior understandings, discussions and representations are hereby merged herein." (the "complete integration clause").

Genesis maintains that it was induced to enter into the Settlement Agreement by **97** Hoechst's representation that it had authority to negotiate on behalf of Chiron. In its

complaint, Genesis alleges that the Hoechst representatives began the meeting by projecting onto a screen, two memos that Chiron sent Hoechst, proposing to grant Genesis certain distribution rights to RabAvert and other vaccines.

The first memo, dated May 30, 1996, stated that Chiron "would be prepared to ... sell Genesis all Chiron vaccines, including rabies vaccine, at a price equal to the 'best' distributor price ... for a 5 year period," and "[w]ork with Genesis to 'bid' on contracts for rabies vaccines." The second memo, dated June 21, 1996, stated that "Chiron has offered to sell Genesis ... the complete line of Chiron vaccines at the best price offered to vaccine distributors in the U.S. In addition, we would work with Genesis on "bid requests"... with Genesis receiving a price ... equal to the best price given to any other vaccine distributor ... for that bid. Soon after the Settlement Agreement meeting, Grossman traveled to California ostensibly, to close the deal, and to discuss a distributorship with Chiron. Grossman met only briefly with Chiron's president, who avoided all discussion of a distribution agreement. According to Grossman, Chiron refused to meet again with Grossman, refused to respond to Grossman's request for confirmation of an agreement with it, and claimed that Hoechst had "no authority to speak or negotiate on behalf of Chiron or represent Chiron in any way."

On March 9, 1998, Genesis filed suit in the Superior Court of New Jersey against Chiron, Hoechst, Chiron Behring, and Bio–Pop. Specifically, the suit sought to enforce the alleged Distribution Agreement, or alternatively to recover damages for, among other things, breach of contract, fraud, civil conspiracy and tortious interference. On May 22, 1998, Chiron removed the case to federal district court in New Jersey. Thereafter, Hoechst moved to dismiss the complaint for lack of personal jurisdiction, and for failure to state a claim, contending that the Parol Evidence Rule barred Genesis' claims. Chiron Behring moved to dismiss the complaint for lack of personal jurisdiction. Chiron and Chiron Behring also joined in Hoechst's motion to dismiss based on the Parol Evidence Rule and filed a separate motion to dismiss on the additional grounds of judicial estoppel and absence of an indispensable party.

The District Court first disposed of Genesis' claims against Hoechst by granting Hoechst's motion to dismiss for lack of personal jurisdiction, noting that "Hoechst is a German company, and the settlement agreement was negotiated and executed in Germany, and no allegation evidence

demonstrated that Hoechst ever entered New Jersey or directed activities there."

**\*\*3** After further briefing and oral argument, the District Court denied Chiron Behring's jurisdictional motion, determining that Chiron Behring's "focal role as the manufacturer of the vaccine" in question, and their close corporate relation with Chiron allowed the court to exercise personal jurisdiction over Chiron Behring. However, the court dismissed the complaint against both Chiron and the Chiron Behring, holding that the Parol Evidence Rule excluded any evidence that Chiron and/or Chiron Behring had authorized Hoechst to negotiate an exclusive distribution agreement with Genesis on their behalf. The Court also denied Chiron and Chiron Behring's motion to dismiss on grounds of judicial estoppel, and on the absence of an indispensable party claim.

Genesis appeals the District Court's dismissal of its claims under the Parol Evidence Rule. Chiron and Chiron Behring appeal the District Court's denial of their motion to dismiss against Chiron Behring for lack of personal jurisdiction decision **\*98** and the denial of their judicial estoppel and indispensable party motions.

## II.

### A.

We must first consider the District Court's denial of Chiron Behring's motion to dismiss based on lack of personal jurisdiction. We review a District Court's decisions regarding personal jurisdiction de novo. See, *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.* 75 F.3d 147, 150 (3d Cir.1996) (holding that "whether personal jurisdiction may be exercised over an out-of-state defendant is a question of law, and this court's review is therefore plenary.").

New Jersey's long-arm statute, N.J. Court Rule 4:4–4, has been interpreted as extending jurisdiction over non-residents "to the uttermost limits permitted by the U.S. Constitution." *Charles Gendler Co. v. Telecom Equity Co.* 102 N.J. 460, 469, 508 A.2d 1127 (1986).

Under the Due Process Clause of the Fourteenth Amendment, personal jurisdiction depends upon "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

Here, we find that Chiron Behring is subject to New Jersey personal jurisdiction because of the nature of its corporate relationship with Chiron Corporation. New Jersey courts have determined that a parent corporation's contacts with the forum state may justify exercise of personal jurisdiction over its (wholly-owned) non-resident subsidiary. See, *Moon Carrier v. Reliance Insurance,* 153 N.J.Super. 312, 379 A.2d 517 (1977). The relevant jurisdictional inquiry is "whether the [subsidiary] and the parent ... so operate as single entity, or unified and cohesive economic unit, that when the parent is within venue of court, the [subsidiary] is also within court's jurisdiction; [this] 'single entity' test requires that a parent over which the court has jurisdiction so control and dominate a subsidiary as in effect to disregard the latter's independent corporate existence." *Moon Carrier v. Reliance Insurance,* 153 N.J.Super. 312, 379 A.2d 517 (1977). This court has also used the single entity test. See, e.g., *Lucas v. Gulf & Western Industries, Inc.,* 666 F.2d 800 (Cir.3, 1981).

**\*\*4** Chiron is a multi-national health care company that does business within the State of New Jersey. On the basis of these extensive contacts with the state, Chiron has waived any claims it might have with regards to personal jurisdiction. As the attorney for both Chiron and Chiron Behring admitted at oral argument, Chiron Behring is a wholly-owned subsidiary of Chiron Corporation. There is ample evidence in the record that Chiron dominates Chiron Behring and that the two are acting as a single entity, at least in this matter. For instance, Chiron has ultimate decision making power with regard to all business decisions concerning Chiron Behring (including the distribution of RabAvert). Additionally, both share the same legal counsel in this litigation. Therefore, because of the nature of the relationship between the parent corporation, Chiron, and its wholly-owned subsidiary, Chiron Behring, attributional jurisdiction attaches, and the New Jersey District Court acted properly in exercising personal jurisdiction over Chiron Behring. See, *Lucas v. Gulf & Western Industries, Inc.,* 666 F.2d 800 (Cir.3, 1981) (indicating factors that may have a bearing on attributing the jurisdiction of a subsidiary to a parent corporation); *Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283 (5th Cir.1989) (same).

### **\*99** B.

We next consider the District Court's determination that Genesis failed to state a claim upon which relief could be granted under FRCP 12(b)(6). The district judge granted the

defendant's motion to dismiss, finding that the parol evidence rule barred Genesis' evidence of a completed distribution agreement. For the reasons stated below, we agree with the district judge and will affirm her ruling.

Genesis alleges that there were two aspects to their Settlement Agreement with Hoechst. The first, clearly documented in the Agreement, was Hoechst's $380,000 payment to Genesis for its past efforts. The second was an alleged distribution agreement with Chiron and Chiron Behring. Genesis claims that Chiron and Chiron Behring had [verbally] authorized Hoechst to negotiate at the Frankfurt meeting on their behalf, and that they left that meeting with the essential terms of a distribution agreement hammered out. We agree with the district judge that the parol evidence rule prohibits our consideration of this evidence. See, *Genesis Bio–Pharmaceuticals v. Chiron Corp.* D.C. Civil No. 98–2445 (D.N.J.2000) (determining that if such evidence were allowed into the record, it would allow for the contradiction of the written settlement agreement by "the story of the negotiation" of [the] written contract "as told by the litigant" (quoting *Advanced Medical, Inc. v. Arden Medical Sys., Inc.,* 955 F.2d 188, 195 (3d Cir.1992))).

The parol evidence rule provides that any previous oral representations or agreements, offered to "vary, modify, or supersede the written contract, [are] inadmissible in evidence." *Fr. Winkler KG v. Stoller,* 839 F.2d 1002 (3d Cir.1988); See also, *Compton Press, Inc. Employees' Profit Sharing Retirement Plan v. Granada Investments, Inc.,* 1992 WL 566329 (D.N.J.,1992). (instructing that "the parole evidence rule bars, as a matter of substantive contract law, any attempt to offer oral evidence to vary the terms of a fully integrated written contract").

**\*\*5** The Settlement Agreement in this matter is clearly fully integrated. See, Appellant's Appendix, at A52 (stating that "this Agreement contains the entire agreement of the parties with respect to the subject matter hereof, an all prior understanding, discussions and representations are hereby merged within."). Furthermore, the plain language of the Settlement Agreement requires that Hoechst use "reasonable and diligent efforts ... to assist Genesis in negotiating and concluding an agreement with [Chiron and Chiron Behring] for the distribution by Genesis of Chiron vaccine products." Later in the same paragraph there is a disclaimer that Hoechst's promise to assist Genesis is made "with the understanding that Chiron has strategic leadership of the joint venture."

If Hoechst had truly been "authorized" to negotiate a distribution agreement on behalf of the others, as Genesis contends, then the language in the Settlement Agreement modifying Hoechst's promise "with the understanding that Chiron has strategic leadership of the joint venture" becomes meaningless. Furthermore, if the result of the Frankfurt meeting was "a distribution agreement going forward" between Genesis, Chiron and Chiron Behring, then the language in the Settlement Agreement that Hoechst would subsequently further "assist" Genesis in "negotiating (and concluding)" a distribution agreement with those same parties is superfluous.

The only written evidence that Genesis offers in support of its allegation that it had negotiated a binding distribution agreement with Chiron are the two memos from Chiron to Hoechst. However, these **\*100** documents make no specific mention of any authorization by Chiron and Chiron Behring for Hoechst to conclude a multi-million dollar distribution agreement in their absence. Even when viewing these memos in the light most favorable to Genesis, they require us to draw inferences that are contradicted by the plain language of the Settlement Agreement. We have previously determined that this court is not obliged to accept as true, even at this preliminary stage, such "unsupported conclusions and unwarranted inferences." See, *City of Pittsburgh,* 147 F.3d at 263 (3d Cir.1998). Accordingly, we affirm the ruling of the District Court dismissing this matter for failure to state a claim upon which relief can be granted. In light of this determination, we need not reach Chiron and Chiron Behring's motions to dismiss the complaint based on the judicial estoppel doctrine or the absence of an indispensable party.

### III.

For the reasons set forth above, we affirm the ruling of the District Court denying Chiron Behring's motion to dismiss based on lack of personal jurisdiction. However, we grant Chiron and Chiron Behring's motion to dismiss based on the Parol Evidence Rule.

**All Citations**

27 Fed.Appx. 94, 2002 WL 27261

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 44 of 219

2015 WL 10944445

2015 WL 10944445
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Lawrence HIGGINS, Plaintiff,
v.
FRANK BONIN FUNERAL PARLOR
and Donna George, Defendants.

CIVIL NO. 3:14-CV-581
|
Signed 02/12/2015

**Attorneys and Law Firms**

Lawrence Higgins, Huntsville, TX, pro se.

Anthony T. Bowser, Thomas, Thomas & Hafer LLP, Ira H. Weinstock, Jason M. Weinstock, Ira H. Weinstock, P.C., Harrisburg, PA, for Defendants.

## <u>REPORT AND RECOMMENDATION</u>

Martin C. Carlson, United States Magistrate Judge

### I. <u>Statement of Facts and of the Case</u>

**\*1** This case call upon us to once again consider a curious juxtaposition of issues of life and death.

The plaintiff, Lawrence Higgins, is currently an inmate imprisoned in Texas following his conviction in that state for causing the death of another. (Doc. 14, p.6.) As Higgins has noted the courts in other, related litigation: "Plaintiff knows that he killed a man in Texas ...." (Doc. 13-3, p. 5.)

Higgins' role in the death of another, and his subsequent imprisonment for that death, caused Higgins to be far removed from Pennsylvania in December 2012, when his adult son, Jared Higgins, died. (Doc. 1.) Upon the death of Higgins' son, the Frank J. Bonin Funeral Home, Inc., ("Bonin"), undertook to make arrangements for Jared's burial. (Id.) As part of this sad, funereal process, Bonin contacted Jared Higgins' nearest relative, his spouse who was allegedly residing in Tennessee, to determine the family's wishes with respect to Jared's remains. (Id.) Jared Higgins' wife is then alleged to have executed a waiver form, authorizing Jared's next of kin in Pennsylvania, his mother Donna George, to make these funeral arrangements. (Id.) Donna George, in turn,

authorized the cremation of her child, and Jared's remains were cremated. (Id.)

The performance of this sad duty, a mother's arrangements for her son's funeral, has now become a federal lawsuit. From his prison cell in Texas, Lawrence Higgins brought this action in federal court, suing both Bonin and George. (Id.) Alleging that the disposition of his son's remains was not undertaken in accordance with a Pennsylvania statute governing such matters, 20 Pa. C.S. § 305(b), Higgins' complaint insisted that this cremation was somehow fraudulent and conspiratorial. Higgins then demanded that he be awarded $250,000 in damages as a result of this conduct. (Id.)

This was not Higgins' first legal foray from prison in which this convicted killer has protested the manner in which his son's remains were handled upon his death. Quite the contrary, more than a year prior to the filing of this lawsuit, in April 2013, Higgins filed a nearly identical lawsuit in the Court of Common Pleas of Luzerne County against Bonin and George. (Doc. 13-2.)

We granted Higgins leave to proceed *in forma pauperis* and permitted service of his complaint. The defendants then moved to dismiss this *pro se* complaint. (Docs. 13 and 16.) We recommended that these motions to dismiss be granted, and Higgins' complaint be dismissed. (Doc. 19.) The district court adopted this recommendation dismissing these claims, but allowed Higgins the opportunity to endeavor to amend his complaint upon completion of the parallel state litigation. (Doc. 24.) That litigation has now drawn to a close with the dismissal of Higgins' state complaint. (Doc. 25.) Notwithstanding this failure to state a claim in state court, Higgins now has filed an amended complaint in federal court. (Doc. 27.) Our screening review of this pleading reveals, however, that it simply repeats and restates Higgins' contentions that the cremation of his son's remains was not undertaken in accordance with a Pennsylvania statute governing such matters, 20 Pa. C.S. § 305(b), and that this cremation was somehow fraudulent and conspiratorial. (Id.) Thus, the amended complaint contains all of the flaws and defects previously identified by this Court in Higgins' original complaint; indeed, the amended complaint persists in advancing claims that Higgins has been informed are meritless. Accordingly, for the reasons set forth below, it is recommended that this amended complaint be dismissed with prejudice.

### II. <u>Discussion</u>

Higgins v. Frank Bohin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

## A. Screening of Civil Complaints, Standards of Review

**\*2** This Court has an on-going statutory obligation to conduct a preliminary review of complaints filed by plaintiffs who seek leave to proceed *in forma pauperis.* See 28 U.S.C. §§ 1915 and 1915A. Specifically, we must assess whether a *pro se, in forma pauperis* complaint "fails to state a claim upon which relief may be granted." This statutory text, in turn, mirrors the language of Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. Rule 12(b)(6).

With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal ___ U.S. ____, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's

bald assertions or legal conclusions when deciding a motion to dismiss". Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

**\*3** Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 46 of 219

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has also observed: "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' Twombly, 550 U.S. at 570, 127 S.Ct. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' Id. A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L.Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S.Ct. at 1947. Second, the court should

identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

In addition to these pleading rules, a civil complaint must comply with the requirements of Rule 8(a) of the Federal Rule of Civil Procedure which defines what a complaint should say and provides that:

> (a) A pleading that states a claim for relief must contain (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

**\*4** Applying these benchmarks, we find that Higgins' amended complaint remains subject to dismissal on multiple grounds since the amended complaint still fails to state a claim upon which relief may be granted in federal court. The independent grounds that exist for dismissal of this action are discussed separately below.

## B. Higgins' Amended Complaint Fails on Its Merits

In assessing Higgins' amended complaint, we note that it is well-settled that federal courts are courts of limited jurisdiction. As a general rule, there are two primary grounds for federal district court jurisdiction over a civil lawsuit. First, "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between–(1) citizens of different States." 28 U.S.C. § 1332(a)(1). This ground of federal jurisdiction is known as diversity jurisdiction. The second principal ground for invoking the jurisdiction of a federal court is known as federal question

2015 WL 10944445

jurisdiction. Under this ground of jurisdiction, "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

Here, with respect to Higgins' claims, the amended complaint does not allege any "civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, giving rise to federal question jurisdiction. Indeed, Higgins cannot bring such claims against private parties as civil rights violations pursuant to 42 U.S.C. § 1983, the primary federal civil rights statute. It is well-established that § 1983 does not by its own force create new and independent legal rights to damages in civil rights actions. Rather, § 1983 simply serves as a vehicle for private parties to bring civil actions to vindicate violations of separate, and pre-existing, legal rights otherwise guaranteed under the Constitution and laws of the United States. Albright v. Oliver, 510 U.S. 266, 271 (1994); Graham v. Connor, 490 U.S. 386, 393-94 (1989). Therefore, any analysis of the legal sufficiency of a cause of action under § 1983 must begin with an assessment of the validity of the underlying constitutional and statutory claims advanced by the plaintiff.

In this regard, it is also well-settled that:

> Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. The two essential elements of a § 1983 action are: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of a federally protected right. Parratt v. Taylor, 451 U.S. 527, 535 (1981).

Boykin v. Bloomsburg University of Pennsylvania, 893 F.Supp. 409, 416 (M.D. Pa. 1995), aff'd, 91 F3d 122 (3d Cir. 1996). Thus, it is essential to any civil rights claim brought under § 1983 that the plaintiff allege and prove that the defendant was acting under color of law when that defendant allegedly violated the plaintiff's rights. Therefore, to the extent that the amended complaint continues to seek to hold private parties liable for alleged civil rights violations, it fails to state a valid cause of action under 42 U.S.C. § 1983 since

the statute typically requires a showing that the defendants are state actors. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

*5 Instead, it is evident that Higgins must proceed under this Court's diversity jurisdiction when bringing a civil action as a Texas inmate against these private parties in Pennsylvania "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between– (1) citizens of different States." 28 U.S.C. § 1332(a)(1). However, we find that this amended complaint still fails as a matter of law as a Pennsylvania state law claim brought in federal court based upon diversity of citizenship.

The defects in this amended complaint are manifold. First, to the extent that Higgins is alleging a fraud claim, this spare, bare-bones pleading continues to fail to adequately plead this type of claim. Under the Federal Rules of Civil Procedure, when a plaintiff like Higgins alleges fraud, it is incumbent upon the plaintiff to: "comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity. In order to satisfy Rule 9(b), plaintiffs must plead with particularity 'the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'. Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Lum v. Bank of America, 361 F.3d 217, 223-4 (3d Cir. 2004)(citations omitted.) Thus, "[p]ursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify ' "the who, what, when, where, and how: the first paragraph of any newspaper story.' " Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)). 'Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting In re Nice Sys., Ltd. Secs. Litig., 135 F.Supp.2d 551, 577 (D.N.J. 2001), emphasis supplied)." Animal Science Products, Inc. v. China Nat. Metals & Minerals Import & Export Corp., 596 F.Supp.2d 842, 878 (D.N.J.,2008). "The rule applies not only to fraud actions under federal statutes, but to fraud claims based on

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 48 of 219

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

state law." Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96, 99 (3d Cir. 1983).

Therefore, Higgins must comply with Rule 9(b) in pleading this fraud claim, and we find that he has not done so in his amended complaint. This failure of pleading, however, continues to mask a more profound failure of substance in this case. At bottom, the gravamen of Higgins' claim is that Bonin and George failed to comply with the Pennsylvania statute governing disposition of a decedent's remains, 20 Pa. C.S. § 305, in ways which were somehow fraudulent, and give rise to a private right of action under Pennsylvania law.

In this regard, Higgins' claims rest upon a fundamental misreading of this state statute. While 20 Pa. C.S. § 305 prescribes procedures for disposition of human remains in Pennsylvania, nothing in the statute authorizes a private cause of action for damages against Funeral directors or family members of the deceased. As a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000). Under Pennsylvania law, state courts are typically extremely reluctant to imply a cause of action for damages from a state statute in the absence of some specific expressed intent by the legislature to permit such a cause of action. Rather, it is well-settled that: "The violation of a statute and the fact that some person suffered harm does not automatically give rise to a private cause of action in favor of the injured person. This court will not engraft a private cause of action onto the statute without further guidance from the General Assembly." Estate of Witthoeft v. Kiskaddon, 557 Pa. 340, 348, 733 A.2d 623, 627 (1999), See Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacher, Inc., 437 Pa. Super. 391, 650 A.2d 83 (1994).[1] Since no such legislative intent to allow damages claims has been expressed by the General Assembly, we should not gratuitously engraft such a cause of action upon this statute, and this claim fails as a matter of law.

[1] Our conclusion that § 305 does not give rise to a private cause of action under state law is further bolstered by the fact that Pennsylvania recognizes an independent common law cause of action " against '[a] person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body.' Papieves v. Kelly, 437 Pa. 373, 376–379, 263 A.2d 118 (Pa. 1970) (noting the rule of recovery set forth in the Restatement of

Torts § 868 (1939)). This tort has been narrowly interpreted to protect 'the right of a decedent's nearest relatives ... against intentional, outrageous or wanton conduct that is peculiarly calculated to cause them serious mental or emotional distress.' Id. at 378, 263 A.2d 118; see also Hackett v. United Airlines, 364 Pa.Super. 612, 528 A.2d 971, 974 (Pa. Super. Ct. 1987) (noting that Papieves 'expressly limits [§ 868 claims] to infliction of distress through intentional, outrageous or wanton behavior calculated to bring about such distress')." Beaky v. Cnty. of Bucks, CIV.A. 08-1251, 2009 WL 2390224 (E.D. Pa. Aug. 3, 2009). We further note that Higgins has not alleged well-pleaded facts which would give rise to a claim of wanton mistreatment of a body under Pennsylvania law. Rather, as discussed below, the well-pleaded facts in this complaint indicate that Jared's remains were disposed of in a manner which was entirely in accordance with state law.

**\*6** More fundamentally, the facts alleged by Higgins still do not describe a violation of 20 Pa. C.S. § 305 by either of the defendants named in this complaint. In pertinent part, this statute provides for the following procedure for disposition of human remains:

**(b) Disposition of the remains of a deceased spouse.** —Absent an allegation of enduring estrangement, incompetence, contrary intent or waiver and agreement which is proven by clear and convincing evidence, a surviving spouse shall have the sole authority in all matters pertaining to the disposition of the remains of the decedent.

**(c) Disposition of the remains of others.**—If there is not a surviving spouse, absent an allegation of enduring estrangement, incompetence, contrary intent or waiver and agreement which is proven by clear and convincing evidence, the next of kin shall have sole authority in all matters pertaining to the disposition of the remains of the decedent.

20 Pa. C.S. §§ 305 (b) and (c).

Under Pennsylvania law, "next of kin" is then defined in a hierarchical fashion, and in a way which would permit the decedent's parent, in this case Jared's mother, to act on his behalf once a spouse had waived her rights to dispose of his remains. See 20 Pa.C.S. § 2103.

2015 WL 10944445

According to Higgins' complaint, the process contemplated by Pennsylvania law is precisely what happened here. Upon Jared's death, the funeral director contacted the first decision-maker provided for under state law, Jared's surviving spouse. Once the spouse waived her rights to make decisions regarding Jared's remains, his next of kin in Pennsylvania, his mother, made these end-of-life choices on behalf of her deceased son.

Ignoring this plain language of § 305, authorizing what occurred here, Higgins insists that § 305(d), of Title 20, Pennsylvania Consolidated Statutes, created some substantive rights on his behalf to contest this cremation. That provision of state law provides as follows: "(d) Procedure. —Where a petition alleging enduring estrangement, incompetence, contrary intent or waiver and agreement is made within 48 hours of the death or discovery of the body of the decedent, whichever is later, a court may order that no final disposition of the decedent's remains take place until a final determination is made on the petition." 20 PA. C.S. § 305 (d). Contending that various family members were estranged at the time of Jared's death, Higgins seems to suggest that this statutory text, which merely provided a procedural mechanism for the resolution of family disputes regarding the disposition of human remains prior to internment, also created some form of substantive, free-standing right on his part to collect damages from those who arranged this funeral years after his son's death. Mindful of the fact that Pennsylvania courts "will not engraft a private cause of action onto the statute without further guidance from the General Assembly," Estate of Witthoeft v. Kiskaddon, 557 Pa. 340, 348, 733 A.2d 623, 627 (1999), we conclude that this procedural tool for intervening in the disposition of remains prior to a burial, a tool which Higgins never utilized, simply does not create some substantive right to sue for damages after-the-fact.

In sum, since the well-pleaded facts in Higgins' complaint reveals that the defendants did not violate 20 Pa.C.S. § 305, and further disclose that Higgins is not entitled to lodge a claim for damages under this state statute, Higgins claims fail as a matter of law and should be dismissed. [2]

[2]     Higgins' failure to set forth facts describing a substantive violation of state law is also fatal to any civil conspiracy claim which he attempts to bring under Pennsylvania law since a civil conspiracy claim cannot exist under state law without some underlying substantive violation of state law. See Price ex rel. O.P. v. Scranton Sch. Dist., CIV.A.

11-0095, 2012 WL 37090 (M.D. Pa. Jan. 6, 2012) citing Rose v. Wissinger, 294 Pa.Super. 265, 439 A.2d 1193, 1199 (Pa. Super. Ct. 1982). In short, under Pennsylvania law you may not sue parties for conspiring to take acts that were otherwise lawful.

## C. The Rooker-Feldman Doctrine Also Bars Consideration of This Case

**\*7** Further, we note that, according to Higgins, the state courts have recently rejected the state law claims that Higgins is now attempting to present in this lawsuit. Therefore, at this juncture, Higgins has filed an amended civil action which invites this Court to set aside findings made by state courts in the course of state litigation instigated by the plaintiff. In essence, the plaintiff urges us to sit as a state appellate court and review, re-examine and reject these state court rulings in his parallel state case.

This we cannot do. Indeed, the United States Supreme Court has spoken to this issue and has announced a rule, the Rooker-Feldman doctrine, which compels federal district courts to decline invitations to conduct what amounts to appellate review of state trial court decisions. As described by the Third Circuit:

That doctrine takes its name from the two Supreme Court cases that gave rise to the doctrine. Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine is derived from 28 U.S.C. § 1257 which states that "[f]inal judgments or decrees rendered by the highest court of a state in which a decision could be had, may be reviewed by the Supreme Court....". See also Desi's Pizza, Inc. v. City of Wilkes Barre, 321 F.3d 411, 419 (3d Cir. 2003). "Since Congress has never conferred a similar power of review on the United States District Courts, the Supreme Court has inferred that Congress did not intend to empower District Courts to review state court decisions." Desi's Pizza, 321 F.3d at 419.

Gary v. Braddock Cemetery, 517 F.3d 195, 200 (3d Cir. 2008).

Because federal district courts are not empowered by law to sit as reviewing courts, reexamining state court decisions, "[t]he Rooker-Feldman doctrine deprives a federal district court of jurisdiction in some circumstances to review a state court adjudication." Turner v. Crawford Square Apartments

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 50 of 219

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)
2015 WL 10944445

III, LLP, 449 F.3d 542, 547 (3d Cir. 2006). Cases construing this jurisdictional limit on the power of federal courts have quite appropriately:

> [E]mphasized the narrow scope of the Rooker-Feldman doctrine, holding that it "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." [Exxon Mobil Corp. v. Saudi Basic Industries Corp.], 544 U.S. at 284, 125 S.Ct. at 1521-22; see also Lance v. Dennis, 546 U.S. 459, ____, 126 S.Ct. 1198, 1201, 163 L.Ed.2d 1059 (2006)

Id.
However, even within these narrowly drawn confines, it has been consistently recognized that the Rooker-Feldman doctrine prevents federal judges from considering lawsuits "brought by state-court losers complaining of injuries caused by state-court judgments ... and inviting district court review and rejection of those judgments." This principle applies here and compels dismissal of this case, to the extent that Higgins improperly invites us to act as a Pennsylvania appellate court for matters and claims relating to a state litigation arising out of the plaintiff's parallel state lawsuit.

### D. This Amended Complaint Should Be Dismissed With Prejudice

Having conducted this second legal analysis of Higgins' pleadings and determined that this amended complaint is still wanting, we recognize that in civil cases *pro se* plaintiffs often should be afforded an opportunity to amend a complaint before the complaint is dismissed in its entirety, see Fletcher-Hardee Corp. v. Pote Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless granting further leave to amend would be futile or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). In this case the Court has previously provided the plaintiff with an opportunity to amend these pleadings, but to no avail. The current amended complaint still fails to state a viable civil cause of action against these defendants, and actually repeats assertions that were previously found to be legally insufficient. Since the plaintiff has been afforded an opportunity to correct the deficiencies identified in this prior complaint with respect to these defendants, has failed to state a viable civil cause of action, and the factual and legal grounds proffered in support of the amended complaint make it clear that the plaintiff has

no right to relief, granting further leave to amend would be futile or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). Therefore, it is recommended that the amended complaint be dismissed without further leave to amend.

### III. Recommendation

**\*8** Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the plaintiff's amended complaint (Doc. 27.), should be dismissed with prejudice.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 51 of 219
Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)
2015 WL 10944445

that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 12th day of February, 2015.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 10944445

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 53 of 219

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10943833
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Lawrence HIGGINS, Plaintiff,
v.
FRANK BONIN FUNERAL PARLOR
and Donna George, Defendant.

3:14-CV-00581
|
Signed 04/20/2015

**Attorneys and Law Firms**

Lawrence Higgins, Huntsville, TX, pro se.

Anthony T. Bowser, Thomas, Thomas & Hafer LLP, Ira H. Weinstock, Jason M. Weinstock, Ira H. Weinstock, P.C., Harrisburg, PA, for Defendant.

**ORDER**

Robert D. Mariani, United States District Judge

**\*1 AND NOW, THIS 20th DAY OF APRIL, 2015**, upon *de novo* review of Magistrate Judge Carlson's Report and Recommendation and all related filings, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's Objections (Doc. 29) are **OVERRULED**.

2. The Report and Recommendation (Doc. 28) is **ADOPTED**, for the reasons stated therein.

3. Plaintiff's Amended Complaint (Doc. 27) is **DISMISSED WITH PREJUDICE**.

4. The Clerk of Court is **DIRECTED** to close the case.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 10943833

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

629 Fed.Appx. 168
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Lawrence HIGGINS, Appellant
v.
FRANK BONIN FUNERAL
PARLOR; Donna George.

No. 15–2107.
|
Submitted for Possible Dismissal
Pursuant to 28 U.S.C. § 1915(e)(2) or
Summary Action
|
Pursuant to Third Circuit LAR 27.4 and
I.O.P. 10.6 Nov. 13, 2015.
|
Opinion filed: Nov. 17, 2015.

**Synopsis**
**Background:** Father brought action against funeral home and
his son's ex-wife, claiming that the cremation of his son's
remains violated his rights as next of kin under Pennsylvania
law. The United States District Court for the Middle District
of Pennsylvania, Robert D. Mariani, J., dismissed for failure
to state a claim. Father appealed.

**Holdings:** The Court of Appeals held that:

father waived his right to challenge son's wife's right to
determine the disposition of his son's remains, and

father failed to state a claim of fraud with particularity.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*169** On Appeal from the United States District Court for
the Middle District of Pennsylvania, (D.C. Civ. No. 3–14–cv–
00581), District Judge: Honorable Robert D. Mariani.

**Attorneys and Law Firms**

Lawrence Higgins, Huntsville, TX, pro se.

Anthony T. Bowser, Esq., Thomas, Thomas & Hafer, Ira H.
Weinstock, Esq., Jason M. Weinstock, Esq., Harrisburg, PA,
for Frank Bonin Funeral Parlor; Donna George.

Before: AMBRO, SHWARTZ and GREENBERG, Circuit
Judges.

OPINION [*]

[*]     This disposition is not an opinion of the full Court
        and pursuant to I.O.P. 5.7 does not constitute
        binding precedent.

PER CURIAM.

Lawrence Higgins appeals from an order of the District Court
dismissing his amended complaint with prejudice. For the
following reasons, we will summarily affirm.

Higgins is incarcerated in the State of Texas. His adult
son, Jared Higgins, died in Pennsylvania on December 28,
2012, and upon his death, the Frank J. Bonin Funeral Home
of Hazelton, Pennsylvania undertook to make arrangements
for disposing of Jared's remains. His surviving spouse,
Brandy Prast of Tennessee, was contacted by the Funeral
Home and she waived her statutory right to dispose of her
husband's remains in favor of his biological mother and
Higgins' ex-wife, Donna George, apparently also of Hazelton,
Pennsylvania, who then arranged for cremation on January 3,
2013.

Higgins filed suit in the United States District Court for
the Middle District of Pennsylvania against the Funeral
Home and Ms. George, alleging that the cremation was in
violation of his rights as next of kin and not undertaken in
accordance with the governing Pennsylvania statute, 20 Pa.
Cons.Stat. Ann. § 305. Higgins alleged that Jared and Brandy
were "enduringly estranged," and that Brandy's waiver was
fraudulently obtained by the conspiring defendants. Higgins
appeared to invoke jurisdiction in the federal courts on the

ground that the written waiver executed by Jared's surviving spouse had crossed state lines. Higgins demanded money damages.

The defendants moved separately to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6). The Magistrate Judge filed a Report and Recommendation, in which he recommended that the motions be granted. The Magistrate Judge noted the following deficiencies in the complaint: that the suit could not proceed under 42 U.S.C. § 1983 because the defendants are private parties and not state actors; that the complaint failed to state a plausible claim for fraud and conspiracy under Fed.R.Civ.P. 8(a), 9(b); that § 305 prescribes procedures for the disposition of human remains but nothing in the statute authorizes a cause of **\*170** action for damages against funeral directors or family members of the deceased; and that the facts alleged by Higgins did not describe a violation of § 305(b) and (c) by either of the defendants in any event. The District Court adopted the recommendation, but allowed Higgins to amend his complaint upon the completion of a similar lawsuit he had filed in Pennsylvania state court.[1]

[1]    Higgins filed a similar lawsuit in the Luzerne County Court of Common Pleas in April, 2013.

When that state lawsuit was dismissed, Higgins filed an amended complaint, which restated and repeated his contention that the cremation of his son's remains was in violation of his rights and wishes, not undertaken in accordance with § 305, and based on a fraudulent waiver by the surviving spouse. He asserted jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332(a)(1). Higgins specifically alleged that the Funeral Home and Ms. George knew how to contact him in Texas but instead conspired to obtain a waiver from Jared's estranged wife in favor of Ms. George. He observed that he too is a next of kin, and he stated that he "was excluded because of his ex[-]wife[']s pure hate and for no other reason." In an apparent attempt to state his fraud claim with particularity, Higgins asserted that the written waiver executed by the surviving spouse was fraudulent because it was undated and not notarized. Higgins attached a copy of the Waiver of Rights obtained by the Funeral Home from the surviving spouse to his amended complaint.

The Magistrate Judge recommended that the amended complaint be dismissed with prejudice for failure to state a claim upon which relief may be granted, Fed.R.Civ.P.

12(b)(6), noting that it did not cure the previously-noted deficiencies. In an order entered on April 20, 2015, the District Court approved and adopted the Magistrate Judge's Report and Recommendation and dismissed the amended complaint with prejudice.

Higgins appeals. We have jurisdiction under 28 U.S.C. § 1291. Our Clerk granted him leave to appeal *in forma pauperis* and advised him that the appeal was subject to summary dismissal under 28 U.S.C. § 1915(e)(2)(B) or summary action under Third Cir. LAR 27.4 and I.O.P. 10.6. He was invited to submit argument in writing, and he has done so. He argues, as he did in the proceedings below, that the Waiver of Rights is fraudulent because it is undated.

We will summarily affirm the order of the District Court because no substantial question is presented by this appeal, Third Circuit LAR 27.4 and I.O.P. 10.6. We exercise plenary review over Rule 12(b)(6) dismissals. *See Weston v. Pennsylvania,* 251 F.3d 420, 425 (3d Cir.2001). Dismissal under Rule 12(b)(6) is proper where the amended complaint fails to state a claim upon which relief may be granted, such as where the plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Conclusory allegations are insufficient to survive a motion to dismiss. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009).

Although we agree with the Magistrate Judge and the District Court that there is no private right of action for damages **\*171** under 20 Pa. Cons.Stat. Ann. § 305 itself, Pennsylvania recognizes that one who wantonly mistreats or, acting without privilege, intentionally withholds the body of a decedent, is liable in tort to the member of the decedent's family who is entitled to dispose of the body. *Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118, 120 (1970). This cause of action includes the right to recover money damages for physical harm resulting from mental suffering. *Id.* As a threshold matter, we note that Higgins did not allege physical harm. In addition to that pleading deficiency, we agree with the Magistrate Judge and the District Court that he also cannot state a plausible tort claim based on his allegation that § 305 was violated because that statute was not violated. Instead, Higgins forfeited his rights because he failed to comply with

the statute's procedure for challenging the surviving spouse's rights.

Section 305(b) of the Pennsylvania Probate, Estates and Fiduciaries Code provides that the surviving spouse shall have the sole authority to dispose of a deceased spouse's remains, unless there is proof by clear and convincing evidence that the couple are "enduringly estranged" as follows:

> (b) Disposition of the remains of a deceased spouse.—Absent an allegation of enduring estrangement, incompetence, contrary intent or waiver and agreement which is proven by clear and convincing evidence, a surviving spouse shall have the sole authority in all matters pertaining to the disposition of the decedent.

20 Pa. Cons.Stat. Ann. § 305(b). Enduring estrangement means "[a] physical and emotional separation from the deceased at the time of death of the person authorized by this section to determine the final disposition of the decedent's remains, which has existed for a period of time that clearly demonstrates an absence of due affection, trust and regard for the deceased." *Id.* at § 305(e).

To challenge the surviving spouse's right, a timely petition must be filed in state court. The statute provides that "[w]here a petition alleging enduring estrangement ... is made within 48 hours of the death or discovery of the body of the decedent ... a court may order that no final disposition of the decedent's remains take place until a final determination is made on the petition." *Id.* at § 305(d). [2] Higgins does not allege that he filed this required petition.

[2]
> The person filing the petition must then give "[n]otice to each person with equal or higher precedence than the petitioner to the right to dispose of the decedent's remains and to his attorney if known and to the funeral home or other institution where the body is being held...." *Id.*

We note that the statute further provides that "[i]f there is not a surviving spouse [and] absent an allegation of enduring estrangement.... which is proven by clear and convincing evidence, the next of kin shall have sole authority in all matters pertaining to the disposition of the remains of the decedent," *id.* at 305(c). Under the governing statute, that would be the deceased's parents, including Higgins *and* Ms. George, *see* 20 Pa. Cons.Stat. Ann. § 2103. The statute further provides that "[i]f two or more persons with equal standing as next of kin disagree on disposition of the decedent's remains, the authority to dispose shall be determined by the court, with preference given to the person who had the closest relationship with the deceased," *id.* at § 305(d)(2). Unfortunately for Higgins, these provisions, which might have given him room for argument, only apply if there is no surviving spouse. We agree with him that Pennsylvania law respects the rights of the next of kin equally. **\*172** *See Kulp v. Kulp,* 920 A.2d 867, 873 (Pa.Super.Ct.2007) ("[T]he rights and feelings of the next of kin are paramount, where there is no surviving spouse[. Mother and Father] ... stand on equal footing as Son's next of kin."). But the rights of the next of kin are only at issue if (a) there is no surviving spouse, or (b) a petition alleging enduring estrangement has been filed and proven. In short, Higgins failed to involve the state courts in a timely fashion in the first instance by filing the required petition under § 305(d) alleging enduring estrangement, and thus he cannot state a plausible tort claim based on a violation of § 305(c).

In order to overcome his failure to timely involve the state courts in the matter of his wishes for a burial, Higgins alleged in his amended complaint that the defendants engaged in a fraud and conspiracy to deprive him of his rights as next of kin by negotiating a waiver of rights from the surviving spouse in favor of Ms. George. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). A plaintiff may satisfy Rule 9(b)'s particularity requirement by alleging who made a misrepresentation to whom and the general content of the misrepresentation, or otherwise by "injecting precision and some measure of substantiation into their allegations of fraud." *Lum v. Bank of America,* 361 F.3d 217, 223–24 (3d Cir.2004) (citation omitted). *See also Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007) (same).

Higgins' allegations of fraud do not satisfy Rule 9(b)'s particularity requirement. Something more must be alleged to state a plausible claim for fraud than that the written waiver obtained by the Funeral Home from Jared's surviving spouse was undated. Higgins' claim that Ms. George unlawfully conspired with the Funeral Home to achieve the right to

dispose of their son's remains is speculative and conclusory. We have examined the written waiver and nothing on the face of this exhibit to the amended complaint suggests that the Funeral Home fraudulently obtained the surviving spouse's waiver. Moreover, the circumstances do not suggest fraud, given that Ms. George stands on equal footing with Higgins as Jared's next of kin, *see Kulp,* 920 A.2d at 873, and lives in the area, whereas Higgins is domiciled in a faraway state and his liberty is restricted. The allegations of fraud simply are insufficient to survive a motion to dismiss. *See Fowler,* 578 F.3d at 210.

For the foregoing reasons, we will summarily affirm the order of the District Court dismissing the amended complaint with prejudice.

**All Citations**

629 Fed.Appx. 168

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 60 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

2020 WL 5049402
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

IN RE NATIONAL COLLEGIATE
STUDENT LOAN TRUSTS LITIGATION

CONSOLIDATED C.A. No. 12111-VCS
|
Date Submitted: June 5, 2020
|
Date Decided: August 27, 2020

**Attorneys and Law Firms**

Garrett B. Moritz, Esquire, Benjamin Z. Grossberg, Esquire and S. Reiko Rogozen, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware, Attorneys for NC Residuals Owners Trust and NC Owners LLC.

Kimberly A. Evans, Esquire and Rebecca A. Musarra, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware and Lance Gotthoffer, Esquire of Chaitman, LLP, New York, New York, Attorneys for The National Collegiate Master Student Loan Trust I, The National Collegiate Student Loan Trust 2003-1, The National Collegiate Student Loan Trust 2004-1, The National Collegiate Student Loan Trust 2004-2, The National Collegiate Student Loan Trust 2005-1, The National Collegiate Student Loan Trust 2005-2, The National Collegiate Student Loan Trust 2005-3, The National Collegiate Student Loan Trust 2006-1, The National Collegiate Student Loan Trust 2006-2, The National Collegiate Student Loan Trust 2006-3, The National Collegiate Student Loan Trust 2006-4, The National Collegiate Student Loan Trust 2007-1, The National Collegiate Student Loan Trust 2007-2, The National Collegiate Student Loan Trust 2007-3, The National Collegiate Student Loan Trust 2007-4.

Catherine A. Gaul, Esquire of Ashby & Geddes, P.A., Wilmington, Delaware and Michael Hanin, Esquire and Uri Itkin, Esquire of Kasowitz Benson Torres LLP, New York, New York, Attorneys for AG Mortgage Value Partners Master Fund, L.P., AG Opportunistic Whole Loan Select, L.P., AG Pisgah, L.P., AG Super RMBS LLC, AG TCDRS, L.P., AG Strategic ABS Fund Master, L.P., One William Street Capital Master Fund, Ltd., OWS Credit Opportunity I, LLC, OWS Global Fixed Income Fund (USD-Hedged), Ltd., LibreMax Master Fund, Ltd., LibreMax Value Master Fund, Ltd., LibreMax MSW Fund, Ltd.., Waterfall Delta Offshore Master Fund, LP, Waterfall Eden Master Fund, Ltd., and Waterfall Sandstone Fund LP.

John W. Shaw, Esquire and Jeffrey T. Castellano, Esquire of Shaw Keller LLP, Wilmington, Delaware and Matthew A. Martel, Esquire, Joseph B. Sconyers, Esquire, Keith M. Kollmeyer, Esquire and Anthony M. Masero, Esquire of Jones Day, Boston, Massachusetts, Attorneys for U.S. Bank National Association.

Kurt M. Heyman, Esquire and Melissa N. Donimirski, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware and Erik Haas, Esquire, Joshua Kipnees, Esquire, George A. LoBiondo, Esquire, Jared Buszin si, Peter Shakro, Esquire, Devon Hercher, Esquire and Jonah Wacholder, Esquire of Patterson Belknap Webb & Tyler LLP, New York, New York, Attorneys for Ambac Assurance Corporation.

Jason C. Jowers, Esquire, Stephen B. Brauerman, Esquire, Brett M. McCartney, Esquire and Elizabeth A. Powers, Esquire of Bayard, P.A., Wilmington, Delaware, Attorneys for Wilmington Trust Company.

Rebecca L. Butcher, Esquire and Jennifer L. Cree, Esquire of Landis Rath & Cobb LLP, Wilmington, Delaware and John P. Doherty, Esquire and William Hao, Esquire of Alston & Bird LLP, New York, New York, Attorneys for GSS Data Services, Inc.

Stacey A. Scrivani, Esquire of Stevens & Lee, P.C., Wilmington, Delaware, Attorney for Pennsylvania Higher Education Assistance Agency d/b/a American Educational Services.

**OPINION**

SLIGHTS, Vice Chancellor

*1 The key constituents of several related Delaware statutory trusts cannot agree on how the trusts should be governed or how they should operate. Several of the constituents brought discreet operational controversies before the Court in separately filed lawsuits. When it became clear the disputes between the parties ran deeper than what was alleged in these lawsuits, all interested parties agreed to

2020 WL 5049402

consolidate the actions so that multiple competing requests for declaratory relief could be joined for decision in cross-motions for judgment on the pleadings. [1]

[1]  This procedural posture is the product of a planning session, for lack of a better description, between the Court and all interested parties. The Court scheduled the planning session after discerning that the fundamental disagreements related to the governance and operation of the trusts were disabling the trusts from functioning. Having now wrestled with more than 100 competing requests for declaratory relief, all I can say is that the plan to tee up core disputes related to the trusts sounded like a good idea at the time. *See* 10 *Del. C.* § 6503 (providing, under Delaware's Declaratory Judgments Act, that the court may "construe a [a contract] either before or after there has been a breach thereof"). I have done my best to forge through the labyrinth of the requested declarations and cross-declarations and thank the parties for gallant efforts to provide lit torches along the way. While I have addressed the discreet questions of law that have been submitted for decision, this Opinion will not resolve all of the parties' disputes. For example, in this procedural posture, the Court cannot decide questions of authority or propriety regarding specific acts that have been taken on behalf of the Trusts (*e.g.*, directions that purported to appoint counsel to represent the Trusts). As will become clear, the applicable contracts are extremely complex, and it would be improper to decide such questions without a well-developed factual record and the benefit of specific briefing. With that being said, I trust this Opinion is a valuable first step toward bringing clarity to the parties as they sort through broader aspects of their disagreements regarding the trusts' governance and operations.

The trusts at issue are offshoots of the National Collegiate Student Loan Master Trust I (collectively, the "Trusts"). Each are Delaware statutory trusts formed between 2003 and 2007 for the narrow purpose of acquiring and servicing a sizable portfolio of student loans (the "Student Loans"). [2] According to the Trusts' constitutive documents (the "Trust Agreement(s)"), the Trusts' purpose was to be implemented in three basic steps.

[2]  Trust Agreement § 2.03(a) (JC0586) ("The purpose of the Trust is to engage in the following activities and only these activities."); Joint Compendium of Contracts (D.I. 404) ("Joint Compendium") (citing specific contracts as JC ____). The Court follows the parties' convention of citing the applicable contracts by providing a reference to the page number of the relevant contract as organized in the Joint Compendium.

**\*2** *First*, the Trusts "acquire[d] a pool of Student Loans" with proceeds from the issuance of debt instruments (the "Notes"). [3] *Second*, upon acquiring the Student Loans, the Trusts entered into an Indenture (the "Indenture(s)"). [4] In the Indenture, the Trusts granted all "right, title and interest in" the Student Loans to U.S. Bank National Association as Indenture Trustee ("U.S. Bank" or the "Indenture Trustee"). [5] The Indenture made clear that the Trusts transferred the Student Loans to the Indenture Trustee "for the benefit of the holders of the Notes" (the "Noteholders," further defined below). [6] *Third*, the Trusts promised to "provide for" the "administration" and the "servicing of the Student Loans." [7]

[3]  Trust Agreement § 2.03(a)(i) (JC0586).

[4]  Trust Agreement § 2.03(a)(i) (JC0586).

[5]  Trust Agreement § 2.03(a)(i) (JC0586); Indenture (Granting Clause) (JC2760).

[6]  Trust Agreement § 2.03(a)(i) (JC0586); Indenture (Granting Clause) (JC2760).

[7]  Trust Agreement § 2.03(a)(ii) (JC0586); Trust Agreement § 3.02(b) (JC0588); Def./Countercl. Pl. Wilm. Tr. Co.'s Verified Countercl. for Declaratory J. ("Owner Trustee Counterclaim") (D.I. 393) ¶ 31.

Each of the three steps has occurred as planned. Taken together, they form the heart of a securitization transaction whereby the Trusts acquired pools of Student Loans and then issued debt securities (backed by the Student Loans) to the Noteholders. Under this transaction structure, the Trusts serve as special purpose vehicles designed to separate the Student Loans from the balance sheets of the financial institutions that first extended credit to the borrowers.

Consistent with the limited "activities" in which the Trusts are to engage, the Trusts have no officers or employees, and only one entity, Wilmington Trust Company (the "Owner

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 62 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

Trustee"), possesses the right to "act on behalf of the Trust[s]." [8] The Owner Trustee now finds itself in the middle of a tug of war between various parties with various economic interests in the Trusts.

8    Trust Agreement § 3.02(b)(i) (JC0586).

Broadly speaking, the Trusts' stakeholders have broken into two factions. On the one side, the holders of residual beneficial interests in the Trusts (the "Owners," further defined below) characterize the broader controversy as a "dispute between equity and debt." [9] According to the Owners, they represent the Trusts' equity interests—in that they are the beneficiaries of proceeds from the Student Loans if (and only if) the Notes are paid off—while other deal constituents are mere creditors of the Trusts. In short, they believe the measure of all other parties' rights is their respective bargained-for contractual rights, and *only* those rights. With this in mind, the Owners maintain they can direct the Owner Trustee to do anything with respect to the Trusts as long as the directions fit within certain contractual boundaries.

9    *See* Pls.' Single Combined Reply Br. to Defs.' Joint Answering Br., U.S. Bank's Opp'n with Respect to Pls.' Proposed Decl. D, and GSS's Individual Answering Br. ("PRB") (D.I. 450) at 1.

Pulling the Owner Trustee in the other direction are the Indenture Trustee, the Noteholders and the reinsurer for certain of the Notes, Ambac Assurance Corporation ("AMBAC," together with the Indenture Trustee and the Noteholders, the "Indenture Parties"), all of whom have lined up to argue they are more than mere creditors. Indeed, the Indenture Parties read the Indenture as creating an assignment of the Trusts' interests in the Student Loans for the benefit of the Indenture Parties. For this reason, they maintain the Owners lack any plenary authority to control the Trusts, and certainly have no right to cause the Trusts to enter into self-dealing transactions.

 **\*3**  The parties' vastly different interpretations of the Trusts' governing documents, and of the resulting transactional structure they created, have left the Trusts in a state of near paralysis. Third parties interacting with the Trusts cannot determine who actually speaks for the Trusts and who has authority to bind the Trusts. The full extent of the Trusts' dysfunction was perhaps most vividly exposed when, on May 31, 2020, the United States District Court for the District

of Delaware held that the Trusts' purported act of resolving claims brought against the Trusts by the Consumer Financial Protection Bureau (the "CFPB") for alleged unfair loan collection practices was ineffective. Specifically, the court determined that the proposed consent judgment effecting the settlement was executed on behalf of the Trusts by a party who lacked authority to bind the Trusts. [10]

10    *See Consumer Fin. Prot. Bureau v. The Nat'l Collegiate Master Student Tr., et al.*, 2020 WL 2915759 (D. Del. May 31, 2020) (the "CFPB Decision").

As explained below, much of the divergence in the parties' views regarding the governance and operation of the Trusts arises from their disparate construction of language in the Indenture known as the Granting Clause (or the "Grant"). In this clause, the Trusts granted the Indenture Trustee "all" of the Trusts' "right, title and interest" in the Student Loans. [11] The Grant is further characterized as a right to "pledge, bargain, sell, warrant, alienate ... convey, assign [and] transfer" Trust collateral, and includes, among other rights, a transfer of the "immediate and continuing right" to "bring Proceedings in the name of the [Trusts]." [12]

11    Indenture (Granting Clause) (JC2760).

12    Indenture (Appendix A) (definition of "Grant") (JC2842). The Indenture defines "Proceedings" as "any suit in equity, action at law or other judicial or administrative proceeding" (a "Proceeding"). Indenture (Appendix A) (definition of "Proceeding") (JC2849).

According to the Owners, as a matter of law, the Granting Clause cannot create both an assignment of, and a security interest in, pledged collateral. Thus, in their view, the Granting Clause grants the Indenture Parties, at most, a security interest in collateral (i.e., the Student Loans). This construction, according to the Owners, supports their "debt versus equity" view of this securitization transaction and, relatedly, their contention that the Indenture Parties have no say in the governance of the Trusts. Alternatively, the Owners contend the Granting Clause is ambiguous and the Court must receive parol evidence before declaring its intended purpose.

The Indenture Parties counter that the Owners misstate the law. Specifically, they maintain there is no rule of law that would prohibit the Granting Clause from creating an absolute

2020 WL 5049402

assignment of the collateral (and all rights in the collateral) while also granting a precautionary security interest in that same collateral. Given that they have received an absolute assignment from the Trusts through the Grant, the Indenture Parties argue the Owners (and the Owner Trustee) have retained only limited roles in the governance and operation of the Trusts.

Neither the parties nor the Court have identified New York precedent (which governs the Indentures) that addresses the construction and legal effect of the Granting Clause in as much detail as is required to resolve the parties' competing declarations. For reasons I explain below, based on persuasive authority and contrary to the Owners' construction, I am satisfied that a contract may unambiguously create both a precautionary security interest *and* an assignment without offending any rule of law. The Owners' effort to frame the only reasonable construction of the Grant as a binary choice between creating a security interest *or* an assignment, therefore, is misplaced. Given this lack of ambiguity, persuasive precedent directs that I "read the sweeping language of the Granting Clause" without "limits that it lacks on its face." [13] This leads to the inescapable conclusion, based on the plain language of the Indenture, that the Trusts currently have no beneficial interest in the Student Loans that serve as collateral for the Notes.

[13] *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 413 (S.D.N.Y. 2017).

**\*4** Another dispute that presents an issue of first impression, this time under Delaware law, is the extent to which the Owners, who through the Trusts retain an economic incentive to collect the Student Loans, owe fiduciary duties to the Indenture Parties, who are to reap the financial benefits deriving from these loans. Applying both the law related to so-called "assignments for collection," and an aspect of Delaware's common law of fiduciary duties as expressed by Chancellor Allen in *In re USACafes L.P. Litigation*, [14] I am satisfied that the Owners' ultimate control over certain aspects of these owner-directed Trusts justifies the imposition of fiduciary duties upon them, running to the Indenture Parties, to the extent they exercise that control as the Trusts' fulfill their role as administrator (and collector) of the Student Loans.

[14] *In re USACafes L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991).

Apart from these two issues of first impression, the parties' remaining disputes are too numerous to recite here. [15] Indeed, the parties are so disconnected in their views of the transactional structure created by the Trust Related Agreements (defined below) that they have brought 143 competing requests for declaratory relief relating to nearly all aspects of the Trusts' governance and operation. Broadly speaking, the parties' other disputes center on the following topics: (i) which contracts constitute the Trusts' governing instruments, (ii) which parties have the right to direct the Trusts, (iii) what expenses are compensable as "Owner Trustee" expenses, (iv) which parties (beyond the Owners) owe fiduciary duties and to whom are those duties owed, (v) whether the Noteholders may enforce the Trusts' constitutive documents, (vi) whether all of the Owners must act together to direct the Trusts and (vii) various discreet issues related to the Trusts' governance.

[15] The sheer number of requests for declaratory relief has necessitated an Opinion of substantial length but of limited practical value to readers beyond the parties to this litigation and perhaps those involved in the structured finance community. The weeds of this multi-faceted dispute have grown high and much of this Opinion dwells deep within them. The Court's treatment of the assignment/security interest and the *USACafes* issues, however, may be useful beyond the limited context of this case and are highlighted in these early pages for those who may wish to focus on the discussion of these novel issues later in the Opinion.

As noted, the parties present their requests for declaratory relief on cross-motions for judgment on the pleadings. In this posture, the Court may grant judgment only if that relief is appropriate as a matter of undisputed fact or as a matter of law. With this in mind, I have resolved several, indeed most, of the competing declarations, but others must await resolution on a more developed factual record. Attached to this Opinion is an Appendix with all of the requests for declaratory relief and a notation of whether the request has been granted or denied.

# I. BACKGROUND

I have drawn the facts from the pleadings and from the applicable contracts, all of which have been incorporated by reference in the pleadings. [16] I have confined my review of the contracts to those provided by the parties in the Joint Compendium of Contracts. [17]

[16]    In addition to documents attached to the pleadings, the court may consider documents that are "incorporated by reference" or "integral" to the pleadings. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004); *H-M Wexford LLC v. Encrop, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003); *see also* Verified Am. Compl. ("Owners' Compl.") (D.I. 382); Def. U.S. Bank Nat'l Ass'n's Countercl. to the Verified Am. Compl. ("U.S. Bank Counterclaim") (D.I. 394); Owner Trustee Counterclaim.; GSS Data Servs., Inc.'s Joinder in Mot. for J. on the Pleadings (D.I. 420); Declaratory J. Countercls. on Common Contract Interpretation Issues ("Ambac Counterclaim") (D.I. 391); The Noteholder Gp.'s Declaratory J. Countercls. On Common Contract Interpretation Issues ("Noteholder Counterclaims") (D.I. 395) (collectively, the "Pleadings").

[17]    *See* Joint Compendium. While each of the 15 Trusts has a separate set of governing documents, the parties have represented that the various iterations of these agreements are "substantially similar." See [Owner Trustee's] Opening Br. in Supp. of Mot. for J. on the Pleadings (D.I. 412) at 6 n.3. For this reason, I adopt the parties' convention of citing to a single version of the underlying contracts except where versions are materially different.

## A. The Parties

**\*5**  The Trusts are fifteen Delaware statutory trusts formed under the Delaware Statutory Trust Act (the "DSTA") to hold Student Loans with a face amount of ~$15 billion. [18] Each Trust is governed by a series of interlocking contracts, including a Trust Agreement, an Administration Agreement and an Indenture, each of which is further described below. [19] Because the Trusts' purpose is strictly limited to (i) acquiring Student Loans by issuing certain Notes, (ii) executing the Indenture and (iii) fulfilling loan servicing obligations, the Trusts have no officers or employees. [20]

[18]    Owners' Compl. ¶ 35; 12 *Del. C.* § 3801.

[19]    Owner Trustee Counterclaim ¶ 32; Trust Agreement § 2.03(a)(i) (JC0586) (referencing the Indenture); Indenture (Appendix A) (JC2831) (referencing the Administration Agreement).

[20]    Trust Agreement § 2.03 (JC0586); Indenture § 3.12 (JC2776) (captioned "No Other Business"); Owner Trustee Counterclaim ¶ 32.

In lieu of officers and employees, the Trusts act through the Owner Trustee (Wilmington Trust), which is empowered to "act on behalf of the Trust[s]." [21] As the trustee in a separate trust relationship, U.S. Bank National Association serves as "Indenture Trustee" for the "Indenture Trust Estate" and is the recipient of the Grant. [22]

[21]    Trust Agreement § 1.01 (JC0582) (definition of Owner Trustee), § 2.01 ("The Trust continued hereby shall be known as ... in which name the Owner Trustee may take any action as provided herein."), § 2.03(b)(i) (JC0586); Owners' Compl. ¶ 11.

[22]    Owners' Compl. ¶ 12; Indenture (Granting Clause) (JC27060) ("The [Trusts] hereby Grant[ ] to the Indenture Trustee ...."); Indenture (Appendix A) (JC2842) (defining "Indenture Trust Estate" as "all money, instruments, rights and other property that are subject or intended to be subject to the lien and security interest of the Indenture for the benefit of the Noteholders (including all property interests granted to the Indenture Trustee)"). I incorporate this definition of "Indenture Trust Estate" in the balance of this Opinion.

To assist the Owner Trustee (and ultimately other Trust constituents), the parties engaged GSS Data Services, Inc. (the "Administrator") to act as one of the Trusts' Administrators. [23] The Administrator's duties are memorialized in an Administration Agreement, where the Administrator agrees to "perform ... the duties and obligations of the Owner Trustee" as well as the Trusts' obligations under the Indenture. [24]

[23]    Owners' Compl. ¶ 13. GSS Data Servs., Inc. was not the only Trust Administrator. In the interests of brevity, however, I will refer to GSS

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 65 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

as the exemplar Administrator for purposes of this Opinion.

24    Administration Agreement § 1(a)(i) (JC3661), § 1(b)(i) (JC2662).

The Administrator, in turn, entered into certain Servicing Agreements with entities such as the Pennsylvania Higher Education Assistance Agency ("PHEAA").[25] In the applicable Servicing Agreement, PHEAA agreed to collect proceeds from certain Student Loans on behalf of the Trusts.[26]

25    See Servicing Agreement (JC4071).

26    Servicing Agreement §§ 2.02, 4.01, 4.09 (JC4075–76, 80) (The "Servicer" agrees to provide the services listed in the "Program Manual," defined as "Borrower communications," "Procedures for delinquency and default" and "Disbursement procedures," among other things.).

The Noteholders[27] hold the Notes issued by the Trusts.[28] NC Residuals Owners Trust and NC Owners LLC and Pathmark Associates, LLC (collectively, "Owners") hold certain "Trust Certificates" that evidence "the Beneficial Interest of an Owner" of the Trusts (the "Trust Certificates").[29]

27    I use the term Noteholders as it is defined in the Noteholder Counterclaims to mean AG Mortgage Value Partners Master Fund, L.P., AG Opportunistic Whole Loan Select, L.P., AG Pisgah, L.P., AG Super RMBS LLC, AG TCDRS, L.P., AG Strategic ABS Fund Master, L.P., One William Street Capital Master Fund, LTC., OWS Credit Opportunity I, LLC, OWS Global Fixed Income Fund (USD-Hedged), Ltd., LibreMax Master Fund, Ltd., Libre Max Value Master Fund, Ltd., LibreMax MSW Fund, Ltd., Waterfall Delta Offshore Master Fund, LP, Waterfall Eden Master Fund, Ltd. and Waterfall Sandstone Fund, LP. See Noteholder Counterclaims at 1 n.1.

28    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2845) (definition of "Noteholders").

29    Trust Agreement § 1.01 (JC0584) (definition of "Trust Certificate"); Owners' Compl. ¶ 40 (alleging

the Owners hold certain "Beneficial Interest[s]"), ¶ 41 (alleging "[n]one of" the Trusts' "third party beneficiaries ... are a beneficial owner of the Trust").

 *6  For three of the fifteen Trusts, AMBAC acts as the "Note Insurer" with the obligation to cover shortfalls in amounts due to certain Noteholders and the right to reimbursement of amounts paid if there are sufficient recoveries from the Trusts.[30] AMBAC has represented the interests of the "Note Insurers" in this litigation.

30    Owner Trustee Counterclaim ¶ 36; Owners' Compl. ¶ 14.

## B. The Trust Related Agreements

At their formation, each of the 15 Trusts and the Owner Trustee executed a Trust Agreement governed by Delaware law.[31] The Trust Agreement states, "it is the intention of the parties hereto that ... this Agreement constitute the governing instrument of the Trust."[32] But the Trust Agreement does not purport to be the only contract that speaks to the Trusts' governance and operation. To the contrary, each Trust Agreement refers to the Indenture as well as the Administration Agreement, defining them both as "Trust Related Agreements."[33]

31    Trust Agreement (cover page) (JC0573); Trust Agreement (recitals) (JC0578); Trust Agreement § 14.10 (JC0610) (captioned "Governing Law").

32    Trust Agreement § 2.05 (JC0587).

33    In its definitions, the Trust Agreement provides the "Trust Related Agreements" include "any instruments ... signed by the Owner Trustee on behalf of the Trust" as well as the "Indenture," "Administration Agreement," "Loan Purchase Agreements," and the "Deposit and Security Agreement," (among other documents) (hereinafter, the "Trust Related Agreements"). Trust Agreement § 1.01 (definition of "Trust Related Agreements") (JC0584); see also Trust Agreement § 2.03(a)(i) (JC0586) ("The purpose of the Trust is to ... execute the Indenture."). As to the Trusts for which AMBAC provides reinsurance (the "Insured Trusts"), the securitization transaction is governed by slightly different versions of these agreements, (the

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 66 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

"Insured Indenture," and the "Insured Trust Agreement").

One of the Trust Related Agreements, the Indenture, is an agreement, governed by New York law, between the applicable Trust and the Indenture Trustee (in its capacity as the Indenture Trustee). [34] The other key Trust Related Agreement is an Administration Agreement, executed by the Trust, the Indenture Trustee (in its capacity as such) and the Administrator. [35] Because of the interlocking nature of the Trust Related Agreements, the Trust Agreements, the Indentures and the Administration Agreements each play a pivotal role in the overall structure of the securitization transaction.

[34]     Indenture (recitals) (JC27060); Indenture § 11.12 (JC2824) (captioned "Governing Law").

[35]     Administration Agreement (recitals) (JC3660). When the Administration Agreements were signed, non-party First Marblehead Data Services, Inc. was the acting Administrator. *Id.*

The overlapping nature of the Trust Related Agreements is well illustrated by the manner in which they address how the Owner Trustee will receive directions. As explained in more detail below, the Owners possess certain circumscribed authority to direct the Owner Trustee under the Trust Agreement. [36] Even though the Trust Agreement is the Trusts' "governing instrument," that agreement contains a broad prohibition that "no Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to ... any Trust Related Agreement," and the Owner Trustee may decline to "follow any such direction, if given." [37] As this sequence reveals, the Trust Agreement qualifies and subordinates its role in the Trusts' governance to the other Trust Related Agreements in several critical respects.

[36]     *See* Trust Agreement § 4.01 (JC0590).

[37]     Trust Agreement § 4.02(b) (JC0591).

 **\*7**  Further, to accommodate the overlapping role of the Trust Related Agreements, some provisions of the Trust Agreement lie dormant "for so long as any of the Notes is outstanding." [38] For instance, Section 5.02 of the Trust Agreement directs that "income with respect to ... Trust Property" (i.e., the Student Loans) "shall be remitted directly to the Indenture Trustee for application *in accordance with the Indenture*." [39] Only *after* the Notes are repaid does the payment priority in Section 5.02

of the Trust Agreement (the "Trust Agreement Waterfall") spring to life. [40]

[38]     Trust Agreement § 5.02 (JC0593).

[39]     Trust Agreement § 5.02 (JC0593) (emphasis supplied). "Trust Property" is further defined below.

[40]     Trust Agreement § 5.02 (JC0593).

## C. The Trust Res and the Granting Clause

Apart from issuing the Notes and acquiring and servicing the Student Loans, one of the Trusts' purposes is to "execute the Indenture." [41] On the first page of the Indenture, in a section captioned "Granting Clause," the Trusts agreed to an "absolute" assignment of their sole asset, the Student Loans. [42] As will become clear, the Granting Clause is center stage in the parties' dispute. Given its importance, I reproduce the provision, in its entirety, below:

The [Trust] hereby Grants to the Indenture Trustee at the Closing Date with respect to the Financed Student Loans, as trustee for the benefit of the holders of the Notes, [43] all the [Trust's] right, title and interest in and to the following:

(a) the Financed Student Loans, and all obligations of the Obligors thereunder including all moneys paid thereunder on or after the Cutoff Date;

(b) all Servicing Agreements and all Student Loan Purchase Agreements, including the right of the [Trust] to cause the Sellers to repurchase or the Servicers to purchase, Student Loans from the [Trust] under circumstances described therein; [44]

(c) each Guarantee Agreement, [45] including the right of the [Trust] to cause the Guarantee Agency to make Guarantee Payments in respect of the Student Loans, the TERI Deposit and Security Agreement and the [Trust's] rights to the TERI Pledge Fund as the same relate to the Student Loans and the proceeds thereof, and of the other Basic Documents; [46]

(d) all funds on deposit from time to time in the Trust Accounts related to the Notes (and sub-accounts thereof), including the Reserve Account Initial Deposit; and

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 67 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

(e) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, "Collateral"). [47]

Stated succinctly, the Granting Clause creates a broad transfer of the Trusts' interest in a list of assets and related contractual rights, defined as the "Collateral," to the Indenture Trustee. [48]

[41]    Trust Agreement § 2.03 (JC0586).

[42]    Indenture (Granting Clause) (JC2760).

[43]    As to the Trusts for which AMBAC provides reinsurance, the Insured Indenture states the Grant is made "for the benefit of the holders of the Notes and AMBAC." *See* Insured Indenture (Granting Clause) (JC3461).

[44]    In the Student Loan Purchase Agreements, certain parties first acquired the Student Loans and bundled them together so that they could be sold to the Trusts. *See* Indenture (Appendix A) (Definition of "Student Loan Purchase Agreements") (JC2853).

[45]    In the Guaranty Agreements, certain parties agreed to guarantee payments on the financed Student Loans to the Noteholders. Indenture (Appendix A) (JC2842, 54).

[46]    The Indenture defines the "Basic Documents" to include the "Trust Agreement, the Indenture, all Student Loan Purchase Agreements, the Deposit and Sale Agreement, the Servicing Agreements, the Administration Agreement, the Back-up Administration Agreement" and "the Guarantee Agreements" (among other documents)

(the "Basic Documents"). Indenture (Appendix A) (JC2833).

[47]    Indenture (Granting Clause) (JC2760–61). Sub-paragraph (e) is not included in the Master Trust Indenture. (JC08666–67).

[48]    Indenture (Granting Clause) (JC2760–61).

**\*8** The Indenture clarifies, "[t]he foregoing Grant is made in trust to secure the payment of principal of and/or interest on ... the Notes" and "to secure compliance with the provisions of this Indenture." [49] Relatedly, the Granting Clause makes clear that the Indenture Trustee, "on behalf of the holders of the Notes, acknowledges [the] Grant" and "accepts" the separate trust relationship established by the Indenture "to the end that the interest of the [Noteholders] may be adequately and effectively protected." [50]

[49]    Indenture (Granting Clause) (JC2761).

[50]    Indenture (Granting Clause) (JC2761).

Aside from the broad conveyance in the Granting Clause, the Indenture also provides an expansive definition of "Grant."

"Grant" means mortgage, pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to the Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 68 of 219

> otherwise and generally to do and
> receive anything that the Granting
> party is or may be entitled to do
> or receive thereunder or with respect
> thereto. [51]

Critically, the Indenture provides that a Grant includes "all rights, powers and options," but it does *not* include "obligations." [52] Thus, to the extent the Trusts are saddled with obligations under the Trust Related Agreements, those obligations are not swept into the Grant to the Indenture Trustee and, therefore, remain with the Trusts.

[51]     Indenture (Appendix A) (definition of "Grant") (JC2842).

[52]     Indenture (Appendix A) (definition of "Grant") (JC2842).

As an example of a Trust obligation, in Section 3.05, the Indenture provides the Trusts "will" take such other action necessary or advisable to (i) "maintain or preserve the lien and security interest ... of [the] Indenture," (ii) "protect the validity of" the "Grant," (iii) "enforce any of the Collateral" and (iv) "preserve and defend title to the Indenture Trust Estate and the rights of the Indenture Trustee." [53]

[53]     Indenture § 3.05 (JC2771–2).

Multiple provisions in the Trust Agreement yield to the Indenture "for so long as any of the Notes are outstanding." [54] Besides Section 5.02 (discussed above), Section 2.03(b) provides, in relevant part:

> *Until the Indenture is discharged*, the operations of the Trust shall be conducted in accordance with the following standards:
>
> (i) The Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement;
>
> (ii) The Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates; ...

> (iv) The Trust shall conduct its business at the office of the Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of their respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner; ...

> **\*9** (vii) For so long as any of the Notes are outstanding, the Trust shall not (A) merge or consolidate with or into any other entity, (B) convey or transfer all or substantially all of its assets to any other entity (other than to the Indenture Trustee pursuant to the Indenture), or (C) dissolve, liquidate or terminate in whole or in part; and

> (viii) For so long as any of the Notes are outstanding, the Trust shall not own or acquire any financial asset that requires the Trust, the Owners or the Administrator to make any decisions regarding such asset other than the servicing of the asset. [55]

[54]     *See* Trust Agreement § 2.03(b)(vii–viii) (JC0587) ("[u]ntil the Indenture is discharged"); Trust Agreement § 4.01(a)–(b) (JC0590) ("for so long as any of the Notes are outstanding"); Trust Agreement § 5.02 (JC059) ("for so long as any of the Notes is outstanding").

[55]     Trust Agreement § 2.03(b) (JC0586–87) (emphasis supplied).

This structure allows the Trust Agreement to facilitate and protect the Trusts' "transfer of all or substantially all of its assets ... pursuant to the Indenture" while also providing the Trusts with a residual governance structure that kicks in once the Indenture is "discharged." [56] But, until such time, the Trusts are prohibited from "engaging in any business" other than the acquisition, collection and transfer of Student Loans, and "all [of] the [Trusts'] right, title and interest in" the Student Loans remains in the Indenture Trust Estate (as defined) subject to the control of the Indenture Trustee. [57]

[56]     *See* Trust Agreement § 2.03(b)(viii) (JC0587); Indenture § 4.01 (JC2784) (providing for the Indenture's discharge when, among other things, "no Notes are outstanding").

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 69 of 219

*In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)*

2020 WL 5049402

57      Indenture (Granting Clause) (JC2760); Indenture
(Appendix A) (JC2842) (definition of "Indenture
Trust Estate"); Indenture § 6.01 (JC2797)
(recognizing the Indenture Trustee has certain
"rights and powers vested in it by [the] Indenture");
Indenture § 6.02(c) (JC2798) (providing that the
Indenture Trustee "may execute any of the trusts").

To support this structure, in a section entitled "Trust
Accounts," the Indenture provides that the "Indenture
Trustee, on behalf of the Noteholders, shall possess all right,
title and interest in" the proceeds from the Student Loans, and
further provides the trust accounts into which the proceeds are
deposited "shall be under the sole dominion and control of
the Indenture Trustee for the benefit of the Noteholders." [58]
The upshot of these provisions is that the proceeds from the
Student Loans will flow to the Indenture Trustee pursuant
to the Trusts' "absolute" grant of "all" their "interest" in the
Student Loans "for the benefit of the holders of the Notes." [59]
As long as the Indenture is in effect, such proceeds must
be distributed according to the payment scheme in Section
8.02 of the Indenture (the "Indenture Waterfall"), rather than
according to the Trust Agreement Waterfall. [60]

58      Indenture § 8.02(c) (JC2805).

59      Indenture (Granting Clause) (JC2760); Indenture §
3.07(f) (JC2773), §§ 4.01–.02 (JC2783–84).

60      Indenture § 8.02 (JC2804).

**D. Directions to the Owner Trustee**

The Trust Agreement provides the means by which the Trusts
will operate. The Owner Trustee is appointed as "trustee" of
the Trusts with "all the rights, powers and duties set forth ... in
the [DSTA]" to "hold the Trust Property in trust ... for the use
and benefit of the Owners." [61] Even so, the Owner Trustee's
obligations under the Trust Agreement are "subject to" its
obligations "under the Trust Related Agreements." [62]

61      Trust Agreement §§ 2.04–.05 (JC0587); Trust
Agreement § 1.01 (JC0584) (defining "Trust
Property" as "all right, title and interest of the
Trust or the Owner Trustee on behalf of the
Trust in and to any property contributed to the
Trust by the Owners or otherwise acquired by the
Trust, including without limitation all distributions,

payments or proceeds thereon.") (hereinafter, the
"Trust Property").

62      Trust Agreement § 2.05 (JC0587).

**\*10**  In Section 4.01(a), the Trust Agreement directs the
Owner Trustee to "take such action or refrain from taking such
action ... with respect to nonministerial [sic] matters, as it shall
be directed by all the Owners for so long as any of the Notes
are outstanding." [63]  Section 4.01(b) continues:

> (b) Without limiting the generality of
> the foregoing, in connection with the
> following nonministerial matters, the
> Owner Trustee will take no action, and
> will not have authority to take any
> such action, unless it receives prior
> written approval from all the Owners
> for so long as any of the Notes are
> outstanding: [64]

Section 4.01(b) goes on to list certain "nonministerial"
actions, such as (i) initiating "any claim or lawsuit by the
Trust" or compromising a claim brought against the Trust
(except those related to ordinary course debt collection) or
(ii) amending the Trust Agreement or any Trust Related
Agreement. [65]

63      Trust Agreement § 4.01(a) (JC0590). For the
remainder of this Opinion, when quoting from
a contract, I use the term "nonministerial" as it
appears in the parties' agreements, but otherwise
spell the term correctly.

64      Trust Agreement § 4.01(b) (JC0590).

65      Trust Agreement § 4.01(b) (JC0590–91).

Immediately following this language, in Section 4.02, entitled
"Action Upon Instruction," the Trust Agreement enumerates
certain circumstances in which the Owner Trustee need not
follow Owner directions:

> (a) The Owner Trustee shall take such action or actions as
> may be specified in this Agreement or in any instructions
> delivered in accordance with this Article IV or Article VIII;
> provided, however, that the Owner Trustee shall not be

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 70 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action (i) is contrary to the terms hereof or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as a partnership for Federal income tax purposes.

(b) No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given. [66]

As emphasized in both subsections (a) and (b), the Trust Agreement underscores the importance of the Trust Related Agreements in the Trusts' governance. Indeed, under the Trust Agreement, Owner instructions are improper (and can be ignored by the Owner Trustee) if they contradict the overlapping Trust Related Agreements or undermine the Trusts' narrow purpose. [67]

[66]     Trust Agreement § 4.02(a)–(b) (JC0591–92).

[67]     Trust Agreement § 4.02(a)–(b) (JC0591–92); *see also* Trust Agreement § 8.09 (JC0601) ("Notwithstanding anything herein to the contrary, the Owner Trustee shall not take any action [ ] that is inconsistent with the purposes of the Trust.").

Given the complex web of Trust Related Agreements, the parties to the Trust Agreement provided the Owner Trustee with a "Right to Receive and Rely Upon Instructions" while performing its duties. [68] Section 8.06 states:

> **\*11**  In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement, or such provision is ambiguous as to its application, or is or appears to be

in conflict with any other applicable provision, or in the event that this Agreement or any Trust Related Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Owners requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, the Owner Trustee shall not be liable to any Person on account of such action or inaction. If the Owner Trustee shall not have received appropriate instructions within ten days of such notice (or within such shorter period of time as may be specified in such notice) the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee shall deem to be in the best interests of the Owners, and the Owner Trustee shall have no liability to any Person for such action or inaction. [69]

With this provision, the Owner Trustee has a discretionary safe harbor it may employ if the Owners issue questionable instructions. When the Owner Trustee asks for clarifying directions from the Owners, and then follows those directions in "good faith," the Owner Trustee "shall not be liable to any Person." [70]

[68]     Trust Agreement § 8.06 (JC0601).

[69]     Trust Agreement § 8.06 (JC0601).

[70]     Trust Agreement § 8.06 (JC0601). The Trust Agreement for the Insured Trusts allows the Owner Trustee to request instructions from the Owners

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 71 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

*as well as* AMBAC, and, "to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, which have been *approved* by [AMBAC,] or received from [AMBAC], the Owner Trustee shall not be liable." Insured Trust Agreement § 8.06 (JC0029) (emphasis supplied).

### E. The Indenture Trustee's Role in the Trusts' Governance

To summarize some of the foregoing provisions, the Trusts granted all of their "right, title and interest" in the Collateral to the Indenture Trustee. [71] While the Trust Agreement contains provisions allowing the Owners to direct the Owner Trustee, the Owners are prohibited from directing the Owner Trustee to take "any action" that is contrary to the Indenture. [72]

[71]  *See* Indenture (Granting Clause) (JC2760).

[72]  Trust Agreement § 4.02(b) (JC0591).

In addition, even though the Indenture Trustee has received the Collateral from the Trusts by assignment, the Indenture contemplates that the Indenture Trustee has no baseline obligation "to administer, service or collect the loans in the Indenture Trust Estate." [73] Indeed, the Indenture gives the Indenture Trustee a minimal role—at least as long as the Student Loans are generating enough proceeds to pay off the Notes. The duty to service the Student Loans and collect proceeds belongs, instead, to the Trusts. [74]

[73]  Indenture § 3.20(b) (JC2779).

[74]  Indenture § 3.20(d) (JC2779).

This paradigm shifts dramatically, however, if proceeds from the Student Loans begin to flag, and the Trusts cannot make required payments on the Notes (an "Event of Default"). [75] If an Event of Default occurs, the Indenture Trustee must spring into action. Specifically, the Indenture provides the Indenture Trustee "shall," subject to certain directions from the Noteholders, "exercise all rights, remedies, powers, privileges and claims of the [Trusts]" and, in such event, the Trusts' right to enforce key contractual right rights with respect to the Collateral "shall be suspended." [76] Following an Event of Default, the Indenture Trustee may "elect to maintain possession of the related Indenture Trust Estate." [77]

[75]  Indenture § 5.01 (JC2784).

[76]  Indenture § 5.16(b) (JC2796).

[77]  Trust Agreement § 5.05 (JC2793).

Similarly, in Section 5.04, the parties agreed that "if an Event of Default shall have occurred and be continuing, the Indenture Trustee may, or shall, at the written direction of the [ ] Noteholders ... enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture." [78] To date, no party has represented to the Court that an Event of Default has occurred.

[78]  Indenture § 5.04 (JC2789).

### F. The Owner Trustee's Obligations and Expenses

**\*12** Like the Indenture Trustee, the Owner Trustee's obligations under the Basic Documents are narrowly defined. Except as "expressly provided by the terms of [the Trust Agreement]," the parties agreed the Owner Trustee "shall not have any duty or obligation to ... take or refrain from taking any action ... in connection with" any of the Basic Documents. [79] Given the limited nature of its duties, the Owner Trustee receives *de-minimus* annual compensation. [80]

[79]  Trust Agreement § 8.07 (JC0601).

[80]  Owner Trustee Counterclaim ¶ 37.

The Trust Agreement states, "no implied duties or obligations shall be read into this Agreement against the Owner Trustee." [81] Moreover, the Owner Trustee "shall not be personally liable with respect to any action taken or omitted ... in good faith in accordance with the instructions of the Administrator or the Owners." [82]

[81]  Trust Agreement § 8.07 (JC0601).

[82]  Trust Agreement § 9.01(ii) (JC0602).

To the extent the Owner Trustee does act on behalf of the Trusts, it "may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them." [83] If the Owner Trustee chooses to act through agents, it "shall not be liable" for their misconduct as long as the agents were selected "with reasonable care." [84]

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 72 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

83    Trust Agreement § 9.03(b) (JC0603).

84    Trust Agreement § 9.03(b) (JC0603).

The Trust Related Agreements establish the means by which the Owner Trustee and its agents are compensated for their services. Section 10.01 of the Trust Agreements provides:

> The Owner Trustee shall receive compensation from the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its services hereunder.... The Owner Trustee shall be entitled to be reimbursed ... for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements. [85]

The Indenture places "Owner Trustee fees and expenses" at the top of the Indenture Waterfall. [86]

85    Trust Agreement § 10.01 (JC0603).

86    Indenture § 8.02(d)(1) (JC2807).

### G. Administration and Servicing Agreements

While the Trust Agreement and the Indenture govern many of the high-level aspects of the Trusts' operation, these agreements do not explain the nitty-gritty of how proceeds from the Student Loans are collected from the underlying borrowers. For these details, one must look to, among other documents, the applicable Administration Agreement and Servicing Agreement.

At approximately the same time as the applicable Trust Agreement and the Indenture were executed, the Trusts, the Owner Trustee and the Indenture Trustee entered into an Administration Agreement with the Administrator. [87] Dovetailing with the Trusts' retention of certain "obligations"

under the Indenture, the Administration Agreements make clear the Administrator will "perform" the "duties of the [Trusts]" as well as "the duties and obligations of the Owner Trustee on behalf of the [Trusts] under the Indenture and the Trust Agreement" [88] This structure aligns with the Owner Trustee's limited role because, to the extent the Administrator assumes the Owner Trustee's obligations, the Trust Agreement provides that "the Owner Trustee shall be *deemed to have discharged* its duties." [89]

87    *See* Administration Agreement (recitals) (JC3643).

88    Administration Agreement § 1(a)(i) (JC3661), § 1(b)(i) (JC3662).

89    Trust Agreement § 8.03 (JC0600) (emphasis supplied).

**\*13** If the Administrator believes the Trusts are facing a non-ministerial decision, the Administration Agreement provides that the Administrator:

> ... shall not be under any obligation to take any action, and in any event shall not take any action, unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement. [90]

90    Administration Agreement § 1(c)(i) (JC3663). Presumably, in such instances, the Administrator would seek direction from those authorized to give it. As to the Trusts for which AMBAC provides insurance, the Insured Administration Agreement states the Administrator may receive non-ministerial instructions from "the Indenture Trustee or AMBAC." Insured Administration Agreement § 1(c)(i) (JC3890).

The Administration Agreement also specifies that the "initiation of any claim or lawsuit by [a Trust]" outside the "ordinary course of business" is a "nonministerial" matter that would require directions from the Indenture Trustee or

the Owner Trustee. [91] On the other hand, the Administrator need not await instructions before pursuing ordinary course lawsuits initiated "by the [Trust] or its agents ... for the collection of the Student Loans owned by the [Trust]." [92] In connection with the assumption of these duties, the Trusts executed a power of attorney in favor of the Administrator "for the purpose of executing on behalf of the [Trusts]" certain "documents, reports, filing, instruments, certificates and opinions." [93]

[91]   Administration Agreement § 1(c)(i)(B) (JC3663).

[92]   Administration Agreement § 1(c)(i)(B) (JC3663).

[93]   Administration Agreement § 1(b)(i) (JC3662).

As noted above, the Administrator does not shoulder all the Trusts' logistical duties. To shed some of this burden, for each Trust, the Administrator contracted with a Servicer (or a similar entity) in a Servicing Agreement. [94] In that agreement, the Servicer promised to "provide and perform" certain services such as "[b]orrower communications," "[p]rocedures for delinquency and default," and "[d]isbursement." [95]

[94]   *See, e.g.*, Servicing Agreement (JC4071) (stating that the Administrator "desires to oversee the servicing of" certain "education loans" and the Administrator "desires to utilize the expertise of the Servicer to service such education loans").

[95]   Servicing Agreement §§ 4.01, 4.09 (JC4076, JC4080).

**H. Securitization Transactions**
It is undisputed that the contractual structure described above is intended to facilitate a form of a "securitization transaction." [96] Such transactions "involve[ ] the pooling and repackaging of loans into securities that are then sold to investors." [97] The securitization label connotes "the fact that very often, the form of instrument that the parties use to obtain funds from the ultimate investor [ (in this case, the Notes) ] is a security." [98] One of the objects of these transactions is to isolate financial assets from certain types of credit risk. [99] Thus, with regard to the Trusts, the ultimate investor (the Noteholder) is exposed only to the risk that the underlying borrower (the student) cannot repay, but is shielded from the risk that another entity (e.g., the financial institution that first extended credit to the student) will default on its obligations. [100]

[96]   *See* Oral Arg. on R.12(c) Cross Mots. for J. on the Pleadings via Video Conference (D.I. 482–83) ("Tr.") at 114, 147, 276, 279 (parties characterizing the transactions as "major securitizations" and recognizing the treatise, JASON H.P. KRAVITT, ET AL, SECURITIZATION OF FINANCIAL ASSETS (3d ed. 2020) ("Kravitt"), as authoritative in this area of law).

[97]   Kravitt § 1.01.

[98]   Kravitt § 1.02.

[99]   Kravitt §§ 1.01, 3.06, 4.04.

[100]   Kravitt §§ 1.01, 3.06, 4.04.

**\*14** While securitization transactions can take many forms, the Trusts, through the documents discussed above, implemented the securitization in a two-tiered structure. [101] First, an entity, known as the "sponsor," acquired financial assets (in this case, the pooled Student Loans) from the originators. [102] The sponsor then transferred the loans to an entity known as the "Depositor." [103] The Depositor then sold the loans to the "Issuer" (i.e., the Trusts). [104]

[101]   Kravitt § 4.04.

[102]   *See Fixed Income Shares v. Citibank N.A.*, 130 F. Supp. 3d 842, 846 (S.D.N.Y. 2015) (discussing a two-tiered structure).

[103]   *Id.* at 846.

[104]   Kravitt §§ 1.01, 3.06, 4.04; *see also BlackRock*, 247 F. Supp. 3d at 385–85 (explaining "Indenture Trusts" and their role in securitization transactions). In the remainder of this Opinion, I use the term "Issuer" as a generic term that refers to the party that issues securities in a securitization transaction (the "Issuer").

In the second "tier," the Issuer issues notes under an Indenture. [105] The Issuer then collateralizes the notes by transferring its rights to the proceeds of the pooled loans to an Indenture Trustee, who holds the pooled loans on behalf of the Noteholders. [106]

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 74 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

105     Kravitt §§ 1.01, 3.06, 4.04; *see also BlackRock*, 247
        F. Supp. 3d at 385–85.

106     Kravitt §§ 1.01, 3.06, 4.04; *see also BlackRock*, 247
        F. Supp. 3d at 385–85.

One of the critical advantages of a securitization transaction is that it allows parties to structure the transaction as a sale or assignment of financial assets from the Issuer to the Indenture Trustee (rather than a secured loan), while also allowing the Issuer to retain administrative responsibility for servicing the financial assets.[107] The "premise" underlying this compromise "is that the purchaser, as the owner of the financial assets, prefers for the seller to exercise day-to-day control in order to maximize the value of the transaction for the purchaser, but, consistent with ownership, possesses the right to displace the seller from that role."[108] "While such an approach is [well understood], logical and grounded in common sense, it has not been examined rigorously in judicial decisions."[109]

107     *See* Kravitt § 5.03(D)(3) ("In what is probably the
        vast majority of purchases of financial assets by
        parties ... for business and practical reasons ... the
        seller and purchaser both desire the seller to retain
        administrative responsibility.").

108     Kravitt § 5.03(D)(3).

109     Kravitt § 5.03(D)(3).

**I. Procedural Posture**

The Trusts first appeared before this Court in case number 12111-VCS, filed in 2016, when the Owners caused the Trusts to petition the Court for an emergency audit under the Servicing Agreement.[110] In hindsight, many claims asserted in this opening salvo appear as glimmers of the more fundamental disputes that were brewing over the Trusts' *de jure* governance. Over the next three years, three more cases were filed in this Court—each related in some way to the parties' contradictory interpretations of the Trust Related Agreements (the "Related Chancery Actions").[111]

110     *See* D.I. 1 (filed in 12111-VCS).

111     *See Nat'l Collegiate Master Student Loan Tr. I.
        v. U.S. Bank Nat'l Ass'n*, C.A. No. 2018-0167-
        JRS (filed Mar. 9, 2018); *AG Mortg. Value P'rs*

        *Master Fund, et al. v. VCG Owners Tr., et al.*,
        C.A. No. 2018-0825-JRS (filed Nov. 13, 2018); *NC
        Residuals Owners Tr., et al. v. Wilm. Tr. Co., et al.*,
        C.A. No. 2019-088-JRS (filed Nov. 1, 2019).

**\*15** As these actions progressed, it became clear that, absent a definitive construction of the Trust Related Agreements, the various parties interested in the Trusts' governance would continue to pull the Owner Trustee in opposite directions, and the Trusts would fall into a deepening state of paralysis.[112] To help break the gridlock, the Court appointed a special master to determine whether certain "Disputed Instructions" were "proper under the terms of the Trust [Related] Agreements."[113] Yet, as noted, the claims pending before the Court did not ask the Court to interpret the Trust Related Agreements more broadly (at least not in a way that would be binding upon all the Trusts' constituents)[114]

112     *See, e.g.*, D.I. 362 (filed in 12111-VCS) (rulings
        of the Court involving a dispute over certain
        directions to the Owner Trustee).

113     *See* Order Regarding [the Owner Trustee's] Mot. to
        Appoint a Successor Owner Tr. (D.I. 308) at 4.

114     *See, e.g.*, D.I. 362 (filed in 12111-VCS) (stating that
        to obtain a judgment deciding "what [ ] disputed
        provisions of the trust documents definitively
        mean ... one must seek a declaratory judgment
        under our Declaratory Judgment Act," which had
        not yet happened).

Once the full breadth of the parties' disagreements came into focus, the Related Chancery Actions were consolidated into this Action, and the Court asked the parties to create a list of "Common Contract Interpretation Issues" that, if decided, would clarify the governance disputes that plague the Trusts.[115] In response, the parties filed pleadings that sought 143 separate declarations from the Court related to the governance and operation of the Trusts (the "Declarations").[116] These Declarations are reproduced in the Appendix accompanying this Opinion. The parties then filed competing Motions for Judgment on the Pleadings under Court of Chancery Rule 12(c) (the "Motions").[117]

115     *See* Order Consolidating Cases (D.I. 377); Letter to
        the Hon. Joseph R. Slights, III from Jeff Castellano
        re: list of contract interpretation issues (D.I. 373).

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

116    *See* Pleadings; Excel Chart Organizing Requested Decls. ("Chart") (D.I. 481). The parties have not submitted some of the Declarations for Judgment on the Pleadings. As a result, this Opinion does not address those Declarations. *See* Chart (The unsubmitted Declarations include: (i) Owner Trustee's Declarations E, F, G, X and (ii) U.S. Bank's Declarations H–O and Z–OO).

117    Ct. Ch. R. 12(c); D.I. 409 (Noteholders' Motion); D.I. 410 (AMBAC's Motion); D.I. 411 (Owner Trustee's Motion); D.I. 413 (Owners' Motion); D.I. 418 (U.S. Bank's Motion).

As noted, while this Court wrestled with the multiple claims for declaratory judgment, my learned colleague down the street wrestled with some of these same issues in an action before the United States District Court for the District of Delaware seeking to enforce a proposed consent judgment against the Trusts on behalf of the CFPB (the "CFPB Action"). [118] In the CFPB Action, the CFPB seeks damages and penalties for the Trusts' alleged violations of federal lending laws related to the Trusts' collection of private student loan debt. [119] On September 18, 2017, following an investigation, the CFPB filed a motion for approval of a Proposed Consent Judgment ("PCJ") that had been signed by the CFPB and attorneys who purported to have authority to act on behalf of the Trusts at the direction of the Owners. [120] On May 31, 2020, the court in the CFPB Action construed the Trust Related Agreements and ultimately held the parties representing the Trusts lacked the authority to execute the PCJ because (i) the Owner Trustee is "the only entity through which the Trusts may be bound" and (ii) the Owner Trustee "never delegated" its power to execute the PCJ to any other party or attorney(s). [121]

118    *See CFPB v. Nat'l Collegiate Master Student Loan Tr., et al.*, C.A. No. 17-1323-MN (D. Del.); *CFPB Decision*, 2020 WL 2915759.

119    *CFPB Decision*, 2020 WL 2915759, at *2.

120    *Id.*

121    *Id.*, at *3.

**\*16**  The federal court issued the CFPB Decision shortly after this Court heard oral argument on the cross-Rule 12(c)

Motions. [122] The Motions were submitted for decision on June 5, 2020. [123]

122    *Compare id.*, at *1, *with* D.I. 476 (oral argument held on May 20, 2020).

123    *See* Chart.

## II. ANALYSIS

After the pleadings are closed, Court of Chancery Rule 12(c) allows a party to move for judgment on the pleadings. [124] In reviewing a motion under Rule 12(c), this court "is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party." [125] With deference to the non-movant in mind, "judgment on the pleadings is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact .... If the contract's meaning is unambiguous, [and that meaning supports the movant's claim or defense], the court must grant judgment on the pleadings in favor of the moving party." [126]

124    Ct. Ch. R. 12(c).

125    *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

126    *Lillis v. AT & T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (quotations omitted). As noted above, the Indentures are governed by New York Law, but no party has identified, and the Court is unaware of, a substantive difference between New York and Delaware law regarding the rules of contract construction. *See House of Europe Funding I Ltd. v. Wells Fargo Bank, N.A.*, 2015 WL 1472301, at *3 (S.D.N.Y. Mar. 30, 2015) ("*House of Europe II*") (applying New York law and stating, "[i]f a court concludes that the contractual terms are complete, clear and unambiguous[,] it must proceed to interpret those terms according to their plain meaning") (internal quotations omitted); *Cty. of Suffolk v. Long Island Power Auth.*, 100 A.D.3d 944, 947 (N.Y. Sup. Ct. App. Div. 2012) ("[A]greements are construed in accord with the parties' intent" as evidenced by "their own writing," and an agreement that is "clear and unambiguous

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 76 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

on its face must be enforced according to the plain meaning of its terms."); *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012) ("Where the language of a contract is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids, and it must be enforced as written.").

When construing a contract, the court must be mindful that "[a]mbiguity does not exist simply because the parties disagree about what the contract means." [127] Instead, contracts are ambiguous only when the provisions at issue are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [128]

[127]   *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[128]   *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Inc. Co.*, 616 A.2d 1192, 1196 (Del. 1992); *see also GMG Capital Invs., Inc. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (same); *House of Europe II*, 2015 WL 1472301, at *3 ("If a court concludes that the contractual terms are complete, clear, and unambiguous[,] it must proceed to interpret those terms according to their plain meaning.") (internal quotations omitted).

**\*17**   In determining whether a contract has only one reasonable interpretation, the court must read the agreement "in full and situated in the commercial context between the parties." [129] In this regard, when assessing "commercial context," the court may consider guidance from "experienced commentators" when seeking to understand "the basic business relationship between parties" in order to "give sensible life" to a contract. [130] If contracts overlap with other agreements in a single transaction, courts strive to "give a consistent reading" to the interrelated documents. [131]

[129]   *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[130]   *Id.* at 927.

[131]   *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at *47 (Del. Ch. Dec. 7, 2009), *aff'd*, 8 A.3d 1143 (Del. 2010); *see also MPEG LA, LLC v. Samsung Elecs. Co.*, 166 A.D.3d 13, 17 (N.Y. App. Div. 2018) (holding that interrelated agreements "must be read together."); *Cortlandt St. Recovery Corp.*

*v. Bonderman*, 96 N.E.3d 191, 198 (N.Y. Ct. App. 2018) ("When reviewing a contract, particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby.") (internal quotations omitted); PRB at 28 (same).

**A. The Big Picture**
Much like the way the Indenture Parties and the Owners have pulled the Owner Trustee in different directions, in their arguments before the Court, the parties have presented discordant views of how the instant securitization transaction is supposed to work. But if one allows the Trust Related Agreements to work as written, with each agreement playing the tune it was designed to play, a certain harmony emerges. Explaining why this is so will, at times, require the Court to cut a path through the tangled weeds of interrelated contractual language. So, while I repeat much of the discussion in this section elsewhere in this Opinion, in the interest of clarity, I begin my analysis with a plain statement of how this securitization works. This summary will also serve as a roadmap for the balance of this Opinion.

As discussed in subsection II.B, while the Trust Agreements are the Trusts' constitutive documents, they reflect just a small part of the larger structure the parties used to create the securitization transaction. Indeed, in subsection II.C, I explain why the most important aspect of the parties' arrangement is the Granting Clause. There, the Trusts transferred their beneficial interest in the Student Loans to the Indenture Trustee. In effect, the Granting Clause creates a two-trust structure wherein the Trusts are designed to hold legal title to the Student Loans to collect payments from the underlying student-borrowers, while the Indenture Trustee holds all beneficial interest in the Student Loans for the benefit of the Noteholders and AMBAC until the Indenture is discharged. Ultimately, the goal of the securitization transaction is to funnel the stream of payments flowing from the Collateral to the Collateral's beneficial owners (the Noteholders). The chart (below) provides a visual depiction of this two-trust structure for reference.

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 77 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402



One central pillar of this two-trust structure is the Owner Trustee—the *only* entity authorized to act on behalf of the Trusts (absent delegation). *Ab initio*, the parties contemplated the Owner Trustee would make two key delegations of its authority. *First*, the Trust Agreement provides that the Granting Clause automatically transfers to the Indenture Trustee the Owner Trustee's rights to act on behalf of the Trusts as to the Collateral. *Second*, the parties agreed the day-to-day management function with respect to the Student Loans would be centralized in the Administrator. To fulfill this role, the Owner Trustee granted the Administrator a power of attorney to act on behalf of the Trusts.

**\*18**  As discussed in Section II.D, when the skies were clear, the parties did not intend that either of the two trustees (the Owner Trustee or the Indenture Trustee) would take an active role in managing the Student Loans. Instead, the Trusts retained servicing obligations (e.g., to "enforce" the Collateral), which the Administrator agreed to perform.

The parties anticipated that certain non-ministerial matters might arise which would require the Administrator to seek additional guidance.[132] For example, the Administrator might be asked to settle a non-ordinary course lawsuit brought against the Trusts. In such an event, the Administrator would not be authorized to act absent direction. These non-ordinary course claims would trigger the sometimes-confusing reality that *both* the Indenture Trustee and the Owners may direct the Administrator and the Trusts—setting up the potential for conflicting instructions.[133]

[132]  *See, e.g.*, Administration Agreement § 1(c) (JC3663) (declaring, as an example, the "compromise of any action, claim or lawsuit brought against the [Trusts]" outside of claims initiated "in the ordinary course of business").

[133]  *See, e.g.*, Administration Agreement § 1(c) (JC3663) (Administrator can receive nonministerial direction from either "the Indenture Trustee, in accordance with the Indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement"); Trust Agreement § 4.1(b) (JC0590) (Owner Trustee not permitted to "compromise any claim or lawsuit brought by or against the Trust" without "prior written approval from all the Owners."); Indenture (Appendix A) (JC2842) (defining "Grant" to include the Trusts' "immediate and continuing right to ... make waivers or other agreements ... with respect" to the Collateral).

On the one hand, the Indenture Trustee would have two options when the Administrator is confronted with non-ministerial claims. *First*, if the claims asserted against the Trusts relate to the Collateral, the Indenture Trustee may settle the legal action directly on behalf of the Trusts.[134] This right allows the Indenture Trustee to protect the Noteholders' and AMBAC's beneficial interest. *Alternatively* (and consistent with its passive role), the Indenture Trustee could direct the Administrator to negotiate and settle the lawsuit at the expense of the Trusts. If the Administrator received this direction from the Indenture Trustee, it would be authorized to act accordingly.

[134]  *See* Indenture (Appendix A) (definition of "Grant") (the Indenture Trustee possesses an "immediate and continuing right ... to make waivers or other agreements ... in the name of the [Trusts] or otherwise and generally to do and receive anything that the [Trusts are] entitled to do or receive ... with respect" to the Collateral.). To be clear, nothing in this Opinion holds that the Trusts would lack standing to enforce the Indenture or that the Indenture Trustee could act on behalf of the Trusts in a way that violated that agreement. In Section II.C.3, I hold that it is uncertain, at this stage of the proceedings, whether the Grant includes the Trusts' rights under the Basic Documents (defined below to include the Indenture). While I find the language facially ambiguous, it is likely that the Owners will be able to show with the benefit of parol evidence that the Trusts retained the right to enforce the Indenture. Otherwise, the Owners' residual beneficial interest in the Trusts would appear to be meaningless as the Indenture Trustee

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 78 of 219

2020 WL 5049402

could use the Collateral however it wanted without recourse. Indeed, it seems likely that while the Indenture Trustee possesses plenary authority over the Collateral, the Indenture Trustee agreed to certain contractual limitations concerning its use of the Collateral. *See, e.g.*, Indenture § 3.14 (JC2776) (stating that the "Financed Student Loans may *only be sold, transferred, exchanged or otherwise disposed of by the Indenture Trustee*" if certain conditions are met) (emphasis supplied). And as just stated, if the Indenture Trustee were to breach the Indenture, nothing in this Opinion holds as a matter of law that the Trusts would lack standing to sue the Indenture Trustee for that breach.

**\*19** On the other hand, the Owners' economic interest in the Student Loans hinges on the Noteholders being repaid and the Trusts fulfilling their obligations under the Indentures. Once the Notes are no longer outstanding and the Indenture is discharged, the residual Student Loan payment stream reverts to the Trusts—flowing through the Trust Agreement Waterfall (ultimately to the Owners). Of course, if the Trusts breach their obligations, the Indenture Trustee possesses remedies under the Indenture that could wipe out the Owners' reversionary interest in the Collateral. To protect their interest, the Owners have a right to direct the Owner Trustee as to non-ministerial matters to ensure the Trusts fulfill their obligations.

Returning to the example of non-ordinary course litigation asserted against the Trusts, the Trust Agreement gives the Owners the right to direct the Owner Trustee—which (if properly directed) could settle litigation brought against the Trusts. [135] But, unlike the Indenture Trustee, the Owners' indirect authority to direct the Trusts is circumscribed because it derives from their control over the Trusts. Because the Trusts hold mere legal title to the Collateral, the Trusts' authority to control the Collateral is strictly limited to the control required to fulfill their contractual obligations. [136] And the Owners' rights to direct the Owner Trustee cannot exceed the Trusts' rights in the Collateral.

[135]    Here, I'll note that, depending on the terms of any settlement, other Trust Related Agreements might provide an independent bar to the Owners directing the Owner Trustee to settle litigation on behalf of the Trusts. For example, the Trusts may not amend the Indenture (including the Indenture Waterfall)

without consent from the Indenture Trustee. *See* Indenture § 3.07(f) (JC2773).

[136]    For example, the Trusts agreed to "diligently enforce, and take all steps, actions and proceedings reasonably necessary to protect [their] rights with respect to each Financed Student Loans." Indenture § 3.20(f) (JC2779); *see also* Indenture § 3.07 (JC2772) (The Trusts promised to "use [their] best efforts not to permit any action to be taken by others that would ... result in the amendment, hypothecation, subordination, termination or discharge of ..." any documents within the Indenture Trust Estate.).

This reality has a key consequence. Because of the Trusts' limited interest, the Owners lack authority to direct the Owner Trustee to act on behalf of the Trusts *unless* the Owner direction arises out of a Trust obligation. The Owners, therefore, could not direct the Owner Trustee to settle non-ordinary course litigation unless the Trusts had a contractual obligation to do so.

For example, a third party might threaten to file a lien against the Collateral—which would trigger the Trusts' obligation to prevent "any lien ... to be created on or extend to ... the Indenture Trust Estate." [137] The Owner Trustee, or by extension the Administrator, subject to direction by the Owners, could settle such a lawsuit to ensure the Trusts fulfill their obligations. [138] But, under all circumstances, until the Indenture is discharged, the Trusts cannot take any action that derogates from the Granting Clause or otherwise violates a Basic Document. [139]

[137]    Indenture § 3.8(iii) (JC2774).

[138]    As I highlight above, depending on the terms of any settlement, the Indenture Trustee's consent may be required. *See* Indenture § 3.07(f) (JC2773) (Indenture Trustee consent required to amend a Basic Document).

[139]    *See, e.g.*, *In re Nat'l Collegiate Student Loan Tr.*, 2020 WL 4813889 (3d Cir. Aug. 19, 2020) (discussed further below) (holding that the Trusts cannot appoint an additional Servicer on terms that gave the Trusts enhanced rights (e.g., the right to remove the Servicer) that originally belonged

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 79 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

exclusively to the Indenture Trustee under the Granting Clause).

**\*20** The Basic Documents' provision for administrative fees and expenses reinforces the Owners' and the Owner Trustee's minimal role. For example, as explained in Section II.E, if the Owner Trustee incurs expenses while performing its limited, ministerial duties, it may submit *its* expenses for reimbursement at the top of the Indenture Waterfall. But, in harmony with its ministerial role, the parties did not saddle the Owner Trustee with a plenary duty to defend the Trusts in lawsuits or negotiate on behalf of the Trusts. For this reason, any fees generated from these activities could not constitute Owner Trustee expenses. In other words, the Owner Trustee has no right to seek reimbursement for *Trust* expenses.

On the other hand, the Administrator also has a right to reimbursement of its expenses. But, as the entity charged with fulfilling the Trusts' obligations, the Administrator *does* have a right to incur expenses on behalf of the Trusts. Again, this arrangement reflects the reality that the Administrator (not the Owner Trustee or the Owners) is the central actor in the Trusts' day-to-day management and operations.

Section II.F addresses contractual and fiduciary duties. As I have explained, the Owner Trustee delegated its authority to act on behalf of the Trusts (as was its right) to both the Administrator and the Indenture Trustee (as to the Collateral). Accordingly, the Owner Trustee has neither a common law fiduciary obligation nor a contractual duty to monitor the Student Loans or the Trusts.

In what appears to be an issue of first impression under Delaware law, in Section II.F.4, I explain why the securitization transaction created an assignment of the Collateral for the benefit of the Noteholders and AMBAC. While the Owners did not agree affirmatively to manage the Student Loans, to the extent they use their rights to direct the Owner Trustee (and, in turn, the Trusts), as a matter of fiduciary duty, the Owners cannot use the Trusts' legal title to the Student Loans to self-deal at the expense of the Student Loans' beneficial owners. [140]

[140]  For example, the Owners could not direct the Owner Trustee (and indirectly the Administrator) to engage a Servicer affiliated with the Owners on terms that were not arms-length.

Simply put, the Owners must regulate their conduct to recognize that while the Notes are outstanding, they do not possess *any* direct or indirect beneficial interest in the Collateral. This principle leads to the inescapable conclusion that the Owners owe fiduciary duties to the Noteholders and AMBAC (the *owners* of the Collateral) to the extent the Owners cause the Trusts to exercise control over the Collateral in relation to the Trusts' fulfillment of their obligations. Stemming from the principles Chancellor Allen first articulated in *In re USACafes*, this fiduciary duty arises —not from the Noteholders and AMBAC's interests in the *Trusts*—but from their interest in the *Collateral*. [141]

[141]  *See In re USACafes*, 600 A.2d 43.

To provide a reader's digest version of the Trusts' governance (and, perhaps, a roadmap for resolving future disputes), the validity of any purported attempt to act on behalf of the Trusts must involve at least three levels of analysis. *First*, one must ascertain whether the Trust Related Agreements specifically address the purported exercise of authority to act on behalf of the Trusts. [142] *Second*, the Trusts cannot take any action that compromises the Indenture Trustee's rights under the Granting Clause. [143] *Third*, to the extent the Owners purport to direct the Trusts and thereby control the Collateral in connection with the Trusts' fulfillment of their obligations, the Owners owe fiduciary duties to the Collateral's beneficial owners.

[142]  *See, e.g.*, Indenture § 3.07(c) (JC2773) (Trusts cannot amend a Basic Document without consent of Indenture Trustee); Indenture § 3.14 (JC2776) (Indenture Trustee can "only" sell or dispose of the Student Loans if certain conditions are met); Trust Agreement § 4.02(b) (JC0591) (Owners cannot direct the Owner Trustee to contravene a Trust Related Agreement).

[143]  *See, e.g.*, Indenture (Granting Clause) (JC2760) (stating the Trusts assigned to the Indenture Trustee their rights under "all Servicing Agreements"); *see generally In re Nat'l Collegiate*, 2020 WL 4813889, at *8–11 (discussion of "shared" rights under the Granting Clause and holding that "The Odyssey Agreement Violates the Granting Clause by Reserving for the Trusts Rights Belonging to the Indenture Trustee for the Benefit of the Noteholders").

**\*21** Without the benefit of a more specific case or controversy, and perhaps more developed factual records, it

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 80 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

is impossible to give the parties more precise guidance than the framework I have just provided. [144] The Trusts' interests in fulfilling their obligations may overlap with the Indenture Trustee's rights to act on behalf of the Trusts in matters that relate to the Collateral. While it is possible to harmonize these competing interests, to do so will require a careful review of all three of the steps I have just outlined. [145]

[144]  I note here that the Third Circuit Court of Appeals recently provided more precise guidance when it reviewed whether the Trusts validly appointed an additional "Special Servicer" for the Trusts. The Owners believed that the original "Special Servicer"—which was engaged to collect delinquent Student Loan payments—was failing in its duties. Without the consent of the Indenture Trustee, the Owners purported to direct the Owner Trustee to appoint an additional "Special Servicer." The agreement that governed the Trusts' relationship with the additional "Special Servicer" gave the Trusts (and, therefore the Owners) a right to veto the subsequent removal of the "Special Servicer," whereas the original Service Agreement did not. The Third Circuit invalidated the "Special Servicer's" appointment on two grounds. *First*, the court held the appointment violated the Granting Clause. The court noted the Grant includes the Trusts' rights in all "Servicing Agreements." On the other hand, the Trusts retain an obligation to "provide for ... the servicing of the Student Loans." Trust Agreement § 3.02(a) (ii) & (iii) (JC0586). Based on this obligation, the court held the Trusts *could* appoint an additional Servicer to fulfill this obligation. But the problem with the Owners' directions was that the new "Servicing Agreement" granted the Trusts enhanced rights when compared with the original "Servicing Agreements" (*i.e.*, the right to remove the Servicer). The new "Servicing Agreement" was thus invalid—not because the Trusts appointed an additional Servicer, but because the new agreement derogated from the Grant. *Second*, the court held the additional "Servicing Agreement" amended a "Basic Document" without the requisite consent. *See In re Nat'l Collegiate*, 2020 WL 4813889, at *11–15.

[145]  One question this Opinion does not resolve is what should happen if: (i) the Owners issue a

valid direction to the Owner Trustee, directing the Trusts to take an action in relation to the Collateral that is directly related to the Trusts' fulfillment of their obligations under the Indenture, and (ii) the Indenture Trustee purports to take a contractually valid, but contradictory, action on behalf of the Trusts (pursuant to its right to act on behalf of the Trusts as to the Collateral). I am not convinced the parties have joined issue on this narrow question, and it is not clear to me that this factual scenario has arisen in the past or will arise in the future. In any event, I do not reach the question as it is not before the Court.

Against the backdrop of this high-level summary, I invite the reader (if so inclined) to don a scuba tank and take a deep dive into the minutia of the parties' competing Declarations and the Trust Related Agreements.

## B. The Governing Instruments of the Trusts

At the threshold, the Owners seek a Declaration that the Trust Agreements "are the governing instruments of the Trusts under the DST Act." [146] The Owner Trustee seeks a similar Declaration. [147] This Declaration, it seems, would place the contracts related to the Trusts in a hierarchy, and that, in turn, would suggest that the Trust Agreements trump all others. Given that this Declaration affects all of the other, more specific Declarations at issue here, I tackle this one first.

[146]  Owners' Compl. ¶ 149(d).

[147]  Owner Trustee Counterclaim ¶ 74(a).

**\*22**  The DSTA provides that a statutory trust's "governing instrument" is "any written instrument ... which creates a statutory trust or provides for the governance of the affairs of the statutory trust and the conduct of its business." [148] In Section 2.05, captioned "Declaration of Trust," the Trust Agreement states, "[i]t is the intention of the parties hereto that the Trust constitute a statutory trust under the [DSTA] and that *this Agreement constitute the governing instrument of the Trust*." [149] Based on the plain meaning of this provision, I am satisfied that each Trust Agreement is the governing instrument for the applicable Trust. [150]

[148]  12 *Del. C.* § 3801(e) (definition of "Governing instrument").

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 81 of 219

149 Trust Agreement § 2.05 (JC0587) (emphasis supplied).

150 *See Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 56 A.3d 1072, 1120 (Del. Ch. May 4, 2012), *aff'd*, 45 A.3d 148 (Del. 2012), and *aff'd*, 68 A.3d 1208 (Del. 2012), *as corrected* (July 12, 2012) (holding that the definite article "the" made clear that a contract referred to "only one transaction"); *ION Geophysical Corp. v. Fletcher Int'l Ltd.*, 2010 WL 4378400, at *8 (Del. Ch. Nov. 5, 2010) (applying New York law) ("[P]lacing the article 'the' in front of a word connotes the singularity of the word ....").

But that does not end the analysis or create the documentary hierarchy the Owners seek. The Indenture Parties contend it would "obscure the fundamental structure of the securitizations, each of which is governed by several interlocking agreements that must be read together to give full effect to their meanings," if the Court were to issue a declaration that Trust Agreements are the Trust's "governing documents"—hard stop. [151] Such a declaration, they say, would "sever symbiotic agreements that recognize their interlocking roles in governing the Trusts' operations." [152] For reasons explained below, I am satisfied the Indenture and other Trust Related Agreements are not inoperative or subordinated simply because those agreements are not the Trusts' "governing instrument."

151 *See* Joint Answering Br. in Opp'n to NC Residual Owners Trs.' and NC Owners LLC's Mot. for J. on the Pleadings ("JAB") (D.I. 437) at 36.

152 JAB at 36.

"It is, of course, axiomatic that a contract may incorporate by reference provisions contained in some other instrument." [153] As long as a contract "refers to another instrument" and "makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties." [154] Here, the Trust Agreements make frequent reference to other Trust Related Agreements and, in particular, the Indenture. [155]

153 *State ex rel. Hirst v. Black*, 83 A.2d 678, 299 (Del. Super. Ct. 1951).

154 *Brastor Mercantile, Ltd. v. Central Citrus S/A*, 1989 WL 70971, at *4 (Del. Super. Ct. June 6, 1989) (citing *Hirst*, 83 A.2d at 681); *see also* 17A C.J.S. *Contracts* § 419 (2020) ("Matters incorporated by reference or annexed to a contract will be construed as part of the contract, for the purpose and to the extent indicated.").

155 *See, e.g.*, Trust Agreement § 2.03(a)(i) (JC0586) (stating the Trusts' purpose is to "execute the Indenture"), § 4.02(b) (JC0591) (stating the Owners may not "direct the Owner Trustee" to act in a manner contrary to the Trust Related Agreements).

While a "mere reference in one agreement to another agreement, without more, does not incorporate the latter agreement," the first page of the Trust Agreements states that one of the central purposes of the Trusts is to "execute the Indenture." [156] In this spirit, the Trust Agreement prohibits the Owners from directing the Owner Trustee to contravene any Trust Related Agreement, which, of course, includes the Indenture. [157] These are more than mere references; they are explicit manifestations of intent that the Trust Related Agreements play a central role in the Trusts' governance and day-to-day operations. [158] As a result, "matters incorporated into [the Trust Agreement] by reference are as much part of [the Trust Agreement] as if they had been set out in the contract verbatim." [159] Subject to this clarification, the Court will grant the Owners' and the Owner Trustee's Motions as to their respective Declarations (D) and (A). [160]

156 Trust Agreement § 2.03 (JC0586) (referencing the Trust Related Agreements and the Indenture), § 4.02 (JC0591) (referencing the Trust Related Agreements); *Town of Cheswold v. Central Del. Bus. Park*, 188 A.3d 810, 818–19 (Del. 2018); *see also* 17A C.J.S. *Contracts* § 419 (2020) (stating the elements of the incorporation by reference doctrine).

157 Trust Agreement § 1.01 (JC0584) (definition of "Trust Related Agreement"), § 4.02(a) (JC0591).

158 *See Town of Cheswold*, 188 A.3d at 819 (stating that to be incorporated by reference, an agreement must make more than a "mere reference" to another agreement and must make an "explicit

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 82 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

manifestation of intent" to incorporate the other document).

159    17A C.J.S. *Contracts* § 419 (2020).

160    *See* Owners' Compl. ¶ 149(d); Owner Trustee Counterclaim ¶ 74(a).

## C. The Granting Clause

 **\*23** The second category of competing Declarations relates to the scope of the Granting Clause. [161] These disputes include (i) whether any Trust Property could be distributed according to the Trust Agreement Waterfall while the Notes are outstanding, (ii) whether the Granting Clause creates an assignment or a mere security interest in the Collateral (iii) whether the Collateral includes all the Trusts' rights under all Basic Documents, (iv) whether the Trusts' extra-contractual tort claims are included within the Collateral and (v) whether the Indenture establishes contractual prerequisites that must be satisfied before the Indenture Trustee exercises its rights in the Collateral.

161    *Compare* Owners' Compl. ¶ 149(a)–(b), *with* U.S. Bank Counterclaim ¶ 3(a)–(o).

When ruling on each of these disputes, New York law (which governs the Indenture) requires that the Granting Clause be read to "mean what it says" as long as the contract is "clear and unambiguous." [162] In the words of the United States District Court for the Southern District of New York, the Court may not "read the sweeping language of the Granting Clause to have limits that it lacks on its face." [163]

162    *BlackRock*, 247 F. Supp. 3d at 413 (internal quotation and citation omitted).

163    *Id.*

### 1. While the Notes Are Outstanding, No Trust Property Can Be Distributed According to the Trust Agreement Waterfall

One of the parties' fundamental disagreements concerns whether any Trust Property could be distributed according to the Trust Agreement Waterfall (rather than the Indenture Waterfall) while the Notes are outstanding. According to the Owners, in the Indenture, the Trusts have granted "only the assets expressly enumerated in the Granting Clause." [164] They point to the Granting Clause's detailed list of assets and contractual rights and argue that the list would be surplusage

if the Grant had simply intended to transfer *all* the Trusts' assets. [165] Implicit in this line of argument is the notion that property remains outside the Grant that could be distributed according to the Trust Agreement Waterfall. On the other hand, U.S. Bank (as Indenture Trustee) interprets the Trust Related Agreements to create an absolute assignment of the Trusts' assets and contractual rights for the benefit of the Noteholders. [166]

164    Owners' Compl. ¶ 149(a).

165    Pls.' Opening Br. in Supp. of their Mot. for J. on the Pleadings ("POB") (D.I. 413) at 18.

166    *See* U.S. Bank Counterclaim ¶ 3(a).

I begin my analysis of these divergent interpretations, as I must, with the plain language of the Indenture. On the first page of the Indenture, the Trusts "Grant[ed]" all their "right title and interest" in the Student Loans and certain contracts, as well as "all present and future ... choses in action in respect of" the Student Loans and the applicable contracts. [167] The Indenture defines the assets and contractual rights included within the Grant as the "Collateral." [168]

167    Indenture (Granting Clause) (JC2760–61). One of the Indentures contains different language. *See* Indenture (Granting Clause) (JC0866–67) ("The [Trusts] ... hereby bargain, assign, pledge and grant a security interest ... in Any and all other real or personal property of every name and nature."). Given that this clause also includes the terms "bargain" and "assign," the Owners have not shown that this Indenture should be interpreted differently from the other Indentures when read in context with the other Trust Related Agreements.

168    Indenture (Granting Clause) (JC2761).

The plain meaning of the Granting Clause is that the Trusts granted only contractual rights and assets that meet the definition of "Collateral." [169] But, when read in context with the Trust Related Agreements, it becomes clear that the definition of Collateral includes "all" the Trusts' "right, title and interest in" the "Student Loans" which, under the Trust Agreement, are the *only* assets the Trusts can hold or acquire. [170] It is, therefore, immaterial that some aspects of the Grant are only "in respect of" the Collateral because

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 83 of 219

*In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)*

2020 WL 5049402

the Trust Agreement prohibits the Trusts from acquiring any assets other than those listed. [171]

169    Indenture (Granting Clause) (JC2760).

170    Indenture (Granting Clause) (JC2760); Trust Agreement § 2.03 (JC0586); POB at 18.

171    *Compare* Trust Agreement § 2.03(a) (JC0586) ("The purpose of the Trust is to engage in the following activities and *only* those activities: (i) To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes."), *with* Indenture (Granting Clause) (JC2760) ("The Issuer hereby Grants ... the Financed Student Loans."); *see also* Trust Agreement § 2.03(b)(iv) (JC0587) (requiring the Trusts to "avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the Assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner"); Indenture § 3.12 (JC2776) ("The [Trusts] shall not engage in any business other than financing, purchasing, owning, selling and servicing the Financed Student Loans.").

**\*24** To be clear, even if the Owners could identify Trust Property or contractual rights that fall outside the definition of "Collateral," therefore falling outside the Indenture Trust Estate, while the Notes are outstanding, the Trusts cannot distribute *any* property to the Owners unless the property has flowed through the Indenture Waterfall. [172] While the Notes are outstanding, the Trust Agreement directs "Income with respect to and proceeds of the Trust Property [ (defined as 'all right, title and interest of the Trust ... *in and to any property* contributed to the Trust by the Owners *or otherwise acquired* by the Trust)']" to be "remitted directly to the Indenture Trustee for application in accordance with the Indenture." [173] For this provision to work, notwithstanding that the Granting Clause includes only the "Collateral," no "Trust Property" can be distributed according to the Trust Agreement Waterfall while the Notes are outstanding.

172    *See* Indenture (Appendix A) (JC2842) (definition of "Indenture Trust Estate"); *cf.* PRB at 30 (arguing the Trusts retain certain extracontractual internal affairs claims that are not among the assets identified in the granting clause).

173    Trust Agreement § 5.02 (JC0590) (emphasis supplied).

### 2. The Granting Clause Creates an Assignment of the Collateral, and the Trusts Lack Plenary Authority to Control the Collateral

The parties' very different understanding of how the Trusts are to be governed may best be explained by their disparate views regarding whether the Granting Clause intends an assignment, a security interest, or both. The Indenture Parties contend the Granting Clause creates both a present assignment *and* a precautionary security interest in the Collateral. [174] For their part, the Owners view the Grant as creating *only* a security interest in the Collateral. [175] While the difference between an assignment and a security interest can have many legal implications, the distinction is important here because it dictates which party (the Trusts and/or the Indenture Trustee) may exercise proprietary rights with respect to the Collateral. [176]

174    Def. U.S. Bank Nat'l Ass'n's Reply Br. in Supp. of its Mot. for J. on the Pleadings ("U.S. Bank RB") (D.I. 446) at 9.

175    Pls.' Single Combined Answering Br. in Resp. to Rule 12(c) Opening Brs. (D.I. 433) ("PAB").

176    *See generally* 21 C.J.S. *Creditor and Debtor* § 3 (2020) (discussing the difference between a security interest and an assignment and stating that an assignment "does not create a lien in favor of creditors on property, which is still regarded as the assignor's, but it passes both legal and equitable title to the property absolutely beyond the control of the assignor").

As explained below, the only reasonable interpretation of the Trust Related Agreements is that the Granting Clause creates an assignment of the Collateral while also preserving bare legal title to the Collateral in the name of the Trusts so that the Trusts may fulfill their servicing obligations. This assignment divests the Trusts of standing to enforce rights with respect to the Collateral except to the extent necessary to fulfill their obligations.

As a general matter, under New York common law, "[a]n unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor." [177] A transfer creates

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

an assignment if it conveys a party's rights "in toto" so that nothing is "held back" from the grant.[178]

177    *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984).

178    *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 2016 WL 796850, at *8–9 (S.D.N.Y Feb. 25, 2016) ("*NCUAB I*"), *aff'd*, 898 F.3d 243 (2d Cir. 2018) ("*NCUAB II*"). *House of Europe Funding I, LTD v. Wells Fargo Bank*, 2014 WL 1383703, at *15–16 (S.D.N.Y. Mar. 31, 2014) ("*House of Europe I*") ("A party that has assigned away its rights under a contract lacks standing to sue for breach of that contract.").

**\*25**   On its face, the Granting Clause certainly appears to be a broad grant of the Collateral with nothing held back. It states the Trusts "hereby Grant[ ] to the Indenture Trustee ... all the [Trusts'] right, title and interest in" the Collateral.[179] The definition of "Grant" includes "sell," "convey," and "assign," as well as the "immediate and continuing right" to bring "any suit" "in the name of the Trusts ... with respect" to the Collateral.[180] And, to reiterate, the Trust Related Agreements define the Collateral so that it is coextensive with the type of property the Trusts can acquire.[181]

179    Indenture (Granting Clause) (JC2760).

180    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (definitions of "Grant" and "Proceedings") (JC2842, 2849).

181    *Compare* Indenture (Granting Clause) (JC2760) (the Trusts assigned all their "right, title and interest" in the "Financed Student Loans."), *with* Trust Agreement § 2.03(i) (JC0586) ("The purpose of the Trust is to ... acquire a pool of Student Loans.").

Given the importance of consistency and predictability in the securitization industry, as already noted, New York law is clear that when interpreting indentures, courts must be careful not to read "sweeping language of [a] Granting Clause to have limits that it lacks on its face."[182] Notwithstanding this clear direction, and in an effort to find such a limitation, the Owners highlight what they perceive as a conflict between the Indenture Parties' construction of the Granting Clause and the Trust Related Agreements. Specifically, the Owners

underscore that the Trusts still have legal title to the Student Loans.[183] Because the Granting Clause purports to convey the Trusts' "title" to the Indenture Trustee, the Owners believe this inconsistency shows that other aspects of the Granting Clause (such as the "immediate and continuing right" to bring claims in the name of the Trusts with respect to the Collateral) should not be taken at face value.[184]

182    *BlackRock*, 247 F. Supp. 3d at 413.

183    PAB at 48; U.S. Bank RB at 18 ("[T]rue ownership ... of the Student Loans still lies with the Trusts."); Trust Agreement § 14.02 (JC0609) ("Legal title to all Trust Property shall be vested at all times in the Trust.").

184    *See* PAB at 48.

In response, the Indenture Parties observe that the "Trusts' *rights* in the Student Loans" (which are subject to the Granting Clause) are legally distinct from "the Student Loans themselves" (which the Trusts "did not sell and transfer").[185] Indeed, the Indenture Parties readily concede that legal title to the Student Loans "still lies with the Trusts."[186] This was no accident, say the Indenture Parties, since it was necessary for the Trusts to maintain legal title in the Collateral (the loans) so they could fulfill their role in the collection of the loans as needed to satisfy the purpose of the Trusts.[187]

185    *See* U.S. Bank RB at 17 (emphasis supplied).

186    U.S. Bank RB at 18; Trust Agreement § 14.02 (JC0609).

187    *See* U.S. Bank RB at 18.

Indeed, the Indenture obligates the Trusts to "enforce all of [their] rights under ... the Basic Documents" and to enforce "all terms ... of all Financed Student Loans."[188] And the Administration Agreement states that "lawsuits ... for the collection of the Student Loans owned by the [Trusts]" will be "initiated in the ordinary course of business by the [Trusts] or [their] agents."[189] These narrow limitations, by the Indenture Parties' reckoning, are in place solely to facilitate the Trusts' servicing obligations and cannot be expanded to undermine the Granting Clause's clear assignment of rights in the Collateral to the Indenture Trustee.[190]

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 85 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

188    Indenture § 3.07(c) (JC2772), § 3.20(d) (JC2779); *see also* Trust Agreement § 2.03(ii) (JC0586) (the Trusts are to "provide for the ... servicing of the Student Loans"); Trust Agreement § 4.01(a), (b)(i) (JC0590).

189    Administration Agreement 1(c)(i)(B) (JC3663).

190    U.S. Bank RB at 17–18.

**\*26** In this regard, I note that many cases the Indenture Parties cite to support their reading of the Indenture appear, at first glance, to prove too much. The cases hold that a broad grant of all "rights, title and interest" in collateral will divest the Issuer of *standing* to bring claims that are related to the collateral.[191] Indeed, these cases treat lack of an assignor's standing to bring collateral-related claims as part of the very definition of an assignment.[192] Given that the Indenture Parties argue the Trusts *are intended* to have standing to "enforce the Collateral," it is not clear that this authority actually advances their construction of the Granting Clause.[193]

191    *See House of Europe I*, 2014 WL 1383703, at 16 ("HOE I assigned its rights to Wells Fargo ... [and] lacks standing to sue ... for any breaches"); *NCUAB I*, 2016 WL 796850, at \*9 ("[O]nce the NGN Trust made its own assignment to the Indenture Trustee, it could no longer pursue any claims directly."); *NCUAB II*, 898 F.3d 243, at \*254 ("We presume that the express grant of the right to institute proceedings to the Noteholders entails the denial of such a right to others.").

192    *See, e.g.*, *House of Europe I*, 2014 WL 1383703, at 16 (holding that because an issuer assigned its rights in collateral, it "lacks standing").

193    Indenture § 3.05(iii) (JC2771); None of the cases the Indenture Trustee cites discuss whether the Issuer/plaintiff had servicing obligations; each involve the Issuer's attempt to sue another deal party—rather than underlying borrowers. *See Triaxx Prime CDO 2006-1, LTD v. The Bank of N.Y. Mellon*, 2018 WL 1417850, at \*1 (S.D.N.Y. Mar. 8, 2018), *aff'd*, 741 F. App'x 875 (2d Cir. 2018) ("*Triaxx II*") (holding Issuer lacked standing to sue indenture trustee for breach of contract, negligence and breach of fiduciary duty); *BlackRock*, 247 F. Supp. 3d at 410–413 (holding Issuer lacked

standing to sue trustee for certain failures to identify problems with mortgage backed securities in a resecuritization transaction because the issuer "assigned the Trust Estate as collateral to the Indenture Trustee").

For example, in *House of Europe Funding I v. Wells Fargo*, the court held that, after the Issuer agreed to the grant, it "lack[ed] standing to sue [ ] for breaches" of a collateral administration agreement because it was "no longer the real party in interest with respect to an action upon the instrument."[194] The indenture in *House of Europe* also contained a license that the indenture trustee granted *back* to the Issuer to "exercise all of the Issuer's rights pursuant to" the collateral administration agreement.[195] The court found this distinction was critical and held that the Issuer had standing to bring suit related to the collateral administration agreement because of the *license* (but not because it retained any rights after executing the indenture).[196]

194    *House of Europe I*, 2014 WL 1383703, at \*15, \*16 (interpreting the following grant language: "the Co-Issuers hereby Grant to the Indenture Trustee ... all of their right, title, and interest in, to, and under the Asset Management Agreement and the Collateral Administration Agreement").

195    *Id.*, at \*15–16.

196    *Id.*, at \*16.

*House of Europe* could be read to create a rule that if parties wish for an Issuer to fulfil servicing duties, the Issuer should be granted a license to exercise rights with respect to the collateral for that purpose. A fairer reading of the case, however, is that after executing the indenture, the Issuer lacks the plenary "*right* to sue" in relation to the collateral, but as other New York courts have recognized, an Issuer may still have "standing based upon the contractual *duties* [ (rather than retained *rights*) ] ... under the Indenture."[197]

197    *Id.*, at \*15; *Hildene Capital Mgmt., LLC v. The Bank of N.Y. Mellon*, 105 A.D.3d 436, 438 (N.Y. Sup. Ct. App. Div. 2013) ("Most significantly, PreTSL XX has standing based upon the contractual duties it assumed under the Indenture."); *In re Nat'l Collegiate*, 2020 WL 4813889, at \*9 (interpreting the Trust Related Agreements at issue in this Action and noting that

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 86 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

"more instructive here is the outcome in" *Hildene* because the Trusts "assumed certain contractual obligations under the Basic Documents that were not annulled by the Granting Clause," and, for this reason, the Trusts retain the power that is concomitant with their obligations—otherwise, the Trusts' obligations in the Trust Related Agreements would be rendered meaningless).

**\*27** After careful consideration, I am satisfied that when read in context with the Trust Related Agreements, the Granting Clause creates an assignment of the Collateral to the Indenture Trustee—including an immediate and continuing right to bring legal proceedings in the Trusts' name. [198] The only limitation to the sweeping language in the Granting Clause that can be drawn from the plain language of the Trust Related Agreements is the Trusts' retention of legal title to the Collateral so that the Trusts may fulfill their servicing obligations. [199]

[198]   *See* Indenture (Appendix A) (definition of "Grant") (JC2842).

[199]   *BlackRock*, 247 F. Supp. 3d at 413 (stating courts should not "read the sweeping language of the Granting Clause to have limits that it lacks on its face.").

While some of the cases the parties have cited could be read to support the opposite conclusion, the weight of authority holds that a securitization trust's retention of bare legal title and servicing responsibilities does not, *ipso facto* or *ipso jure*, mean that the trust has conveyed a mere security interest. [200] Courts in multiple jurisdictions have found transactions to be sales or assignments (rather than mere security interests) despite the grantor's retention of bare legal title so that the grantor can continue to service the assigned assets. [201] And, as an aside, I note the Bankruptcy Code specifically contemplates that an Issuer may sell its "interest" in a financial asset while retaining "legal title to service or supervise the servicing of such" financial asset. [202]

[200]   *See House of Europe I*, 2014 WL 1383703, at \*11, \*15 ("A CDO issuer like HOE I owns the underlying assets and is therefore required [ (i.e., has standing) ] by actions that adversely affect the underlying assets," but, at the same time, "HOE I [ ] lacks standing" to bring its own claims "under [ ] contracts" in which it has

conveyed all "right, title and interest."); *Triaxx Prime CDO 2006-1, LTD v. OCWEN Loan Serv.*, 762 F. App'x 601, 607–08 (11th Cir. 2019) ("*Triaxx III*") (involving a special purpose entity obligated "to file financing statements," "take action as necessary to secure the rights and remedies of the Secured Party" and to "enforce any of the Pledged Securities" even though it had transferred its rights in a "complete assignment") (internal quotation omitted); *Triaxx Prime CDO 2006-1, LTD v. Bank of N.Y. Mellon*, 2017 WL 1103033, at \*3–4 (S.D.N.Y. Mar. 21, 2017) ("*Triaxx I*") (noting that a servicer might have an obligation to exercise "rights or remedies with respect to [ ] Collateral" "*on behalf of the Issuer*" even though the issuer had assigned "all of its right, title and interest" in the collateral and had been "divest[ed]" of "any rights" to "commence litigation on their own behalf") (emphasis supplied); *NCUAB I*, 2016 WL 796850, at \*3–4 (noting the Issuer trust transferred its "right, title and interest" while, at the same time, the parties agreed that "legal title to the Trust Estate shall be vested at all times in the [issuer] as a separate legal entity"); *Hildene*, 105 A.D.3d at 436 (holding that an entity which had "granted its right, title and interest" in certain collateral still "has standing based upon the contractual duties it assumed under the Indenture") (internal quotations omitted).

[201]   *See In re Mortg. Funding, Inc.*, 48 B.R. 152, 154 (Bankr. D. Nev. 1985) (involving a non-recourse sale of financial assets with the seller receiving a fee for servicing and retaining "bare legal title"); *In re S. Indus. Banking*, 45 B.R. 97, 100 (Bankr. Tenn. 1984) (grantor "merely held legal title" such that proceeds from property were not "property of" the transferor); *Matter of Federated Dept. Stores, Inc.*, 1990 WL 120751, at \*1–2 (Bankr. S.D. Ohio 1990) (transferor did not "retain any ownership rights" where transferee bore "the risk that the Receivables will prove uncollectable" even though the transferor continued to service the receivables).

[202]   11 *U.S.C.* § 541(d).

**\*28** To be sure, the Trusts may have a right to distributions if the Notes are repaid. [203] Notwithstanding this dynamic, in *TraxxPrime v. Ocwen Loan Servicing*, the court held that a similar transaction structure made the applicable trust the

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 87 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

"resulting beneficiary of the Indenture Trust," but rejected the argument that the Trusts' "status as a potential beneficiary renders the transfer ... 'incomplete.' " [204]

203    *See* Trust Agreement § 5.02 (JC5093).

204    *Triaxx III*, 762 F. App'x at 606.

It is not surprising that sophisticated parties would seek to structure transactions so that an Issuer/assignor trust can "exercise day-to-day control in order to maximize the value" of the transaction, but also, "consistent with ownership," allow the assignee to "possess the right to displace" the Issuer from that role. [205] The Trust Related Agreements reflect this transactional structure. For example:

- The Granting Clause transfers to the Indenture Trustee the "*immediate and continuing*" right to bring Proceedings in the name of the Trusts, while also omitting in that transfer the Trusts' servicing "obligations" from the definition of "Grant." [206]

- Even though the Indenture Trustee has received the "immediate and continuing" right to file suit in the name of the Trusts, the Indenture provides that the "Indenture Trustee" has "no obligation to administer, service or collect the loans in the Indenture Trust Estate." [207]

- The Trust Agreement prohibits the Trusts from acquiring "any financial asset that requires the Trust, the Owners or the Administrator to *make any decisions regarding such asset other than the servicing of the asset.*" [208]

- Rather than relying on the Indenture Trustee, the Indenture states the Trusts "*shall* cause to be diligently enforced and taken all reasonable ... proceedings necessary for the enforcement of all terms ... of all Financed Student Loans made and agreements in connection therewith." [209]

- Section 5.16 of the Indenture, entitled "Performance and Enforcement of Certain Obligations," provides that the Trusts "shall" enforce certain Basic Documents "as the Indenture Trustee *may request.*" [210]

- To the extent the Trusts continue to make payments on the Notes, the Indenture Trustee has the right to direct the Trusts to "exercise any and all rights ... lawfully available to the [Trusts] under ... the Basic Documents." [211]

- But if the Student Loan proceeds are insufficient to repay the Notes, the Indenture requires the Indenture Trustee to take over, stating the Indenture Trustee "shall ... exercise all rights, remedies, powers, privileges and claims of the [Trusts]." [212]

- The Trusts agreed that, "[w]ithout derogating from the absolute nature of the assignment granted to the Indenture Trustee," the Trusts would not modify the terms of any Collateral or the Basic Documents absent consent from the Indenture Trustee (among others). [213]

Taken together, these provisions reflect the Indenture Trustee's present ownership of rights in the Collateral. They also establish the Trusts as an administrative vassal with duties to enforce (but no present beneficial interest or plenary rights in) the Collateral.

205    Kravitt § 5.03(D)(3).

206    Indenture (Appendix A) (definition of "Grant") (JC2842) (emphasis supplied).

207    Indenture §§ 3.20(b),(d) (JC2779) (emphasis supplied).

208    Trust Agreement § 2.03(b)(viii) (JC0587) (emphasis supplied).

209    Indenture §§ 3.20(b),(d) (JC2779) (emphasis supplied).

210    Indenture § 5.16 (JC2796) (emphasis supplied); *see also* Indenture § 5.03(f) (JC2788) (stating the Indenture Trustee possesses an independent right to bring "[a]ll rights of action and of asserting claims under this Indenture ... in its own name as trustee of an express trust"); Indenture § 3.14 (JC2776) (stating the Indenture Trustee has an independent right to dispose of the Financed Student Loans under certain circumstances).

211    Indenture § 5.16(a) (JC2796).

212    Indenture § 5.16(b) (JC2796).

213    Indenture § 3.07(f) (JC2773).

**\*29** Having failed to identify a disabling conflict between rights in and title to the Collateral, the Owners seek to avoid judgment on U.S. Bank's requested Declaration regarding

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 88 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

the Granting Clause by arguing that several aspects of the Indenture are ambiguous and cannot be construed without yet-to-be-developed extrinsic evidence. [214] For example, the Owners see ambiguity in the Indenture's definition of "Grant," which states that the "Grant" includes both a "pledge of" and "a lien upon and a security interest in" the Collateral. [215] This, according to the Owners, cannot be reconciled with an absolute assignment.

[214]   *See* PAB at 23–48.

[215]   Indenture (Appendix A) (definition of "Grant") (JC2842); *see also* POB at 25.

The Indenture does use these terms; it even speaks of perfecting a security interest in the Collateral. [216] But the Indenture's use of the term "Security Interest" in the definition of "Grant" is consistent with an absolute assignment because the Uniform Commercial Code ("UCC") defines a "Security Interest" as *both* an interest which "secures payment" *and* "any interest of ... a buyer of accounts ... [or] payment intangible[s]." [217] Moreover, New York's statutory law (which has adopted the UCC) prohibits courts from considering whether a financing statement was filed when determining the substantive nature of a transaction. [218] Indeed, the UCC states the filing of a financing statement "is not of itself a factor in determining whether the collateral secures an obligation." [219] The statute's official comments elaborate that although sophisticated parties may choose to file a "precautionary" financing statement, that filing cannot be used to answer "the substantive question of" whether an assignment was a true assignment. [220] Commenters likewise have recognized "precautionary" financing statements protect sophisticated parties' option to structure a true assignment so that it *also* creates a security interest as a failsafe in the event a court (erroneously) characterizes an assignment as a security interest (which must be perfected to be enforceable against third-party creditors). [221]

[216]   Indenture (Granting Clause) (JC2760); Indenture § 3.06 (JC2772).

[217]   6 *Del. C.* § 1-201(35); N.Y. U.C.C. Law § 1–201(35) (McKinney) (same); Indenture § 3.22(b) (JC2780) ("The Financed Student Loans constitute 'accounts' or 'payment intangibles' within the meaning of the applicable UCC.").

[218]   N.Y. U.C.C. Law § 9–505 (McKinney) ("The 'filing' of a financing statement "is not itself a factor in determining whether the collateral secures an obligation.").

[219]   N.Y. U.C.C. Law § 9–505 (McKinney).

[220]   N.Y. U.C.C. Law § 9–505 cmt. 2 (McKinney).

[221]   Kravitt § 3.04 (stating, "a prudent purchaser will always perfect its purchased interest, even if absolutely certain that a transfer in fact constitutes a true sale").

More fundamentally, under the Indenture, the Indenture Trustee's rights are "cumulative." [222] There is, therefore, no inconsistency in a grant that assigns all "right, title and interest" while also containing language sufficient to create a security interest as a backstop. [223] In such circumstances, an indenture's reference to "preservation of a security interest in the collateral [ ] does not circumscribe the [ ] indentures' grant of 'all right, title and interest.' " [224]

[222]   Indenture § 5.09 (JC2794); *see also* Indenture § 3.23 (JC2782) (stating the Indenture creates "ownership and/or security interests in the [Trusts'] assets").

[223]   Indenture (Granting Clause) (JC2760); Kravitt § 3.04. Multiple provisions in the Indenture evidence a dual intent to create an assignment, as well as language that would be sufficient to create a security interest. *See, e.g.*, Indenture § 3.05 (JC2771) (obligating the Trusts to "preserve the lien" *and* "protect the validity of any Grant").

[224]   *Triaxx II*, 2018 WL 1417850, at *4 (rejecting an argument much like the one the Owners make here); *see also ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809, 814 (8th Cir. 2009) (rejecting an argument that "[d]efendants must not have intended the financing statements to cover all of Hanson's assets because doing so would render the subsequent descriptions of the annuity contracts superfluous" and holding "nothing in the UCC prevents a creditor from filing redundant or precautionary financing statements"); *In re QDS Components, Inc.*, 292 B.R. 313, 345 (Bankr. S.D. Ohio 2002) (addressing analogous law governing the distinction between a "true lease" and a security

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 89 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

interest and stating, "the filing of a financing statement by a cautious lessor does not destroy true lease status, [and] it stands to reason that the ultra-cautious lessor, who takes the additional step of obtaining subordination agreements from the lessee's senior secured lender, has not thereby admitted that it has entered into a disguised financing agreement."); *Rollins Commc'ns, Inc. v. Ga. Inst. of Real Estate, Inc.*, 231 S.E.2d 397, 399 (Ga. Ct. App. 1976) ("It is our view that the lessor, faced with such uncertainty, should be permitted to make provisions for a precautionary filing without risk that such provisions would, in and of themselves, as urged in the instant appeal, convert the lease into a secured transaction."). New York Courts agree. *Accord BlackRock*, 247 F. Supp. 3d at 413 (finding an assignment notwithstanding language in an Indenture that the assignment of collateral was made "as security for the benefit of the Noteholders").

**\*30** Likewise, the Indentures' reference to the "Trust's rights" and requirement that the Trust "enforce ... *its* rights with respect to each Financed Student Loans" do not alter this conclusion.[225] Courts have interpreted similar references to *an Issuer's* rights to be:

> irrelevant both because it creates a duty rather than a right (the Issuer '*shall* enforce,' not the Issuer 'retains the right to enforce'), and because there is no inconsistency between a provision that confers a right to [the Issuer] and a provision that assigns all such rights to [the Indenture Trustee].[226]

Put differently, one can reconcile an assignor's promise to "enforce any of the Pledged Securities" with the conclusion that the assignor granted more than a security interest because the assignor retains an *obligation* to "defend challenges to the preference and priority of" the assignee, rather than a right that the Trust could wield for its own benefit.[227]

[225]   *See* Indenture § 3.20(f) (JC2779) (emphasis supplied).

[226]   *House of Europe I*, 2014 WL 1383703, at \*16 (involving a grant of all "right, title, and interest in, to, and under" certain agreements and the grantor's obligation to "enforce all of *its* material rights" under those agreements) (emphasis supplied); *Triaxx III*, 762 F. App'x 601, 608 (involving a special purpose entity obligated "to file financing statements," "take action as necessary to secure the rights and remedies of the Secured Party" and to "enforce any of the Pledged Securities") (internal quotation omitted).

[227]   *Triaxx III*, 762 F. App'x at 608.

In yet another attack on the plain language of the Indenture, the Owners urge the Court to find that the "execution of an absolute form of assignment is not controlling evidence" of an intent to assign the Trusts' interest in the Collateral.[228] In support of this argument, the Owners cite authority from bankruptcy courts recognizing the power of a bankruptcy trustee to claw back assigned property into the debtor's bankruptcy estate.[229] It is black letter law that a bankruptcy trustee's "strong-arm powers" "serve essentially to marshal all of the debtor's assets, including *some that the debtor itself could not recover*, in order to enhance the resources available to the pool of creditors."[230] In bankruptcy cases, courts can (and do) ignore the titles contracting parties use to describe their transaction.[231]

[228]   *See* PAB at 15 (quoting *In re Ridgewood Realty of L.I. Inc.*, 2015 WL 7755431, at \*1 (Bankr. S.D.N.Y. Dec. 1, 2015)).

[229]   *See, e.g.*, *In re the Matter of Joseph Kanner Hat Co., Inc. v. City Trust Co.*, 482 F.2d 937 (2d Cir. 1973) (involving a claim by a bankruptcy trustee that his interest in property was entitled to priority); *In re Candy Lane Corp.*, 38 B.R. 571 (Bankr. S.D.N.Y. 1984) (involving an action by a "[t]rustee in bankruptcy"); *In re Grant Assocs*, 1991 WL 21228 (S.D.N.Y. Feb. 5, 1991) (determining whether certain financial assets were "property of the bankruptcy estate").

[230]   *Matter of Quality Holstein Leasing*, 752 F.2d 1009, 1014 (5th Cir. 1985) (emphasis supplied).

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 90 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

231  *See, e.g., In re Candy Lane*, 38 B.R. at 571, 575 (looking past "broad language" to determine the "true nature of a security transaction").

Of course, in this case, there is no bankruptcy trustee and no third-party rights are involved. [232] Instead, the Owners are trying to walk back the Trusts' promise to the Indenture Trustee to convey "*all*" their "right, title and interest" in the Collateral. [233] As other courts have reasoned, in the financial asset securitization context, "all must mean all," and I must give effect to the "breadth and completeness of the Granting Clause." [234]

232  This Court does not decide whether the Collateral would constitute a part of the Trusts' estate if the Trusts were forced into bankruptcy proceedings because this question is not before the Court.

233  Indenture (Granting Clause) (JC2760).

234  *BlackRock*, 247 F. Supp. 3d at 413; *Triaxx III*, 762 F. App'x at 605 ("To determine whether the assignment in the Indenture Agreement is complete and unequivocal, we look to the terms of the agreement.").

**\*31** But even assuming, *arguendo*, the Court could look past the plain language of the Grant (it cannot), [235] the Trust Related Agreements contemplate a transaction that possesses the most important characteristic of an assignment; the Noteholders have no recourse against the Trusts even if the Notes are not repaid. [236] For this reason, the allocation of risks provided for in the Trust Related Agreements reflects an unmistakable intent that the Grant create more than a mere security interest. [237]

235  *See BlackRock*, 247 F. Supp 3d at 412; PAB at 13–14.

236  Indenture § 3.01 (JC2769) ("The Notes will be non-recourse obligations of the [Trusts]").

237  *See Triaxx III*, 762 F. App'x at 603 (finding that if notes are "limited-recourse obligations," it weighs in favor of finding an assignment rather than a secured loan); *Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 545 (3d Cir. 1979) (discussing the "extremely relevant factor of recourse and the risks allocated" in assessing the

proper characterization of a transaction) (internal quotation omitted).

At the end of the day, "the words parties use to bind themselves together in a contractual relationship matter." [238] While this court has held that other securitization indentures create security interests (rather than assignments), those indentures stated "the [Trust] hereby Grants to the Trustee ... a continuing security interest in, and lien on, all of its right, title and interest in, to and under" certain financial assets. [239] Here, in contrast, the Trusts granted "*all*" their "*right, title and interest* in and to*" the Collateral. [240] This difference matters, and U.S. Bank has offered the only reasonable interpretation of the Trust Related Agreements that accounts for the specific language the parties chose to characterize the assignments. Given the true assignment, the Trusts lack plenary authority to control the Collateral during the life of the Indenture, and thus cannot bring claims related to the Collateral unless strictly tied to one of their contractual obligations. [241]

238  *Zohar II 2005–1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at \*1 (Del. Ch. Nov. 30, 2017).

239  *Id.*, at \*9 (emphasis supplied); *see also* Kravitt § 4.04 (noting that the "second sale" in a two-tiered securitization structure "need not be a true sale for bankruptcy purposes").

240  Indenture (Granting Clause) (JC2760) (emphasis supplied).

241  *See Hildene*, 105 A.D.3d at 438 (holding that an entity that had "granted its right, title and interest" in certain collateral still "has standing based upon the contractual duties it assumed under the Indenture") (internal quotations omitted).

### 3. The Indenture Trustee Has Not Demonstrated the Trusts Granted All Their Rights Unambiguously Under the Basic Documents

The parties have also joined issue regarding whether the "Basic Documents" are included within the Collateral. [242] This question is important because the Indentures define "Basic Documents" to include, among other agreements, the Indenture, the Trust Agreements, the Administration Agreements and the Servicing Agreements (i.e., a much longer list of contracts than those specifically mentioned in the Granting Clause). [243] And, as outlined above, to the extent the Trusts' rights in a specific agreement are swept over

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 91 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

to the Indenture Trustee in the Grant, the Indenture Trustee has immediate and continuing authority to use those rights for the benefit of the Noteholders and AMBAC.

242    *See* U.S. Bank Counterclaim ¶ 3(d).

243    Indenture (Appendix A) (JC2833) (definition of "Basic Documents"); Indenture (Granting Clause) (JC2760); PAB at 61.

**\*32**  If a contract right is included in the Indenture Trust Estate, it does not necessarily mean the right cannot be "shared" between the Trusts and the Indenture Trustee.[244] To the contrary, the Student Loans are within the Indenture Trust Estate, yet the Trusts must exercise certain rights related to the Student Loans if they are to make good on their promise to "enforce" the Collateral.[245] It does follow, however, that a contract right residing in the Indenture Trust Estate cannot be directly or indirectly clawed-back to the Trusts—nor can the Trusts exercise a Collateral-right for any purpose other than fulfilling their obligations.[246]

244    *See In re Nat'l Collegiate*, 2020 WL 4813889, at \*8–10 (interpreting the Trust Related Agreements and holding that, although the right to appoint servicers is included within the Granting Clause, the Trusts may "share" the right to appoint servicers in connection with the obligations they assumed under the Indenture).

245    Indenture § 3.05(iii) (JC2771).

246    *In re Nat'l Collegiate*, 2020 WL 4813889, at \*10–11 (holding that the Trusts' efforts to appoint an additional Servicer violated the Granting Clause "by Reserving for the Trusts Rights Belonging to the Indenture Trustee for the Benefit of the Noteholders").

To repeat, the Granting Clause assigns all the Trusts' "right, title and interest" in certain contracts that govern the inner workings of the securitization transaction, including, in subsection (b), the "Servicing Agreements" and the "Student Loan Purchase Agreements."[247] In subsection (c), the Granting Clause also conveys the Trusts' rights under "each Guarantee Agreement."[248] This much is undisputed, but the parties' interpretations of the Indenture diverge with respect to the remainder of subsection (c).[249]

247    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2852–53) (defining "Servicing Agreement" and "Student Loan Purchase Agreements," respectively as the agreements "under which [the] servicer agrees to service Financed Student Loans included in the Indenture Trust Estate" and the agreements "providing for the sale of Student Loans from the Sellers to the Depositor for deposit into the Indenture Trust Estate").

248    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842, 54) (defining "Guarantee Agreements" as certain contracts through which payments of principal and interest owing on certain Student Loans were guaranteed).

249    Indenture (Granting Clause) (JC2760); *compare* PAB at 58 ("If the drafters of the Indenture had intended to include all of the Basic Documents, ... they would not have placed it at the end of a paragraph otherwise relating solely to guarantees."), *with* U.S. Bank RB at 22 ("The Granting Clauses expressly include 'each of the other Basic Documents.' ").

In its briefs, U.S. Bank argues the Granting Clause's reference to "each of the other Basic Documents" should be read as an independent object in which the Trusts granted all their "right, title and interest."[250] The Owners agree that, in isolation, the Granting Clause could be interpreted as U.S. Bank reads it.[251] Even so, the Owners contend U.S. Bank's reading is not the only reasonable construction because the other contracts listed in subsection (b) and (c) are among the Basic Documents.[252] According to the Owners, the Indentures' drafters could have simply granted the Trusts rights in "the Basic Documents," rather than identifying a few agreements and then referencing "all other Basic Documents."[253]

250    U.S. Bank RB at 22 (citing Indenture (Granting Clause) (JC2760)).

251    *See* PAB at 57 (listing U.S. Bank's interpretation among the ways the Granting Clause "could be parsed.").

252    *See* Indenture (Appendix A) (JC2833) (definition of "Basic Documents"); PAB at 58–59.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 92 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

253    *See* Indenture (Appendix A) (JC2833) (definition of "Basic Documents"); PAB at 58–59.

**\*33** Ultimately, given lawyers' well-recognized "impulse towards over inclusiveness," the Indenture is fairly susceptible to the interpretation U.S. Bank advances. [254] At this stage, it is reasonable to read the Granting Clause as identifying some contracts by name while also sweeping in others by its reference to other Basic Documents. [255] This interpretation gives independent meaning to each item in the list and is in harmony with the broader Trust Related Agreements. [256]

254    *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at \*2–5 (Del. Ch. Dec. 7, 1999) (recognizing the lawyers' "impulse towards over inclusiveness").

255    *See* U.S. Bank RB at 24; *Johnson City Cent. Sch. Dist. v. Fidelity and Deposit Co. of Md.*, 226 A.D.2d 990, 992–93 (N.Y. Sup. Ct. App. Div. 1996) (stating an interpretation is reasonable if language is "fairly susceptible" to that reading).

256    *See In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1151 (N.Y. Ct. App. 2016) (holding that contracts must be interpreted to give "fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect").

On the other hand, the Owners advance a different interpretation. They read subsection (c) as a grant of (i) the Guarantee Agreement, (ii) the TERI Deposit and Security Agreement and (iii) the TERI Pledge fund as all three relate to (a) the Student Loans and the proceeds thereof, and (b) each of the other Basic Documents. [257] The Owners contend the reference to "other Basic Documents" was intended to sweep into the Grant the Trusts' rights related to the Guarantee Agreement and the TERI Deposit and Security Agreement to the extent such rights were discussed in other Basic Documents—without sweeping in *all* the Trusts' rights under *any* Basic Document. [258]

257    *See* PAB at 55; Tr. at 39.

258    PAB at 56–57; Tr. at 39.

I am satisfied the Owners' proffered construction is also reasonable. [259] Because both parties have offered reasonable interpretations of the Indenture, "parol evidence is necessary to interpret the contract" with respect to this issue, and neither party is entitled to judgment on the pleadings. [260] And, again, to come full circle, the question of whether (or not) the Granting Clause includes the Trusts' rights under all of the Basic Documents is important because it answers whether the Indenture Trustee has an immediate and continuing right to enforce *the Trusts'* (as opposed to its own) rights under, for example, the Indenture.

259    One of the Trust Agreements, which the parties have called the "Master Trust Agreement," also supports the Owners' reading because, unlike the other Indentures, it does not mention "Basic Documents" in its granting clause. *See* Master Trust Indenture (JC0866) (Clause III) (omitting "Basic Documents" from a similar granting clause); *See Cty. of Suffolk*, 100 A.D.3d at 947 ("Separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement.").

260    *See Foot Locker, Inc. v. Omni Funding Corp. of Am.*, 78 A.D.3d 513, 515 (N.Y. Sup. Ct. App. Div. 2010) (stating that where a contract is ambiguous, "parol evidence is necessary to interpret the contract."). This ruling is not intended to detract from or contradict my prior rulings that nothing in the Trust Related Agreements supports the notion that the Trusts could monetize any rights they may possess and then distribute any property according to the Trust Agreement's Waterfall. For reasons stated above, Section 5.02 of the Trust Agreement forecloses that option. (JC0593).

### 4. The Granting Clause Assigned All Tort Claims in Respect of the Collateral

**\*34** While related to the discussion above, the parties separately dispute the narrow issue of whether the Granting Clause effectively assigned the Trusts' extracontractual tort claims under New York law. [261] The Owners contend the Trusts' tort claims fall outside the Grant while the Indenture Trustee argues the Trusts have assigned their rights to bring such claims under the Indenture. [262] This question is critical because it appears the Trusts have tort claims that could be asserted against various service providers, and the Owners and the Indenture Trustee dispute whom, as between them, has the plenary right to control such claims. [263]

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 93 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

261    POB at 19–20.

262    *Compare* Owners' Compl. ¶ 149(a), *with* U.S. Bank Counterclaim ¶ 3(c).

263    *See, e.g.*, *In re Nat'l Collegiate Student Loan Trs. Litig.*, 2020 WL 3960334 (Del. Ch. July 13, 2020) (involving a tort claim asserted by the Trusts against a service provider). At this juncture, I will reiterate that nothing in this Opinion holds that a right swept into the Granting Clause cannot, *ipso jure*, be "shared" between the Trusts and the Indenture Trustee. *See In re Nat'l Collegiate*, 2020 WL 4813889, at \*8–10 (the Third Circuit grappling with "shared" rights). Rather, it is likely that the Trusts must have standing to use the Collateral to fulfill their obligations—otherwise, the Trusts' obligations would be "rendered meaningless." *Id.* at \*10. With that said, I do not decide whether the Trusts have any obligation that is germane to the Trusts' tort claims. That question has not been presented in the competing requests for declaratory relief.

In *Commonwealth v. Morgan Stanley*, the New York Court of Appeals held that "where an assignment of fraud or other tort claims is intended in conjunction with the conveyance of a contract or note, there must be some language—although no specific words are required—that evinces that intent and effectuates the transfer of such rights." [264] When read in context with the other Trust Related Agreements, the Granting Clause "evinces" an intent to transfer to the Indenture Trustee a right to assert tort claims on behalf of the Trusts relating to the Collateral.

264    *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 35 N.E.3d 481, 486 (N.Y. Ct. App. 2015); *Triaxx I*, 2017 WL 1103033, at \*5.

The Granting Clause's language is, once again, ground zero for this dispute. In the Indenture, the Trusts conveyed "the immediate and continuing right" to "bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the [Trusts are] or may be entitled to do or receive ... with respect" to the Collateral. [265]

265    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842, JC2849) (definitions of "Grant" and "Proceeding").

When interpreting a similar agreement, the Second Circuit implicitly confirmed that an assignment of all "right, title and interest in and to the ... Trust Estate," including "all present and future claims ... in respect of" the transferred collateral, is sufficient to transfer tort claims (e.g., breach of fiduciary duty claims). [266] In reaching this conclusion, the court affirmed the district court's reasoning that "the contract must be read to mean what it says" when "nothing was held back" after giving effect to a similar granting clause. [267] The same result follows here.

266    *NCUAB II*, 898 F.3d at 247–48; *see also NCUAB I*, 2016 WL 796850, at \*6, \*8–11 (clarifying that the underlying assignment in *Nat'l Credit* included tort claims); *but see Triaxx I*, 2017 WL 1103033, at \*5 (interpreting a securitization indenture and holding that "tort claims do not transfer with a broad assignment of rights," but noting this holding was rendered "without the benefit of specific briefing").

267    *NCUAB I*, 2016 WL 796850, at \*9–10.

**\*35** Moreover, the notion that the Granting Clause excluded the Trusts' tort claims conflicts with the structure of the Trust Related Agreements. [268] The Trust Agreement Waterfall directs that proceeds from all "Trust Property" be remitted to the Indenture Trustee. [269] As noted, "Trust Property" includes "all right, title and interest of the Trust ... in and to *any* property contributed to ... or otherwise acquired by the Trust." [270] Any proceeds from a tort claim belonging to the Trusts, therefore, would be "Trust Property," remitted directly to the Indenture Trustee (that is, such proceeds would be treated the same as proceeds from the Collateral). This dynamic belies the notion that the parties intended to exclude any of the Trusts' extra-contractual tort claims from the Granting Clause. The only reasonable interpretation of the Granting Clause is that a right to assert these claims was transferred from the Trusts to the Indenture Trustee.

268    *See Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (stating that a court should interpret an agreement "in the context of the overall structure of the contract").

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 94 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

269    Trust Agreement § 5.02 (JC0593).

270    Trust Agreement § 1.01 (JC0584) (definition of "Trust Property") (emphasis supplied).

**5. The Indenture Does Not Require the Satisfaction of Contractual Prerequisites Before the Indenture Trustee May Exercise Control over the Collateral**

Having determined that the Trusts conveyed their rights in the Collateral (including the immediate and continuing right to bring Proceedings in the name of the Trusts with respect to the Collateral), I turn next to the question of whether the Indenture establishes a contractual limitation on the Indenture Trustee's rights. As explained below, it does not.

In Section 5.16(b), the Indenture contemplates the Indenture Trustee's role will change if an "Event of Default" occurs because of the Trusts' failure to repay the Notes. [271] In such an event, the Indenture states the Indenture Trustee *shall ... exercise all rights, remedies, powers, privileges and claims of the [Trusts] ... in connection with the Basic Documents.*" [272]

271    Indenture § 5.16(b) (JC2796).

272    Indenture § 5.16(b) (JC2796) (emphasis supplied).

Sections 5.03(c) and 5.04 contain similar language outlining how the Indenture Trustee's role ratchets up after an Event of Default:

| Section 5.03(c) | Section 5.04 |
| --- | --- |
| "If an Event of Default occurs and is continuing, the Indenture Trustee may, or shall at the written direction of [certain Noteholders], proceed to protect and enforce its rights, the rights of the holders of the Notes, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law." [273] | "If an Event of Default shall have occurred and be continuing, the Indenture Trustee may, or shall, subject to [certain limited rights of the Noteholders to direct the Indenture Trustee] ... institute Proceedings in its own name and as a trustee of an express trust for the collection of all amounts then payable on the notes or this Indenture." [274] |

273    Indenture § 5.03(c) (JC2787) (emphasis supplied).

274    Indenture § 5.04 (JC2789) (emphasis supplied).

Both Sections 5.03(c) and 5.04 implicate Section 5.11 of the Indenture, which gives the Noteholders certain limited rights to direct the Indenture Trustee regarding the Collateral:

the Interested Noteholders, representing not less than a majority of the Outstanding Amount of the applicable [ ] Notes ... shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to

the Notes or exercising any trust or power conferred on the Indenture Trustee. [275]

275    Indenture § 5.11 (JC2795–95).

**\*36** Against this backdrop, the Owners ask the Court to declare "[t]he Indenture Trustee may not bring suit absent an Event of Default including expiration of any applicable cure period." [276] U.S. Bank, on the other hand, seeks Declarations that it (as Indenture Trustee) may prosecute, defend, or settle lawsuits concerning claims in respect of the Collateral without the occurrence of (i) an Event of Default or (ii) any other contractual predicate or condition precedent. [277] Further, U.S. Bank contends that it may bring claims in relation to the Collateral at any time "directly in its capacity as Indenture

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 95 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

Trustee and/or directly on behalf of and in the name of the Trusts."[278]

[276]  Owners' Compl. ¶ 149(b).

[277]  U.S. Bank Counterclaim ¶ 3(d).

[278]  U.S. Bank Counterclaim ¶ 3(e).

In this regard, the Owners' main argument is that even if there is nothing in the Indenture stating that the Indenture Trustee "shall *not*" bring claims before an Event of Default (or "EOD"), the Indenture Trustee's Declarations "read" Sections 5.03(c), 5.04 and 5.16(b) (the "EOD Provisions") "out of the Indenture."[279]  To the extent the Owners are arguing that U.S. Bank's reading fails to give independent meaning to the EOD Provisions, that view of U.S. Bank's construction is not supported by the Indenture's plain language.

[279]  PAB at 65.

Each EOD Provision can be interpreted as a trigger for certain *mandatory* duties of the Indenture Trustee ("the Indenture Trustee *shall ...*"), as well as a means by which the Noteholders may exercise a limited right to direct the Indenture Trustee.[280]  It is consistent for the Indenture Trustee, on one hand, to possess an "immediate and continuing right" to "bring Proceedings in the name of the [Trusts]" while, on the other, to have no obligation to monitor the Student Loans or otherwise "enforce" the Collateral unless an Event of Default triggers its *mandatory* duties.[281]  It is also consistent for the Indenture Trustee to possess a present right to control the Collateral while also possessing an independent right to "request" that the Trusts act "at the Administrator's expense," as Section 5.16(a) provides.[282]

[280]  *See* Indenture § 5.03(c) (JC2787) ("The Indenture Trustee *may*, or *shall* at the written direction of the Interested Noteholders") (emphasis supplied), § 5.04 (JC2789) (same), § 5.16(b) (JC2796) ("The Indenture Trustee *shall* ... at the direction ... of the Interested Noteholders ... exercise all rights, remedies, powers privileges and claims of the [Trusts].") (emphasis supplied).

[281]  *See* Indenture § 3.20(b) (JC2779) ("the Indenture Trustee shall have no obligation to administer, service or collect the loans in the Indenture Trust

Estate"); Indenture (Appendix A) (definition of "Grant") (JC2842).

[282]  Indenture § 5.16(a) (JC2796).

In support of their argument that the phrase "the Indenture Trustee *may*" should be read as an implicit limitation on the Granting Clause, the Owners cite to cases interpreting contracts that lack a broad Granting Clause like the one at issue here.[283]  This distinction is critical because, as explained at length above, the plain language of the Granting Clause includes all the Trusts' "right[s]" in the Collateral as well as the "immediate and continuing" right to bring Proceedings in the name of the Trusts.[284]

[283]  Indenture (Appendix A) (JC2842) (definition of "Grant"), § 5.03 (JC2787) ("the Indenture Trustee may"), § 5.04 (JC2789) (same); *See* PAB at 65–69 (citing *U.S. Bank Nat'l Ass'n v. U.S. Timberland Klamath Falls, L.L.C.*, 2004 WL 1699057 (Del. Ch. July 29, 2004) and *Harris Tr. & Sav. Bank v. E-II Hldgs., Inc.*, 722 F. Supp. 429, 441 (N.D. Ill. 1989)). The Owners' citation to *Cortland Street*, 96 N.E.3d at 199 (addressing an argument that an indenture trustee's right to bring claims for payment "on the Notes" should be read to "mean solely a claim for payment due under the terms and conditions of the Notes" rather than, for example, a fraudulent transfer claim) (internal quotations omitted) also misses the mark. There, the court addressed the specific types of claims an indenture trustee may bring after an event of default (*e.g.*, fraudulent transfer claims versus a simple breach of contract claim to collect payments under notes), but did not hold that permissive language should be read as a prohibition of *all* claims. *Id.*

[284]  Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842) (definition of "Grant").

**\*37**  Since the Indenture Trustee has the "immediate and continuing" right to bring Proceedings in the name of the Trusts, as well as all the Trusts' "rights" to the Collateral, the Indenture must "be read to mean what it says."[285]  Once again, the Court will not "read the sweeping language of the Granting Clause to have limits that it lacks on its face."[286]  For these reasons, U.S. Bank has offered the only reasonable interpretation of the Trust Related Agreements on this issue. The Indenture Trustee may bring suit as to the Collateral

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 96 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

before an Event of Default; there are no contractual conditions precedent to the exercise of this right.

285    *BlackRock*, 247 F. Supp. 3d at 413 (internal quotation omitted); Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842) (definition of "Grant"); *see also Kass v. Kass*, 235 A.D.2d 150, 159 (N.Y. Supp. Ct. App. Div. 1997), *aff'd*, 696 N.E.2d 174 (N.Y. Ct. App. 1998) ("If the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent.").

286    *BlackRock*, 247 F. Supp. 3d at 413.

\* \* \* \* \*

Based on the analysis above, and subject to the clarifications I have provided: (i) U.S. Bank's Motion as to its Declarations A, C, D, E, F, G, Q and R (ii) AMBAC's Motion as to its Declaration O and P; (iii) the Noteholders' Motion as to their Declarations N and O are GRANTED; and (iv) the Owners' Motion is DENIED as to its Declarations A and B. U.S. Bank's motion is DENIED as to its Declaration B because its reading of the Indenture in support of that Declaration is not the only reasonable construction of the Indenture.

**D. The Trusts' Governance and Direction Rights**

As I turn to the next major area of dispute regarding the Trusts' governance, I begin by highlighting a rare example of agreement between the parties. Each faction agrees that the Owners do not have a "freestanding right to act on behalf of the Trusts." [287] Beyond this simple statement, however, the parties read the Trust Related Agreements very differently as to whom may direct the Trusts and when.

287    *See* PAB at 85.

In response to the specific questions posed by the parties' Declarations, I find as follows: (i) the Owner Trustee is the Trusts' trustee, and the Owners cannot remove the Owner Trustee from this role; (ii) the Owners have circumscribed rights to direct the Owner Trustee; (iii) certain Indenture Parties can act in the name of the Trusts as to the Collateral; (iv) AMBAC has a right to consent to certain Owner directions before they are followed; and (v) certain negative covenants in the Indenture restrict the Trusts' power to

sell Collateral or amend Basic Documents. I address each Declaration *seriatim*.

**1. Absent Delegation, the Owner Trustee Has the Sole Authority to Act for the Trusts, and the Owners Cannot Supplant the Owner Trustee From this Role**

Section 3806(a) of the DSTA provides, "[e]xcept to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees." [288] Apparently with this direction in mind, Section 2.03(b) of the Trust Agreement states:

> until the Indenture is discharged, ... the Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust ... but such action shall not be in violation of the terms of this Agreement. [289]

Based on this unambiguous language, the Trust Agreement does not alter the default rule of Section 3806(a), and the Owner Trustee is the *only* entity authorized to act directly on behalf of the Trusts. [290]

288    12 *Del. C.* § 3806(a).

289    Trust Agreement § 2.03(b) (JC0586) (emphasis supplied).

290    12 *Del. C.* § 3806(a).

**\*38** Moving beyond this baseline premise, the DSTA also provides that:

> [e]xcept to the extent otherwise provided in the governing instrument of a statutory trust, a trustee of a statutory trust has the power and authority to delegate to 1 or more other persons the trustee's rights, powers or duties to manage and control the

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 97 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

business and affairs of the statutory trust. [291]

Again, the Trust Agreement does not "otherwise provide" with respect to delegation. [292] The Trust Agreement expressly allows that the Owner Trustee may "act directly or ... through agents or attorneys pursuant to agreements entered into with any of them." [293]

[291]    12 *Del. C.* § 3806(i).

[292]    12 *Del. C.* § 3806(i).

[293]    Trust Agreement § 9.03(b) (JC0603).

Indeed, the Trust Related Agreements contemplate the Owner Trustee *will* make two critical delegations of its authority to act on behalf of the Trusts. First, in Section 14.03, entitled "Pledge of Collateral by Owner Trustee is Binding," the Trust Agreement provides:

> [t]he pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement [ (i.e., the Indenture) ] ... shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property. [294]

By this provision, Section 14.03 ties a transfer of the *Trusts* "right, title and interest ... in and to *any property*" to an automatic transfer of "the rights of the Owner Trustee and the Owners in and to such Trust Property." [295] Thus, if the Trusts transfer Trust Property, the Owner Trustee and the Owners' rights associated with the transferred property will automatically flow along with the transferred property. [296]

[294]    Trust Agreement § 14.03 (JC0609).

[295]    Trust Agreement § 1.01 (definition of "Trust Property") (JC0584) (emphasis supplied), § 14.03 (JC0609).

[296]    Here again, this is not to say that the Owner Trustee and Owners may not "share" some or all of these rights with the Indenture Trustee.

To reiterate, in the Indenture, the Trusts transferred all of their "right, title and interest" in the Collateral—including the "immediate and continuing" right to bring Proceedings in the name of the Trusts with respect to the Collateral. [297] The Indenture is a Trust Related Agreement incorporated by reference into the Trust Agreement. [298] And, in the Indenture, the Owner Trustee, the Owners and the Trusts granted their respective rights in the Collateral to the Indenture Trustee. [299] The Indenture Trustee, thus, can act in the name of the Trusts "with respect" to the Collateral. [300]

[297]    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (definition of "Grant") (JC2842).

[298]    Trust Agreement § 1.01 (JC0584) (definition of "Trust Related Agreements").

[299]    In this regard, under the Grant, the Indenture Trustee received the respective rights of the Owners and the Owner Trustee to direct the Trusts with regards to the Collateral under Section 4.01(b) and Section 2.03(b) of the Trust Agreement. *See* Trust Agreement § 14.03 (JC0609).

[300]    Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (definition of "Grant") (JC2842).

**\*39** As for the second key delegation, per the Administration Agreement, the Owner Trustee and the Trusts delegated their respective duties to the Administrator. [301] The Administrator, in turn, agreed to "take all appropriate action that is the duty of the [Trusts] to take pursuant to the Trust Related Agreements," and to that end, the Trusts and the Owner Trustee appointed the Administrator as the Trusts' attorney-in-fact. [302] Accordingly, the Administrator also can act on behalf of the Trusts in matters specified in the Administration Agreement. [303]

[301]    Administration Agreement § 1(a)(i) (JC3661).

[302]    Administration Agreement § 1(a)(i) (JC3661), § 1(b)(i) (JC3662); 2A C.J.S. *Agency* § 11 (2020) ("An attorney-in-fact is one given authority under

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 98 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

a power of attorney to act as agent with respect to matters set forth therein.").

303      Administration Agreement § 1(b)(i) (JC3662) (stating the Administrator may "execute[ ] on behalf of the [Trusts] all such documents, reports, filings, instruments, certificates and opinions" related to certain duties of the Trusts).

With these two examples in mind, while the *Owner Trustee* may be able to authorize agents to act on behalf of the Trust under Section 9.03(b), nothing in the Trust Agreement empowers the *Owners* unilaterally to supplant the Owner Trustee's role in managing the Trusts. [304] To re-emphasize, 12 *Del. C.* § 3806(a) of the DSTA provides that "Except to the extent otherwise provided [in the Trust Agreement], the business and affairs of a statutory trust *shall be managed by or under the direction of its trustees.*" [305] The Trust Agreement confirms that the Owner Trustee—not the Owners—is the Trusts' sole trustee empowered to manage the Trusts. [306]

304      Trust Agreement § 9.03(b) (JC0603).

305      12 *Del. C.* § 3806(a) (emphasis supplied).

306      Trust Agreement § 4.01(a) (JC0590).

The Owners do have a right to direct the Owner Trustee as to non-ministerial matters, but nothing in Section 4.01 supports the notion that this non-ministerial direction right includes the power to force the Owner Trustee to delegate its role as Owner Trustee to another party. [307] This means that any order from the Owners that would direct the Owner Trustee to authorize a third party to act on behalf of the Trusts, subject only to the Owners' directions, would contravene 12 *Del. C.* § 3806(a) and Section 4.01(a) of the Trust Agreement. [308] These provisions empower the Owner Trustee (and *only* the Owner Trustee) to manage the business and affairs of the Trusts—subject to *direction* from the Owners. [309]

307      Trust Agreement § 4.01(a) (JC0590).

308      12 *Del. C.* § 3806(a); Trust Agreement § 4.01(a) (JC0590).

309      12 *Del. C.* § 3806(a); Trust Agreement § 4.01(a) (JC0590).

Simply put, only the Owner Trustee can fulfil the role of the Owner Trustee. If the *Owner Trustee* decides to delegate its

authority, it may. [310] But any nonministerial Owner direction under Section 4.01(a) *must* flow through the Owner Trustee so that the Owner Trustee can exercise its right to decline to follow Owner instructions that contravene the Trust Related Agreements (as discussed below). [311] Any other reading of the Trust Agreement would allow the Owners to direct the Owner Trustee to delegate all of its authority to the Owners, who would then be free to manage the Trusts as to non-ministerial matters without review by the Owner Trustee. This construction is unreasonable because it would render the Owner Trustee's role in Section 4.02 "meaningless," "illusory," and "mere surplusage." [312]

310      Trust Agreement § 9.03(b) (JC0603).

311      Trust Agreement § 4.02(a) (JC0591).

312      *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

**\*40** Even when following Owner directions, the Owner Trustee remains the party through whom the Trusts must act (unless it has elected properly to delegate that authority). Under Section 9.03(b) of the Trust Agreement, once the Owners issue a valid instruction, "the Owner Trustee" may determine how to execute the instruction, either (i) "directly" or (ii) "at the expense of the Trust, through agents." [313] Nothing in Section 9.03(b) can be read as giving the Owners the right to direct the Owner Trustee when making this choice. [314] To be sure, if the Owner Trustee decides to act through agents, the Owners still possess the right to direct the Owner Trustee as to non-ministerial matters, but the Owners cannot cut the Owner Trustee out of the loop.

313      Trust Agreement § 9.03(b) (JC0603).

314      *See CFPB Decision*, 2020 WL 2915759, at *3.

This principle is important because the court in the CFPB Action struck down an attempt by the Owners to do just that. [315] Specifically, the Owners purported to direct the Owner Trustee to authorize attorneys to represent and act on behalf of the Trusts—subject only to directions from the Owners. [316] These attorneys then purported to execute the PCJ on behalf of the Trusts during negotiations with the CFPB. The court rejected this attempt and held that "the Owner Trustee remains the party through whom [the PCJ] must be" executed. [317] Stated differently, if the Owners direct the Owner Trustee to hire counsel for the Trusts,

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 99 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

those professionals would be contractors *of the Trust*—not "delegates" of the Owner Trustee. [318] If the Owners then wish to direct the Trusts' counsel on non-ministerial matters, any such direction must flow through the Owner Trustee.

[315]   *CFPB Decision*, 2020 WL 2915759, at *5.

[316]   *Id.*

[317]   *Id.*

[318]   *Cf.* PAB at 85.

* * * * *

Based on the foregoing analysis, and subject to the clarifications I have provided, the Owners' Motion as to their Declarations W, X and Y is DENIED, and the Noteholders' Motion as to their Declarations C and D is GRANTED.

### 2. The Owners Have Circumscribed Rights to Direct the Owner Trustee

While the Owners cannot supplant the Owner Trustee from its role as the Trusts' trustee, under Section 4.01 of the Trust Agreement, the Owner Trustee must "take such action or refrain from taking such action ... with respect to nonministerial matters, as it shall be directed by *all* the Owners." [319] The Trust Agreement contemplates that, as a matter of default, the Owners may act on a matter if a super majority of the Owners consent to the action. Section 4.03, captioned "Super-majority Control," states:

> Except as otherwise expressly provided in this Agreement, any action which may be taken or consent or instructions which may be given by the Owners under this Agreement may be taken by the Owners holding in the aggregate at least 85%" interest in the Trusts. [320]

[319]   Trust Agreement § 4.01(a) (JC0590) (emphasis supplied).

[320]   Trust Agreement § 4.03 (JC0592) (emphasis supplied).

The Trust Agreement *does* "otherwise expressly provide" in Section 4.01 when it states, "the Owner Trustee will take such action or refrain from taking such action ... as it shall be directed by *all* the Owners for so long as any of the Notes are outstanding." [321] When read together, the plain meaning of Sections 4.01 and 4.03 is that the Owner Trustee is to follow instructions issued by "*all*" of the Owners on non-ministerial matters—subject to limitations provided in Section 4.02 (discussed below). As non-exclusive examples of "nonministerial" matters, the Trust Agreement lists, (i) initiating any "claim" by the Trusts or compromising any lawsuit "brought by or against the Trust" except for claims initiated in the ordinary course of business to collect proceeds from the Student Loans and (ii) amending or modifying any Trust Related Agreement. [322]

[321]   Trust Agreement § 4.01(a) (JC0590) (emphasis supplied).

[322]   Trust Agreement § 4.01(b) (JC0590–91).

**\*41** Section 4.01 is expressly limited by Section 4.02, which constrains the Owners' ability to direct the Owner Trustee. [323] Specifically, the Owner Trustee need not follow Owner directions that would violate the Trust Related Agreements or expose the Owner Trustee to the risk of personal liability for which the Owners have not provided indemnity satisfactory to the Owner Trustee. [324] Moreover, beyond simply empowering the Owner Trustee to ignore improper directions, the Trust Agreement expressly *forbids the Owners* from directing the Owner Trustee to act or refrain from acting in a manner "contrary to" the Trust Agreement or the Trust Related Agreements. [325]

[323]   Trust Agreement § 4.02 (JC0591).

[324]   Trust Agreement § 4.02(a) (JC0591). Among the reasons the Owner Trustee might refuse an Owners' direction are instances where implementing the direction will (i) violate the Trust Related Agreements, (ii) create negative tax consequences, (iii) cause certain negative regulatory consequences or (iv) subject the Owner Trustee to certain types of personal

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 100 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

jurisdiction outside Delaware. Trust Agreement § 4.02 (JC0591–92).

325    Trust Agreement § 4.02(b) (JC0591).

Given the uncertainty that can accompany contract interpretation, the Owner Trustee need not be certain that an Owner instruction violates the Trust Related Agreements before refusing to comply. All that is required for a valid Owner Trustee refusal is that the Owner Trustee "reasonably determine[s]" *or* is "advised by counsel" that: (i) an Owner instruction is contrary to "any document contemplated" by the Trust Agreement or is "otherwise contrary to law," (ii) the instruction "is likely to result in personal liability on the part of the owner Trustee," [326] or (iii) the order would adversely affect the tax status of the Trusts. [327] In connection with this provision of the Trust Agreement, the Owners ask the Court for two related Declarations:

- Declaration E: "The Owners may direct the Owner Trustee to take any action with respect to the Trusts, subject solely to the limitations set forth in Section 4.02(b)" (i.e., that the Owners cannot direct the Owner Trustee to take an action contrary to the Trust Related Agreements). [328]

- Declaration G: "The only grounds for the Owner Trustee to refuse an Owner direction are the specific exceptions set out in Sections 4.02 of the Trust Agreements." [329]

326    This ground for refusal is unambiguously eliminated if the Owners provide the Owner Trustee "indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the owner Trustee's taking of such action." Trust Agreement § 4.02(a) (JC0591).

327    Trust Agreement § 4.02(a) (JC0591).

328    Owners' Compl. ¶ 149(e).

329    Owners' Compl. ¶ 149(g).

The Owners correctly concede that these Declarations, as written, would still prohibit the Owners from directing the Owner Trustee to take an action inconsistent with the "purposes" of the Trusts because such an order would contradict the terms of the Trust Agreement. [330] The Owners also correctly acknowledge that these Declarations would not allow a binding Owner instruction that would violate the

implied covenant of good faith and fair dealing that inheres in every contract. [331]

330    *See* PRB at 49 (citing Trust Agreement § 8.09 (JC0601) (prohibiting the Owner Trustee from taking an action that would be "inconsistent with the purposes of the Trust")). These purposes include the execution of the Indenture in which the Trusts agreed to Grant the Collateral to the Indenture Trustee "for the benefit of the holders of the Notes." Indenture (Granting Clause) (JC2760); Trust Agreement § 2.03 (JC0586).

331    PRB at 54; *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("The implied covenant of good faith and fair dealing inheres in every contract and requires that a party in a contractual relationship refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.") (internal quotations omitted).

**\*42** As these concessions make clear, the Owners are not arguing that the language found in Section 4.02, alone, answers whether the Owner Trustee is obliged (or not) "to follow Owner instructions." [332] Rather, these Declarations reference (and incorporate) all Trust Related Agreements as potential sources for reasons why the Owners would be prohibited from issuing an instruction or the Owner Trustee would be entitled to decline to act.

332    *See* JAB at 57.

Setting aside any fiduciary duties the Owners owe to AMBAC and the Noteholders, an analysis of the propriety of the Owners' instructions and the Owner Trustee's response thereto is limited to the language of the Trust Related Agreements and the implied covenant of good faith and fair dealing. [333] If any interested party wishes to bring a contract-based challenge to an Owner instruction, it must support the claim(s) with these tools in hand, and these tools alone. [334]

333    I address the scope of the Owners' fiduciary duties elsewhere in this Opinion.

334    *See, e.g.*, *In re Nat'l Collegiate*, 2020 WL 4813889, at \*10, \*12 (holding that a specific Owner direction was invalid both because it violated the Granting

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 101 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

Clause and because it amended a Basic Document without the Indenture Trustee's consent).

If a dispute arises between the parties over the propriety of an Owner direction, as long as other jurisdictional requirements are met, then the affected parties could seek declaratory relief under 10 *Del. C.* § 6502, which allows courts of this state to construe "a contract either before or after there has been a breach thereof." [335] Indeed, the purpose of the Declaratory Judgment Act is to "afford relief from uncertainty and insecurity with respect to rights, status and other legal relations," which would fairly encompass a judicial resolution of whether (or not) a particular Owner direction is "contrary" to the Trust Related Agreements. [336] As I state elsewhere in this Opinion, if a court rendered final judgment in such an action, the doctrines of *res judicata* and collateral estoppel would govern the judgment's preclusive effect.

[335]  10 *Del. C.* §§ 6502, 6503; *Horizon Personal Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *20 n.169 (Del. Ch. Aug. 4, 2006) (stating that, as long as other jurisdictional requirements are met, a party could bring a claim under the Declaratory Judgment Act "to determine a controversy between the parties as to the interpretation of" an agreement) (internal citation and quotation omitted).

[336]  10 *Del. C.* § 6512.

* * * * *

Based on the foregoing analysis and subject to the clarifications I have provided, the Court addresses the parties' specific requests for declaratory relief as follows: (i) the Owners' Motion as to their Declarations C, E, G, H, I, J, N and FF (ii) the Noteholders' Motion as to their Declaration B (iii) the Owner Trustee's Motion as to its Declaration C are all GRANTED; and (iv) the Owners' Motion as to their Declaration M is DENIED.

### 3. The Basic Documents Make Clear The Indenture Trustee May Act Directly on Behalf of the Trusts as to the Collateral; The Basic Documents Are Not Clear Regarding the Extent to Which AMBAC and the Indenture Trustee May *Direct* the *Trusts* to Act

The parties dispute the extent to which the Basic Documents authorize the Indenture Trustee to act directly with respect to the Collateral and the extent to which the Basic Documents authorize AMBAC and the Noteholders (either directly or through the Indenture Trustee) to issue directions to the Trusts. As explained below, the answer to the first is clear; the answer to the second not so much.

**\*43**  Section 3806(a) of the DSTA provides, in relevant part:

> To the extent provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust. [337]

As already discussed, Section 4.01 of the Trust Agreement gives the Owners a circumscribed right to direct the Owner Trustee which, in turn, is authorized to act on behalf of the Trusts. [338] The Owners' Declaration F asks the Court to declare that the "Indenture Trustee, the Administrator, and [AMBAC] are not 'persons' authorized by the Trust Agreements to direct the Owner Trustee concerning nonministerial matters." [339] This Declaration, as worded, is overbroad and cannot be granted.

[337]  12 *Del. C.* § 3806(a).

[338]  Trust Agreement § 4.01 (JC0590).

[339]  Owners' Compl. ¶ 149(f).

In support of their proffered Declaration, I gather one of the Owners' main arguments is that, to the extent the Indenture Parties find rights to direct the Trusts in contracts other than the Trust Agreements, such rights would be invalid under Section 3806(a) of the DSTA because the Trust Agreement is the lone governing instrument. [340] But, as I have explained, the Trust Related Agreements (including the Indenture and the Administration Agreement) are incorporated by reference into the Trust Agreement. [341] The fact that direction rights are traced to other Trust Related Agreements, therefore, cannot be invoked as a basis to invalidate the direction.

[340]  *See* PRB at 45.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 102 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

341    *See* Section II.B. Again, given this dynamic, the Trust Related Agreements should be "interpreted together" and "regarded as a part of" the Trust Agreement. *Hirst*, 83 A.2d at 681; *Town of Cheswold*, 188 A.3d at 819.

The Owners also argue that a naked right to direct the *Trusts* to do something (without more) cannot be effective because only the Owner Trustee may act for the Trusts. [342] To be sure, Section 2.03(b)(i) of the Trust Agreement does provide that *only* the Owner Trustee may act on behalf of the Trusts (unless proper delegation by the Owner Trustee has occurred). [343] According to the Owners, because the Trust Agreement is clear on this point, to be valid, a direction right must trace back to the root of Section 2.03(b)(i), either as (i) a right to direct the Owner Trustee or (ii) a right to direct another party to which the Owner Trustee has delegated authority. [344]

342    PRB at 45–47.

343    *See* Trust Agreement § 2.03(b)(i) (JC0586).

344    PRB at 45–47; *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 254 (Del. 2017) (stating it is a "settled" rule of contract interpretation that a court must "prefer specific provisions over more general ones").

To be clear, even if the Owners' reading of the Trust Agreement is correct, as I have explained more than once above, the Grant conveys to the Indenture Trustee the right to act directly in the *name* of the Trusts *as to the Collateral*. [345] The Granting Clause traces to Section 2.03(b)(i) because the Trust Agreement states that any "pledge" (i.e., the Grant) "*shall be effective to transfer* or convey *the rights of the Owner Trustee* ... in and to such Trust Property." [346] In matters related to the Collateral, therefore, the Indenture Trustee has the option of acting in the Trusts' name or, alternatively, directing the Administrator to act on behalf of the Trusts with respect to non-ministerial matters. [347]

345    *See* Indenture (Granting Clause) (JC2760) (emphasis supplied); Indenture (Appendix A) (definition of "Grant") (JC2842). This aspect of the Granting Clause is discussed elsewhere in this Opinion. For the Insured Indenture, AMBAC has the right to "direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee ... or exercising

any trust or power conferred on the Indenture Trustee" as long as certain prerequisites are met. Insured Indenture § 5.11 (JC3495).

346    Trust Agreement § 14.03 (JC0609) (emphasis supplied).

347    Administration Agreement § 1(c)(i) (JC3663).

**\*44** Likewise, as explained above, the Administrator has a power of attorney to act in the name of the Trusts. [348] This right also traces to Section 2.03(b)(i) because the Owner Trustee executed the Administration Agreement, which authorizes the Administrator to execute certain "documents, reports, filings, instruments, certificates and opinions" "on behalf of the [Trusts.]" [349] The Administration Agreement affirms the Administrator's responsibility to use this power of attorney to perform "the duties of the [Trusts]," as well as to discharge its obligations to follow directions given by the Indenture Trustee or AMBAC. [350]

348    *See* Administration Agreement 1(b)(i) (JC3662); *see also* Indenture (Appendix A) (JC2831) (defining an "Authorized Officer" of the Trusts to include "the Administrator who is authorized to act for the Owner Trustee and/or the Administrator in matters relating to the [Trusts]").

349    *See* Administration Agreement (recitals) (JC3660); Administration Agreement § 1(b)(i) (JC3662).

350    Administration Agreement § 1(a)(i) (JC3661), § 1(c)(i) (JC3663); Insured Administration Agreement § 1(c)(i) (JC3890).

The upshot is that the Indenture Trustee may act in the name of the Trusts as to the Collateral. Because the definition of "Collateral" is so broad, any further debate over the Indenture Trustee's direction rights is largely academic since it is difficult to imagine a circumstance where the Indenture Trustee's concerns (and resulting actions) would relate to some matter other than the Collateral. [351] Nevertheless, for the sake of completeness, I address the instances where the Trust Related Agreements appear to provide the Indenture Trustee and AMBAC with specific rights to direct "the Trusts" – Sections 5.16, 3.19 and 3.08(i) of the Indenture and Section 8.1 of the Trust Agreement. [352] Because the parties dispute the proper construction of each of these provisions, I address them briefly below.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 103 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

351     Thus, by of example, if a third party asserted claims against the Trusts relating to or arising out of the Collateral, then the Indenture Trustee could defend or settle that litigation directly on behalf of the Trusts if it chose to do so. *See* Indenture (Granting Clause, Subsection (e)) (JC2761); Indenture (Appendix A) (definition of "Grant") (JC2842); Trust Agreement § 14.03 (JC0690). As I have stated elsewhere, however, nothing in this Opinion holds that the Indenture Trustee could use its rights to act on behalf of the Trust to breach the Indenture or that it would be protected from suit if it did so. *See, e.g.*, Indenture § 3.14 (JC2776) (stating that the Student Loans "may only be sold ... by the Indenture Trustee" if certain conditions are met).

352     *See* JAB at 53–54.

Sections 5.16 and 3.19 of the Indenture, on their face, permit the Indenture Trustee (and AMBAC where applicable) to direct the *Trusts*.[353] Specifically, in Section 5.16(a), the Indenture Trustee has the right to direct the *Trusts* to "exercise any and all rights, remedies, powers and privileges lawfully available to the [Trusts] under or in connection with the Basic Documents."[354] Section 3.19 is similar in that it gives the Indenture Trustee a right to request that the *Trusts* "do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture."[355]

353     Indenture § 3.19 (JC2778) ("the [Trust] will"), § 5.16 (JC2796) ("the [Trust] shall").

354     Indenture § 5.16(a) (JC2796). For the Insured Trusts, the Indentures and Administration Agreements also provide AMBAC with similar rights. *See* Insured Indenture § 5.16 (JC3497). The Insured Indenture contains materially similar language and should be interpreted the same as to AMBAC provided that it meets the other criterion in Section 5.16. *See* Insured Indenture § 5.16 (JC3497).

355     *See* Indenture § 3.19 (JC2778); JAB at 53. AMBAC has a similar direction right under Section 3.19 of the Insured Indenture. *See* Insured Indenture § 3.19 (JC3480). For purposes of this Opinion, the language of Section 3.19 is materially similar in both agreements and should

be interpreted in the same way as to the Indenture Trustee and AMBAC.

**\*45** At first glance, both provisions appear clear enough. In certain circumstances, the Indenture Trustee may direct the Trusts. But the clarity is fleeting. Without more context, it is unclear how a right to direct "the Trusts" flows through the Trust Related Agreements or what legal or practical significance the parties intended for these rights to carry. On the one hand (as the Indenture Parties seem to argue), it is reasonable to interpret a right to direct the Trusts as a right to direct the Owner Trustee because, beyond the Indenture Trustee's right to act directly with respect to the Collateral, only the Owner Trustee (or its designees) may cause the Trusts to act.[356] On the other hand, as the Owners correctly point out, the drafters of the Trust Related Agreements knew how to create a right to direct the Owner Trustee when they intended to grant that right by doing so in express, declarative language.[357]

356     *See* Trust Agreement § 2.03 (JC0586) ("The Trust will act solely in its own name and the Owner Trustee ... will act on behalf of the Trust."); JAB at 23; Reply Br. in Supp. of AMBAC Assurance Corp.'s Mot. for J. on the Pleadings ("AMBAC RB") (D.I. 447) at 23.

357     Trust Agreement § 2.03 (JC0586); PRB at 45–46.

On this record, I am unable to provide a definitive declaration of what these "Trust" direction rights actually mean. The Indenture must be read to give "independent meaning" to each provision, and this court is disinclined to infer that unexplained differences in contract language are the result of "sloppy drafting."[358] Without further clarity on how (or if) a direction from the Indenture Trustee to the Trusts would work, I cannot declare that the right exists.[359]

358     *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) ("Courts attempt to interpret each word or phrase in a contract to have an independent meaning."); *Norton v. K-Sea Transp. P'rs, L.P.*, 67 A.3d 354, 364 (Del. 2013) (declining to infer that language was the result of "sloppy drafting" where drafters "new how to impose an affirmative obligation when they so intended").

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 104 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

359   I note that the Indenture Parties' argument that the right to direct the Trusts doveatils with the Indenture Trustee's right to direct the Administrator (and Ambac's similar right with respect to the Insured Trusts), as provided for in the Administration Agreement, also falls short because, here again, the argument fails to trace how a direction to the Trusts would flow. Would it be directed to the Owner Trustee (none of the provisions say that), or to the Administrator (same), or would it be directed to an inanimate Trust in hopes that some constituent with authority to act for the Trust might pick it up and execute it? *See* AMBAC RB at 23 ("The Indenture Trustee (and AMBAC and the Noteholders) are empowered by [ ] Section 5.16 to secure the Administrator's performance of its duties on behalf of the Trusts."); JAB at 53 (arguing Sections 5.16 and 3.19 are "direction rights").

Turning to the other disputed direction rights, AMBAC and U.S. Bank assert that the Indenture Trustee (and AMBAC as to the Insured Trusts) has the right to direct the Trusts "with respect to the disposition of the assets and property of those Trusts" under Section 3.08(i) of the Indenture. [360] That provision states, in relevant part, "the [Trust] shall not ... sell ... the properties or assets of the [Trusts] ... unless directed to do so by the Indenture Trustee pursuant to the terms hereof." [361] While Section 3.08(i) prohibits a sale of the Student Loans absent direction from the Indenture Trustee, nothing in Section 3.08(i) explains when or how the Indenture Trustee could issue such an order or to whom specifically it would be directed.

360   AMBAC RB at 36–37; Indenture § 3.08(i) (JC2774); Insured Indenture § 3.08(i) (JC3475).

361   Indenture § 3.08(i) (JC2774); Insured Indenture § 3.08(i) (JC3475) (same except for "unless directed to do so by the Indenture Trustee or AMBAC").

**\*46**   The only guidance provided by Section 3.08(i) is that any direction from the Indenture Trustee regarding the sale of Trust assets must be "*pursuant to the terms hereof.*" [362] It appears the relevant "terms hereof" refer to Section 3.14 of the Indenture, which states the "Financed Student Loans may only be sold ... by the Indenture Trustee ... if the Indenture Trustee" receives certain directions from the Administrator. [363] This, of course, says nothing about a right

belonging to the Indenture Trustee or AMBAC unilaterally to direct the Trusts to dispose of assets.

362   Indenture § 3.08(i) (JC2774).

363   Indenture § 3.14 (JC2777).

Finally, AMBAC and U.S. Bank's attempt to invoke Section 8.01 of the Trust Agreement as authority for the Administrator to direct the Owner Trustee fails under the weight of the provision's clear terms. [364] In relevant part, Section 8.01 states, "the Owner Trustee is authorized to ... take such action as the Administrator directs with respect to the Trust Related Agreements." [365] On its face, this language only *authorizes* the Owner Trustee to follow Administrator directions; it does not explain how or when the Administrator, itself, has the right to direct the Owner Trustee. Without more, Section 8.01 does not establish the Administrator's right to direct the Owner Trustee.

364   *See* JAB at 54; Trust Agreement § 8.01 (JC0599).

365   Trust Agreement § 8.01 (JC0599).

\* \* \* \* \*

Based on the foregoing analysis and subject to the clarifications I have provided, (i) AMBAC's Motion as to its Declarations K, L and N, (ii) the Owners' Motion as to their Declaration F and (iii) the Noteholders' Motion as to their Declaration M are all DENIED.

### 4. AMBAC Does Not Have the Right to Direct the Owner Trustee, But Any Owner Directions to the Owner Trustee Regarding Non-Ministerial Matters Related to the Insured Trusts Require AMBAC's Consent Before Execution

In AMBAC's Declaration M, it asks the Court to declare that, as to certain trusts for which AMBAC provides reinsurance, "AMBAC has the right to direct the Owner Trustee." [366] In support of this Declaration, AMBAC cites Section 8.06 of the Trust Agreement for the Insured Trust, [367] which provides:

> In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 105 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

the application of any provision of this Agreement or any Trust Related Agreement ... the Owner Trustee may give notice ... to the Owners and [AMBAC] requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions ... received from [AMBAC], the Owner Trustee shall not be liable. [368]

366    AMBAC Counterclaim ¶ M.

367    JAB at 55.

368    Master Trust Agreement § 8.06 (JC0029).

On its face, this language does not amount to a right to direct the Owner Trustee. The effect of this provision is limited to protecting the Owner Trustee from liability, rather than granting AMBAC a direction right. Like the other Trust Agreements, the affirmative right to direct the Owner Trustee of the Insured Trust is set forth in Section 4.01(a), which states, "The Owner Trustee will take such action or refrain from taking such action ... as it shall be directed by all the Owners with the consent of [AMBAC]." [369]

369    Master Trust Agreement § 4.01(a) (JC0018).

Any instructions AMBAC provides under Section 8.06 are not binding on the Owner Trustee and, if followed, are limited in their effect to insulating the Owner Trustee from monetary liability. On the other hand, to the extent the Owners direct the Owner Trustee to take a non-ministerial action without obtaining AMBAC's consent, the Insured Trust Agreement would have been breached, and AMBAC would have a right to pursue a remedy. [370] At this stage, however, it would be premature to declare the exact nature of the remedy to which AMBAC would be entitled. [371]

370    Master Trust Agreement § 4.01(a) (JC0018).

371    *See, e.g.*, *Zimmerman v. Crothall*, 62 A.3d 676, 698 (Del. Ch. 2013) (noting that an operating agreement "required an amendment approved by the Common

unitholders" but only awarding $1 in damages after trial).

* * * * *

**\*47**  Based on the foregoing and subject to the clarifications I have provided, AMBAC's Motion as to its Declaration C is GRANTED. AMBAC's Motion as to its Declaration M is DENIED.

### 5. The Indenture Limits the Owners' Ability to Amend the Basic Documents While the Scope of Other Negative Covenants is Unclear at this Stage

AMBAC (joined by the Noteholders) asks the Court to declare that neither the Owners nor the Owner Trustee acting at the direction of the Owners can (i) cause the Trusts to amend any terms of the Collateral or the Basic Documents or (ii) transfer or otherwise dispose of any Trust Property without consent from the Indenture Trustee, the Noteholders and AMBAC (with respect to the Insured Trusts). [372] In support of this Declaration, AMBAC cites Sections 3.07(f) and 3.08(i) of the Indenture (the "Amendment and Sale Provisions"), which provide, respectively:

3.07(f): The [Trust] agrees that it will not, without the prior written consent of the Indenture Trustee [and either (i) a majority of the Noteholders or (ii) AMBAC as to the Insured Indenture] amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Collateral or the Basic Documents, except to the extent otherwise provided therein. [373]

And

3.08(i): So long as any Notes are Outstanding, the [Trusts] shall not: [ ] except as expressly permitted by this Indenture or any other Basic Document, sell, transfer, exchange or otherwise dispose of any of the properties or assets of the [Trust] ... unless directed to do so by the Indenture Trustee [or AMBAC as to the Insured Trusts] pursuant to the terms hereof. [374]

372    AMBAC Counterclaim ¶¶ A, B, F; Noteholder OB at 29.

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 106 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

373    Indenture § 3.07(f) (JC2773); Insured Indenture § 3.07(f) (JC3474); Indenture § 3.07(c) (JC2773) (similar).

374    Indenture § 3.08(i) (JC2774); Insured Indenture § 3.08(i) (JC3475).

While the plain meaning of the Amendment and Sale Provisions requires consent from either the Indenture Trustee, AMBAC or the Noteholders before Basic Documents may be amended or Trust Property can be transferred, both sections are qualified by the phrase "except to the extent otherwise provided" and "except as expressly permitted." [375] AMBAC explains away this language by declaring, with no analysis, "there is no such provision in the Indentures applicable to" these Declarations. [376] For their part, the Owners seize on the qualifying language in the Amendment and Sale Provisions and argue AMBAC's unqualified Declarations are overbroad because they would read out the "otherwise provided" qualification from the Indenture. [377]

375    Indenture § 3.07(f) (JC2773), § 3.08(i) (JC2774).

376    Opening Br. in Supp. of AMBAC Assurance Corp.'s Mot. for J. on the Pleadings (D.I. 410) at 23, 25.

377    PAB at 107, 109.

As for Section 3.07(f) (regarding amendments to Basic Documents without consent), the Owners do not identify any contract language that would permit the Owners to direct the Owner Trustee to amend a Basic Document without the requisite consent. [378] In other words, their only objection to AMBAC's interpretation of Section 3.07(f) is that AMBAC has failed to prove a negative (i.e., that nothing in the Basic Documents "otherwise provides"). Given that AMBAC threw down the gauntlet in its Opening Brief, I am satisfied that the Owners' failure to identify relevant contract language means it does not exist, and the Owners cannot amend a Basic Documents or the terms of any Collateral without consent from the requisite Indenture Parties.

378    PAB at 107 (failing to identify any contractual provision that would allow the Owners unilaterally to amend a Basic Document).

**\*48** On the other hand, the Owners do flag certain language in the Trust Related Agreements that they read as allowing the Trusts to transfer or sell the Collateral, which could coincide

with the "except as expressly permitted by this Indenture" language from Section 3.08(i)—as well as the Owners' right to direct the Owner Trustee in non-ministerial matters. [379]

379    Indenture § 3.08(i) (JC2774); PAB at 108 (citing Indenture § 3.14).

*First*, the Owners cite Section 3.14 of the Indenture, which states:

> 3.14: Financed Student Loans *may* only be sold, transferred, exchanged or otherwise disposed of by the Indenture Trustee ... if the Indenture Trustee is provided with the following: (a) an Issuer Order stating the sale price and directing that Financed Student Loans be sold, transferred or otherwise disposed of ... and (b) a certificate signed by an Authorized Officer of the [Trust] to the effect that the disposition price is equal to or in excess of the amount required by the applicable Guarantee Agreement... [380]

Nothing in Section 3.14 suggests the *Owners* unilaterally could direct the Owner Trustee to dispose of Trust Property because, on its face, Section 3.14 only states the circumstances when the *Indenture Trustee* "*may*" (not must) dispose of Trust Property. [381]

380    Indenture § 3.14 (JC2776–77) (emphasis supplied); *see also* Indenture (Appendix A) (JC2844) (defining "Issuer Order" to mean a "written order or request signed in the name of the [Trusts] by any one of its Authorized Officers"); Indenture (Appendix A) (JC2831) (defining an "Authorized Officer" of the Trusts as "the Administrator"); Administration Agreement § 1(a)(i)(d) (JC3661) (obligating the Administrator to "take all appropriate action that it is the duty of the [Trusts] to take pursuant to the Trust Related Agreements" including "[t]he preparation of an Issuer Order and Officer's Certificate ... for the release of property of the Trust Estate").

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 107 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

381    Indenture § 3.14 (JC2776–77).

*Second*, the Owners cite language from the Deposit and Sale Agreements. [382]  In these contracts, the Trusts first acquired the Student Loans before assigning them as Collateral to the Indenture Trustee. [383]  Under the Deposit and Sale Agreements, the "seller" of the Student Loans made certain representations and warranties. [384]  If these representations and warranties were breached, the seller promised the Trusts it would "cure or repurchase" the applicable Student Loan. [385]

382    PAB at 108.

383    *See* PAB Ex. E (the Deposit and Sale Agreement by and between the National Collegiate Funding LLC, in its capacity as seller, and the National Collegiate Student Loan Trust 2006-4, as purchaser).

384    PAB Ex. E § 4.02.

385    PAB Ex. E § 5.

While not spelled out in their Answering Brief, I gather the Owners' unstated theory is that, in the event of a breached seller representation, the Owners could direct the Owner Trustee to cause the Administrator to exercise the Trusts' rights under the Deposit and Sale Agreement. [386]  Neither party traces the means by which such an order would flow through the Trust Related Agreements. Given this lack of clarity, at this juncture, I cannot fully endorse any party's interpretation of Section 3.08(i).

386    *See* Trust Agreement § 4.01(a) (JC0590).

\* \* \* \* \*

Based on the foregoing and subject to the clarifications I have provided, (i) AMBAC's Motion as to its Declarations A and F and (ii) the Noteholders' Motion as to their Declarations A and G are GRANTED; and (iii) AMBAC's Motion as to its Declaration B is DENIED.

## E. Owner Trustee and Administrator Expenses

**\*49**  In exchange for their role as the Trusts' trustee and administrator, the parties to the Trust Related Agreements agreed upon a mechanism by which the Owner Trustee and the Administrator, respectively, could be reimbursed for their expenses. In Section 10.01 of the Trust Agreement and

Section 3 of the Administration Agreement, respectively, the parties agreed:

> The Owner Trustee shall be entitled to be reimbursed by the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements. [387]

And

> As reimbursement for its expenses related [to its role as Administrator,] the Administrator shall be entitled to: ... reimbursement for the following expenses: ... (i) annual audits ... [and] (iii) any other expenses of the [Trusts]. [388]

387    Trust Agreement § 10.01 (JC0603).

388    Administration Agreement § 3 (JC3664).

These rights of the Owner Trustee and the Administrator for expense reimbursement ripple through the other Trust Related Agreements. For example, the Administration Agreement states the Administrator "will" pay "the Owner Trustee fees and expenses" set forth in Section 10.01 of the Trust Agreement. [389]  Likewise, Section 8.02(d) of the Indenture (the Indenture Waterfall) states that at regular intervals:

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 108 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

the Administrator *shall instruct* the Indenture Trustee in writing ... to make the following deposits and distributions to the Persons ... specified below ... in the following order of priority ... and the Indenture Trustee *shall comply* with such instruction. (1) FIRST: pro rata (i) Indenture Trustee fees and expenses ..., Owner Trustee fees and expenses... and Administration Fees and expenses. [390]

389    Administration Agreement § 1(a)(ii)(C) (JC3662).

390    Indenture § 8.02(d) (JC2807) (emphasis supplied); *see also* Indenture (Appendix A) (JC2831) (defining "Administration Fee" to mean "the meaning specified in Section 3 of the Administration Agreement").

The Indenture defines the Administrator's written instruction to the Indenture Trustee under Section 8.02(d) as an "Issuer Order," (i.e., any "written order or request signed in the name of the [Trusts] by any one of [the Trusts'] Authorized Officers and delivered to the Indenture Trustee"). [391] The Administrator is an "Authorized Officer" of the Trusts. [392]

391    Indenture (Appendix A) (JC2844) (defining "Issuer Order").

392    Indenture (Appendix A) (JC2831) (definition of "Authorized Officer").

Taken together, the unambiguous language of the Trust Related Agreements allow for *reimbursement* of Owner Trustee and Administrator expenses *after* such expenses have been incurred. [393] Nothing in the Trust Related Agreements permits advancement of Owner Trustee or Administrator expenses. Under the plain meaning of the word "reimburse," the Owner Trustee or the Administrator must first incur an expense and *then* seek "reimbursement" for the expense. [394]

393    *See* Trust Agreement § 10.01 (JC0603) ("The Owner Trustee shall be entitled

to *reimbursement*.") (emphasis supplied); Administration Agreement § 3 (JC3664) ("as *reimbursement* for its expenses") (emphasis supplied).

394    *Reimbursement*, BLACKS LAW DICTIONARY (11th ed. 2019) (defining "Reimbursement" as "Repayment"); *Reimburse*, MERRIAM-WEBSTER (Last visited July 25, 2020) https://www.merriam-webster.com/dictionary/reimburse (defining Reimburse to mean "to pay back" or "make restoration or payment of an equivalent to"); *see also U.S v. Serafini*, 233 F.3d 758, 767 n.11 (3d Cir. 2000) ("As it is used in its common parlance, reimbursement means the delivery of money to a person to pay back that person for money the person expended for some matter.") (internal citation and quotation omitted).

**\*50**  To constitute an Owner Trustee expense, the Owner Trustee (or one of the agents the Owner Trustee employs under Section 9.03(b)) must spend funds "in connection with the exercise and performance of [the Owner Trustee's] rights and duties under this Agreement and the Trust Related Agreements." [395] Because the Owner Trustee's duties are limited, and the Owner Trustee has no "duty or obligation to manage ... or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action ... except as expressly provided," an expense must directly link to one of the Owner Trustee's ministerial roles under the Trust Related Agreements to be a valid Owner Trustee expense. [396]

395    Trust Agreement § 9.03(b) (JC0603), § 10.01 (JC0603). In this regard, nothing in the Trust Related Agreements requires that Owner Trustee Expenses be incurred for the "benefit" of the Trusts. *Cf.* AMBAC Declarations G and H. Rather, such expenses must be incurred in connection with the Owner Trustee's rights and duties.

396    Trust Agreement § 8.07 (JC0601).

To the extent expenses are incurred by the Owner Trustee in the performance of a role not contemplated by the Trust Related Agreements, the Owner Trustee cannot seek reimbursement for such expenses. [397] The Owners cannot expand the Owner Trustee's role by ordering the Owner Trustee, for example, to undertake an obligation the Owner Trustee has delegated to the Administrator and, as noted, the Administrator has agreed to perform *all* of the Owner

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 109 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

Trustee's "duties and obligations."[398] This leaves the Owner Trustee with only the most basic ministerial function, and Owner Trustee expenses must be incurred in connection with this limited role.

[397]    *See* Trust Agreement § 8.07 (JC0601) (stating the Owner Trustee has no "duty or obligation to manage ... the Trust Property").

[398]    Administration Agreement § 1(b)(i) (JC3662); Trust Agreement § 8.03 (JC0600).

To be clear, nothing in Section 10.01 provides for reimbursement of the *Trusts'* fees and expenses. Rather, on its face, Section 10.01 only addresses reimbursement of the Owner Trustee for "*its* reasonable expenses."[399] "Its," in this case, modifies "expenses" and refers to the Owner Trustee—limiting reimbursable expenses to those incurred by the Owner Trustee, not by the Trusts or the Owners. As a result, Owner Trustee expenses must be: (i) submitted at the discretion of the Owner Trustee (ii) a "reimbursement," (iii) "reasonable," (iv) incurred at the direction of the Owner Trustee and (v) incurred "in connection with the exercise and performance of [the Owner Trustee's] rights and duties under the [Trust Agreement] and the Trust Related Agreements."[400]

[399]    Trust Agreement § 10.01 (JC0603).

[400]    Trust Agreement § 10.01 (JC0603).

If, for example, the Owners direct the Owner Trustee to hire counsel to represent the Trusts, and the Owner Trustee determines it will need an attorney to help it review the Owners' instruction for compliance with the Trust Related Agreements, those attorneys' fees will be Owner Trustee expenses if the Owner Trustee chooses to submit them to the Administrator. The fees of any attorneys hired to represent the *Trusts* (rather than the Owner Trustee), however, would constitute *Trust* expenses that do not fit within Section 10.01.

On the other hand, while Section 3 of the Administration Agreement has materially similar language ("As reimbursement for *its* expenses related [to] the Administrator's obligations"), the Administration Agreement contemplates the Administrator must "perform ... the duties of the [Trusts]."[401] Mirroring this obligation, Section 3 of the Administration Agreement provides for reimbursement of certain Administrator expenses, including "expenses of

the [Trusts]."[402] Thus, under certain circumstances, the Administrator—but not the Owner Trustee—may have a limited right to seek reimbursement for Trust expenses.

[401]    Administration Agreement § 1(a)(i) (JC3661).

[402]    Administration Agreement § 3(b)(iii) (JC3664) (defining "Administration Fee" as, among other things, "Reimbursement for ... [a]ny other expenses of the [Trusts]"); Indenture § 8.02(d)(1) (JC2807) (allowing for reimbursement of "Administration fees" at the top of the Indenture Waterfall); Indenture (Appendix A) (JC2831) (defining "Administration Fee" as "the meaning specified in Section 3 of the Administration Agreement").

**\*51** Once the Owner Trustee submits its expenses to the Administrator and the Administrator instructs the Indenture Trustee to make distributions under the Indenture Waterfall, the Indenture is clear that the Indenture Trustee *shall* make the distribution as directed by the Administrator.[403] Nothing in any Trust Related Agreement suggests the Administrator or the Indenture Trustee has any subjective discretion to define what is (or is not) an Owner Trustee expense.[404]

[403]    Indenture § 8.02(d) (JC2807).

[404]    Relatedly, nothing in the language of the Trust Agreement or the Indenture *requires* the Owner Trustee to provide any "certification" of its expenses. *Cf.* Def. GSS Data Servs., Inc.'s Individual Answering Br. in Opp'n to NC Residual Owners Tr.'s and NC Owners LLC's Mot. for J. on the Pleadings (D.I. 436) at 3 (arguing the parties informally agreed the Owner Trustee would certify its expenses and that it is "reasonable for the Administrator to request information from the parties confirming the character of their submitted expenses"). While there may be good reasons to provide a certification, "when a written contract is meant to embody the whole agreement completely, such proof of a collateral agreement [ (*e.g.*, the informal agreement that the Owner Trustee would certify its expenses) ] is not admissible." *Pine River Master Fund Ltd. v. Amur Fin. Co., Inc.*, 2017 WL 4548143, at *17 (Del. Ch. Oct. 12, 2017), *aff'd*, 190 A.3d 996 (Del. 2018).

To the contrary, the Indenture contemplates that the work-a-day reality for the Indenture Trustee will be that it will rely on

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 110 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

the accuracy of Issuer Orders since the Administrator is given the primary responsibility to calculate amounts owed under the Indenture Waterfall. [405] In accordance with the Indenture Trustee's limited administrative role, "[e]xcept during the continuance of an Event of Default, ... in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements ... upon certificates or opinions furnished to ... the Indenture Trustee" as long as the Indenture Trustee "examine[s] the certificates" to determine "whether or not they conform to the requirements of this Indenture." [406]

[405]     Administration Agreement § 1(a)(i) (JC3661).

[406]     Indenture § 6.01(b)(ii) (JC2797).

Having said this, the Indenture Trustee need not obey an Issuer Order if it would "require the Indenture Trustee to risk its own funds or otherwise incur financial liability in the performance of its duties." [407] Therefore, if the Owner Trustee were to request reimbursement for an expense that did not meet the contractual definition of an Owner Trustee expense, then, as a practical matter, the Indenture Trustee could refuse to obey an Issuer Order. [408] Similarly, the Administrator could refuse to submit an Issuer Order to the Indenture Trustee if the Owner Trustee requests reimbursement to which it is not entitled. [409] If the Owner Trustee disagreed with the Administrator or Indenture Trustee's position, the Owner Trustee could file a breach of contract action, and a court would be called upon to decide whether the particular expense did (or did not) meet the applicable contractual definition.

[407]     Indenture § 6.01(g) (JC2798).

[408]     Indenture § 8.02(d) (JC2807).

[409]     The Owners ask the Court to declare that the Owner Trustee "is not prohibited from certifying prospectively that expenses for specified categories of legal services are proper Owner Trustee expenses." Owners' Compl. ¶ 149(S), (R) (similar); POB at 37; PRB at 77. Given that the Owners, themselves, recognize that there are "no contract provisions supporting" a nebulous "certification" procedure, it is unclear what legal effect any such certification would have. *See* PRB at 75. Given this disconnect from the language in the parties'

agreement, the Court will not issue the Owners' Declarations S and R.

**\*52** At the conclusion of such litigation, a court might render a judgment holding that a particular expense was (or was not) an Owner Trustee or Administrator expense. Then, the doctrines of issue preclusion and *res judicata* would govern whether any "similar" expenses in the future were also Owner Trustee or Administrator expenses. [410] Beyond these general principles, it is impossible to say whether any future, "similar" expense would merit the same treatment as any past expense.

[410]     *See Cal. State Teachers' Ret. Sys.*, 179 A.3d at 842–43 (setting forth the elements of issue preclusion); *LaPoint*, 970 A.2d at 192 (setting forth the elements of res judicata).

\* \* \* \* \*

Based on the foregoing and subject to the clarifications I have provided, (i) the Indenture Trustee's Motion as to its Declarations P, S, T, U, W, X and Y, [411] (ii) the Owners' Motion as to their Declarations P, Q and T and (iii) the Owner Trustee's Motion as to its Declarations H, I, J, K and L are all GRANTED. But (i) the Owners' Motion as to their Declarations O, R and S, (ii) AMBAC's Motion as to its Declarations G and H, (iii) the Noteholders' Motion as to their Declarations H and I and (iv) the Indenture Trustee's Motion as to its Declaration V [412] are all DENIED.

[411]     I acknowledge the Owners' argument that many of the Indenture Trustee's declarations–(p)–(s)–are not justiciable for lack of a case or controversy. *See* PAB at 98–99. There remains a live dispute as to whether "certain expenses should be paid at the top of the Trusts' waterfall." Owners' Compl. ¶ 148. In challenging Special Master Order Number 2, the Owners argued that the expenses of a professional retained at their direction were payable "at the top of the waterfall." D.I. 347 at 3–4. A justiciable controversy remains where an issue "h[angs] like a sword poised to drop," even if a party has shifting positions. *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at \*12 (Del. Ch. July 31, 2019).

[412]     In this regard, the Indenture Trustee's Motion as to its Declaration V is denied only to the

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 111 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

extent it implies the Administrator could not seek reimbursement for Trust expenses. As explained above, the Administration Agreement allows the Administrator to seek reimbursement for "expenses of the [Trusts]." Administration Agreement § 3(b)(iii) (JC3664).

### F. Owner Trustee and Owner Duties

The parties seek various Declarations regarding the contractual and extracontractual contours of the Owners' and the Owner Trustee's duties to act in the interests of various parties to the Trust Related Agreements. Section 3809 of the DSTA provides, "[e]xcept to the extent otherwise provided in the governing instrument of a statutory trust ..., the laws of this State pertaining to trusts are hereby made applicable to statutory trusts."[413] "Thus, unless the Trust Agreement or the Act 'otherwise provides,' existing trust law applies, including default fiduciary duties provided by statute or common law."[414]

[413]  12 *Del. C.* § 3809.

[414]  *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1111 (Del. Ch. 2008).

At common law, the "duties of a trustee to trust beneficiaries" include "loyalty, good faith, and due care."[415] Section 3806(c) of the DSTA, however, permits the elimination of fiduciary duties that otherwise exist under common law.[416] While parties may agree to waive default fiduciary duties, the DSTA forbids parties from eliminating the "implied *contractual* covenant of good faith and fair dealing."[417] In the alternative entity context, which corresponds well here, this Court has consistently held that drafters "must make their intent to eliminate fiduciary duties plain and unambiguous."[418]

[415]  *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995).

[416]  *See* 12 *Del. C.* § 3806(c).

[417]  12 *Del. C.* § 3806(c) (emphasis supplied).

[418]  *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp.*, 2014 WL 4374261, at *13 (Del. Ch. Sept. 4, 2014) (internal quotation and citation omitted).

**\*53** For reasons explained below, I find: (i) the Owner Trustee owes limited contractual fiduciary duties, but those duties have been satisfied through the Administration Agreement; (ii) the Owner Trustee's remaining contractual obligations are narrow; (iii) the Owners are the Trusts' beneficial owners and yet, given their right to control certain aspects of the Trusts' operations, they owe fiduciary duties to the *Trusts*; (iv) only holders of Trust Certificates have standing to bring derivative claims on behalf of the Trusts; (v) the Owners owe direct but limited fiduciary duties to the Noteholders and AMBAC; and (vi) the implied covenant does not support broad declarations regarding duties owed by the Owners or the Owner Trustee to the Indenture Parties.

### 1. The Owner Trustee Does Not Owe Extra-contractual Duties

Whether (or not) the Owner Trustee owes fiduciary duties and to whom those duties are owed is hotly debated between the parties. The Owner Trustee's position is that it owes fiduciary duties to no one; the Owners maintain the Owner Trustee owes them fiduciary duties, and the Noteholders and AMBAC argue the Owner Trustee owes them fiduciary duties.[419] As I will explain below, the Owner Trustee's position is the only reasonable reading of the Trust Agreement.

[419]  *Compare* Owners' Compl. ¶ 149 (ii), (jj), *with* Noteholder Gp.'s and AMBAC's Joint Answering Br. in Partial Opp'n to [the Owner Trustee's] Mot. for J. on the Pleadings (D.I. 431) ("Partial Opp'n") at 27, *and* Owner Trustee Counterclaim ¶ 74(r).

As a default matter, the "business and affairs of a statutory trust shall be managed under the direction of its trustees."[420] For this reason, under normal circumstances, the trustee of a statutory trust (i.e., the Owner Trustee) would be expected to manage the trust for the benefit of other parties and would, in that capacity, owe fiduciary duties.[421] But this default rule can be modified if "otherwise provided in the [trust's] governing instrument."[422] Here, the Trust Agreement *does* "otherwise provide."

[420]  12 *Del. C.* § 3806(a).

[421]  *Cinerama*, 663 A.2d at 1148 ("In general, the duties of a trustee to trust beneficiaries" are "loyalty, good faith, and due care" which are "broadly similar to those of a corporate director to his corporation.")

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 112 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

422    12 *Del. C.* § 3806(a).

Section 8.03 of the Trust Agreement states, "[i]t shall be the duty of the Owner Trustee ... to administer the Trust in the interest of the Owners." [423] Commensurate with Owner Trustee's *de minimis* compensation, however, the Trust Agreement qualifies this general duty in Section 8.07:

> The Owner Trustee shall not have a duty or obligation to manage ... or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action ... except as *expressly* provided by the terms of *this* Agreement. [424]

The only reasonable interpretation of this language is that the Owner Trustee has no affirmative duty to manage the Trusts unless a specific provision in the Trust Agreement triggers an Owner Trustee duty to act. [425]

423    Trust Agreement § 8.03 (JC0600); *see also* Trust Agreement § 2.05 (JC0587) ("The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners.").

424    Trust Agreement § 8.07 (JC0601) (emphasis supplied).

425    *See, e.g.*, Trust Agreement § 8.07 (JC0601) (obligating the Owner Trustee to "promptly take all action as may be necessary to discharge any liens on any part of the Trust Property which result from claims against the Owner Trustee").

Section 8.07 thus creates a contractual duty that replaces common law fiduciary duties. [426] That contractual duty is incongruous with common law fiduciary duties because, at common law, a Delaware fiduciary has an unremitting duty to act in the best interests of the beneficiary, and the scope of that duty could never be reduced to a few express provisions in a contract. [427] But the Owner Trustee's duties have been reduced to contract, as permitted by our law, and it is that contract (the Trust Agreement) that defines the scope of those duties. [428]

426    *See, e.g.*, *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 101 (Del. 2013) (finding that the operative contract "creates a contractual duty that replaces the common law fiduciary duties"); *Norton*, 67 A.3d at 361 (finding language requiring a general partner to take actions that it reasonably believed to be in "the best interest of the Partnership" to be a "contractual fiduciary duty").

427    Trust Agreement § 8.07 (JC0601) (emphasis supplied); *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 778 (Del. Ch. 2005) (stating that a "faithful fiduciary" has an "affirmative duty to act" in "the best interests of the Company" after "taking into account" all reasonably available information as well as "potential alternatives" to her action).

428    Trust Agreement § 8.07 (JC0601).

**\*54** While the Owner Trustee has a general contractual duty to administer the Trusts for the benefit of the Owners, the Trust Agreement whittles down that general duty to a fine point. [429] *First*, the Owner Trustee cannot take an action that is "inconsistent with the purposes of the Trust[s]"—even if that action would otherwise be in the Owners' interests. [430] *Second*, the Owner Trustee has no unilateral authority to act on "nonministerial matters." [431] Given that fiduciary duties arise only to the extent that one exercises "control over the property of another," the scope of the Owner Trustee's contractual fiduciary duties could not extend to matters over which it has no authority, discretion or control (i.e., "nonministerial matters"). [432] *Finally*, in the same breath the Trust Agreement obligates the Owner Trustee to "administer the Trusts[s] in the interest of the Owners," the Trust Agreement also states, "the Owner Trustee *shall be deemed to have discharged its duties and responsibilities* ... to the extent the Administrator has agreed ... to ... discharge such duties, ... and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement." [433] As contemplated and permitted by this provision, the Administrator, in fact, has agreed to perform *all* of the Owner Trustee's "duties and obligations" in the Administration Agreement. [434]

429    Trust Agreement § 8.03 (JC0600) ("It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 113 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

this Agreement and to administer the Trust in the interest of the Owners.").

430    *See* Trust Agreement § 8.09 (JC0601). The Owners are similarly prohibited from ordering the Owner Trustee to act or refrain from acting in a way that would violate the Trust Related Agreements—which encompasses an order that would contravene the Trusts' purposes. Trust Agreement § 4.02(b) (JC0591).

431    Trust Agreement § 4.01 (JC0590).

432    *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch. 2015); *In re USACafes*, 600 A.2d at 48 ("I understand the principles of fiduciary duty, stated most generally, to be that one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."); *Sokol Hldgs., Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *3 (Del. Ch. Aug. 5, 2009) ("The hallmark of a fiduciary relationship is that one person has the power to exercise control over the property of another as if it were her own.").

433    Trust Agreement § 8.03 (JC0600) (emphasis supplied).

434    Trust Agreement § 4.01(b) (JC0590); Administration Agreement § 1(b)(i) (JC3662) ("The Administrator shall perform ... the duties and obligations of the Owner Trustee.").

The only reasonable interpretation of this sequence is that the Owner Trustee is now conclusively "deemed to have discharged its duties"—which were already limited. [435] As a result, even if the Owner Trustee possesses some baseline contractual duty to act in the interests of the Owners regarding *ministerial* matters, that duty has been discharged via the Administration Agreement.

435    *Compare* Trust Agreement § 8.03 (JC0600) ("The Owner Trustee shall be deemed to have discharged its duties and responsibilities ... to the extent the Administrator has agreed ... to perform such acts or to discharge such duties of the Owner Trustee."), *with* Administration Agreement § 1(b)(i) (JC3662)

("The Administrator shall perform ... the duties and obligations of the Owner Trustee.").

Turning to duties the Owner Trustee purportedly owes to other Indenture Parties, the plain language of the Trust Agreement forecloses any notion that the Owner Trustee owes any extra-contractual duties (fiduciary or otherwise) to the Noteholders or AMBAC. [436] The Owner Trustee's duty is to "administer the Trust in the interest of the Owners." [437] If the drafters of the Trust Agreement (or the Trust Related Agreements) had intended the Owner Trustee to administer the Trusts in the interests of another deal party, the Trust Agreements would have said so. [438] To settle all doubt, Section 8.07 states, "no implied duties or obligations shall be read into this Agreement against the Owner Trustee." [439]

436    *See* Trust Agreement § 8.07 (JC0601).

437    Trust Agreement § 8.03 (JC0600).

438    *Fortis Advisors LLC v. Shire US Hldgs., Inc.*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (reasoning that courts generally will not "blue-pencil" contracts by inserting language into agreements that does not exist).

439    Trust Agreement § 8.07 (JC0601).

\* \* \* \* \*

**\*55**  Based on the foregoing and subject to the clarifications I have provided, (i) the Owners' Motion as to their Declarations KK and II and (ii) the Owner Trustee's Motion as to its Declaration U are GRANTED; but (iii) the Owners' Motion as to their Declaration JJ is DENIED.

### 2. The Owner Trustee's Contractual Duties are Narrow and Few

Having determined the Owner Trustee does not owe fiduciary duties, I turn next to the scope of the Owner Trustee's *contractual* obligations under the Trust Related Agreements. The Indenture Parties maintain that the Owner Trustee has a "duty to administer the Trusts in accordance with the Trust Agreements." [440] This overstates the Owner Trustee's role. Nothing in the Trust Related Agreements saddles the Owner Trustee with a contractual obligation to administer, supervise or review *any* aspect of the Trusts' operations beyond an overarching obligation to act in good faith.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 114 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

440    Partial Opp'n at 19.

While the Owner Trustee *may* decline to follow Owner directions that are "contrary to" the Trust Related Agreements, nothing requires the Owners to *study* each Owner direction to determine whether (or not) it is proper.[441] Section 4.02(b) simply states that if the Owners issue an improper instruction, the Owner Trustee is not "*obligated to* follow" that direction.[442] And even if the Owners Trustee were to follow an improper Owner or Administrator instruction, as long as the Owner Trustee follows the relevant instruction "in good faith," the Owner Trustee "shall not be personally liable."[443]

441    Trust Agreement § 4.02(b) (JC0591) ("No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee *be obligated to follow any such direction*, if given.") (emphasis supplied).

442    Trust Agreement § 4.02(b) (JC0591) (emphasis supplied).

443    Trust Agreement § 9.01(ii) (JC0602). Whether the Owner Trustee acted in "good faith/bad faith raises [ ] a question of fact which generally cannot be resolved on the pleadings." *Desert Equities*, 624 A.2d at 1208–09.

While the Owner Trustee does not have to use them, as noted, the Trust Agreement provides the Owner Trustee with two safe harbors when confronted with unclear or questionable Owner instructions. In such instances, the Owner Trustee "*may*" (but need not):

> give notice ... to the Owners requesting instructions, and to the extent that the Owner Trustee shall have acted or refrained from acting *in good faith* in accordance with any instructions received from the Owners,[444] the Owner Trustee *shall not be liable to any Person* on account of such action or inaction.[445]

Additionally, and at the expense of the Trusts, the Owner Trustee may "consult with counsel, accountants and other skilled persons" selected with "reasonable care."[446] If the Owner Trustee exercises this voluntary right, "the Owner Trustee shall not be liable" for any action taken in good faith reliance on advice from its advisors.[447] While important, neither of these two safe harbors impose an affirmative obligation on the Owner Trustee to monitor Owner instructions.[448]

444    Under the Insured Trust Agreement, any instructions must be "received from the Owners" and "approved by" AMBAC for the Owner Trustee to avail itself of the safe harbor. Insured Trust Agreement § 8.07 (JC0029).

445    Trust Agreement § 8.07 (JC0601) (emphasis supplied).

446    Trust Agreement § 9.03(b) (JC0603).

447    Trust Agreement § 9.03(b) (JC0603).

448    To the contrary, the Owner Trustee is permitted to "rely on a certificate" for "all purposes" that is signed by an authorized representative of the Owners, and such certificate "shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon." Trust Agreement § 9.03(a) (JC0603). Given that "the law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith," nothing in the Trust Agreements suggests that the Owner Trustee has a background duty to suspect the Owners would act in direct contravention of the Trust Related Agreements. *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

**\*56**  On the other hand, if the Owner Trustee acts as to a ministerial matter without Owner instructions,[449] it may not act "in violation of" the Trust Agreement or in a manner "inconsistent with the purposes of the Trust."[450] But, even when acting without Owner instructions, as long as the Owner Trustee avoids "willful misconduct or gross negligence," the Owner Trustee "shall not be personally liable."[451]

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 115 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

449    *See, e.g.,* Trust Agreement § 4.01(a) (JC0590).

450    Trust Agreement § 2.03(b)(i) (JC0586), § 8.09 (JC0601).

451    Trust Agreement § 9.01 (JC0602).

* * * * *

Based on the foregoing and subject to the clarifications I have provided, (i) the Owner Trustee's Motion as to its Declarations D, R, and S and (ii) the Owners' Motion as to their Declaration LL are GRANTED.

### 3. The Owners Are the Trusts' Beneficial Owners; The Owners Owe Fiduciary Duties to the Trusts Because of Their Direction Rights; and Only Beneficial Owners of the Trusts Have Standing to Bring Derivative Claims on Behalf of the Trusts

As noted above, the common law of trusts applies to statutory trusts unless otherwise provided in a trust's governing instrument, and a governing instrument may waive default fiduciary duties with clear and unambiguous language.[452] The DSTA, at 12 *Del. C.* § 3805(a), provides that "except to the extent otherwise provided in the governing instrument of the statutory trust, a beneficial owner [of a statutory trust] shall have an undivided beneficial interest in the property of the statutory trust."[453] In turn, the DSTA defines "beneficial owner" as "any owner of a beneficial interest in a statutory trust, the fact of ownership to be determined and evidenced ... in conformity to the applicable provisions of the governing instrument of the statutory trust."[454]

452    12 *Del. C.* § 3809, § 3806(c), (e).

453    12 *Del. C.* § 3805(a).

454    12 *Del. C.* § 3801(a).

The Trust Agreements define the "Owners" as "any ... Person who becomes an owner of a Beneficial Interest," and defines "Beneficial Interest" as "all or any part of the interest of that Owner in the Trust."[455] The Trust Agreements then provide for "Trust Certificates" that "evidenc[e] the Beneficial Interest[s]" of the Owners.[456] Finally, the Trust Agreements state that the Owner Trustee "may treat the Person in whose name any Trust Certificate is registered as the sole owner of the Beneficial Interest."[457]

455    Trust Agreement § 1.01 (JC0582) (JC0579).

456    Trust Agreement § 1.01 (JC0484) (definition of "Trust Certificate").

457    Trust Agreement § 3.02(b) (JC0588).

Based on the foregoing language, and following the DSTA's direction that I determine the "fact of ownership ... in conformity to" the Trust Agreement, any party that does not hold a Trust Certificate is not a "beneficial owner" of the Trusts.[458] Conversely, any party that *does* hold a Trust Certificate *is* a "beneficial owner."[459] It follows that, if the Owners hold Trust Certificates, then they are beneficial owners of the Trusts to which those certificates relate.

458    12 *Del. C.* § 3801(a).

459    12 *Del. C.* § 3801(a).

As discussed above, Section 3806(a) of the DSTA and Section 4.01(b) of the Trust Agreement permit the Owners (*qua* beneficial owners) to "direct the trustees or other person in the management of" the Trusts.[460] Under the principles established by this court in *Cargill v. JWH Special Circumstance LLC*, the Owners owe fiduciary duties *to the Trusts* when the Owners "(1) ... exercise[ ] control over the Trust[s] or [their] assets" and (2) exercise "that control to benefit themselves at the expense of the Trust."[461] As Vice Chancellor Parsons noted in *Cargill*, this conclusion flows from the Owners' direction rights and the concomitant authority to control the "property of another."[462]

460    12 *Del. C.* § 3806(a); Trust Agreement § 4.01(b) (JC0590).

461    *Cargill*, 959 A.2d at 1121.

462    *Id.* (citing *In re USACafes*, 600 A.2d 43).

 *57  Consistent with the DSTA's policy of giving maximum "effect to the principle of freedom of contract," the Trust Agreement could have waived or modified the Owners' fiduciary duties to the Trusts with clear and unambiguous language.[463] While such a waiver is possible, the Owners have identified no language in the Trust Agreement that purports to modify the default fiduciary duties they owe to the Trusts.

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 116 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

463    12 *Del. C.* § 3806(c), § 3825(b).

This holding has limited practical consequences because 12 *Del. C.* § 3816(b) states that "[i]n a derivative action, the plaintiff *must be a beneficial owner.*"[464] Here, the "General Assembly used the mandatory and exclusive 'must,' rather than the permissive may."[465] Accordingly, even if the Indenture purports to Grant the right to bring derivative breach of fiduciary duty claims on behalf of the Trusts to constituents other than the beneficial owners, those contractual transfers cannot "contravene any mandatory provisions of the Act."[466] For this reason, only a holder of a Trust Certificate has standing to bring a derivative claim on behalf of the Trusts.

464    12 *Del. C.* § 3816(b) (emphasis supplied).

465    *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011).

466    *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999).

No party has standing to pursue a derivative claim on behalf of the Trusts unless that party holds a Trust Certificate, even if the party is a Trust creditor (like the Noteholders and AMBAC), even if the party is an assignee and even if the Trusts were insolvent when the creditor/assignee filed suit. Creditor fiduciary claims cannot exist in the DST context because the mandatory language in the DSTA limiting derivative standing to beneficial owners still controls. "[C]ourts cannot interpret the common law to override the express provision the General Assembly adopted."[467]

467    *Bax*, 28 A.3d at 1045.

On this point, *Bax* is instructive.[468] There, the Supreme Court considered whether *Gheewalla* (which holds that creditors of insolvent corporations may have standing to bring derivative claims) applied to creditor suits in the context of an insolvent LLC.[469] The Supreme Court construed materially similar statutory language to that in Section 3816(b).[470] After a careful analysis, our highest Court held the statutory language was unambiguous and applied the statute's plain meaning, holding that only members or assignees of an LLC interest "have derivative standing to sue on behalf of an LLC —creditors do not."[471]

468    *Id.* at 1037.

469    *Id.* at 1041–42, 1044–45 (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007)).

470    *Compare* 12 *Del. C.* § 18–1002 ("In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action."), *with* 12 *Del. C.* § 3816(b) ("In a derivative action, the plaintiff must be a beneficial owner at the time of bringing the action.").

471    *Bax*, 28 A.3d at 1024.

Given the clear and unambiguous language of 12 *Del. C.* § 3816(b), the same result follows here.[472] In hopes of resisting this inevitable outcome, the Noteholders and AMBAC make much of Section 3809 of the DSTA, which provides that "the laws of this State pertaining to trusts are hereby made applicable to statutory trusts."[473] This general principle does not change the mandate of Section 3816(b), as revealed by the fact that Section 3809 also contains the modifying clause: "*[e]xcept to the extent provided ... in this subchapter.*"[474] The General Assembly *did* "otherwise provide" as relates to derivative standing, and I must give effect to the plain meaning of their words.[475]

472    Of course, this does not mean the Indenture Parties could not assert direct claims, as discussed below.

473    12 *Del. C.* § 3809.

474    12 *Del. C.* § 3809 (emphasis supplied).

475    The Indenture Parties cite *NCUAB I*, 2016 WL 796850, at *9 as holding "that direct and derivative claims of [of a Delaware Statutory Trust may be] granted to the indenture trustee pursuant to [a] grant." JAB at 104. *NCUAB* is far more complicated than Defendant's parenthetical explanation lets on. The case involved the re-securitization of certain residential mortgage backed securities *certificates*. In that case, the court noted that the assets transferred to the Indenture Trustee were "Owner Trust Certificates which shall evidence the beneficial ownership interest in the trust estate." *NCUAB I*, 2016 WL 796850, at *3. Accordingly, the Indenture Trustee, by virtue of

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 117 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

the securitization transaction, was held to have standing to bring derivative claims because it had been assigned all "right, title and interest" in the "Re-securitized Certificates." *Id.*, at \*7. Here, in contrast, the Indenture Trustee does *not* hold the Trust Certificates or a beneficial interest in the Trust Certificates. Section 14.03 of the Trust Agreement does not change this outcome because it serves to transfer the Owners' "rights ... in and to [the] Trust Property," but *not* "in and to" the Trust Certificates. (JC0690).

\* \* \* \* \*

**\*58** Based on the foregoing and subject to the clarifications I have provided, (i) the Owners' Motion as to their Declarations DD, EE, HH, NN and PP, (ii) AMBAC's Motion as to its Declaration I and (iii) the Noteholders' Motion as to their Declaration J are all GRANTED.

### 4. The Owners Owe Direct Fiduciary Duties to the Noteholders and AMBAC to the Extent the Owners Exercise Control over the Collateral

AMBAC and the Noteholders seek a Declaration that the Owners owe them direct fiduciary duties.[476] It appears this Declaration raises an issue of first impression under Delaware law, as neither party has cited a controlling decision that addresses whether a securitization Issuer's controllers owe fiduciary duties to the Issuer's assignees.

[476] JAB at 21; AMBAC Counterclaim ¶¶ I, J; Noteholder Counterclaims ¶¶ J, K; JAB at 21.

By the Noteholders' and AMBAC's lights, they are "entitled to the same rights as a common law trust beneficiary."[477] The Noteholders and AMBAC draw this conclusion, not from their status as "beneficial owners" of the Trusts, but from the structure of the Trust Related Agreements as a whole, which they interpret as establishing the Noteholders and AMBAC as the "beneficiaries with priority interests in the Trust Property."[478]

[477] JAB at 21.

[478] JAB at 23.

In support of this argument, the Indenture Parties cling to 12 *Del. C.* § 3801(i).[479] There, the DSTA provides that property of a statutory trust is to be administered "for the benefit of ... beneficial owners *or as otherwise provided in the governing instrument*."[480] The Noteholders and AMBAC then reason that the Trust Related Agreements evidence an intent to make the Noteholders (and AMBAC as to the Insured Trusts) the "beneficiaries of the Trusts' assets."[481] Specifically, the Indenture Parties cite: (i) the purposes of the Trusts (i.e., to enter into a securitization transaction and to "conserve" the Trust Property), (ii) the Granting Clause, (iii) the Noteholders' and AMBAC's status as third-party beneficiaries of the Trust Agreement and the Indenture and (iv) the Indenture Waterfall.[482]

[479] JAB at 19 (citing 12 *Del. C.* § 3801(i)).

[480] 12 *Del. C.* § 3801(i) (emphasis supplied).

[481] JAB at 19.

[482] JAB at 19–21.

No matter how emphatically the Noteholders and AMBAC proclaim otherwise, the Trust Agreement unambiguously states the Trusts are to be administered "in the interest of the Owners."[483] Given that I must give priority to the "specific provisions" in the Trust Related Agreements "over more general ones," the Noteholders and AMBAC's reading of the Trust Agreement on this point is unreasonable.[484] Nothing in the Trust Related Agreements suggests the Noteholders or AMBAC have a beneficial interest in the Trust or a general right to compel the Owners as fiduciaries to administer the Trusts in their interests.

[483] Trust Agreement § 8.03 (JC0600); *see also* Trust Agreement § 8.06 (JC0601) (granting safe harbor to the Owner Trustee when it acts as it "shall deem to be *in the best interests of the Owners*") (emphasis supplied); Trust Agreement § 2.05 (JC0587) (The Owner Trustee is to "hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners subject to the obligations of the Owner Trustee under the Trust Related Agreements.").

[484] *See Brinckerhoff*, 159 A.3d at 254 (A court must "prefer specific provisions over more general ones.").

**\*59** To the contrary, the Noteholders are the assignees of Trust Property and the holders of debt instruments issued

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 118 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

by the Trusts. [485] "Delaware courts have traditionally been reluctant to expand existing fiduciary duties, [and] [ ] the general rule is that [a business entity's fiduciaries] do not owe creditors [or assignees] duties beyond the relevant contractual terms." [486] For these reasons, neither the Noteholders nor AMBAC have demonstrated that their relationship <u>to the Trusts</u> makes them beneficiaries of fiduciary duties.

[485]     Indenture (Granting Clause) (JC2760); Indenture § 2.01 (JC2761).

[486]     *Gheewalla*, 930 A.2d at 99 (internal quotations omitted).

But this finding does not conclude the analysis. While the Noteholders and AMBAC are not beneficial owners *of the Trusts* (*qua* creditors and assignees), they are the beneficial owners *of the Collateral* (*qua* owners). In the Indenture, the Trusts granted all their interest in the Collateral "to the Indenture Trustee, as trustee for the benefit of the holders of the Notes [and AMBAC under the Insured Indenture]." [487] Yet, as outlined above, the Trusts retained legal title to the Collateral so that they could collect Student Loans for distribution according to the Indenture Waterfall. [488] While the parties have not identified a Delaware case directly on point, at common law, when parties agree to split legal and equitable title to property in an assignment for purposes of collection, "the resultant split in ownership gives rise to a fiduciary relationship between the assignor and assignee." [489]

[487]     Indenture (Granting Clause) (JC2760) (the Trusts Grant "to the Indenture Trustee ... as trustee for the benefit of the holders of the Notes."); Insured Indenture (Granting Clause) (JC3461).

[488]     *See* Trust Agreement § 5.02 (JC0593).

[489]     *Schoonmaker v. Lawrence Brunoli, Inc.*, 828 A.2d 64, 80 (Conn. 2003); *Cal. Ins. Guarantee Ass'n v. Workers' Comp. Appeals Bd.*, 203 Cal. App. 4th 1328, 1335 (Cal. Ct. App. 2012) ("An assignment for collection vests legal title in the assignee which is sufficient to enable him to maintain an action in his own name, but the assignor retains the equitable interest in the thing assigned" and "a fiduciary relationship exists" between assignor and assignee.); *Harrison v. Adams*, 128 P.2d 9, 12–13 (Cal. 1942) (same); *In re Liquidation of Home*

*Ins. Co.*, 953 A.2d 443, 499 (N.H. 2008) (An assignment for collection "gives rise to a fiduciary relationship between assignor and assignee."); 6 AM. JUR. 2D ASSIGNMENTS § 115 (2020) ("An assignment of a claim for the purposes of collection gives rise to a fiduciary relationship between the assignor and the assignee."); 6A C.J.S. ASSIGNMENTS § 98 (2020) ("The resultant split in ownership" arising from an assignment for collection "gives rise to a fiduciary relationship between the assignor and assignee.").

This legal conclusion melds with the key "underlying premise for the imposition of fiduciary duties," i.e., the "separation of legal control from beneficial ownership." [490] If parties agree to divide property in this way, "[e]quitable principles act in those circumstances to protect the beneficiaries who are not in a position to protect themselves." [491] For this reason, the Trusts owe fiduciary duties to the Noteholders and AMBAC (the beneficial owners of the Collateral) to the extent the Trusts exercise control over the Collateral.

[490]     *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998).

[491]     *Id.* at 9.

To be clear, this fiduciary duty arises because of the Noteholders and AMBAC's relationship to the *Collateral*, rather than their relationship to the *Trusts*. As long as the Notes are outstanding, the Indenture Trustee holds the Collateral "for the benefit of the holders of the Notes and AMBAC." [492] To the extent the Trusts exercise control over this property (which now belongs to the Noteholders and AMBAC), such as when they act to collect the Student Loans, the Trusts must "regulate their conduct" and act in the best interests of the Collateral's beneficial owners. [493]

[492]     Insured Indenture (Granting Clause) (JC3461).

[493]     *Malone*, 722 A.2d at 9. For example, if the Trusts were to engage additional service providers, those contractors would be compensated out of proceeds from the Collateral. For this reason, the Trusts would be exercising control over property that was within the Indenture Trust Estate—which would implicate the Trusts' fiduciary duties to the Noteholders and AMBAC.

**\*60** This conclusion recognizes the substantive reality of the securitization transaction. In effect, the Indenture created an

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 119 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

inverse "assignment for collection." [494] "An assignment for collection only leaves the beneficial or equitable ownership of the claim in the assignor, while vesting legal title in the assignee; the assignee is empowered to collect the claim." [495] While, in this case, the assignor conveyed beneficial ownership of the Collateral and retained legal title (rather than the inverse), the substance and structure of the instant securitization transaction leads to the same conclusion. [496] To wit, to the extent the holder of mere legal title to the Collateral (i.e., the Trusts) controls the Collateral to fulfill its obligations under the Indenture, it does so for the benefit of the Collateral's beneficial owners (i.e., the Noteholders and AMBAC). [497]

[494]   Compare Indenture (Granting Clause) (JC2760), with Indenture § 3.05 (JC2771) (obligating the Trusts to "Enforce [ ] the Collateral"); 6 AM. JUR. 2D ASSIGNMENTS § 111 (2020) (defining an "assignment for collection only").

[495]   6 AM. JUR. 2D ASSIGNMENTS § 115 (2020); see also 6A. C.J.S. ASSIGNMENTS § 98 (2020) ("[A]n assignment merely for collection does not transfer the beneficial ownership to the assignee, such an assignment, when it is absolute and the thing assigned is capable of assignment, vests legal title to the thing assigned in the assignee, so that he or she may collect from the debtor.").

[496]   See Feeley v. NHAOCG, LLC, 62 A.3d 649, 668 (Del. Ch. Nov. 28, 2012) ("Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that 'equity regards substance rather than form.' ") (quoting Monroe Park v. Metro. Life Ins. Co., 457 A.2d 734, 737 (Del. 1983)).

[497]   See Malone, 722 A.2d at 9 (The "underlying premise for the imposition of fiduciary duties is a separation of legal control from beneficial ownership.").

In turn, this fiduciary duty of the Trusts extends to the Owners under the principles established in In re USACafes, L.P. and applied to Delaware Statutory Trusts in Cargill v. JWH Special Circumstance LLC; "fiduciary duties [may be] owed by those that control a fiduciary." [498] And "one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment

of the property or its beneficial owner." [499] Because the Owners have the right to direct the Trusts, the Owners also owe fiduciary duties to the Noteholders and AMBAC to the extent they direct the Trusts in their control the Collateral for the purposes of collecting the Student Loans (or otherwise purport to exercise control over the assigned Collateral). And again, while the Trust Agreements could have waived this fiduciary duty with clear and unambiguous language, nothing in the Trust Agreements purports to alter the Owners' common law fiduciary duties. [500]

[498]   Cargill, 959 A.2d at 1110; In re USACafes, 600 A.2d at 47–50; see also Fannin v. UMTH Land Dev., L.P., 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020) (recognizing that USACafes is "stare decisis" and that this court has "followed USACafes consistently") (internal quotation omitted).

[499]   In re USACafes, 600 A.2d at 47–50; Cargill, 959 A.2d at 1120–21 (applying USACafes to Delaware Statutory Trusts).

[500]   12 Del. C § 3806(c).

At this stage, I do not "attempt to delineate the full scope" of this duty. [501] What is clear is that the Owners' duty "surely entails" an obligation not "to use control over [the Collateral] to advantage the [Owners] at the expense" of the Noteholders an AMBAC. [502]

[501]   In re USACafes, L.P. Litig., 600 A.2d at 49.

[502]   Id.

* * * * *

Based on the foregoing and subject to the clarifications I have provided, (i) the Noteholders' Motion as to their Declaration L and (ii) the Owners' Motion as to their Declarations MM, OO and QQ are GRANTED, but (iii) the Owners' Motion as to their Declarations GG, RR and SS is DENIED.

### 5. The Implied Covenant Is Not a Basis to Support Sweeping Contractual Duties without Specific Factual Allegations and Contract Language

*61  The Noteholders and AMBAC seek Declarations that the implied covenant of good faith and fair dealing saddles both the Owners and the Owner Trustee with broad and

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 120 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

nebulous duties to act in their interests.[503] While it is true the implied covenant "attaches to every contract by operation of law," and cannot be waived under the DSTA, the implied covenant is a limited "gap-filling tool" used "to infer contractual terms to which the parties would have agreed had they anticipated a situation they failed to address."[504] As it assesses whether the implied covenant applies or has been breached, the court must understand that "existing contract terms control" and the "implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty ... unattached to the underlying legal document.' "[505] When the court relies on the implied covenant, it essentially reads an implied term into a contract.[506] This "quasi-reformation" process is "rare" and requires a "fact-intensive exercise governed solely by issues of compelling fairness."[507]

[503]     Noteholder Counterclaims ¶ 4(K); AMBAC Counterclaim ¶ J; JAB at 66–67 (arguing against the Owners' Declaration KK that Wilmington Trust owes an "extracontractual" duty because of the implied covenant).

[504]     12 *Del. C.* § 3806(c), (e); *Dawson v. Pittco Capital P'rs*, 2012 WL 1564805, at \*24 (Del. Ch. Apr. 30, 2012) ("The implied covenant attaches to every contract."); *In re Encore Energy P'rs L.P. Unitholder Litig.*, 2012 WL 3792997, at \*12 (Del. Ch. Aug. 31, 2012) ("The implied covenant is a limited gap-filling tool to infer contractual terms.").

[505]     *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Glenfed Fin. Corp. Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Sup. Ct. App. Div. 1994)).

[506]     *Id.*

[507]     *Id.* (internal quotations omitted).

At this stage of proceedings, it would be inappropriate to issue sweeping declarations concerning abstract duties that either the Owners or the Owner Trustee may owe to another deal party based on the implied covenant. To be sure, the implied covenant inures in the Trust Related Agreements, and nothing in this Opinion should be read to prevent the Noteholders or AMBAC from pleading and proving a breach of the implied covenant based on a specific factual predicate. But the implied

covenant is not a basis with which to saddle the Owners or the Owner Trustee with generalized duties as a matter of law.

\* \* \* \* \*

Based on the foregoing and subject to the clarifications I have provided, (i) the Noteholders' Motion as to their Declaration K and (ii) AMBAC's Motion as to its Declaration J are DENIED.

## G. The Noteholders Are Third-Party Beneficiaries of the Trust Agreements

The Noteholders have asked the Court to declare that they are "[e]xpress third-party beneficiaries of the Trust Agreement" and that they "may sue to enforce the Trust Agreement."[508] The Owners do not dispute that the Noteholders are "among the Trust Agreements' [contractually designated] third-party beneficiaries,"[509] and for good reason. Section 14.04 of the Trust Agreement unambiguously states, "for so long as any of the Notes are outstanding ... the Noteholders are third party beneficiaries hereof."[510]

[508]     Noteholder Counterclaims ¶ P.

[509]     PAB at 158.

[510]     Trust Agreement § 14.04 (JC0690); *see also Ark. Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at \*2 (Del. Ch. June 28, 2019) (Under Delaware law, a third party to a contract may sue to enforce its terms.").

Notwithstanding Section 14.04, the Owners maintain that the Noteholders' "rights to sue to enforce the Trust Agreements are circumscribed by the Indentures' no action and no-recourse clauses."[511] These clauses are found in Sections 5.06 (the "no action clause") and 11.15 (the "no recourse clause") of the Indenture.

[511]     PAB at 158.

The no action clause states, "no holder of the Notes shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless" certain conditions are satisfied, including that the "holder of the notes has previously given written notice to the Indenture Trustee of a continuing Event of Default."[512] This language

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 121 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

makes clear that the Noteholders must satisfy the conditions in the no action clause before bringing any Proceeding "with respect to" the Indenture.[513]

---

512      Indenture § 5.06 (JC2793).

513      Indenture § 5.06 (JC2793).

---

**\*62** But, at this stage, the Court will not venture into hypothetical questions about what future claims would (or would not) constitute a claim "with respect to" the Indenture. No party has sought such a fact specific Declaration, and the Owners raise the issue only to "reserve[ ] their rights."[514] Nothing in this Opinion prevents the Owners from raising Section 5.06 as a defense in the future. The Noteholders' Declaration is limited on its face to their status as third-party beneficiaries—not any defenses other parties may raise to any future claim.

---

514      PAB at 158.

---

The same result follows for the no recourse clause. To prevail on a claim against the Owners, the Noteholders would need either to explain why the no recourse clause does not apply or satisfy its conditions.[515]

---

515      Indenture § 11.15 (JC2824–25).

---

Based on the foregoing, the Noteholders' Motion as to their Declaration P is GRANTED.

---

### H. No Person May Own All of the Trust Certificates

The Trust Agreements limit the transfer of the Owners' Beneficial Interests in the Trusts. Section 3.04(c) of the Trust Agreement states:

> No Transfer [of Trust Certificates] shall be valid if, as a result of such Transfer, (i) any Person would have a Percentage Interest or a Sharing Ratio of 100%, considering for such purpose all interests owned by any Affiliate of such Person as owned by such Person.[516]

The Trust Agreement further defines "Affiliate" with respect to any specified Person as "any other Person controlling or controlled by or under common control with such specified Person."[517] In turn, the agreement defines "control" as "the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise."[518] Based on this language, the Noteholders' Declaration E asks the Court to declare that "a transfer of Certificates is invalid if it would cause a specific Person to own or control, directly or indirectly, or with an Affiliate, 100% of the Certificates."[519]

---

516      Trust Agreement § 3.04(b) (JC0589); *see also* Trust Agreement § 1.01 (JC0583) (defining "Transfer" as "the sale, transfer or other assignment of all of an Owner's right, title and interest in all or a portion of such Owner's Beneficial Interest").

517      Trust Agreement § 1.01 (JC0578) (definition of "Affiliate").

518      Trust Agreement § 1.01 (JC0578) (definition of "Affiliate").

519      Noteholder Counterclaims ¶ E.

---

The Owners resist this Declaration by arguing it amounts to an effort by the Noteholders to "relitigate" an issue this Court has already decided.[520] It is true this is not the first occasion the Court has been asked to interpret Section 3.04(c) of the Trust Agreements. In November, 2017, certain parties objected to instructions the Owners were providing to the Owner Trustee in connection with a case the Trusts brought against PHEAA.[521] After a brief period of discovery, the Court ruled that, while 99.9999% of the Trust Certificates were under the common control of one person, "the only evidence in the record is uncontradicted sworn testimony" that .0001% of the Trust Certificates were controlled by an unaffiliated party.[522]

---

520      *See* PAB at 135.

521      *See* Rulings of the Court on Ownership Issue, *Nat'l Collegiate Student Loan Master Tr., et al. v. Pa. Higher Educ. Assistance Agency*, C.A. No. 12111-VCS (Del. Ch. Nov. 7, 2017) (C.A. No. 12111-VCS) (D.I. 235) ("Ownership Issue Tr.").

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 122 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

522    Ownership Issue Tr. at 17–18.

Nothing on the face of the Noteholders' Declaration E contradicts this then-extant finding of fact. As I have already stated, if a party brings a claim or raises a question of law or fact that has already been decided by this Court, then the doctrines of *res judicata* and issue preclusion would come into play and those doctrines may or may not bar the claim. For today's purposes, however, it is enough that the Noteholders' Declaration E is supported by the unambiguous language of the Trust Agreement.

## I. Declarations That Involve Disputed Question of Material Fact

**\*63** In various ways, the parties have sought to draw the Court into factual disputes over (i) whether specific delegations of Owner Trustee authority are appropriate, [523] (ii) whether certain expenses are "Owner Trustee" expenses, [524] (iii) whether parties "consented" to certain actions, [525] (iv) whether parties acted in "good faith" [526] and whether certain orders conflicted with the purposes of the Trusts [527] (among other factual determinations). At this stage, it would constitute reversible error to decide a "factual question when deciding a motion for judgment on the pleadings." [528] The parties agreed the purpose of these cross-motions for judgment on the pleadings would be to seek "declaratory relief regarding ... Common Contract Interpretation Issues" that do not require the Court to decide disputed questions of fact. [529] That is all I do today.

523    *See, e.g.*, Owners' Compl. ¶ 149 (AA) ("The Owner Trustee had the power to enter into the terms set forth in the BPA Engagement Letter"), ¶ 149(Z) (stating the Owner Trustee "had the power to enter into" a specific agreement).

524    *See, e.g.*, Owners' Compl. ¶ (BB) (stating certain expenses "must be paid by the Administrator and the Indenture Trustee").

525    *See, e.g.*, AMBAC Counterclaim ¶ D (stating the "Owners lacked authority to direct the Owner Trustee to execute the 2015 Chaitman Letter").

526    *See, e.g.*, Owner Trustee Counterclaim ¶ 74(v) (stating the Owner Trustee has no liability for "following the directions of the Owners").

527    *See, e.g.*, Owners' Compl. ¶ 149 (U) (stating a specific direction letter is not "contrary to the terms of the Trust Agreement").

528    *Desert Equities*, 624 A.2d at 1206–07 (holding that Rule 12(c) motions are not appropriate procedural vehicles in which to address disputed issues of fact).

529    *See* Stip. and Order Regarding Pleadings and Br. Sched. (D.I. 388) at 1.

\* \* \* \* \*

Based on the foregoing and subject to the clarifications I have provided, (i) the Owners' Motion as to their Declarations U, V, Z, AA, BB and CC, (ii) the Owner Trustee's Motion as to its Declarations N, O, P, Q, V, W and (iii) AMBAC's Motion as to its Declaration D are all DENIED.

## III. CONCLUSION

For the foregoing reasons, the parties, cross-Motions are **GRANTED** in part and **DENIED** in part, as delineated below.

The Owners' Motion as to their Declarations C, D, E, G, H, I, J, N, P, Q, T, DD, EE, FF, HH, II, KK, LL, MM, NN, OO, PP and QQ is **GRANTED.** The Owners' Motion as to their Declarations A, B, F, M, O, R, S, U, V, W, X, Y, Z, AA, BB, CC, GG, JJ, RR and SS is **DENIED.**

The Owner Trustee's Motion as to its Declarations A, C, D, H, I, J, K, L, R, S and U is **GRANTED.** The Owner Trustee's Motion as to its Declarations N, O, P, Q, V and W is **DENIED.**

The Indenture Trustee's Motion as to its Declarations A, C, D, E, F, G, P, Q, R, S, T, U, W, X and Y is **GRANTED.** The Indenture Trustee's Motion as to its Declarations B and V is **DENIED.**

AMBAC's Motion as to its Declarations A, C, F, I, O and P is **GRANTED**. AMBAC's Motion as to its Declarations B, D, G, H, J, K, L, M and N is **DENIED.**

The Noteholders' Motion as to their Declarations A, B, C, D, E, G, J, L, N, O and P is **GRANTED.** The Noteholders' Motion as to their Declarations H, I, K and M is **DENIED.**

Case 3:20-cv-01446-RDM-MCC  Document 75-2  Filed 03/22/21  Page 123 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

**IT IS SO ORDERED.**

**APPENDIX:**

**Owner Declarations:** [530]

A. The Granting Clause of the Indenture did not assign or pledge the power to assert all claims on behalf of the Trusts, but rather assigned or pledged as collateral the Trusts' right, title, and interest in and to only the assets expressly enumerated in the Granting Clause. **DENIED**

B. The Indenture Trustee may not bring suit absent an Event of Default including expiration of any applicable cure period. **DENIED**

C. The Trusts are Owner-directed. **GRANTED**

D. The Trust Agreements are the governing instruments of the Trusts under 12 *Del. C.* § 3801, *et seq.* (the "DSTA"). **GRANTED**

**\*64** E. The Owners may direct the Owner Trustee to take any action with respect to the Trusts, subject solely to the limitations set forth in Section 4.02(b). **GRANTED**

F. The Indenture Trustee, the Administrator, and the Note Insurer are not "persons" authorized by the Trust Agreements to direct the Owner Trustee concerning non-ministerial matters. **DENIED**

G. The only grounds for the Owner Trustee to refuse an Owner direction are the specific exceptions set out in Sections 4.02 of the Trust Agreements. **GRANTED**

H. Whether an Owner direction's purpose is to benefit the Owners does not provide a valid reason for the Owner Trustee to refuse to follow an Owner direction. **GRANTED**

I. The Owners may challenge the Owner Trustee's refusal to follow an Owner direction if the Owner Trustee asserts that one of the exceptions set forth in Section 4.02 of the Trust Agreement applies. **GRANTED**

J. If the Owners and the Owner Trustee disagree over the construction of the Trust Agreement or any Trust Related Agreement, or if the Owner Trustee is uncertain as to such construction, either may seek a declaratory judgment to resolve the issue. **GRANTED**

K. The Court may resolve disputes over whether a given instruction is contrary to the Trust Agreement or any Trust Related Agreement. **UNOPPOSED (GRANTED)**

L. Retroactively, in determining whether a past Owner Trustee refusal to follow an Owner direction constituted a breach of the Trust Agreement, the Court of Chancery reviews determinations by the Owner Trustee that one of the exceptions set forth in Section 4.02(a) or (b) of the Trust Agreement applies for reasonableness, not correctness. **UNOPPOSED (GRANTED)**

M. Prospectively, if the Court of Chancery has ruled that a given Owner direction is valid, the Owner Trustee cannot continue to refuse to comply with the direction or similar future directions. **DENIED**

N. Prospectively, if the Court of Chancery has issued a declaration resolving a dispute over contract interpretation of the Trust Agreement or any Trust Related Agreement, the Owner Trustee cannot refuse to comply with an instruction based on a contrary contract interpretation (whether asserted by the Owner Trustee or by some other party). **GRANTED**

O. The invoices of the Trusts' professional advisors retained pursuant to the Owners' directions are payable as Owner Trustee expenses and as Administrator expenses. **DENIED**

P. The Administrator and the Indenture Trustee do not have discretion as to whether to pay Owner Trustee expenses submitted by the Owner Trustee. **GRANTED**

Q. The Administrator and the Indenture Trustee may not condition payment of expenses sent by the Owner Trustee on the Owner Trustee providing a certification of the expenses. **GRANTED**

R. Nevertheless, the Owners may direct the Owner Trustee to certify the invoices of the Trusts' professional advisors retained pursuant to the Owners' directions as Owner Trustee expenses. If the Owners provide such a direction, the Owner Trustee has no discretion to refuse to do so unless one of the exceptions in Section 4.02 of the Trust Agreement applies. **DENIED**

S. The Owner Trustee is not prohibited from certifying prospectively that expenses for specified categories of legal services are proper Owner Trustee expenses

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 124 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

payable under Section 8.02(d)(1)(i) of the Indenture and not expenses of the Trusts payable under Section 5.02 of the Trust Agreement. **DENIED**

**\*65** T. The Court's resolution of disputes over what constitutes an Owner Trustee expense is binding on all parties to the proceeding and parties in privity with them. **GRANTED**

U. The Legal Invoice Direction Letter and accompanying draft Issuer Order are not contrary to the terms of the Trust Agreement or of any document contemplated by the Trust Agreement to which the Trusts or the Owner Trustee are a party nor are they otherwise contrary to law nor are they likely to result in personal liability on the part of the Owner Trustee. **DENIED**

V. The BPA Judgment Direction Letter and accompanying draft Issuer Order are not contrary to the terms of the Trust Agreement or of any document contemplated by the Trust Agreement to which the Trust or the Owner Trustee is a party nor were they otherwise contrary to law nor are they likely to result in personal liability on the part of the Owner Trustee. **DENIED**

W. If properly directed, the Owner Trustee has the power to engage agents and attorneys to exercise and perform any of the Owner Trustee's rights and duties, including to act on behalf of the Trust subject to direction by the Owners. **DENIED**

X. If properly directed, the Owner Trustee has the power to delegate any of its authority, including the power to delegate authority to agents. **DENIED**

Y. If properly directed, the Owner Trustee has the power to delegate to agents and attorneys its right to engage and agents and attorneys to act on behalf of the Trust subject to direction by the Owners. **DENIED**

Z. The Owner Trustee had the power to enter into the terms set forth in the 2015 Chaitman Engagement Letter. **DENIED**

AA. The Owner Trustee had the power to enter into the terms set forth in the BPA Engagement Letter. **DENIED**

BB. Issuer Orders and engagement letters that have been signed by the Owner Trustee (including the 2015 Chaitman Engagement Letter and the BPA Engagement Letter) are Trust Related Agreements, and therefore payment under those Issuer Orders and engagement

letters must be paid by the Administrator and Indenture Trustee without requiring involvement of the Owner Trustee, subject only to the Indenture expense caps. **DENIED**

CC. The 2019 Chaitman Direction Letter and accompanying 2019 Chaitman Engagement Letter are not contrary to the terms of the Trust Agreement or of any document contemplated by the Trust Agreement to which the Trust or the Owner Trustee is a party nor were they otherwise contrary to law nor are they likely to result in personal liability on the part of the Owner Trustee. **DENIED**

DD. The Owners are the Trusts' "beneficial owners" as that term is used in the DSTA. **GRANTED**

EE. No other parties are "beneficial owners" of the Trusts as that term is used in the DSTA. **GRANTED**

FF. The Owners have no generalized contractual duties not to act in their own interest to the detriment of the interests of the Noteholders, the Indenture Trustee, Ambac or the Administrator. **GRANTED**

GG. The Owners have no extracontractual duties to the Noteholders, the Indenture Trustee, Ambac or the Administrator. **DENIED**

HH. Even assuming that an Owner with a controlling interest in a Trust may owe fiduciary duties to the Trust, only another Owner has standing to assert any such fiduciary claims. **GRANTED**

**\*66** II. Wilmington Trust holds the Trust Property for the use and benefit of the Owners. **GRANTED**

JJ. Wilmington Trust has a duty to administer the Trusts in the interest of the Owners. **DENIED**

KK. Wilmington Trust does not owe any extracontractual duties to the Noteholders, the Indenture Trustee, Ambac or the Administrator. **GRANTED**

LL. If the Owner Trustee acts in good faith in accordance with Owner instructions as set forth in the safe harbor provisions of Section 8.06 or 9.01(ii) of the Trust Agreement, the Owner Trustee cannot be held liable for breach of the Trust Agreement, the Indenture, or any other Trust Related Agreement nor can it be held liable for a breach of any purported extracontractual duties. **GRANTED**

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 125 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

MM. The Noteholders are creditors of the Trusts. **GRANTED**

NN. The Noteholders are not "beneficial owners" of the Trusts as that term is used in the DSTA. **GRANTED**

OO. The Noteholders do not have legal status equivalent to that of the beneficiaries of a Delaware common law trust. **GRANTED**

PP. Ambac is not a "beneficial owner" of the Trusts as that term is used in the DSTA. **GRANTED**

QQ. Ambac does not have legal status equivalent to that of the beneficiaries of a Delaware common law trust. **GRANTED.**

RR. The Owners do not owe the Noteholders extracontractual duties. **DENIED**

SS. The Owners do not owe Ambac extracontractual duties. **DENIED**

530    *See* Owners' Compl. (D.I. 382) ¶ 149.

**Owner Trustee Declarations** 531

A. The Trust Agreements are the sole governing instruments of the Trusts under 12 *Del. C.* § 3801, *et seq.* **GRANTED**

B. The Owners may direct the Owner Trustee in accordance with the terms of the Trust Agreements, including Sections 2.03, 4.01, 4.02 and 8.06, subject to applicable limitations in the Trust Agreements, including those in Section 4.02. **UNOPPOSED (GRANTED)**

C. The Owners have a duty to direct the Owner Trustee in a manner not contrary to the terms of the Trust Agreements and the Trust Related Agreements, and their failure to do so constitutes a violation of the Trust Agreements. **GRANTED**

D. The Owner Trustee has the right (but not the obligation) to (a) review any direction to determine whether it is contrary to the (i) Trusts' interests, (ii) Trust Related Agreements, or (iii) the law, and (b) decline to follow any such direction. **GRANTED**

E. If the Court of Chancery determines that a given direction is not contrary to the Trusts' interests, the Trust Agreement, the Trust Related Agreements, or the

law, the Owner Trustee must comply with the direction (subject to Owner Trustee's rights and protections under the Trust Agreements) and in such case, the Owner Trustee would have no liability to any Person for following such direction. **NOT SUBMITTED**

F. The Court of Chancery or any court of competent jurisdiction may resolve issues over the construction of the Trust Agreement or any Trust Related Agreement, or the validity of an instruction. **NOT SUBMITTED**

G. The Court of Chancery may resolve disputes over whether a given instruction is contrary to the Trust Agreement or any Trust Related Agreement. **NOT SUBMITTED**

H. The Owner Trustee may, but is under no duty, contractual or otherwise, to retroactively or prospectively certify its fees or expenses as "Owner Trustee fees and expenses" as such term is used in the Waterfall provisions. (Indenture § 8.02(e)(1)). **GRANTED**

**\*67** I. The Owner Trustee has the sole authority to determine what expenses qualify as Owner Trustee fees and expenses, including without limitation the fees and expenses of the Owner Trustee's personal counsel advising it in connection with its service as Owner Trustee. **GRANTED**

J. The Administrator and the Indenture Trustee do not have discretion as to whether to pay Owner Trustee fees and expenses submitted by the Owner Trustee. **GRANTED**

K. The Administrator and the Indenture Trustee may not condition payment of fees and expenses submitted by the Owner Trustee on the Owner Trustee providing a certification of the fees and expenses. **GRANTED**

L. If a dispute arises concerning the Owner Trustee's determination of what constitutes Owner Trustee fees and expenses, the Court of Chancery's resolution of this dispute is binding on all parties to the proceeding and parties in privity with them. **GRANTED**

M. The Owners do not have the power to directly retain any professionals or advisors to act on behalf of the Trusts under the Trust Agreement – all such Trust professionals must be appointed by the Owner Trustee. **UNOPPOSED (GRANTED)**

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 126 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

N. BPA's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

O. Chaitman's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

P. McCarter's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

Q. DiCello Levitt & Casey LLC's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

R. The Owner Trustee's duties are limited to the contractual ministerial duties expressly set forth in the Trust Agreements, such as maintaining the ownership register, and distributing funds to Owners of record if such event should ever occur, and the Owner Trustee has no implied duties, nor any duty to generally administer the Trusts. **GRANTED**

S. If the Owner Trustee acts in good faith in accordance with Owner instructions, as set forth in the Safe Harbor provisions of Sections 8.06 or 9.01(ii) of the Trust Agreement, the Owner Trustee cannot be held liable for breach of the Trust Agreement, the Indenture, or any other Trust Related Agreement nor can it be held liable for a breach of any purported extracontractual duties. **GRANTED**

T. The Owner Trustee has the power and authority to engage agents and attorneys selected with reasonable care to exercise and perform any of the Owner Trustee's rights and duties. **UNOPPOSED (GRANTED)**

U. To the maximum extent set forth in Section 3806(b) of the DST Act, the Trust Agreements eliminated all common law or other extra contractual duties (including fiduciary duties) of the Owner Trustee, and Owner Trustee does not owe any such extracontractual duties to any party and to the maximum extent set forth in to Section 3806(e) of the DST Act, the Trust Agreements exculpate the Owner Trustee from liability for the performance of its duties under the Trust Agreement in the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing. **GRANTED**

V. The Owner Trustee has no liability to any party for following the directions of the Owners to execute the 2015 Chaitman Engagement Letter on behalf of the Trusts and/or for executing any other documents related to such engagement pursuant to Owner directions, including any Issuer Orders purporting to certify invoices of Chaitman or any other counsel retained by Chaitman. **DENIED**

**\*68** W. The Owner Trustee has no liability to any party for following the directions of the Owners to execute the BPA Engagement Letter on behalf of the Trusts and/or for executing any other documents related to such engagement pursuant to Owner directions, including any Issuer Orders purporting to certify invoices of BPA. **DENIED**

X. The 2019 Chaitman Engagement Letter violates the terms of the Trust Agreements and/or Trust Related Agreements. **NOT SUBMITTING**

Y. When, following instructions in good faith under the Trust Agreement, the Owner Trustee signs a document in any form (including correspondence, contracts or issuer orders) reciting that it executed the document solely in its capacity as Owner Trustee and not in its individual capacity, the statements and obligations therein are not attributable to, or binding on the Owner Trustee personally. **UNOPPOSED (GRANTED)**

531    *See* Owner Trustee Counterclaim (D.I. 393) ¶ 74.

**U.S. Bank Declarations** [532]

A. Under the Granting Clauses of the Indentures, the Trusts Granted to the Indenture Trustee all of the Trusts' right, title, and interest (but none of their obligations) in and to all of the assets and contracts set forth under the Granting Clauses for the benefit of the Noteholders and Note Insurer, as applicable. **GRANTED**

B. The Granting Clauses include a Grant of each of the Basic Documents. **DENIED**

C. The Granting Clauses Grant to the Indenture Trustee all present and future claims, demands, causes, and choses in action in respect of the assets and contracts set forth the Granting Clauses. **GRANTED**

D. While the Indentures and Notes remain outstanding, the Indenture Trustee is permitted to prosecute, defend,

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 127 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

or settle lawsuits or other actions concerning claims in respect of any of the assets and contracts Granted under the Granting Clauses without the occurrence of (i) an Event of Default or other default or (ii) any other contractual predicate or condition precedent. **GRANTED**

E. While the Indentures and Notes remain outstanding, if the Indenture Trustee prosecutes, defends, or settles a lawsuit or other action concerning claims in respect of the assets and contracts Granted under the Granting Clauses, it may do so directly in its capacity as Indenture Trustee and/or directly on behalf of and in the name of the Trusts. **GRANTED**

F. While the Indentures and Notes remain outstanding, if there is no express duty or obligation imposed on the Trusts concerning the assets and contracts Granted under the Granting Clauses, the Trusts are divested of any control over such assets and contracts and lack authority to bring any lawsuit or other action concerning the same. **GRANTED**

G. While the Indentures and Notes remain outstanding, if a duty or obligation is imposed on the Trusts concerning the assets and contracts Granted under the Granting Clauses, the Trusts are permitted to exercise control over such assets and contracts only to the extent required to discharge the applicable duty or obligation and have authority to bring a lawsuit or other action concerning such items only as required under the same duty or obligation. **GRANTED**

H. Only authorized parties, including the Owner Trustee and the Administrator, may act on behalf of and in the name of the Trusts subject to directions from the Owners or other authorized parties, in conformity with the requirements of the Trust Agreements and other Basic Documents. **NOT SUBMITTED**

 **\*69** I. The Owners are bound by the terms of the Trust Agreements. **NOT SUBMITTED**

J. The Owner Trustee is not required to follow any direction from the Owners that does not comply with the requirements of Section 4.02 or Article IX of the Trust Agreements or any other applicable provision of the Trust Agreements concerning directions. **NOT SUBMITTED**

K. Section 4.02 of the Trust Agreements provides, among other things, that the Owner Trustee is not required to follow directions that are (i) contrary to the terms of the Trust Agreements or of any document contemplated thereby to which the Trusts or the Owner Trustee is a party or (ii) otherwise contrary to law. **NOT SUBMITTED**

L. Under the Administration Agreements, the Administrator has the authority to act on behalf of and in the name of the Trusts, and to advise the Owner Trustee when action is necessary to comply with the Trusts' duties under the Trust Related Agreements. **NOT SUBMITTED**

M. Under Sections 1(c) or 1(d) of the Administration Agreements, as applicable, the Indenture Trustee and the Note Insurer, as applicable, are permitted to direct the Administrator to take non-ministerial actions on behalf of and in the name of the Trusts. **NOT SUBMITTED**

N. Under Section 8.06 of the Trust Agreement for The National Collegiate Master Student Loan Trust I, the Note Insurer has the authority to direct the Owner Trustee to take actions on behalf of and in the name of that Trust. **NOT SUBMITTED**

O. Under the Trust Agreements, the following include valid grounds for the Owner Trustee to decline to follow a direction from the Owners:

a. The Owner Trustee reasonably determines, or is advised by counsel, that a direction would require the Trusts to undertake conduct that has no connection with, and does not relate to, the Trusts' obligations as Issuers of Notes under the Indenture or any other obligations under the Basic Documents (while the Indentures and Notes remain outstanding); or

b. The Owner Trustee reasonably determines, or is advised by counsel, that a direction would require the Trusts to undertake conduct that is intended to benefit the Owners to the detriment of (x) the Trusts' ability to discharge its obligations as Issuers under the Indentures or other obligations under the Basic Documents or Trust Related Agreements, or (y) the interests of the Noteholders and Note Insurer (for both (x) and (y), while the Indentures and Notes remain outstanding). **NOT SUBMITTED**

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 128 of 219
In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)
2020 WL 5049402

P. Income and proceeds from the Trusts must be distributed in accordance with the Indentures so long as the Notes and Indentures are outstanding. **GRANTED**

Q. Distribution provisions in Article V of the Trust Agreements become operative only if the Notes are paid in full and the Indentures are discharged and satisfied (including satisfaction of all other related payment obligations). **GRANTED**

R. If operative, the distribution provisions in Article V of the Trust Agreements provide for, among other things, (i) payment of expenses of the Trusts, and (ii) payment of the Owners in accordance with other provisions in the Trust Agreements. **GRANTED**

 **\*70** S. While the Indentures and Notes remain outstanding, Article VIII of the Indentures provide that the Administrator and Owner Trustee are entitled to reimbursement of their respective fees and expenses subject to certain enumerated limitations. **GRANTED**

T. The Owner Trustee is the party with the authority to determine what constitutes fees and expenses of the Owner Trustee, including without limitation fees and expenses of retained agents, experts or professionals. **GRANTED**

U. The Administrator is the party with the authority to determine what constitutes fees and expenses of the Administrator, including without limitation fees and expenses of retained agents, experts or professionals. **GRANTED**

V. The Indentures do not provide for reimbursement of expenses of the Owners or the Trusts. **DENIED**

W. Under Article VIII of the Indentures, the Administrator is required to provide written instructions to the Indenture Trustee in the form of an Issuer Order to distribute funds as specified therein, and the Indenture Trustee is obligated to distribute funds to reimburse fees and expenses of the Owner Trustee and Administrator only to the extent that the Administrator provides a valid Issuer Order instructing the Indenture Trustee to make such distributions. **GRANTED**

X. The Indenture Trustee may conclusively rely upon Issuer Orders from the Administrator instructing the Indenture Trustee to distribute funds to reimburse fees and expenses of the Owner Trustee and Administrator,

and shall not be liable for distributing funds in accordance with any such Issuer Orders. **GRANTED**

Y. The Indenture Trustee is not obligated to follow an Issuer Order or any other written instruction from the Administrator concerning the distribution of funds to the extent such Issuer Order or written instruction (i) does not comport with Article VIII of the Indentures; (ii) fails to clearly identify the manner in which funds should be distributed, or (iii) qualifies or questions the propriety of the Issuer Order, written instruction, or the specified distribution of funds thereunder. **GRANTED**

Z. Under the Trust Agreements, the Owner Trustee is permitted to act through, or consult with, agents, experts, or other professionals to discharge its duties and obligations and may delegate or assign its authority to act for the Trusts to such representatives as necessary, subject to the following conditions and limitations:

a. such representatives must be subject to the ongoing direction and control of the Owner Trustee, and to the extent the Owners seek to direct or control such representatives, they may do so only through the Owner Trustee;

b. such representatives cannot bind the Trusts without knowledge of and approval from the Owner Trustee and must observe all applicable duties, obligations, and covenants of the Trusts and the Owner Trustee; and

c. in the event any such representative retains agents, experts, or professionals to represent, or work on behalf of or for, the Trusts or the Owner Trustee, any such agents, experts or professionals are subject to the limitations set forth in paragraphs (z)(i) and (ii) above. **NOT SUBMITTED**

AA. The Trust Agreements do not otherwise permit the Owner Trustee to assign or delegate its authority to act for the Trusts, or any of its rights or obligations, to the Owners. **NOT SUBMITTED**

 **\*71** BB. The 2015 Chaitman Engagement Letter and 2019 Chaitman Engagement Letter are invalid. **NOT SUBMITTED**

CC. Any engagement letters or contracts that Chaitman LLP purported to execute on behalf of the Trusts are likewise invalid. **NOT SUBMITTED**

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 129 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

DD. Under the Trust Agreements, the Owners are expressly prohibited from directing the Owner Trustee to take or refrain from taking any action contrary to the Trust Agreements or any Trust Related Agreements. **NOT SUBMITTED**

EE. The contractual prohibition described in the immediately preceding declaration restricts the Owners from providing directions that would require the Trusts to undertake conduct:

a. that has no connection with, and does not relate to, the Trusts' obligations as Issuers of Notes under the Indentures or any other obligations under the Basic Documents (while the Indentures and Notes remain outstanding); or

b. intended to benefit the Owners to the detriment of (x) the Trusts' ability to discharge its obligations as Issuers under the Indentures or other obligations under the Basic Documents, or (y) the interests of the Noteholders and Note Insurer (for both (x) and (y), while the Indentures and Notes remain outstanding). **NOT SUBMITTED**

FF. The Owners owe common law fiduciary duties to the Trusts and the direct and intended economic beneficiaries of the Trusts, including the Noteholders and Note Insurer. **NOT SUBMITTED**

GG. The Owners' common law fiduciary duties include a duty to act with due care and loyalty and a duty to avoid conflicts of interest. **NOT SUBMITTED**

HH. The Owners owe an implied duty of good faith dealing under the Trusts Agreements to the Trusts and the direct and intended economic beneficiaries of the Trusts, including the Noteholders and Note Insurer. **NOT SUBMITTED**

II. Under 12 Del. C. § 3806(c), the Owners' implied duty of good faith and dealing cannot be eliminated by contract. **NOT SUBMITTED**

JJ. The Noteholders, the Note Insurer, and Indenture Trustee are among the parties that have standing to assert claims against the Owners for breach of contract and breach of extracontractual duties, including without limitation claims for breach of fiduciary duty and breach of the implied duty of good faith and fair dealing. **NOT SUBMITTED**

KK. The Owner Trustee holds the property of the Trusts subject to the obligations of the Owner Trustee under the Basic Documents, including without limitation the obligations of the Trusts as Issuers under the Indentures executed by the Owner Trustee on behalf of and in the name of the Trusts. **NOT SUBMITTED**

LL. The Owner Trustee is bound by the Trusts' Grant of the assets and contracts under the Granting Clauses, including without limitation, the first priority lien and security interest in favor of the Indenture Trustee and the applicable terms of the Uniform Commercial Code. **NOT SUBMITTED**

MM. The Owner Trustee is prohibited from taking any actions that are inconsistent with the purposes of the Trusts (which purposes include entering into the Indentures and issuing the Notes), and is authorized to take all actions required or permitted to be taken by the Owner Trustee pursuant to the Trust Agreements, the Trust Related Agreements, and the Basic Documents. **NOT SUBMITTED**

 **\*72** NN. The law firm of McCarter & English lacked the authority to execute the Proposed Consent Judgment on behalf of the Trusts under the Trust Related Agreements and applicable law. **NOT SUBMITTED**

OO. Regardless of whether McCarter & English had authority to execute the Proposed Consent Judgment, it was improper (or in violation of the Trust Related Agreements) for McCarter & English to enter into the Proposed Consent Judgment. **NOT SUBMITTED**

532      *See* U.S. Bank Counterclaim (D.I. 394) ¶ 3.

**AMBAC Declarations** [533]

A. For as long as the Notes are outstanding, neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Trusts to amend, modify, supplement, terminate, waive or surrender the terms of any Collateral or the Basic Documents, or take any action that would have the effect of amending, modifying, supplementing, terminating, waiving, or surrendering the terms of any Collateral or Basic Document, without first securing the requisite written consent of the Indenture Trustee, and the Noteholders or Ambac, as applicable. **GRANTED**

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 130 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

B. For as long as the Notes are outstanding, neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Trusts to transfer or otherwise dispose of any of the properties or assets of the Trust, unless directed to do so by the Indenture Trustee or Ambac (with respect the Insured Trusts). **DENIED**

C. Neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Master Trust to take any non-ministerial action without Ambac's consent. **GRANTED**

D. The Owners lacked authority to direct the Owner Trustee to execute the 2015 Chaitman Letter on behalf of the Master Trust. **DENIED**

E. The Owner Trustee has the right to decline to follow a direction if it reasonably finds or is advised by counsel that the direction is (i) contrary to the Trust Related Agreements, (ii) contrary to the law, or (iii) likely to result in personal liability on the part of the Owner Trustee for which no indemnification is satisfactory. **UNOPPOSED (GRANTED)**

F. A direction that would benefit the Owners but amend, modify, waive, or surrender the Grant of the Indenture, or the manner and priority of payments provided for in the waterfall in Section 8.02 of the Indenture, is a direction that is contrary to the (i) Trust Related Agreements and/ or (ii) the law. **GRANTED**

G. Owner Trustee expenses must be incurred on behalf of the Owner Trustee for the benefit of the Trusts. **DENIED**

H. The Owner Trustee has the right to determine that expenses do not qualify as Owner Trustee expenses, if not incurred on behalf of the Owner Trustee for the benefit of the Trusts. **DENIED**

I. The Owners owe fiduciary duties to the Trusts. **GRANTED**

J. The Owners have a duty not to cause the Trusts to act, or to themselves act on behalf of the Trusts, in their own interest to the detriment of the interests of the Trusts, the Noteholders or the Note Insurer (with respect to the Insured Trusts) before the Notes are discharged. **DENIED**

K. Ambac has the right to direct the NCSLT 2007-3 and NCSLT 2007-4 Trusts with respect to the disposition of the assets and property of those Trusts. **DENIED**

L. For the NCSLT 2007-3 and NCSLT 2007-4 Trusts, Ambac has the right to direct the Indenture Trustee to instruct the Issuer to undertake any act reasonably necessary or proper to carry out more effectively the purpose of the Indentures, and to direct the Administrator with respect to non-ministerial matters. **DENIED**

**\*73** M. For the Master Trust, Ambac has the right to direct the Owner Trustee. **DENIED**

N. The Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to direct the Issuer on matters relating to the Indenture. **DENIED**

O. While the Notes are outstanding, the Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to direct the Issuer to bring claims and compromise claims brought against the Trusts. **GRANTED**

P. Until the Notes are discharged, the Indenture Trustee has the right to bring all of the Trusts' claims relating to the Collateral, and the right to control the litigation of such claims, for the benefit of Ambac (in the Insured Trusts) and the Noteholders. **GRANTED**

533      *See* AMBAC Counterclaim (D.I. 391).

**Noteholder Declarations** [534]

A. For as long as the Notes are outstanding, neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Trusts to amend, modify, supplement, terminate, waive or surrender the terms of any Collateral or the Basic Documents, or take any action that would have the effect of amending, modifying, supplementing, terminating, waiving, or surrendering the terms of any Collateral or Basic Document, without first securing the requisite written consent of the Indenture Trustee, and the Noteholders or Ambac, as applicable. **GRANTED**

B. For a direction by the Owners to be effective while the Notes are outstanding, all of the Owners must

Case 3:20-cv-01446-RDM-MCC Document 75-2 Filed 03/22/21 Page 131 of 219

In re National Collegiate Student Loan Trusts Litigation, Not Reported in Atl. Rptr. (2020)

2020 WL 5049402

provide the direction, in writing, to the Owner Trustee. **GRANTED**

C. Absent a power of attorney from the Owner Trustee, the Owners cannot act on behalf of the Trusts. **GRANTED**

D. Only the Owner Trustee, or its authorized agents acting within the scope of their agency, can act on behalf of the Trusts. **GRANTED**

E. A transfer of Certificates is invalid if it would cause a specific Person to own or control, directly or indirectly, or with an Affiliate, 100% of the Certificates. **GRANTED**

F. The Owner Trustee has the right to decline to follow a direction if it reasonably finds or is advised by counsel that the direction is (i) contrary to the Trust Related Agreements, (ii) contrary to the law, or (iii) likely to result in personal liability on the part of the Owner Trustee for which no indemnification is satisfactory. **UNOPPOSED (GRANTED)**

G. A direction that would benefit the Owners but amend, modify, waive, or impair the Grant of the Indenture, or the manner and priority of payments provided for in the waterfall in Section 8.02 of the Indenture, is a direction that is contrary to the (i) Trust Related Agreements and/ or (ii) the law. **GRANTED**

H. Owner Trustee expenses must be incurred on behalf of the Owner Trustee for the benefit of the Trusts. **DENIED**

I. The Owner Trustee has the right to determine that expenses do not qualify as Owner Trustee expenses, if not incurred on behalf of the Owner Trustee for the benefit of the Trusts. **DENIED**

J. The Owners owe fiduciary duties to the Trusts. **GRANTED**

K. The Owners have a duty not to cause the Trusts to act, or to themselves act on behalf of the Trusts, in their own interest to the detriment of the interests of the Trusts, the Noteholders or the Note Insurer (with respect to the Insured Trusts) before the Notes are discharged. **DENIED**

**\*74** L. To the extent the Owners exercise control over the Collateral, they owe duties to the beneficiaries of the Collateral. **GRANTED**

M. The Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to direct the Issuer on matters relating to the Indenture. **DENIED**

N. While the Notes are outstanding, the Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to bring claims and to compromise claims on behalf of the Trusts. **GRANTED**

O. Until the Notes are discharged, the Indenture Trustee has the right to bring all of the Trusts' claims relating to the Collateral, and the right to control the litigation of such claims, for the benefit of Ambac (in the Insured Trusts) and the Noteholders. **GRANTED**

P. Express third-party beneficiaries of the Trust Agreement, including any holder of the Notes, may sue to enforce the Trust Agreement. **GRANTED**

534    *See* Noteholder Counterclaims (D.I. 395) ¶ 4.

**All Citations**

Not Reported in Atl. Rptr., 2020 WL 5049402

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Kane v. Schatz, Not Reported in Atl. Rptr. (2018)

2018 WL 4327530

2018 WL 4327530
Only the Westlaw citation is currently available.
**NON-PRECEDENTIAL DECISION -**
**SEE SUPERIOR COURT I.O.P. 65.37**
Superior Court of Pennsylvania.

Lauren Hope KANE, Appellant

v.

Steven SCHATZ and Jonathan Kaplan and L.
Kenneth Chotiner and Anthony DeMichele and
Jeffrey Brien and John Innelli and John McNamara

No. 3141 EDA 2016
|
Filed September 11, 2018

Appeal from the Order August 11, 2016, In the Court of
Common Pleas of Philadelphia County, Civil Division at
No(s): September Term 2013 No. 3691

BEFORE: PANELLA, J., OLSON, J., and STEVENS [*],
P.J.E.

[*]      Former Justice specially assigned to the Superior
         Court.

MEMORANDUM BY PANELLA, J.

**\*1** Lauren Hope Kane, Esquire, appeals from the order
entered in the Philadelphia County Court of Common
Pleas, granting summary judgment in favor of Steven
Schatz, Esquire, Jonathan Kaplan, Esquire, L. Kenneth
Chotiner, Esquire, Anthony DeMichele, Esquire, Jeffrey
Brien, Esquire, John Innelli, Esquire, and John McNamara,
Esquire (collectively, Appellees) in this action for wrongful
use of civil proceedings. We affirm.

The relevant facts and procedural history of this case are as
follows:

> [Appellant]    is   an   attorney.
> [Appellant's]   husband,   Marty
> Feierstein ("Feierstein") at all times
> relevant hereto, was involved in the
> music industry. In 2004, Feierstein
> entered into a Recording Contract with
> a musician known as Link Wray.

> Under the terms of the Recording
> Contract, Wray was required to
> provide Feierstein with songs that
> Feierstein would license and distribute
> for sale. In addition to the Recording
> Contract, Feierstein and Wray also
> entered into a Loan Agreement
> whereby Feierstein lent funds and
> equipment to Wray so that Wray could
> complete the recordings. Wray gave
> Feierstein power of attorney on Wray's
> behalf to collect certain royalties. The
> Power of Attorney was later assigned
> to [Appellant] giving [Appellant] the
> authority to collect the royalties owed
> to Wray.

Trial Court Opinion, filed 8/11/16, at 1-2.

Wray did not complete the recordings, and Feierstein filed an
action against Wray and his family for breach of contract. The
Wrays did not file an answer. Appellee Steven Schatz, one of
Feierstein's then-representatives, prepared a default judgment
which was entered against the Wrays. Appellee L. Kenneth
Chotiner, one of Schatz's associates, performed 11.5 hours of
work on the Feierstein file. A third attorney, Oscar Schermer,
also contributed work at that stage, but is not part of the
present litigation. Following the entry of default judgment,
Appellee Jonathan Kaplan began representing Feierstein.

The court held an assessment of damages hearing, and Kaplan
presented testimony and evidence. The court ultimately
issued a finding that Feierstein did not sustain his burden of
proving damages, as he failed to present credible evidence of
Wray's failure to repay loans, return recording equipment, pay
various bills, or of Feierstein's lost profits. Kaplan filed post-
trial motions challenging the verdict, which the court denied.
Thereafter, Kaplan withdrew as counsel. Feierstein appealed
the verdict, which was affirmed by this Court.

Throughout the proceedings, Appellant sent Feierstein's
attorneys letters with directives to pursue certain courses
of action, including which experts to hire, assets to pursue,
and motions to file. She also gave counsel instructions to
communicate solely with her, rather than Feierstein, and
referred to Feierstein as her client.

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 134 of 219

Kane v. Schatz, Not Reported in Atl. Rptr. (2018)

2018 WL 4327530

Following the failed appeal, Feierstein filed a professional negligence complaint against Appellees Kaplan, Chotiner, and Schatz. In response, Appellee John Innelli, who represented Schatz, filed a joinder complaint against Appellant, which sought contribution and indemnification. Appellees Anthony DeMichele and Jeffrey Brien, representing Kaplan, also filed a joinder complaint against Appellant, alleging Appellant's negligence in negotiating and drafting the underlying recording contract and agreements, and throughout subsequent litigation. Appellee John McNamara and Attorney Marc Bogutz, representing Chotiner, filed a cross-claim against Appellant, alleging professional negligence in her dealings with the Wray contract and subsequent litigation.

**\*2** After negotiations, Feierstein agreed to release Chotiner from the malpractice action, and the court granted Chotiner's motion for summary judgment. Subsequently, Appellant filed motions for summary judgment in response to the joinder complaints from Kaplan and Schatz. The court granted the motions, and dismissed the joinder complaints. Following arbitration and an appeal, Feierstein settled his malpractice actions against Kaplan and Schatz.

Appellant filed this ***Dragonetti*** [1] action against Kaplan, Chotiner, and Schatz. The basis for her wrongful use of civil process claims were Kaplan and Schatz's joinder complaints, and Chotiner's cross-claim. Following preliminary objections, Appellant amended her complaint to include Innelli, McNamara, Brien, DeMichele, and Bogutz.

1    42 Pa.C.S.A. § 8351.

Chotiner, McNamara, and Bogutz filed motions for summary judgment, which the court granted. Appellant then filed motions for partial summary judgment against all remaining parties. In turn, those Appellees filed cross-motions for summary judgment. The court denied Appellant's motions, and granted the summary judgment motions of Appellees. The court dismissed Appellant's complaint with prejudice. Thereafter, Appellant filed a notice of appeal.

Preliminarily, we are compelled to address procedural issues stemming from Appellant's error-riddled notice of appeal and appellate brief. Appellant endeavored to appeal from the orders entered on January 6, 2016, granting Chotiner's motion for summary judgment, and February 19, 2016, granting McNamara's motion for summary judgment. [2] Appellant filed an "Application for Determination of Finality" of those

orders; the court denied it, stating that the orders were interlocutory, and an appeal would be unlikely to resolve the remaining issues in the case.

2    The February 19, 2016 order also granted the motion for summary judgment filed by Attorney Bogutz, who previously represented Appellee Chotiner. Appellant listed Bogutz only as counsel for Chotiner in her notice of appeal, and not as a defendant. Consequently, Bogutz is not listed on the caption of this appeal, and has not filed a brief. In a footnote within her reply brief, Appellant nevertheless asks this Court to overturn the order granting summary judgment in favor of Bogutz. Appellant's request is outrageous. Pa.R.A.P. 105 dictates we liberally construe the Rules "to secure the just, speedy and inexpensive determination of every matter to which they are applicable." Evaluating the merits of Appellant's claim would be anything but. Appellant's failure to properly appeal the dismissal of Attorney Bogutz from the action cannot be cured by her inadequate and belated attempts to challenge that ruling on appeal.

Following the order granting summary judgment to the remaining Appellees, entered on August 11, 2016, Appellant filed a notice of appeal. Appellant's notice of appeal does not state her intention to appeal from the orders entered on January 6, 2016, and February 19, 2016. Nevertheless, the notice of appeal lists Chotiner and McNamara as defendants in the case. Chotiner and McNamara now ask that we quash Appellant's appeal as untimely filed.

Appellants are strongly discouraged from filing one notice of appeal from multiple orders. ***See K.H. v. J.R.***, 826 A.2d 863, 870 (Pa. 2003). However, where the appeal stems from a single complaint on one docket, and the parties challenged multiple orders during the course of litigation, "appellate courts have not generally quashed appeals, provided that the issues involved are nearly identical, no objection to the appeal has been raised, and the period for appeal has expired." ***Id.*** (citation omitted). And we note, the "[f]ailure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal[.]" Pa.R.A.P. 902.

**\*3** Appellant previously attempted to appeal the orders granting summary judgment to Appellees Chotiner and McNamara, but was unable to do so, as those orders were interlocutory. Appellant's first opportunity to appeal was

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 135 of 219

Kane v. Schatz, Not Reported in Atl. Rptr. (2018)
2018 WL 4327530

after the order granting summary judgment to the remaining Appellees was entered. *See* Pa.R.A.P. 341(b) (explaining a final order is one that disposes of all claims and all parties). Appellant timely appealed within 30 days of that order. Though Appellant failed to indicate she was also challenging the previously entered order granting Chotiner and McNamara's motions for summary judgment, both were listed as defendants in the notice of appeal, and each filed a brief addressing the substantive issues raised. While Appellant's notice of appeal is certainly flawed, we decline to quash her appeal with respect to Appellees Chotiner and McNamara.

Nevertheless, the argument portion of Appellant's brief wholly fails to address the February 19, 2016 order granting Appellee McNamara's motion for summary judgment. While she includes a copy of the order, pursuant to Pa.R.A.P. 2111(a)(2), she presents *no* challenge to the order granting McNamara's motion in her statement of questions involved or in the text of her argument. This is, as Appellant so frankly notes in her reply brief, "an error." Appellant's Reply Brief, at 24. Unfortunately for Appellant, it is a fatal one.

She attempts to remedy this defect by requesting, in her reply brief, that this Court overturn the order granting summary judgment in favor of Appellee McNamara. Pennsylvania Rule of Appellate Procedure 2113, which governs reply briefs, "does not sanction the use of Reply Briefs to raise new issues." *Bishops, Inc. v. Penn Nat. Ins.*, 984 A.2d 982, 997 (Pa. Super. 2009) (citations omitted). "A reply brief may not be used as an opportunity to raise additional issues on appeal." *Id.*, at 998 (citation omitted). Thus, we find Appellant has waived any argument pertaining to Appellee McNamara.

Turning to Appellant's preserved issues, we review challenges to the entry of summary judgment as follows:

> [We] may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. *See* Pa.R.C.P., Rule 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order

to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*E.R. Linde Constr. Corp. v. Goodwin*, 68 A.3d 346, 349 (Pa. Super. 2013) (citation omitted).

In Pennsylvania, a person may be liable for wrongful use of civil proceedings if that person initiates or continues civil proceedings against another, while acting "in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based, [and] the proceedings have terminated in favor of the person against whom they are brought." 42 Pa.C.S.A. § 8351(a). The plaintiff bears a heavy burden in sustaining a *Dragonetti* claim. He must prove: the defendant initiated or continued civil proceedings against him; the proceedings terminated in his favor; the defendant did not have probable cause for the action; the defendant's primary purpose in bringing the action was not to secure proper discovery, joinder of parties, or adjudication of the claim on which the proceedings were based; and he has suffered damages. *See* 42 Pa.C.S.A. § 8354.

 **\*4** We begin by evaluating Appellant's claim that the court erred in granting summary judgment in favor of Chotiner. According to Appellant, the issue of whether the underlying cross-claim terminated in her favor should have been presented to a jury.

The parties agree that Chotiner filed a cross-claim against Appellant in the Feierstein malpractice action. In it, Chotiner denied Feierstein's malpractice allegations, but stated that if he was found liable, Appellant should be held fully or partially responsible. The cross-claim accused Appellant of negligence in drafting the initial recording contract and loan agreement with Link Wray. It also purported Appellant acted negligently in formulating strategy for the litigation against the Wrays. Chotiner then filed a motion for summary judgment in the Feierstein case. Feierstein filed a response opposing the motion, stating he would agree to withdraw claims against Chotiner, and would prefer Chotiner be voluntarily dismissed. The court granted Chotiner's motion for summary judgment, and he was dismissed from the malpractice action.

Appellant asserts Chotiner's cross-claims mirror those in the joinder complaints of Kaplan and Schatz. Appellant claims that because the trial court found in her favor on the summary judgment motions opposing joinder that she filed against Kaplan and Schatz, it would have also found in her favor on Chotiner's cross-claims.

"Civil proceedings may be terminated in favor of the person against whom they are brought by the favorable adjudication of the claim by a competent tribunal." *Keystone Freight Corp. v. Stricker*, 31 A.3d 967, 972 (Pa. Super. 2011) (citation omitted). "Generally, when considering the question of 'favorable termination' in a wrongful use of civil proceedings case, whether a withdrawal or abandonment constitutes a favorable, final termination of the case against [whom] the proceedings are brought initially depends on the circumstances under which the proceedings are withdrawn." *Clausi v. Stuck*, 74 A.3d 242, 246 (Pa. Super. 2013) (citations omitted).

Here, Chotiner was dismissed from the malpractice action by the court's order granting his motion for summary judgment. Chotiner's cross-claim against Appellant was derivative, as it was conditional on a finding by the court that Chotiner was negligent in his representation of Feierstein. The court's order granting Chotiner's motion for summary judgment against Feierstein meant Chotiner's cross-claim was no longer viable. Though Appellant may believe that Chotiner's cross-claim, if evaluated, would have also been dismissed, Chotiner was dismissed from the malpractice action before any such evaluation could occur. Appellant has failed to prove Chotiner's cross-claim against her terminated in her favor. Appellant cannot prove her wrongful use of civil proceedings claim against Chotiner without such a showing. Consequently, the court properly granted Chotiner's motion for summary judgment in Appellant's *Dragonetti* action.

Turning to Appellant's claims against Appellees Kaplan, Schatz, Innelli, Brien, and DeMichele, we evaluate Appellant's assertion that Appellees had no probable cause for bringing the joinder complaints against her in the Feierstein action.

"A party has probable cause to bring an action when he reasonably believes in the facts on which it is based *and* in the viability of the legal theory under which it is brought." *Gentzler v. Atlee*, 660 A.2d 1378, 1382 (Pa. Super. 1995) (internal quotation marks and citation omitted; emphasis in original). An attorney must not intend merely to harass the other party by initiating litigation. *See* 42 Pa.C.S.A. § 8352.

 **\*5**  However, even where a party possesses probable cause, a *Dragonetti* action may still be sustained by a showing of gross negligence. *See Keystone Freight Corp.*, 31 A.3d at 973. "Gross negligence is defined as the want of even scant care and the failure to exercise even that care which a careless person would use." *Id.* (citation omitted).

In its opinion, the trial court adeptly highlighted the profusion of facts supporting its finding that Appellees had probable cause for filing joinder complaints against Appellant. Wray authorized Appellant to collect royalties owed and pursue copyright and trademark matters in his name. *See* Appellant's Motion for Summary Judgment, filed 4/11/16, Exhibit 3, "Agreement for Payment of Loan"; Kaplan and Schatz's Response to Appellant's Motion for Summary Judgment, filed 5/16/16, Exhibit D. Wray thereafter thanked Appellant and Feierstein for "talking through the contract" with him, and assured them he would do as *they* instructed. *Id.* Appellant's own motion for summary judgment includes letters she wrote to Feierstein's various legal representatives, asserting that she represented Feierstein. Appellant wrote letters to Schatz's firm, describing herself as involved in a professional capacity on Feierstein's behalf. *See* Appellant's Motion for Summary Judgment, filed 4/11/16, Exhibit 5. Appellant later described her role in the case to Kaplan as follows:

> As you are certainly aware from my letters to you, I represent [Feierstein] with regard to his issues with you and your representation of him in the Link Wray Case.
>
> Consequently, I find your effort to contact him directly, both disrespectful to me as his counsel as well [as] a violation of the ethical rules. There is no question that you know it is fundamental that you should not be contacting an individual directly when he or she is represented by counsel. However from your conduct thus far, apparently you feel that you are above these rules. If these rules are not followed, unfortunately, there will be consequences to pay.

*Id.*

Appellant exchanged more letters thereafter with Kaplan, directing him to pursue certain assets from Mr. Wray's estate. The letters were all written on Appellant's business letterhead, with her legal office's name and address on it. Incredibly, in her appellate brief Appellant describes these letters as "classic red herrings" to goad the attorneys into action. Appellant's

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 137 of 219

Kane v. Schatz, Not Reported in Atl. Rptr. (2018)
2018 WL 4327530

Brief at 45. Appellant avers the recipients were aware she was merely acting in an advisory capacity to Feierstein. We disagree.

The evidence demonstrates Appellant held herself out to be one of Feierstein's lawyers, though she was not an attorney of record. Appellant was intimately involved in the underlying litigation, as shown by the letters she includes as exhibits in her motion for summary judgment. Far from red herrings, these letters conveyed Appellant's close involvement with the case, and her expectations that Appellees would take particular actions in the case. The missive quoted above goes so far as to implicitly threaten Kaplan should he choose not to comply with Appellant's directives. Appellant's complete immersion in the Wray litigation provided Appellees sufficient probable cause for filing joinder complaints against her. [3]

[3]    Though she includes relevant law in her appellate brief, Appellant does not argue Appellees were grossly negligent in filing the joinder complaints. Therefore, we will not address that issue.

 *6  To the extent Appellant argues Appellees were collaterally estopped from showing probable cause, due to the court's order granting her motion for summary judgment on Kaplan and Schatz's joinder complaints in the malpractice case, Appellant confuses the elements of a *Dragonetti* action. Appellant's success on those motions demonstrates the action terminated in her favor. It does not, however, prove the separate element of probable cause. By Appellant's logic, a wrongful use of civil proceedings claim could be proven simply by presenting evidence of any unsuccessful previous civil complaint. Appellant's claim is premised on a misapprehension of the law. Consequently, she is due no relief on this issue.

Finally, Appellant posits the trial court prematurely ruled on Appellees' motions for summary judgment. She complains she was unable to conclude discovery on "the reasons why Kaplan sued [her]" before the court granted summary judgment in favor of Appellees. Appellant's Brief, at 70. In doing so, Appellant ignores her own motion for summary judgment on the issue of liability, filed several months earlier. Appellant's motion requested the court rule in her favor on the liability issue because Appellees lacked probable cause to join her as a defendant in the malpractice action.

A motion for summary judgment represents to the court that all relevant discovery has been completed. *See* Pa.R.C.P. 1035.2. Appellant filed her motion for summary judgment several months before the discovery deadline. Appellant's complaint that she was unable to conclude discovery on the issue of probable cause is belied by her own, earlier motion for summary judgment on that issue. Moreover, as the trial court notes in its opinion, Appellant's basis for alleging incomplete discovery was an inadvertently disclosed email that Appellant was repeatedly told to return. Appellant's final issue lacks merit. Accordingly, we affirm the trial court's order granting summary judgment.

Order affirmed.

**All Citations**

Not Reported in Atl. Rptr., 2018 WL 4327530

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLISON L. MERRILL and
BRITTANY WILK,

               Plaintiffs,                               Hon. Paul L. Maloney

v.                                            Case No. 1:20-cv-183

TRANSWORLD SYSTEMS, INC., and
U.S. BANK NATIONAL ASSOCIATION,

               Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiffs Allison Merrill and Brittany Wilk filed a putative Class Action Complaint against Defendants Transworld Systems, Inc. (TSI) and U.S. Bank National Association (U.S. Bank), alleging a claim under the Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, and state-law claims for violation of the Michigan Collection Practices Act (MCPA), Mich. Comp. Laws § 445.251, *et seq.*; the Michigan Occupational Code (MOC), Mich. Comp. Laws § 339.101 *et seq.* (only as to TSI); violation of Mich. Comp. Laws § 600.2907; and for unjust enrichment. TSI and U.S. Bank have filed motions to dismiss the Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Court **GRANT IN PART AND DENY IN PART** TSI's motion and **GRANT** U.S. Bank's motion.

## I.     BACKGROUND

After defaulting on their private student loans, Plaintiffs Merrill and Wilk were sued in Michigan courts by the National Collegiate Student Loan Trusts (NCSLT) to which their loans

had been transferred, sold, or assigned for securitization. Plaintiffs allege that U.S. Bank and TSI or its predecessor, which retained the collection attorneys who filed the lawsuits in the names of the NCSLT Trusts, violated the FDCPA, the MCPA, and the MOC by: (1) falsely representing that the NCSLT Trusts authorized the filing of the lawsuits and/or collection of the debts, when in fact no such authorization existed or was rescinded; (2) falsely representing, either expressly or by implication, that they could prove that the Trusts owned the loans in question, when in fact no valid and enforceable assignment existed; and (3) in one of the Merrill collection cases, falsely representing that documents that were filed and served were true and accurate copies of the original instruments or could be authenticated by TSI. (ECF No. 1 at PageID.14–15, 22–25.) Plaintiffs base these claims, at least in part, upon the following: (1) a 2015 directive from the NCSLT Trust Owners to the Trust Administrator to stop providing TSI with defaulted loan files without additional authorization from the Trusts; (2) a 2018 lawsuit filed by the NCSLT Trusts against TSI, U.S. Bank, and others in the Chancery Court of Delaware, captioned *National Collegiate Master Student Loan Trust I*, *et al. v. U.S. Bank, National Association, et al.*, Case No. 2018-0167-JRS;[1] and (3) a September 15, 2017 Consent Order in Consumer Financial Protection Bureau

---

[1] As U.S. Bank notes in its opening brief, Case No. 2018-0167-JRS was consolidated with *National Collegiate Student Loan Master Trust I v. Pennsylvania Higher Education Assistance Agency*, No. CV 12111-VCS (Del. Ch. Ct.). In his August 27, 2020 Opinion, Vice Chancellor Slights explained the nature of the consolidated cases as a dispute between two factions—the Owners, or holders of the Trusts' residual beneficial interests in the Trusts' assets, i.e., the student loans, on the one hand, and the Indenture Trustee, the Noteholders and a reinsurer for certain of the notes, on the other. *In re Nat'l Collegiate Student Loan Trusts Litig.*, No. CV 12111-VCS, 2020 WL 5049402, at *2 (Del. Ch. Aug. 27, 2020). The court explained:

> The parties' vastly different interpretations of the Trusts' governing documents, and of the resulting transactional structure they created, have left the Trusts in a state of near paralysis. Third parties interacting with the Trusts cannot determine who actually speaks for the Trusts and who has authority to bind the Trusts. The full extent of the Trusts' dysfunction was perhaps most vividly exposed when, on May 31, 2020, the United States District Court for the District of Delaware held

(CFPB) administrative proceeding 2017-CFPB-0018 against TSI imposing a $2.5 million penalty arising out of certain lawsuits on behalf of the Trusts, in which complete documentation required to prove that the Trusts owned the loans did not exist.[2] (*Id.* at PageID.9, 13–14.)

A. **The Trusts and Servicing of the Student Loans**

A rudimentary background of the Trusts, their structure, and functioning is helpful to the analysis of the instant motions. The Trusts are fifteen statutory trusts created pursuant to the Delaware Statutory Trust Act (DSTA), 12 Del. Code § 3801-26, for the limited purposes of (1) acquiring a pool of student loans through the issuance of notes; (2) executing an Indenture; and (3) entering into agreements for the administration of the Trust, including servicing of the student loans. NCSLT 2005-3 Trust Agreement § 2.03.[3] Once the student loans are acquired, the Trusts convey beneficial title to them (and related assets) to the Indenture Trustee for the purpose of securing repayment of the notes. Indenture (Granting Clause).[4] In addition to the notes, the Trusts

---

that the Trusts' purported act of resolving claims brought against the Trusts by the Consumer Financial Protection Bureau (the "CFPB") for alleged unfair loan collection practices was ineffective. Specifically, the court determined that the proposed consent judgment effecting the settlement was executed on behalf of the Trusts by a party who lacked authority to bind the Trusts.

*Id.* at *3.

[2] *See* https://files.consumerfinance.gov/f/documents/201709_cfpb_transworld-systems_consent-order.pdf.

[3] *Available at* https://www.sec.gov/Archives/edgar/data/1338373/000088237705003116/ncslt_ex10-9.htm. The Trust Agreement and related contracts for the NCSLT 2005-3 Trust, one of the trusts relevant to Plaintiffs' allegations, are representative of the other Trust Agreements and related contracts for the other trusts.

[4] *Available at* https://www.sec.gov/Archives/edgar/data/1338373/000088237705003116/ncslt_ex4-1.htm.

created certificates evidencing the residual equity interests of the Trust owners (Residual Owners). NCLST 2005-3 Trust Agreement § 1.01 (defining "Trust Certificate").

The Trusts have no officers or employees, but instead act through an Owner Trustee appointed by the Trust Agreement, in which "all the rights, powers and duties" set forth in the Trust Agreement and the DSTA are vested. Trust Agreement § 2.04. The Trusts also appointed an Administrator that agrees to perform its own duties as well as certain duties of the Trust and the Owner Trustee under the Trust Related Agreements. Administration Agreement § 1(a)–(d);[5] Trust Agreement § 7.11, 8.01, 8.03. Under the Trust Agreement, the Residual Owners have limited rights to direct the Owner Trustee to take certain actions but cannot act directly on behalf of the Trust. Trust Agreement §§ 2.03(b), 4.02(a). The Owner Trustee is not obligated to act on that direction if it is contrary to the terms of the Trust Agreement or related documents. Trust Agreement § 4.02(b); *see also In re Nat'l Collegiate Student Loan Trusts Litig.*, No. 12111-VCS, 2020 WL 5049402, at *10 (Del. Ch. Aug. 27, 2020) ("Indeed, under the Trust Agreement, Owner instructions are improper (and can be ignored by the Owner Trustee) if they contradict the overlapping Trust Related Agreements or undermine the Trusts' narrow purpose.").

The Trusts' operating structure is embodied in certain agreements. For servicing obligations, the various parties entered into Primary Servicer, Special Servicer, and Subservicer agreements. The Administrator entered into certain Servicing Agreements with Pennsylvania Higher Education Assistance Agency (PHEAA) to act as the pre-default servicer in collecting proceeds from the student loans on behalf of the Trust. *Id.* at *5. For special servicing (delinquent and default loan servicing), the Owner Trustee, acting on behalf of the Trusts, First Marblehead

---

[5] *Available at*
*https://www.sec.gov/Archives/edgar/data/1338373/000088237705003116/ncslt_ex10-10.htm*.

4

Education Resources (FMER), and U.S. Bank entered into a Special Servicing Agreement (SSA) for collection of delinquent or defaulted loans and U.S. Bank to act as Back-Up Special Servicer. (ECF No. 11-3.) Pursuant to a September 26, 2008 agreement, when loans reach a certain level of delinquency, PHEAA is required to transfer those loans to the Special Servicer. The SSA designated FMER as Special Servicer and U.S. Bank (which also served as the Indenture Trustee) as the Back-Up Special Servicer to become the Successor Special Servicer automatically in the event FMER resigned or was removed as the Special Servicer. (SSA § 8, ECF No. 11-3 at PageID.142.) In addition, FMER entered into a Default Prevention and Collection Services Agreement (TSI Agreement) with TSI's predecessor, NCO Financial Systems, Inc. (NCO), pursuant to which NCO agreed to serve as a Special Sub-Servicer in the event that U.S. Bank became the Successor Special Subservicer. The TSI Agreement is incorporated into the SSA by reference and attached to the SSA as an exhibit. (SSA § 8.G & Ex. II, ECF No. 11-3 at PageID.145, 169.)

U.S. Bank became the Successor Special Servicer on June 21, 2012, when FMER resigned. (ECF No. 1 at PageID.8.) Thus, pursuant to the TSI Agreement, NCO became the Special Subservicer. As Successor Special Servicer, U.S. Bank was neither required nor permitted "to undertake direct collection or enforcement activities . . . with respect to consumer borrowers or other consumer obligors." (SSA § 8A, ECF No. 11-3 at PageID.142.) Instead, NCO was responsible for all collection activities, including administering all collection litigation, selecting, supervising, and paying collection attorneys, and providing evidentiary support for collection attorneys. (TSI Agreement § 2.4(a)–(c), ECF No. 11-4 at PageID.175.) TSI succeeded NCO as the Special Subservicer in 2014.

**B.      The Collection Lawsuits against Merrill and Wilk**

In March 2019, the Shermeta Law Group, acting on behalf of TSI, filed a lawsuit in the Grand Traverse County Circuit Court in the name of NCLST 2005-3 against Merrill, seeking to collect $36,816.10 on a Note that had allegedly been assigned to NCSLT Trust 2005-3. (ECF No. 1-1.) During the action, TSI employees created and submitted an affidavit executed by TSI employee Jennifer A. Audet, who attested that the document attached as an exhibit to the affidavit was a "true copy" of the underlying Note for the loan on which the action was based, when in fact, the exhibit was constructed from pages of two separate documents and was created by TSI's "affidavit production team." (ECF No. 1 at PageID.14–15.) Plaintiffs allege that Ms. Audet had no knowledge as to whether the terms attached to the signature page were the actual terms and conditions of the note the Merrill signed. They further allege that Ms. Audet lacked knowledge of how the documents were created by the original lender or how they were maintained prior to transmittal to TSI. TSI ultimately dismissed the action with prejudice. (*Id.* at PageID.15.)

The Shermeta Law Group filed another collection action against Merrill on March 13, 2019 in the Leelanau County Circuit Court on behalf of TSI but in the name of NCSLT 2006-4. The complaint alleged that Merrill owed $42,033.92 on a Note that had been assigned to NCSLT 2006-4. TSI ultimately dismissed this lawsuit with prejudice. (*Id.*)

In 2014, TSI or NCO obtained judgments against Wilk in two cases in the Washtenaw County Circuit Court, captioned *National Collegiate Student Loan Trust 2006-3 v. Brittany Wilk*, Case No. 131036-CK, and *National Collegiate Student Loan Trust 2004-2 v. Brittany Wilk*, Case No. 14477-CK. On or about November 4, 2019, TSI served a writ of garnishment in Case No. 131036 on the Michigan Department of Treasury seeking to attach Wilk's Michigan income tax refund. On September 10, 2019, TSI served a writ of periodic garnishment on Wilk's employer,

seeking to garnish her paycheck. As a result of the garnishment, Wilk has had her personal funds seized by TSI. (*Id.* at PageID.16–17.)

## II. MOTION STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court has held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . .Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . .Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

*Id.* at 678-79 (internal citations omitted).

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided they are referenced in the complaint and central to its claims. *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008).

## III. DISCUSSION

### A. Plaintiff Wilk—Collateral Estoppel

TSI contends that Plaintiff Wilk is collaterally estopped from arguing that TSI (or its predecessor) obtained the judgments against her without authorization from the Trusts and that the chain of title to the loans was defective. "Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." *Abbott v. Michigan.*, 474 F.3d 324, 330 (6th Cir. 2007) (citing 28 U.S.C. § 1738). Because the state-court proceedings occurred in Michigan, the Court applies Michigan law. In Michigan, collateral estoppel has three elements: (1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment; (2) the parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel. *See Storey v. Meijer, Inc.*, 431 Mich. 368, 373 n.3 (1988). An issue is "actually litigated" if the party opposing estoppel "had a full and fair opportunity to litigate the issue." *People v. Gates*, 434 Mich. 146, 156–57 (1990). The Michigan Supreme Court has stated that "'a default judgment is just as conclusive an adjudication and as binding upon the parties of whatever is essential to support the judgment as one which has been rendered following answer and contest.'" *Barnes v. Jeudevine*, 475 Mich. 696, 705 (2006) (quoting *Perry & Derrick Co. v. King*, 24 Mich. App. 616, 620 (1970) (bracket omitted); *see also Eager v. Credit Bureau Collection Servs., Inc.*, Nos. 1:13-cv-30, 1:13-cv-84, 1:13-cv-159, 1:13-cv-173,

8

1:13-cv-261, 1:13-cv-267, 1:13-cv-341, 2013 WL 5719224, at *3 and n.6 (W.D. Mich. Oct. 18,
2013); *Fifth Third Bank v. U.S. Dep't of Agriculture–Rural Dev.*, No. 1:12-cv-1123, 2013 WL
529858, at *3 (W.D. Mich. Feb. 11, 2013).

All of the elements of collateral estoppel are present in this case. First, the issues Plaintiff
Wilk asserts in this case—TSI's or its predecessor's authority to initiate the collection lawsuits on
behalf of the Trusts and proof that the Trusts owned Wilk's student loans—were factual questions
essential to entry of the judgments against Wilk. Second, Wilk had a full and fair opportunity to
litigate these issues. "A default judgment is treated the same as a litigated judgment for purposes
of res judicata and is considered a decision on the merits." *Richards v. Tibaldi*, 272 Mich. App.
522, 531 (2006). Finally, mutuality of estoppel is present because TSI would be bound by
judgments against it (or its predecessor) in the Wilk cases had they been entered in favor of Wilk.
*See Braton v. Litchalk*, 55 Mich. App. 708, 720 (1974) (stating that mutuality of estoppel "exists
if a person attempting to take advantage of the earlier judgment would have been bound by it if it
had gone against him") (citing *Howell v. Vito's Trucking & Excavating Co.*, 386 Mich. 37, 43
(1971)).

Plaintiffs argue that collateral estoppel is inapplicable because Wilk's claims are not based
on the default judgments entered in 2014, but instead on the garnishments that TSI filed in 2019.
Plaintiffs allege that, in filing the garnishments, TSI represented, explicitly and/or implicitly, that
the Trusts had authorized the garnishments when, in fact, TSI filed them in the name of the Trusts
without their authorization or consent.[6] (ECF No. 21 at PageID.359–60.) Plaintiff Wilk cites *Todd*

---

[6] Plaintiffs also argue that they alleged that, in connection with the issuance of the Wilk
garnishments, TSI represented that it had reviewed the file, but its employees did not actually do
so and instead acted as a "robo-signer." However, these allegations pertain to TSI's activity during
collection lawsuits generally rather than to its activity in filing the Wilk garnishments. (ECF No.

*v. Weltman, Weinberg & Reis Co.*, 434 F.3d 432 (6th Cir. 2006), and *Vanderkodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397 (6th Cir. 2020), to support her argument that she is attacking the garnishment, not the judgment. But *Todd* and *Vanderkodde* both dealt with the *Rooker-Feldman* doctrine, not preclusion doctrines. TSI does not argue that Plaintiffs claim injury from the state-court judgments and thus does not ask the Court to apply *Rooker-Feldman*. *See Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that *Rooker-Feldman* "is confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"). The Sixth Circuit recognized in both cases that state-law preclusion doctrines may still apply even where the *Rooker-Feldman* doctrine does not. *Vanderkodde*, 951 F.3d at 404; *Todd*, 434 F.3d at 437.

In contrast to *Vanderkodde* and *Todd*, Wilk's claims in this case are not based on new violations that occurred in connection with the garnishment, but upon Plaintiff's allegation that TSI filed the garnishments without the Trusts' authorization or consent. However, this issue was necessarily and conclusively determined when the state courts entered the default judgments against Wilk in the state-court actions.[7] Thus, Wilk's claims are barred by collateral estoppel.[8]

---

1 at PageID.11–12.) Plaintiffs do not allege that TSI submitted an affidavit in support of the Wilk garnishments.

[7] To the extent Wilk argues that, subsequent to entry of the judgments, the Trusts withdrew their authorization for TSI to pursue collection of the judgments, this allegation fails for the reasons set forth below in Section B.1.b.

[8] Because Wilk's claims are barred by collateral estoppel, the Court need not address U.S. Bank's argument that Wilk's FDCPA claim is barred by the FDCPA one-year statute of limitations and her MCPA is partially barred because the 2013 Washtenaw County collection case was filed outside of the six-year limitations period set forth in Mich. Comp. Laws Section 600.5813.

### B. FDCPA Claim

#### 1. TSI

TSI argues that Plaintiffs fail to state a FDCPA claim against it because Plaintiffs do not allege that TSI itself did anything to violate the Act. In fact, TSI notes, the Merrill state-court complaints that Plaintiffs attached to their complaint in this case plainly show that the Shermeta Law Group—not TSI—filed the collection actions against Merrill (and presumably Wilk). In other words, TSI argues, it did not act as "debt collector" toward Plaintiffs for purposes of the FDCPA. TSI further argues that the records custodian affidavit it filed in the Merrill case in Grand Traverse County Circuit Court cannot give rise to a FDCPA claim because the records custodian's representations in the affidavit were not made for the purpose of collecting a debt.

The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. To state a claim under § 1692e, "(1) plaintiff must be a 'consumer' as defined by the Act; (2) the "debt" must arise out of transactions which are 'primarily for personal, family or household purposes;' (3) defendant must be a 'debt collector' as defined by the Act; and (4) defendant must have violated § 1692e's prohibitions." *Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012) (citing *Whittiker v. Deutsche Bank Nat'l Trust Co.*, 605 F. Supp. 2d 914, 926 (N.D. Ohio 2009)). As noted above, Plaintiffs allege that TSI violated the FDCPA by: (1) filing lawsuits and collecting judgments in the name of the NCSLT Trusts when it was not authorized to do so; (2) falsely asserting in lawsuits that an unbroken chain of title from the original lender to the NCSLT Trusts existed; and (3) submitting documents as true copies that were created by TSI's staff and/or falsely affirming that the affiant had first-hand knowledge of how the documents were created or maintained prior to their transfer to TSI. In particular, Plaintiffs allege that TSI violated

11

15 U.S.C. § 1692e(2)(A) by falsely representing "the character, amount, or legal status of [the] debt[s]." (ECF No. 1 at PageID.21.)

### a. *Debt Collector Status*

The FDCPA defines the term "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Thus, a person may be a "debt collector" if (1) debt collection is the principal purpose of the person's business; or (2) the person "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Whether a defendant qualifies as a "debt collector" depends, not on the defendant's alleged conduct in the particular case, but on the defendant's regular activity. *See Golliday v. Chase Home Fin., LLC*, 761 F. Supp. 2d 629, 635 (W.D. Mich. 2011) (noting that "the court must look beyond the facts of the particular case to determine whether a defendant's 'principal purpose' is to collect debts or whether the defendant regularly engages in collecting debts"). In other words, "the focus is not on the events of the particular transaction but on the principal purpose of the defendant's business and/or the defendant's regular activities." *Id.* (internal quotation marks omitted) (quoting *Stamper v. Wilson & Assoc. PLLC*, No. 3:09-cv-270, 2010 WL 1408585, at *8 (E.D. Tenn. Mar. 31, 2010)); *see also Schroyer v. Frankel*, 197 F.3d 1170, 1176 (6th Cir. 1999) (stating that to prove that an attorney or a law firm "regularly" collects debts for purposes of the FDCPA, a plaintiff must show that the attorney or law firm "collects debts as a matter of course for its clients or for some clients, or collects debts as a substantial, but not principal, part of his or its general law practice").

12

TSI makes two related arguments regarding its debt collector status. First, it contends that, because Plaintiffs fail to allege that TSI itself took any action toward collecting the debts in a communication that contained the alleged misrepresentations and because the Merrill state-court complaints attached to the complaint in this case show that the collection actions were filed by attorneys of record on behalf of the Trusts, not by TSI, TSI did not act as a "debt collector" in this case. (ECF No. 14 at PageID.210 (arguing that "TSI is not subject to FDCPA liability because it did not act as a 'debt collector' with respect to the plaintiffs and the subject loans"); (ECF No. 24 at PageID.560 ("Regardless, TSI's role in the debt collection industry generally has no probative value as to whether TSI is a 'debt collector ' in this case.").) This argument lacks merit for, as explained in *Golliday*, *supra*, in determining whether a defendant is a "debt collector" under the FDCPA, the focus is not on the conduct at issue but on the defendant's regular activities. Here, Plaintiffs allege that TSI is a "debt collector" as defined by the FDCPA because its principal business is the collection of debts and it regularly collects and attempts to collect debts due, owed or asserted to be due or owed to other persons or companies. (ECF No. 1 at PageID.1–2.) TSI does not contend that this allegation is insufficient to establish that it is a "debt collector," nor does it deny that its principal business is the collection of debts owed to another. The TSI Agreement is compelling proof of this fact.

TSI further argues that, with the exception of providing the records custodian affidavit (which it argues cannot support an FDCPA claim), it did not violate the FDCPA because it did not engage in debt collection. This argument ignores Plaintiffs' allegations that TSI uses an "Attorney Network" to initiate collection actions on behalf of the Trusts; TSI's "legal compliance managers" direct the attorneys that TSI retains; and "TSI directs the litigation, responds to discovery requests, and confers with the attorneys ostensibly representing the NCSLT Trusts." (ECF No. 1 at

PageID.9.) Plaintiffs further allege that the Shermeta Law Group filed the collection actions against Merrill on behalf of TSI. (*Id.* at PageID.14.)

TSI's argument is essentially that a debt collector cannot be liable for another debt collector's FDCPA violations, but it cites no authority for this proposition. However, *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103 (6th Cir. 1996), which U.S. Bank cites in support of its motion to dismiss, suggests TSI's argument is flawed. There, Credit Acceptance Corp. (CAC) provided dealer financing for used cars. Once the dealer completed the contract and sale, the contract was automatically assigned to CAC. Following the assignments of their contracts, the plaintiffs defaulted on their loans, and CAC retained counsel to file lawsuits. The plaintiffs sued both CAC and the law firm alleging FDCPA violations based on the law firm's debt collection activity. *Id.* at 105–06. Because it concluded that CAC was not a debt collector, the Sixth Circuit held that the district court properly granted CAC summary judgment. *Id.* at 107–08. Here, TSI, although similarly situated to CAC, *is* alleged to be a debt collector and thus can be liable for its attorneys' debt collection activity. *See White v. Sherman Fin. Grp., LLC*, 984 F. Supp. 2d 841, 853 (E.D. Tenn. 2013) (noting that under *Wadlington*, where a defendant is a debt collector under the FDCPA, it may be held vicariously liable for FDCPA violations committed by an attorney it hires who also qualifies as a debt collector). Moreover, another district court has previously rejected the same argument by TSI. *See Lizarraga-Davis v. Transworld Sys., Inc.*, No. 18-cv-04081, 2019 WL 8263436, at *5 (N.D. Cal. Aug. 29, 2019) (rejecting TSI's summary judgment argument that the plaintiff failed to identify any collection activity by TSI; the plaintiff alleged that TSI directed the law firm's collection efforts, and TSI failed to present any evidence refuting this theory). TSI's argument has no more merit here, at least on a motion to dismiss.

### b.    *FDCPA Violation*

TSI argues that Plaintiffs have not adequately pled an FDCPA claim against TSI because the representations in the records custodian affidavit that TSI provided in the *Merrill* case were not made "in connection with the collection of any debt" as required by 15 U.S.C. § 1692e. TSI does not address the two violations Plaintiffs allege in connection with the filing of the complaint. Nonetheless, before reaching TSI's affidavit argument, I explain why Plaintiffs' allegation that TSI filed the lawsuits without the Trusts' authorization does not raise a plausible FDCPA violation and should be dismissed.

First, to the extent Plaintiffs assert that the Trusts never authorized TSI to service the loans or file the lawsuits in the first place, they provide no factual support for this conclusion. Moreover, as U.S. Bank demonstrates in its brief in support of its motion to dismiss, the SSA and the incorporated-by-reference TSI Agreement plainly refute Plaintiffs' allegation. As mentioned above, the Owner Trustee—at the time, Wilmington Trust Company—had "all the rights, powers and duties" set forth in the Trust Agreement and was a party to the SSA. (ECF No. 11-3 at PageID.136, 157.) The SSA authorized FMER, and later NCO/TSI, through the TSI Agreement, to facilitate "the enforcement and collection of Delinquent Loans and Defaulted Loans to maximize the collection of amounts payable on the Student Loans," by, among other things, "[r]etaining counsel on behalf of the applicable Trust . . . to further pursue enforcement and collection of Delinquent Loans and Defaulted Loans, including through litigation . . . ." (SSA, § 2B(xv), ECF No. 11-3 at PageID.136, 139; *see also* TSI Agreement § 2.4 ("Litigation Management"), ECF No. 11-4 at PageID.175–76.) Thus, contrary to Plaintiffs' allegation, the Trusts specifically authorized TSI to file lawsuits to collect the student loans. As for Plaintiffs' allegation that the Residual Owners issued a directive to the Administrator in 2015 to stop

providing TSI with defaulted loan files, it is inaccurate. Instead, the Owner Trustee directed the Administrator "to immediately cease and desist from giving any direction to PHEAA." *National Collegiate Master Student Loan Trust I v. U.S. Bank Nat'l Assoc.*, No. 2018-0167-JRS, 2018 WL 3094756 (Del. Ch. Ct. June 15, 2018) (Verified Am. Compl. ¶ 60(2)).

Similarly, Plaintiffs' allegation that the Trusts filed suit in Delaware Chancery Court in 2018 against TSI and U.S. Bank seeking an injunction to prevent TSI from continuing to act without authorization is inaccurate. Instead, the action was filed by the Residual Owners, rather than the Owner Trustee, on behalf of the Trusts. *See In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 5049402, at *2 (characterizing the Trust-related disputes as between two factions—the Residual Owners and the Noteholders (and the Indenture Trustee)—pulling the Owner Trustee in two directions). And as the District of Delaware has recently concluded, "unless the Trust Related Agreements provide otherwise, the Trusts are 'managed by or under the direction of' their trustee(s) and neither the power to direct such trustee(s) or other persons nor the exercise of such power by any person(s) (including the beneficial owner(s)) causes such person(s) to be a trustee, *i.e.* to assume the powers and responsibilities of a trustee." *Consumer Fin. Prot. Bureau v. National Collegiate Master Student Trust*, No. 17-1323, 2020 WL 2915759, at *3 (D. Del. May 31, 2020) (quoting DSTA § 3806(a)). In other words, the Owner Trustee not only may, but must, refuse the Residual Owners' directions when are contrary to the Trust Related Agreements. In any event, Plaintiffs allege no fact establishing that TSI was removed as, or does not remain, the Special Subservicer authorized to engage in collection activity on behalf of the Trusts.

Returning to TSI's argument, TSI contends that application of the factors set forth in *Goodson v. Bank of America, N.A.*, 600 F. App'x 422 (6th Cir. 2015), to the records custodian affidavit shows that TSI did not provide the affidavit in connection with the collection of a debt.

As TSI notes, to determine whether a communication is actionable under the FDCPA at the pleading stage, "the question for the Court is whether it is plausible, based on the facts alleged in the complaint, that one of the purposes animating the defendant's decision to send the communication was to induce payment." *Underhill v. Best*, No. 2:17-cv-154, 2018 WL 2150464, at *3 (W.D. Mich. May 10, 2018) (citing *Estep v. Manley Deas Kochalski*, 552 F. App'x 502, 505 (6th Cir. 2014)). In *Goodson*, the court cited the following factors as relevant to the whether a communication's animating purpose was to induce payment by the debtor: (1) the nature of the relationship of the parties; (2) whether the communication expressly demanded payment or stated a balance due; (3) whether it was sent in response to a inquiry or request by the debtor; (4) whether the statements were part of a strategy to make payment more likely; (5) whether the communication was from a debt collector; (6) whether the communication stated that it was an attempt to collect a debt; and (7) whether it threatened consequences should the debtor fail to pay. 600 F. App'x at 431 (citing *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011), and *McDermott v Randall S. Miller & Assocs., P.C.*, 835 F. Supp. 2d 362, 370–71 (E.D Mich. 2011)).

TSI contends that because the records custodian affidavit was provided to Merrill's counsel in response to discovery he had propounded in the collection suit, the animating purpose of the affidavit was not debt collection, but to comply with the state-court rules regarding discovery.[9]

---

[9] Plaintiffs attached a copy of the Audet affidavit to their complaint. (ECF No. 1-2.) Although Plaintiffs did not expound on the circumstances under which the affidavit was furnished, TSI has attached to its brief a declaration from Eduardo Pallares, an attorney with the Shermeta law firm who served as counsel for Plaintiff Merrill in the Grand Traverse County Circuit Court case. (ECF No. 14-2.) Attorney Pallares states that the affidavit was provided as part of a response to Merrill's motion to compel discovery in that case. TSI argues that the Court may consider the response to the motion to compel in deciding the motion to dismiss because Plaintiffs referred to the affidavit in their complaint and it is a public record because it was filed in the Merrill lawsuit. Plaintiffs do not dispute this contention. Because the documents attached to the Pallares declaration were filed

17

TSI further argues that the majority of the *Goodson* factors demonstrate that the affidavit was not provided for purposes of debt collection. Plaintiffs dispute that the *Goodson* factors are even applicable in this case because they were intended to evaluate letters sent directly to consumers rather than affidavits prepared in connection with debt collection litigation. The Court need not decide whether *Goodson* applies to litigation-related affidavits because even if it does, those factors, and the context in which TSI provided the affidavit, support a plausible claim that an animating purpose of the affidavit was to induce payment on a debt. While TSI is correct that the Shermeta firm provided the affidavit in order to comply with applicable discovery rules, TSI ignores that the affidavit was provided in the context of a debt collection suit, and the information it provided served to establish both the validity of the debt and its path from Charter One Bank, N.A. to NCSLT 2005-3. The goal of the lawsuit was to obtain payment. Given this context, *Goodson* factors (1) through (5) indicate that an animating purpose of the affidavit was to induce payment. First, as to the parties' relationship, although TSI did not directly provide the affidavit to Merrill's counsel, TSI was the Subservicer charged with collecting Merrill's loan, it retained the Shermeta firm to sue Merrill on behalf of the Trusts, and it oversaw the litigation. TSI was more than simply a passive keeper of the records. Second, the affidavit did not demand payment, but it did state the amount due as May 23, 2019. (ECF No. 1-2 at PageID.33.) Third, the affidavit was provided in response to a discovery request by Merrill's counsel, which *might* indicate that it was not part of a debt collection effort. But the affidavit was more than "merely a ministerial response to a debtor inquiry." *Grden*, 643 F.3d at 173. Rather, TSI provided it in the course of litigation as one necessary step toward securing a judgment. In other words, the affidavit made the

---

in the Merrill lawsuit, the Court will consider them. *See Granader v. Public Bank*, 417 F.2d 75, 82–83 (6th Cir. 1969) ("Federal courts may take judicial notice of proceedings in other courts of record.") (collecting cases).

litigation "more likely to succeed." *Id.* Fifth, as explained above, TSI was a debt collector. As for the last two factors, while the affidavit did not provide the FDCPA debt collection warning or threaten consequences, the absence of those characteristics does not undermine the plausibility of the claim.

Accordingly, Plaintiff Merrill has stated a valid FDCPA claim against TSI based on the alleged false misrepresentation that the Trusts owned the loans in question and the filing of a false or misleading affidavit in the Merrill Grand Traverse County Circuit Court case. However, Plaintiff Merrill's claim that TSI filed the lawsuits without authorization from the Trusts fails to state a claim. In addition, the portion of Plaintiffs' claim based on § 1692f(1), which prohibits "[t]he collection any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law," is subject to dismissal. The complaint alleges no facts to support such a claim, and Plaintiffs fail to respond to TSI's argument for dismissal of this portion of the claim.

## 2. U.S. Bank

U.S. Bank argues that Plaintiff's FDCPA claim against it must be dismissed because Plaintiffs fail to allege that it is a debt collector. As noted above, the FDCPA's definition of "debt collector" contains two prongs or categories: the "principal purpose" prong and the "regularly collects" prong. Plaintiffs do not allege that U.S. Bank qualifies as a debt collector under the "principal purpose" prong. Plaintiffs' sole allegation pertaining to U.S. Bank's debt collector status is that "U.S. Bank, through TSI, regularly collects debts allegedly owed to various NCSLT Trusts, and thus is a 'debt collector' as defined in Section 803(6) of the [FDCPA]." (ECF No. 1 at PageID.2.) Plaintiffs do not allege that U.S. Bank regularly collects debts itself, that is, that U.S. Bank performs direct debt collection in its role as Special Servicer or otherwise. Such an allegation

would be at odds with the SSA, which provides that the Back-Up Special Servicer (U.S. Bank) is not "require[d] or permit[ted] . . . to undertake direct collection or enforcement activities . . . with respect to consumer borrowers or other consumer obligors." (SSA, § 8.A., ECF No. 11-3 at PageID.142.) Plaintiffs also allege that U.S. Bank retains control over various aspects of TSI's debt collection activities and that TSI acts as U.S. Bank's agent. (ECF No. 1 at PageID.8.) Because Plaintiffs do not allege that U.S. Bank directly participated in any of TSI's debt collection activities, their claim against U.S. Bank is founded on a theory of vicarious liability for TSI's violations.

Courts within the Sixth Circuit have recognized that vicarious liability may be imposed against a principal for its debt collector-agent's FDCPA violations. *See White*, 984 F. Supp 2d at 853 (collecting cases). A principal will be held vicariously liable, however, only where it is itself a debt collector. *See Havens-Tobias v. Eagle*, 127 F.Supp.2d 889, 897–98 (S.D. Ohio 2001) (stating that "the law holds that '[l]iability under the FDCPA is possible only if one is a 'debt collector' within the meaning of the Act'") (quoting *West v. Costen*, 558 F. Supp. 564, 573 (W.D. Va. 1983)). As the Sixth Circuit stated in *Wadlington*, "it would [not] accord with the intent of Congress, as manifested in the terms of the Act, for a company that is *not* a debt collector to be held vicariously liable for a collection suit filing that violates the Act only because the filing attorney is a 'debt collector.'" 76 F.3d at 108 (italics in original).

Plaintiffs' theory alleged in their complaint is that U.S. Bank is an indirect debt collector through its association with TSI. In cases such as this, where the plaintiff alleges that an entity defendant is an indirect debt collector by reason of another entity's debt collection activity, courts have required a showing that the two entities constitute a "single economic enterprise"—a showing akin to that required for corporate veil piercing—to render the entity a debt collector. *See Gold v.*

*Midland Credit Mgmt., Inc.*, 82 F.Supp.3d 1064, 1072 (N.D. Cal. 2015) (proof of indirect debt collector status "requires an examination of the relationship between" the two companies); *Johnson v. Midland Credit Mgmt. Inc.*, No. 1:05-cv-1094, 2006 WL 2473004, at *14 (N.D. Ohio Aug. 24, 2006) ("To prove Encore is an indirect debt collector which may be held liable for the acts of its debt collection subsidiary, Johnson must pierce the corporate veil.") (citing, among others, *Crawford v. Equifax Payment Servs.*, No. 97 C 4240, 1998 WL 704050, at *10 (N.D. Ill. Sept. 30, 1998)); *Jenkins v. Union Corp.*, 999 F. Supp. 1120, 1142–43 (N.D. Ill. 1998) ("To find Union liable as an indirect debt collector under the FDCPA, plaintiffs must show Union and Transworld share an interdependence that renders them a 'single economic enterprise.'") (quoting *Harrison v. NBD, Inc.*, 968 F. Supp. 837, 845 (E.D.N.Y. 1997)). For example, in *United States v. ACB Sales & Service, Inc.*, 590 F. Supp. 561 (D. Ariz. 1984), an action under the Federal Trade Commission Act against an FDCPA debt collector, the court found that a corporate parent and its sixteen subsidiary collection agencies constituted "one economic enterprise" based on the companies' appearance to the public, their actual interdependent relationship, the letterhead and logo of each subsidiary indicating that it was a collection agency owned by the parent, use of common facilities, and an interlocking directorate. *Id.* at 574–75. Here, Plaintiff's allegation that U.S. Bank regularly collects debts through TSI is a bare legal conclusion that falls far short of "nudge[ing] their claim[] [against U.S. Bank] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. There is no plausible factual basis in the complaint to support that U.S. Bank and TSI constitute a single economic enterprise or are so entwined that their separate existences should be disregarded.

Plaintiffs do not address the insufficiency of their indirect debt collector allegation. Instead, they point to *Winne v. National Collegiate Student Loan Trust 2005-1*, 228 F. Supp. 3d 141 (D.

Me. 2017), in which the court concluded that the plaintiff sufficiently alleged that U.S. Bank is a debt collector because the "regularly collects" prong of the FDCPA's "debt collector" definition includes both direct and indirect debt collection, and the plaintiff had alleged that U.S. Bank is a Special Servicer to the Trusts and had hired TSI to collect debts. *Id.* at 152–53. *Winne*, a district court case, is not binding on this Court and did not apply Sixth Circuit law. Its reasoning is also unpersuasive. As U.S. Bank notes, the *Winne* court conflated the "debt collector" and vicarious liability analysis without inquiring as to whether the plaintiff had alleged sufficient facts to conclude that U.S. Bank and TSI constitute a single economic enterprise such that U.S. Bank can be considered an indirect debt collector. For example, as *Wadlington* illustrates, a client may hire a debt-collector attorney to sue on a debt, thereby forming a principal-agent relationship, but if the client does not independently qualify as a debt collector, it cannot be held liable for the attorney's FDCPA violations. *See Havens-Tobias*, 127 F.Supp.2d at 897–98. U.S. Bank's authority to coordinate and oversee TSI's debt collection activities is pertinent to the issue of agency but is not determinative of whether U.S. Bank is an indirect debt collector.

Plaintiffs also argue that U.S. Bank is a debt collector because, under the SSA, it regularly collects debts. This assertion or theory does not appear in the complaint. Regardless, it ignores the interplay between the SSA and the TSI Agreement. As discussed above, the SSA, which incorporated the TSI Agreement by reference, recognized that at some point, U.S. Bank might succeed FMER as the Special Servicer, and in that event, NCO (and TSI as NCO's successor) would assume the enforcement and collection obligations set forth in Section 2.B. of the SSA that FMER had been performing. Section 8.A. of the SSA, which states that U.S. Bank "shall assume the rights, duties and obligations of the Special Servicer *to the extent expressly required to be assumed and performed* by the Back-Up Special Servicer under this Agreement," and that "nothing

in this Agreement shall be construed to require or permit . . . [U.S. Bank] to undertake direct collection or enforcement activities including, without limitation, Early Awareness Services, with respect to consumer borrowers or other consumer obligors," underscores the parties' intent that U.S. Bank would not perform debt collection in its role as Special Servicer. (SSA, § 8.A., ECF No. 11-3 at PageID.142 (italics added).) Thus, the SSA does not show what Plaintiffs claim. Accordingly, the FDCPA claim should be dismissed against U.S. Bank.

### C.    MCPA and MOC Claims

TSI moves to dismiss the MCPA and MOC claims as a follow-on to its argument for dismissal of the FDCPA claim. As the parties recognize, the MCPA and MOC contain language that is very similar to that of the FDCPA. *See Gamby v. Equifax Info. Servs. LLC*, 462 F. App'x 552, 556 n.5 (6th Cir. 2012) (noting similarly between FDCPA and MCPA); *Nelski v. Risk Mgmt. Alternatives, Inc.*, No. 01-cv-71974-DT, 2005 WL 1038788, at *5 (E.D. Mich. Apr. 21, 2005) (noting that the FDCPA and the MCPA prohibit similar behavior). Thus, "MCPA claims which simply duplicate . . . claims under the FDCPA need not be addressed separately." *Comer v. Roosen Varchetti & Olivier, PLLC*, No. 17-13218, 2018 WL 5719793, at *4 (E.D. Mich. Nov. 1, 2018) (internal quotation marks omitted). Likewise, because the MOC's prohibitions are similar to those of the FDCPA, *see* Mich. Comp. Laws § 339.915(e) (prohibiting a licensee from making an "inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt"), courts may analyze MOC claims in the same manner as FDCPA claims. *See Boozer v. Enhanced Recovery Co.*, No. 17-cv-14190, 2019 WL 5295730, at *12 (E.D. Mich. Oct. 18, 2019). Because TSI offers no independent basis for dismissal of the MCPA and MOC claims, both claims should be allowed to proceed with the exception of Plaintiff's allegation that that TSI falsely represented that the NCSLT Trusts had authorized the filing of the lawsuits to collect the debts.

U.S. Bank argues that it is entitled to dismissal of the MCPA claim because Plaintiffs merely recite that U.S. Bank is a "regulated person" under the MCPA without alleging any factual basis showing that Plaintiff falls into any of the categories of businesses included within the definition of "regulated person" under the statute. *See* Mich. Comp. Laws. § 445.251(g). Plaintiffs do not directly address this argument. Instead, they assert that U.S. Bank may be held vicariously liable for the collection activity of TSI, which is a "regulated person" under the MCPA. (ECF No. 21 at PageID.359.) Applying the rationale of *Wadlington* in relation to the FDCPA, however, U.S. Bank may not be held liable under the MCPA for the acts of a "regulated person" unless U.S. Bank is itself a "regulated person" because the statute prohibits certain acts only by "[a] regulated person." Mich. Comp. Laws § 445.252. Accordingly, U.S. Bank is entitled to dismissal of the MCPA claim.

### D. Violation of Mich. Comp. Laws § 600.2907

Count IV alleges a claim pursuant to Mich. Comp. Laws § 600.2907. The statute provides, in pertinent part:

> Every person who shall, for vexation and trouble or maliciously, cause or procure any other to be arrested, attached, or in any way proceeded against, by any process or civil or criminal action, or in any other manner prescribed by law, to answer to the suit or prosecution of any person, without the consent of such person, or where there is no such person known, shall be liable to the person so arrested, attached or proceeded against, in treble the amount of the damages and expenses which, by any verdict, shall be found to have been sustained and incurred by him . . . .

Mich. Comp. Laws § 600.2907.

Defendants argue that this claim is insufficiently pled because it fails to allege the elements of a common-law claim of malicious prosecution. To maintain a common-law action for malicious prosecution, a plaintiff must show that: (1) prior proceedings terminated in favor of the plaintiff; (2) the absence of probable cause for those proceedings; (3) malice, defined as a purpose other

than that of securing the proper adjudication of the claim; and (4) special injury that flows directly from the prior proceedings. *Young v. Motor City Apartments Ltd. Dividend Hous. Ass'n No. 1 and No. 2*, 133 Mich. App. 671, 675 (1984) (citing *Friedman v. Dozorc*, 412 Mich. 1, 48 (1981)). "Special injury" requires "injury to one's fame (as by a scandalous allegation), injury to one's person or liberty, and injury to one's property." *Friedman*, 412 Mich. at 33. With the exception of the special injury element, Plaintiffs do not dispute that they have not alleged the requisite elements for a common-law malicious prosecution claim, but they argue that the claim they have alleged under the statute does not depend on the common-law elements of favorable termination and absence of probable cause. The Court disagrees.

Plaintiffs cite *VanOrman v. Shook*, 602 F. Supp. 204, 206 (W.D. Mich. 1985), for the proposition that "in Michigan, malicious prosecution is both a common law and a statutory cause of action." The *VanOrman* court made this statement in passing, without much analysis, but cited *Drouillard v. Metropolitan Life Ins. Co.*, 107 Mich. App. 608 (1981). As in *VanOrman*, the *Drouillard* court made this statement with minimal analysis and no consideration of whether a plaintiff asserting a claim under the statute must allege the same elements for a common-law malicious prosecution cause of action. Courts that have conducted more in-depth analyses, however, have concluded that the statute does not create a separate statutory cause of action but merely provides an additional remedy for an underlying malicious prosecution claim. In *Sage Int'l, Ltd. v. Cadillac Gage Co.*, 556 F. Supp. 381 (1982), the court rejected the plaintiffs' argument that a plaintiff may proceed on a malicious prosecution claim under § 600.2907 without a showing of special injury. Citing two decisions from the Michigan Court of Appeals, *LaLone v. Rashid,* 34 Mich. App. 193 (1971), and *Peisner v. Detroit Free Press, Inc.*, 68 Mich. App. 360 (1976), and a decision from the Southern District of New York, *Chrysler Corp. v. Fedders Corp.*, 540 F. Supp.

706 (S.D.N.Y. 1982), the court concluded that rather than providing a separate cause of action for malicious prosecution, the statute simply provides for treble damages in certain types of malicious prosecution cases. In *LaLone*, posing the question of the statute's meaning, the court was "forced to conclude that the enactment provided only an additional method of computing punitive damages . . . [because] it added nothing to the substantive law . . . ." 34 Mich. App. at 202. State and federal courts continue to construe the statute in this manner, requiring a plaintiff to plead and prove all of the common law elements of malicious prosecution when seeking relief pursuant to § 600.2907. *See Bloch v. Bloch*, No. 307640, 2013 WL 951076, at *3 (Mich. Ct. App. Mar. 7, 2013) (per curiam) (noting that the statute "does not create a cause of action") (citing *LaLone*, 34 Mich. App. at 202); *Galinis v. County of Branch*, No. 1:14-cv-460, 2015 WL 13037567, at *5 (W.D. Mich. Aug. 11, 2015), *aff'd*, 660 F. App'x 350 (6th Cir. 2016) (citing common-law elements in analyzing the plaintiff's claim under § 600.2907).

The Michigan Supreme Court's decision in *Camaj v. S.S. Kresge Co.*, 426 Mich. 281 (1986)—which Plaintiffs cite—did not alter this interpretation. Rather, *Camaj* limited the statute's application to a narrow class of malicious prosecution cases known as "straw-party" suits. 426 Mich. at 287–89. Nothing in *Camaj* suggests that a plaintiff asserting a "straw-party"-type malicious prosecution claim is relieved from pleading the elements of common-law malicious prosecution.

Given that Plaintiffs are bound to plead the elements of the common-law cause of action, their claim fails at the first element, as neither Merrill nor Wilk can satisfy the favorable termination requirement.[10] Both of the cases against Merrill were dismissed with prejudice, *see*

---

[10] Plaintiffs' claim also fails because it is based on their allegation that Defendants filed the collection lawsuits without the consent of the Trusts. As set forth above, the SSA and the TSI Agreement specifically authorized TSI to retain attorneys to file lawsuits on behalf of the Trusts.

*Delorean v. Cork Gully*, 118 B.R. 932, 939 (E.D. Mich. 1990) ("For purposes of malicious prosecution, a stipulated dismissal with prejudice does not amount to a termination in the claimant's favor.") (citing *Kauffman v. Shefman*, 169 Mich. App. 829, 841 (1988)), and the Trusts obtained judgments against Wilk in both cases against her. Thus, this claim is subject to dismissal.

### E.    Unjust Enrichment

In Count V, Plaintiffs allege that Defendants were unjustly enriched because they obtained a benefit from Plaintiffs in the form of payments and/or garnishment proceeds. Unjust enrichment is an equitable doctrine based on the principle that a party should not be allowed to profit at the expense of another. *McCreary v. Shields*, 333 Mich. 290, 294 (1952). In cases of unjust enrichment, the law implies a contract to prevent the inequity arising from a defendant's receipt of a benefit from the plaintiff. *Sweet Air Inv., Inc. v. Kenney*, 275 Mich. App. 492, 504 (2007). To establish unjust enrichment, a plaintiff must show: (1) the receipt of a benefit by the defendant from the plaintiff; and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Michigan Educ. Employees Mut. Ins. Co. v. Morris*, 460 Mich. 180, 198 (1999). A court will not imply a contract where there is an express contract governing the same subject matter. *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F.Supp.2d 824, 833 (E.D. Mich. 2014) (citing *Fodale v. Waste Mgmt. of Mich., Inc.*, 271 Mich. App. 11, 36 (2006)).

Plaintiffs' claim is subject to dismissal for several reasons. First, as Defendants note, express contracts exist in this case covering Plaintiff's payments on their student loans. That is, Plaintiffs entered into Credit Agreements with their lenders, pursuant to which TSI collected student loan payments. (ECF No. 1-1; ECF No. 1-2 at PageID.38–41; ECF No. 1-3.) Plaintiffs do

---

Plaintiffs fail plausibly to allege that the Trusts have revoked or altered TSI's authority to continue filing lawsuits on behalf of the Trusts.

not deny that express contracts exist, but they contend that those contracts do not bar equitable relief in this case because they are not between Plaintiffs and TSI or U.S. Bank. But Michigan courts do not require that the contract be between the plaintiff and the defendant for this bar to apply. *See New Dimension Dev., Inc. v. Orchard, Hiltz & McCliment*, No. 262565, 2005 WL 2806234, at *6 (Mich. Ct. App. Oct. 27, 2005) (holding that unjust enrichment claim was barred by the plaintiffs' contracts with non-parties to the suit covering the subject matter at issue in the lawsuit); *Elite Commc'ns, Inc. v. Lastar.Com, Inc.*, No. 241843, 2004 WL 94106, at *3 (Mich. Ct. App. Jan. 20, 2004) (per curiam) (holding that the trial court did not err in failing to imply a contract because an express contract existed between the plaintiff and the third-party that contracted for the plaintiff's services).

Second, Plaintiffs do not allege that TSI or U.S. Bank received and retained a benefit from Plaintiffs. First, Plaintiffs do not allege that Merrill made any payments to TSI or any other party in either of the collection lawsuits. (ECF No. 1 at PageID.14–15.) As for Wilk, while Plaintiffs allege that TSI garnished her income tax refund and her paycheck on behalf of the NCSLT Trusts, they do not allege that that TSI retained those funds for its own benefit. In fact, under the SSA, funds that subservicers such as TSI collect on defaulted loans are deposited into a collection account in the name of the Indenture Trustee for the benefit of the Note holders. (SSA, § 2.B.(ix)–(x), ECF No. 11-3 at pageID.130.) Subservicers retain only their fees and expenses for their services. (SSA, § 5B., ECF No. 11-3 at PageID.139–40.) Plaintiffs also do not allege any fact showing that they conferred a benefit on U.S. Bank. Under Michigan law, a plaintiff must show that the defendant received a direct benefit from the plaintiff. *See Smith v. Glenmark Generics, Inc., USA.*, No. 315898, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014) (citing, among others, *Kammer Asphalt Paving Co. v. East China Twp. Schs.*, 443 Mich. 176, 179, 187–88

(1993)). Plaintiffs allege no fact showing that they conferred a direct benefit upon either Defendant.

Finally, Plaintiffs pled no basis for concluding that it would be unjust or inequitable if the collected funds are not returned do them. *See Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 924–25 (6th Cir. 2008) (noting that a contract will not be implied under Michigan law without a showing that it would be unjust or inequitable to allow the defendant to retain the benefit). Plaintiffs do not deny that they are debtors on the underlying student loans, and they do not allege they will be subjected to double liability or duplicative claims by different creditors claiming to own the loans. Thus, Plaintiffs have not pled an adequate basis for this claim.

## IV.    CONCLUSION

For the foregoing reasons, I recommend that the Court **grant in part and deny in part** Defendant TSI's Motion to Dismiss (ECF No. 13) as follows: (1) dismiss Plaintiff Wilk's FDCPA, MCPA and MOC claims as barred by the doctrine of collateral estoppel; (2) as to the FDCPA claim, dismiss Plaintiffs' allegation that TSI misrepresented that the Trusts authorized the filing of the lawsuits/garnishments and dismiss Plaintiff's claim under § 1692f(1) but allow the remainder of the claim to proceed as to Plaintiff Merrill; (3) as to the MCPA and MOC claims, dismiss Plaintiffs' allegation that TSI misrepresented that the Trusts authorized the filing of the lawsuits/garnishments and allow the remainder of the claims to proceed as to Plaintiff Merrill; and (4) dismiss Counts IV (violation of Mich. Comp. Laws § 600.2907) and V (unjust enrichment). I further recommend that Defendant U.S. Bank's Motion to Dismiss (ECF No. 10) be **granted** in its entirety and that U.S. Bank be dismissed from this case.

## **NOTICE**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated: December 1, 2020                     /s/ Sally J. Berens
                                                                    SALLY J. BERENS
                                                                    U.S. Magistrate Judge

2021 WL 210715
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division.

Allison L. MERRILL and Brittany Wilk, Plaintiffs,

v.

TRANSWORLD SYSTEMS, INC., and U.S.
Bank National Association, Defendants.

No. 1:20-cv-183
|
Signed 01/21/2021

**Attorneys and Law Firms**

Daniel O. Myers, The Law Offices of Daniel O. Myers, PLLC, East Lansing, MI, Heidi Marie Hodek, Matthew Hanley, Ranieri Hanley & Hodek, PLC, Traverse City, MI, for Plaintiffs.

Bradley J. St. Angelo, Bryan Christopher Shartle, Justin Harriss Homes, Sessions Israel & Shartle LLC, Metairie, LA, Deborah A. Lujan, Collins Einhorn Farrell PC, Southfield, MI, for Defendant Transworld Systems, Inc.

Albert J. Rota, Jones Day, Dallas, TX, Andrew J. Clopton, Jones Day, Detroit, MI, for Defendant U.S. Bank National Association.

## ORDER ADOPTING REPORT AND RECOMMENDAITON

Paul L. Maloney, United States District Judge

**\*1** Plaintiffs Allison Merrill and Brittany Wilk obtained student loans. In lawsuits filed against them in state court, the state-court plaintiffs alleged Merrill and Wilk failed to make loan payments. Merrill and Wilk subsequently filed this lawsuit in federal court, alleging that the state court lawsuits violated federal and state statutes and also alleging various torts.

Defendants filed motions to dismiss. (ECF No. 10 - U.S. National Bank Association; ECF No. 13 - Transworld Systems (TSI).) The Magistrate Judge issued a report recommending that Defendant U.S. Bank's motion be granted. (ECF No. 28 R&R.) The Magistrate Judge also recommended that Defendant TSI's motion be granted in part and denied

in part. Plaintiffs filed objections to some, but not all, of the recommendations. (ECF No. 30.) Defendants filed responses. (ECF Nos. 32 and 34.) The Court has reviewed the record and will adopt the Report and Recommendation.

After being served with a report and recommendation (R&R) issued by a magistrate judge, a party has fourteen days to file written objections to the proposed findings and recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). A district court judge reviews de novo those portions of the R&R to which objections have been filed. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). Only those objections that are specific are entitled to a de novo review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam).

### A. U.S. Bank is a "debt collector"

The Magistrate Judge discusses the Fair Debt Collection Practice Act (FDCPA) claim against Defendant US Bank on pages 19 through 23 of the R&R. (PageID.606-610.) The Magistrate Judge concludes that Plaintiffs do not allege that U.S. Bank qualifies as a debt collector under the "principal purpose prong," a conclusion to which Plaintiffs do not specifically object.

The Magistrate Judge also concludes U.S. Bank does not qualify as a debt collector under the "regularly collects" prong. Plaintiffs object, insisting that U.S. Bank assumed debt collection duties and responsibilities through the Third Amendment to the Default Prevention and Collection Services Agreement and the Special Servicing Agreement (SSA). (Obj. at 2 PageID.620.)

Plaintiffs' objection is overruled. The Magistrate Judge explained the interaction between the Default Prevention and Collection Services Agreement, which the Magistrate Judge referred to as the TSI Agreement (PageID.592), and the SSA. Reading the two documents together supports the conclusion that the parties did not intend U.S. Bank to perform debt collection duties should it become the Successor Special Servicer. (R&& at 22-23 PageID.609-10.) The third full paragraph of the Third Amendment, the second "whereas" paragraph, encapsulates the point made by the Magistrate Judge. That paragraph states that the initial Special Servicer arranged for the outsource of "certain default prevention and collection activities of the Special Servicer ... in the event that U.S. Bank became the successor Special

Servicer ....” (PageID.395.) The various duties U. S. Bank assumed, which Plaintiffs identify in their objection, do not establish that U.S. Bank, as the Successor Special Servicer, “regularly collects” debts. [1]

## B. Michigan Compiled Laws § 600.2907

**\*2** The Magistrate Judge concludes that the statute does not state a separate cause of action for malicious prosecution but only an additional remedy. The Magistrate Judge also concludes that, to state a claim for malicious prosecution under the statute, a plaintiff must allege the elements of the common-law tort. Because Plaintiffs did not, and could not, allege the favorable termination requirement, the Magistrate Judge concludes Plaintiffs’ claim under § 600.2907 must be dismissed.

Plaintiffs object. Plaintiffs contend the statute allows a distinct claim that does not rely on the common law elements. Plaintiffs also argue that the Magistrate Judge neglected to consider that TSI acted outside its authority and in violation of a consent decree.

Plaintiffs’ objection is overruled. For claims arising under state law, this Court must follow the guidance of the state courts. While Plaintiffs assert that the Magistrate Judge relied on “outdated case law” (PageID.623), Plaintiffs have not identified any subsequent developments that would undermine the holdings in state court opinions cited and discussed in the R&R. Although unpublished, the most recent state court opinion of which this Court is aware that addresses the interaction between the statute and the common law concerning malicious prosecution concludes that the statute “does not create a cause of action.... [I]t merely trebles the damages upon receiving a judgment.” *Bloch v. Bloch*, No. 307640, 2013 WL 951076, at \*3 (Mich. Ct. App. Mar. 7, 2013). And, if Plaintiffs have to plead and prove the elements of common law malicious prosecution, they have not explained why the second part of their objection makes a difference.

For these reasons, the Court **ADOPTS** the Report and Recommendation (ECF No. 28) as its Opinion.

The Court **GRANTS** Defendant U.S. Bank's motion to dismiss. (ECF No. 10.)

The Court **GRANTS IN PART and DENIES IN PART** Defendant TSI's motion to dismiss (ECF No. 13) as explained in the conclusion of the R&R (PageID.616).

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 210715

## Footnotes

1    As an example, Plaintiffs contend that TSI must get the consent of U.S. Bank to settle or dismiss any collection action, citing “Dkt. Entry 21-2 § 2.4.” (Obj. PageID.621.) In the original agreement, § 2.4(e) provides that “Special Servicer agrees to designate a business contact with authority to review and approve collection settlement proposals with NCO.” (PageID.324.) The Third Amendment, however, amends § 2.4. In the added subjection (h), NCO administers and manages collection litigation “and, except as contemplated in the Operating Guidelines, no further approval, consent or direction of the Special Servicer shall be required with respect to management of litigation relating to ASLs.” (PageID.401.)

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5351042
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Christina PRUKALA, Plaintiff,
v.
CHASE BANK, N.A., Defendant.

3:19-CV-1791
|
Filed 09/04/2020

**Attorneys and Law Firms**

Joseph T. Sucec, Grantham, PA, for Plaintiff.

Jenny N. Perkins, Ballard Spahr, LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

Robert D. Mariani, United States District Court Judge

**I. INTRODUCTION AND PROCEDURAL HISTORY**

**\*1**  On September 9, 2019, Plaintiff Christina Prukala filed a putative class action complaint in the Court of Common Pleas of Lackawanna County against Defendant JPMorgan Chase Bank, N.A., improperly named as "Chase Bank", [hereinafter "Chase"] for alleged violations of Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA") and the federal Fair Debt Collection Practices Act ("FDCPA"). (Doc. 1, Ex. 1). On October 16, 2019, Defendant Chase properly removed the action to this Court. (Doc. 1).

On October 21, 2019, Defendant filed a Motion to Dismiss Plaintiff's complaint. (Doc. 4). On November 4, 2019, Plaintiff amended her complaint eliminating the FDCPA claims, but still alleging Defendant violated the FCEUA when Defendant reported Plaintiff's consumer credit report as "delinquent, with derogatory information therein." (Doc. 8, at ¶¶ 1, 11). Plaintiff seeks relief under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). (Id. at ¶ 39). Plaintiff seeks monetary damages, punitive damages, and injunctive relief on behalf of herself and a putative class. (Id. at 10-11).

On December 5, 2019, Defendant again filed a Motion to Dismiss Plaintiff's Amended Complaint with prejudice, which is now pending before the Court. (Doc. 9). The issues have been fully briefed and Defendant's Motion is ripe for disposition.

For the reasons set forth below, the Court will grant Defendant's Motion to Dismiss with prejudice. (Doc. 9).

**II. FACTUAL ALLEGATIONS**

Plaintiff's Amended Complaint (Doc. 8) alleges the following facts which, for the purposes of resolving Defendant's Motion to Dismiss, the Court takes as true:

Plaintiff Christina Prukala is a citizen and resident of the Commonwealth of Pennsylvania. (Doc. 8, at ¶ 4). Defendant Chase is a "corporate entity engaged in, among other enterprises, collection of allegedly overdue credit accounts." (Id. at ¶ 5a). Defendants John Does 1-10 are unknown individuals or entities who "played a substantial role in the commission of the acts." (Id. at ¶ 5b). Defendants X, Y, and Z Corporations are unknown entities who also "played a substantial role in the commission of the acts." (Id. at ¶ 5c).

Plaintiff possesses consumer debts, used for "personal, household or family purposes," that Defendant was seeking to collect. (Id. at ¶ 10).

One of Plaintiff's consumer accounts was reported as delinquent and derogatory information was placed on her credit report by Defendant. (Id. ¶¶ 11, 14; Doc. 8-1, at 21–22). When Plaintiff discovered the derogatory information on her credit report, she "sent Defendant letters both disputing the high balance of each account and requesting copies of the original contracts." (Id. at ¶ 12).

Defendant updated the Credit Reporting Agencies ("CRAs") on a regular basis, which is reflected on Plaintiff's consumer credit report. (Id. at ¶¶ 15, 17). Defendant "constructively, if not actively" updated the information on Plaintiff's consumer report "without either reinvestigating said derogatory information or notating on the report that the account was disputed." (Id. at ¶ 19).

**\*2**  Defendant had actual and/or constructive notice that Plaintiff disputed the debts as Plaintiff sent letters

2020 WL 5351042

to Defendant indicating her dispute and requesting an accounting of the debts and the original contracts. (*Id.* at ¶ 18A; Doc. 8-1, at 23–25). Plaintiff never received a response from Defendant to her letters. (*Id.* at ¶ 18B).

The derogatory information on the consumer credit report "negatively reflects upon Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor and Plaintiff's credit worthiness." (*Id.* at ¶ 16).

As a result, Plaintiff suffered "repeated disruption of te [sic] pursuit of any business affairs affected by the false, unverified information on her credit report as well as the emotional distress suffered from being the target of Defendant's collection activity." (*Id.* at ¶ 43). Plaintiff's damages include "lost time in dealing with said violations, including but not limited to loss of credit opportunities and business standing in the community, and in seeking and contacting legal counsel for the purpose of exploring and commencing this litigation." (*Id.* at ¶ 34).

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.' " *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.' " *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* at 786-787 (quoting *Iqbal*, 556 U.S. 679).

**\*3** However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

### IV. ANALYSIS

Defendant Chase argues that Plaintiff's Amended Complaint should be dismissed for failure to state a claim upon which relief can be granted. (Doc. 9). Defendant's argument under the UTPCPL is twofold: (1) Plaintiff has not pleaded facts that she suffered an ascertainable loss resulting from Defendant's fraudulent actions, and (2) Plaintiff has not pleaded facts

that demonstrate justifiable reliance on Defendant's actions or failure to act. (Doc. 10, at 6–7). The Court agrees.

Pennsylvania's FCEUA statute outlines actions taken by creditors which constitute an "unfair or deceptive debt collection act or practice." 73 Pa. Stat. Ann. § 2270.4(b). It further declares any violation of the FCEUA to also constitute a violation of Pennsylvania's UTPCPL. 73 Pa. Stat. Ann. § 2270.5(a). The UTPCPL provides a private right of action to any person who has suffered "any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by [the UTPCPL]." 73 Pa. Stat. Ann. § 201-9.2.

The FCEUA does not provide a private cause of action for violations; instead, plaintiffs must use the UTPCPL's remedy provision to obtain relief. *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 359 (E.D. Pa. 2013); *see* 73 Pa. Stat. Ann. § 201-9.2. Consequently, to plead a cause of action under the FCEUA, plaintiffs must be able to state a claim under the UTPCPL. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015); *see also Baldwin v. Monterey Fin. Servs., Inc.*, No. 3:14-CV-2346, 2017 WL 4767696, at *6 (M.D. Pa. Oct. 20, 2017).

To state a claim under the UTPCPL, the plaintiff first must allege "an ascertainable loss as a result of the defendant's prohibited action." *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001). Second, the plaintiff must show that "he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Hunt v. U.S. Tobacco Co.*, 583 F.3d 217, 224 (3d Cir. 2008)(quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004)).

To allege an ascertainable loss, the plaintiff "must be able to point to money or property that he would have had but for the defendant's fraudulent actions." *Benner*, 917 F. Supp. 2d at 359. Damages resulting from emotional distress are not cognizable under the UTPCPL. *Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 358 (E.D. Pa. 2015). Likewise, the cost of retaining counsel does not qualify as an ascertainable loss. *Grimes v. Enter. Leasing Co. of Philadelphia, LLC*, 105 A.3d 1188, 1193 (Pa. 2014)(explaining that the UTPCPL separately provides for awards of costs and reasonable attorney's fees).

**\*4** Moreover, "damages cannot be speculative." *Jarzyna v. Home Properties, L.P.*, 185 F. Supp. 3d 612, 626 (E.D. Pa. 2016), *aff'd*, 783 F. App'x 223 (3d Cir. 2019); *see also Grimaldi v. Bank of Am.*, No. 3:12-CV-2345, 2013 WL 1050549, at *5 (M.D. Pa. Mar. 14, 2013)(holding a hypothetical attempt to refinance a home is not an ascertainable loss). The test for speculative damages is not necessarily about "the difficulty in calculating the amount," but instead with "whether there are identifiable damages." *Kaymark*, 783 F.3d at 182 (quoting *Pashak v. Barish*, 450 A.2d 67, 69 (Pa. 1982)).

Here, Plaintiff alleged that she has suffered "repeated disruption of any business affairs" and "emotional distress." (Doc. 8, at ¶ 43). Plaintiff failed to provide any facts regarding what the business affairs are, in what ways they were disrupted, or what specifically was lost because of the disruption. (*See generally*, Doc. 8). Without alleging any facts that she lost money or property that she would have had but for Defendant's actions, Plaintiff's damages are speculative and unascertainable.

Furthermore, Plaintiff's "emotional distress" (*Id.* at ¶ 43) is not cognizable under the UTPCPL and is, therefore, not an ascertainable loss. Additionally, Plaintiff's damages connected to retaining legal counsel (*Id.* at 10–11) are not an ascertainable loss under the statute.

Plaintiff has not met her burden to prove that she has lost any money or property that she would have had but for Defendant's actions. Plaintiff's Amended Complaint does not allege an ascertainable loss as required for a UTPCPL or FCEUA claim.

In addition to alleging an ascertainable loss, the Pennsylvania Supreme Court "has categorically and repeatedly stated that, due to the causation requirement in the Consumer Protection Law's standing provision, 73 Pa. Cons.Stat. § 201–9.2(a) (permitting suit by private plaintiffs who suffer loss "as a result of" the defendant's deception), a private plaintiff pursuing a claim under the statute must prove justifiable reliance." *Hunt*, 538 F.3d at 221.

The Pennsylvania Supreme Court has held that the UTPCPL is to be "liberally construed to effectuate its objective of protecting the consumers." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007). However, the Pennsylvania Supreme Court has also held, "Nothing in the legislative history suggests that the legislature ever intended statutory

2020 WL 5351042

language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." *Weinberg*, 777 A.2d at 446. Therefore, the plaintiff's justifiable reliance on the defendant's fraudulent conduct must have caused the harms suffered by the plaintiff. *See Hunt*, 538 F.3d at 224–225; *Walkup*, 147 F. Supp. 3d at 358.

It is the plaintiff's burden to prove justifiable reliance in the complaint. *Weinberg*, 777 A.2d at 446; *see also Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 202 (Pa. 2007)("... [A] plaintiff alleging violations of the [UTPCPL] must prove justifiable reliance."); *Hunt*, 538 F.3d at 227 (rejecting a presumption of reliance).

Viewing all facts in the light most favorable to the Plaintiff and drawing all reasonable inferences in Plaintiff's favor, there is no allegation of causation or justifiable reliance in the Amended Complaint. (*See generally*, Doc. 8). Even if the disrupted pursuit of business affairs was an ascertainable loss (*Id.* at ¶ 43), Plaintiff does not allege how the Defendant's actions caused such a disruption. Plaintiff pleads that Defendant caused derogatory information to be placed on her consumer credit report despite sending Defendant a dispute letter. (*Id.* at ¶¶ 14, 18). However, she does not explain what the derogatory information is or how that derogatory information impacted her business pursuits. Nor does Plaintiff allege reliance, justifiable or not, on any actions taken or statements made by the Defendant.

 **\*5**  Plaintiff's Amended Complaint does not allege causation or justifiable reliance as is required by the UTPCPL and FCEUA; and therefore, fails to state a claim upon which relief may be granted.

A district court may dismiss a complaint without leave to amend "on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004). Furthermore, "it is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 230 (3d Cir. 2011)("A district court may enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint.").

A motion to dismiss with prejudice is appropriate in cases where the plaintiff has already had the opportunity to amend her complaint, but was still unable to plead facts sufficient to survive a Rule 12(b)(6) motion. *Ghaffari v. Wells Fargo Bank N.A.*, 621 F. App'x 121, 125 (3d Cir. 2015)("[Plaintiff] had already been given an opportunity to amend his complaint after Wells Fargo filed its motion to dismiss his original complaint."); *see also Fletcher-Harlee Corp.*, 482 F.3d at 253 ("Here, Fletcher-Harlee was not caught unaware by the Court's entry of judgment, as it had notice of Pote's motion and every opportunity to amend its complaint beforehand."); *Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*, No. CV1700018FLWLHG, 2018 WL 1535285, at \*8 n.3 (D.N.J. Mar. 29, 2018) ("Plaintiff filed the Second Amended Complaint ... with full knowledge of the arguments in Defendant's original motion, and, yet, has failed to address them. Plaintiff's demonstrated inability to allege the most basic facts, which should be within her knowledge, in support of her claim ... makes dismissal with prejudice the appropriate outcome here.").

Plaintiff does not allege facts sufficient to state a claim upon which relief can be granted in her Amended Complaint, nor does she request leave to amend the complaint. (*See generally*, Doc. 8). The Court is not required to grant leave to amend where, as here, the plaintiff already has had an opportunity to amend her complaint. Defendant Chase filed a Motion to Dismiss Plaintiff's original Complaint on October 21, 2019. (Doc. 4). Defendant's original Motion not only raised the defects in Plaintiff's FDCPA claims (*Id.* at 7–11), but also raised the same defects that are present in Plaintiff's FCEUA and UTPCPL allegations. (*Id.* at 11–15). In response, Plaintiff saw fit not to amend her complaint at all, other than abandoning her FDCPA claims. (*Compare* Doc. 1-2, Ex. 1 *with* Doc. 8). Defendant Chase therefore raised the same two defects of the UTPCPL claim once again in its Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 10, at 6–10). Plaintiff opposed the Motion but neither addressed these issues nor sought leave to amend the Amended Complaint. (Doc. 11).

The Court deems Plaintiff had the opportunity to amend her Complaint and cure its deficiencies but did not do so. No further leave will be granted.

 **\*6**  Without alleging justifiable reliance on the Defendant's prohibited statements or actions and without alleging an ascertainable loss as a result of that reliance, Plaintiff's complaint does not state a claim upon which relief can be

**Prukala v. Chase Bank, N.A., Slip Copy (2020)**

2020 WL 5351042

granted under the UTPCPL and the FCEUA. Plaintiff was on notice of these defects after Defendant's initial Motion to Dismiss, but saw fit not to address them. The complaint must be dismissed without leave to amend.

### V. CONCLUSION

Therefore, for the reasons set forth in this Memorandum Opinion, the Court will grant Defendant's Motion to Dismiss with prejudice (Doc. 9). A separate Order follows.

**All Citations**

Slip Copy, 2020 WL 5351042

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

625 Fed.Appx. 594
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Karen SARPOLIS, individually and as administratrix
of the Estate of Angela Anastacia Miller, Appellant

v.

Allan TERESHKO; Heather Tereshko; Post
& Schell, P.C.; Pennsylvania Professional
Join Liability Underwriting Association;
University of Pennsylvania Community Health
Network; Community Health Systems, Inc.;
Chop Newborn Care; Message America, Inc.;
Chestnut Hill Healthcare Medical Associates.

No. 14–3291.
|
Submitted Under Third Circuit
LAR 34.1(a) Nov. 19, 2015.
|
Filed: Jan. 7, 2016.

**Synopsis**

**Background:** Following settlement of her medical malpractice action, plaintiff filed suit against judge who had presided over medical malpractice action, university health care system, and others, asserting federal claims of civil conspiracy and Racketeer Influenced and Corrupt Organizations Act (RICO) violations, and state law claims for fraud and civil conspiracy. Following removal, the United States District Court for the Eastern District of Pennsylvania, 26 F.Supp.3d 407, Petrese B. Tucker, J., dismissed federal claims, exercised supplemental jurisdiction over state law claims, and then dismissed same. Plaintiff appealed.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge, held that:

rule that motion for reconsideration was improper when party failed to raise argument earlier did not apply to determination

whether plaintiff waived appellate review of claim asserted for first time in motion for reconsideration challenging district court's exercise of supplemental jurisdiction over state law claims;

Court of Appeals did not lack jurisdiction to consider issue of supplemental jurisdiction;

district court did not abuse its discretion in exercising supplemental jurisdiction over and dismissing state law claims for fraud;

district court was not required to analyze basis for exercising supplemental jurisdiction over state law claim for fraudulent inducement before dismissing it;

"continuing tort" doctrine did not apply to toll two-year limitations period governing plaintiff's state law claim for fraudulent inducement; and

district court did not abuse its discretion in exercising supplemental jurisdiction over and then dismissing plaintiff's state law claim for civil conspiracy.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*596** Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil Action No. 2–13–cv–005521), District Judge: Honorable Petrese B. Tucker.

**Attorneys and Law Firms**

Todd M. Mosser, Esq., Philadelphia, PA, for Appellant.

David H. Colvin, Esq., Fox Rothschild, John M. Myers, Esq., Johnathan S. Perkins, Esq., Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Stuart T. O'Neal, III, Esq., Burns White, West Conshohocken, PA, Ira L. Podheiser, **\*597** Esq., Burns White, Pittsburgh, PA, for Allan Tereshko; Heather Tereshko; Post & Schell, P.C.; Pennsylvania Professional Join Liability Underwriting Association; University of Pennsylvania Community Health Network; Community Health Systems, Inc.; Chop Newborn Care; Message America, Inc.; Chestnut Hill Healthcare Medical Associates.

Before: AMBRO, HARDIMAN, and NYGAARD, Circuit Judges.

Case 3:20-cv-01446-RDM-MCC    Document 75-2    Filed 03/22/21    Page 180 of 219

OPINION[*]

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

AMBRO, Circuit Judge.

Appellant Karen Sarpolis appeals the dismissal with prejudice of her state-law civil conspiracy and fraud claims. She contends that the District Court erred in exercising supplemental jurisdiction over those claims rather than remanding them to state court. Sarpolis also contends that the District Court erred in dismissing her civil conspiracy claim because the element of malice was adequately pleaded. For the reasons stated below, we affirm the District Court.[1]

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## I. Background

This case stems from a prior medical malpractice action that Sarpolis started in state court. In 2005, she filed a complaint in the Philadelphia Court of Common Pleas alleging that her daughter died as a result of medical malpractice at Chestnut Hill Hospital. In December 2008 and January 2009, certain pretrial motions in the case were assigned to Judge Allan Tereshko, who ordered the parties to attend a settlement conference. After the conference, on January 23, 2009, Judge Tereshko entered an order stating that, as the Court had been informed that the parties had reached a settlement, the case would no longer be listed for trial save that any party could request that it be returned to the trial list by written motion. Although Sarpolis was represented by counsel in the malpractice action, no such motion was filed.

Proceeding *pro se*, Sarpolis began this action in 2013 by filing a complaint against Judge Tereshko in the Philadelphia Court of Common Pleas. In an amended complaint, Sarpolis claimed that Judge Tereshko was part of a wide-ranging conspiracy to defraud her and devalue her malpractice claim, and also named all of the Appellees as defendants, including the University of Pennsylvania Community Health Network, Community Health Systems, Inc., and Post & Schell, P.C.[2] Although the basis of her claims is not altogether clear,

Sarpolis appears to make two central allegations: first, that the University of Pennsylvania and Community Health Systems conspired to avoid liability for malpractice claims in their acquisition of Chestnut Hill Hospital, and did so by "tampering with evidence, witnesses and judges in the pending [malpractice] cases." Am. Compl. at ¶ 18. Second, "*[b]efore* Defendant Allan Tereshko ... perform[ed] any judicial acts, he conspired with Post and Schell, [the Pennsylvania Professional Liability Joint Underwriting Association], and his wife Heather Tereshko to have the case transferred **\*598** to his jurisdiction with the intent to obstruct justice and assist in carrying out the [d]efenses' objectives for disposition of the case." *Id.* at ¶ 45 (emphasis in original). Specifically, Judge Tereshko allegedly failed to disclose that his wife was employed by Post & Schell and to recuse himself on that basis, pressured Sarpolis to accept a low settlement offer, and made the false promise that the case could be easily reinstated if the settlement were not finalized.[3] Sarpolis does not deny that she accepted a tentative settlement in the malpractice action, but she alleges that the settlement never became final because opposing counsel from Post & Schell insisted on unreasonable settlement terms.

[2] Sarpolis' claims against the remaining Appellees are no longer at issue, as by order dated June 29, 2015, we granted motions to affirm the District Court's dismissal of all claims against the Pennsylvania Professional Liability Joint Underwriting Association, Heather Tereshko, and the Children's Hospital of Philadelphia Newborn Care.

[3] While these allegations arise from judicial acts by Judge Tereshko, the parties do not raise the issue of judicial immunity, and because we affirm the dismissal of all claims on other grounds, it is not necessary for us to address it.

Based on these allegations, the amended complaint alleged one count of civil conspiracy and three counts for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). The defendants removed the case to the Eastern District of Pennsylvania and filed motions to dismiss. In Pennsylvania, a civil conspiracy claim requires allegations sufficient to state an independent cause of action underlying the conspiracy, *see McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 660 (Pa.Super.2000), and the District Court liberally construed the amended complaint to allege fraud and fraudulent inducement as the objects of the conspiracy (although the latter claim was first raised in

Sarpolis' briefing). The Court analyzed the fraud claims in conjunction with the civil conspiracy claim and determined that it should be dismissed for four reasons:

(1) [Sarpolis'] underlying claim of fraud is barred by the applicable statute of limitations;

(2) [She] is not entitled to the equitable remedy of statutory tolling because [she] did not exercise due diligence in bringing this action;

(3) to the extent [she] seeks to assert a claim for fraud in the inducement in entering the settlement agreement, [the District Court] is not the proper forum for [her] to bring such a claim; and

(4) [She] has not, and cannot, allege that [the] [d]efendants' sole motivation was to cause her harm.

J.A. at 35A. The District Court dismissed all of Sarpolis' claims, including her federal RICO claims, but did not explain its decision to exercise supplemental jurisdiction over the state-law civil conspiracy and fraud claims.

Sarpolis then moved for reconsideration and requested remand of her state-law claims for the first time. Without waiting for the District Court to decide her motion for reconsideration, however, she filed a notice of appeal. One day after that was filed, the District Court summarily denied the motion for reconsideration. Sarpolis later retained counsel who represents her in this appeal.

## II. Discussion

We begin by addressing Sarpolis' argument that the District Court erred in exercising supplemental jurisdiction over her civil conspiracy and fraud claims. Federal courts may exercise supplemental jurisdiction over claims that share "a common nucleus of operative fact" with claims over which the district court has original jurisdiction. *Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). 28 U.S.C. § 1367(c)(3) confers discretion **\*599** on federal district courts to decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." When exercising this discretion, a district court should not retain supplemental jurisdiction over any remaining state-law claims "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco,* 204 F.3d 109, 123 (3d Cir.2000)

(citation omitted). We review a district court's decision to exercise supplemental jurisdiction for abuse of discretion. *De Asensio v. Tyson Foods, Inc.,* 342 F.3d 301, 311 (3d Cir.2003).

At the outset, Appellees contend that Sarpolis waived the issue of supplemental jurisdiction by failing to raise it until she moved for reconsideration. Although they are unable to cite any case from this Circuit to the effect that issues raised for the first time on reconsideration are waived, Appellees argue that we should nonetheless find waiver based on the well-settled rule that reconsideration is improper when a party should have raised an argument earlier. *See, e.g., United States v. Dupree,* 617 F.3d 724, 732 (3d Cir.2010). This rule applies only to the merits of a motion for reconsideration, however, and does not determine whether an issue is waived on appeal.

Seizing on Sarpolis' failure to comply with Federal Rule of Appellate Procedure 4(a)(4)(B)(ii) by filing an amended notice of appeal after the District Court denied reconsideration, Post & Schell makes two further arguments that the issue of supplemental jurisdiction was waived. First, the firm contends that Sarpolis' failure to file an amended notice of appeal deprives us of jurisdiction over the District Court's order denying reconsideration. Whether an issue has been waived on appeal is a distinct inquiry from our jurisdiction to review a particular order, however, and Post & Schell cites no authority showing that failure to file an amended notice of appeal waives any claims first raised on reconsideration.

Second, relying on *Carrascosa v. McGuire,* 520 F.3d 249 (3d Cir.2008), Post & Schell argues that Sarpolis' failure to file an amended notice of appeal deprives us of jurisdiction to review any arguments first raised on reconsideration. Although in *Carrascosa* the appellant failed to file an amended notice of appeal and the Court stated that we "d[id] not have jurisdiction to review any arguments raised for the first time in Carrascosa's Motion for Reconsideration," *id.* at 254, this statement simply set out the limits of our jurisdiction in a case where the appellant sought to challenge both the denial of reconsideration and the underlying order. In this case, however, Sarpolis challenges only the District Court's exercise of supplemental jurisdiction in the order dismissing her claims. As we are mindful that she was proceeding *pro se* in the District Court, we thus decline to treat as waived the issue of supplemental jurisdiction.

As for that issue, Sarpolis' primary argument is that the District Court erred in exercising supplemental jurisdiction and dismissing her claims without addressing the merits of her claims for fraudulent misrepresentation and fraud in the inducement. Although Sarpolis asserts that the District Court should have ruled on a claim that the University of Pennsylvania and Community Health Services fraudulently misrepresented the funds available to pay malpractice claims against Chestnut Hill Hospital, the amended complaint does not list any counts of fraudulent misrepresentation. The Court liberally construed the amended complaint to state claims of fraud and fraud in the inducement as objects of the conspiracy, and held that the fraud **\*600** claim was time-barred. Sarpolis does not explain how her purported claim of fraudulent misrepresentation is different from the general claim of fraud decided by the District Court, and hence we see no error in the lack of a separate ruling on fraudulent misrepresentation.[4]

[4]   To the extent that Sarpolis contends in a footnote that the District Court's ruling on conspiracy to commit fraud is irrelevant to the fraudulent misrepresentation claim because "[she] did not allege that [the University of Pennsylvania] conspired with [Judge] Tereshko," *see* Reply to Brief for Appellee the University of Pennsylvania at 3 n.1, the amended complaint establishes that this is not the case. *See* Am. Compl. at ¶ 58 (alleging that the University of Pennsylvania and Community Health Systems "conspired" to avoid malpractice liability through fraud, and did so "[w]ith the assistance of all other defendants").

Sarpolis also contends that the District Court erred in exercising supplemental jurisdiction over a claim that she was fraudulently induced to accept the settlement agreement and withdraw her malpractice claim. The Court dismissed the fraudulent inducement claim because it was not the proper forum to hear the claim, as only the Philadelphia Court of Common Pleas could grant Sarpolis relief from a settlement reached in that Court. Although this reasoning does not explain why the District Court chose to exercise supplemental jurisdiction, as Sarpolis had not yet raised the issue, the Court was not required to give a supplemental jurisdiction analysis before dismissing the fraudulent inducement claim. *See Acri v. Varian Assocs.,* 114 F.3d 999, 1000 (9th Cir.1997).

An affirmative justification for exercising supplemental jurisdiction, however, is apparent in the District Court's analysis of the statute-of-limitations defense to Sarpolis'

closely related civil conspiracy claim. The Court reasoned that Sarpolis had failed to state a claim for civil conspiracy because the underlying tort of fraud was time-barred. The Pennsylvania statute of limitations for fraud is two years, 42 Pa. Cons.Stat. Ann. § 5524(7), and although the existence of a conspiracy tolls the statute of limitations, *see Baker v. Rangos,* 229 Pa.Super. 333, 324 A.2d 498, 510 (1974), Judge Tereshko's January 2009 order was the last alleged act of the conspiracy. Similarly, no act of fraudulent inducement is alleged to have occurred after the January 2009 order, and the statute of limitations therefore expired two years before Sarpolis filed this case in 2013.

On appeal, Sarpolis argues that the statute of limitations should be tolled because the alleged insistence of Post & Schell attorneys on unreasonable terms renders the fraudulent inducement claim a continuing tort. This argument fails because the continuing tort doctrine is not applicable to claims of ongoing harm from a completed tort. *See Dellape v. Murray,* 651 A.2d 638, 640 (Pa.Cmwlth.Ct.1994). To the extent that Sarpolis alleges that opposing counsel insisted on unreasonable settlement terms after she had agreed to settle and to withdraw her malpractice claim, their insistence is not part of any fraudulent inducement to accept the settlement and withdraw her claim but rather an ongoing harm to Sarpolis in the form of withholding the promised benefits of the settlement. The continuing tort doctrine is therefore not in play. Because the District Court already had before it the statute-of-limitations issue, remand would merely have wasted judicial resources by requiring the defendants to make substantially the same arguments in state court. The interest of judicial economy thus justified the District Court's retaining jurisdiction over the fraudulent inducement claim. **\*601** *See Blakely v. United States,* 276 F.3d 853, 863 (6th Cir.2002).

Sarpolis' remaining arguments on the issue of supplemental jurisdiction are unpersuasive. Although *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), counsels remand when the statute of limitations prevents a plaintiff from re-filing in state court, the case does not support remand of Sarpolis' state-law claims because they were untimely when filed. The grant of discretion in 28 U.S.C. § 1367(c)(1) to remand claims that "raise[ ] a novel or complex issue of State law" also does not support remand because Sarpolis' claims do not raise such an issue. Finally, it is simply not the case that most courts accept that the proper course is to remand whenever all federal claims are dismissed. We therefore conclude that the District Court did not abuse its discretion in exercising supplemental jurisdiction.

Sarpolis also claims that the District Court erred in dismissing her civil conspiracy claim because the element of malice was adequately pleaded. We exercise plenary review of the District Court's decision to grant a motion to dismiss. *Connelly v. Steel Valley Sch. Dist.,* 706 F.3d 209, 212 (3d Cir.2013). "Proof of malice is an essential part of a cause of action for conspiracy," *Goldstein v. Phillip Morris, Inc.,* 854 A.2d 585, 590 (Pa.Super.Ct.2004), and malice requires that the conspirators act with the sole purpose of injuring the plaintiff. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (1979). Even had Sarpolis sufficiently pleaded that Appellees had the sole purpose of injuring her, she failed to state a civil conspiracy claim because, as the District Court held, the underlying claim of fraud is time-barred. *See Pelagatti v. Cohen,* 370 Pa.Super. 422, 536 A.2d 1337, 1342 (1987) (holding that civil conspiracy claim requires availability of an independent cause of action for the acts alleged).

\* \* \* \* \* \*

The District Court therefore did not err in dismissing Sarpolis' civil conspiracy claim, and it also did not err in exercising supplemental jurisdiction. Thus, we affirm its judgment. [5]

[5]    As we affirm on other grounds, it is not necessary for us to address Post & Schell's argument that Sarpolis' claims are barred by Pennsylvania's absolute privilege against liability for libelous or defamatory statements made in the course of judicial proceedings.

**All Citations**

625 Fed.Appx. 594

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

614 Fed.Appx. 80
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

James E. SCHWARTZ, Appellant

v.

ONEWEST BANK, FSB.

No. 13–4680.
|
Submitted Under Third Circuit
LAR 34.1(a) June 4, 2015.
|
Filed: June 5, 2015.

**Synopsis**
**Background:** Mortgagor, who owned two parcels of land, brought action against mortgage assignee, asserting claims under state law for quiet title, slander of title, violation of the Fair Credit Extension Uniformity Act (FCEUA), violation of the Unfair Trade Practices and Consumer Protection Law (UTPCPL), abuse of process, and intentional interference with existing and prospective contractual relations, arising from assignee's attempts to foreclose on parcel of land that was not subject to the mortgage. The United States District Court for the Eastern District of Pennsylvania, Nitza I. Quinones Alejandro, J., 2013 WL 6037078, granted summary judgment in mortgagor's favor on quiet title claim and dismissed remaining claims for failure to state a claim. Mortgagor appealed.

**Holdings:** The Court of Appeals, Shwartz, Circuit Judge, held that:

assignee's allegedly improper communications were protected by absolute judicial privilege, and

mortgagor failed to state abuse of process claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*81** Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. No. 2–13–cv–00113), District Judge: Hon. Nitza I. Quinones Alejandro.

**Attorneys and Law Firms**

H. Peter Nelson, Esq., Grim, Biehn & Thatcher, Perkasie, PA, for Appellant.

Martin C. Bryce, Jr., Esq., Daniel McKenna, Esq., Ballard Spahr, Brett L. Messinger, Esq., Brian J. Slipakoff, Esq., Duane Morris, Philadelphia, PA, for OneWest Bank, FSB.

Before: FISHER, JORDAN, and SHWARTZ, Circuit Judges.

OPINION [*]

[*]     This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SHWARTZ, Circuit Judge.

James Schwartz brought Pennsylvania state law claims against OneWest Bank, FSB ("OneWest"), based on statements OneWest allegedly made in connection with foreclosure proceedings on Schwartz's property. The District Court dismissed Schwartz's claims, holding that OneWest's statements were protected by Pennsylvania's absolute judicial privilege and that Schwartz's abuse of process claim was inadequately pled. We will affirm.

I

We draw the following facts from Schwartz's First Amended Complaint ("FAC"), accepting them as true in accordance with our standard of review. Schwartz owns two parcels of land in Tinicum Township, Pennsylvania: approximately thirty acres on the north side of Hollow Horn Road (the "North 30 Parcel") and approximately twenty acres on the south side of Hollow Horn Road (the "South 20 Parcel"). Schwartz executed a note and mortgage on the North 30 Parcel in 2007, and OneWest acquired the mortgage by assignment in 2010 (the "Assignment"). OneWest filed a

foreclosure action against Schwartz in Pennsylvania state court, asserting that the mortgage "covers both the South 20 Parcel and the North 30 Parcel," and OneWest's counsel "continu[ed] to assert this position" in communications to Schwartz's counsel. **\*82** App. 31. OneWest sought a default judgment against Schwartz and a "Sheriff Sale" of Schwartz's properties in connection with the foreclosure action, "not recognizing that only the North 30 Parcel is subject to the" mortgage. App. 30. The FAC alleges that OneWest's actions thwarted Schwartz's attempted sale of the parcels to Schmidt Properties, LLC, and of development rights on the properties to Tinicum Township.

Based on these facts, Schwartz asserted the following causes of action: quiet title and a "declaratory judgment," seeking a declaration "that the only property subject to the [mortgage] is the North 30 Parcel" (Counts I & II), App. 31–32; slander of title (Count III); violation of the Fair Credit Extension Uniformity Act ("FCEUA"), 73 Pa. Stat. Ann. § 2270.1 *et seq.* (Count IV); violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. § 201–1 *et seq.* (Count V); abuse of process (Count VI); and intentional interference with existing and prospective contractual relations (Counts VII & VIII).

OneWest moved to dismiss the FAC in its entirety for failure to state a claim, and Schwartz cross-moved for summary judgment as to Counts I and II. The District Court entered judgment in favor of Schwartz on Counts I and II, concluding that, as OneWest conceded, the mortgage applied only to the North 30 Parcel, and granted OneWest's motion to dismiss Counts III through VIII. The District Court reasoned with respect to all but the abuse of process claim that Schwartz's causes of action depended on "alleged misrepresentations made during the course of the foreclosure action," including the filing of the foreclosure action itself and the communications between OneWest's counsel and Schwartz's counsel, and that these alleged misrepresentations were not actionable under Pennsylvania's absolute judicial privilege. App. 19. With respect to the abuse of process claim, the District Court reasoned that the FAC failed to state a claim under Pennsylvania law because it merely alleged that OneWest commenced the foreclosure action for an improper purpose, and commencement of an action alone does not provide a basis for an abuse of process claim. Schwartz appeals. [1]

[1] The District Court had jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction under 28

U.S.C. § 1291. We exercise plenary review over the District Court's grant of OneWest's motion to dismiss, accepting the facts alleged in the FAC as true. *Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.,* 694 F.3d 340, 350 (3d Cir.2012).

II

A

We first address the District Court's dismissal of all claims but the abuse of process claim on the ground that they depended on communications protected by Pennsylvania's absolute judicial privilege. "The judicial privilege ... extends to 'communications [ (1) ] which are issued in the regular course of judicial proceedings and [ (2) ] which are pertinent and material to the redress or relief sought.' " *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 311 (3d Cir.2003) (quoting *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 355 (1986)). This privilege sweeps broadly to protect "[a]ll communications pertinent to any stage of a judicial proceeding," *Binder v. Triangle Publ'ns, Inc.,* 442 Pa. 319, 275 A.2d 53, 56 (1971), including "not only ... communications made in open court, but also ... pleadings and even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest," *Richmond v. McHale,* **\*83** 35 A.3d 779, 785 (Pa.Super.Ct.2012) (internal quotation marks and emphasis omitted). Although the judicial privilege most often bars defamation suits, Pennsylvania courts have applied the privilege broadly to confer "immunity from civil liability in the context of judicial proceedings." *Moses v. McWilliams,* 379 Pa.Super. 150, 549 A.2d 950, 956–57 (1988).

Here, all of Schwartz's claims arise from the foreclosure action and communications that occurred in connection with that action, namely the foreclosure complaint, the related sale notices posted as a result of the state court judgment in the foreclosure action, *see* Pa. R. Civ. P. 3129.1, and communications between OneWest's and Schwartz's attorneys that directly pertained to the foreclosure action, *see* App. 29–30, 33. [2] These communications reflected counsel's efforts to share their clients' litigation positions regarding OneWest's assertion that the mortgage covered both parcels, and thus were "pertinent and material to the redress or relief sought" in the foreclosure case. *Post,* 507 A.2d at 355; *see,*

*e.g., Richmond,* 35 A.3d at 784, 786 (holding statement "made by one attorney to another during a discussion regarding discovery in a pending case" was privileged, as it "was made in connection with [the attorney's] representation of his client in a judicial proceeding"). Thus, we will affirm the District Court's dismissal of all claims, other than the abuse of process claim, on the ground that the allegedly improper communications that form the basis for these claims are protected by the judicial privilege. [3]

2    In his brief, Schwartz also contends that statements made in the Assignment, which are unconnected to any judicial proceeding, are not privileged. Although the Assignment is attached to the FAC, the FAC includes no allegations based upon it and mentions it only once in passing to explain why OneWest may be liable for claims associated with the mortgage. Thus, the District Court did not err by declining to consider the Assignment as a basis for liability. *Cf. Frederico v. Home Depot,* 507 F.3d 188, 201 (3d Cir.2007) (declining to consider factual allegations in plaintiff's briefs that provided more specificity than her complaint, as "we do not consider after-the-fact allegations in determining the sufficiency of ... complaint[s]").

3    We need not decide whether the judicial privilege applies to the tort of abuse of process based upon these communications, *see Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 312 (3d Cir.2003), as we will affirm with respect to that claim on a different basis, as discussed in II.B. *infra.*

**B**

We next address the District Court's dismissal of the abuse of process claim. Under Pennsylvania law, "abuse of process is the improper use of process after it has been issued." *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020, 1023 (1987) (internal quotation marks omitted). Thus, merely "initiati [ng] ... litigation for a wrongful purpose" alone is not actionable. *Rosen v. Tesoro Petroleum Corp.,* 399 Pa.Super. 226, 582 A.2d 27, 33 (1990) (internal quotation marks omitted) (concluding plaintiffs failed to state a claim for abuse of process where they "merely complain that

'defendant issued and served process on the plaintiffs' for various improper and ulterior purposes" but did not include "any allegation of a coercive use of the process").

Here, Schwartz's abuse of process claim relies entirely on OneWest's filing of the foreclosure action itself, asserting that it was filed for the improper purpose of "attempt[ing] to unlawfully gain ownership of [the] South 20 Parcel." App. 39. An abuse of process claim bars the use of process invoked "to coerce a desired result that is not the legitimate object of the process." *McGee,* 535 A.2d at 1026. The **\*84** purpose of the process was to foreclose on the property, an authorized goal of the procedure. Schwartz has not alleged any act "not authorized by" or that perverted the process. *Rosen,* 582 A.2d at 32 (internal quotation marks omitted); *see also Gen. Refractories,* 337 F.3d at 304 ("A perversion of legal process occurs when a party uses the process primarily to accomplish a purpose for which the process was not designed." (internal quotation marks omitted)). Thus, even if the foreclosure action was based on incorrect facts, the allegations in the FAC do not demonstrate that the process was pursued to achieve an unauthorized purpose. *See Gen. Refractories,* 337 F.3d at 304. Thus, Schwartz fails to state a claim for abuse of process.

**C**

Finally, we address Schwartz's argument that the District Court abused its discretion by failing to offer him leave to amend the FAC, despite the fact that, as Schwartz concedes, he did not request leave to amend before the District Court. In this non-civil rights case, the District Court is not required to sua sponte offer an amendment. *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252–53 (3d Cir.2007). Thus, Schwartz's claim that the District Court erred by not allowing him to amend his complaint fails.

**III**

For the foregoing reasons, we will affirm the judgment of the District Court.

**All Citations**

614 Fed.Appx. 80

**Footnotes**

End of Document                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7009007
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Lorayne E. SOUDERS, Plaintiff

v.

BANK OF AMERICA, et al., Defendants.

Civil Action No. 1:CV–12–1074.
|
Dec. 6, 2012.

**Attorneys and Law Firms**

Lorayne E. Souders, Etters, PA, pro se.

Andrew J. Soven, Reed Smith LLP, Philadelphia, PA, for
Defendants.

### *REPORT AND RECOMMENDATION*

THOMAS M. BLEWITT, United States Magistrate Judge.

### I. BACKGROUND.

**\*1** On June 6, 2012, *pro se* Plaintiff Lorayne E. Souders'
Complaint, originally filed in the Pennsylvania Court of
Common Pleas, York County Civil Division under the Docket
Number 2012–SU–001845–93, was removed to the United
States District Court for the Middle District of Pennsylvania,
by Defendants Bank of America, Bank of New York,
Mellon Trustee CWABS 2007–12 Asset–Backed Certificates
(hereinafter "Bank of New York, Mellon"), and MERSCORP
(hereinafter "MERS") by Notice of Removal under 28 U.S.C.
§ 1446(d). (Doc. 1). Attached to the Notice of Removal,
as required by 28 U.S.C. § 1446(a), marked as Exhibit
A is Plaintiff's Complaint. (Doc. 1, p. 2). Also, Plaintiff's
Complaint had Exhibits attached to it, namely, Exhibits A to
C. Defendants based their Notice of Removal on the following
statutes: (1) diversity jurisdiction under 28 U.S.C. §§ 1332(a)
(1) and 1441(b); and (2) federal question jurisdiction under 28
U.S.C. § 1331, as Plaintiff asserts claims for damages under
two federal statutes, the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq,* and the
Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C.
§ 1692, *et seq.* (Doc. 1, p. 4; Exhibit A, Complaint ¶¶ 2,
3, and 9 and Requests for Relief ¶¶ 2–4). This case was

then referred to the undersigned for issuance of a Report and
Recommendation.

On June 7, 2012, Disclosure Statements pursuant to Federal
Rule of Civil Procedure 7.1 were provided identifying each
of the three Defendants, and on June 11, 2012, Plaintiff filed
a Demand for a Trial by Jury. (Docs. 2 & 5, respectively).

On June 13, 2012, Defendants filed a Motion to Dismiss
Plaintiff's Complaint pursuant to Fed.R.Civ.P. 12(b)(6). **(Doc.
6).** On June 20, 2012, Defendants filed a Brief in Support
of their Motion to Dismiss with an attached Exhibit and
an Appendix consisting of copies of unpublished decisions.
(Doc. 8). On July 2, 2012, Plaintiff filed a Brief in Opposition
to Defendants' Motion to Dismiss (Doc. 9), and on July 13,
2012, Defendants responded to Plaintiff's Opposition Brief by
filing a Reply Brief. (Doc. 12).

On July 16, 2012, Plaintiff then filed an Addendum to her
Document 9 Brief in Opposition. (Doc. 13). On July 20, 2012,
Defendants then filed an Unopposed Motion for Leave to File
a Response to Plaintiff's Addendum. (Doc. 14). Defendants'
Document 14 motion was granted by an Order of the Court.
(Doc. 15). On July 26, 2012, Defendants filed their Response
to Plaintiff's Document 13 Addendum. (Doc. 16). On August
2, 2012, Plaintiff filed an Addendum containing information
being entered into the case as a matter of record. (Doc.
17). Lastly, on October 5, 2012, Plaintiff filed a Motion for
Judicial Notice. (Doc. 19).

We now turn to discuss the Defendants' Document 6 Motion
to Dismiss Plaintiff's Complaint and the documents that
followed in relation and response to this Motion (Docs. 8, 9,
12, 13, and 16).

### II. STANDARD OF REVIEW.

#### *A. MOTION TO DISMISS*

**\*2** In *Reisinger v. Luzerne County,* 712 F.Supp.2d 332,
343–44 (M.D.Pa.2010), in describing the motion to dismiss
standard, the Court stated:

The Third Circuit Court of Appeals recently set out the
appropriate standard applicable to a motion to dismiss
in light of the United States Supreme Court's decisions
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 433 (2007),
and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173
L.Ed.2d 868 (2009). "[T]o survive a motion to dismiss, a
complaint must contain sufficient factual matter, accepted

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7009007

as true to 'state a claim that relief is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 570). The Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. Moreover, it continued, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). *McTernan v. City of York,* 577 F.3d 521, 530 (3d Cir.2009). The Circuit Court discussed the effects of *Twombly* and *Iqbal* in detail and provided a road map for district courts presented with a motion to dismiss for failure to state a claim in a case filed just a week before *McTernan, Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009).

[D]istrict courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*Iqbal,* 129 S .Ct. at 1949.] Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege a plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Philips [v. Co. of Allegheny* ], 515 F.3d [224,] 234–35 [ (3d Cir.2008) ]. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1949. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. Fowler,* 578 F.3d at 210–11.

The Circuit Court's guidance makes clear that legal conclusions are not entitled to the same deference as well-pled facts. In other words, "the court is 'not bound to accept as true a legal conclusion couched as a factual allegation.' " *Guirguis v. Movers Specialty Services, Inc.,* No. 09–1104, 2009 WL 3041992, at *2 (3d Cir. Sept.24, 2009) (*quoting Twombly,* 550 U.S. at 555) (not precedential).

**\*3** Where the parties submit exhibits with their filings, a court must determine what documents may be considered with a motion to dismiss. In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Third Circuit Court of Appeals had

held that "a court can consider certain narrowly defined types of material without converting the motion to dismiss" to one for summary judgment. *In re Rockefeller Center Properties, Inc. Securities Litigation,* 184 F.3d 280, 287 (3d Cir.1999). Specifically, a court can consider "a document integral to or explicitly relied upon in the complaint ... [and] an indisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (*Id.* (internal citations and quotation omitted)). The Circuit Court explained the rationale for these exceptions: "the primary problem raised by looking to documents outside the complaint-lack of notice to the plaintiff-is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint." FN11 *Id.* (internal citations and quotations omitted)). Matters of public record, including government agency records and judicial records, may be considered. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 257 n. 5 (3d Cir.2006) (citation omitted); *Pension Benefit Guarantee Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993).

*See also Santiago v. Warminster Tp.,* 629 F.3d 121, 133 (3d Cir.2010).

### III. ALLEGATIONS OF COMPLAINT.

Plaintiff's Complaint was originally filed on April 30, 2012, in the Pennsylvania Court of Common Pleas, York County Civil Division, Docket No. 2012–SU–001845–93. As stated, Defendants filed a Notice of Removal on June 6, 2012, in this Court. Plaintiff's Complaint filed in the Court of Common Pleas, York County Civil Division, was attached to Defendants' Notice of Removal as Exhibit A. Defendants' Motion to Dismiss Plaintiff's Complaint will be addressed in this Report and Recommendation.

In her Complaint, Plaintiff alleges that on June 26, 2007, she executed an Adjustable Rate Note and a Mortgage refinance with Countrywide Home Loans (n/k/a Bank of America) for one hundred twenty thousand dollars ($120,000.00). (Doc. 1, Complaint, ¶ 11, and attached Exhibit "A"). However, when Plaintiff went to the York County Register of Deeds office, she discovered that on October 14, 2011, her mortgage had been assigned by MERS to Bank of New York, Mellon Trustee to CWABS 2007–12 Asset–Backed Certificates. (Complaint, ¶ 12, Exhibit "B").

Based on these facts, Plaintiff alleges Defendants are liable for fraud, misrepresentation, and deceptive and unfair trading

Souders v. Bank of America, Not Reported in F.Supp.2d (2012)

2012 WL 7009007

practices. (Complaint, ¶ 8). More specifically, she states that her loan number 171186255 was verified as being listed in the Securities and Exchange Commission's website, and that once the loan was sold to investors on Wall Street, thereby secured and converted, it lost its security making the assignment of the loan from MERS to the Bank of New York, Mellon after August 1, 2007 (allegedly the cut-off date for mortgage assignments to enter the pool according to the Trust, CWABS 2007–12, prospectus page 7) invalid, improper, fraudulent, and, according to Plaintiff, in violation of "New York Law." (Complaint, ¶¶ 13–14).

**\*4** Plaintiff also questions the Mortgage's legitimacy based on the "law of 1871, Cannot separate the Note from the Mortgage," averring that if the Mortgage was never correctly endorsed by all parties according to the Trust's pooling and servicing agreement or if the Note was not conveyed with the Mortgage, the Mortgage becomes null and void. (Complaint, ¶ 15).

Additionally, Plaintiff states that there is no evidence that Countrywide endorsed the Note to anyone or that the Mortgage was properly assigned to the present purported holder-in-due-course Bank of New York, Mellon. She states that this alleged lack of evidence that the Note was endorsed puts the Note out of eligibility and makes the Mortgage null and void. (Complaint, ¶¶ 15–16).

Furthermore, Plaintiff alleges that Defendants fraudulently "concealed their wrongdoings and prevented Plaintiff from discovering her cause of action" and that she "has been injured by the fraud by Defendants and has remained in ignorance of it without any fault or want of diligence or care on her part." (Complaint, ¶¶ 17–18). She also states that Defendants made misleading statements "that the loan contained certain terms desirable to the consumer when it did not" and that "Defendant's use of deceit or trickery caused Plaintiff to act to her disadvantage." (Complaint, ¶¶ 19–20).

As relief, Plaintiff requests the following: (1) judgment against Defendants as jointly and severally liable for all issues in excess of one million dollars ($1,000,000.00); (2) costs and attorneys fees pursuant to 18 U.S.C. § 1964(c) and 18 U.S.C. § 1692(k); (3) actual and statutory damages for FDCPA violations under 18 U.S.C. § 1692(k); (4) rescission of the mortgage and note amount to clear title to property with fixtures; (5) damages for "unfair and deceptive acts and practices"; (6) damages in the amount of three times the interest paid and clear title to the property stemming from "the exorbitant interest"; (7) return of down payment and other payments as well as interest on the above matter; (8) cost of litigation pursuant to 15 U.S.C. § 1601 *et. seq.;* (9) pre-judgment and post-judgment interest at the maximum rate allowable by law; (10) compensatory and punitive damages; (11) punitive damages as allowed by law; and (12) any relief the court deems just and appropriate. (Complaint, Requests for Relief ¶¶ 1–13).

## IV. RESPONSIVE PLEADINGS.

### *A. MOTION TO DISMISS*
In response to Plaintiff's Complaint, Defendants filed a Motion to Dismiss and Brief in Support. (Docs. 6 and 8, respectively). Defendants state that Plaintiff alleges she executed a Note and Mortgage in favor of the original lender, Countrywide Home Loans, n/k/a Defendant Bank of America, for one hundred twenty thousand dollars ($120,000.00), on June 26, 2007. (Doc. 8, p. 3). Defendants avers that according to Plaintiff's Complaint, Exhibit "A" shows that MERS was the named mortgagee on the Mortgage, as nominee for Lender Countrywide Home Loans, Inc. (*Id.*). Defendants then aver that on October 14, 2011, MERS assigned the Mortgage to Bank of New York, Mellon, Trustee to CWABS, 2001–12 Asset Backed Certificates. (*Id.*). On October 24, 2011, the Assignment was recorded by the York County Recorder of Deeds. (*Id .*).

**\*5** In their Brief, Defendants presented the following "Statement of Questions Involved":

1. Should Plaintiff's Complaint be dismissed with prejudice for lack of standing to challenge the Mortgage Assignment on which her entire claim is based?

   Suggested Answer: Yes.

2. Should Plaintiff's Complaint be dismissed with prejudice for failure to state any claim upon which relief may be granted?

   Suggested Answer: Yes.

3. Does Plaintiff's Complaint fail to comply with Federal Rule of Civil Procedure 8(a)?

   Suggested Answer: Yes.

4. Should the lis pendens be stricken upon dismissal or in the alternative on equitable grounds?

Case 3:20-cv-01446-RDM-MCC   Document 75-2   Filed 03/22/21   Page 193 of 219
Souders v. Bank of America, Not Reported in F.Supp.2d (2012)
2012 WL 7009007

Suggested Answer: Yes.

(Doc. 8, p. 5).

Therefore, Defendants argue that Plaintiff's Complaint should be dismissed with prejudice based on three (3) grounds: (1) lack of standing; (2) failure to state both a RICO and FDCPA claim in accordance with 12(b)(6); and (3) failure to comply with Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. (*Id.*). Defendants also aver that because the Complaint should be dismissed with prejudice, the Lis Pendens Plaintiff filed against Defendants in state court should be stricken upon dismissal or, alternatively, on equitable grounds. (*Id.*, p. 14). As Exhibit 1 to their Brief (Doc. 8), Defendants attached a copy of the Notice of Lis Pendens Plaintiff filed against them on June 1, 2012, in the Court of Common Peals of York County. (Doc. 8–1).

### B. PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

On July 2, 2012, Plaintiff filed a Brief in Opposition to Defendants' Motion to Dismiss. (Doc. 9). In this brief, Plaintiff avers that Defendants' Motion to Dismiss is untimely because Defendants received a copy of the Complaint filed with the Court of Common Pleas of York County on May 4, 2012, but untimely filed their Notice of Removal on June 6, 2012, and their Motion to Dismiss on June 13, 2012, because both documents were filed after the thirty (30) day time period to respond to the Complaint expired. (Doc. 9, p. 1). Plaintiff also asserts that Defendants have "committed fraudulent acts upon the Plaintiff," under the following statutes: (1) mortgage fraud under 12 CFR § 1731.2; (2) forging endorsements under 18 U.S.C. § 510; (3) counterfeit endorsements under 18 U.S.C. § 473; (4) fraudulent destruction under 18 Pa.Cons.Stat. § 4103; (5) Article 9 of the UCC; (6) notary fraud in the State of California; and (7) a RESPA violation under 12 U.S.C. § 2605. (Doc. 9, pp. 1–2). Regarding the RESPA claim, Plaintiff argues that because Defendants failed to provide verified and certified copies and "originals" of the debt proof Plaintiff requested, Defendants were in violation of RESPA. (Doc. 9, pp. 1–2). However, because Plaintiff did not raise any of these new claims in her original Complaint, she is precluded from raising them in her Brief in Opposition, but rather would have to file a Motion to Amend her Complaint and a support brief. *See* Fed.R.Civ.P. 15.

**\*6** In *Commonwealth of Pennsylvania ex. rel. Zimmerman v. PepsiCo, Inc.*, the Third Circuit stated "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." 836 F.2d 178, 181 (3d Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1984)).

Therefore, based on the *Commonwealth of Pennsylvania ex. rel. Zimmerman* rationale, any claims Plaintiff has not raised in her Complaint, but has attempted to raise in her Brief in Opposition and subsequent Addendums to her Brief in Opposition, will not be considered by the undersigned in this Report and Recommendation.

Furthermore, in her Brief in Opposition, Plaintiff asks the Court to "sustain [ ] a Motion for Default Judgment." (Doc. 9, p. 5). We will recommend that this request be denied since Plaintiff has not complied with Rule 55 of the Federal Rules of Civil Procedure, which governs Default and Default Judgment procedure. An entry of default under Rule 55(a) of the Federal Rules of Civil Procedure must precede an entry of default judgment under Rule 55(b)(2). *See Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.,* 175 Fed. App'x 519, 521 n. 1 (3d Cir.2006). In the present case, there has not been default entered against Defendants. Thus, Plaintiff cannot request default judgment against Defendants. In the case at hand, the Clerk has not entered default against Defendants, nor has Plaintiff filed a Motion for Entry of Default with an accompanying Support Brief as required by Middle District Local Rule 7.5. While Plaintiff states that the Court must enter default judgment against Defendants based on her argument that Defendants failed to timely file their Notice of Removal and subsequent Motion to Dismiss, we find that the entry of default judgment against Defendants is not appropriate as discussed above. Also, as discussed below, Plaintiff waived her claim that Defendants did not timely remove this case from state court when she failed to timely move to remand the case to state court.

Therefore, we will recommend that Plaintiff's request for Default Judgment against Defendants be denied.

### C. DEFENDANTS' REPLY BRIEF

On July 13, 2012, Defendants filed a Reply in Support of their Document 6 Motion to Dismiss Plaintiff's Complaint. (Doc. 12). Defendants argue that, first of all, Plaintiff's Opposition Brief did not provide a basis for denying their Motion to Dismiss. As discussed hereinafter, we agree with Defendants

2012 WL 7009007

that Plaintiff failed to provide a basis for denying Defendants'
Motion to Dismiss. Rather, Plaintiff, as discussed above,
improperly attempted to raise new claims in her Opposition
Brief, and failed to provide any factual information or
arguments in response to Defendants' Motion to Dismiss or in
support of her claims raised in her Complaint.

In their Reply Brief, Defendants also respond to Plaintiff's
Opposition Brief argument that Defendants' Notice of
Removal and subsequent filings were untimely and therefore
should be dismissed. Plaintiff also states that this case
should be remanded back to state court based on Defendants'
untimely removal of it. Defendants state that Plaintiff waived
her right to challenge the timeliness of their Removal and
subsequent filings because Plaintiff did not timely file a
motion to remand the case to state court within thirty days
of its removal, and she did not file objections to Defendants'
Notice of Removal. (Doc. 12, p. 1). We address Defendants'
removal of this case from state court to federal court below
regrading Plaintiff's Addendum.

 **\*7** Furthermore, Defendants argue that Plaintiff's
Opposition Brief RESPA claim is irrelevant to the issues at
hand in the Motion to Dismiss because Plaintiff failed to
file any such RESPA claim in her Complaint, and had not
amended her pleadings to contain a RESPA claim. (Doc. 12,
p. 2). Lastly, Defendants aver that in her Opposition Brief,
Plaintiff has failed to properly raise a fraud claim against
Defendants in an attempt to defeat their Motion to Dismiss
because she has failed to state both a RICO and FDCPA
claim. (*Id.*). Defendants claim that Plaintiff has failed to
satisfy Rule 9(b)'s factual specificity requirements for a fraud
claim, and that Plaintiff's attempt to justify her fraud claim
based on a case from New Jersey is irrelevant because in
that case, the plaintiff survived a 12(b) Motion to Dismiss
due to specific allegations regarding a loan modification.
However, Plaintiff has only alleged generalized allegations
of "bad faith" in Plaintiff's Complaint and Opposition Brief
without supporting her allegations with factual specificity.
(Doc. 12, p. 3).

### D. PLAINTIFF'S ADDENDUM TO HER
### OPPOSITION BRIEF
On July 16, 2012, Plaintiff filed, sans leave of court, an
Addendum to her Opposition Brief. (Doc. 13). In this
Addendum, Plaintiff attempted to clarify her argument that
Defendants' Notice of Removal was not timely and therefore
the Court should remand this case to state court. Plaintiff
states that Defendants Bank of America and MERS received

the Complaint on May 3, 2012, and Defendant Bank of
New York, Mellon received the Complaint on May 4, 2012.
Plaintiff attached Exhibits showing service on Defendants to
her Doc. 13 Addendum. Plaintiff argues that in their Notice of
Removal filed on June 6, 2012, Defendants incorrectly stated
that they received the Complaint on May 7, 2012, and that
because Defendants did not file the Notice of Removal until
after the thirty (30) day responsive pleading time period had
concluded, the Complaint should be remanded back to the
Court of Common Pleas, York County Civil Division. (Doc.
13, p. 2). More specifically, Plaintiff refers to 28 U.S.C. §
1446(b)(1), which states the following:

> (b) Requirements; Generally.-
>
> (1) The notice of removal of a civil action or proceeding
>     shall be filed within 30 days after the receipt by the
>     defendant, through service or otherwise, of a copy of
>     the initial pleading setting forth the claim for relief upon
>     which such action or proceeding is based, or within 30
>     days after the service of summons upon the defendant
>     if such initial pleading has then been filed in court and
>     is not required to be served on the defendant, whichever
>     period is shorter.

(Doc. 13, p. 2).

Therefore, Plaintiff is arguing that based on 28 U.S.C. §
1446(b) (1), because Defendants did not filed their Notice
of Removal until June 6, 2012, after the thirty (30) day
time period had concluded, Defendants Notice of Removal
and subsequent Motion to Dismiss were not timely filed and
therefore should be dismissed and the case remanded back to
the Court of Common Pleas of York County.

### E. DEFENDANTS' RESPONSE TO PLAINTIFF'S
### ADDENDUM
 **\*8** On July 20, 2012, upon an Order granting Defendants
leave to respond to Plaintiff's Addendum, Defendants filed
a Response to Plaintiff's Document 13 Addendum. (Doc.
16). In their response, Defendants aver that Plaintiff lost her
opportunity to argue that Defendants' Notice of Removal was
untimely filed because Plaintiff failed to file a Motion to
Remand within thirty (30) days after Defendants filed their
Notice of Removal as required by 28 U.S.C. § 1447(c). (Doc.
14–1, p. 3; Doc. 16, p. 2).

We agree with Plaintiff that Defendants did not timely file
their Notice of Removal. Defendants now concede (Doc. 16,

Souders v. Bank of America, Not Reported in F.Supp.2d (2012)

2012 WL 7009007

p. 2, n. 2) that Plaintiff (Doc. 13) is correct with respect to her assertion that the last Defendant in this case was served on May 4, 2012, not on May 7, 2012, as Defendants previously stated, and that Defendants' Notice of Removal filed on June 6, 2012, was not timely.

However, as Defendants correctly point out (Doc. 12, p. 1), Plaintiff failed to file a motion to remand this case back to state court. Defendants contend that since Plaintiff failed to timely file a motion to remand case back to state court within thirty days of its removal, that her case had to remain in federal court even though their removal was not timely filed since this was a procedural defect and not a jurisdictional defect under *Ariel Land Owners, Inc. v. Dring,* 351 F.3d 611, 614 (3d Cir.2003). (Doc. 16, p. 2).

28 U.S.C. § 1447 addresses procedure after removal, and § 1447(c) states that "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)." 28 U.S.C. § 1447(c); *see also Ramos v. Quien,* 631 F.Supp.2d 601, 606–607 (E.D.Pa.2008). Defendants point to several Third Circuit cases in which the Court refused to determine whether a defendant's notice of removal was filed more than thirty (30) days after the receipt of the complaint because, absent of any subject matter jurisdiction defects, the plaintiff had waived objection to removal by virtue of plaintiff's failure to timely file a motion to remand within the thirty (30) day time period required by 28 U.S.C. § 1447(c). (Doc. 14–1, pp. 3–4; Doc. 16, p. 2–3). *See Ariel Land Owners v. Dring,* 351 F.3d 611 (3d Cir.2003) (holding that 28 U.S.C. § 1447(c) "is clear that, if based on a defect other than [subject matter] jurisdiction, remand may only be effected by a timely motion" brought within thirty (30) days of the notice of removal filing.); *see also Farina v. Nokia, Inc.,* 625 F.3d 97 (3d Cir.2010) (The Court refused to determine whether defendant's removal notice was filed more than thirty (30) days after the Complaint's receipt because Plaintiff failed to file a Motion to Remand within the thirty (30) days after the filing of the Notice of Removal and therefore waived objection to removal); *see also McGlinchey v. Hartford Acc. & Indem. Co.,* 866 F.2d 651 (3d Cir.1989) ("In particular, it is well established that the 30–day time limit for removal in the first paragraph of 1446(b) is procedural, and that a case may not be remanded for failure to comply with the 30–day time limit absent a timely motion.").

**\*9**  As such, we agree with Defendants that because Plaintiff failed to timely file a motion to remand within the thirty (30) day time period after Defendants filed their Notice of Removal, and because Plaintiff's argument contesting Defendants' removal notice as untimely is based on a procedural defect, not a subject matter jurisdiction defect, and we find that this case should not be remanded to state court as Plaintiff requests. *See Ramos v. Quien,* 631 F.Supp.2d 608("A motion to remand based on an objection to a procedural defect in the removal process is clearly waived it if is not raised within thirty days after the filing of the notice of removal.") (citations omitted). Therefore, because Plaintiff has waived her opportunity to oppose Defendants' removal of this case to the Middle District of Pennsylvania, this case should remain in federal court. Thus, we will address the merits of Defendants' Motion to Dismiss.

Furthermore, we note that based on the aforementioned *Zimmerman* rationale that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," in our analysis of Defendants' Motion to Dismiss and the subsequent briefs and addendums that Plaintiff filed, we will not be addressing the claims or relief requests that Plaintiff attempted to raise in her briefs and addendums, but had failed to raise in her Complaint. *See Ex. rel. Zimmerman, supra.* Therefore, we will respectfully recommend that the following claims and relief requests raised by Plaintiff in her Opposition Brief and Addendums, but not raised in her Complaint, be dismissed with prejudice: (1) Mortgage Fraud under 12 CFR § 1731.2; (2) Forging Endorsements under 18 U.S.C. § 510; (3) Counterfeit Endorsements under 18 U.S.C. § 473; (4) Fraudulent destruction under 18 Pa.Cons.Stat. § 4103; (5) Article 9 of the UCC; (6) Notary Fraud in the State of California; (6) a RESPA violation under 12 U.S.C. § 2605; and (7) a request for default judgment against Defendants. Furthermore, we have already addressed the timeliness of removal issue, and, therefore, we will not be addressing that issue in the discussion that follows. Instead, we will be analyzing the following issues raised by Defendants in their Motion to Dismiss and Plaintiff's direct responses to these issues, including: (1) standing; (2) failure to state both a RICO and FDCPA claim under 12(b)(6); (3) rescission of the mortgage as a remedy; and (4) violations of Rules 8(a) and 9 of the Federal Rules of Civil Procedure.

# V. DISCUSSION.

## A. STANDING

### 1. Assignment of Mortgage

Souders v. Bank of America, Not Reported in F.Supp.2d (2012)

2012 WL 7009007

As mentioned, Plaintiff essentially challenges the validity of a Mortgage Assignment. Plaintiff asserts claims under RICO and the FDCPA in connection with the Mortgage Assignment. Since we have detailed the allegations of Plaintiff's Complaint above, we do not repeat them. (*See also* Doc. 8, pp. 3–4).

First, we turn Defendants' argument that Plaintiff's Complaint alleging improper assignment of her mortgage based on an alleged assignment "cut-off date" should be dismissed because Plaintiff lacks standing to challenge the Assignment of the Mortgage in the first place. (Doc. 8, p. 7). Defendants argue that Plaintiff lacks standing because the mortgage assignment is a contract to which she is not a party or third-party beneficiary, therefore Plaintiff is effectively barred from filing any claims challenging the validity of the mortgage assignment. (*Id.*); *see* 6 Am.Jur.2d Assignments § 1 (an assignment is a contract); *see also Ira G. Steffy & Son, Inc.,* 7 A.3d 278, 287–88 (Pa.Super.Ct.2010) (a plaintiff does not have standing to challenge alleged misconduct if a plaintiff is not a party to or third-party beneficiary of the contract that is the basis for a plaintiff's claims); *see also Shuster v. Pa. Turnpike Commonwealth,* 395 Pa. 441, 149 A.2d 447, 452 (1953) (one who is not a party to a contract lacks standing to argue that the contract is invalid).

**\*10** The Third Circuit has held that "[t]o satisfy the Article III case or controversy requirement, a Plaintiff must establish that he or she has suffered an 'injury in fact' that is both 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Doe ex rel. v. Lower Merion School Dist.,* 665 F.3d 524, 542 (3d Cir.2011) (citation omitted). Thus, in addressing Defendants' contention that Plaintiff does not have standing to challenge the validity of the assignment of her mortgage, initially we must determine if Plaintiff can show that she has suffered or will suffer "injury in fact." "If a borrower cannot demonstrate potential injury from the enforcement of the note and mortgage by a party acting under a defective assignment, the borrower lacks standing to raise the issue." *In re Walker,* 466 B.R. 271, 285–86 (Bkrtcy.E.D.Pa.2012) (citations omitted).

Plaintiff does not allege that she is a party to the mortgage assignment made on October 14, 2011, nor does the mortgage assignment state that she is either a party to or third-party beneficiary of the assignment. (Complaint, Ex. "B"). In order for Plaintiff to be considered a third-party beneficiary to the mortgage assignment, the assignment would have had to explicitly state intent to name Plaintiff a third-party beneficiary to the assignment. *Ira G. Steffy & Son, Inc., supra.*

However, in examining the language of the Assignment of Mortgage, Plaintiff is not a stated party of the Assignment of Mortgage nor does the Assignment of Mortgage explicitly state its intent to afford Plaintiff third-party beneficiary status. The October 14, 2011 Assignment of Mortgage document states the following:

> For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is **3300 S.W. 34th Avenue, Suite 101 Ocala, FL 34474** does here grant, sell, assign, transfer and convey unto **THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATE HOLDERS OF CWABS INC., ASSET–BACKED CERTIFICATES, SERIES 2007–12** whose address is **101 BARCLAY ST– 4W, NEW YORK, N.Y. 10286** all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

(Complaint, Exhibit "B").

Therefore, the Assignment of Mortgage does not name Plaintiff as a party to or third-party beneficiary of the assignment, but instead states outright that all beneficial interest is bestowed upon the Bank of New York, Mellon. (*Id.*). Also, we do not find that Plaintiff can show she suffered or will suffer "injury in fact." As the Court explained in the case of *In re Walker,* 466 B.R. at 286, even if the above October 14, 2011 Assignment were defective and the original assignor still had ownership rights in the Note, Plaintiff's payments to the assignee would still satisfy her liability under the Note.

**\*11** Furthermore, it is well-established that a borrower (in this case, Plaintiff) does not have standing to challenge the validity of mortgage assignments, because, according to 6A C.J.S. Assignments § 132, "the only interest or right which

2012 WL 7009007

an obligor or a claim has in the instrument of assignment is to insure him or herself that he or she will not have to pay the same claim twice." 6A C.J.S. Assignments § 132; *see also Ward v. Security Atl. Mortgage Elec. Registration Systems, Inc.,* 858 F.Supp.2d 561,568 (E.D.N.C.2012) ("Plaintiffs lack standing to challenge the validity of any such assignment [of mortgage]."); *see also Livonia Property Holdings, LLC v. 12840–12976 Farmington Road Holdings, LLC,* 717 F.Supp.2d 724, 735–37 (E.D.Mich.2010) ("hold[ing] that Borrower may not challenge the validity of assignments to which it was not a party or third-party beneficiary, where it has not been prejudiced, and the parties to the assignments do not dispute (and in fact affirm) their validity.").

Therefore, we will recommend that the Court dismiss with prejudice Plaintiff's claim that Defendants improperly and fraudulently assigned her mortgage in violation of an alleged "cutoff" date for mortgage assignment and grant Defendants' Motion to Dismiss Plaintiff's fraud claim regarding the assignment of the mortgage because Plaintiff lacks standing to raise these claims because the contract underlying her claims is the assignment of the mortgage, to which she is neither a party nor third-party beneficiary. Based on the foregoing and the cited case law, we find futility and prejudice to Defendants in allowing Plaintiff to amend her stated claims against Defendants, and we will not recommend that the Court grant Plaintiff leave to file an amended complaint regarding these claims. The Third Circuit has held that a Plaintiff whose Complaint fails to state a cognizable claim is entitled to amend his pleading unless the Court finds bad faith, undue delay, prejudice, or futility. *See Grayson v. Mayview State Hospital,* 293 F.3d 103, 111 (3d Cir.2002); *Alston v. Parker,* 363 F.3d 229, 235–236 (3d Cir.2004).

### 2. RICO

In their Motion to Dismiss, Defendants also assert that Plaintiff not only lacks standing to raise her claims because she is not a party to or third-party beneficiary of the mortgage assignment contract underlying her claims, but also because she has not met the standing requirements necessary to raise a RICO claim. (Doc. 8, p. 10). Defendants state that the RICO statute "confers standing upon '[a]ny person injured in his business or property by reason of a violation of section 1962 ...' 18 U.S.C. § 1964(c)." (*Id.*). Defendants also state that the "Third Circuit has construed § 1964(c) 'as requiring a RICO plaintiff to make two related but analytically distinct threshold showings ...:(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C.

§ 1962.' *Maio v. AETNA, Inc.,* 221 F.3d 472, 482–83 (3d Cir.2000)." (Doc. 8, p. 10). We agree with Defendants. *See Clark v. Conahan,* 737 F.Supp.2d 239, 255 (M.D.Pa.2010) ("In order to have standing to bring a RICO claim pursuant to 18 U.S.C. § 1962(c), ..., Plaintiffs must plead injury to his (sic) business or property, and that Defendants proximately caused such injury.") (citations omitted). The Clark Court also stated that "injury for RICO purposes requires proof of concrete financial loss, not mere injury to an intangible property interest." *Id.* (citing *Maio v. AETNA, Inc.,* 221 F.3d 472, 483 (3d Cir.2000)).

**\*12** Defendants argue that based on this aforementioned RICO standing requirements and case law, because Plaintiff has not alleged that she has suffered any injury to her property or business caused by any Defendant, her RICO claim should be dismissed. (*Id.*). We agree with Defendants analysis of Plaintiff's RICO claim because Plaintiff has not alleged that she has suffered an injury to her business or property. *See Maio v. AETNA, Inc., supra; Clark v. Conahan, supra.* No foreclosure action has even been initiated against Plaintiff's property. Therefore, because Plaintiff has failed to allege any injury to her property or business in accordance with the RICO requirements of § 1964(c) which are necessary to state a claim, we will recommend that Plaintiff's RICO claims be dismissed with prejudice and, Defendants' Motion to Dismiss Plaintiff's Complaint be granted with regards to Plaintiff's RICO claims due to Plaintiff's lack of standing under RICO. *See Maio v. AETNA, Inc., supra; Clark v. Conahan, supra.* Based on the foregoing, we find futility and prejudice to Defendants in allowing Plaintiff to amend her RICO claims against Defendants, and we will not recommend that the Court grant Plaintiff leave to file an amended complaint regarding these claims. *See Grayson v. Mayview State Hospital,* 293 F.3d at 111; *Alston v. Parker,* 363 F.3d at 235–236.

### B. FAILURE TO STATE A CLAIM UNDER 12(b)(6)

### 1. RICO Claims

Even if Plaintiff has standing to raise her RICO claims against Defendants, and we find that she does not, we will recommend that Plaintiff's RICO claims be dismissed based upon her failure to adequately allege activity that satisfies requisite acts under RICO. As the Court stated in *Pagnotti Enterprises, Inc. v. Beltrami,* 787 F.Supp. 440, 444 (M.D.Pa.1992):

A " 'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

Racketeering activity is defined as (A) certain acts chargeable under state law, (B) acts indictable under specific provisions of Title 18 of the United States Code, (C) acts indictable under specific provisions of Title 29 of the United States Code, (D) any offense involving fraud in connection with a case under Title 11, fraud in the sale of securities, or the felonious manufacture or distribution of drugs, or (E) any act indictable under the Currency and Foreign Transactions Reporting Act. 18 U.S.C. § 1961(1).

More recently, in *Morales v. Superior Living Products, LLC,* 398 Fed.Appx. 812, 814 (3d Cir.2010), when discussing the standard for a prima facie case under RICO, the Third Circuit Court stated:

> [A] claimant must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of a racketeering activity.' *Lum. v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004). Because appellants present a fraud-based RICO claim, they must plead with particularity the circumstances of the alleged fraud. *Id.* They may meet this requirement by pleading the 'date, place or time' or by 'injecting precision and some measure of substantiation into their allegations.' *Id.* at 224 (citation omitted).

**\*13** In their Motion to Dismiss, Defendants aver the following:

> Plaintiff's allegations do not allege a period, object or any certain illegal action by any alleged Defendant [with regards to her RICO claim]. Plaintiff merely alleges that it was improper for MERS to assign the Mortgage to the Bank of New York, Mellon due to a misunderstood and mischaracterized "cut off date" relating to the Trust, that this was a violation of an unspecified New York law, and that Defendants had knowledge of same. *See supra;* see Complaint, ¶¶ 13–20. Furthermore, despite Plaintiff's theory, there is nothing criminal about securitizing a mortgage loan or assigning a Mortgage, and broad allegations like Plaintiff's should be disregarded in evaluating a RICO conspiracy claim. *See Am. Dental Ass'n. v. CIGNA Corp.,* No. 09–12033, 2010 WL 1930128, at \*8 (11th Cir. May 14, 2010) ("In analyzing the [RICO] conspiracy claim ... *Iqbal* instructs us that our first task is to eliminate any allegations in Plaintiffs' complaint that are merely legal conclusions.").

(Doc. 8, p. 12).

We agree with Defendants' analysis of Plaintiff's RICO claims. We find that Plaintiff's RICO claims against Defendants are vague and based on legal conclusions, completely failing to assert with factual sufficiency any particular conduct that would indicate Defendants were engaged in predicate acts of racketeering. *See id* . Plaintiff's Complaint fails to sufficiently describe the structure, purpose, function and course of conduct of the enterprise. Rather, Plaintiff relies on vague and conclusory allegations in her attempt to allege a RICO claim, which are is not sufficient enough to properly allege a RICO claim. *See Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir.2002) (Court held that with respect to RICO claims, Plaintiff must allege fraud with the heightened pleading particularity required by Fed.R.Civ.P. 9(b)).

Therefore, we will recommend that the Court dismiss with prejudice Plaintiff's RICO claims against Defendants due to her failure to allege that Defendants were engaged in conduct of an enterprise acting in a pattern of racketeering, and grant Defendants' Motion to Dismiss. As discussed above, we find futility and prejudice to Defendants in allowing Plaintiff to amend her RICO claims.

### 2. FDCPA CLAIM

Plaintiff also asserts that Defendants violated the FDCPA when they assigned Plaintiff's mortgage. Under the FDCPA, debt collectors are restricted from using unfair collection methods and from making misleading or false representations. 15 U.S.C. §§ 1692e, 1692f.

"The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices, including threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1324 (7th Cir.1997) (citation omitted). "A basic tenet of the Act is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt, deserve the right to be treated in a reasonable and civil manner." *Id.* (citation omitted). "In the most general terms, the FDCPA prohibits a debt collector from using certain enumerated collection methods ... to collect a 'debt' from a consumer." *Bass,* 111 F.3d at 1324. The FDCPA prohibits debt collectors from: engaging in conduct "the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; from using "any false, deceptive, or misleading representations or means in connection with the collection

2012 WL 7009007

of any debt," 15 U.S.C. § 1692e; or from using unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f.

**\*14** Consumers have a private cause of action against debt collectors. 15 U.S.C. § 1692k. "The FDCPA is a strict liability statute to the extent it imposes liability without proof of an intentional violation." *Allen ex rel. Martin v. LaSalle Bank, N.A.,* 629 F.3d 364, 368 (3d Cir.2011). Further, the FDCPA is a "remedial statute" and courts construe the FDCPA broadly to ensure its purpose is to protect all consumers, even the least sophisticated consumers, is given effect. *Brown v. Card Serv. Ctr.,* 464 F.3d 450, 453 (3d Cir.2006) (citations omitted).

In their Motion to Dismiss, Defendants argue that Plaintiff's FDCPA claim should be dismissed with prejudice because: (1) she has not alleged violation of any specific section of the FDCPA; (2) she has not alleged that any of Defendants are "debt collectors" under the FDCPA; (3) she has not alleged any abusive, confusing or otherwise improper behavior; and (4) she has not alleged that Defendants have engaged in any debt collection activity. (Doc. 8, p. 13).

While there is no question that Defendants are indeed debt collectors under the definition of a debt collector as defined by 15 U.S.C. § 1692(a)(6) of the FDCPA, Plaintiff has failed to properly allege a claim under the FDCPA because she has not alleged her claim with factual sufficiency, but rather legal conclusions. *Oppong v. First Union Mortgage Corporation,* 215 Fed. Appx. 114, 118 (3d Cir.2007) (stating that a mortgagee is a "debt collector" under the FDCPA's definition in § 1692(a)(6)). While Plaintiff has stated that Defendants were "fraudulent" and used "misrepresentations," she failed to specifically state what provision of the FDCPA Defendants allegedly violated and failed to allege any facts to support these purportedly legal conclusions that Defendants engaged in fraudulent activities and made misrepresentations. As stated above, in evaluating a Complaint in response to a Motion to Dismiss, a complaint's allegations must be supported with factual sufficiency, and not just mere legal conclusions. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 433, 455 (2007). In *Bridgenorth v. American Education Services,* 412 Fed.Appx. 433, 435 (3d Cir.2011), the Third Circuit cited to *Iqbal* and stated that "merely reciting an element of a cause of action or making a bare conclusory statement is insufficient to state a claim." We agree with Defendants and find that Plaintiff's Complaint regarding the alleged violations under the FDCPA is not sufficient under *Twombly* and *Iqbal* to state a claim.

In her Complaint, Plaintiff has failed to state what, if any, FDCPA section Defendants had allegedly violated. Nor does Plaintiff attempt to clarify, in her Brief in Opposition, what sections of the FDCPA Defendants had violated. Therefore, we will recommend that Defendants' Motion to Dismiss be granted and Plaintiff's FDCPA claims be dismissed for failure to allege any such claim with factual sufficiency required to survive a 12(b)(6) Motion to Dismiss. *See Kimmel v. Phelan Hallinan & Schmieg, PC,* 847 F.Supp.2d 753, 769–770 (E.D.Pa.2012) (Plaintiff had to "link each alleged violation of the FDCPA to the predicate factual allegations giving rise to the violation in order to state a claim under Fed.R.Civ.P.8."). However, in an abundance of caution, we will recommend that the Court dismiss without prejudice Plaintiff's FDCPA claims. Based on the foregoing and the cited case law, we find that it is not clear whether it is futile for the Court to allow Plaintiff to amend her FDCPA claims against Defendants, and we will recommend that the Court grant Plaintiff leave to file an amended complaint regarding these claims.

### 3. RESCISSION AS REMEDY

**\*15** As part of her request for relief, Plaintiff has requested that the Court rescind the Mortgage based on chain of title issues. (Complaint ¶ 15; Prayer for Relief ¶ 5). Defendants aver that because Plaintiff has not alleged any "legal or factual basis for rescission of the Mortgage, nor has she averred her ability to tender the balance owing under the Mortgage," rescission is not an available remedy "even if Plaintiff had stated any viable claim for relief ...." (Doc. 8, p. 13).

It would be futile to delve into the elements necessary to properly request rescission of Plaintiff's mortgage in this Report and Recommendation because of our recommendation that Plaintiff's Complaint be dismissed with prejudice due to lack of standing, failure to state a claim under 12(b)(6), and failure to conform to Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. Insofar as we are recommending that Plaintiff's Complaint be dismissed with prejudice, we find that it is unnecessary to delve into the Complaint's prayer for relief. However, to the extent that Defendants contend in their Motion to Dismiss that this Court should dismiss Plaintiff's request that her mortgage be rescinded, we will recommend that the Court dismiss with prejudice Plaintiff's mortgage rescission prayer for relief and grant Defendants' Document 6 Motion to Dismiss in this regard. *See Gehman v. Argent Mortg. Co. LLC,* 726 F.Supp.2d 533, 542 n. 13 (E.D.Pa.2010) (Court held that under the Truth in Lending Act (TILA), 15 U.S.C. § 1635, rescission is not an available

Souders v. Bank of America, Not Reported in F.Supp.2d (2012)

2012 WL 7009007

remedy for "residential mortgage transactions."). We also agree with Defendants that in order for Plaintiff to request rescission of the Mortgage, and for Defendants to remove the mortgage lien, Plaintiff must tender the balance owing under the Mortgage. *See American Mortg. Network, Inc. v. Shelton,* 486 F.3d 815, 820–21 (4th Cir.2007); *Valentine v. Influential Sav. & Loan Ass'n,* 572 F.Supp. 36, 40–41 (E.D.Pa.1983). Otherwise, Plaintiff would realize a windfall, *i.e.,* both a free and clear property and retention of the mortgage loan monies. As Defendants point out, Plaintiff has not averred she has the ability to tender the balance owing under the Mortgage. (Doc. 8, p. 13).

### C. RULES 8(a) AND 9(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

#### 1. RULE 8(a) VIOLATION

Rule 8(a) states that "A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief ...." Fed.R.Civ.P. 8(a). Defendants argue that Plaintiff's Complaint is not in accordance with Rule 8(a) and therefore should be dismissed. They also aver that "the Complaint purports to bring claims against three separate Defendants, but the cause or causes of action upon which Plaintiff seeks to recover as to each or any Defendant remains unclear. *See* Complaint ¶¶ 13–20." (Doc. 8, p. 13). Paragraphs thirteen (13) through twenty (20) of Plaintiff's Complaint state the following:

> **\*16** 13. The Plaintiff suspected fraud because according to the Trust, CWABS 2007–12 the prospectus on page 7 states that the cut off date for mortgage assignments to enter the pool is August 1, 2007. From the Securities and Exchange Commission's website, incorporated herein and marked Exhibit "C".

> 14. The Plaintiff's loan number 171186255 was verified as being listed in the Securities and Exchange Commission's website and converted into stock. It is then sold to investors on Wall Street. Once the loan was securitized and converted, it forever lost its security. MERS making the assignment to the Trustee after August 1, 2007 is a violation of New York Law.

> 15. The Plaintiff is questioning the legitimacy of the mortgage and if there is a break in the chain of title. If the Mortgage was never correctly endorsed by all parties according to the Trust's pooling and servicing agreement, the mortgage becomes null and void. Also, if the Mortgage is separated from the Note it becomes null

and void. Law of 1871, Cannot separate the Note from the Mortgage.

> 16. There is no evidence that Countrywide endorsed the Note to anyone or that the Mortgage was properly assigned to the now purported holder-in-due-course the Bank of New York, Mellon. According to New York law, the note would be put out of eligibility. *Ibanez v. Wells Fargo,* MA Jan. 7, 2011 MA Supreme Court.

> 17. Defendants fraudulently concealed their wrongdoings and prevented Plaintiff from discovering her cause of action.

> 18. Plaintiff has been injured by the fraud by Defendants and has remained in ignorance of it without any fault or want of diligence or care on her part.

> 19. Defendants made many misleading statements that the loan contained certain terms desirable to the consumer when it did not.

> 20. Defendant's use of deceit or trickery caused Plaintiff to act to her disadvantage.

(Complaint, ¶¶ 13–20).

In analyzing Defendants' argument that Paragraphs thirteen (13) through twenty (20) of Plaintiff's Complaint fail to conform to Rule 8(a), we find that even under the most liberal construction, Plaintiff's Complaint is not in conformity with Rule 8(a). It does not give Defendants fair notice of what Plaintiff's claims against them are and the grounds upon which the claims rest. Plaintiff claims that Defendants are liable for fraudulent, misrepresentative conduct, but yet fails to point to any facts or statutes to support her general allegations. *See* Complaint, ¶¶ 13–20. Clearly, Plaintiff's allegations found in paragraphs thirteen (13) through twenty (20) of her Complaint do not give Defendants fair notice as to what her claims against them are and the grounds upon which they rest. Therefore, due to Plaintiff's failure to comply with Rule 8(a), we will recommend that Plaintiff's Complaint be dismissed. However, based on our above discussions regarding Defendants' Motion to Dismiss, we will recommend that Plaintiff's Complaint be dismissed with prejudice due to futility in allowing leave to amend and, that Defendants' Motion to Dismiss be granted.

#### 2. RULE 9(b) VIOLATION

**\*17** Defendants also contend that Plaintiff's Complaint is in violation of Rule 9(b) of the Federal Rules of Civil Procedure because Rule 9(b) requires specific factual averments of misrepresentation in order for a plaintiff to properly raise a claim for fraud or conspiracy. (Doc. 8, p. 13). The Third Circuit has determined that in order to comply with Rule 9(b)'s particularity requirement of a fraud claim, the following elements must be pled: (1) a specific false representation of material facts; (2) knowledge by the person who made the misrepresentation as to its falsity; (3) ignorance of its falsity by the person to whom the representation was made; (4) the intention that the representation should be acted upon; and (5) the plaintiff acted upon the false representation to his or her damage. *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 99 (3d Cir.1983). Rule 9(b) is satisfied if a Complaint sets forth precisely what omissions or statements were made in what documents or oral statements and the manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud. *In re Theragenics Corp. Securities Litigation,* 105 F. Su pp.2d 1342, 1348 (N.D.Ga.2000) (citing *Brooks v. Blue Cross and Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997)). Furthermore, in accordance with 15 U.S .C. § 78u–4(b)(2), a complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Furthermore, according to the Supreme Court, a strong inference "is more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

In light of the specific elements that must be pled in order to successfully state a claim for fraud in accordance with Rule 9(b) and in light of the factual sufficiency case law standards provided above necessary to allege a defendant's fraudulent state of mind, we find that Plaintiff's averments against Defendants, as stated in Paragraphs thirteen (13) through twenty (20) in her Complaint, clearly lack factual sufficiency because Plaintiff has not alleged any of the five elements necessary to properly plead a claim for fraud. Furthermore, as discussed above in the section titled "Failure to State a Claim under 12(b)(6)," we find that Plaintiff has failed to state both RICO claims and FDCPA claims with the required factual sufficiency, and that Plaintiff has attempted to support her allegations with sweeping legal buzz words and conclusions.

Furthermore, in her Brief in Opposition to Defendants' Motion to Dismiss and in her Addendums, Plaintiff did not provide any more factual information to support her claims and to oppose Defendants' Motion to Dismiss argument based on violations of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. Therefore, because Plaintiff's Complaint does not conform to the standards of either Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure, and because Plaintiff did not attempt to provide sufficient facts to support her claims in her Brief in Opposition or Addendums, we will recommend that Plaintiff's Complaint be dismissed with prejudice based on violations of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure and, that Defendants' Motion to Dismiss (Doc. 6) be granted.

### D. LIS PENDENS

**\*18** Lastly, Defendants aver that should the Court grant Defendants' Motion to Dismiss, and that the Lis Pendens Plaintiff filed in York County Court attached to Defendants' Brief (Doc. 8–1) should be stricken. (Doc. 8, p. 14). Defendants base their argument on the Pennsylvania Superior Court case *Psaki v. Ferrari,* in which the Superior Court stated, "a party is not entitled to have his case indexed as lis pendens unless title to real estate is involved in litigation." 377 Pa.Super. 1, 546 A.2d 1127, 1128 (Pa.Super.Ct.1988). Defendants point out that presently there is not any foreclosure action pending against Plaintiff.

In the alternative, Defendants argue that even if their Motion to Dismiss is denied, the Court should still strike Plaintiff's Lis Pendens on equitable grounds because "Defendants will likely prevail on the merits of the litigation and because Plaintiff is in no way prejudiced by its removal. *See e.g., Rosen v. Rittenhouse Towers,* 334 Pa.Super. 124, 482 A.2d 1113, 1116 (Pa.Super.Ct.1984) (courts should weight the equities when deciding the propriety of a lis pendens)." (Doc. 8, p. 14). Defendants argue that Plaintiff has no likelihood of success on her Complaint and therefore "cannot claim prejudice by striking the lis pendens since Plaintiff's pursuit of more than \$1,000,000.00 in monetary damages clearly outweighs the value of any purported issue affecting title that might arise from an assignment of Plaintiff's \$120,000.00 Mortgage loan." (Doc. 8, pp. 14–15).

Even though we will recommend that the Court dismiss with prejudice all of Plaintiff's claims against Defendants except her FDCPA claims, we will also recommend that the Court strike Plaintiff's Lis Pendens, as Defendants request. Thus, even though we are not recommending that the Court dismiss Plaintiff's entire Complaint with prejudice, we find that based on equitable grounds, the Court should strike

2012 WL 7009007

Plaintiff's Lis Pendens because Plaintiff's one million dollar ($1,000,000.00) prayer for relief far surpasses the amount in controversy, which is the one hundred twenty thousand dollar ($120,000.00) mortgage amount.

## VI. RECOMMENDATION.

Based on the foregoing discussion, we respectfully recommend that the Court **GRANT** Defendants' **Document 6 Motion to Dismiss** and **DISMISS WITH PREJUDICE** the following:

1. Plaintiff's claim that Defendants' Notice of Removal and Document 6 Motion to Dismiss were untimely filed.

2. Plaintiff's request for default judgment against Defendants.

3. Plaintiff's Complaint with respect to all claims except her FDCPA claims against Defendants.

We recommend that the Court **DISMISS WITHOUT PREJUDICE** Plaintiff's FDCPA claims against Defendants, and that Plaintiff be granted leave to amend only these claims.

We also recommend that Defendants' request for the Court to strike Plaintiff's Lis Pendens filed against Defendants in York County Court be **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7009007

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Souders v. Bank of America, Not Reported in F.Supp.2d (2013)

2013 WL 451863
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Lorayne E. SOUDERS, Plaintiff

v.

BANK OF AMERICA, et al., Defendants.

Civil Action No. 1:12–CV–1074.
|
Feb. 6, 2013.

**Attorneys and Law Firms**

Lorayne E. Souders, Etters, PA, pro se.

Andrew J. Soven, Reed Smith LLP, Philadelphia, PA, for Defendants.

***ORDER***

CHRISTOPHER C. CONNER, District Judge.

**\*1** AND NOW, this 6th day of February, 2013, upon consideration of the Report and Recommendation of United States Magistrate Judge Thomas M. Blewitt (Doc. 20), recommending that plaintiff's complaint be dismissed as to all claims except FDCPA claims, and, following an independent review of the record, and noting that defendants filed objections [1] to the report (Doc. 22), and the court finding Judge Blewitt's analysis to be thorough and well-reasoned, and the court finding the objections to be without merit and squarely addressed by Judge Blewitt's report (Doc. 20), it is hereby ORDERED that:

[1] Where objections to a magistrate judge's report and recommendation are filed, the court must perform a *de novo* review of the contested portions of the report. *Supinski v. United Parcel Serv.,* Civ. A. No. 06–0793, 2009 WL 113796, at \*3 (M .D. Pa. Jan. 16, 2009) (citing *Sample v. Diecks,* 885 F.2d 1099, 1106 n. 3 (3d Cir.1989); 28 U.S.C. § 636(b)(1)(c)). "In this regard, Local Rule of Court 72.3 requires 'written objections which ... specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for those objections.' " *Id.* (citing *Shields v. Astrue,* Civ. A. No. 07–417, 2008 WL 4186951, at \*6 (M.D.Pa. Sept. 8, 2008)).

1. Plaintiff's motion for leave to file memorandum (Doc. 26) is GRANTED.

2. The Report and Recommendation of Judge Blewitt (Doc. 20) are ADOPTED.

3. Defendants' motion to dismiss (Doc. 6) is GRANTED and plaintiff's complaint with respect to all claims except her FDCPA claims against defendants is DISMISSED with prejudice. Plaintiff's motion to amend (Doc. 21) is GRANTED. The amended complaint (Doc. 23) is accepted for purposes of filing. Defendants shall respond to said amended complaint within twenty (20) days. Defendants' motion to strike (Doc. 24) is DENIED.

4. The above-captioned case is REMANDED to Magistrate Judge Blewitt for further proceedings.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 451863

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 673458

2021 WL 673458
Only the Westlaw citation is currently available.
United States District Court, D. Utah.

TAYLOR et al, Plaintiffs,
v.
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-1 et al, Defendants.

Case No. 2:19-CV-00120-BSJ
|
Signed 02/22/2021

**Attorneys and Law Firms**

Ronald Ady, Salt Lake City, UT, for Plaintiffs.

Bryan C. Shartle, Justin H. Homes, Michael D. Alltmont, Pro Hac Vice, Sessions Fishman Nathan & Israel, Metairie, LA, George W. Burbidge, II, Christensen & Jensen PC, Salt Lake City, UT, for Defendants.

### MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Bruce S. Jenkins, United States Senior District Judge

**\*1** Before the Court are cross motions for summary judgment.[1] The Court heard oral argument on the motions for summary judgment on July 16, 2020.[2] Mr. Ronald Ady appeared on behalf of Plaintiffs Alex and Nallely Taylor ("the Taylors.") Mr. Michael Alltmont appeared on behalf of Defendants National Collegiate Student Loan Trust 2007-1 ("NCSLT"), Transworld Systems ("TSI"), and EGS Financial Care ("EGS").[3] The Court reserved on the matter and ordered the parties to submit additional briefing.[4]

1     Defs.' Mot. Summ. J., ECF No. 86; Pls.' Mot. Summ. J., ECF No. 90.

2     Hr'g Mins., ECF No. 132.

3     EGS was formerly known as NCO. Pls.' Am. Compl., ECF No. 8. On or about November 5, 2012, NCO became the default loan servicer on

Mr. Taylor's loan. Defs.' Mot. Summ. J., ECF No. 86. On or about November 1, 2014, TSI succeeded NCO as the default loan servicer. *Id.*

4     Defendants submitted additional briefing on July 23, ECF No. 133, and Plaintiffs submitted reply briefing on July 30, 2020, ECF No. 134. The matter is now fully briefed.

Having considered the parties' briefs, the evidence presented, the arguments of counsel, and the relevant law, the Court hereby GRANTS Defendants' motion for summary judgment and DENIES Plaintiffs' motion for summary judgment.

### BACKGROUND

I. Factual Background

This case revolves around a $30,000 student loan and Defendants' efforts to collect on it. When the Taylors filed the present action in November of 2018, they alleged the loan at issue was the result of identity fraud and alternatively that NCSLT could not prove it owned the loan.[5] The Taylors have since retracted the identity theft claims and admitted that Mr. Taylor took out the loan as will be explained below.[6] However, to fully understand this case, one must understand the history of the loan origination and sale to NCSLT.

5     Pls.' Am. Compl., ECF No. 8. The case was originally filed in Utah state court in November of 2018. It was removed to federal court by defendants on the basis of diversity jurisdiction in February of 2019. Notice of Removal, ECF No. 3.

6     Notice of Withdrawal of Pls.' Non Est Factum Claims, ECF No. 129.

In 2006, Plaintiff Mr. Taylor took out a student loan for the principal amount of $30,000 from JP Morgan Chase Bank ("Chase").[7] Mr. Taylor endorsed and deposited the check,[8] The purpose of the loan was for Mr. Taylor to attend the University of Nevada, Las Vegas ("UNLV") in the spring of 2007.[9] But Mr. Taylor did not attend UNLV in the spring of 2007.[10] Mr. Taylor never lived in Las Vegas, but rather at all relevant times was a resident of Sandy, Utah.[11]

7     Defs.' Mot. Summ. J. App., ECF No. 87, Ex. A-1. JP Morgan Chase Bank is the successor by merger to Bank One, N.A. Defs.' Resp. to Jan. 6, 2020

Court Order, ECF No. 62, Ex. 3, Pool Supplement and Schedule Excerpt.

8    Defs.' Mot. Summ. J. App., ECF No. 87, Ex. A-2.

9    *Id.*, Ex. A-1.

10   Pls.' Am. Compl., ECF No. 8.

11   *Id.*

In March of 2007, Chase sold Mr. Taylor's loan as part of a pool of student loans to NCSLT. [12] On November 14, 2009, the first payment became due on Mr. Taylor's loan after deferment, [13] On September 1, 2010, Mr. Taylor's loan charged off. [14] He had not made any payments. [15] On October 15, 2014, NCSLT commenced a collection action against Mr. Taylor in Utah state court ("the 2014 collection action"). [16] Mr. Taylor did not appear, and on January 27, 2015, a default judgment was entered against him for the amount of $65,607.76. [17] Mr. Taylor did not appeal the default judgment. [18] In 2018, Defendant TSI, acting on behalf of NCSLT, began to garnish Mr. Taylor's wages. [19]

12   The Taylors dispute the validity and proof of the sale. Pls.' Mot. Summ. J., ECF No. 90.

13   Defs.' Mot. Summ. J. App., ECF No. 87, Ex. A-5.

14   *Id.*

15   *Id.*

16   Pls.' Am. Compl., ECF No. 8. My. Taylor was personally served with the Summons and Complaint on October 9, 2014. Defs.' Mot. Summ. J. App., ECF No. 87, Ex. E-1. On October 15, 2014, the Summons and Complaint were filed with the Third District Court. *Id.*, Ex. E-2.

17   Pls.' Am. Compl., ECF No. 8. The district court clerk entered default. Defs.' Mot. Summ. J. App., ECF No. 87, Ex. E-4. Utah Rule of Civil Procedure 55(b)(1) permits the clerk to enter default judgment when plaintiff's claim against defendant is for a sum certain. Rule 55 provides the clerk shall enter judgment if: "A) the default of the defendant is for failure to appear; B) the defendant is not an infant or incompetent person; C) the defendant has been personally served pursuant to Rule 4(d)(1);

and D) the plaintiff, through a verified complaint, an affidavit, or an unsworn declaration ... submitted in support of the default judgment, sets forth facts necessary to establish the amount of the claim, after deducting all credits to which the defendant is entitled, and verifies the amount is warranted by information in the plaintiff's possession."

In support of NCSLT's motion for default, NCSLT submitted the note disclosure statement, the note signed by Alex Taylor, the loan payment history report, and a declaration of costs and attorney's fees. Defs.' Mot. Summ. J. App., ECF No. 87, Ex. E-3. The total judgment was for the amount of $65,607.76. Defs.' Mot. Summ. J. App., ECF No. 87, Ex. E-4. The total amount included Mr. Taylor's account balance ($49,258.30), interest from September 1, 2010 to August 7, 2014 ($15,944.46), and accrued costs to date of judgment ($405.00). *Id.*

Mr. Taylor was served a notice of judgment by US Mail. Defs.' Mot. Summ. J. App., ECF No. 87, Ex. E-5.

18   May 14, 2020 Hr'g Tr. (The Court: "Nobody appealed the default judgment." Mr. Ady: "Nobody appealed, no.").

19   Pls.' Am. Compl., ECF No. 8.

## II. The Taylors' Present Lawsuit

**\*2** In November of 2018, Plaintiffs Alex and Nallely Taylor commenced this action in Utah state court. [20] The Taylors moved for relief from the default judgment under Utah Rule of Civil Procedure 60(b)(6). [21] Rule 60(b) allows a court to relieve a party from judgment "on motion and upon just terms" for mistakes, inadvertence, neglect, newly discovered evidence, fraud, void judgments, satisfied judgments, or other reasons. Rule 60(b)(6) is a catchall provision, and only specifies "any other reason that justifies relief." [22] The rule further specifies that a motion under Rule 60(b) must be brought "within a reasonable time." Utah R. Civ. P. 60(c).

20   Notice of Removal, ECF No. 3, Ex. A.

21   Pls.' Am. Compl., ECF No. 8. The Taylors also moved for relief pursuant to Utah Code Ann. § 13-11-19(1)(a), a provision of the Utah Consumer Sales Practices Act ("UCSPA"). *Id.* Utah Code

Ann. § 13-11-19(1)(a) permits a consumer to bring an action for violations of the UCSPA.

22    Rule 60(b) subdivisions one though five list specific reasons to relieve a party from judgment: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation or other misconduct of an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or vacated, or it is no longer equitable that the judgment should have prospective application. Utah R. Civ. P. 60.

The Taylors argued they were entitled to relief under Rule 60(b)(6) because Defendants lacked standing to bring the original collection action in state court.[23] Defendants lacked standing, the Taylors argued, because Mr. Taylor was the victim of identity theft and did not take out the loan, or alternatively because Defendants could not prove they owned Mr. Taylor's loan.[24] They argued this lack of standing thus deprived the state court of subject matter jurisdiction and rendered the judgment void.[25]

23    Pls.' Am. Compl., ECF No. 8.

24    *Id.* The Taylors later added an additional theory regarding Defendants' alleged lack of standing: Defendant NCSLT, as a Delaware statutory trust, could not bring the state court action because Utah does not recognize the capacity of a Delaware statutory trust to sue. Pls.' Mot. Summ. J., ECF No. 90. This theory was raised for the first time in the Taylors' motion for summary judgment and will be addressed below.

25    Pls.' Am. Compl., ECF No. 8.

The Taylors complaint brought eight causes of action against Defendants: 1) Violation of the Utah Consumer Sales Practices Act "UCSPA" § 13-11-19(1); 2) Fraud upon the court; 3) Invasion of privacy; 4) Violation of UCSPA § 13-11-4(2); 5) Communications fraud; 6) Unjust enrichment; 7) Intentional infliction of emotional distress; and 8) Civil conspiracy.[26] Underpinning each cause of action were the Taylors' assertions that Mr. Taylor was the victim of identity

theft, that Defendants were aware that Mr. Taylor did not take out the loan, and that Defendants were wrongfully pursuing collection of a debt from Mr. Taylor even though they knew he did not owe on it.[27] Additionally, for each cause of action, the Taylors also plead in the alternative that Defendants could not prove they owned the loan and therefore did not have standing when they initiated the 2014 collection action.[28] In February 2019, the case was removed to federal court by Defendants on the basis of diversity jurisdiction.[29]

26    *Id.*

27    *See* Pls.' Am. Compl., ECF No. 8. For example, Plaintiffs assert under their first cause of action for violations of the UCSPA § 13-11-19(1), "Plaintiff Alex Taylor was never party to the fraudulent loan, and because the Plaintiff Alex Taylor was never a party to that transaction, NCSLT 2007-1 could not suffer an injury due to the Plaintiff Alex Taylor's non-existent conduct, so that the entry of default judgment against the Plaintiff Alex Taylor did not redress the Defendant NCSLT 2007-1's alleged injury."

Likewise, under Plaintiffs' second cause of action for fraud upon the court, Plaintiffs state "NCSLT 2007-1 and TSI prosecuted the collection action ... all while knowing that: the student loan for which NCSLT 2007-1 claimed was the product of forgery or fraud, that is, Plaintiff Alex Taylor asserts (on information and belief) that NCSLT 2007-1 knew either directly or through its servicing agent AES that the Plaintiff Alex Taylor had not signed the student loan documents which created the obligation for which NCSLT 2007-1 claimed in the collection action, that Plaintiff Alex Taylor was not a party to those student loan documents ..."

28    *See id.* For example, Plaintiffs asserted under the first cause of action: "Alternatively, on information and belief, NCSLT 2007-1 never acquired ownership of the student loan which is the subject of the collection action ... and so had no standing to bring that collection action, thereby rendering the judgment entered in the collection action void."

Plaintiffs assert under the second cause of action: "NCSLT 2007-1 did not own the student loan which was the subject of the collection action in case no. 140415060. In particular, at all times

material to the Plaintiffs' claims NCSLT 2007-1, NCO and TSI knew or should have known NCSLT 2007-1 did not have the chain of assignment documents necessary to establish that it acquired the student loan from the originator of the student loan, JP Morgan Chase Bank ..."

29    Notice of Removal, ECF No. 3.

III. The Taylors' Motion to Amend the Complaint

**\*3** In October of 2019, Plaintiffs sought leave to amend their complaint. [30] The proposed amended complaint added a new theory to the case. [31] Mr. Taylor's loan was discharged in bankruptcy, Plaintiffs argued, because a recently issued Fifth Circuit opinion [32] held that certain student loans could be dischargeable under the bankruptcy code. [33] Therefore, Plaintiffs argued the state court judgment was void because Mr. Taylor's debt was discharged in bankruptcy in 2009. [34] Up until this point in the litigation, Plaintiffs insisted that Mr. Taylor was the victim of identity theft. [35] However, the proposed amended complaint also sought to add new facts to the case – that Mr. Taylor filed for bankruptcy in 2009 and listed defendant NCSLT on his creditor's matrix. [36] Defendants opposed the proposed amendment and argued the new allegations were wholly inconsistent with Plaintiffs' theory of identity theft. [37]

30    Second Mot. to Amend Compl., ECF No. 43.

31    *Id.*, Proposed Amended Complaint.

32    *In re Crocker*, 941 F.3d 206 (5th Cir. 2019), as revised (Oct 22, 2019).

33    Second Mot. to Amend Compl., ECF No. 43.

34    *Id.*, Proposed Amended Complaint.

35    Pls.' Am. Compl., ECF No. 8.

36    Second Mot. to Amend Compl., ECF No. 43, Proposed Amended Complaint.

37    Defs.' Mem. Op. to Second Mot. to Amend Compl., ECF No. 48.

On January 6, 2020, the Court held a hearing on Plaintiff's Motion to Amend the Complaint. [38] At the hearing, the Court inquired into these contradictory allegations, at which point

Mr. Ady conceded Mr. Taylor took out the loan in question. [39] The Court ruled at the hearing and denied the Motion to Amend the Complaint. [40] The Court noted Mr. Taylor listed the student loan obligation as undisputed on his bankruptcy creditor's matrix. [41] Defendants moved for sanctions and argued that Plaintiffs had deliberately misled the Court. [42] The Taylors later officially withdrew their allegations that Mr. Taylor did not take out the student loan. [43]

38    Hr'g Mins. Jan. 6, 2020, ECF No. 57.

39    Hr'g Tr. Jan. 6, 2020, ECF No. 60, (The Court: "Now he's either the guy or he isn't the guy." Mr. Ady: "I would have to say that he's the guy. I think our position here on this motion is he is the guy.").

40    *Id.*

41    *Id.*, (The Court: "[H]asn't he asserted in his pleadings that he's not the guy?" Mr. Ady: "He has." The Court: "But yet, in 2009, in an uncontested listing in his schedules, he shows them as creditor, is what you tell me, uncontested.").

42    Defs.' Mot. for Sanctions, ECF No. 64. **The Motion for Sanctions is not the subject of the present order.**

43    Notice of Withdrawal of Pls.' Non Est Factum Claims, BCF No. 129. Although the hearing on the motion to amend the complaint was held on January 6, 2020, the Taylors did not officially withdraw the factual allegations until July 13, 2020.

DISCUSSION

I. Summary judgment:

A court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts must view the facts and draw reasonable inferences in the light most favorable to non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, only facts to which there is a "genuine" dispute must be viewed in the light most favorable to the non-moving party. *Id.* at. 380, A genuine dispute exists where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

## II. Parties' Arguments

The Taylors argue Defendants cannot prove they own Mr. Taylor's loan and therefore NCSLT did not have standing when it commenced the collection action in 2014.[44] In support of this theory, the Taylors assert NCSLT did not disclose any assignment documents showing Mr. Taylor's loan was assigned from Chase.[45] They also argue NCSLT cannot prove the sale from Chase was valid because a condition precedent to the sale was never satisfied, specifically that the loan was never guaranteed by The Education Resources Group, Inc. ("TERI") because it did not receive the original note.[46] Lastly, the Taylors challenge the sufficiency and admissibility of schedule 1, a key document purporting to show Mr. Taylor's loan was part of a pool of loans sold from Chase to NCSLT.[47]

[44]    Pls.' Mot. Summ. J., ECF No. 90. The Court notes the Taylors' action is likely untimely under Federal Rule of Procedure 60(c). As the matter is folly briefed, the Court will address the merits.

[45]    *Id.*

[46]    *Id.*

[47]    *Id.*

**\*4** Additionally, the Taylors brought new theories regarding NCSLT's lack of standing in their motion for summary judgment.[48] The Taylors argue NCSLT "plead itself out of court" in the collection action because it brought the action as a Delaware statutory trust, and trusts have no independent existence or right to sue under Utah law.[49] The Taylors further argue NCSLT should have registered under the Utah Business Trust Registration Act to have standing in Utah state court.[50] Because NCSLT affirmatively plead a lack of standing, the Taylors argue the state court judgment is void.[51] The Taylors ask this Court to grant their motion for summary judgment, to set aside the state court default judgment as void, and to dismiss the case with prejudice.[52]

[48]    *See id.*

[49]    *Id.*

[50]    Pls.' Reply to Pls.' Mot. Summ. J., ECF No. 126.

[51]    Pls.' Mot. Summ. J., ECF No. 90.

[52]    *Id.*

Defendants also brought a motion for summary judgment and argue the evidence conclusively establishes NCSLT owns Mr. Taylor's loan.[53] Additionally, Defendants argue they had standing as a Delaware statutory trust to bring the state court action.[54] Alternatively, Defendants argue the Taylors' new arguments that NCSLT did not have standing as a trust and should have registered under the Utah Business Trust Registration Act are barred by *res judicata.*[55] Defendants ask this Court to dismiss all of the Taylors' claims with prejudice, in addition to any other relief the court deems appropriate.[56]

[53]    Defs.' Mot. Summ. J., ECF No. 86.

[54]    Defs.' Reply to Resp. to Mot. for Sanctions, ECF No 120.

[55]    Defs.' Reply to Resp. to Mot. for Sanctions, ECF No. 120.

[56]    Defs.' Mot. Summ. J., ECF No. 86.

As discussed above, the Taylors initially alleged Mr. Taylor was the victim of identity theft and did not take out the loan. However, the Taylors later withdrew this claim and admitted Mr. Taylor took out the loan. Accordingly, the Court need not decide this issue. The issues before the Court are thus: 1) whether NCSLT owned the loan in 2014 when it commenced the collection action; and 2) whether a Delaware statutory trust has standing to sue in Utah state court.

## III. NCSLT Owned Mr. Taylor's Loan in 2014

The Court finds NCSLT owns Mr. Taylor's loan and owned it in 2014. The chronology and documentation of the loan purchase are set out below.

As discussed above, Mr. Taylor signed the credit agreement with Chase on November 28, 2006.[57] On December 7, 2006, Chase issued the check to Mr. Taylor for $30,000.[58] Mr. Taylor signed and deposited the check on or around December 12, 2006.[59]

[57]    Defs.' Mot. Summ. J. App., ECF No. 87, Ex. A-1. The amount of the loan was for $30,000. Alex Taylor's name is on the credit agreement.

Additionally, the credit agreement includes the last four digits of his social security number, an ID number, and his birth year. The note was signed on November 28, 2006.

58    *Id.*, Ex. A-2.

59    *Id.*, Ex. B.

On March 8, 2007, Chase sold Mr. Taylor's loan to NCSLT through a near simultaneous two-step process. [60] First, Chase sold Mr. Taylor's loan, along with a pool of other student loans, to National Collegiate Funding, LLC through a pool supplement agreement. [61] The pool supplement agreement states JP Morgan Chase "sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor") ... each student loan set forth on the attached schedule 1." [62] The pool supplement agreement then states "The Depositor in turn will sell the Transferred Bank One Loans to The National Collegiate Student Loan Trust 2007-1 (the "Trust")." [63]

60    Defs.' Mot. Summ. J., ECF No. 86.

61    Defs.' Mot. Summ. J, App., ECF No. 87, Ex. A-3.

62    *Id.*

63    *Id.*

NCSLT submitted an excerpt from schedule 1 showing Mr. Taylor's loan was included in the pool supplement. [64] Critically, the excerpt includes the last four digits of Mr. Taylor's social security number and the same ID number he listed on his credit agreement. [65] Additionally, the Lender is listed as Chase Bank, the total net disbursed amount is for $30,000, and the disbursement date is December 7, 2006. [66]

64    *Id.*

65    *Id.*

66    *Id.*

**\*5** Second, National Collegiate Funding, LLC, sold the loans to NCSLT through a deposit and sale agreement. [67] This second step occurred on the same day as the first step – March 8, 2007. [68] The Deposit and Sale Agreement states it is "between The National Collegiate Funding, LLC, as seller, and the National Collegiate Student Loan Trust 2007-1, as purchaser ..." [69] The deposit and sale agreement states that

it is for the purchase and sale of the student loans listed on schedule 1 of the pool supplement agreement. [70] The agreement included the assignment of each of the loans in the pool supplement to the purchaser. [71]

67    *Id.*, Ex. A-4.

68    *Id.*

69    *Id.*

70    *Id.* Article 1 states, "This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto."

71    *Id.* Article III states, "The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans." It then states, "The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all the Seller's rights and interest under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto." Schedule A lists the JP Morgan Chase Bank Pool Supplements dated March 8, 2007. Schedule B lists the JP Morgan Chase Bank loans that were originated under Bank One's Corporate Advantage Loan Program, and Campus One Loan Program dated May 1, 2002.

Documents subpoenaed from Chase support the Court's finding that Chase sold the loans to NCSLT. [72] Specifically, the last page of Chase's document production includes a database entry with Mr. Taylor's name, the last four digits of his social security number, and the initial disbursement date of December 7, 2006. [73] The entry states Mr. Taylor's loan was closed and transferred off the system on March 8, 2007. [74] As noted above, March 8, 2007 was the date of the sale from Chase to NCSLT. [75] Additionally, Chase sent a letter to Mr. Taylor on August 16, 2018, in response to an inquiry from Mr. Taylor to the Consumer Financial Protection Bureau regarding his student loan account. [76] The letter stated, in relevant part, "American Education Services serviced this loan from December 7, 2006, the date of disbursement, through March 8, 2007, when we sold it to National Collegiate

Trust ... you must contact Transworld Systems, Inc.... for information about this loan" [77]

72    Pls.' Disc. Mot., ECF No. 77, Ex. C.

73    *Id.*

74    *Id.*

75    Defs.' Mot. Summ. J., ECF No. 86.

76    Defs.' Exs. in Resp. to Req. from Ct., ECF No. 97, Ex. A.

77    *Id.*

Given the evidence set out above, the Court finds NCSLT owns Mr. Taylor's loan and owned it in 2014. The Court will now turn to address Plaintiffs' additional arguments challenging the validity of the sale documentation and the foundation of NCSLT's evidence.

A. The TERI Guaranty Agreement

The Taylors argue NCSLT cannot prove assignment from Chase because a condition of the sale was never met – that The Education Resource Institute ("TERI") receive the original note endorsed to it. [78] To make this argument, the Taylors first look to the pool supplement agreement, which states the loans are made "on the condition that they qualify for and in fact are covered by a guaranty issued by The Education Resources Institute, Inc." [79] Second, the Taylors look to the TERI guaranty agreement, which states "TERI must have received from [JP Morgan Chase Bank] the original Promissory note, or a lost note affidavit or other acceptable and admissible evidence of the Loan, enforceable against the Borrower ... endorsed to TERI in such manner as to transfer to TERI all rights in and title to such Promissory Note and Loan." [80] The Taylors then conclude that because NCSLT did not provide an original note to TERI, and it was not endorsed to TERI, NCSLT cannot prove it is a successor-in-interest to Chase. [81]

78    Pls.' Mot. Summ. J., ECF No. 90.

79    *Id.* (citing the Note Purchase Agreement, ECF No. 91, Ex. M).

80    *Id.*, Ex. K.

81    ECF No. 90.

**\*6** The Court finds this argument unconvincing. Section 2.2. of the TERI guaranty agreement, which the Taylors rely on the make this argument, is premised upon the occurrence of a "guaranty event." [82] A guaranty event is defined by the agreement as any of the following events: "a) failure of the Borrower to make monthly principal and/or interest payments on a Loan when due, provided such failure persists for a period of one hundred fifty (150) consecutive days; b) the filing of a petition in bankruptcy with respect to the Borrower, or; c) the death of the Borrower." [83] However, at the time the loan was sold, Mr. Taylor had not defaulted or filed for bankruptcy. [84] Second, even if Mr. Taylor had defaulted prior to the sale of the loan, the failure of NCSLT to provide an original note to TERI would not void the sale of Mr. Taylor's loan. The TERI guaranty agreement states that TERI must have received "the original Promissory note, or a lost note affidavit or other acceptable and admissible evidence of the Loan." [85] Mr. Taylor's credit agreement states the faxed copy of the credit agreement is an original note. [86] Further, because the TERI agreement states TERI must have received the note or "other acceptable and admissible evidence of the loan," TERI did not need to receive the original loan note for the guaranty to come into effect. Defendants argue that because Mr. Taylor's loan was not in default at the time of the sale, "plaintiffs' argument that there was not a 'note' endorsed by Chase to TERI produced is irrelevant" [87] The Court agrees.

82    Pls.' App. Exs. To Pls.' Mot. Summ. J., ECF No. 91, Ex. K. Section 2 is titled "Guarantee of Loans." Section 2.1 states, in relevant part, "TERI hereby guarantees to Bank One, unconditionally except as set forth in Section 2.2 below, the payment of 100% of the principal of and accrued interest on every Loan as to which a Guaranty Event has occurred."

83    Pls.' App. Exs. To Pls.' Mot. Summ. J., ECF No. 91, Ex. K.

84    The patties dispute the date of default. As discussed above, a guaranty event is defined as a default, filing for bankruptcy or death. Pls.' App. Exs. To Pls.' Mot. Summ. J., ECF No. 91, Ex. K. The Taylors argue the loan defaulted on June 6, 2007, and charged off on October 4, 2007. Pls.' Resp. to Pls.' Mot. Summ. J., ECF No. 106. This argument assumes NCSLT had knowledge Mr. Taylor did not

attend or was no longer attending school. NCSLT states the loan charged off without any payments on September 1, 2010. Defs.' Mot. Summ. J., ECF No. 86. Even assuming arguendo the Taylors are correct about the date of default, it still occurred after the sale date of March 8, 2007.

85    Pls.' Summ. J. Exs., ECF No. 91, Ex. K.

86    Defs.' Mot. Summ. J. App., ECF No. 87, Ex. A-1. Paragraph 15 of the Credit Agreement states: "If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement and I will refax the first page upon request by Lender ... If the Borrower faxes the Signature Page, and the Lender approves the application, you and I agree that all copies of this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement."

87    Defs.' Resp. to Pls.' Mot. Summ. J., ECF No. 116.

**B. Business Records**
The Taylors argue Defendants' evidence of the sale is inadmissible because Defendants have not met the criteria of the business records exception [88] under Federal Rule of Evidence 803(6). [89] Specifically, the Taylors argue Defendants cannot produce a percipient witness to the creation of schedule 1 and cannot satisfy the requirements of Rule 803(6)(A) – that the record was made by someone with knowledge. [90]

88    The business records exception states: The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that

complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6).

89    Pls.' Mot. Summ. J., ECF No. 90.

90    *Id.*

**\*7** However, Rule 803(6) does not require a party introducing evidence of business records to produce a witness to the creation of such records. [91] Rather, the rule requires the party introducing the records to lay a sufficient foundation by showing that it was the regular practice to base such records upon a transmission from a person with knowledge, [92] As the advisory committee stated:

> It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based, A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge ... In short, the scope of the phrase "person with knowledge" is meant to be coterminous with the custodian of the evidence or other qualified witness. Fed, R. Evid. 803 advisory committee's note to 1974 amendment.

The Court finds Defendants laid a sufficient foundation to introduce the business records. The Taylors insist Defendants' custodian of records, Mr. Bradley Luke, is not qualified to introduce the records because he was not a witness to

the creation of them.[93] Defendants identified Mr. Luke as their custodian of records in their first amended initial disclosures.[94] Mr. Luke testified through affidavit that he is the designated records custodian for NCSLT, that TSI is the designated records custodian of Mr. Taylor's loan, that Mr. Luke had personal knowledge of the business records maintained by TSI, and that the student loan records were "created, compiled and recorded as part of a regularly conducted business activity at or near the time of the event and from information transmitted from a person with personal knowledge."[95] Accordingly, Mr. Luke's testimony satisfies the requirements of Rule 803(6), and NCSLT's evidence of schedule 1 is admissible.

[91]    Fed. R. Evid. 803(6) advisory committee's note to 1974 amendment.

[92]    *Id.*

[93]    Pls.' Mot Summ. J., ECF No. 90.

[94]    *Id.*, Ex. C-1.

[95]    Defs.' Mot Summ. J. App., ECF No. 87, Ex. A.

<u>C. Schedule 1</u>

Plaintiffs further argue the schedule 1 excerpt produced by Defendants cannot be trusted.[96] Specifically, Plaintiffs argue Defendants cannot prove the excerpt came from schedule 1 because Defendants did not produce the entire schedule.[97] Defendants state the entire schedule 1 contains the private information of thousands of students not necessary to a determination regarding Mr. Taylor's loan in this case.[98] The Court held a discovery conference on September 17, 2019 regarding schedule 1 and ordered NCSLT to turn over the metadata to schedule 1, but not the entire schedule.[99] Defendants produced the metadata.[100]

[96]    Pls.' Mot. Summ. J., ECF No. 90.

[97]    *Id.*

[98]    Defs.' Resp. to Defs.' Mot Summ. J., ECF No, 116.

[99]    Order Requiring Produc. of Schedule 1 Metadata, ECF No. 55. "Defendants shall within ten (10) days of September 17, 2019 produce the metadata for Schedule 1 referred to in the 2007-1 Pool Supplement Agreement, JP Morgan Chase Bank, N.A., Defendants' document number 150795_7028-001_POOL."

[100]   Hr'g Tr., May 14, 2020, (Mr. Alltmont: To be clear, we have not withheld Schedule 1, we have produced it. We produced an excerpt from Schedule 1 relating only to Plaintiff's loan. And in September of last year, we came before you on a motion to compel the Plaintiff wanted then exactly what he is asking for now which is a full copy of the schedule. And we raised our hand and said, Your Honor, that has thousands of loans on it, a lot of consumer information, and we have provided him the relevant piece of the document Ultimately, he backed off and settled on the metadata from the document, We produced it pursuant to the guidelines that were available online from Microsoft on how to extract that data. We produced to them a copy of the steps we took which came right from Microsoft. And in September, in October, in November, in December we heard no dispute about that production.").

**\*8** Mr. Luke's affidavit states the schedule 1 excerpt "was taken directly from the full schedule and the substance has not been altered in any way,"[101] The Court notes Defendants identified Mr, Luke as the custodian of records early in litigation, but Plaintiffs did not depose him.[102] Nor did Plaintiffs protest the metadata as inadequate until nearly six months after Defendants produced it.[103] Based on the affidavit of Mr. Luke, the Court finds Defendants' production of the schedule 1 excerpt was sufficient to prove Mr. Taylor's loan was part of the pool sold to NCSLT.

[101]   Defs.' Mot. Summ. J. App., ECF No. 87, Ex. A. Transcript from July 10, 2020 hearing: Mr. Alltmont: "We offered to bring Mr, Luke to the Court with a full copy of Schedule 1 for an in camera review so that the Court could see that the excerpt was an exact extraction from the actual Schedule 1."

[102]   Defs.' Resp, to Defs.' Mot Summ. J., ECF No. 116.

[103]   Defendants produced the metadata in September of 2019, *See* Hr'g Tr., May 14, 2020, *supra* note 106. Plaintiffs filed a discovery motion regarding

the alleged inadequacy of the metadata on March 9, 2020. Pls.' Short Form Disc. Mot., ECF No. 77.

D. Conclusion

In conclusion, the Court finds NSCLT owned Mr. Taylor's loan when it commenced the 2014 collection action. The Taylors' challenges to the sufficiency and foundation of NCSLT's evidence of the loan sale are futile. NCSLT showed through conclusive documentation the steps of the loan sale, from the origination of the loan between Mr. Taylor and Chase, to the sale from Chase to NCSLT in 2007. As such, NCSLT had standing when it brought the collection action against Mr. Taylor in 2014.

IV. NCSLT had standing to bring the 2014 collection action as a Delaware Statutory Trust

As discussed above, the Taylors argue for the first time in their motion for summary judgment that NCSLT plead itself out of court by bringing the 2014 state court action as a statutory trust, instead of as the trustee or beneficiary of a trust. [104] Utah law does not recognize the independent existence of a trust outside of its trustee or trust beneficiaries, the Taylors argue, and thus, a foreign statutory trust did not have standing to file a claim in Utah state court. [105] The argument follows that without standing, a court cannot have subject matter jurisdiction, and because a challenge to subject matter jurisdiction can be brought at any time, the 2014 default judgment is void. [106]

[104] Pls.' Mot. Summ. J., ECF No. 90.

[105] Id.

[106] Id.

First, NCSLT argues the Taylors' arguments on this issue are barred by res judicata, were waived, and are otherwise meritless. [107] Even if the arguments are not barred, NCSLT counters that as a Delaware statutory trust, it had the capacity and standing to sue in its own name. [108] Specifically, NCSLT states it was established under a specialized Delaware law that allows for the creation of statutory trusts that are separate legal entities. [109] Further, NCSLT argues the Taylors confuse standing with legal capacity. [110]

[107] Pls.' Reply to Pls.' Mot Summ. J., ECF No. 133.

[108] Id.

[109] Id.

[110] Id.

Additionally, the Taylors raised for the first time in their reply motion that NCSLT should have registered as a Utah Business trust to have standing to sue in Utah state court. [111] NCSLT argues Utah courts routinely recognize business trusts that have sued in their own name. [112] To support this proposition, NCSLT cites to case law where the Plaintiff was a registered Utah Business Trust, or where the defendant was a foreign statutory or business trust. [113] Because the Utah Business Trust code states a business trust can be sued whether or not it is registered under the chapter, [114] cases of foreign business trusts sued in Utah are inapposite. NCSLT has not cited to case law where a foreign statutory trust brought suit in Utah state court, except for a sole case from 1967, *Bennett Association v. Utah State Tax Commission*. [115] While in *Bennett*, the plaintiff was a Massachusetts business trust, the case occurred nearly 30 years prior to the enactment of the Utah Business Trust Registration Act and it is not clear whether standing was ever raised in that case. The Court finds the Taylors' new arguments were waived and are meritless.

[111] Pls.' Reply to Pls.' Mot. Summ. J., ECF No. 126.

[112] Pls.' Reply to Pls.' Mot. Summ. J., ECF No. 133.

[113] *Merrick Young Ina v. Wal-Mart Real Estate Bus. Tr.*, 257 P.3d 1031, 1032 (Utah Ct. App. 2011); *Crestwood Cove Apartments Bus. Tr. v. Turner*, 164 P.3d 1247, 1255 (Utah 2007) (Crestwood Cove was a Utah Business Trust); *Bennett Ass'n v. Utah State Tax Comm'n*, 426 P.2d 812, 813 (Utah 1967) (stating that business trust was taxable as a corporation).

[114] "A business trust may be sued whether or not the business trust is registered under this chapter." Utah Code Ann. § 16-15-106.

[115] Pls.' Reply to Pls.' Mot. Summ. J., ECF No. 133, (citing *Bennett Ass'n v. Utah State Tax Comm'n*, 426 P.2d 812, 813 (Utah 1967)). In *Bennett*, the Plaintiff was a Massachusetts business trust. *Id*. The case is a Utah Supreme Court case, and the opinion does not discuss Plaintiff's standing as a foreign business trust *Id*. The Court could infer from *Bennett* that

foreign business trusts have standing in Utah state courts. However, because the Utah Business Trust Registration Act was originally enacted in 1995, nearly 30 years after *Bennett*, the Court will not make this inference.

### A. Waiver

**\*9** The Court finds the Taylors waived the above arguments. The Taylors' arguments are more properly characterized as legal capacity arguments rather than as standing arguments. Utah Rule of Civil Procedure 9 states "Except when required to show that the court has jurisdiction, a pleading need not allege: (a) a party's capacity to sue or be sued." The rule further states, "[t]o raise any of those issues, a party must do so by a specific denial ..." Utah R. Civ. P. 9(a)(2), Even when a party appears, a failure to raise a specific negative averment of lack of capacity waives the argument. *See Phillips v. JCM Dev. Corp.*, 666 P.2d 876, 884 (Utah 1983). As discussed above, Mr. Taylor did not appear. His failure to appear and raise the issue of NCSLT's legal capacity thus waived it.

The Taylors argue that because NCSLT could not sue in Utah, the Utah courts could not remedy NCSLT's complaint, and thus NCSLT did not have standing,[116] Again, they argue this lack of standing deprives the court of subject matter jurisdiction, and challenges to subject matter jurisdiction can be brought at any time. However, "standing is not the same as legal capacity to sue." *Elite Legacy Corp. v. Schvaneveldt*, 391 P.3d 222, 234 (Utah Ct. App. 2016) (citation omitted). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* (citation omitted). The Taylors' arguments regarding standing on this point are in fact challenges to NCSLT's legal capacity. As such, the arguments were waived for the reasons discussed above.

[116] Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct 1540, 1547 (2016), as revised (May 24, 2016) (citation omitted).

Additionally, as explained below, the Court finds the Taylors' new arguments unavailing. Because the Court requested

additional briefing on these arguments, the Court will now turn to address the merits.

### B. NCSLT had legal capacity and standing to bring the 2014 collection action in its own name

NCSLT is a Delaware statutory trust and is authorized to sue and be sued pursuant to the Delaware statute under which it was created.[117] While Utah courts have not directly ruled on the issue, several courts outside Utah recognize the standing and legal capacity of Delaware statutory trusts to sue in their own names.[118] The Taylors argue Utah does not recognize the independent existence of a trust outside of the trustee or the trust's beneficiaries.[119] But Utah law allows for the creation of business trusts under the Utah Business Trust Registration Act, which are permitted to sue in their own name.[120] This leads the Taylors to their next argument raised in their reply memorandum, which apparently concedes that trusts may sue in their own name – that NCSLT should have registered as a Utah Business Trust prior to bringing suit in Utah.[121]

[117] Del. Code Ann. tit. 12, § 3804. "A statutory trust may sue and be sued." The Trust Agreement states it is a statutory trust under the Delaware Statutory Trust Act. Pls.' Mem. in Opp'n to Defs.' Mot. to Strike, ECF No. 131, Ex. 2, Trust Agreement and Declaration of Trust.

[118] *See, e.g., Kwang Kim v. Wilmington Tr. Co.*, 2018 WL 4296983, \*7-8 (S.D. Cal. Sept. 7, 2018) ("the NCSL Trust is a Delaware statutory trust As such, the NCSL Trust has the capacity to sue or be sued as a separate legal entity."); *Foster v. Nat'l Collegiate Student Loan Trust 2007-4*, 2018 WL 1095760, \*1, n.1 (Tex. App. Mar, 1, 2018) ("A statutory trust is a juridical entity, separate from its trustee and beneficial owners, that may sue and be sued, own property, and transact business in its own name."); *In re Countrywide Fin. Corp. Mortgage-backed Sea Litig.*, 2014 WL 4162382, \*10 (C.D. Cal. 2014) ("a statutory trust formed under the laws of Delaware, exists separately from the parent and 'may sue and be sued.' "); *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat. Ass'n*, 2015 WL 2359295, \*4 (S.D.N.Y. May 18, 2015) ("These trusts are statutorily empowered to sue and be sued in their own right[.]"); *Dargahi v. Hymas*,

2008 WL 8586675, *4 (S.D.N.Y. Oct. 15, 2008) ("The trust is 'subject to attachment and execution as if it were a corporation.' ").

119    Pls.' Mot. Summ. J., ECF No. 90.

120    Utah Code Ann. § 16-15-106.

121    Pls.' Reply to Pls.' Mot. Summ, J., ECF No, 126.

C. NCSLT is not a Utah Business Trust and did not need to register as one to bring suit in Utah

 **\*10**  The Taylors argue NCSLT should have registered as a Utah Business Trust and that without such registration, NCSLT was barred from bringing suit in Utah, thus depriving it of standing. [122] The Taylors cite to the Utah Business Trust Registration Act ("UBTRA") subsection on business trusts powers, which states: "(1) A business trust registered under this chapter may in its trust name: (a) sue ... (2)(a) A business trust may not maintain any action, suit, or proceeding in this state unless the business trust is registered under this chapter." Utah Code Ann. § 16-15-106.

122    *Id.*

The Utah Rules of Civil Procedure do not specify whether a foreign business trust must register in the state prior to bringing suit. *See* Utah R. Civ, P. 17. The rules make no mention of business trusts, domestic or foreign. *See id.* Further, this Court found no Utah case law discussing whether foreign business trusts must register under the UBTRA prior to bringing suit in Utah. The Court finds the UBTRA specifically exempts foreign business trusts from registration when engaged in activities in Utah solely to fulfill their duties as a trustee in another state, Further, the Court finds NCSLT does not fit within the definition of a Utah business trust because it does not transfer property to a trustee and does not transact business within Utah.

i) The statute does not apply to a foreign business trust bringing suit in Utah solely to enforce its duties as a trustee in another state

A review of the UBTRA is instructive here. Section 102 of the Act, titled "Definition of business trust," states that "[b]usiness trust has the same meaning as in Section 7-5-1" of Utah's Financial Institutions Act. Utah Code Ann. § 16-15-102, Utah's Financial Institutions Act defines "business trust" as "an entity engaged in a trade or business that is created by a declaration of trust that transfers property to

trustees, to be held and managed by them for the benefit of persons holding certificates representing the beneficial interest in the trust estate and assets." Utah Code Ann. § 7-5-1(1)(a). Most important, the section defining business trusts states, "[t]he requirements of this chapter do not apply to ... an institution authorized to engage in a trust business in another state that is engaged in trust activities in this state solely to fulfill its duties as a trustee of a trust created and administered in another state." Utah Code Ann. § 7-5-1(3)(a).

Indeed, NCSLT is a business trust authorized to engage in trust business in Delaware. [123] Its sole reasons for engaging in trust activities in Utah was to secure its rights to a contractual obligation with Mr. Taylor. As such, the UBTRA does not apply to NCSLT by virtue of the Act's reference to the definition of business trust in the Utah Financial Institutions Act. Additionally, the Court finds NCSLT does not fall within the definition of a Utah business trust because it does not transfer property to a trustee and does not conduct business within Utah.

123    Defs.' Surreply, ECF No. 133.

ii) NCSLT does not fall within the definition of a Utah Business Trust

First, NCSLT argues it is not a business trust under Utah law because it does not transfer property to a trustee, [124] Delaware's Statutory Trust Act, under which NCSLT is registered, defines a statutory trust as an unincorporated association which: "Is created by a governing instrument under which property is or will be held, managed, administered, controlled, invested, reinvested and/ or operated, or business or professional activities for profit are carried on or will be carried on ..." Del. Code Ann. tit 12, § 3801.

124    *Id.*

 **\*11**  The Delaware code does not mention transferring property as a function of the trust, as opposed to Utah's definition of a business trust. NCSLT's Trust Agreement comports with these requirements. The Trust Agreement vests legal title to the trust property in the trust as a separate legal entity unless the law requires title to vest in the Owner Trustee. [125]

125    Pls.' Opp'n Mem. To Defs.' Mot. to Strike, ECF 131, Ex. 2, Trust Agreement and Declaration of

Trust. NCSLT's Trust Agreement states in section 2.05 "The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners." Section 14.02 states: "Legal title to all Trust Property shall be vested at all times in the Trust as a separate legal entity."

Second, the Court finds NCSLT is not engaged in a trade or business in Utah. The UBTRA does not define trust business. *See* Utah Code Ann. § 16-15-101–110. But the Act does require a business trust to register before doing business in Utah. Utah Code Ann. § 16-15-104, Further, the Act requires the certificate of registration to set forth "the business purpose for which the business trust is organized." *Id.* Utah's Financial Institutions Act defines "trust business" as "[A] business in which one acts in any agency or fiduciary capacity, including that of personal representative, executor, administrator, conservator, guardian, assignee, receiver, depositary, or trustee under appointment as trustee for any purpose permitted by law ..." Utah Code Ann. § 7-5-1(b).

Both the UBTRA and the Utah Financial Institutions Act are premised on the business activity taking place in Utah. Utah Code Ann. § 16-15-104 ("A business trust shall register with the division before doing business in the state.") The Taylors argue NCSLT is in the business of suing on defaulted student loans.[126] But bringing suit to enforce a debt obligation is not transacting business under Utah law.[127] *See Gen. Motors Acceptance Corp. v. Lund*, 208 P. 502, 503 (Utah 1922) ("Filing suit within the courts of this state to recover an indebtedness or to enforce an obligation is not "doing business" within the meaning of the statute. This court has so held in at least three cases.") (interpreting corporations code); *George R. Barse Live-Stock Comm'n Co. v. Range Valley Cattle Co.*, 50 P. 630, ¶1 (Utah 1897) ("The bringing of a suit by a foreign corporation to secure its legal rights, under the circumstances shown in this case, is not 'doing business,' within the constitution or laws of this state."). Utah's Revised Business Corporations Act states: "The following, nonexhaustive list of activities does not constitute 'transacting business' ... maintaining, defending, or settling in its own behalf any legal proceeding." Utah Code Ann. § 16-10a-1501.

[126]   Pls.' Reply to Defs.' Surreply, ECF No. 134.

[127]   As this Court found no case law interpreting the Utah Business Trust Registration Act's definition of "trust business," case law interpreting the corporations code is persuasive here.

### iii. Conclusion

Because NCSLT does not transfer property to a trustee and is not engaged in a business or trade in Utah, it is not a Utah Business Trust and did not need to register as one prior to bringing suit in Utah. It is unclear if, in assessing legal capacity, Utah state courts would treat foreign statutory trusts as foreign corporations, unincorporated associations, or recognize their status under Delaware law as a separate legal entity. As noted above, the Delaware code defines a Delaware Statutory trust as an "unincorporated association."[128] Utah law recognizes that an unincorporated association may sue and be sued in its own name.[129]

[128]   " 'statutory trust' means an unincorporated association ..." Del. Code Ann. tit 12, § 3801 (West).

[129]   "When two or more persons associated in any business either as a joint-stock company, a partnership or other association, not a corporation, transact such business under a common name, whether it comprises the names of such associates or not, they may sue or be sued by such common name." Utah R. Civ. P. 17(d).

**\*12**   Whether a foreign statutory trust would be recognized as a separate legal entity, treated as a foreign corporation, or as an unincorporated association, in any case it would only be required to register in the state if it was conducting business in the state.[130] And as discussed above, the corporations code specifically excludes bringing suit from an activity that requires foreign corporations to register in the state. Utah Code Ann. § 16-10a-1501. Additionally, under the Assumed Name Statute, an unincorporated association's failure to register would not bar the plaintiff from bringing suit, because the applicable statute allows the plaintiff to cure the defect through registration.[131]

[130]   *Graham v. Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist.*, 1999 UT App 136, ¶ 13, 979 P.2d 363, 369 (finding an unincorporated association doing business in Utah must register under the assumed name statute to file suit, but that

a failure to register prior to suit can be cured.). *Hebertson v. Willowcreek Plaza*, 923 P.2d 1389, 1392 (Utah 1996) (Discussing Utah Rule of Civil Procedure 17(d): "Clearly the rule contemplates two factors: (i) parties transacting business, and (ii) transacting such business *under a common name.*")

131    *See Graham v. Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist.*, 979 P.2d 363, 369 (Rejecting argument that failing to register under Assumed Name Statute deprived court of jurisdiction and holding that Plaintiff could cure deficiencies in complaint by registering under the statute.).

In sum, NCSLT does not conduct business in the state of Utah, and as such it did not need to register as a Utah Business Trust, foreign corporation, unincorporated association, or otherwise, NCSLT brought suit in its own name to enforce its contractual rights with Mr. Taylor. This is exactly the kind of action that was contemplated by the drafters of the UBTRA when they, by reference, excluded this activity from the definition of trust business. As such, the Taylors' arguments that NCSLT did not have standing, either because Utah does not recognize Delaware statutory trusts' independent legal existence, or because NCSLT should have registered as a Utah Business Trust, are meritless. NCSLT had legal capacity and standing when it brought suit in 2014.

CONCLUSION

The Court finds NCSLT owns the loan and owned it in 2014, Mr. Taylor owes on the loan, and NCSLT had legal capacity and standing to bring suit in Utah in its own name. The Court thus DENIES the Taylors' Motion for Summary Judgment and GRANTS Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 673458

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.