**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHELSEY GOSSE, *on her own behalf and on behalf of other similarly situated persons*, <br><br> Plaintiff, <br><br> v. <br><br> TRANSWORLD SYSTEMS, INC.; U.S. BANK, N.A.; RATCHFORD LAW GROUP, P.C.; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, <br> Defendants. | Case No: 3:20-cv-01446-RDM-MCC <br><br><br><br> (JURY DEMAND) |

**PLAINTIFF'S COUNTER-STATEMENT**
**OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO**
**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

The following undisputed material facts are not addressed by the Defendants'

proposed Statement of Facts but are material to the issues before the Court herein

and are stated in opposition to Defendants' renewed Summary Judgment Motion

("the Motion) as a Counterstatement of Undisputed Material Facts ("CSMF") as

follows:

A. UNDERLYING COLLECTION ACTION BY THE TRUST AGAINST PLAINTIFF
   GOSSE

1.     The Trust sued Plaintiff in a Pennsylvania state court proceeding.

Lehigh Cty. Case No. 2019-C-2482. **Ex. A**

2.      The Plaintiff (defendant in the state court action) moved to dismiss the

action by preliminary objections asserting that the Trust lacked standing. *See* **Ex. B**.

3.     Plaintiff's preliminary objections in the state court action were

1

granted. **Ex. C**.

4.    The Order is final and was not appealed.

**B. THERE IS A MATERIAL ISSUE OF FACT AS TO WHETHER THE DEFENDANT TRUST POSSESSES SCHEDULE 1 TO THE POOL SUPPLEMENT LISTING THE LOANS ALLEGEDLY TRANSFERRED TO IT OR WHETHER SCHEDULE 1 DERIVED FROM TERI'S LOAN DATABASE IS NOW LOST**

5.    According to the Amended and Restated Loan Origination Agreement between The Education Resources Institute, Inc. ("TERI") and Bank One. TERI would gather the data concerning loans made in the name of Bank One.  *See* **Ex. D** ("Loan Origination Agreement") at pg. 2, Sec. 1.

6.    Regarding loans originated by TERI as private label loans under the names and charters of banks like Bank One's loan to Plaintiff, TERI, at one time had two loan databases derived from its loan guarantor duties:

    a.  TERI's "Loan Database" containing unredacted information about the loans, lenders, and borrowers, and;

    b.  A redacted version of that database called both the "Delivered Database" and "Initial Loan Database".[1]

---

[1] The "'Loan Database' consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria. *See* **Ex. E** at p. 24, "Database Agreement" Article I, "Definitions."

*See* definition of terms in the June 2001 "Database Sale And Supplementation Agreement" hereinafter "Database Agreement" attached hereto as **Ex. E**)

7.    The term "Loan Database" is defined in the June 2001 Database Agreement among First Marblehead Education Resources, Inc. ("FMER"), TERI, and First Marblehead Corporation ("FMC") as follows:

> "Loan Database" consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including, without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria.

**Ex. E**, "Database Agreement" at p. 2 Article I, "Definitions".

8.    The terms "Delivered Database" and "Initial Loan Database" are defined in the Database Agreement as meaning the database created pursuant to Sections 3.01 and 3.02 therein, in relevant part from Sec. 3.01 "INITIAL LOAN DATABASE AND UPDATES" stating:

> **TERI and/or its Outsource Provider will create a derivative work of the Loan Database as it exists on the Closing Date, by deleting therefrom all Excluded Data**…referred to in this Agreement as the Delivered Database and its contents as the Initial Loan Database. … **Each Update shall consist of all additions or modifications, other than Excluded Data, made to the Loan Database** since the last previous delivery hereunder, and shall be added to and deemed a part of the Delivered Database. (emphasis added).

*Id.*

9. "Excluded Data" in the Database Agreement means:

(a) the name of any borrower or obligor, (b) any unique identifier with respect to any borrower or obligor such as social security number or complete mailing address, (c) the identity of any lender with respect to any loan, and (d) any data of any type provided to or held by TERI with respect to loans originated by National City Bank.

*Id.*

10.     Thus, TERI retained ownership of the unredacted Loan Database while the First Marblehead entities had access only to the redacted "Delivered Database"/ "Initial Loan Database".

11.     Despite this contractual restriction on social security and other personal identifier data being passed to FMER from TERI, the Trusts' servicer, Pennsylvania Higher Education Association ("PHEAA") t/a American Education Services ("AES") testified through its corporate representative, Jennifer Wilbert ("Wilbert"), that it received the social security information from FMER on behalf of TERI. **Ex. F**, Wilbert Dep., 92:2 – 19.

12.     Thereafter, in 2010 in regard to the foregoing loan databases, FMC, FMER, and FMER's wholly owned subsidiary, TERI Marketing Services, Inc. ("TMSI")[2], engaged in adversary litigation with TERI in TERI's bankruptcy wherein the Court addressed TERI's proprietary rights to restrict access to its data in its

---

[2] TMSI is described as FMER's wholly owned subsidiary in the Marketing Services Agreement, **Ex. G**.

"Delivered Database" and "Loan Database" as described in the "Database Agreement" and the effect of the 2008 Transitional Services Agreement ("TSA") on those rights, and held in relevant part the following:

> Importantly, the TSA also addressed the status of the Loan Database, as previously governed by the Database Agreement. Under the TSA, First Marblehead would retain perpetual rights to use of the Loan Database (in its redacted form), and would, in return for a fee to be paid by TERI, assist in *rebuilding* TERI's copy of the Loan Database. TSA, § 2.1.

**Ex. H**, In re THE EDUCATION RESOURCES INSTITUTE, INC., 442 B.R. 20, 22 (D. Mass. E.D. 2010).

13.     Regarding the "Database Agreement" referenced in the foregoing opinion excerpt; the Court explained that it "…provided for, among other things, (1) the transfer of a redacted version of TERI's Loan Database to First Marblehead[3] and (2) continued updating of the Loan Database." Id.

14.     The adversary bankruptcy hearing transcript underlying the Court's foregoing opinion discusses TERI's loss of its original database which then caused it to rely on FMER's redacted information to rebuild it and that TERI's unredacted Loan Database was not available to FMC/FMER. Hr'g Tr. 29:6-31:20 (Nov. 29,

---

[3] Note that the Court referred to "First Marblehead" as a collective term of First Marblehead Entities consisting of FMC, FMER and First Marblehead Data Services, Inc. ("FMDS"). However, the "Master Servicing Agreement" clarifies that FMC is prevented from the disclosure of Servicing Information to FMC, leaving FMC with only information in the "Delivered Database." (*See* the July 1, 2001 "Master Servicing Agreement" attached to Meyer's Declaration (Dkt No. 176-6) as Ex. 2 at pg. 24 "Sec. 11.14(c) Confidentiality and Restrictions on Use of Information, Firewall").

2010), ECF No. 1184. The relevant parts of the transcript in a dialogue between the

Court and FMC's counsel Jenkins are as follows:

> MR. JENKINS: … TERI did retain its right to the, quote/unquote, "loan data base." That was not transferred to the First Marblehead entities. The question obviously is, "Well, where did it go?" What happened was that TERI did not maintain its database. **It was not stored anywhere** that we're aware of, nor did they state anywhere in their pleadings that it went to any particular place; but that was not what was sold to the First Marblehead entities.

> What was sold to the First Marblehead entities was the right to this delivered database, and what would be retained by TERI, this loan database, would remain subject to certain restrictions. So in essence, like a license -- an exclusive license right.

> THE COURT: And just so that I'm clear, the loan database is simply the unredacted delivered database.

> MR. JENKINS: I believe that is what it's defined as, right.

> THE COURT: Okay. So it is the gross pile of information –

> MR. JENKINS: Right. It's what TERI had before we entered into this agreement –

> THE COURT: Right.

> MR. JENKINS: -- and what it -- what it retained.

> THE COURT: Is what TERI had before it redacted.

> MR. JENKINS: Right, and sent over that delivered data base to First Marblehead.

> THE COURT: Right.

> **Ex. I**, 29:6 – 30:2 (emphasis added)

6

15.     Because FMER and FMC did not store or otherwise have full access to

the Loan Database from TERI, they allegedly added to the Delivered Database

redacted data information from unidentified and therefore unknown sources to fill

the missing information:

> MR. JENKINS: So after receiving the delivered database, the First Marblehead entities began using data from its own propri -- for its own proprietary and permitted uses. The First Marblehead entities also obtained data from other sources in other contexts, in other capacities unrelated to TERI, and much of its information overlapped with what eventually you would describe as the loan database.
>
> So in other words, First Marblehead on its own, had collected much of what TERI would call the loan database from other sources. For example, First Marblehead was the admin -- is the administrator for trusts holding somewhere around twelve billion dollars' worth of student loans. That information First Marblehead had on its own, in no capacity related to TERI. So over time, the delivered database was built out, made more robust, and to that information that First Marblehead retained it added its own proprietary and permitted use information.
>
> So for years prior to the rejection of the Data Base Agreement, the First Marblehead entities as a service provider to TERI provided TERI with access to two of the First Marblehead entities' proprietary data bases, known as the Guarantee System and the RMS System. So on a daily basis TERI could access these systems at First Marblehead and get access to its database information.
>
> Why it did not at some point realize it didn't keep its loan database and take that information and rebuild it, we don't know. But what is clear is that First Marblehead had no obligation to maintain, store the loan data base that was TERI's, for it.
>
> So as we come to the petition date in the case, shortly thereafter TERI decides to reject what's referred to as the FMC contracts, one of which was the Data Base Agreement. TERI had two problems though.

It needed the FMC entities to provide transition services so it could move some of those services to its own platform; and it needed FMC's entities' help to rebuild the loan database that it had not maintained.

**Ex. I**, 30:8 – 31:20 (emphasis added)

16.     In approximately 2001, TERI agreed to sell to FMER and FMC (a) the "Delivered Database" and (b) virtually all of TERI's loan-related and administrative operations. (*See* Master Servicing Agreement between TERI and FMER/FMC (ECF No. 176-6, Ex. 2 thereto). TERI also agreed to outsource TERI's origination, staff support, and other administrative functions exclusively to FMER to perform origination, servicing, and other services for it.[4]

17.     Notwithstanding the sale to FMER and FMC of its operations and of the Delivered Database, TERI retained ownership of its Loan Database and the Master Servicing Agreement restricted FMC's access to only the redacted Delivered Database and requiring FMER to refrain from disclosing Servicing Information to FMC.[5]

---

[4] 2.01 FMER SERVICES. TERI hereby hires, designates and appoints FMER as its agent and consultant to provide, and FMER hereby accepts such appointment and agrees to provide, all origination services (including underwriting, documentation, technical support and disbursements), customer service, collections, accounting services, guarantee claims management and administrative services reasonably required to service the Programs including, without limitation, the services described in EXHIBIT B attached hereto and made a part hereof (the "Services"). The appointment includes a limited power to act as attorney-in-fact for purposes of prosecuting and settling all collections of defaulted loans.

[5] 11.15 CONFIDENTIALITY AND RESTRICTIONS ON USE OF INFORMATION, FIREWALL.

18.     The parties contemplated that FMC would use the data received from the Delivered Database in the securitization of the loans into the Trusts. **Ex. H** "Database Agreement" at Article II, Sec. 2.02 "FMER Restrictions."

19.     In the Motion, none of the Defendants or their three (3) affiants state they are familiar with TERI's record keeping practices. **Ex. J**, Deposition of TSI's Bradley Luke ("Luke Dep.") 54:15 – 19; Deposition of FMC/Cognition's Jens Meyer ("Meyer Dep.") **Ex. K**, 80:24 - 81: 17.

20.     TERI's Loan Database is lost and neither TERI nor anyone else kept or maintained it. *See* e.g., **Ex. I**, 29:6 – 13.

21.     Servicer AES admitted it did not receive TERI's database or records in statements made to consulting firm hired to perform a servicing review. *See* **Ex. L**, Glanfield Dep. Exhibit 5 thereto, Boston Portfolio Advisors audit.

## C. DEFENDANTS HAVE NOT PRODUCED SCHEDULE 1 TO THE POOL SUPPLEMENT

22.     The Trust claims an interest in Gosse's loan along with other loans

---

(c) FMER agrees to use all information it receives from TERI concerning Program loans and borrowers including, without limitation, nonpublic personal information described in Section 11.15(b) and all Servicing Information, solely for purposes of providing the Services and not to disclose the same to any Person except (i) as necessary to perform the Services, and (ii)only subject to a confidentiality agreement. In particular and not by way of limitation, FMER shall establish clear policies and procedures to prevent the disclosure of Servicing Information to FMC. Such policies shall restrict disclosures to FMC solely to the Delivered Database as defined in the Database Sale and Supplementation Agreement of even date herewith among TERI, FMER and FMC. FMC agrees to be bound by the restrictions contained in this Section 11.15.

allegedly sold and transferred pursuant to the terms of a Pool Supplement between JP Morgan Chase and National Collegiate Funding, LLC. *See* **Ex. M**.

23.    The subject Pool Supplement states that the loans being sold and conveyed were "set forth on the attached Schedule 1". ECF 176-6, Meyer Declaration, ¶ 7(a), Ex. 4.

24.    Defendants have not produced any document with the term "schedule" in it to describe the loans, including Plaintiff's loan, that were allegedly sold and transferred into the Defendant 2007-3 Trust 1.

25.    Cognition Financial, f/k/a First Marblehead Corporation ("FMC"), testified that an excel spreadsheet populated from its MS Access database systems titled "Loan Sale Roster" serves as "Schedule 1" to the Pool Supplement for the 2007-3 Trust despite the term "schedule" being absent from the document. **Ex. K**, Meyer Dep. 85:16 – 21 (the excel spreadsheet/ "Loan Sale Roster" is hereinafter referred to as "the Roster").

26.    FMC's prior affidavit in support of Defendants' original Summary Judgment Motion made no reference to any Defendant possessing a "schedule" or "Schedule 1" to the Pool Supplement despite attaching the same spreadsheet as what currently is the Roster. ECF 112-2.

27.    TSI's prior Luke affidavit from Defendants' original Motion did not identify as Schedule 1 the same Roster exhibit attached thereto.  Instead, the affidavit

described the Roster as a "printout accurately reflecting **the information contained in a digital Excel file maintained by TSI since the file** was received from Cognition on or about November 14, 2012." *See* ECF 112-1 at ¶ 15.b.

28.     TSI's new affidavit from Luke attached to its renewed Motion now describes the same Roster as "reflecting" Schedule 1. *See* ECF 176-6 at ¶ 13.

29.     TSI's Luke testified at deposition herein that he received computer records of the Trusts' acquisition of loans from FMER or FMC, **Ex. J**, Luke Dep. 68:1 - 11.  Luke testified that FMER sent him computer records of many of the Trusts months later in November 2012 via an FTP electronic link and a physical thumb drive, Luke Dep. 69:4 - 12.

30.     Luke previously testified in another National Trust Collegiate Trust collection action in 2014 that:

>   a.  He received computer records of the Trusts' acquisition of loans
>       from an entity known as GSS Data Services, Inc. the administrator
>       of the Trusts. *See* **Ex. M**, 35:8 – 37:19.
>
>   b.  He couldn't affirmatively say in 2014 who created the records **Ex.**
>       M, 36:2–7.

31.     Defendant U.S. Bank testified that the Roster sent by FMER to TSI to allegedly identifying loans owned by the 2007-3 Trust is not Schedule 1 insofar as:

>   a.  There is a Pool Supplement with a schedule attached that identifies

the loans that are sold to the NCF [National Collegiate Funding]

entity and that under the deposit and sale agreement, those loans

are then assigned to [Trust] 2007-3, P, Kaplan Dep. 90:2 - 90:15

b.  All of the information in Schedule 1 is not in the Roster, **Ex. N**,

Kaplan <u>Dep.,</u> 68:5-10.

c.  Not all of the information in Schedule 1 is in the Roster, rather

FMC technicians excerpted data from Schedule 1 to create the

Roster, **Ex. N**. Kaplan Dep. 69:22 - 70:11.

32.    Defendant U.S. Bank also testified that, other than information told to

it by TSI, it otherwise has no knowledge of whether the Roster is one of the

spreadsheets created to show loans transferred to the Trusts as part of the closing of

the securitization of those trusts, **Ex. N**, Kaplan Dep. 73:2 – 78:5.

33.    FMC testified that servicer PHEAA/AES' records reflect which loans

are in any given Trust and that FMC's MS Access Database information is simply

an historical "snapshot" of the loans allegedly sold to the Trusts based on a "roster"

of loan data FMC received from the servicer PHEAA/AES.

34.    PHEAA/AES does not know how FMC assigned loans to the Trusts but

would change the owner's name for loan in its system at FMC's request. **Ex. L**,

Glanfield Dep. 12:01.

35.    FMC's Meyer testified the Loan Roster information is not in any

original undisturbed state but is instead fungible allowing the data to be supplemented by FMC for tracking purposes. **Ex. K**, Meyer Dep. 52:18 – 53:14.

36.    Meyer also testified he is unfamiliar with servicer PHEAA/AES' recordkeeping practices, including any practices involving preservation of the original loan tapes from which the database is created. **Ex. K**, Meyer Dep. 29:1 - 22.

37.    Although Meyer relies upon the servicer data in the loan tapes, he admits the servicers do not have access to Schedules 1 and 2 from the Pool Supplements. **Ex. K**, Meyer Dep. 40:22 – 41:3.

38.    Luke does not have any knowledge of the record keeping systems of the originating banks like JP Morgan, FMER, TERI, or GSS, Luke Dep. 53:18-23; 53:25 – 54:7; 54:15-19; 54:21 – 55:19; 63: 17 – 64:1; 65:13 – 65:18; 141:1 – 141:8.

**D. THERE IS A MATERIAL ISSUE OF FACTS AS TO WHETHER DEFENDANTS KNOW THEY ARE FILING COLLECTION LAWSUITS WITHOUT SUFFICIENT PROOF OF THE TRUSTS' OWNERSHIP OF THE LOANS EVEN AFTER THE 2017 CONSENT ORDER BETWEEN DEFENDANT TSI AND THE CFPB**

39.    Prior to filing the underlying collection action against Plaintiff attorney Ratchford of Defendant Ratchford Law Group, P.C. ("RLG") approximated that he was involved in the filing of dozens of collection actions on behalf of the NCSLT Trusts while at RLG and with prior law firms. **Ex. O**, RLG Dep. 17:9 – 18:8.

40.    Ratchford filed the Gosse collection action attaching a Note Disclosure and a Pool Supplement as Exhibits, RLG Dep. 17:4-8

41.     Ratchford filed other NCT actions using the same exhibit attachments of a Note Disclosure and a Pool Supplement without any reference therein to the defendant borrower's loan. RLG Dep.  27:21 – 28:4.

42.     Ratchford has tried hundreds if not thousands of collection actions RLG Dep. 23:9 – 22.

43.     Ratchford prosecutes collections action for various NCSLT trusts and does so in a uniform manner without regard to which trust is involved. RLG Dep. 25:23 – 26:24.

44.     Ratchford is not sure if he has ever seen or attached a Schedule I to any Pool Agreement in connection with filing a collection action for an NCSLT trust. RLG Dep. 31:5 - 21

45.     In Plaintiff's defense of the underlying collection action as the defendant therein, Plaintiff attached a list of fourteen other lawsuits RLG had filed against student loan borrowers whose loans an NCSLT Trust claimed to own. *See again* **Ex. B**.

46.     RLG testified regarding ten other NCSLT collection complaints it filed that:

a)  All attached as exhibits thereto a Pool Supplement and a Note disclosure statement, RLG Dep. 27:7 – 28:4.

b) All of the Pool Supplement exhibits failed to refer to the defendant borrowers' loan(s) in the collection lawsuits, RLG Dep. 46:9 – 15; 48:24 – 49:5; 52:2 – 10; 57:23 – 58:3; 63:6 – 11; 69:1 – 7; 70:12 – 71:3; 72:13 – 17; 76:3 – 9; 80:5 – 9; 81:6 - 22.

c) All were defended by preliminary objections to the complaint for failure to show transfer of the debt or ownership of the debt, and therefore no capacity to sue by the trust. *See again* **Ex. B**.

d) All of the preliminary objections were granted, and all the cases were dismissed by the state court without appeal. *See again* **Ex. C**

47.    Ratchford testified regarding his understanding of the TSI consent order with the CFPB to be that:

a) TSI agreed to only pursue claims that they owned and were within the statute of limitations, RLG Dep. 96:13- 25.

b) It was not his understanding that TSI was filing false affidavits in support of collection Complaints for the Trusts. RLG Dep. 109:5 – 10.

48.    As a result of becoming aware of the Consent Order:

a) He vaguely remembers investigating his existing NCT files but does not recall closing any of them as a result of his investigation. RLG Dep. 97:21 – 98:24.

b)  He did not recall what changes if any he made with regards to bringing collection actions on behalf of the National Collegiate Loan Trusts. RLG Dep. 95:11 – 21.

### E. There is a Material Issue Fact as to U.S. Bank's Role as Successor Special Servicer in Defendants' Ongoing Conspiracy to File Collection Lawsuits Without Sufficient Proof Of The Trusts' Ownership Of The Loans

49.     While U.S. Bank testified it served a second role as successor servicer, **Ex. N**, Kaplan 11:15 - 11:17, it remains an issue of material fact actions exactly US Bank performs in that role.

50.     On the one hand it testified broadly it doesn't perform any special servicing function pursuant to the terms of the Special Servicing Agreement ("SSA"), 16:22 - 17:04.

51.     However, it then testified it "entered into a special subservicing agreement with [Turnstile Capital Management] to perform certain activities related to the special servicing for the 2007-3 [trust]". *Id.* at 23:11 - 24:02.

52.     When pressed further as to whether U.S. Bank assigned all of its functions as successor special servicer to Turnstile, its counsel would not permit answer in this regard. Id.

53.     However, to confuse matters more, U.S. Bank also testified to participating in a review of Defendant TSI's special servicing of the Trusts, *Id.* at 50:18 - 51:08.

16

54.     The only other insight into U.S. Bank's special servicing role from discovery herein was that its role is limited to covering delinquent or defaulted loans. *Id.* at 35:21 - 36:03.

55.     Attempting to gain insight into US Bank's role as successor special servicer from a different angle, Plaintiff queried US Bank regarding any payment for services it may have rendered to the Trusts or entities related thereto.  US Bank admitted it was due a special servicing fee which it then declined and redirected fully in a 62/38 percentage split to NCO and Turnstile Capital Management, LLC 14:12 - 15:05.

56.     Asked further whether it had assigned all of its functions as successor special servicer to Turnstile, US Bank was again forbidden to answer by counsel. 23:11 - 24:02.

**PLAINTIFF'S RESPONSE TO
<u>DEFENDANTS' PROPOSED STATEMENT OF MATERIAL FACTS</u>**

Pursuant to F.R.CP. 56, Plaintiff submits the following response to the Proposed Statement of Material Facts in Support of the Renewed Summary Judgment Motion of Defendants National Collegiate Student Loan Trust 2007-3 (the "Trust"), U.S. Bank National Association ("U.S. Bank"), Transworld Systems Inc. ("TSI"), and Ratchford Law Group, P.C. ("Ratchford"), (collectively the "Defendants")(ECF 176):

1. Admitted and denied.

a. It is admitted that student loans were allegedly originated by TERI in the name of the participating national banks as alleged generally by FMC's affiant Meyers in ¶ 4 of his affidavit/Declaration (ECF 176-1). There are no facts alleged to show that Meyer has personal knowledge for the statement made in the last sentence of ¶ 4. Any sales of specific loans were pursuant to the terms of a Pool Supplement that states the loans sold are identified on Schedule 1 to the Pool Supplement. *See* **Ex. K**, Meyer Declaration, ECF 176-6 at ¶ 7-8, 11(e), Ex. 5 thereto. The lack of Schedule 1 is discussed above and below.  A state court has already ruled that the Defendant Trust lacked standing to pursue its underlying collection action against Ms. Gosse having failed to respond to Ms. Gosse's preliminary objections to its complaint which objected to the Trust's standing to sue her as owner of the subject loan. *See* Exhibit C, State Court judgment.

b. The Defendants cannot show ownership of the loan through admissible evidence. The Pool Supplement stated that the loans being sold and conveyed were "set forth on the attached Schedule 1". Ex. __ at p.1. The issue has always been that the Defendants do not have Schedule 1 to the agreement and therefore cannot state which loan belongs to any particular trust, i.e., ECF 67 - Amended Complaint at

¶46 "The Pool Supplement attached to [the underlying Gosse collection complaint] does not include the Loan Schedule". In Meyer's affidavit in support of Defendants' prior Summary Judgment Motion (ECF 112-1, hereinafter "the prior Motion"), he never made reference to any "schedule" at all much less that FMC had "Schedule 1" to the subject Pool Supplement. Defendants' new Meyer affidavit claims that FMC created and holds Schedule 1 while at the same time Meyer disclaims that FMC has any custodial status or obligation to maintain documents at all. *See* ECF 176-1, Meyer Declaration at ¶ 6. Putting aside the inconsistency with his prior affidavit omitting reference to any schedule and that FMC cannot attest to any chain of title from origination as the document's custodian, a review of testimony concerning the document he now calls Schedule 1 shows that at most he testified that the same referenced Excel spreadsheet allegedly extracted from its MS Access database "serves as Schedule 1", not that it is Schedule 1. *See* **Ex. K**, Meyer Dep. 85:16-21.

The document Meyer now describes as "Schedule 1" from FMC's MS Access database is allegedly created from loan tapes allegedly received from the servicer, PHEAA. *See* Exhibit B, Meyer Dep. 74:16 -75:6.  Meyer describes the loan tapes as the sole source of the MS

19

Access database, **Ex. K**, Meyer Dep. 37:5-8; 39:18 – 40:6; 52:18 – 53:14.  The loan tapes are not authenticated by anyone. **Ex. K**, Meyer Dep. 29:4 - 30:4; 31:13-19; 61:18 – 62:6.  However, there is no effort to explain the loan tapes' origin. Who created them? What systems were used to create them and when and why? Without these basic facts, the loan tapes and anything derived from them are not admissible as evidence since computer records are no different than any other records - they must be authenticated before they are admitted as evidence.

2.      Denied. There has been no discovery conducted of the issues relating to the program, any party's role therein, or its purpose. The Defendants should not be allowed to assert facts relating to any program or its purpose having been granted by the Court their request to limit discovery to ownership. In any event, this statement does not show the Defendant Trust owns the Plaintiff's loan. The state court found otherwise. *See* **Ex. C**.

Moreover, FMC was not the party who originated the loans. The loan documents relating to the origination were created and held by The Education Resource, Inc. (TERI).  TSI's Bradley Luke in ¶ 9 of his prior affidavit at ECF 112-2 admitted this:

> The Education Resources Institute, Inc. ("TERI") processed the Loan at origination, ensured the Loan was disbursed, and initially

> maintained the loan records and documents that were created during the origination and disbursement process (the "Origination Records").

Yet, TSI's Luke testified that he was not familiar with the record keeping of TERI[6] while FMC's representative Meyer testified to the same[7]. Therefore, neither FMC nor TSI can authenticate the loan assignment documents nor can they provide any testimony upon which this Court may find that the loan assignment documents they present qualify for admission into evidence under the business record exception to the hearsay rule.

To the extent that the Court is concerned about the purpose of the loan program, the purpose was to use a rent-a-charter scheme with national banks such as Defendant US Bank to sell the pooled student loans to eventual securitized bond investors. The details were set out in a summary:

---

[6] Luke Dep. 54:16-19 ("Q. Do you have any knowledge of the recordkeeping of TERI? MR. SHARTLE: Object to the form. THE WITNESS: No, sir.").

[7] Q. Okay. I just -- and then, my other question is, when we were discussing the different participants, do you know what role the Education Resources, Inc. played in this -- in these transaction… MR. HOMES: Objection. THE WITNESS: You mean [TERI]? BY MR. BORISON: Q.   Yeah. Yeah, I'm sorry, the formal name is the Education Resources, yes, but you can call [it] [TERI]. A.   Yeah, so it's my understanding that [TERI] was the grantor on loans. Q. Did they play any role in the recordkeeping, as far as you know? MR. ROTA:   Objection. THE WITNESS:  I would not be a hundred percent sure in detail.  But they -- they would be informed of the loan securitizations and the transfer of ownerships since they are guaranteeing the loans. BY MR. BORISON: Q.   They would be provided information, but would they generate any information or maintain any information, to your knowledge? MR. HOMES: Objection. THE WITNESS: I would not know, since I -- I never worked for [TERI]. Meyer Dep., 80:24-81:17.

Summary of Program Participants

Program Lender: As program lender, [LENDER NAME] is an FDIC insured financial institution able to "export" the laws concerning interest rate and fees from the state where Lender is located to all 50 states. [LENDER NAME] will sub-contract origination functions to TERI but will be the legal entity who approves credit criteria and makes program loans in accordance with TERI underwriting guidelines. [LENDER NAME] will provide initial loan funding and own the loans until they are purchased in a transaction organized by the Securitization Sponsor at agreed upon intervals.

Program Origination Processing: TERI will provide the full complement of alternative student loan origination capabilities for [LENDER NAME]'s programs. These services include application processing, underwriting, loan documentation and disclosure, and loan disbursement processing. TERI may subcontract these services as provided in the Loan Origination Agreement.

Program Guarantor: The Education Resources Institute, Inc. (TERI) will provide loan guarantee services on behalf of the Lender during the loan holding period and then to the Securitization Sponsor from the point of purchase forward. As guarantor, TERI approves the program's underwriting guidelines.

Program Servicer: The Servicer, [Pennsylvania Higher Education Assistance Agency (PHEAA)] is responsible for performing loan servicing and administration services over the life of the loan. The Servicer maintains loan servicing procedures in accordance with the loan program guidelines.

*See* Ex. ___.

3.      Admitted and denied.

a.  It is admitted that the loans sold under that Agreement were to be
    identified on a Schedule 1.

b.  It is denied that defendants have provided Schedule 1 that identifies
    which loans were actually sold to the Trusts including the Defendant
    Trust herein. While at first blush the testimony offered by Meyer
    suggests that FMC had the original Schedule 1 in its possession, his full
    testimony shows that the document he claims is Schedule 1 is actually
    just a second or later generation excel spreadsheet which, as previously
    discussed herein above, FMC titled, "roster", and which FMC extracted
    from a MS Access Database that FMC populated from "Loan Tapes"
    provided to it by PHEAA/AES. Meyer's deposition testimony also
    confirms that the document he claims is Schedule 1 only "serves as"
    rather than constitutes Schedule 1. *See* Meyer Dep. 85:16-21.

Nor has it been shown that the Roster derives from the actual original source,
the TERI database. Instead, Meyer testified that the MS Access Database
information is not a history of the loan information but simply a "point in time
reflection" of the loans allegedly sold to the Trusts as a "roster" of loan data FMC
received from the servicer PHEAA/AES with whose recordkeeping practices he is
unfamiliar. Meyer Dep. 29:4 - 30:4; 61:18 – 62:6. Yet, in circular fashion PHEAA's

representative testified that the source of any loan information it had was FMC, *See*

again ECF 176-4 at ¶ 12.  PHEAA also stated to Boston Portfolio Advisers that it

did not have information relating to assignments of the loans[8].

Finally, neither PHEAA's loan data nor FMC's MS Access Database

information is in any original undisturbed state. Instead, FMC admits that its excel

spreadsheet database of loans merely "serves as" the schedule that were sold to the

trust, not that it is the original source data from a traceable historical chain from

origin to FMC's systems or PHEAA's systems[9].  Also, FMC admits its secondhand

spreadsheet data has no historical information regarding its origin[10]. Indeed, Meyer

---

[8] **Ex. N**, Glanfield Dep. 11:18 - 012:19 ("Q. So there's a statement, "PHEAA is not aware of the criteria FMC used for assigning a batch of loans to any given trust, except the general knowledge that FMC was able to package loans and appeal to investors." Correct? A. That was our understanding, yes. Q. Right. And that was an understanding that you reached based on your interviews with PHEAA; correct? A. That's correct.").

[9] **Ex. M**, Meyer Dep. 37:5-8 ("A. …we do have the MS Access Database that **serves as, essentially**, the initial roster of the loans that were sold into the trust.")(emphasis added). **Ex. M**, Meyer Dep. 85:16 – 21. ("Q. Okay. Is it, Exhibit 3, Cognition-Gosse-002, the document you referred to earlier, as Schedule I to the Pool Supplement? A.  Yes, it would **serve as** Schedule I to the Pool Supplement.")  See also: **Ex. M**, Meyer Dep. 31:13-19 ("Q. …do you have any knowledge of who created the information that was placed into the loan tapes?  A.  That would be the system processes at the loan servicer, and that would have been employees of the loan servicer that would service the loans"). Further: **Ex. M**, Meyer Dep. 40:13 – 41:10. ("A.  … you could go to a system of records and ask for data extract from the system of records at the loan level to create a loan roster of loans that were sold into the trust. Q.  And when you say system of records, what does that mean? A. That would be the loan servicing system. Q. Okay. Did the loan servicers have Schedule I or Schedule II, to your knowledge? A. Not to my knowledge. Q. Would you know if they did have those documents? A. I would not necessarily know if they have those documents. Q. Who would know? A. The loan servicer.").

[10] **Ex. M**, Meyer Dep. 39:18 – 40:6. ("Q. And so, these Excel spreadsheets, are they based on information taken from the MS Access Database we've been discussing? A. That's correct. Q. Is there any other source for that information?  A.  It could be recreated on the loan data tapes, directly. Q.   But the loan data tapes is the same information that's already populating in your MS

admits he did not consult the Pool Supplements directly for loan information prior to his deposition testimony, Meyer Dep. 38:15-22. He did not do so because he admits further that what he understands to be "Schedule I" to the Trust's Pool Supplement was always merely electronic data disconnected from any paper data like the Pool Supplement itself [11].

However, FMC believes PHEAA has the original loan ownership data although it does not and believes it despite FMC not knowing anything about PHEAA's recordkeeping practices[12]. Finally, FMC admits its data can be and is supplemented or changed thereby further undermining its trustworthiness as an

---

Access Database, correct? A. That's correct."). Also see: **Ex. M**, Meyer Dep. 61:18 – 62:6. ("Q.     So, if the loan tapes do not contain the metadata, you do not know the history of the information contained in the loan tapes, correct?  A. There is no history in the loan tapes. The loan tape is a standardized data abstract from the system of records. It's a point in time reflection of the data as it was extracted out of the system of record, as such, it does not have history.")

[11] **Ex. M**, Meyer Dep. 95:4-24. ("Q. You said that you were told about information, who told you? A. That would be multiple people at the company.  Q. Do you have any names? A. Uhm, I would not be able to recall the names, but it was discussions in the ordinary course of business. MR. BORISON: Okay. That's all. MR. ROTA: Scott, I just want to make sure we're all clear. … the question you just asked referred to Mr. Meyer's testimony regarding why the Schedule I … was a separate file and not incorporated into the document itself; is that right?
MR. BORISON: That's correct.").

[12] **Ex. M**, Meyer Dep. 29:4 - 30:4. ("Q. … are you familiar with the recordkeeping of any of the servicers that sent you loan tapes? A.   Can you clarify what you mean with the recordkeeping?  Meaning whether they preserved the loan tapes they sent to us or the internal recordkeeping of their own internal systems? Q.     Well, we know they preserved the loan tape they sent to you because you got data off of them, correct? A.  I do not know if -- the servicers preserved the loan tape itself, if they sent it to us. Because it's just a data extract as part of a data exchange between the loan servicer and us. Q. … are you familiar with any of the servicers' internal recordkeeping? A. No, no, I am not.")

original loan data source [13]. PHEAA admits the same fungible nature of the data in its loan ownership database.[14]

4.      Denied. Until Plaintiff can show that Plaintiff's loan was transferred to the Defendant Trust, any program under which Plaintiff's loan was allegedly originated is irrelevant for purposes of determining the Motion herein.

5.      Admitted. Gosse has never disputed having received a loan. The Defendants have only presented a single page of this loan document, not the complete document. The single page states there are "four (4) pages of this Loan Request/Credit Agreement". The single page provided shows that the Plaintiff was charged a 7.5% origination fee. The issue here is whether the Defendant Trust owns her loan. This single page of a four-page document does not show that the Defendant Trust owns Gosse's loan.

---

[13] **Ex. M**, Meyer Dep. 52:18 – 53:14 ("A. … the database are sourced from the loan data tapes. **We add additional attributes to the records**… if I get one hundred loans in a data tape from the loan servicer, then my database for that data tape would contain one hundred loans, but I may have an additional data element that is a unique identifier of the individual loan record. It may have a date column that specifies when that loan record was loaded into the database, and it may contain additional enhancements that we do in order to better carry the data, aggregate the data, group the data, but the core attributes are coming from the loan data tape would not be touched")(emphasis added). See also: **Ex. M**, Meyer Dep. 77:12 – 78:4. ("Q. Okay. And your testimony is that you looked at Schedule I, which you considered to be the document you referenced  at 10A, correct? A.  Yes. Q. Is that document - is it labeled Schedule I on that? A.  No, it is not labeled Schedule I.  Q. Why not? A.  Because we use a different naming convention for these Excel spreadsheets. Q. But the Pool Supplements use the term Schedule I, correct?").

[14] **Ex. N**, Glanfield BPA Dep. 12:11-19 ("Q. And the same for the next sentence, which said, "PHEAA would change the owner on its system upon notification from FMC"; correct? A. That's what we have, yes. Correct. Q. Right. And that would have been based on information you obtained from PHEAA? A. Correct.")

6.    Denied to the extent that the Defendants claim that, because a single page of a four-page document identified a particular loan program, that means the loan was covered by the referenced Pool Supplement. As stated above, the loans covered by the Pool Supplement are those identified in Schedule1 which Defendants have not produced.  These arguments are also estopped and barred by the state court ruling against the Defendant Trust herein.

7.    Denied to the extent that the Defendants claim that because a single page of a four-page document identified the term "full deferment" that it somehow means the loan was covered by the referenced Pool Supplement. As stated above the loans covered by the Pool Supplement are those identified in Schedule 1 which Defendants have not produced.   These arguments are also estopped and barred by the state court ruling against the Defendant Trust herein.

8.    Denied to the extent that the Defendants claim that the loan having been disbursed to Plaintiff means the loan was somehow covered by the referenced Pool Supplement as a transfer or assignment to the Defendant Trust. As stated above, the loans covered by the Pool Supplement are those identified in Schedule 1 which Defendants have not produced. These arguments are also estopped and barred by the state court ruling against the Defendant Trust herein.  *See* Order attached as **Ex. C**.

9.    Denied to the extent that the Defendants claim that since PHEAA serviced the loan for JP Morgan Chase that means the Plaintiff's loan was covered

by the referenced Pool Supplement or that PHEAA has any knowledge about JP Morgan Chase and how they kept and maintained documents for the Trust.  testified that PHEAA has no knowledge as to the accuracy of organization documents or data. **Ex. F**, Wilbert Dep., 142:13 – 20; 143:4 – 23. As stated above the loans covered by the Pool Supplement are those identified in Schedule 1 which Defendants have not produced.  These arguments are also barred by the state court ruling against the Defendant Trust herein. *See* Order attached as **Ex. C**.

10.    Denied to the extent that the Defendants claim that the signature indicates the document is "fully executed" when Defendants have not provided the complete agreement.  Further, the delivery of one page of four pages to PHEAA does not mean the Plaintiff's loan was covered by the referenced Pool Supplement. As stated above, the loans covered by the Pool Supplement are those identified in Schedule 1 which Defendants have not produced. PHEAA also testified that PHEAA has no knowledge as to the accuracy of organization documents or data. **Ex. F**, Wilbert Dep., 143:4 – 23.  These arguments are also barred by the state court ruling against the Defendant Trust herein. *See* Order attached as **Ex. C**.

Further, Defendants rely on the revised declaration of Meyer to describe the role of FMC's subsidiary affiliated entity, FMER, in transfer of loans to the Trusts, but Meyer testified FMER played no role[15].

---

[15] **Ex. M**, Meyer Dep. 56:5-18. ("Q. And the information -- so, we talked about role of First

11.     PHEAA servicing of Plaintiff's loan and possession of one page of a four page Note Disclosure Statement document does not show the Defendant Trust owned Plaintiff's loan. The loans covered by the Pool Supplement were identified in Schedule 1 and that document has not been produced as discussed above. The arguments are also barred by the state court ruling against the Defendant Trust herein. *See* Order attached as **Ex. C**.

12.     Denied to the extent that Defendants rely on this allegation to claim that Plaintiff's loan was covered by the Pool Supplement. The loans covered by the Pool Supplement were identified in Schedule 1 and that document has not been produced as discussed above. These arguments are also barred by the state court ruling against the Defendant Trust herein.  *See* Order attached as **Ex. C**.

13.     Denied. The loans covered by the Pool Supplement were identified in Schedule 1 and that document has not been produced as discussed above. The arguments are also barred by the state court ruling against the Defendant Trust herein. *See* Order attached as Ex. **Ex. C**.

14.     Denied. The loans covered by the Pool Supplement were identified in Schedule 1 and that document has not been produced as discussed above.

---

Marblehead Data Services, the National Collegiate Loan Funding, LLC, what about -- what was the role, if any, of The First Marblehead Education Resources, Inc., in these transactions? MR. HOMES:  Objection. THE WITNESS:  It wouldn't – as far as I know, they would not have a role in the transaction itself, outside of providing default prevention services on the loans that are being sold from the loan owner or lender to the trust. ")

15.     Admitted that there may be other Pool Supplements, but the mere existence of other Pool Supplements does not show Plaintiff's loan was covered by any particular Pool Supplement. The loans covered by the Pool Supplement at issue herein were identified in Schedule 1 and that document has not been produced as discussed above.

16.     There has been no discovery conducted of the issues relating to the corporate relationship between these entities. The Defendants should not be allowed to assert facts relating to any program or its purpose having been granted by the Court their request to limit discovery to ownership. In any event, this statement does not show the Defendant Trust owns the Plaintiff's loan. The state court found otherwise. *See* **Ex. C**.

17.     Admitted that the loans covered by the Pool Supplement are set forth in a Schedule 1. Denied to the extent that the Defendants claim to have produced Schedule 1 to the Pool Supplement, but have not done so and have no credible factual to assert this for the reasons set forth above. **CSMF**

18.     Denied.  The testimony provided by Meyer is that he produced excel spreadsheets from a MS Access Database that was populated by "loan tapes". *See* **CSMF** herein. The contention is also contradicted by Luke's prior testimony that it was TERI's role to originate the loans. *See* ECF 112-1 at ¶ 9. It is also inconsistent with the terms of the Loan Database Agreement that identified TERI as the holder

of the unredacted loan information and only provided for FMER to receive a "delivered database" of the loans. *See again* **Ex. H**.

19.    Denied. *See* **CSMF** . Also, the Pool Supplement does not describe Schedule I as an electronically formatted rather than a paper document attachment. Thus, Meyer testified that the roster excel spreadsheet which Movant is referring to herein "would serve as Schedule 1", i.e., it is not actually Schedule 1 to the Pool Supplement agreement. **Ex. K**, Meyer Dep. 85:16-21.   In fact, none of the affiants who submitted declarations in support of Defendants' Motions and who were deposed herein by Plaintiff can attest that the FMC or PHEAA loan "roster" information even accurately captures the information in the original loan tapes from which FMC says the loan roster was allegedly derived.  In fact, US Bank testified it could not do so per US Bank, **CSMF 31(b) and (c)**. The original loan tapes have never been produced much less authenticated. Moreover, the Defendants have offered conflicting testimony concerning the source of these loan tapes. FMC testified that it received the loan tapes from the servicer, PHEAA. *See* Meyer Dep. 40:22 – 41:3CSMF explaining that FMC's MS Access Database was populated from loan tapes it received from the servicers.   PHEAA testified "When a pool of Loans was sold, PHEAA received from First Marblehead Corporation electronic data identifying all of the Loans serviced by PHEAA that were subject to the particular sale to the National Collegiate Student Loan Trust entity. been produced." *See* ECF

31

176-4 at ¶ 12. Absent from PHEAA's affidavit is any claim that the electronic data it received is Schedule 1 to the Pool Supplement.  Thus, in circular fashion FMC and PHEAA claim the loan tape information came from the other.

20.    Denied. *See* responses to 1, 2, 3, 18 and 19.

21.    Denied. *See* responses to 1, 2, 3, 18 and 19.

22.    Admitted and denied.

> a.  Admitted that the loans covered by the Pool Supplement are set forth on Schedule 1 to the Pool Supplement.
>
> b.  Denied to the extent that the Defendants claim to have produced Schedule 1 to the Pool Supplement for the reasons set forth above in response to Nos. 1, 2, 3, 18 and 19.

23.    Denied. The database was populated from information included in loan tapes. Meyer testified that he received the loan tapes from the servicer, PHEAA.

24.    Denied to the extent that it is claimed that the loan tapes were part of the origination of the loans. There is no record evidence that is true.

25.    Denied. Meyer testified the excel spreadsheets were produced from the MS Access Database that was populated from the loan tapes. CSMF Meyers Dep., 87:8 – 15; *See also* **Ex.** __ ("Cognition-Gosse-001" and Ex. 2 to Meyer Dep.).

26.    Denied.  This statement does not show the Defendant Trust owns the Plaintiff's loan. The only source for loans covered by the Pool Supplement is the

Schedule 1 that Defendants have not produced. To the extent that the Defendants contend this shows ownership of Plaintiff's loan by the Defendant Trust, the state court found otherwise. *See* **Ex. C**. Additionally, nowhere in the Meyers Decl., ECF 176-6, ¶ 8 does he attest that the "Roster" attached as Exhibit A-5 to his Declaration is the "Roster tab" of Schedule 1 of the Pool Supplement. See ECF 176-6 at ¶ 26, n. 5.

27.     Denied. The referenced ¶ 13 of the "Trust Receipt" does not refer to Plaintiff's loan. To the extent that PHEAA is claiming to state in its Declaration facts based on information from a notice that it received from an unidentified third party, it is inadmissible hearsay. **Ex. F**, Wilbert Dep., 62:9 – 19. PHEAA also testified it had no obligation to verify the accuracy of any information provided to it. Defendants' reliance on the testimony of Wilbert in her affidavit is misplaced. Ms. Wilbert's testimony is about what documents unattached to the Pool Supplement say and/or what PHEAA's COMPASS servicing system "reflects" or "shows." In other words, Ms. Wilbert is testifying about the information she can *see* on her computer screen, without providing the Court and the parties with copies of those documents or screenshots. *See, e.g.,* ECF 112-3, Wilbert Decl. at ¶¶ 21-24. ("PHEAA's COMPASS servicing system shows that PHEAA began servicing Plaintiff Chelsey A. Gosse's JP Morgan Chase Bank, N.A. loan on August 8, 2007 …"); ¶ 21. This is the classic definition of inadmissible hearsay. Fed. R. Evid. 801, 802.

28.    Admitted. The payment was not to the Defendant Trust.

29.    Denied. The only document identified as being held by PHEAA is a single page of a credit agreement and the disclosure statement. The "terms and conditions" of the loans, proof of amounts disbursed or copies of cashed "checks" that prove the loans disbursed to borrowers, and other origination documents either do not exist or were not provided to PHEAA for the Gosse loan. **Ex. F**, Wilbert Dep. 49:25 – 50:20; 52:13 – 53:6; 59:5 – 15; 61:11 – 19. PHEAA testified it had no obligation to verify the accuracy of any information provided to it and they have any documentation or procedures about the file transfer for the documents passed to them. **Ex. F**, Wilbert Dep. 54:2 – 17; 61: 4 – 9; 62:9 – 19; 143:11 – 23; 62:21 – 63:15.

30.    – 31. Denied to the extent that the alleged statements show that the Defendant Trust owns the Plaintiff's loan. PHEAA testified it had no obligation to verify the accuracy of any information provided to it despite her acknowledgment that PHEAA has a contractual obligation to service the loans accurately and they have no procedures regarding the transfer of loan documents. PHEAA testified it had no obligation to verify the accuracy of any information provided to it, **Ex. F**, Wilbert Dep., 36:12 – 37:2; 40:8-23; 62:16 – 19 62:21—63:15. Therefore, any information provided to US Bank by it is not verified and hearsay.

32.    Denied. As explained throughout herein and previously, the source for loans covered by the Pool Supplement is Schedule 1. Neither referenced document

is Schedule 1. Mr. Luke has no personal knowledge of any documentary proof of loan transfers or assignments to the Trusts[16].  Instead, he merely relies upon what was told to him orally by someone from FMER for his belief that loans like Plaintiff's were transferred to the Trusts.[17]

33.    – 39. Admitted. It does not prove the Defendant Trust owns the loan.

40.    – 42. Denied. Any records provided to NCO to collect on defaulted loans, including by litigation, are hearsay upon hearsay because they are not records of the Schedule 1 list of loans for the Pool Supplement for the Defendant Trust herein. **Ex. J**, Luke Dep., 98:11 – 19. Additionally, PHEAA did not provide TSI with any training or information that would support any claim that they are a valid "custodian" to the Trusts. **Ex. F**. Wilbert Dep., 75:24 – 77:9; 78:12 – 79:2; 80:11 – 82:6. Therefore, these record documents are not business records. It is otherwise denied that possession of the Deposit and Sale Agreement proves the Defendant Trust owns Plaintiff's loan.

43.    Denied to the extent that it is claimed that the excel spreadsheets are

---

[16] Q. And any knowledge you have about the trust prior to 2010 is because of information that was conveyed to you by others; correct? MR. SHARTLE:  Object to the form. THE WITNESS: Yes, sir, that's accurate. Luke Dep. 112:12 – 18.

[17] **Ex. L**, Luke Dep., 45:20 – 46:11. ("THE WITNESS: First Marblehead used information that was received from the servicers for the individual loans to acquire such things as the account balances as of a certain date. So they used the servicer's information to create these loan rosters to put together the list of loans that were to be sold. BY MR. BORISON: Q. And how do you know that? A.  This is from conversations and training with First Marblehead. Q.  Is that your only source of knowledge? MR. WEBER: Object to the form. THE WITNESS: I believe so.")

Schedule 1 for the reasons set forth in answer to paragraphs nos. 1, 2, 3, 18 and 19 herein. There is no existing Schedule 1.

44.    – 46. Admitted but it does not prove the Defendant Trust owns Plaintiff's loan.

47.    Denied. TSI did not "service" the loan. Its role was to facilitate collection of the loan through its Collection Network and initiate litigation through its Attorney Network of which Defendant Ratchford is a member firm who had no access to the full "rosters" that are claimed to be Schedule 1, only an excerpt used for litigation. **Ex. J**, Luke Dep., 24:5 – 14; 26:7 - 13; 3 92:14 – 93:1; 98:11 – 19; 101:18 – 25; 102:2 – 22; 105; 21 - 6.

48.    – 50. Admitted but it does not prove the Defendant Trust owns Plaintiff's loan.

51.    – 53. Admitted. The state court held that the Defendant Trust lacked standing to sue her.

54.    Denied. Any Amended Complaint by the Defendant Trust against Gosse was never filed with the state court and therefore does not change the Court's holding that the Defendant Trust lacked standing to sue her. Additionally, since the documents attached to the Complaint did not include the "Schedule 1" list of loans for the subject Pool Supplement, the Defendant Trust did not include in its proposed Amended Complaint any documents proving the Trust's ownership of the Loan.

57.    Denied. Ratchford had documents but none of the documents proved that the Defendant Trust owned Plaintiff's loan as discussed in ¶¶ 51 - 53 above.

58.    – 57. Admitted but it was never filed with the state court and did not therefore change the state court's holding that the Defendant Trust lacked standing to sue her. In any event there was no appeal of the state court's order.

58.    Admitted.

Date: May 15, 2023                    Respectfully submitted,

*/s/Robert P. Cocco*

Robert P. Cocco, Esq.
Robert P. Cocco, P.C.
Attorney I.D. No. 61907
1500 Walnut St., Ste. 900
Philadelphia, PA 19102
(215) 351-0200
bob.cocco@phillyconsumerlaw.com

Christina L Henry, Esq.
Henry & DeGraaff, P.S.
787 Maynard Ave S
Seattle, Washington, 98104
Tel 206/330-0595
Fax 206-400-7609
chenry@HDM-legal.com
*Admitted Pro Hac Vice*

Scott C. Borison, Esq.
1900 S. Norfolk St. Suite 350
San Mateo CA 94403
Scott@borisonfirm.com
301-620-1016
Fax (301) 620-1018
*Admitted Pro Hac Vice*

Counsel for Plaintiff and the Class