```
                 UNITED STATES DISTRICT COURT
                          FOR THE
               MIDDLE DISTRICT OF PENNSYLVANIA
                         -  -  -
CHELSEY GOSSE,               ) Civil Action No.
                             ) 3:20-cv-01446-RDM-MCC
                             )
          Plaintiff,         )
                             )
                             )
          vs                 )
                             )
                             )
US BANK NA, et al,           )
                             )
                             )
          Defendants.        )
                             )
                             )
                             )
```

                       -   -   -


             VIRTUAL DEPOSITION OF JENNIFER WILBERT

  REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
  WITHOUT AUTHORIZATION FROM THE CERTIFYING
  AGENCY

Jennifer Wilbert  Confidential
February 24, 2023

Page 2

```
 1            VIRTUAL DEPOSITION OF JENNIFER
 2   WILBERT, a witness herein, called by the
 3   Plaintiffs, for examination, taken pursuant to
 4   the Federal Rules of Civil Procedure, by and
 5   before Karen A. Nickel, a Certified Realtime
 6   Reporter and a notary public in and for the
 7   Commonwealth of Pennsylvania, held remotely
 8   with all parties appearing from their
 9   respective locations, on Friday, February 24,
10   2023, at 11:00 a.m.
11   COUNSEL PRESENT:
     For the Plaintiffs:
12   Christina Henry, Esq.
     Henry & DeGraaff, P.S.
13   119 First Avenue South
     Suite 500
14   Seattle, WA 98104
     chenry@hdm-legal.com
15
     Robert P. Cocco, Esq.
16   Robert P. Cocco, PC
     1500 Walnut Street, Suite 900
17   Philadelphia, PA 19102
     bob.cocco@phillyconsumerlaw.com
18
     Scott C. Borison, Esq.
19   Borison Law Firm, LLC
     5500 Buckeystown Pike
20   Frederick, MD 21703
21   For the Defendant, U.S. Bank, NA:
     Albert J. Rota, Esq.
22   Jones Day
     2727 North Harwood Street
23   Suite 500
     Dallas, TX 75201
24   ajrota@jonesday.com
25
```

Page 3

```
 1   For the Defendant, National Collegiate Student
     Loan Trust 2007-3:
 2   Justin G. Weber, Esq.
     Troutman Pepper
 3   3000 Two Logan Square
     Eighteenth and Arch Streets
 4   Philadelphia, PA 19103
     justin.weber@troutman.com
 5
     For the Defendant, Ratchford Law Group:
 6   Andrew M. Schwartz, Esq.
     Gordon Rees
 7   Three Logan Square
     1717 Arch Street
 8   Suite 610
     Philadelphia, PA 19103
 9   amschwartz@grsm.com
10   For the Defendant, Transworld Systems, Inc.:
     Bryan C. Shartle, Esq.
11   Bradley J. St. Angelo, Esq.
     Sessions, Israel & Shartle, LLC
12   3850 North Causeway Boulevard
     Suite 200
13   Metairie, LO 70002
     bshartle@sessions.legal
14   bstangelo@sessions.legal
15   For the Deponent:
     Stacey A. Scrivani, Esq.
16   Stevens & Lee
     111 North Sixth Street
17   Reading, PA 19601
     stacey.scrivani@stevenslee.com
18
19               -  -  -
                I N D E X
20
     WITNESS                        PAGE
21
     Jennifer Wilbert
22
        By Ms. Henry            6, 137
23      By Ms. Scrivani            132
        By Mr. Shartle             133
24      By Mr. Rota                134
25
```

Page 4

```
 1              E X H I B I T S
 2
     NUMBER      DESCRIPTION          PAGE
 3
     Exhibit 1   Subpoena with
 4               Exhibit A              9
     Exhibit 2   Wilbert Declaration   64
 5   Exhibit 3   PHEAA-GOSSE-000017 -
                 000300               102
 6   Exhibit 4   PHEAA-GOSSE-000301-
                 000305               106
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            P R O C E E D I N G S
 2            THE COURT REPORTER:  The
 3   attorneys participating in this deposition
 4   acknowledge that I am not physically present in
 5   the deposition room and that I will be
 6   reporting this deposition remotely.
 7            They further acknowledge that, in
 8   lieu of an oath administered in person, the
 9   witness will verbally declare her testimony in
10   this matter is under penalty of perjury.
11            The parties and their counsel
12   consent to this arrangement and waive any
13   objections to this manner of reporting.  Please
14   indicate your agreement by stating your name
15   and your agreement on the record.
16            MS. SCRIVANI:  Stacey
17   Scrivani, we agree on behalf of the witness.
18            MR. ROTA:  Al Rota, we agree
19   on behalf of U.S. Bank.
20            MS. HENRY:  Christina Henry,
21   we agree on behalf of the Plaintiffs.
22            MR. SHARTLE:  This is Bryan
23   Shartle.  We agree on behalf of Transworld
24   Systems, Inc.
25            MR. SCHWARTZ:  Andrew
```

Jennifer Wilbert   Confidential
February 24, 2023

Page 6

1  Schwartz, we agree on behalf of Ratchford
2  Group.
3             MR. WEBER:  Justin Weber,
4  agree on behalf of National Collegiate Student
5  Loan Trust 2007-3.
6             JENNIFER WILBERT, a witness herein,
7  having been first duly sworn, was examined and
8  testified as follows:
9                   EXAMINATION
10 BY MS. HENRY:
11     Q.    Good morning.
12     A.    Good morning.
13            MS. HENRY:  Before we get
14 started, there has been an agreement between
15 the Defendants about how objections will be
16 handled in this matter.  I'm going to ask Al
17 Rota to put that agreement on the record.
18            MR. ROTA:  The parties have
19 agreed that an objection made on behalf of one
20 Defendant will count as an objection on behalf
21 of all the other Defendants.
22            Given that we all have different
23 clients, more than one of us may object at any
24 time, but we're going to endeavor to try to
25 avoid that.

Page 7

1             MS. HENRY:  Thank you.
2             MS. SCRIVANI:  Ms. Henry, if I
3  may, on behalf of PHEAA, first, we would like
4  to reserve reading and signing.  Second, I
5  would just like to make a brief statement on
6  the record.
7             Ms. Wilbert is here as a designee on
8  behalf of Pennsylvania Higher Education
9  Assistance Agency, which will be referred to as
10 PHEAA throughout today, pursuant to a Subpoena.
11            The final topic document requests
12 were provided late in the day yesterday
13 following several weeks of discussions between
14 myself and counsel for PHEAA and Plaintiff's
15 counsel, Mr. Cocco, during which we discussed
16 PHEAA's understanding of the narrow issue to be
17 inquired into, specifically, that reference to
18 the owner issue, which is not otherwise defined
19 in the Subpoena, Exhibit A, refers to whether
20 National Collegiate Student Loan Trust 2007-3
21 is the owner of Plaintiff's loan, and Ms.
22 Wilbert is prepared to testify with respect to
23 those topics in connection with that statement.
24 BY MS. HENRY:
25     Q.    My name is Christina Henry and I'm

Page 8

1  the attorney for the Plaintiff.  Can I ask you
2  to state your full name for the record.
3      A.    Jennifer Susan Wilbert.
4      Q.    Sorry, can you say that one more
5  time?
6      A.    Jennifer Susan Wilbert.
7      Q.    Thank you.  And where do you live,
8  Jennifer?
9      A.    I live in New Cumberland,
10 Pennsylvania.
11     Q.    And where are you physically now?
12     A.    I am at the PHEAA headquarter
13 building in Harrisburg, Pennsylvania.
14     Q.    And how far is Harrisburg,
15 Pennsylvania, from your home?
16     A.    About ten minutes.
17     Q.    I'm going to take your deposition.
18 This is the corporate deposition of
19 Pennsylvania Higher Education Assistance
20 Agency, otherwise known as PHEAA.  PHEAA also
21 does business as American Education System or
22 AES; is that correct?
23     A.    American Education Services.
24     Q.    American Education Services.  Thank
25 you.

Page 9

1             And I'm going to put in the chat
2  here -- can you see that?
3      A.    Yes.
4      Q.    Let me try that again.  Let me open
5  it first.  Okay.  Can you see that document?
6      A.    Yes, I can.
7      Q.    And I also should put this in the
8  chat so you can see it, so that everybody sees
9  it.  All right.  If everyone can see that
10 document in the chat, this document is going to
11 be Exhibit A.  This document is a Subpoena.
12 And if I go to the next page, it is the updated
13 topics, Exhibit A for this deposition.
14            (Deposition Exhibit No. 1 was
15 marked for identification.)
16 BY MS. HENRY:
17     Q.    So this exhibit is going to be
18 marked as Exhibit 1, which is a Subpoena for
19 today's deposition.  Have you seen this
20 document and have you reviewed it?
21            MS. SCRIVANI:  I'm going to
22 just object, Ms. Henry.  The document that I'm
23 seeing looks like it's updated, particularly on
24 Page 1, with today's date and time.  I never
25 actually received an updated version of this.

Jennifer Wilbert  Confidential
February 24, 2023

Page 10

1  I am not objecting to the document.  I just
2  want to be clear that I did not share it with
3  my client because I didn't have it.  So she has
4  seen the topics, but not the first couple of
5  pages of it.
6        MS. HENRY:  All right.
7  BY MS. HENRY:
8     Q.    And Ms. Wilbert, have you seen the
9  Exhibit A that's attached to this Subpoena?
10    A.    Yes.
11    Q.    And are you familiar with these
12 topics?
13    A.    Yes, I am.
14    Q.    Okay.  Now, have you been designated
15 by PHEAA to represent the corporation today in
16 this deposition?
17    A.    Yes, I have.
18    Q.    For this deposition, you are
19 designated by PHEAA as the person most
20 knowledgeable concerning the topics in Exhibit
21 A, and are you reasonably available to talk
22 about all the documents in the topics in this
23 deposition?
24    A.    Yes --
25          MR. ROTA:  Objection.

Page 11

1  BY MS. HENRY:
2     Q.    Ms. Wilbert?
3           MS. SCRIVANI:  You can answer.
4           THE WITNESS:  Yes, I am.
5  BY MS. HENRY:
6     Q.    And are you also able to talk today
7  about the loan for Ms. Chelsey Gosse, the
8  Plaintiff in this action?
9           MS. SCRIVANI:  Objection.  You
10 can answer.
11          THE WITNESS:  I'm sorry,
12 Stacey, did you say, please answer?
13          MS. SCRIVANI:  You can answer.
14          THE WITNESS:  Okay.  Yes, I
15 can talk to the loan.
16 BY MS. HENRY:
17    Q.    Okay.  And have you produced
18 documents today that were requested in this
19 Subpoena?
20    A.    That's correct.
21    Q.    Okay.  And are you here today to
22 produce those documents on behalf of PHEAA?
23          MS. SCRIVANI:  Objection.  I'm
24 not sure I understand the question.  I sent the
25 documents over last night, with an extra one

Page 12

1  this morning, so I'm not sure what the question
2  is.
3  BY MS. HENRY:
4     Q.    So those documents were produced by
5  your attorney yesterday to us.  Are those
6  documents that are produced on behalf of PHEAA
7  and are you prepared to present them today on
8  behalf of this Subpoena?
9           MS. SCRIVANI:  You can answer.
10          THE WITNESS:  I provided the
11 documents to Stacey, and I'm prepared to
12 discuss them.
13 BY MS. HENRY:
14    Q.    Okay.  And those documents were
15 labeled PHEAA-Gosse 00001 through 000315; is
16 that correct?
17    A.    I don't know the exact titles of the
18 documents, but I can certainly look at them and
19 confirm that those are the documents.
20    Q.    Those are actually the Bates numbers
21 on the bottom, and then this morning, I
22 received two additional documents that were
23 000315 A through 315 B.
24          MS. SCRIVANI:  The labels were
25 added by counsel.

Page 13

1           THE WITNESS:  Yes, that's
2  correct.
3  BY MS. HENRY:
4     Q.    Can I ask you who designated you to
5  speak on behalf of PHEAA this morning?
6           MS. SCRIVANI:  Objection.  You
7  can answer.
8           THE WITNESS:  My legal counsel
9  reached out to me to discuss this matter.
10 BY MS. HENRY:
11    Q.    And who is your legal counsel?
12          MS. SCRIVANI:  You can answer.
13          THE WITNESS:  Jim Jarecki,
14 James Jarecki initially reached out to me
15 regarding the declaration.
16 BY MS. HENRY:
17    Q.    And does Mr. Jarecki work for PHEAA?
18    A.    He does.
19    Q.    Did you have any conversations about
20 your designation as a corporate representative
21 for these topics for your testimony today?
22          MS. SCRIVANI:  Objection.
23 With whom?
24 BY MS. HENRY:
25    Q.    Ms. Wilbert?

Jennifer Wilbert   Confidential
February 24, 2023

Page 14

1      A.    I'm not sure I understand the
2  question.
3            MS. SCRIVANI:  I don't
4  understand the question.
5  BY MS. HENRY:
6      Q.    Did you have any conversation with
7  anyone about your designation as the corporate
8  representative for these topics today?
9            MS. SCRIVANI:  You can answer.
10           THE WITNESS:  I discussed with
11  my attorneys.
12  BY MS. HENRY:
13     Q.    Okay.  Did you discuss with anyone
14  else?
15     A.    No.
16     Q.    Do you understand that the answers
17  you're giving today will be on behalf of PHEAA
18  and not by you individually?
19     A.    Yes.
20     Q.    Do you understand that the answers
21  you give will be all the information that is
22  available to PHEAA?
23           MS. SCRIVANI:  Objection.  You
24  can answer.
25           THE WITNESS:  I'm sorry, when

Page 15

1  you say "all the information that is available
2  to PHEAA" --
3  BY MS. HENRY:
4      Q.    Concerning these topics.
5      A.    Yes.
6      Q.    Okay.  Have you ever had your
7  deposition taken before?
8      A.    Yes.
9      Q.    How many times have you had your
10  deposition taken?
11     A.    One time.
12     Q.    And can you tell me, what was the
13  occasion for that deposition?
14     A.    It was a regulatory matter.
15     Q.    Would you tell me a little bit more
16  about that?
17           MS. SCRIVANI:  No.  I'm going
18  to instruct the witness that she's unable to
19  answer that question.  It's unrelated to the
20  matters at issue in this case and it is
21  pursuant to regulatory obligations that govern
22  PHEAA that she is unable to provide any
23  additional information.
24           MS. HENRY:  So you're
25  instructing her not to answer?

Page 16

1            MS. SCRIVANI:  I am.
2  BY MS. HENRY:
3      Q.    So who did you meet with today to
4  prepare for your deposition testimony?
5      A.    Stacey, as well as Andy Petsu, who
6  is also joining us today.
7      Q.    Did you meet with any employees of
8  PHEAA?
9      A.    No, I did not.
10     Q.    Did you meet with any other
11  employees or people that were not lawyers
12  outside of PHEAA?
13     A.    No, I did not.
14     Q.    And how much time did you prepare
15  for today's testimony?
16     A.    I believe we had three meetings
17  together, and then I prepared offline to review
18  the documents.
19     Q.    And have you done any other
20  preparation, outside of preparing for today's
21  testimony, in relation to this lawsuit?
22           MS. SCRIVANI:  Objection.  You
23  can answer.
24           THE WITNESS:  Not outside of
25  this, no.

Page 17

1  BY MS. HENRY:
2      Q.    In relation to Ms. Gosse's loan,
3  have you talked to anyone else at PHEAA
4  regarding this loan?
5            MS. SCRIVANI:  Objection.  You
6  mean outside of counsel?
7            MS. HENRY:  Yes.
8            MS. SCRIVANI:  You can answer.
9            THE WITNESS:  Outside counsel,
10  no, not other than Stacey.
11           MS. SCRIVANI:  Outside of
12  counsel, all counsel.
13           THE WITNESS:  Oh.  Sorry.  I'm
14  having a little bit of trouble.
15  BY MS. HENRY:
16     Q.    Let me repeat it.  Outside of just
17  preparing for today's deposition, have you
18  spoken to anyone else, outside of the lawyers
19  that you have already discussed about
20  Ms. Gosse's loan?
21     A.    Specific to this Subpoena, no.
22     Q.    What about specific to this lawsuit?
23     A.    No.
24     Q.    Did you review any documents in
25  preparation for your testimony?

Jennifer Wilbert  Confidential
February 24, 2023

Page 18

1    A.    Yes.
2    Q.    And what documents did you review?
3    A.    I reviewed the documents that were
4  submitted to you, the loan sale agreement, the
5  borrower's account.
6          I'm sorry.  I think I might have
7  said the loan sale agreement.  I meant the loan
8  sale file.  All of the documents that were
9  produced to you.  The servicing agreement, the
10 declaration.
11   Q.    Anything else?
12   A.    I believe that's all.
13   Q.    And what else did you do to prepare
14 for today's deposition?
15         MS. SCRIVANI:  Objection.  You
16 can answer.
17         THE WITNESS:  Thank you.  I
18 did not do anything additional.
19 BY MS. HENRY:
20   Q.    Those documents that you just talked
21 about, the loan sale document -- let's see, you
22 said Gosse's loan file, the -- let's see.  You
23 said the loan file and all the other documents
24 that were produced yesterday for this
25 deposition, and the documents attached to your

Page 19

1  declaration.
2          Was there anything else that you
3  looked at?
4          MS. SCRIVANI:  Objection,
5  asked and answered.  You can answer.
6          THE WITNESS:  Nothing
7  specific, outside of the borrower's loan, no.
8  BY MS. HENRY:
9    Q.    And where were those documents kept
10 at PHEAA?
11   A.    We have several different places, so
12 the loan details are still on COMPASS, which is
13 our servicing system.  The loan sale file is
14 stored in PageCenter.
15         The servicing agreements are stored
16 in our legal database, as well as some of my
17 files themselves, and some of the borrower's
18 supporting documentation is stored in our
19 FileNet system.
20   Q.    Anything else?
21   A.    I believe that's all of the
22 documents.
23   Q.    And in those different systems, how
24 are they filed?
25         MS. SCRIVANI:  Objection.  You

Page 20

1  can answer.
2          THE WITNESS:  Can you expand
3  on your question as to how they are filed?
4  BY MS. HENRY:
5    Q.    Okay.  Well, you said that they were
6  stored in several different places.  The loan
7  file was stored in the PageCenter.  The
8  servicing documents are stored in a legal
9  database, and some of the files themselves are
10 also stored in other places.
11         How are they actually -- let's say,
12 how are they indexed; how do you find them?
13   A.    Okay.  So for our COMPASS servicing
14 system that is the system that houses all the
15 loan detail, I need to log in with my user name
16 and password, and then I can search for a
17 borrower with an SSN or account number or by
18 name.
19         The documents contained in FileNet,
20 I can also identify those by a borrower's SSN,
21 so they are indexed at the SSN level.
22         The documents in contract workflow
23 are identified by the lender's name, so they
24 would be indexed by the lender that they were
25 logged under.  And for PageCenter, those files

Page 21

1  are stored within a designated, what we call
2  mailbox.
3          So, for example, the lender has
4  their mailbox.  There's various page sets
5  within that mailbox.  I selected on loan sale.
6  It then provides dates.  I would go back to
7  that date and then search by SSN.
8    Q.    You mentioned a new -- a new place.
9  I think you said content workflow?
10   A.    I said contract workflow.
11   Q.    Contract workflow?
12   A.    Yes.  That's where the legal
13 documents for contracts are stored.
14   Q.    So that's where the contracts are
15 stored?
16   A.    Yes.
17   Q.    So that's an additional place?
18   A.    We do, to clarify, we do have a
19 separate place for contracts that are stored,
20 but older contracts are stored in contract
21 workflow.  So these specific contracts were in
22 contract workflow, just to clarify.
23   Q.    Okay.  And can I ask you, why are
24 the documents in so many different places?
25         MS. SCRIVANI:  Objection.  I

Jennifer Wilbert   Confidential
February 24, 2023

Page 22

1    don't know if you can answer that, but you can
2    try.  I think it's beyond the scope.
3            THE WITNESS:  I mean, I don't
4    know why exactly, but I can tell you that many
5    of them are in different formats.  They require
6    different databases based on the format.
7    BY MS. HENRY:
8        Q.   Okay.  In your experience, if you
9    have to gather information from a borrower,
10   where do you usually go to get information
11   first, you first go to --
12           MR. ROTA:  Objection.
13           MS. SCRIVANI:  You can answer.
14           THE WITNESS:  I'm sorry,
15   Stacey.  What did you say?
16           MS. SCRIVANI:  You can answer.
17           THE WITNESS:  It depends on
18   what information that I'm looking for.
19   BY MS. HENRY:
20       Q.   Okay.  If you're looking to find out
21   which trust owns the loan, which database would
22   you look in?
23       A.   I would first go to COMPASS.
24       Q.   And what information ownership is
25   stored in COMPASS?

Page 23

1        A.   COMPASS, through the borrower's
2    detail record, has the original lender, as well
3    as the current owner.
4            For the trust, it also identifies
5    the securitization it was included in by the
6    bond issue.
7        Q.   Okay.  What is a bond issue?
8            MS. SCRIVANI:  Objection.  You
9    can answer if you know.
10           THE WITNESS:  It's a
11   designated field on our COMPASS system that is
12   where we store the date of the securitization.
13   So when I say "date," for example, 2007-3, we
14   create a code for that and put it in that bond
15   issue field on our system.  It's just an
16   identifier.
17   BY MS. HENRY:
18       Q.   Okay.  So I'm going to ask the
19   question again.  Do you know what a bond issue
20   is?
21           MS. SCRIVANI:  Objection,
22   asked and answered.  If you have a different
23   answer, you can provide it then.
24           THE WITNESS:  I don't have a
25   different answer to provide.

Page 24

1    BY MS. HENRY:
2        Q.   Let me ask again.  Apart from the
3    field in your COMPASS system, do you know what
4    a bond issue is?
5            MS. SCRIVANI:  Objection,
6    outside the scope.  You can answer if you know.
7            THE WITNESS:  I know that
8    there are certain bonds that are tied to
9    securitization, but it's not -- speaking to
10   this, that field is not always used for that
11   purpose.
12           So I just -- that's why I'm telling
13   you what that bond issue field on our COMPASS
14   system is used for.
15   BY MS. HENRY:
16       Q.   Okay.  Just so that I can
17   understand, what did you mean when you said
18   that that field is not always used for that
19   purpose?
20       A.   It depends on the lenders.  For this
21   specific item that we're talking about, 2007-3,
22   securitization is identified by the bond issue
23   field as NCT 2007-3.
24       Q.   Okay.  And it's different for other
25   trusts that are serviced by PHEAA?

Page 25

1            MR. ROTA:  Objection.
2            MS. SCRIVANI:  Objection.  You
3    can answer if you know.
4            THE WITNESS:  I don't work on
5    other trusts, so I don't know what they use for
6    the bond issue, if they use one.  They may not.
7    I know specific to this and the NCT
8    securitization.
9    BY MS. HENRY:
10       Q.   Okay.  You mentioned securitization.
11   What is securitization?
12           MS. SCRIVANI:  Objection.  You
13   can answer, to the best of your knowledge,
14   personally.
15           THE WITNESS:  The
16   securitizations were the loan sales that
17   occurred between the original lender and the
18   National Collegiate Trust.  They did them for
19   multiple years, maybe several within a year, to
20   securitize the loans within a certain group by
21   that trust.
22           That's how I can best explain it.
23   BY MS. HENRY:
24       Q.   Okay.  You mentioned that when you
25   pull information to put in the Social Security

Jennifer Wilbert   Confidential
February 24, 2023

Page 26

1  number or the borrower's name; correct?
2      A.    Correct.
3      Q.    Do you have to match the borrower's
4  identification with some other data file, or is
5  that Social Security number and borrower
6  information in each data file?
7          MR. ROTA:  Objection.
8          THE WITNESS:  Any
9  documentation that I'm looking for specific to
10  that borrower, I would confirm that the data
11  elements match.
12          For example, if I'm looking at the
13  credit agreement, I would look for a SSN,
14  borrower name or disbursement date to ensure
15  that it's the loan in question.
16  BY MS. HENRY:
17      Q.    Okay.  And that's actually looking
18  at the loan documents themselves; right?
19      A.    Correct.
20      Q.    And just so I'm keeping up and can
21  remember, where are those physical loan
22  documents kept?
23      A.    FileNet.
24      Q.    FileNet.  Okay.  And are those
25  imaged?

Page 27

1      A.    Yes.
2      Q.    And does PHEAA have the originals?
3      A.    I'm sorry, I didn't hear your
4  question.
5      Q.    Does PHEAA have any originals?
6      A.    If we received the originals at
7  disbursement and conversion, then we would
8  maintain the originals.
9      Q.    And do you know if there are any
10  originals for Ms. Gosse's loan?
11      A.    I do not know if there are
12  originals.
13      Q.    Did you look at that before you --
14  before your testimony today?
15      A.    I looked at the documents within
16  FileNet and the signature on the document in
17  FileNet.  I did not confirm in our boxes of
18  documents that we have originals.
19      Q.    Okay.  Isn't it true that some
20  originals are destroyed after a period of time?
21          MS. SCRIVANI:  Objection,
22  beyond the scope.  If you understand the
23  question, you can answer.
24          THE WITNESS:  Yes.  I mean,
25  our internal policy is that, after a certain

Page 28

1  amount of time, originals are destroyed, unless
2  there's different clauses in the servicing
3  agreement that indicate you have to maintain
4  them for a certain amount of time.
5  BY MS. HENRY:
6      Q.    So you said you work on 2007-3
7  loans; correct?
8      A.    Correct.
9      Q.    Are you aware of any originals that
10  still exist for 2007-3 loans?
11          MR. ROTA:  Objection.
12          THE WITNESS:  Do I answer,
13  Stacey?
14          MS. SCRIVANI:  You can answer
15  if you know.
16          THE WITNESS:  Specifically,
17  no, I don't.  I know we maintain originals for
18  the trust, but I don't know, specifically, for
19  2007-3, if there are paper copies of documents.
20          There may be, at some point in time,
21  the process did change that the borrower could
22  electronically sign and that is deemed an
23  original.  And so those imaged copies of that
24  document would be considered the original.
25          So there may be documents in FileNet

Page 29

1  that are the original document versus an actual
2  paper copy.
3          MR. ROTA:  Christina, I'm
4  sorry, Ms. Scrivani has made a number of
5  objections.  To keep the number of objections
6  down, can we just have an agreement that all of
7  her objections apply to all Defendants and
8  moving forward, to the extent that she objects,
9  it would apply to all?
10          MS. HENRY:  That's fine for
11  now, yes.
12          MR. ROTA:  Thank you.
13          MS. HENRY:  Except, of course.
14  When she is instructing the client not to
15  answer.  I think that that's only --
16          MR. ROTA:  I couldn't do that.
17  I'm just talking about form, outside the scope,
18  et cetera.
19          MS. HENRY:  Sure.  All right.
20  BY MS. HENRY:
21      Q.    Are there copies in other locations?
22          MR. ROTA:  Objection.
23          MS. SCRIVANI:  I'm sorry,
24  could you repeat the question?
25  BY MS. HENRY:

Jennifer Wilbert   Confidential
February 24, 2023

Page 30

```
 1        Q.    Are there copies of loan documents
 2   in other locations for the 2007-3 trust?
 3              MS. SCRIVANI:  Objection.  You
 4   can answer.
 5              THE WITNESS:  Our copies are
 6   maintained in FileNet.
 7   BY MS. HENRY:
 8        Q.    Does Transworld System have any
 9   copies of the loan documents for the 2007-3
10   trust?
11              MS. SCRIVANI:  Objection.  You
12   can answer.
13              THE WITNESS:  They would have
14   copies of the loan documents that we
15   transferred to them when the loans default.
16   They are transferred off our system, once they
17   go to a zero balance, to TSI for our
18   post-default collections.
19   BY MS. HENRY:
20        Q.    I'm going to ask you, can you give
21   me a little bit of background about yourself?
22   Can you tell me a little bit about your
23   education starting from high school and going
24   forward?
25        A.    Yes.  I went to high school at
```

Page 31

```
 1   Susquenita High School in Perry County.  I then
 2   graduated and went to college in the University
 3   of Pittsburgh.  I completed two and a half
 4   years at the University of Pittsburgh.
 5        Q.    Okay.  Can you tell me about your
 6   work history since after completing university
 7   -- at the University of Pittsburgh?
 8        A.    Just since --
 9        Q.    Starting from when you left
10   university until now.
11        A.    So I worked at a store called R & S
12   in Marysville, Pennsylvania, until I started
13   working at PHEAA in November of 2002.
14              I started as a customer service
15   representative and then became a lender
16   representative in July, I believe July of 2003.
17   And then I believe around June of 2007, I went
18   to client relations as a relationship manager.
19              In 2014, I became a senior client
20   relationship manager.  And then in 2019, I
21   became one of the directors of client
22   relations.
23        Q.    Is that your current position?
24        A.    Yes, it is.
25        Q.    What are your job duties as the
```

Page 32

```
 1   director of client relations?
 2        A.    I oversee several senior client
 3   relationship managers that would manage the
 4   portfolios directly with clients.
 5              I also oversee a team of lender
 6   representatives that work with the clients
 7   directly on borrower issues.
 8        Q.    Anything else?
 9        A.    No.
10        Q.    How many people work for you?
11        A.    Currently, five.
12        Q.    Are you working every day in the
13   office?
14        A.    I am not.  I am remote a few days a
15   week and in the office a few days a week.  It's
16   a hybrid schedule.
17        Q.    Okay.  In your position, do you
18   handle any loans besides the 2007-3 trust?
19              MS. SCRIVANI:  Objection.  You
20   can answer.
21              THE WITNESS:  Yes, I do
22   oversee clients that have loans outside of the
23   2007-3 trust.
24   BY MS. HENRY:
25        Q.    And what other clients?
```

Page 33

```
 1              MS. SCRIVANI:  Objection.
 2   That's beyond the scope and it's proprietary
 3   information.  I'm instructing her not to
 4   answer.
 5   BY MS. HENRY:
 6        Q.    Let me rephrase this.  What
 7   percentage of your clients are the 2007-3
 8   trust?
 9              MS. SCRIVANI:  You can answer
10   if you know.
11              THE WITNESS:  I don't know the
12   percentage.
13   BY MS. HENRY:
14        Q.    Do the five people who work for you,
15   do they all work on the 2007-3 trust?
16        A.    They do not.
17        Q.    How many of the five people that
18   work for you work on the 2007-3 trust?
19        A.    I have one senior client
20   relationship manager that manages the portfolio
21   as a whole, and then I have a lender
22   representative that works on the trust, 2007-3
23   trust, for borrower-related issues.
24        Q.    So who is the senior client manager;
25   what is her name?
```

Jennifer Wilbert   Confidential
February 24, 2023

Page 34

1     A.    Katrina Althouse.
2     Q.    Katrina?
3     A.    (Witness nodded head affirmatively.)
4     Q.    And is she located in the same
5  office as you?
6     A.    Not today, but yes, when she is in
7  the office, yes.
8     Q.    And what is the name of the lender
9  rep?
10    A.    Lori Masso (phonetic).
11    Q.    And you said she handles borrower
12 inquiries?
13    A.    Correct.
14    Q.    So is there just one person at PHEAA
15 that handles borrower inquiries for the 2007-3
16 trust?
17          MS. SCRIVANI: Objection. Let
18 me just get my objection on the record. These
19 questions are beyond the scope of the very
20 narrow issue that we are here for for this
21 deposition.
22          I'm going to let her answer, but if
23 we keep going down this path, I'm probably
24 going to stop my generosity.
25          You may answer the question.

Page 35

1          THE WITNESS: Due to the
2  number of inquiries we could get on the lender
3  team outside of just the 2007-3 trust, there
4  could be backups in place across the team that
5  could step in and answer an inquiry on the
6  2007-3 trust.
7  BY MS. HENRY:
8     Q.    PHEAA's main function is as a loan
9  servicer; is that correct?
10          MS. SCRIVANI: Objection. You
11 can answer if you know.
12          THE WITNESS: PHEAA, as a
13 whole, has many different services, I'll say.
14 I don't know that I would say our main item is
15 servicing. We offer state grants, and that is
16 our main mission.
17          So we do servicing activity, but
18 that is just a part of our business.
19 BY MS. HENRY:
20    Q.    Okay. So when you say "servicing
21 activity," what is loan servicing?
22    A.    Loan servicing would be from the
23 point that the loan is converted to us, from
24 the originator, until the loan is at a zero
25 balance.

Page 36

1          We would send the borrower billing
2  statements, make phone calls up until the loan
3  is outsourced. If the loan becomes delinquent,
4  send delinquency letters.
5          We would update their system of
6  record when they remit any payments, take any
7  borrower phone calls that may come in, offer
8  them a portal and website to view their account
9  details, as well as make payments.
10    Q.    Anything else?
11    A.    I would say that covers it.
12    Q.    Okay. As a loan servicer, does
13 PHEAA have an obligation to maintain accurate
14 records of the student loans they service?
15          MS. SCRIVANI: Objection. You
16 can answer.
17          THE WITNESS: Yes.
18 BY MS. HENRY:
19    Q.    And why is that important?
20          MS. SCRIVANI: Objection. Go
21 ahead. You can answer.
22          THE WITNESS: It's important
23 because we're servicing a borrower's loan and
24 we need to ensure that what we're sending them
25 is accurate, as well as we are -- we have a

Page 37

1  contract in place with the client that requires
2  us to service the loan accurately.
3  BY MS. HENRY:
4     Q.    Anything else?
5     A.    I don't believe so.
6     Q.    Why is it important to service the
7  loan accurately?
8          MS. SCRIVANI: Objection. You
9  can answer.
10          THE WITNESS: It's a
11 borrower's loan. You're dealing with payments.
12 You're dealing with their balance. You need to
13 ensure that the loan is accurately reflecting
14 the interest rate, the balance that they are
15 paying down, if they are making payments on it,
16 all the correspondence that may be coming in,
17 any phone calls that may be occurring.
18          It's the borrower's loan you're
19 talking about, so it needs to be accurate.
20 BY MS. HENRY:
21    Q.    Should a loan servicer keep the
22 documents that they have for these loans in
23 order?
24          MS. SCRIVANI: Objection.
25          MR. ROTA: Objection.

Jennifer Wilbert  Confidential
February 24, 2023

Page 38

1           MS. SCRIVANI:  If you
2    understand the question, you can answer it,
3    Jen.
4           THE WITNESS:  I'm sorry, can
5    you repeat the question again?
6    BY MS. HENRY:
7        Q.    Should a loan servicer keep the
8    documents they service in order?
9           MS. SCRIVANI:  Same objection.
10   You can answer if you understand.
11          THE WITNESS:  I guess my
12   question is in order how, what --
13   BY MS. HENRY:
14       Q.    Organized.
15       A.    Organized?
16       Q.    Organized.
17          MR. ROTA:  Same objection.
18   BY MS. HENRY:
19       Q.    So I'll say it again.  Should a loan
20   servicer keep the documents they service
21   organized?
22          MS. SCRIVANI:  Objection.  You
23   can answer.
24          THE WITNESS:  My personal
25   opinion is, yes, you would want to keep the

Page 39

1    documents organized because the borrower is
2    going to potentially call and inquire about
3    their loan.
4           You have certain obligations through
5    the servicing agreement in which you need to
6    maintain certain documentation.  If you need to
7    send the borrower anything, you need to
8    identify that documentation that you are
9    looking for.
10          So, yes, the documents need to be
11   organized, and also our representatives need to
12   be able to find the documentation as well.
13   BY MS. HENRY:
14       Q.    Okay.  You said in the beginning
15   that that answer was your personal feeling.  If
16   you were testifying on behalf of PHEAA, would
17   your answer be any different?
18       A.    No.
19       Q.    Okay.  Any other reason that you can
20   think of as to why a servicer should keep the
21   documents they service organized?
22       A.    No.
23       Q.    Okay.  Do you have confidence that
24   the documentation that PHEAA has is correct and
25   accurate?

Page 40

1           MS. SCRIVANI:  Objection.
2    With respect to Ms. Gosse's loan, with respect
3    to 2007-3, with respect to every piece of paper
4    in the building?
5           MS. HENRY:  I'll say it again.
6    I'll strike that and say it again.
7    BY MS. HENRY:
8        Q.    Would you have confidence that the
9    documentation for the 2007-3 trust is correct
10   and accurate?
11          MR. ROTA:  Objection.
12          THE WITNESS:  Yes.
13   BY MS. HENRY:
14       Q.    Why?
15          MS. SCRIVANI:  Objection.  You
16   can answer.
17          THE WITNESS:  We have an
18   obligation to our clients to service the loans
19   in accordance with their credit agreement and
20   the servicing guidelines.  And that means they
21   need to be accurate.
22          So my confidence is that they are
23   being serviced accurately.
24   BY MS. HENRY:
25       Q.    Do you have custody procedures for

Page 41

1    these 2007-3 trust documents?
2           MR. ROTA:  Objection.
3           MS. SCRIVANI:  You can answer.
4           THE WITNESS:  We have a
5    custodian agreement for this.  As far as the
6    procedures, that would be maintained in our
7    records management department.  I don't know
8    how specific they get as far as this trust, so
9    I cannot speak to that exactly.
10   BY MS. HENRY:
11       Q.    Okay.  Let's break that down.  You
12   said you have custodial agreements.  What
13   custodial agreement are you referring to?
14       A.    For the documents that we need to
15   maintain for the 2007-3 trust.
16       Q.    Okay.  And where is that custodial
17   agreement?
18          MR. ROTA:  Objection.
19          MS. SCRIVANI:  You mean
20   physically in which one of the systems is it
21   maintained?
22   BY MS. HENRY:
23       Q.    Let me ask.  You've mentioned that
24   there are custodian agreements.  Can you tell
25   me what custodian agreements you're referring

Jennifer Wilbert  Confidential
February 24, 2023

Page 42

1   to and where they are located.
2              Just a moment.
3              (Brief pause.)
4              MS. HENRY:  I'm sorry.  I had
5   an interruption.  Let me back up to where I
6   was.
7              Can I have the court reporter repeat
8   the question I asked?
9              (Reporter read back previous
10  question.)
11  BY MS. HENRY:
12      Q.   Ms. Wilbert?
13      A.   Yes.  So we have custodian language
14  in our servicing agreement, and then there are
15  custodian agreements that tie to the trust, and
16  they are housed in contract workflow.
17      Q.   And have you produced those
18  custodial agreements as part of the Subpoena?
19      A.   I did not produce the custodial
20  agreements.
21      Q.   And why not?
22              MS. SCRIVANI:  I'll answer
23  that.  They are not responsive to any of the
24  document requests in the Subpoena.
25              MS. HENRY:  Okay.

Page 43

1   BY MS. HENRY:
2       Q.   Did you look at them before today's
3   deposition?
4       A.   I did look at them.
5       Q.   Okay.  And why did you look at them?
6       A.   Because they tie back to the
7   custodian language in the servicing agreement
8   specific to the credit agreement and the
9   disclosure statement that was produced.
10      Q.   And what information did you review
11  that was important to tie them back for today's
12  deposition?
13              MR. ROTA:  Objection.
14              MS. SCRIVANI:  Objection.
15  Unless I instruct you not to answer, Jen, you
16  can answer.
17              THE WITNESS:  I just read the
18  custodian agreement to confirm that it tied to
19  the 2007-3 securitization.
20  BY MS. HENRY:
21      Q.   Does PHEAA create any documents
22  relating to the loans that they collect for the
23  2007-3 trust?
24              MS. SCRIVANI:  Objection.
25              THE WITNESS:  I'm not sure I

Page 44

1   understand the question.
2   BY MS. HENRY:
3       Q.   Does PHEAA create any documents
4   relating to the loans collected for the 2007-3
5   trust?
6               MS. SCRIVANI:  Objection.
7   Same question.
8               THE WITNESS:  I still don't
9   understand the question.  What documents would
10  you be referring to?
11              I did indicate what we would send
12  out while we're servicing the loan, but are you
13  referring to other documents?
14  BY MS. HENRY:
15      Q.   No.  I'm just -- however you
16  understand that question.
17              MR. ROTA:  Objection.
18              THE WITNESS:  So as previously
19  indicated, we do send billing statements on a
20  monthly basis to the borrower.  We could
21  potentially send interest notices to the
22  borrower while they're on an in-school status.
23  Again, we could send delinquency statements
24  until the loan is outsourced.  We could send
25  privacy policies.  We could send -- we had sent

Page 45

1   the transfer letter.  There are a number of
2   documents that we could send on a borrower's
3   loan.
4               I could not tell you every single
5   one of them off the top of my head.
6   BY MS. HENRY:
7       Q.   Okay.  What people have access to
8   the loan document files?
9               MS. SCRIVANI:  Objection.  Do
10  you mean employees of PHEAA, outside of PHEAA?
11  BY MS. HENRY:
12      Q.   Well, let's break it down.
13  Referring to 2007-3 only, how many people at
14  PHEAA have access to the 2007-3 loan document
15  files?
16              MS. SCRIVANI:  Objection.
17              THE WITNESS:  I can't answer
18  that.  I don't know how many people have
19  access.
20  BY MS. HENRY:
21      Q.   Okay.  And I'm going to ask you, why
22  is that?  Would there be more than the people
23  on your team that have access to those files?
24      A.   Yes.  The customer service
25  representatives would have access to FileNet so

Jennifer Wilbert  Confidential
February 24, 2023

Page 46

1  that they could reference the borrower's loan
2  file if the borrower would call in and have a
3  question.
4        So individuals in customer service
5  that take phone calls and process, as well as
6  other departments, I'm sure.  I don't know
7  exactly who in other departments, but I know
8  for sure the customer service representatives
9  and processors have access to the data.
10     Q.    Okay.  And how do they access the
11 files?
12     A.    The same way I stated at the
13 beginning.
14     Q.    Okay.  So they have to use a log-in;
15 is that right?
16     A.    That's correct.
17     Q.    Okay.  And do they all log in
18 through the computer?
19           MS. SCRIVANI:  Objection.  As
20 opposed to what?  Are they using --
21 BY MS. HENRY:
22     Q.    Meaning they're only looking at
23 electronic files, they're not looking at
24 anything in paper form; is that correct?
25           MR. ROTA:  Objection.

Page 47

1           THE WITNESS:  The majority of
2  them would just be looking at imaged files.
3  Individuals in our records management
4  department could have access to original
5  documents, but for the majority of anything
6  that anyone would be looking at, it would just
7  be images in FileNet.
8  BY MS. HENRY:
9      Q.    And does PHEAA give access to
10 individuals outside of PHEAA -- does PHEAA give
11 access to individuals outside of PHEAA to these
12 loan files for 2007-3?
13           MS. SCRIVANI:  Objection.  You
14 can answer.
15           MR. ROTA:  Objection.
16           THE WITNESS:  Not to our
17 system.  Not to our FileNet system.  So we may
18 produce the documents and provide them to the
19 client or TSI, for example, but they don't have
20 access to our FileNet system or viewing imaged
21 documents.
22 BY MS. HENRY:
23     Q.    Okay.  So maybe we can go over that
24 a bit more.  So you stated before that when a
25 loan goes into default, at some point, PHEAA is

Page 48

1  no longer servicing that loan; is that correct?
2      A.    That's correct.
3      Q.    And maybe you can go over, at what
4  point does PHEAA stop servicing the loan?
5      A.    So once the loan goes down to a zero
6  balance, if it defaults, it would then transfer
7  to TSI for special servicing activity, default
8  servicing activity.
9        And at that point, once the loan is
10 zeroed out on our servicing system, we would no
11 longer service the loan.
12     Q.    Okay.  And I'm just going to try to
13 understand that.  So if the person defaults,
14 how does it go from a default to a zero balance?
15 balance?  I don't understand what zero balance
16 means.  Can you explain that?
17     A.    Yes.  So when a loan defaults, we
18 post a financial transaction on their account
19 that brings the loan balance down to zero, and
20 then that data transfers to the default
21 collections entity.
22     Q.    And how does that data transfer?
23     A.    They receive a file for PageCenter.
24     Q.    Okay.  And you said for the 2007-3
25 loans, those defaulted loans are transferred to

Page 49

1  Transworld Systems, Inc.; correct?
2      A.    At this time, yes, that's correct.
3      Q.    And previously it was another
4  entity.  Who was that?
5      A.    Yes.  Previously, those loans were
6  transferred to First Marblehead Data Services.
7      Q.    And can you tell me, when did that
8  happen?
9      A.    In 2012, First Marblehead resigned
10 as the special servicer, and U.S. Bank took on
11 the special servicing activities.  They
12 designated TSI to do that default collection
13 activity.
14        So we began transferring those
15 defaulted loans to -- it was NCO, now TSI.  The
16 name did change.
17     Q.    So you said that TSI does not have
18 access to FileNet.  So how do they, again, get
19 the actual copies of the loan documents?
20           MR. ROTA:  Objection.
21           THE WITNESS:  We transfer the
22 credit agreement and disclosure statement to
23 them.
24 BY MS. HENRY:
25     Q.    What about the terms and conditions,

Jennifer Wilbert  Confidential
February 24, 2023

Page 50

1   Ms. Wilbert?
2       A.    Yes.  I believe it is the credit
3   agreement and the disclosure that's provided to
4   them when the loan defaults.  I don't believe
5   we pull the terms and conditions every time we
6   transfer the credit agreement to them.
7       Q.    Are the --
8       A.    If the terms and conditions are
9   passed to us at conversion and they are in
10  FileNet, they would, obviously, be included.  I
11  don't believe there's any pulling of those
12  terms and conditions outside of that.  The
13  terms and conditions were not passed to us at
14  conversion for some of the loans.
15      Q.    Okay.  Are the terms and conditions
16  kept with the credit agreements?
17      A.    They are not kept with the credit
18  agreements.  We do have files that have terms
19  and conditions for every single prom note --
20  excuse me, program year and original lender.
21      Q.    Okay.  Do you transfer information
22  about disbursement to Transworld System, Inc.?
23            MS. SCRIVANI:  Objection.
24            THE WITNESS:  What,
25  specifically, are you referring to when you say

Page 51

1   "about disbursement"?
2   BY MS. HENRY:
3       Q.    Do you have information about the --
4   whether the loan was actually disbursed?
5       A.    We do have information that is
6   passed at origination.  However, we provide the
7   credit agreement and disclosure statement when
8   the loan defaults, as required.
9             There is -- they could -- if they
10  needed additional information at some point,
11  they could come back and ask for that.  But the
12  credit agreement and disclosure is required as
13  being had when the loan defaults.
14      Q.    Do you have any information for the
15  mailing of that disclosure statement to the
16  borrower and the co-borrower?
17            MS. SCRIVANI:  Objection.
18            THE WITNESS:  No, I do not.
19  BY MS. HENRY:
20      Q.    Is any of that information regarding
21  mailing kept in any of the systems for the
22  2007-3 trust?
23            MS. SCRIVANI:  Objection.
24            THE WITNESS:  Not that I have
25  seen.

Page 52

1   BY MS. HENRY:
2       Q.    What about copies of canceled
3   checks, are those kept for the 2007-3 trust?
4             MS. SCRIVANI:  Objection.
5             THE WITNESS:  Copies of
6   canceled checks from who?
7   BY MS. HENRY:
8       Q.    From the borrowers at disbursement.
9       A.    I'm not sure why we would be getting
10  a copy of the canceled check.
11      Q.    Okay.
12      A.    I don't understand the question.
13      Q.    Do you have any copies of checks
14  that were disbursed to borrowers or copies of
15  checks that were actually cashed by borrowers
16  for proof of disbursement of the loan funds?
17            MS. SCRIVANI:  Objection.  You
18  can answer.
19            THE WITNESS:  So we're getting
20  the loan when it's disbursed, so it's highly
21  unlikely that we would have a copy of the check
22  that was cashed by the borrower because that
23  would not be included in the origination files.
24            There could be an instance where
25  their origination documents may have contained

Page 53

1   a copy of a check, but to my knowledge, that
2   was not a requirement that they include that
3   information.
4             Specific to this specific borrower,
5   I did not see a copy of a check in their loan
6   file that we received at origination.
7   BY MS. HENRY:
8       Q.    Okay.  For the other 2007-3 trusts,
9   have you ever seen a copy of the check in the
10  loan files?
11            MS. SCRIVANI:  Objection.
12            THE WITNESS:  I don't recall
13  seeing a copy of a check.  Again, it's possible
14  there may have been one, but I don't,
15  specifically, recall.
16            I'm sorry.  There's a lot of
17  pounding going on outside my office.  Would I
18  be able to step out for a minute and ask them
19  to stop?
20            MS. SCRIVANI:  Is it a good
21  time for a break?  We've been going about an
22  hour.
23            MS. HENRY:  Yeah, we can take
24  a five-minute break.
25            (Short recess taken.)

Jennifer Wilbert   Confidential
February 24, 2023

Page 54

BY MS. HENRY:

1   BY MS. HENRY:
2        Q.    Ms. Wilbert, you said that PHEAA
3   receives documents from others and are required
4   to receive some documents.
5             Can you tell me, what documents are
6   you required to have for the 2007-3 trust?
7             MS. SCRIVANI:  Objection.  You
8   can answer.
9             THE WITNESS:  The credit
10  agreement and disclosure statement are two
11  documents that we need to maintain.  So we need
12  to have those included in the origination
13  files.
14  BY MS. HENRY:
15       Q.    Are there any other documents that
16  you're required to maintain?
17       A.    No.
18       Q.    Is there any other information you
19  are required to maintain?
20            MS. SCRIVANI:  Objection.
21            THE WITNESS:  We maintain the
22  borrower's loan records, but we, if it is past
23  the origination, we would maintain the
24  documents that are passed to us, but we need to
25  have the credit agreement and disclosure.

Page 55

1   BY MS. HENRY:
2        Q.    Okay.  So can you tell me -- can you
3   tell me what you know about the origination
4   process for these 2007-3 loans?
5             MS. SCRIVANI:  Objection.
6   This is well beyond the scope of the topics.
7   I'm going to instruct her not to answer.
8   BY MS. HENRY:
9        Q.    Ms. Wilbert, can you tell me about
10  the origination of the 2007-3 loans?
11            MS. SCRIVANI:  My objection
12  and instruction stands.
13            MS. HENRY:  So you're
14  instructing her not to answer?
15            MS. SCRIVANI:  I have done it
16  twice, yeah.
17  BY MS. HENRY:
18       Q.    So Ms. Wilbert, do you know who
19  originated these loans?
20            MS. SCRIVANI:  You can answer
21  that.
22            THE WITNESS:  The loans were
23  originated by FMER on behalf of TERI, The
24  Education Resources Institute.
25  BY MS. HENRY:

Page 56

1        Q.    And can you tell me, what is FMER?
2        A.    First Marblehead Education
3   Resources.
4        Q.    And what is TERI?
5        A.    TERI was the guarantor on the loans
6   until they filed for bankruptcy in 2008.
7        Q.    Okay.  And do you know, do those two
8   entities exist any longer?
9        A.    In their current form, I don't -- I
10  don't know.
11       Q.    Okay.  Do those two entities have
12  anything to do with the 2007-3 trust loans
13  today?
14            MR. ROTA:  Objection.
15            THE WITNESS:  Not that I'm
16  aware of.  Not from our perspective as a
17  servicer.
18  BY MS. HENRY:
19       Q.    Do you know when TERI stopped having
20  any obligations to do with these loans?
21            MR. ROTA:  Objection.
22            THE WITNESS:  They filed
23  bankruptcy in 2008, so there was some carryover
24  as far as claim payments that they were
25  remitting after the bankruptcy went through,

Page 57

1   but I don't know what was occurring on the back
2   end outside of the -- as far as our
3   involvement, that activity transferred from the
4   2007-3 from TERI to FMDS at the time and then
5   the special servicers.
6   BY MS. HENRY:
7        Q.    Who is FMDS?
8        A.    First Marblehead Data Services.
9        Q.    And what was their role with the
10  trust?
11       A.    They were the administrator.
12       Q.    And did they give direction to
13  PHEAA?
14            MR. ROTA:  Objection.
15            MS. SCRIVANI:  I'm going to
16  object.  This is, again, going well beyond the
17  scope of the very limited issue that
18  Ms. Wilbert is here to testify about today.
19            Can we please get to the topics that
20  are in the Subpoena?  We have gone an hour and
21  20 minutes and you haven't asked a single
22  question that's related to those topics.
23  BY MS. HENRY:
24       Q.    Ms. Wilbert, can you answer my
25  question?

Jennifer Wilbert   Confidential
February 24, 2023

Page 58

1          MS. SCRIVANI:  I'm instructing
2   you not to answer.  Let's move on.
3          MS. HENRY:  You're instructing
4   her not to answer the question that she raised
5   as to FMDS and who they are and what they do?
6          MS. SCRIVANI:  She didn't
7   raise the issue.  You have been going down
8   rabbit holes.
9          MS. HENRY:  She has -- she has
10  raised the issue as to FMDS and I've asked her
11  who are they and what do they do.
12         MS. SCRIVANI:  And she
13  answered that question.  So I'm instructing her
14  not to answer your outstanding question.  Move
15  on.
16  BY MS. HENRY:
17     Q.    So these entities that no longer
18  have anything to do with the trust, did they
19  have origination documents for the 2007-3
20  trust?
21         MR. ROTA:  Objection.
22         MS. SCRIVANI:  You can answer.
23         THE WITNESS:  Not that I'm
24  aware of.
25  BY MS. HENRY:

Page 59

1      Q.    Not that you're aware of?
2      A.    I don't know -- I would not know if
3   they had origination documents at this point in
4   time.
5      Q.    I'm asking you, did they have
6   origination documents at some point in time?
7          MR. ROTA:  Objection.
8          MS. SCRIVANI:  Objection.  You
9   can answer if you know what other people had.
10         THE WITNESS:  FMER, on behalf
11  of TERI, would have transferred the origination
12  documents to us, so they would have had the
13  documents before they transferred them to us.
14         What they did with them after, I
15  don't know.
16  BY MS. HENRY:
17     Q.    Okay.  So my question is, does PHEAA
18  have all available origination documents for
19  the 2007-3 trust?
20         MS. SCRIVANI:  Objection.
21         THE WITNESS:  We have the
22  documents in which were provided to us at
23  origination.
24  BY MS. HENRY:
25     Q.    Okay.  And who provided them to you?

Page 60

1      A.    I thought I already answered that,
2   but FMER on behalf of TERI.
3      Q.    Okay.  And would there be, to the
4   best of your knowledge, would there be any
5   reason that there are any documents that you
6   would not have from FMER?
7          MS. SCRIVANI:  Objection.
8          THE WITNESS:  Any documents
9   that -- I don't -- you're not asking
10  specifically.  To my knowledge, no.  But I
11  don't know what documents, specifically, you're
12  asking about.
13  BY MS. HENRY:
14     Q.    Okay.  You testified earlier that
15  you do not have the check for Ms. Gosse's loan;
16  correct?
17         MR. ROTA:  Objection.
18         THE WITNESS:  I testified that
19  I did not see it in the origination file, that
20  is correct.
21         MS. SCRIVANI:  Objection.
22  BY MS. HENRY:
23     Q.    Okay.  Would any other entity have
24  that check?
25         MS. SCRIVANI:  Objection.

Page 61

1          MR. ROTA:  Objection.
2          THE WITNESS:  I do not know.
3   BY MS. HENRY:
4      Q.    PHEAA has all the origination files
5   at this point; correct?
6          MR. ROTA:  Objection.
7          MS. SCRIVANI:  Objection.
8          THE WITNESS:  We have the
9   files that were passed to us at conversion.
10  BY MS. HENRY:
11     Q.    Okay.  And does that mean that you
12  do not have all the origination files?  Were
13  all the origination files passed to you at
14  conversion?
15         MS. SCRIVANI:  Objection,
16  asked and answered.  You can answer.
17         THE WITNESS:  I am aware that
18  we have the documents that we were passed at
19  conversion.
20  BY MS. HENRY:
21     Q.    Okay.  For any documents that were
22  passed to you at conversion, what does PHEAA do
23  to confirm the veracity and accuracy and
24  authenticity of any of those documents that are
25  provided?

Jennifer Wilbert  Confidential
February 24, 2023

Page 62

1            MR. ROTA:  Objection.
2            MS. SCRIVANI:  Objection.
3  Calls for a legal conclusion.
4            If you understand the question and
5  can answer it, go ahead.
6            THE WITNESS:  I cannot answer
7  that.
8  BY MS. HENRY:
9      Q.    Let me simplify it for you.  When
10  PHEAA receives these documents at conversion,
11  after disbursement, from those that originated
12  the loans, what do they do to verify the
13  accuracy?
14            MS. SCRIVANI:  Objection.  If
15  you understand, you can answer.
16            THE WITNESS:  We are
17  maintaining the documents that are passed to
18  us.  We have no obligation to verify the
19  accuracy of what is passed to us.
20  BY MS. HENRY:
21      Q.    Okay.  And how were the credit
22  agreements and the disclosure statements passed
23  to PHEAA?
24            MR. ROTA:  Objection.
25            THE WITNESS:  Again, if they

Page 63

1  were original documents, they would have been
2  sent directly to us as originals.
3            If they were electronic, because
4  they were deemed an original versus by an
5  electronic signature, there was a file transfer
6  process that was established between PHEAA and
7  FMER to receive those documents and load them
8  into our repository.
9  BY MS. HENRY:
10      Q.    And do you have any documentation or
11  policies and procedures about that file
12  transfer process?
13            MS. SCRIVANI:  Objection.
14            THE WITNESS:  I do not at this
15  point in time.
16  BY MS. HENRY:
17      Q.    It's my understanding that a number
18  of those documents were sent by paper.  Do you
19  have a way of knowing whether Ms. Gosse's loan
20  was sent to you in paper form or
21  electronically?
22            MR. ROTA:  Objection.
23            THE WITNESS:  If you want to
24  pull up the actual credit agreement that we
25  provided, I can see if it's an electronic

Page 64

1  signature, but I did not validate that
2  information previously.
3            MS. HENRY:  Let's make this
4  Exhibit 2.
5            (Deposition Exhibit No. 2 was
6  marked for identification.)
7  BY MS. HENRY:
8      Q.    Exhibit 2 is in the chat.  Make sure
9  everybody can get that.  And I'm going to put
10  that on the screen.  I'm going to ask that the
11  court reporter designate that as Exhibit 2.
12            Ms. Wilbert, I'm going to have you
13  look at a document here.  It's 104 pages.  It
14  says Exhibit C at the top.  It has filing
15  information at the top of the document.  It
16  says Document 112-3 filed on 9/28/2022, and
17  this case number here is the Gosse case for
18  this lawsuit.
19            Do you see that?
20      A.    Yes.
21      Q.    Okay.  If you take a look at this
22  briefly.  Can you thumb through this and tell
23  me what this document is?
24      A.    It's a servicing agreement.
25      Q.    Let me start from the first page,

Page 65

1  the entire document.
2      A.    That appears to be the declaration
3  that I signed in September, but I would have to
4  see the date on it to be certain that that's
5  the one I signed.
6      Q.    I think I have put you down to Page
7  6 now of that document.
8      A.    That's correct.
9      Q.    Okay.  And is this the declaration
10  that you filed in this lawsuit?
11      A.    Yes.
12            MR. ROTA:  Objection.
13  BY MS. HENRY:
14      Q.    All right.  I'm going to go down to
15  what I believe is attached here as Ms. Gosse's
16  loan.  Okay.  Do you see that in front of you?
17      A.    I do.
18      Q.    Okay.  Now, I'm going to go back to
19  our question here.  Looking at this loan, can
20  you tell whether this loan was transferred to
21  you, to PHEAA, electronically or in paper form?
22            MR. ROTA:  Objection.
23            THE WITNESS:  Can you scroll
24  further down to the bottom?  Keep going,
25  please.

Jennifer Wilbert  Confidential
February 24, 2023

Page 66

1    BY MS. HENRY:
2         Q.    It looks like that's all I can go.
3         A.    Okay.  Back up.
4                Yes.  And that looks like it's an
5    original signature, which would have been sent
6    to us -- should have been sent to us in
7    original form.
8                Again, I don't have access to the
9    original document, so I did not validate that
10   we have that original document.  But that
11   should have been provided as an original.
12        Q.    Can you tell me what you're looking
13   at that tells you it's an original signature?
14               MR. ROTA:  Objection.
15               THE WITNESS:  Again, I said it
16   looks to me like it should be and it looks like
17   an actual signature versus an electronic
18   signature.
19   BY MS. HENRY:
20        Q.    Oh, I see what you mean.  Okay.
21               So let me ask it again.  Do you know
22   if this is a wet signature document that would
23   have been mailed in after the -- what's that?
24        A.    I do not know.
25        Q.    Okay.  Do you know if this is a wet

Page 67

1    signature document that you might have in the
2    vault?
3                MS. SCRIVANI:  Objection.
4                THE WITNESS:  I would not know
5    that.
6    BY MS. HENRY:
7         Q.    Do you have any way of knowing if a
8    document is a wet signature or if it's a faxed
9    in document?
10               MS. SCRIVANI:  Objection.
11               THE WITNESS:  There are
12   individuals that work in our records management
13   department that receive these documents and
14   validate them and have special notations to
15   indicate in their repositories if an original
16   was received and is housed in the warehouse
17   versus a copy coming in through FileNet.
18   BY MS. HENRY:
19        Q.    So do you know if there is an
20   original for this loan?
21               MS. SCRIVANI:  Objection,
22   asked and answered.
23               THE WITNESS:  I do not know if
24   there is an original.
25               MR. ROTA:  Excuse me.  We keep

Page 68

1    using the term "original" in multiple different
2    ways.  Is there another way to make this more
3    clear about what everyone is talking about?
4    Does original mean wet signature?
5                MS. HENRY:  Let's make it
6    clear.
7    BY MS. HENRY:
8         Q.    Do you know if there is a wet
9    signature for this document?
10        A.    I do not know.
11        Q.    Okay.  And you said that there is a
12   records team that validates such records; is
13   that right?
14               MR. ROTA:  Objection.
15               THE WITNESS:  Correct.
16   BY MS. HENRY:
17        Q.    And what do you mean by validate
18   them; how would you validate them?
19        A.    They would confirm that the files,
20   the number of files that we were expected to
21   receive in the transfer process was, in fact,
22   loaded into the imaging system, and they would
23   then, if there were originals received, their
24   department would be the one that would index
25   those documents and store them in our

Page 69

1    warehouse.
2         Q.    All right.  So in your files, is
3    this information that's unredacted; is that
4    right?
5         A.    Correct.
6         Q.    And let's look at the second
7    document.  Is there any way of knowing here
8    whether this document came in paper form or
9    electronic form to PHEAA?
10               MR. ROTA:  Objection.
11               THE WITNESS:  No.
12   BY MS. HENRY:
13        Q.    I'm going to stop sharing for now,
14   but I'm going to probably come back to that.
15               Do you have any specific procedures
16   for the 2007-3 trust?
17               MS. SCRIVANI:  Objection,
18   beyond the scope.  If you have questions
19   related to tracking or ownership, she is
20   prepared to testify about that.
21   BY MS. HENRY:
22        Q.    Ms. Wilbert?
23               MS. SCRIVANI:  I'm instructing
24   her not to answer the question.
25               MS. HENRY:  Okay.

Jennifer Wilbert    Confidential
February 24, 2023

Page 70

1    BY MS. HENRY:
2        Q.    So I'm going to ask you a few things
3    about your declaration.  So I'm going to
4    actually put that back on the screen.  So in
5    Paragraph No. 2, can I have you read that?
6        A.    "I am the director of client
7    relations of Pennsylvania Higher Education
8    Assistance Agency, PHEAA.  The contents of this
9    declaration are based on my personal knowledge
10   and through my discussions with other PHEAA
11   employees.  My responsibilities at PHEAA
12   include knowledge of PHEAA's maintenance and
13   storage of data, record-keeping, document
14   retention and destruction policies."
15       Q.    Okay.  So my question to you is, we
16   talked earlier and you didn't mention that
17   there were any other discussions with any other
18   employees.
19             So to do this declaration, did you
20   have discussions with other employees at PHEAA?
21             MS. SCRIVANI: Objection.  You
22   can answer.
23             MR. ROTA:  Objection.
24   BY MS. HENRY:
25       Q.    Ms. Wilbert?

Page 71

1        A.    Not specific to the declaration.
2    The conversations have been over my career at
3    PHEAA.
4        Q.    Oh.  Okay.  Were there any specific
5    employees that you were referring to in
6    Paragraph 2?
7             MS. SCRIVANI:  Objection.
8             THE WITNESS:  No.
9    BY MS. HENRY:
10       Q.    Okay.  And it says your
11   responsibilities included the maintenance and
12   storage of data, record-keeping, document
13   retention, destruction policies; correct?
14       A.    Correct.
15       Q.    Currently, does PHEAA have document
16   retention and destruction policies?
17       A.    We do.
18       Q.    And what is your experience with
19   working with this document retention and
20   destruction policy?
21       A.    Can you clarify your question?
22       Q.    What is your experience in working
23   with the destruction and retention policies?
24             MS. SCRIVANI:  Same objection
25   to the same question.

Page 72

1             THE WITNESS:  I'm not clear
2    what you're asking as far as my experience.
3    BY MS. HENRY:
4        Q.    Okay.  Let me go back.  It says here
5    that your responsibilities include
6    record-keeping and document retention and
7    destruction policies; correct?
8        A.    It actually says --
9             MR. ROTA:  Objection.
10            THE WITNESS:  -- my
11   responsibilities include knowledge of, not --
12   my direct responsibilities do not include
13   record retention.  I have knowledge of record
14   retention.
15   BY MS. HENRY:
16       Q.    Okay.  Understood.
17            So what do you mean when you say
18   your responsibilities include that kind of
19   knowledge?
20            MS. SCRIVANI:  Objection.
21            THE WITNESS:  I have knowledge
22   of how we are retaining these documents that
23   we're speaking of.
24   BY MS. HENRY:
25       Q.    Okay.  And the destruction?

Page 73

1             MR. ROTA:  Objection.
2    BY MS. HENRY:
3        Q.    What's your knowledge of the
4    destruction policies?
5        A.    We have a retention and destruction
6    policy.  However, for the trust, we are not
7    currently destroying any data for the trust.
8        Q.    Is there any data that's original to
9    destroy?
10            MR. ROTA:  Objection.
11            MS. SCRIVANI:  I'm sorry, what
12   was the question?
13   BY MS. HENRY:
14       Q.    Is there any original data to
15   destroy of the trust?
16            MR. ROTA:  Objection.
17            MS. SCRIVANI:  Objection.
18            THE WITNESS:  We do have
19   original data that is pertaining to the trust,
20   yes, that would go beyond our retention period.
21   BY MS. HENRY:
22       Q.    Okay.  But you just said that you
23   were no longer destroying anything for the
24   trust.
25            MS. SCRIVANI:  Objection.

Jennifer Wilbert   Confidential
February 24, 2023

Page 74

BY MS. HENRY:
1   Q.     My question is why?
3        MS. SCRIVANI:
4   Mischaracterizes testimony.  You can answer if
5   you understand the question.
6        THE WITNESS:  Sorry, Stacey, I
7   didn't hear what you said.
8        MS. SCRIVANI:  I was objecting
9   to her question, that it mischaracterizes your
10  testimony because she was making the impression
11  that, at some point, PHEAA changed their
12  position on whether or not to destroy original
13  data related to --
14       MS. HENRY:  I'm sorry, it's
15  really not appropriate to be having --
16  explaining that to the witness.  I'm going to
17  ask you to stop.  I'm going to try to ask the
18  question again.
19  BY MS. HENRY:
20  Q.     I'm looking back, and you said that
21  you have retention and destruction policy.
22  However, for the trust, we are not currently
23  destroying any data for the trust; is that
24  correct?
25  A.     That's correct.

Page 75

1   Q.     Okay.  Why is that?
2   A.     I don't know if I can answer that
3   specifically, but we were instructed that,
4   specific to the trust, we are not permitted to
5   destroy data at this time.
6   Q.     And who gave you that instruction?
7   A.     PHEAA attorneys.
8   Q.     And do you know why?
9        MS. SCRIVANI:  Objection.
10  Invokes the attorney-client privilege.  I'll
11  instruct her not to answer.
12       MS. HENRY:  Okay.
13  BY MS. HENRY:
14  Q.     And so outside of yourself, who are
15  people who have knowledge of the destruction
16  and retention policies of the trust?
17       MS. SCRIVANI:  Objection, it's
18  beyond the scope.  Instruct you not to answer.
19  BY MS. HENRY:
20  Q.     Ms. Wilbert?
21       MS. SCRIVANI:  I instructed
22  her not to answer.
23  BY MS. HENRY:
24  Q.     All right.  Does anyone at TSI have
25  knowledge of PHEAA's document retention and

Page 76

1   destruction policies?
2        MR. ROTA:  Objection.
3        MR. SHARTLE:  Objection.
4        MS. SCRIVANI:  Objection.
5        THE WITNESS:  To my knowledge,
6   they have never requested our document
7   retention and destruction policy.
8   BY MS. HENRY:
9   Q.     Does anyone at TSI have knowledge of
10  your record-keeping at --
11       MR. SHARTLE:  Objection.
12       MS. SCRIVANI:  Objection.
13  BY MS. HENRY:
14  Q.     Record-keeping policies at PHEAA?
15       MR. SHARTLE:  Same objection.
16       THE WITNESS:  Again, I don't
17  know what knowledge TSI has.  I'm not -- I
18  don't ever recall providing them specific
19  procedures or policies.
20  BY MS. HENRY:
21  Q.     Okay.  Do you know if TSI has any
22  knowledge of PHEAA's maintenance and storage of
23  data for the 2007-3 trust?
24       MR. SHARTLE:  Objection.
25       MS. SCRIVANI:  Objection.

Page 77

1        THE WITNESS:  Same answer.
2   Again, I have never been asked, specifically,
3   by TSI.  But I don't know what knowledge they
4   have.
5   BY MS. HENRY:
6   Q.     Well, let me clarify that for
7   today's deposition, you are speaking on behalf
8   of PHEAA, not just yourself; is that correct?
9   A.     That's correct.
10       MS. SCRIVANI:  Objection.
11  BY MS. HENRY:
12  Q.     Would your answers be different on
13  behalf of PHEAA as opposed to just yourself?
14       MS. SCRIVANI:  She is not here
15  to testify on behalf of PHEAA with respect to
16  those questions because they are outside the
17  scope of the deposition.
18       MS. HENRY:  I respectfully
19  disagree.  So I'm going to continue to ask my
20  question.
21       MS. SCRIVANI:  You can answer
22  if you know.
23       THE WITNESS:  No, I don't
24  believe -- no, they would not be different.
25  BY MS. HENRY:

Jennifer Wilbert   Confidential
February 24, 2023

Page 78

1    Q.    Okay.  Have you asked anyone, in
2  preparation for today's testimony, about any
3  training given to employees at TSI regarding
4  the trust documents?
5    A.    No.
6    Q.    Isn't it true that employees of TSI
7  have real-time access to AES's systems?
8              MS. SCRIVANI:  Objection.  You
9  can answer.
10            THE WITNESS:  That's correct.
11 BY MS. HENRY:
12    Q.    And they have access to the COMPASS
13 system; correct?
14            MS. SCRIVANI:  Objection.
15            THE WITNESS:  They have
16 read-only access to COMPASS.
17 BY MS. HENRY:
18    Q.    They have read-only access.  And do
19 they have access to any other systems at AES or
20 PHEAA?
21    A.    Yes.  They have access to
22 PageCenter.
23    Q.    Anything else?
24    A.    They may have access to the --
25 within the lender portal, they have access to

Page 79

1  My File Gateway, as well as our credit
2  reporting history for the specific borrowers.
3    Q.    Okay.  And do you know how many
4  employees at TSI have access, real-time access
5  to AES documents?
6              MS. SCRIVANI:  Objection.
7              THE WITNESS:  I do not know
8  the number of employees that have real-time
9  access.  It can change on a daily basis.
10 BY MS. HENRY:
11    Q.    Do you know how they gain access to
12 the records of PHEAA?
13            MS. SCRIVANI:  Objection.
14            THE WITNESS:  Yes.  That
15 request would come through the relationship
16 manager who then works with our business
17 support group to set up that access.  They
18 submit an access request form to us.
19 BY MS. HENRY:
20    Q.    Okay.  Does that access request
21 form, does it -- can anybody make an access
22 request form?
23            MS. SCRIVANI:  Objection.
24            THE WITNESS:  There is a
25 designated individual that's responsible for

Page 80

1  providing the access request form for each
2  client.  So, no, anyone cannot request the
3  access.  That individual would need to send us
4  the form that outlines the list of individuals
5  they are requesting access for.
6  BY MS. HENRY:
7    Q.    And who is that designated
8  individual?
9    A.    I don't know the designated
10 individual off the top of my head.
11    Q.    Okay.  And does PHEAA provide any
12 specific training for each of those individuals
13 that request access?
14    A.    We do not provide individual
15 training for each individual that requests
16 access.
17    Q.    Okay.  Has any training been
18 provided to TSI employees?
19            MS. SCRIVANI:  Objection.
20            THE WITNESS:  Training was
21 provided to NCO prior to NCO becoming TSI.
22 BY MS. HENRY:
23    Q.    Okay.  And how do you know that?
24    A.    I recall that individuals from our
25 customer service area to -- they are no longer

Page 81

1  with the agency -- went to NCO to perform such
2  training.
3    Q.    And do you know what that training
4  consisted of?
5              MS. SCRIVANI:  Objection.
6              THE WITNESS:  Specifically,
7  no.  However, our general training would
8  consist of the screens that the clients have
9  access to.  TS -- NCO, excuse me, at the time,
10 training would have been a little more in depth
11 because at the time, they had actually add
12 access, which was in addition -- which was
13 additional screens from any other client.
14            So there would have been additional
15 training provided to them versus regular access
16 requests.
17 BY MS. HENRY:
18    Q.    Was there any training provided
19 concerning the record-keeping, document
20 retention and destruction policies that PHEAA
21 uses for these trust documents?
22            MR. ROTA:  Objection.
23            THE WITNESS:  Not that I'm
24 aware of.
25 BY MS. HENRY:

Jennifer Wilbert   Confidential
February 24, 2023

Page 82

1      Q.    Was there any training provided
2  concerning the maintenance and storage of data
3  that PHEAA has for the trust documents?
4            MS. SCRIVANI:  Objection.
5            THE WITNESS:  No, not that I'm
6  aware of.
7  BY MS. HENRY:
8      Q.    I'm going to have you look at
9  Paragraph 5 of your declaration.  So can you
10  tell me about this 2001 servicing agreement
11  between PHEAA and First Marblehead Corporation?
12            MS. SCRIVANI:  Objection.
13  This goes beyond the scope of her topics here.
14  I don't even know what you're asking about
15  but --
16            MS. HENRY:  I'm sorry.  I'm
17  asking about her declaration that's been filed
18  in this case in support of the summary judgment
19  that is at issue in this Subpoena and
20  deposition.
21            MS. SCRIVANI:  Well, what is
22  your question?
23            MS. HENRY:  Let me rephrase my
24  question.
25            MS. SCRIVANI:  Okay.  Go

Page 83

1  ahead.
2  BY MS. HENRY:
3      Q.    In 2001, there was a servicing
4  agreement between First Marblehead and PHEAA;
5  is that correct?
6      A.    That's correct.
7      Q.    And that's referenced in Paragraph 5
8  of your declaration and attached as Exhibit A;
9  is that correct?
10      A.    That's correct.
11      Q.    And in 2006 -- in 2006, in
12  September, that agreement was amended and
13  restated and it is also attached to your
14  declaration, Exhibit B; is that correct?
15      A.    That's correct.
16      Q.    Do you know why that servicing
17  agreement was amended in 2006?
18            MS. SCRIVANI:  Objection.
19  Only if you know.
20            THE WITNESS:  I do not know.
21  BY MS. HENRY:
22      Q.    Isn't it true that that document was
23  amended to be updated to comply with regulatory
24  requirements that PHEAA had for servicing
25  loans?

Page 84

1            MS. SCRIVANI:  Objection,
2  asked and answered.
3            THE WITNESS:  I don't know the
4  specific reason why the agreement was amended
5  and restated.
6  BY MS. HENRY:
7      Q.    Could you find out why it was
8  amended -- could you find out why it was
9  amended and restated?
10            MS. SCRIVANI:  Objection.
11            THE WITNESS:  I don't believe
12  so.  The individuals that worked on the
13  portfolio at the time are no longer at the
14  agency.
15  BY MS. HENRY:
16      Q.    So no one at PHEAA would know why
17  that amendment was done?
18            MS. SCRIVANI:  Objection.
19            THE WITNESS:  I don't know.
20  There could be notations in our contract
21  workflow, but I wasn't involved at the time, so
22  I don't know what the specific reasons were or
23  if they are outlined.
24            We could have amended and restated
25  agreements done for clients for a number of

Page 85

1  reasons.
2  BY MS. HENRY:
3      Q.    Okay.  Do you know when U.S. Bank
4  became involved with these 2007-3 loans?
5            MS. SCRIVANI:  Objection, well
6  beyond the scope of this deposition.
7            THE WITNESS:  Are you asking
8  anything specifically?  I don't know the
9  specific date that they became involved.  I
10  know in 2012, they became involved as the
11  special servicer, and that's when we began
12  working with them more directly.
13            But other than that, I don't know a
14  specific date.
15  BY MS. HENRY:
16      Q.    Does U.S. Bank give any direction to
17  PHEAA regarding these loans?
18            MR. ROTA:  Objection.
19            MS. SCRIVANI:  Beyond the
20  scope.
21  BY MS. HENRY:
22      Q.    Ms. Wilbert?
23      A.    We have had discussions with U.S.
24  Bank, and they have provided feedback to items
25  specific to all of the trusts.  It wasn't just

Jennifer Wilbert  Confidential
February 24, 2023

Page 86

1  specifically U.S. Bank.  But they were involved
2  in the discussions.
3       Q.    Okay.  And who gives direction to
4  PHEAA regarding the servicing of the 2007-3
5  loans?
6            MS. SCRIVANI:  Objection,
7  beyond the scope.
8            MR. ROTA:  Objection.
9            MS. SCRIVANI:  I'm instructing
10  you not to answer.  We need to move on to the
11  topics related to the ownership of 2007-3 loans
12  and how that's reflected in PHEAA's system.  I
13  have a hard stop at 3:00.
14            MS. HENRY:  I'm actually on
15  the declaration, which is part of the Subpoena
16  and the Exhibit A documents, so this is -- this
17  is directly relevant to where we are, and this
18  is the outline of questioning that I'm asking
19  the witness at this time.
20            MS. SCRIVANI:  Well, let me
21  just be clear.  I have a hard stop at 3:00
22  which will have this deposition going four
23  hours, which will be way longer than it needed
24  to.  So I'm suggesting the time be used
25  efficiently.

Page 87

1            MS. HENRY:  That may be your
2  hard stop if you're saying it has to be
3  continued, but that's not knowledge to me.
4            MS. SCRIVANI:  I'm saying it
5  should be wrapped up by then.
6            MS. HENRY:  You can say that,
7  ma'am, but that's not necessarily what's going
8  to happen.  I'm going to just continue asking
9  my questions.
10  BY MS. HENRY:
11       Q.    So I'm going to ask you, in
12  Paragraph 8, you said here, "In connection with
13  servicing the loans, PHEAA's duties included
14  servicing responsibilities on behalf of the
15  original lending banks."
16            Can you tell me, what
17  responsibilities did PHEAA have on behalf of
18  the original lending banks?
19       A.    The same responsibilities I've
20  already stated regarding the trust, which would
21  include sending correspondence to the borrower,
22  taking their phone calls, sending billing
23  statements, interest notices, servicing the
24  loan.
25       Q.    Was that done on behalf of the

Page 88

1  lending banks?
2       A.    Yes, before they were sold to the
3  trust.
4       Q.    Okay.  So PHEAA was servicing these
5  loans before they started -- before they were
6  sold to the trust?
7       A.    That's correct.
8       Q.    How long was -- for the 2007-3
9  loans, how long was PHEAA servicing these loans
10  before they were allegedly sold to the trust?
11            MS. SCRIVANI:  Objection.
12            MR. ROTA:  Objection.
13            MS. SCRIVANI:  Each loan is
14  different.
15            THE WITNESS:  That could
16  vary --
17            MS. HENRY:  I'm sorry, I'm
18  asking Ms. Wilbert.
19            THE WITNESS:  They all have
20  different disbursement dates, so that could
21  vary.  We began servicing the loan at
22  disbursement.  For example, Ms. Gosse's loan
23  was disbursed on 8/8/2007, if I recall
24  correctly, so we began servicing the loan at
25  disbursement at that time for the original

Page 89

1  lender, which was JPMorgan Chase.  Other loans
2  under the 2007-3 trust could have had different
3  disbursement dates, so that timeframe could
4  vary.
5  BY MS. HENRY:
6       Q.    Okay.
7       A.    It was --
8       Q.    So do your servicing obligations
9  change when the servicing is -- your servicing
10  is for the banks, lending banks, as opposed to
11  when they're allegedly sold to the trust, do
12  any of your duties change?
13            MR. ROTA:  Objection.
14            THE WITNESS:  So there would
15  be different obligations based on the servicing
16  guidelines.  Obviously, the servicing
17  guidelines for our obligations, once the loan
18  has been sold, would not come into play once
19  the originating lender -- when the originating
20  lender is still holding the loan.
21            For example, delinquency notices
22  could change once the loan is sold because the
23  loan is likely, not all, but likely in
24  in-school status before the loan was purchased
25  by the trust.  So we would be sending billing

Jennifer Wilbert   Confidential
February 24, 2023

Page 90

1 statements or interest notices on behalf of the
2 original lender, not necessarily delinquency
3 statements or defaulting the loan, things like
4 that.
5          So the servicing of the loan is
6 different depending on the stage of that loan.
7 The servicing guidelines themselves were the
8 same across the board.
9 BY MS. HENRY:
10    Q.    And does PHEAA send letters to
11 borrowers when the ownership of the loans
12 change?
13    A.    Yes.
14    Q.    And was a letter sent to Ms. Gosse
15 when the ownership of the loan changed?
16    A.    Yes.
17    Q.    And do you have the letter?
18    A.    I do not have that letter.  I have a
19 copy of the letter showing being sent on our
20 servicing system in the history record which
21 was provided to you.
22    Q.    Can you tell me why you do not have
23 a copy of the actual letter?
24          MS. SCRIVANI:  Objection.
25          THE WITNESS:  Because that

Page 91

1 letter was deleted from our retention or data
2 pool that holds letters after ten years.
3 BY MS. HENRY:
4    Q.    So your data retention and
5 destruction policies delete those letters after
6 ten years?
7          MS. SCRIVANI:  Objection.
8          MR. ROTA:  Objection.
9          THE WITNESS:  Correct.
10 BY MS. HENRY:
11    Q.    I'm sorry, can you answer the
12 question?
13          MS. SCRIVANI:  She answered
14 it.
15          THE WITNESS:  That's correct.
16          MR. ROTA:  Same objection.
17 BY MS. HENRY:
18    Q.    Okay.  Do you know why there is --
19 why the policies would delete such a letter?
20          MS. SCRIVANI:  Objection.
21          THE WITNESS:  That's just the
22 data retention for those letters.  I don't know
23 why.  That's just the policy.
24 BY MS. HENRY:
25    Q.    Okay.  I'm going to stop the

Page 92

1 sharing.
2          So can you tell me, where does PHEAA
3 get the Social Security number information for
4 the borrowers?
5    A.    It's --
6          MS. SCRIVANI:  Objection.  Go
7 ahead.
8          THE WITNESS:  It's passed to
9 us at origination.
10 BY MS. HENRY:
11    Q.    And passed at origination from whom?
12    A.    The originating entity.
13    Q.    And then for the 2007-3 trust, who
14 would that be?
15          MS. SCRIVANI:  Objection,
16 asked and answered.
17          MR. ROTA:  Objection.
18          THE WITNESS:  FMER on behalf
19 of TERI.
20 BY MS. HENRY:
21    Q.    So FMER is passing you the Social
22 Security number information?
23    A.    They were, yes.
24    Q.    And are they also passing you the
25 borrower names and other personal

Page 93

1 identification?
2    A.    Yes.
3    Q.    And do you get that as an electronic
4 feed from --
5          MS. SCRIVANI:  Objection,
6 asked and answered.
7 BY MS. HENRY:
8    Q.    -- from FMER?
9    A.    Yes, we did.
10    Q.    Okay.  So, in this case, there was a
11 default on Ms. Gosse's loan; correct?
12    A.    That's correct.
13    Q.    And was the loan charged off?
14    A.    Yes, it was.
15    Q.    And what does charge off mean?
16    A.    It's essentially a default.  These
17 loans were posted as default transactions.
18 Some clients have their loans charged of
19 versus claim paid.  These loans initially were
20 claim paid by the guarantor, TERI.  However,
21 that did change when TERI filed for bankruptcy.
22          So we continued to post these as
23 1030 transactions on our system, which is a
24 claim paid transaction, but no longer a cash
25 scenario.  It would be a non-cash situation.

Jennifer Wilbert  Confidential
February 24, 2023

Page 94

1          So charge off, claim paid is just
2  terminology for a defaulted loan.
3      Q.   Okay.  When you charge a loan off,
4  do you send anything to the IRS, to the
5  borrower, if it's charged off?
6          MS. SCRIVANI:  Objection,
7  beyond the scope.  You can answer if you know.
8          THE WITNESS:  It depends on
9  the client.  I am not -- I'm not sure what the
10  1030 transaction code reports to the IRS.
11  BY MS. HENRY:
12      Q.   Are there any assignment documents
13  for the 2007-3 trust?
14          MS. SCRIVANI:  Objection.
15          THE WITNESS:  There is
16  language in the agreements that the loans would
17  be assigned from the original -- the agreement
18  would be assigned from the original lender to
19  the trust.  Is that what you're asking?
20  BY MS. HENRY:
21      Q.   I don't know.  Which agreements are
22  you referring to?
23      A.   The servicing agreements and the --
24  I'm trying to remember the specific language.
25      Q.   Are you referring to the 2001

Page 95

1  servicing agreement or the 2006 amended and
2  restated agreement that we were looking at that
3  were attached to your declaration, those
4  servicing agreements?
5      A.   I don't remember off the top of my
6  head.  There is assignment language in the
7  agreements, I believe.  But I need to look at
8  the agreements to confirm.
9          I know there is assignment language
10  that is in documentation during the actual
11  securitization.  Several documents are signed
12  at that time between the parties.  But there is
13  also an assignment section, if I recall
14  correctly, in the servicing agreement as well.
15          But you could certainly pull that up
16  to confirm that section.
17      Q.   And is that a document that you
18  supplied either in your declaration or in the
19  documents that your attorney gave me yesterday?
20          MS. SCRIVANI:  Objection.
21          THE WITNESS:  Yes, the
22  servicing agreement is.
23  BY MS. HENRY:
24      Q.   Okay.  So -- but there is not any
25  individual assignments attached to each loan in

Page 96

1  FileNet; correct?
2          MS. SCRIVANI:  Objection.
3          THE WITNESS:  I don't know
4  what that means when you say "individual
5  assignments in FileNet."  I'm sorry.
6  BY MS. HENRY:
7      Q.   Okay.  Well, there is no assignment
8  document that refers to a specific loan in
9  FileNet for the 2007-trust documents; correct?
10          MR. ROTA:  Objection.
11          THE WITNESS:  That's correct.
12  BY MS. HENRY:
13      Q.   Is there an assignment for
14  Ms. Gosse's loan?
15          MS. SCRIVANI:  Objection.
16          THE WITNESS:  Again, I don't
17  know if we're talking about, when you say
18  "assignment," if you mean the transfer letter.
19  There is details that show the transfer, but I
20  don't know if you're referring to the actual
21  assignment that is in the servicing agreement.
22  That would apply to the trust.
23  BY MS. HENRY:
24      Q.   Well, I'm actually --
25      A.   Not referring to any -- go ahead.

Page 97

1      Q.   Sorry.  I'm actually referring to a
2  specific assignment document that would say one
3  entity assigned the document to someone else
4  and signed off on it, an actual document.  Do
5  you see anything like that for Ms. Gosse's
6  loan?
7          MS. SCRIVANI:  Objection.
8          THE WITNESS:  In FileNet, no.
9  Again, there is specific assignment language
10  that would cover loans in the trust.
11  BY MS. HENRY:
12      Q.   Okay.  Do you have any schedules,
13  that term schedules --
14          MR. ROTA:  Objection.
15  BY MS. HENRY:
16      Q.   -- if you know what that means, do
17  you have any schedules for the 2007-3 trust
18  at PHEAA?
19          MS. SCRIVANI:  Objection.
20          THE WITNESS:  I'm not sure
21  what you're asking.  I know what a schedule is,
22  but that could be a number of things.  We have
23  schedules of the servicing agreement.  We have
24  multiple schedules.
25          So I'm not sure what your question

Jennifer Wilbert   Confidential
February 24, 2023

Page 98

1   is exactly.
2   BY MS. HENRY:
3        Q.   What does schedules mean to you?
4        A.   Schedule is normally a document that
5   is attached to an agreement or another document
6   that would reference something.  It could vary
7   depending on what you're talking about.  For
8   example, most of the documents related to the
9   agreement and guidelines have a schedule listed
10  with all of the trusts on it.
11       Q.   Okay.  And is that considered an
12  assignment?
13               MS. SCRIVANI:  Objection.
14               MR. ROTA:  Objection.
15               THE WITNESS:  No, that's not
16  considered an assignment.
17  BY MS. HENRY:
18       Q.   Okay.  That's fine.  Next topic.
19  I'm just going to ask you something I mentioned
20  before but I didn't quite get.
21            You talked about servicing loans for
22  the originating banks before they are
23  securitized and allegedly sold to the NCSLT
24  trust.  Okay?
25       A.   Uh-huh.

Page 99

1        Q.   Do you have separate servicing
2   agreements with the originating banks, like
3   JPMorgan Chase, for servicing the 2007-3 loans?
4               MS. SCRIVANI:  Objection.
5               THE WITNESS:  We do have
6   separate servicing agreements for all of our
7   banks, for those that we service for.
8               However, there is specific language
9   in the servicing agreement that references the
10  original banks for which these programs will
11  apply to and that that assignment would occur
12  from those original lenders to the trust.
13  BY MS. HENRY:
14       Q.   Okay.
15       A.   Again, I would have to look at a
16  document to reference that, but I know that
17  that is referenced in those documents.
18       Q.   Okay.  Why don't I do that just so
19  that we are on the same page and I understand
20  what you're saying.  All right.  Where do you
21  want me to go here?
22       A.   You can start at the 2001 agreement.
23       Q.   That is Exhibit A so -- all right.
24       A.   Go back up.  I'm sorry, I was
25  reading that last --

Page 100

1        Q.   Okay.  I'm sorry.  I wasn't sure if
2   you were --
3        A.   So in 1.5 here, it references the
4   pools of student loans assigned to permitted
5   assignees pursuant to Section 1 -- I think that
6   says 1.1.4.  So it makes a reference there.
7   You can keep going.
8        Q.   Okay.
9        A.   1.7 references owner, means a
10  permitted assignee that purchases student
11  loans.
12            1.8 is permitted assignee.
13            1.10, lender means Bank One,
14  National Association and such other lenders
15  making loans guaranteed by carry and serviced
16  by servicer as the parties may designate as
17  covered by this agreement and in written
18  supplement to this agreement.
19            Securitization transaction means the
20  purchase of a pool of student loans by an SPE
21  in connection with servicer, which servicer
22  agrees to execute a servicer consent letter in
23  substantially the form of Schedule A,
24  references the servicer consent letter which is
25  executed at the securitization which would have

Page 101

1   been done for the 2007-3 trust.
2        Q.   So this is what you're referring to
3   as the evidence of assignment; is that right?
4               MS. SCRIVANI:  Objection.
5               THE WITNESS:  You can keep
6   going.  I mean, there are several different
7   areas within here.
8   BY MS. HENRY:
9        Q.   I'm just trying to understand your
10  testimony.
11              MR. ROTA:  I think you asked
12  her about agreements with the original lenders.
13  And now you have shifted.
14              MS. HENRY:  Yes.  Well,
15  because I'm confused as to what she's answering
16  here.  So --
17              THE WITNESS:  Well, what I
18  answered was we do have agreements with the
19  original lenders as well, but specific -- they
20  could have other loans.  Specific to these
21  trusts, there is language in here that
22  references the securitization and the
23  assignment from the original lender to the
24  purchasing entity.
25  BY MS. HENRY:

Jennifer Wilbert  Confidential
February 24, 2023

Page 102

1    Q.    Okay.
2    A.    If that answers your question, then
3  we're good, but --
4    Q.    Yes, we're good.  Thank you very
5  much.
6    A.    Okay.
7    Q.    Okay.  I want to stop the share.
8  I'm going have you look at one of the other
9  documents that you gave yesterday.
10        So this is the 17-300.  And I'm
11  putting that in the chat.  That will be Exhibit
12  3.
13            (Deposition Exhibit No. 3 was
14  marked for identification.)
15  BY MS. HENRY:
16    Q.    All right.  Tell me if you can all
17  see this.
18    A.    Yes.
19    Q.    Okay.  This is a document that I
20  received from production on behalf of the
21  Subpoena.  It says, PHEAA-Gosse-00017 through
22  300.  Do you see that?
23    A.    Yes.
24    Q.    And if you need me to scroll through
25  this, I can.  Can you tell me, what is this

Page 103

1  document?
2    A.    Yes.  This document is showing all
3  of the loans that defaulted since Gosse's loan
4  defaulted on 11/1/2010 forward in the 2007-3
5  trust.
6    Q.    And why was the 11/1/2010 the
7  cutoff?
8        MS. SCRIVANI:  That was my
9  choice as counsel.
10        MS. HENRY:  Okay.
11  BY MS. HENRY:
12    Q.    So can you tell me, what system did
13  this data come from?
14    A.    That was pulled from our COMPASS
15  system.  A query was done in our task group to
16  pull that data from COMPASS.
17    Q.    And this query has account numbers.
18  Can you tell me, are those account numbers
19  internal to PHEAA?
20    A.    Yes.  They correspond to the
21  borrower's account.  When COMPASS -- so they
22  have their SSN and an account number that we
23  can use in place of an SSN.
24    Q.    But this is not an SSN.  This is a
25  separate account number; right?

Page 104

1    A.    That's an account number, correct.
2    Q.    Okay.  And this has owner code;
3  right?
4    A.    Yes.
5    Q.    Do you see this column?  Can you
6  tell me, do you have some kind of chart that
7  explains what these owner codes are?
8    A.    I do not have a chart that explains
9  what the owner codes are.  The owner code is
10  created for the owner, for the lender.  122962
11  is National Collegiate Trust owner code
12  designated on our system.  The various
13  suffixes, which are the letters that you see
14  after 122962, excuse me, could mean things like
15  quarterly capping, or immediate repay.
16        So, for example, you might see an IM
17  listed there.  That could mean the loan is
18  immediate repayment versus a QC or a QT could
19  mean that it's quarterly capping.
20        Typically, a D, something that
21  starts with a D, like a DF or DP could mean
22  that it was a fully deferred loan.  IO would
23  mean interest only.
24        There are different suffixes that
25  are created to drive certain situations on our

Page 105

1  system.
2        But, again, I don't have a chart
3  that outlines all of those.  It could vary
4  across the board.
5    Q.    Okay.  And then 122962, that's for
6  all National Collegiate Student Loan trusts?
7    A.    Yes.
8    Q.    So you don't differentiate between
9  each of the trusts; is that right?
10        MS. SCRIVANI:  Objection.
11        THE WITNESS:  Sorry, Stacey.
12        MS. SCRIVANI:  Go ahead.
13        THE WITNESS:  They are
14  differentiated by the bond issue that I have
15  listed beside the owner code.  As you can see
16  there, the bond ID is listed as NCT 2007-3.
17  That is specific to the securitization, 2007-3
18  trust.
19  BY MS. HENRY:
20    Q.    Okay.  And you said that this bond
21  -- you said all this information comes from
22  COMPASS; right?
23    A.    Correct.
24        MS. HENRY:  I'm going to take
25  this down and go to your other document.  This

Jennifer Wilbert  Confidential
February 24, 2023

Page 106

1   is going to be the next exhibit.
2                   (Deposition Exhibit No. 4 was
3   marked for identification.)
4   BY MS. HENRY:
5        Q.    All right.  Can you see this up on
6   the screen?
7        A.    Yes.
8        Q.    Let me see if I can blow it up a
9   little bit.  And this is the Gosse, the
10  PHEAA-Gosse Exhibits 3001 to 3005.  Have you
11  reviewed this prior to today's deposition?
12                  MS. SCRIVANI:  Just to be
13  clear, it's 301 to 305.
14                  MS. HENRY:  I'm sorry, 301 to
15  305.  Thank you.
16  BY MS. HENRY:
17       Q.    Can you tell me, what system did
18  this information come from?
19       A.    COMPASS.
20       Q.    This is COMPASS?
21       A.    Yes.
22       Q.    Okay.  And this information is for
23  Gosse's loan; right?
24       A.    Correct.
25       Q.    And right here, I'm going to

Page 107

1   highlight here, it says, bond issue NCT 2007-3.
2   Do you see that?
3        A.    Yes.
4        Q.    And where did that information come
5   from?
6                  MS. SCRIVANI:  Objection.
7                  THE WITNESS:  You mean how did
8   it get on the loan?
9   BY MS. HENRY:
10       Q.    How did it get in the system?
11       A.    When the loan sale process runs, the
12  assigned bond issue for this trust was NCT
13  2007-3.  So that owner code is updated to
14  reflect NCT and the bond issue is assigned as
15  NCT 2007-3 on the day of the sale.
16       Q.    And who provides that information to
17  PHEAA?
18       A.    I'm sorry, I didn't hear your
19  question.
20       Q.    Who provided that information to
21  PHEAA?
22                  MS. SCRIVANI:  Objection.
23                  THE WITNESS:  We received a,
24  not a term sheet.  I'm trying to think of the
25  correct name, but essentially the details of

Page 108

1   what should be included in the sale for the
2   2007-3 securitization from First Marblehead.
3   BY MS. HENRY:
4        Q.    So you mentioned several entities
5   today.  You mentioned First Marblehead
6   Education Resource, First Marblehead Data,
7   FMDR, maybe you can -- First Marblehead Data
8   Resource also; is that right?
9        A.    First Marblehead Data Services.
10       Q.    Data Services, okay.  And First
11  Marblehead Corporation.  So which one is it;
12  where did you receive the information from?
13                  MS. SCRIVANI:  Objection.
14                  THE WITNESS:  The information
15  was provided by First Marblehead, but I don't
16  know outside of that.  FMER is the originator.
17  FMDS was the -- excuse me, FMER was the
18  originator.  FMDS was the administrator on
19  behalf of the guarantor, and First Marblehead
20  was the corporation.  FMC was the corporation.
21  We received the data from an individual at
22  First Marblehead.
23  BY MS. HENRY:
24       Q.    Do you know who that individual is?
25       A.    I have the documentation that shows

Page 109

1   his name, but I can't recall his name off the
2   top of my head.
3        Q.    It's one person?
4        A.    Yes.
5        Q.    Okay.  And did you review whatever
6   document it is that names that person for
7   today's deposition?
8        A.    I did.
9        Q.    And where is that document located?
10       A.    It's in our file, our client files.
11       Q.    Is there a reason that document
12  wasn't produced?
13                  MS. SCRIVANI:  It wasn't
14  produced because it wasn't part of the request.
15                  MS. HENRY:  I'm asking her is
16  there a reason it wasn't produced.  That's all.
17                  THE WITNESS:  I mean, it was
18  an internal document that was submitted for our
19  sale process that referenced that individual's
20  name.
21  BY MS. HENRY:
22       Q.    Okay.  And do you have records that
23  document that transmission of information --
24                  MS. SCRIVANI:  Objection.
25  BY MS. HENRY:

Jennifer Wilbert   Confidential
February 24, 2023

Page 110

1    Q.    -- from that individual?
2            MS. SCRIVANI:  Same objection.
3            THE WITNESS:  I have the
4    request that was submitted that indicates the
5    criteria for the sale based on what was
6    provided from that individual.  It details all
7    the requirements and indicates when the prelim
8    reports, prelim files would be ran.  Excuse me,
9    prelims, they are run in advance of the sale
10   date.  And then that output is provided to the
11   clients through PageCenter.
12   BY MS. HENRY:
13       Q.    Anything else about that process?
14           MS. SCRIVANI:  Objection.
15           THE WITNESS:  No.
16   BY MS. HENRY:
17       Q.    Ms. Wilbert?
18       A.    I said no.
19       Q.    Okay.  So let me get that again.  So
20   there's a criteria for the sale based on what's
21   provided from an individual at First
22   Marblehead, and then the details and
23   requirements then show what files will be run
24   for the sale and what is run in advance of the
25   sale; is that correct, Ms. Wilbert?

Page 111

1            Can you explain?
2            MS. SCRIVANI:  Objection.
3            MR. ROTA:  Objection.
4            THE WITNESS:  First Marblehead
5    provided criteria for the sale.
6    BY MS. HENRY:
7        Q.    Okay.
8        A.    And then we had to provide an output
9    file with the sale information.
10       Q.    All right.
11       A.    That output file was produced to
12   you.  The prelims that I referenced, those run
13   in advance of the sale to give the lender,
14   original lender and the purchasing owner
15   advance notice of what the total amount is
16   going to look like that's included in the sale,
17   as well as the loans included.
18           They have to review it and provide
19   confirmation that we can proceed with the sale.
20   Once they do that, we then proceed with the
21   sale and that final file runs, which was
22   provided to you.
23       Q.    All right.  Thank you.  Anything
24   else?
25           MS. SCRIVANI:  Objection.

Page 112

1            THE WITNESS:  I don't think
2    so.
3    BY MS. HENRY:
4        Q.    I'm going to ask you to look at
5    this, what I have highlighted here.  It says,
6    status, claim paid.  Do you see that?
7        A.    Yes.
8        Q.    Can you tell me, why does it say
9    that the claim is paid?
10           MS. SCRIVANI:  Objection.
11           THE WITNESS:  The loan is
12   defaulted, and as I stated earlier, we use the
13   1030 claim payoff process that was in place
14   when TERI was the guarantor of the loan.
15           So when the loan defaults, the
16   status reflects claim paid.
17   BY MS. HENRY:
18       Q.    And when you said it was because
19   when TERI was on the loan, is that because TERI
20   guaranteed all the loans and paid them?
21       A.    Correct.
22       Q.    Okay.
23           MS. SCRIVANI:  Objection.
24   BY MS. HENRY:
25       Q.    And the Social Security number here,

Page 113

1    you said that that is inputted from information
2    provided by FMER; is that right?
3        A.    That's correct.
4            MS. SCRIVANI:  Objection.
5    BY MS. HENRY:
6        Q.    Okay.  Do you receive any money --
7    did you receive any origination information
8    directly from TERI?
9            MS. SCRIVANI:  Objection.
10           THE WITNESS:  FMER was working
11   on behalf of TERI, so there could have been
12   individuals from FMER and TERI involved.  I
13   can't tell you who was involved at that time as
14   far as individuals go.
15   BY MS. HENRY:
16       Q.    Right.  But PHEAA received the
17   information directly -- did PHEAA receive any
18   information directly from TERI, or did they
19   receive it only from FMER?
20           MS. SCRIVANI:  Objection,
21   asked and answered.
22           THE WITNESS:  We received the
23   information from FMER working on behalf of
24   TERI.
25           MS. HENRY:  Okay.  Thank you.

Jennifer Wilbert   Confidential
February 24, 2023

Page 114

1   I'm going to take this down.  I'm going take a
2   five-minute break.
3          Do you know, do we have breakout
4   rooms?  Is that something that we have here, or
5   no?
6                (Discussion held off the
7   record.)
8                (Short recess taken.)
9   BY MS. HENRY:
10      Q.   So do you remember we talked about
11  access that people outside of PHEAA have to
12  COMPASS and to other records at PHEAA?
13      A.   Yes.
14      Q.   And we talked, specifically, about
15  Transworld System, Inc., having access to PHEAA
16  records; right?
17      A.   Yes.  Correct.
18      Q.   And you provided some documents
19  where there is the agreements, where TSI and
20  formerly NCO could have real-time access to
21  PHEAA's records; right?
22      A.   Correct.
23      Q.   Does PHEAA keep records of every
24  time someone from Transworld, previously NCO,
25  accesses PHEAA's records for the trust?

Page 115

1       A.   I don't know the record history on
2   the COMPASS system.
3       Q.   Do you know who would know?
4       A.   That's an IT question.
5       Q.   So someone in IT would know?
6                MS. SCRIVANI:  Objection.
7                MR. ROTA:  Objection.
8                THE WITNESS:  I don't know if
9   they would know.  I don't know if there is a
10  history.  I would need to -- it's something
11  that would need to be inquired with IT.
12  BY MS. HENRY:
13      Q.   Okay.
14      A.   Or our business support group that
15  deals with the access request.
16      Q.   All right.  So my next question, you
17  probably don't know either, but I'm going to
18  ask it anyway, do you know if there would be
19  such records on a per loan basis or a per
20  borrower basis?
21                MS. SCRIVANI:  Objection.
22  BY MS. HENRY:
23      Q.   Or would it be per access?
24      A.   I don't know that.
25      Q.   Do you know, did you provide all of

Page 116

1   the documents for Ms. Gosse's loan that PHEAA
2   has in its possession?
3                MS. SCRIVANI:  Objection.
4   I'll answer that because I had this discussion
5   with your co-counsel.
6                MS. HENRY:  I'm asking
7   Ms. Wilbert.
8                MS. SCRIVANI:  Well, I'm going
9   to answer it.  You can ask your question, but
10  I'm going to tell you that my discussion with
11  Mr. Cocco was very clearly that we could not
12  provide every record that ever existed at PHEAA
13  related to Ms. Gosse's loan because it's
14  electronic and we were certainly not providing,
15  on this call and otherwise, access to the
16  COMPASS system.
17                So what I told him we would provide
18  and we did provide were screenshots of the
19  documents that were responsive and relevant to
20  the narrow issue.
21  BY MS. HENRY:
22      Q.   Okay.  Ms. Wilbert, I am now going
23  to ask you the question.  Have you provided all
24  the documents to Ms. Gosse's loan that PHEAA
25  has?

Page 117

1       A.   No.
2       Q.   And what information have you not
3   provided?
4                MS. SCRIVANI:  Objection.
5                THE WITNESS:  There are
6   notations on the history of the loan since
7   2007, when the loan was disbursed, through
8   current date.  There could be any -- which was
9   not specific to this request, so I did not
10  review it, but if the customer had provided any
11  deferment or forbearance forms over the life of
12  the loan or any correspondence outside of
13  the ownership issue at hand, then that would have
14  been stored in FileNet as well.
15  BY MS. HENRY:
16      Q.   Can you tell me a little bit about
17  these notations at the time of disbursement?
18  Where are those kept?
19      A.   COMPASS.  So one of the screenshots
20  that I provided to you showed a screen print of
21  our activity.  If I recall correctly, it's
22  called our activity detail screen.  I could be
23  saying this incorrectly.
24                But they provide a screenshot of ITD
25  2A, which is our history record, that stores

Jennifer Wilbert  Confidential
February 24, 2023

Page 118

1    any notations that are made by representatives
2    for processing or correspondence that's mailed
3    automatically through the system, or borrower
4    calls that may have been received, so on and so
5    forth.
6         Q.    I'm going to put that on the screen
7    quickly so that you can explain to me better
8    what you are saying.
9         A.    Sure.
10        Q.    Okay.  So here is the COMPASS
11   documents that we were provided.  Where should
12   I be looking?
13        A.    I think if you go to the last page.
14        Q.    Okay.
15        A.    So right there, that shows the
16   activity detail screen.  ITD 2A is where we
17   store our notations.  And this was --
18        Q.    Is that ITD 2A right here where I've
19   highlighted?
20        A.    Correct.
21        Q.    I'm sorry, I didn't mean to cut you
22   off.  You were continuing?
23        A.    I was just saying this would
24   specifically show the date in which we sent the
25   transfer letter to the borrower when the loan

Page 119

1    sale occurs.
2         Q.    And that's right here?
3         A.    Yes.
4         Q.    Okay.  And is that the notations
5    that you're referring to that happen at
6    disbursement?
7         A.    I'm saying there could be notations
8    on the loan from disbursement date of 8/8/2007
9    forward.  So anything could happen every day on
10   the loan.  Any time there is a phone call
11   received or documentation processed, a letter
12   sent, it would be reflected in this activity
13   detail screen.
14             And so because the loan was
15   disbursed back in 2007, there would be a long
16   history of notations.
17        Q.    There would be an entire year of
18   notations; right?
19        A.    No.  That's just the year from the
20   date of disbursement through the loan sale.
21   I'm talking about there would be notations from
22   disbursement date through current date.
23        Q.    Okay.  And those were not provided?
24        A.    Correct.
25        Q.    All right.  Also on the Exhibit A to

Page 120

1    the Subpoena, there was a request regarding the
2    records that were provided to the Boston
3    Portfolio Advisors regarding their emergency
4    audit in 2015.  Do you recall this?
5         A.    I recall the request, yes.
6         Q.    Okay.  And did you review any
7    documents in preparation for that topic?
8         MS. SCRIVANI:  Objection.  I'm
9    sorry.  I'm confused.  Are you asking about
10   documents that were supposed to be produced
11   pursuant to the documents to produce, or are
12   you asking about topics?
13        MS. HENRY:  I'm asking about
14   topics.
15   BY MS. HENRY:
16        Q.    Topic K, specifically, about the
17   records that we requested provided to BPA, did
18   you review those records before today's
19   deposition?
20        MS. SCRIVANI:  Objection,
21   assumes facts not in evidence.
22        THE WITNESS:  Yes.  I,
23   personally, did not review any specific
24   documents.
25   BY MS. HENRY:

Page 121

1         Q.    Did you review whether PHEAA
2    provided some loans for that BPA audit?
3         MS. SCRIVANI:  Objection,
4    beyond the scope of the topics on Exhibit A.
5    You can answer.
6         THE WITNESS:  I spoke to my
7    counsel regarding that, and I do know that
8    there was a selection of loans that were
9    sampled for that audit.
10   BY MS. HENRY:
11        Q.    And do you know anything about the
12   sample of loans?
13        MS. SCRIVANI:  Objection,
14   beyond the scope.
15        THE WITNESS:  I don't know
16   about the sample of loans, specifically, but I
17   know that there was a sample of around 379
18   loans that were requested in the sample.
19   BY MS. HENRY:
20        Q.    And do you know who the employees
21   were that communicated with BPA regarding those
22   loans?
23        MS. SCRIVANI:  Objection,
24   beyond the scope of the question which is
25   limited to communication concerning the

Jennifer Wilbert  Confidential
February 24, 2023

Page 122

1  ownership issues relating to the 2007-3 loans.
2        You can answer if you know.
3        THE WITNESS:  I'm sorry, did
4  you say employees at PHEAA that communicated
5  with --
6  BY MS. HENRY:
7     Q.   I'll ask it again.  Advisors
8  concerning those 379 loans?
9     A.   I know individuals that were
10  involved with the review at that time, yes.
11     Q.   And can you tell me the names of
12  those individuals?
13     A.   Vicky, her name was Roganish at the
14  time, was in charge of the external audits
15  division.  Specifically individuals within that
16  division that may have spoken to BPA, I don't
17  know that with certainty.
18     Q.   Vicky Beganish (sic), is that
19  B-E-G-A-N-I-S-H (sic)?
20     A.   Yes.
21     Q.   And you said that's no longer her
22  name?
23     A.   Her name has since changed to
24  Lininger.
25     Q.   And how do I spell that?

Page 123

1     A.   I'm going to guess here because I
2  don't know exactly the spelling.  I believe
3  it's L-I-N-I-N-G-E-R.
4        MS. SCRIVANI:  And her maiden
5  name was Roganish with an R.
6        THE WITNESS:  I'm sorry.  I
7  thought that's what she said.
8  BY MS. HENRY:
9     Q.   Thank you.
10        Does she still work at PHEAA?
11     A.   She does.
12     Q.   And do you know what location she
13  works at?
14     A.   It's a remote as well as in office,
15  same as mine.
16     Q.   At the same -- at the Pennsylvania
17  headquarters?
18     A.   Yes.
19     Q.   And you said -- what division is she
20  in?
21     A.   External audits.
22     Q.   Do you know her position?
23     A.   She is a vice president.
24     Q.   Anyone else that communicated with
25  BPA for the BPA audits?

Page 124

1        MS. SCRIVANI:  Objection,
2  beyond the scope of the topics.  You can answer
3  if you know.
4        THE WITNESS:  There were two
5  individuals in client relations at the time
6  that are no longer in client relations, Ken
7  Shutter and Sara Parrish.  They were involved
8  with the request.  I don't know if they had
9  direct communication with BPA.  But they were
10  involved with Vicky for that audit.
11        MS. HENRY:  Okay.  Just one
12  second.  There's someone knocking at my door.
13  I will be one second.
14        (Discussion held off the
15  record.)
16  BY MS. HENRY:
17     Q.   Ken Shutter, and you said Sara
18  Parrish; do they still work at PHEAA?
19     A.   Sara Parrish does not work at PHEAA
20  any longer.  Ken Shutter does for a couple more
21  weeks.
22     Q.   And where is he located?
23     A.   He is in the PHEAA headquarters
24  building as well as remote work from home.
25     Q.   Okay.  And did you communicate with

Page 125

1  Vicky or Ken or Sara concerning ownership
2  issues discussed with the Boston Portfolio
3  Advisors for that audit?
4        MS. SCRIVANI:  Objection.  You
5  can answer.
6        MR. ROTA:  Objection.
7        THE WITNESS:  Sorry, Stacey.
8  Did you say I can answer?
9        MS. SCRIVANI:  You can, yeah.
10        THE WITNESS:  Okay.  I did not
11  speak with Ken or Sara.  My counsel did speak
12  with Vicky.
13  BY MS. HENRY:
14     Q.   Your counsel spoke with Vicky, but
15  you did not speak with Vicky; is that right?
16     A.   That's correct.
17     Q.   Why was that, Ms. Wilbert?
18        MS. SCRIVANI:  Objection.  I'm
19  going to instruct you not to answer regarding
20  attorney-client privilege.
21  BY MS. HENRY:
22     Q.   Just quickly, for Ken Shutter, you
23  said he was in client relations.  What is his
24  role now?
25     A.   He is the vice president of our PA

Jennifer Wilbert   Confidential
February 24, 2023

Page 126

1  Forward program.  I don't know the -- I don't
2  know his exact title.  He is the vice
3  president.
4       Q.    Without getting into details, can
5  you tell me quickly what PA Forward means?
6            MS. SCRIVANI:  Objection,
7  beyond the scope.
8            THE WITNESS:  It's one of
9  PHEAA's private loan programs.
10 BY MS. HENRY:
11      Q.    Okay.  That's all I need to know.
12 And Sara Parrish, do you know when she left
13 PHEAA?
14      A.    I do not remember the exact
15 timeframe.  I believe 2018.
16      Q.    Do you have any idea where she went?
17           MS. SCRIVANI:  Objection.
18           THE WITNESS:  I do.
19 BY MS. HENRY:
20      Q.    Where did she go?
21      A.    CampusDoor.
22      Q.    Campus store?
23      A.    CampusDoor, D-O-O-R.
24      Q.    And is that in Pennsylvania?
25           MS. SCRIVANI:  Objection.

Page 127

1            THE WITNESS:  Yes.
2  BY MS. HENRY:
3       Q.    Do you know what her role is there?
4            MS. SCRIVANI:  Objection.
5            THE WITNESS:  She is the
6  president.
7  BY MS. HENRY:
8       Q.    She is the president of CampusDoor?
9       A.    I believe that's her new title, yes.
10 Unless it changed.
11      Q.    Okay.  So for the 379 loans and the
12 sample of those loans, what is your
13 understanding of what information was relayed
14 to the Boston Portfolio Advisors regarding
15 ownership of the NCSLT trust loans?
16           MR. ROTA:  Objection.
17           MS. SCRIVANI:  Objection.  You
18 can answer.
19           THE WITNESS:  I'm not aware of
20 anything specifically discussed regarding
21 ownership.
22 BY MS. HENRY:
23      Q.    Okay.  Are you aware of anything
24 discussed regarding assignments?
25           MS. SCRIVANI:  Objection.

Page 128

1            THE WITNESS:  Not specific to
2  assignments, no.
3  BY MS. HENRY:
4       Q.    Okay.  And you did not review the
5  379 loans that were selected for that audit;
6  right?
7       A.    No.  That's correct.
8       Q.    Do you know how they were chosen,
9  the 379 loans?
10           MS. SCRIVANI:  Objection.
11           THE WITNESS:  I do not.
12 BY MS. HENRY:
13      Q.    Did you ask anybody about how they
14 were chosen?
15           MS. SCRIVANI:  Objection.
16           THE WITNESS:  I did not.  I
17 know that they were provided to us as the
18 sample.  I don't know how they were chosen.
19 BY MS. HENRY:
20      Q.    Okay.  And it's my understanding
21 that there was some difficulty in matching the
22 borrower information with the data files for
23 those 379 files.  Can you tell me why that
24 would be an issue?
25           MS. SCRIVANI:  Objection.

Page 129

1            MR. ROTA:  Objection.
2            MS. SCRIVANI:  I'm going to
3  instruct you not to answer that question.  It's
4  beyond the scope and I don't understand it.
5  BY MS. HENRY:
6       Q.    I'm just asking, of those 379 loans
7  that were provided as a sample, if there is an
8  outside person that had to review the loans,
9  would they have difficulty matching up the
10 borrower information with the data files?
11           MR. ROTA:  Objection.
12           THE WITNESS:  I do not know
13 what would have been contained in the data
14 files, to answer that question, but based on
15 what they were provided and had access to at
16 the time, there should have been no reason why
17 they had difficulty in doing that.
18 BY MS. HENRY:
19      Q.    Okay.  And are those files still
20 kept in a way that they are easy to access?
21           MR. ROTA:  Objection.
22           MS. SCRIVANI:  Objection.
23 What files?
24 BY MS. HENRY:
25      Q.    The 379 files, are they kept in a

Jennifer Wilbert  Confidential
February 24, 2023

Page 130

1  way that they are segregated or do you know
2  where they are, and are they still accessible?
3            MS. SCRIVANI:  Objection.
4            MR. ROTA:  Objection.
5            THE WITNESS:  As far as I'm
6  aware, they have access to the 379 loans that
7  were identified for the audit.
8  BY MS. HENRY:
9       Q.   In other words, if we -- if you had
10  to produce the documentation that was provided
11  to the BPA audit, could you produce it?
12            MS. SCRIVANI:  Objection,
13  outside the scope.  You can answer if you know.
14            THE WITNESS:  I don't know if
15  we have the documentation that was provided to
16  BPA.
17  BY MS. HENRY:
18       Q.   Okay.  So during this deposition,
19  you referred to several documents that you
20  reviewed in preparation for this deposition.
21       A.   I'm sorry, can I go back to your
22  last question for a minute?
23       Q.   Yes.
24       A.   As far as the information that was
25  provided to BPA, we do still have it imaged in

Page 131

1  the individual borrower's account.  I just
2  don't know if we have the packets available
3  that were sent to BPA.  I just want to make
4  that clear.
5       Q.   Thank you for that clarification.
6            So during the deposition, you
7  referred to several documents that you reviewed
8  in preparation for the deposition that you did
9  not produce.  I'm going to ask that you produce
10  those documents, and I'm going also ask that
11  this deposition be continued because we have --
12  we have a right to ask you about those
13  documents and review those documents reviewed
14  in preparation for this deposition.
15            So I'm going to continue this
16  deposition on the record.
17            MS. SCRIVANI:  You can make
18  your request for any documents to me, but we
19  object to and will not make Ms. Wilbert
20  available again for another deposition.  So if
21  you have anything else to ask her, you should
22  finish it today.
23            MS. HENRY:  I'm putting my
24  request on the record.  And that's where we are
25  at.

Page 132

1            Anyone else have anything else?
2  Otherwise, subject to continuance, we're done
3  for today.
4            MS. SCRIVANI:  I have some
5  followup with Ms. Wilbert to close out some
6  questions.
7            EXAMINATION
8  BY MS. SCRIVANI:
9       Q.   There's been, well, a lot of
10  confusion, but there was particular confusion
11  on issues about whether there is destruction of
12  original wet signature documents.  So I want to
13  focus only on wet signature origination credit
14  documents.
15            Is there something that governs,
16  with respect to the 2007-3, anything that's wet
17  signature in the 2007-3 trust that PHEAA would
18  look to, at least initially, regarding what its
19  obligations are with respect to maintaining the
20  original wet signature documents?
21       A.   Yes.  The servicing agreement does
22  speak to containing the original wet signature
23  documents.  I believe the language is five
24  years after the loan is paid in full or
25  deconverted.

Page 133

1       Q.   And with respect to the documents in
2  the 2007-3, is there, to the best of your
3  knowledge, to the extent PHEAA has any wet
4  signature documents for loans in the 2007-3
5  NCSLT trust, have any of those documents been
6  destroyed, original credit wet signature
7  documents?
8       A.   To the best of my knowledge, no.
9       Q.   And what is your basis for saying
10  that?
11       A.   We -- our retention policy was
12  implemented, I believe, within the last year.
13  And prior to that being implemented, we were
14  told that we were not able to destroy any
15  NCT-related documents.
16            MS. SCRIVANI:  I have no
17  further questions.
18            EXAMINATION
19  BY MR. SHARTLE:
20       Q.   Hi.  I actually have a couple
21  questions.  Good afternoon, Ms. Wilbert.
22       A.   Good afternoon.
23       Q.   You testified earlier to some
24  training that TSI had with respect to the
25  COMPASS system and the document retention

Jennifer Wilbert  Confidential
February 24, 2023

Page 134

1   policy for AES.  I got a question, a couple of
2   questions, actually, relating to that.
3              Is it possible that real-time
4   discussions and calls occurred with TSI
5   representatives about particular matters in
6   CSLP lawsuits otherwise, where AES, some
7   representative at AES, explained how documents
8   and information was maintained by AES?
9       A.    It's possible.  I mean, I have had,
10  myself, have had many calls with Bradley Luke
11  over the years relating to lawsuits.  I can't
12  recall anything specifically, but it's quite
13  possible that that discussion may have occurred
14  with myself or someone on the letter team.
15      Q.    And if Bradley Luke or someone else
16  over at TSI were to testify that such
17  conversations did, in fact, occur, would you
18  have any reason to disagree with that
19  representation?
20      A.    No.
21             MR. SHARTLE:  I have nothing
22  further.
23                 EXAMINATION
24  BY MR. ROTA:
25      Q.    This is Al Rota from U.S. Bank.

Page 135

1   Hello.  I only have a couple of questions about
2   the BPA audit that you were just discussing.
3              Concerning the 379 loans, did PHEAA
4   send hard copy documents, hard copy loan file
5   documents to BPA?
6       A.    Yes, we did.  For the 379 loans,
7   prior to them coming on-site, we did send them
8   the credit agreement, disclosure statement --
9   yes, sorry, disclosure statement and
10  application, if that did enter.  And that was
11  provided before they came on-site.
12      Q.    Okay.  Was any other -- was BPA
13  provided access to any systems?
14      A.    They were provided read-only access
15  to our system while they were on-site.
16      Q.    Okay.  Which system?
17      A.    COMPASS.  I'm sorry.
18      Q.    Okay.  Was BPA provided with any
19  kind of access to any other system?
20      A.    I believe they got -- they were
21  granted system access to COMPASS.
22      Q.    Okay.  Do you know what records,
23  within COMPASS, BPA analyzed concerning the 379
24  loans?
25      A.    Specifically, no.  I do not know

Page 136

1   what they analyzed.
2       Q.    Ms. Henry put up screenshots of the
3   COMPASS system earlier.  Unfortunately, I'm not
4   able -- I'm not able to put those up right now.
5              In one of those documents, Bates No.
6   PHEAA-Gosse-000305, there is a notation that
7   says, and I will read it to you, ATSFR transfer
8   letter, date 09/20/07, requester TSX 08,
9   recipient, and then 198686504?
10             Are you familiar with that type of a
11  notation within the COMPASS system?
12      A.    Yes, I am.
13      Q.    What does that notation refer to?
14      A.    That's an automatic notation that is
15  generated so that when you see the requester is
16  TX, I believe it was 08, that means that that
17  is a system-generated notation.  It's not a
18  physical person putting out that notation.
19             So when our loan process runs, if it
20  was requested that a loan sale letter be sent,
21  the system will automatically trigger that loan
22  sale letter to the recipient that is listed
23  under the recipient field.
24             So if that recipient ID is --
25  matches the borrower's SSN, that would mean

Page 137

1   that that letter was sent to the primary
2   borrower.
3              If it is the co-signer's SSN, that
4   means that the recipient for that communication
5   was sent to the co-signer.
6       Q.    Okay.  So just to be clear, Bates
7   No. PHEAA-Gosse 000305, the notation ATSFR
8   transfer letter refers to a letter describing
9   what?
10      A.    It's a loan sale letter describing
11  that the loan was sold from, in this case
12  JPMorgan Chase to National Collegiate Trust
13  2007-3.
14             MS. HENRY:  Objection.
15             MR. ROTA:  I believe those are
16  all the questions I have.  Thank you.
17             MS. HENRY:  I have a couple
18  other questions.
19                 EXAMINATION
20  BY MS. HENRY:
21      Q.    First of all, I forgot to ask you,
22  we've had a couple of breaks.  Did you speak to
23  anyone during those breaks, Ms. Wilbert?
24      A.    I spoke to my attorney.
25      Q.    What did you speak about?

Jennifer Wilbert   Confidential
February 24, 2023

Page 138

1          MS. SCRIVANI:  Objection and
2   instruct you not to answer, attorney-client
3   privilege.
4   BY MS. HENRY:
5       Q.    And do you have a template from that
6   transfer letter, ATSFR transfer letter?
7       A.    Yes.
8       Q.    -- that you were just referencing?
9       A.    Yes.
10      Q.    And can you provide that template?
11          MS. SCRIVANI:  Objection.  You
12   can make your request to counsel and we'll
13   consider it.
14   BY MS. HENRY:
15      Q.    But you don't have the actual
16   transfer letter that is referenced in the 305
17   Bates numbered document; right?
18          MS. SCRIVANI:  Objection,
19   asked and answered.
20          THE WITNESS:  That's correct.
21   BY MS. HENRY:
22      Q.    Ms. Wilbert?
23      A.    I said that's correct.
24      Q.    Okay.  And you answered a number of
25   questions that were asked about the 375 -- 379

Page 139

1   loans that were transmitted to the Boston
2   Portfolio Advisors.  But you didn't actually
3   talk to anybody that did that transmission at
4   PHEAA; right?
5          MS. SCRIVANI:  Objection.
6          THE WITNESS:  That's correct.
7   BY MS. HENRY:
8       Q.    So how do you know any information
9   about the 379 loans?
10          MS. SCRIVANI:  Objection,
11   asked and answered.
12          THE WITNESS:  My attorney
13   spoke with Vicky in external audits, and I
14   spoke with my attorney.
15   BY MS. HENRY:
16      Q.    Okay.  So when you testified about
17   the 379 loans that were sent by hard copy, that
18   is information that you got from your attorney;
19   is that right?
20      A.    That's correct.
21      Q.    And when you, for the 379 loans,
22   when you said that they only had access to
23   COMPASS, is that information that came from
24   your attorney?
25      A.    I believe that is -- that was the

Page 140

1   case, yes.
2       Q.    Do you have any other information
3   besides what was given to your attorney to know
4   that information, Ms. Wilbert?
5       A.    No, I do not.
6       Q.    And when you stated that they were
7   provided read-only access to your system while
8   they were on-site, was that, again, information
9   that was provided to you by your attorney?
10      A.    Yes, that's correct.
11      Q.    And does your attorney work for
12   PHEAA?
13      A.    It's our outside counsel.
14      Q.    Okay.
15      A.    Stacey.
16      Q.    And so when you said that you knew
17   what records that they were analyzed for the
18   BPA, that, again, was information you only knew
19   through your outside counsel; correct?
20          MS. SCRIVANI:  Objection,
21   mischaracterizes testimony.
22          MR. ROTA:  Objection.
23          MS. SCRIVANI:  She said she
24   did not know what records were analyzed.
25          MS. HENRY:  Strike that.  Fair

Page 141

1   enough.
2   BY MS. HENRY:
3       Q.    You've also never worked for First
4   Marblehead Corporation; correct?
5       A.    That's correct.
6       Q.    And you have never worked for First
7   Marblehead Education Resource; correct?
8       A.    Correct.
9       Q.    And have you ever worked for The
10   Educational Resource Institute or TERI?
11      A.    No.
12      Q.    Have you ever worked for JPMorgan
13   Chase?
14      A.    No.
15      Q.    Have you ever worked for Bank of
16   America?
17      A.    No.
18      Q.    And did you have any training from
19   JPMorgan Chase as to how they maintain their
20   records?
21          MS. SCRIVANI:  Objection,
22   beyond the scope of the deposition and not
23   related to 30(b)(6) at all.
24          MS. HENRY:  I'm sorry.  I
25   disagree with you.

Jennifer Wilbert  Confidential
February 24, 2023

Page 142

BY MS. HENRY:

2    Q.   Can you please answer the question,
3  Ms. Wilbert?

4           MS. SCRIVANI:  I'm instructing
5  you not to answer the question.

6           MS. HENRY:  You're instructing
7  her not to answer?

8           MS. SCRIVANI:  Because you're
9  asking her in her individual capacity which she
10  said --

11          MS. HENRY:  I am asking her --
12  BY MS. HENRY:

13    Q.   In your capacity as a corporate
14  representative of PHEAA, has PHEAA had any
15  training by JPMorgan Chase as to how they have
16  kept documents and maintained documents for the
17  National Collegiate Student Loan Trust 2007-3?

18          MS. SCRIVANI:  Objection,
19  beyond the scope.  You can answer if you know.

20          THE WITNESS:  No.

21  BY MS. HENRY:

22    Q.   Thank you.  Do you know if any
23  changes were made to documents before they were
24  delivered to you?

25          MS. SCRIVANI:  Objection.

Page 143

1           THE WITNESS:  I'm sorry, I
2  cannot hear you.

3  BY MS. HENRY:

4     Q.   Do you know if any changes were made
5  to collateral loan documents for the 2007-3
6  trust before they were delivered to PHEAA?

7           MS. SCRIVANI:  Objection.

8           MR. ROTA:  Objection.

9           THE WITNESS:  No.

10  BY MS. HENRY:

11    Q.   Do you know if any changes were made
12  to the origination data before it was delivered
13  to PHEAA?

14          MS. SCRIVANI:  Objection.

15          THE WITNESS:  No.

16  BY MS. HENRY:

17    Q.   Do you know if any changes were made
18  to any other database information before it was
19  delivered to PHEAA?

20          MS. SCRIVANI:  Objection.

21  BY MS. HENRY:

22    Q.   Of the 2007-3 loans?

23    A.   No.

24          MS. SCRIVANI:  Same objection.

25          MS. HENRY:  Thank you.  And as

Page 144

1  I stated on the record before, we are asking
2  this deposition be continued.

3           MS. SCRIVANI:  We set the date
4  and time aside for this deposition.  The
5  witness is here, was prepared for, and did
6  testify.  And so to the extent the deposition
7  concludes today, PHEAA has satisfied its
8  obligations under the Subpoena for this
9  deposition.  We will not make Ms. Wilbert
10  available again.

11          (At 2:35 p.m., the deposition
12  was concluded.  Signature was not waived.)

Page 145

1           C E R T I F I C A T E
2               - - -
3           I, JENNIFER WILBERT, do hereby
4  certify that I have read the foregoing
5  transcript and it is a true and correct copy of
6  my deposition, except for the changes, if any,
7  made by me on the attached Deposition
8  Correction Sheet.

11

12  _____

13  _____
                Date

Jennifer Wilbert  Confidential
February 24, 2023

Page 146

ERRATA SHEET                    REASON FOR

PAGE      LINE          CHANGE/CORRECTION

1

2      _____   _____   _____

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24

25

Page 147

1    COMMONWEALTH OF PENNSYLVANIA        )
                                        ) SS
2    COUNTY OF ALLEGHENY                 )

3                    CERTIFICATE

4         I, Karen A. Nickel, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
5    certify that the witness, JENNIFER WILBERT, was
     by me first duly sworn to testify the truth,
6    the whole truth, and nothing but the truth;
     that the foregoing deposition was taken at the
7    time and place stated herein; and that the said
     deposition was recorded stenographically by me
8    and then reduced to typewriting under my
     direction, and constitutes a true record of the
9    testimony given by said witness.

10        I further certify that I am not a
     relative, employee or attorney of any of the
11   parties, or a relative or employee of either
     counsel, and that I am in no way interested
12   directly or indirectly in this action.

13        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 7th day
14   of March 2023.

15

16

17            /S/ Karen A. Nickel, Notary Public
              Registered Professional Reporter
18            Certified Realtime Reporter
19            My Commission Expires March 19, 2024

20

21

22

23

24

25

Jennifer Wilbert  Confidential
February 24, 2023

**Exhibits**

EX 0001 Jennifer Wilbert 022423
  4:3 9:14,18
EX 0002 Jennifer Wilbert 022423
  4:4 64:4,5, 8,11
EX 0003 Jennifer Wilbert 022423
  4:5 102:11, 12,13
EX 0004 Jennifer Wilbert 022423
  4:6 106:2

**0**

00001
  12:15
000305
  137:7
000315
  12:15,23
08
  136:8,16
09/20/07
  136:8

**1**

1
  9:14,18,24
  100:5
1.1.4
  100:6
1.10
  100:13
1.5
  100:3
1.7
  100:9
1.8
  100:12
1030
  93:23 94:10
  112:13
104
  64:13
11/1/2010
  103:4,6
112-3
  64:16
122962
  104:10,14
  105:5
17-300
  102:10
198686504
  136:9

**2**

2
  64:4,5,8,11
  70:5 71:6
20
  57:21
2001
  82:10 83:3
  94:25 99:22
2002
  31:13
2003
  31:16
2006
  83:11,17
  95:1
2007
  31:17 117:7
  119:15
2007-3
  6:5 7:20
  23:13 24:21,
  23 28:6,10,
  19 30:2,9
  32:18,23
33:7,15,18,
  22 34:15
  35:3,6 40:3,
  9 41:1,15
  43:19,23
  44:4 45:13,
  14 47:12
  48:24 51:22
  52:3 53:8
  54:6 55:4,10
  56:12 57:4
  58:19 59:19
  69:16 76:23
  85:4 86:4,11
  88:8 89:2
  92:13 94:13
  97:17 99:3
  101:1 103:4
  105:16,17
  107:1,13,15
  108:2 122:1
  132:16,17
  133:2,4
  137:13
  142:17
  143:5,22
2007-trust
  96:9
2008
  56:6,23
2012
  49:9 85:10
2014
  31:19
2015
  120:4
2018
  126:15
2019
  31:20
2:35
  144:11
2A
  117:25
  118:16,18

**3**

3
  102:12,13
30(b)(6)
  141:23
300
  102:22
3001
  106:10
3005
  106:10
301
  106:13,14
305
  106:13,15
  138:16
315
  12:23
375
  138:25
379
  121:17 122:8
  127:11
  128:5,9,23
  129:6,25
  130:6 135:3,
  6,23 138:25
  139:9,17,21
3:00
  86:13,21

**4**

4
  106:2

**5**

5
  82:9 83:7

Jennifer Wilbert Confidential
February 24, 2023

**6**

6
65:7

**8**

8
87:12
8/8/2007
88:23 119:8

**9**

9/28/2022
64:16

**A**

able
11:6 39:12
53:18 133:14
136:4
access
45:7,14,19,
23,25 46:9,
10 47:4,9,
11,20 49:18
66:8 78:7,
12,16,18,19,
21,24,25
79:4,9,11,
17,18,20,21
80:1,3,5,13,
16 81:9,12,
15 114:11,
15,20
115:15,23
116:15
129:15,20
130:6
135:13,14,
19,21 139:22
140:7
accesses
114:25

accessible
130:2
accordance
40:19
account
18:5 20:17
36:8 48:18
103:17,18,
21,22,25
104:1 131:1
accuracy
61:23 62:13,
19
accurate
36:13,25
37:19 39:25
40:10,21
accurately
37:2,7,13
40:23
acknowledge
5:4,7
across
35:4 90:8
105:4
action
11:8
activities
49:11
activity
35:17,21
48:7,8 49:13
57:3 117:21,
22 118:16
119:12
actual
29:1 49:19
63:24 66:17
90:23 95:10
96:20 97:4
138:15
add
81:11
added
12:25
addition
81:12

additional
12:22 15:23
18:18 21:17
51:10 81:13,
14
administered
5:8
administrator
57:11 108:18
advance
110:9,24
111:13,15
Advisors
120:3 122:7
125:3 127:14
139:2
AES
8:22 78:19
79:5 134:1,
6,7,8
AES's
78:7
affirmatively
34:3
afternoon
133:21,22
agency
7:9 8:20
70:8 81:1
84:14
agree
5:17,18,21,
23 6:1,4
agreed
6:19
agreement
5:14,15
6:14,17
18:4,7,9
26:13 28:3
29:6 39:5
40:19 41:5,
13,17 42:14
43:7,8,18
49:22 50:3,6
51:7,12
54:10,25

63:24 64:24
82:10 83:4,
12,17 84:4
94:17 95:1,
2,14,22
96:21 97:23
98:5,9 99:9,
22 100:17,18
132:21 135:8
agreements
19:15 41:12,
24,25 42:15,
18,20 50:16,
18 62:22
84:25 94:16,
21,23 95:4,
7,8 99:2,6
101:12,18
114:19
agrees
100:22
ahead
36:21 62:5
83:1 92:7
96:25 105:12
allegedly
88:10 89:11
98:23
Althouse
34:1
amended
83:12,17,23
84:4,8,9,24
95:1
amendment
84:17
America
141:16
American
8:21,23,24
amount
28:1,4
111:15
analyzed
135:23 136:1
140:17,24

Jennifer Wilbert  Confidential
February 24, 2023

Andrew
  5:25
Andy
  16:5
answer
  11:3,10,12,
  13 12:9
  13:7,12
  14:9,24
  15:19,25
  16:23 17:8
  18:16 19:5
  20:1 22:1,
  13,16 23:9,
  23,25 24:6
  25:3,13
  27:23 28:12,
  14 29:15
  30:4,12
  32:20 33:4,9
  34:22,25
  35:5,11
  36:16,21
  37:9 38:2,
  10,23 39:15,
  17 40:16
  41:3 42:22
  43:15,16
  45:17 47:14
  52:18 54:8
  55:7,14,20
  57:24 58:2,
  4,14,22 59:9
  61:16 62:5,
  6,15 69:24
  70:22 74:4
  75:2,11,18,
  22 77:1,21
  78:9 86:10
  91:11 94:7
  116:4,9
  121:5 122:2
  124:2 125:5,
  8,19 127:18
  129:3,14
  130:13 138:2
  142:2,5,7,19

answered
  19:5 23:22
  58:13 60:1
  61:16 67:22
  84:2 91:13
  92:16 93:6
  101:18
  113:21
  138:19,24
  139:11
answering
  101:15
answers
  14:16,20
  77:12 102:2
anybody
  79:21 128:13
  139:3
anyone
  14:7,13
  17:3,18 47:6
  75:24 76:9
  78:1 80:2
  123:24 132:1
  137:23
Apart
  24:2
appears
  65:2
application
  135:10
apply
  29:7,9 96:22
  99:11
appropriate
  74:15
area
  80:25
areas
  101:7
around
  31:17 121:17
arrangement
  5:12
asked
  19:5 23:22
  42:8 57:21

58:10 61:16
  67:22 77:2
  78:1 84:2
  92:16 93:6
  101:11
  113:21
  138:19,25
  139:11
asking
  59:5 60:9,12
  72:2 82:14,
  17 85:7
  86:18 87:8
  88:18 94:19
  97:21 109:15
  116:6 120:9,
  12,13 129:6
  142:9,11
  144:1
assigned
  94:17,18
  97:3 100:4
  107:12,14
assignee
  100:10,12
assignees
  100:5
assignment
  94:12 95:6,
  9,13 96:7,
  13,18,21
  97:2,9
  98:12,16
  99:11 101:3,
  23
assignments
  95:25 96:5
  127:24 128:2
Assistance
  7:9 8:19
  70:8
Association
  100:14
assumes
  120:21
ATSFR
  136:7 137:7
  138:6

attached
  10:9 18:25
  65:15 83:8,
  13 95:3,25
  98:5
attorney
  8:1 12:5
  95:19 137:24
  139:12,14,
  18,24 140:3,
  9,11
attorney-
client
  75:10 125:20
  138:2
attorneys
  5:3 14:11
  75:7
audit
  120:4 121:2,
  9 124:10
  125:3 128:5
  130:7,11
  135:2
audits
  122:14
  123:21,25
  139:13
authenticity
  61:24
automatic
  136:14
automatically
  118:3 136:21
available
  10:21 14:22
  15:1 59:18
  131:2,20
  144:10
avoid
  6:25
aware
  28:9 56:16
  58:24 59:1
  61:17 81:24
  82:6 127:19,
  23 130:6

**B**

B-E-G-A-N-I-
S-H
  122:19
back
  21:6 42:5,9
  43:6,11
  51:11 57:1
  65:18 66:3
  69:14 70:4
  72:4 74:20
  99:24 119:15
  130:21
background
  30:21
backups
  35:4
balance
  30:17 35:25
  37:12,14
  48:6,15,19
Bank
  5:19 49:10
  85:3,16,24
  86:1 100:13
  134:25
  141:15
bankruptcy
  56:6,23,25
  93:21
banks
  87:15,18
  88:1 89:10
  98:22 99:2,
  7,10
based
  22:6 70:9
  89:15 110:5,
  20 129:14
basis
  44:20 79:9
  115:19,20
  133:9
Bates
  12:20 136:5

137:6 138:17
began
  49:14 85:11
  88:21,24
Beganish
  122:18
beginning
  39:14 46:13
behalf
  5:17,19,21,
  23 6:1,4,19,
  20 7:3,8
  11:22 12:6,8
  13:5 14:17
  39:16 55:23
  59:10 60:2
  77:7,13,15
  87:14,17,25
  90:1 92:18
  102:20
  108:19
  113:11,23
believe
  16:16 18:12
  19:21 31:16,
  17 37:5
  50:2,4,11
  65:15 77:24
  84:11 95:7
  123:2 126:15
  127:9 132:23
  133:12
  135:20
  136:16
  137:15
  139:25
beside
  105:15
besides
  32:18 140:3
best
  25:13,22
  60:4 133:2,8
better
  118:7
billing
  36:1 44:19
  87:22 89:25

bit
  15:15 17:14
  30:21,22
  47:24 106:9
  117:16
blow
  106:8
board
  90:8 105:4
bond
  23:6,7,14,19
  24:4,13,22
  25:6 105:14,
  16,20 107:1,
  12,14
bonds
  24:8
borrower
  20:17 22:9
  26:5,10,14
  28:21 32:7
  34:11,15
  36:1,7 39:1,
  7 44:20,22
  46:2 51:16
  52:22 53:4
  87:21 92:25
  94:5 115:20
  118:3,25
  128:22
  129:10 137:2
borrower's
  18:5 19:7,17
  20:20 23:1
  26:1,3 36:23
  37:11,18
  45:2 46:1
  54:22 103:21
  131:1 136:25
borrower-
related
  33:23
borrowers
  52:8,14,15
  79:2 90:11
  92:4
Boston
  120:2 125:2

127:14 139:1
bottom
  12:21 65:24
boxes
  27:17
BPA
  120:17
  121:2,21
  122:16
  123:25 124:9
  130:11,16,25
  131:3 135:2,
  5,12,18,23
  140:18
Bradley
  134:10,15
break
  41:11 45:12
  53:21,24
  114:2
breakout
  114:3
breaks
  137:22,23
brief
  7:5 42:3
briefly
  64:22
brings
  48:19
Bryan
  5:22
building
  8:13 40:4
  124:24
business
  8:21 35:18
  79:16 115:14

**C**

call
  21:1 39:2
  46:2 116:15
  119:10
called
  31:11 117:22

Jennifer Wilbert  Confidential
February 24, 2023

calls
  36:2,7 37:17
  46:5 62:3
  87:22 118:4
  134:4,10
Campus
  126:22
Campusdoor
  126:21,23
  127:8
canceled
  52:2,6,10
capacity
  142:9,13
capping
  104:15,19
career
  71:2
carry
  100:15
carryover
  56:23
case
  15:20 64:17
  82:18 93:10
  137:11 140:1
cash
  93:24
cashed
  52:15,22
certain
  24:8 25:20
  27:25 28:4
  39:4,6 65:4
  104:25
certainly
  12:18 95:15
  116:14
certainty
  122:17
cetera
  29:18
change
  28:21 49:16
  79:9 89:9,
  12,22 90:12
  93:21

changed
  74:11 90:15
  122:23
  127:10
changes
  142:23
  143:4,11,17
charge
  93:15 94:1,3
  122:14
charged
  93:13,18
  94:5
chart
  104:6,8
  105:2
Chase
  89:1 99:3
  137:12
  141:13,19
  142:15
chat
  9:1,8,10
  64:8 102:11
check
  52:10,21
  53:1,5,9,13
  60:15,24
checks
  52:3,6,13,15
Chelsey
  11:7
choice
  103:9
chosen
  128:8,14,18
Christina
  5:20 7:25
  29:3
claim
  56:24 93:19,
  20,24 94:1
  112:6,9,13,
  16
clarification
  131:5

clarify
  21:18,22
  71:21 77:6
clauses
  28:2
clear
  10:2 68:3,6
  72:1 86:21
  106:13 131:4
  137:6
clearly
  116:11
client
  10:3 29:14
  31:18,19,21
  32:1,2
  33:19,24
  37:1 47:19
  70:6 80:2
  81:13 94:9
  109:10
  124:5,6
  125:23
clients
  6:23 32:4,6,
  22,25 33:7
  40:18 81:8
  84:25 93:18
  110:11
close
  132:5
co-borrower
  51:16
co-counsel
  116:5
co-signer
  137:5
co-signer's
  137:3
Cocco
  7:15 116:11
code
  23:14 94:10
  104:2,9,11
  105:15
  107:13

codes
  104:7,9
collateral
  143:5
collect
  43:22
collected
  44:4
collection
  49:12
collections
  30:18 48:21
college
  31:2
Collegiate
  6:4 7:20
  25:18 104:11
  105:6 137:12
  142:17
column
  104:5
come
  36:7 51:11
  69:14 79:15
  89:18 103:13
  106:18 107:4
comes
  105:21
communicate
  124:25
communicated
  121:21 122:4
  123:24
communication
  121:25 124:9
  137:4
COMPASS
  19:12 20:13
  22:23,25
  23:1,11
  24:3,13
  78:12,16
  103:14,16,21
  105:22
  106:19,20
  114:12 115:2
  116:16

117:19
118:10
133:25
135:17,21,23
136:3,11
139:23
**completed**
31:3
**completing**
31:6
**comply**
83:23
**computer**
46:18
**concluded**
144:12
**concludes**
144:7
**conclusion**
62:3
**conditions**
49:25 50:5,
8,12,13,15,
19
**confidence**
39:23 40:8,
22
**confirm**
12:19 26:10
27:17 43:18
61:23 68:19
95:8,16
**confirmation**
111:19
**confused**
101:15 120:9
**confusion**
132:10
**connection**
7:23 87:12
100:21
**consent**
5:12 100:22,
24
**consider**
138:13

**considered**
28:24 98:11,
16
**consist**
81:8
**consisted**
81:4
**contained**
20:19 52:25
129:13
**content**
21:9
**contents**
70:8
**continuance**
132:2
**continue**
77:19 87:8
131:15
**continued**
87:3 93:22
131:11 144:2
**continuing**
118:22
**contract**
20:22 21:10,
11,20,22
37:1 42:16
84:20
**contracts**
21:13,14,19,
20,21
**conversation**
14:6
**conversations**
13:19 71:2
134:17
**conversion**
27:7 50:9,14
61:9,14,19,
22 62:10
**converted**
35:23
**copies**
28:19,23
29:21 30:1,
5,9,14 49:19

52:2,5,13,14
**copy**
29:2 52:10,
21 53:1,5,9,
13 67:17
90:19,23
135:4 139:17
**corporate**
8:18 13:20
14:7 142:13
**corporation**
10:15 82:11
108:11,20
141:4
**correct**
8:22 11:20
12:16 13:2
26:1,2,19
28:7,8 34:13
35:9 39:24
40:9 46:16,
24 48:1,2
49:1,2
60:16,20
61:5 65:8
68:15 69:5
71:13,14
72:7 74:24,
25 77:8,9
78:10,13
83:5,6,9,10,
14,15 88:7
91:9,15
93:11,12
96:1,9,11
104:1 105:23
106:24
107:25
110:25
112:21 113:3
114:17,22
118:20
119:24
125:16 128:7
138:20,23
139:6,20
140:10,19
141:4,5,7,8

**correctly**
88:24 95:14
117:21
**correspond**
103:20
**correspondenc
e**
37:16 87:21
117:12 118:2
**counsel**
5:11 7:14,15
12:25 13:8,
11 17:6,9,12
103:9 121:7
125:11,14
138:12
140:13,19
**count**
6:20
**County**
31:1
**couple**
10:4 124:20
133:20 134:1
135:1
137:17,22
**course**
29:13
**court**
5:2 42:7
64:11
**cover**
97:10
**covered**
100:17
**covers**
36:11
**create**
23:14 43:21
44:3
**created**
104:10,25
**credit**
26:13 40:19
43:8 49:22
50:2,6,16,17
51:7,12

Jennifer Wilbert  Confidential
February 24, 2023

54:9,25
62:21 63:24
79:1 132:13
133:6 135:8
**criteria**
110:5,20
111:5
**CSLP**
134:6
**Cumberland**
8:9
**current**
23:3 31:23
56:9 117:8
119:22
**custodial**
41:12,13,16
42:18,19
**custodian**
41:5,24,25
42:13,15
43:7,18
**custody**
40:25
**customer**
31:14 45:24
46:4,8 80:25
117:10
**cut**
118:21
**cutoff**
103:7

---

**D**

**D-O-O-R**
126:23
**daily**
79:9
**data**
26:4,6,10
46:9 48:20,
22 49:6 57:8
70:13 71:12
73:7,8,14,19
74:13,23
75:5 76:23

82:2 91:1,4,
22 103:13,16
108:6,7,9,
10,21 128:22
129:10,13
143:12
**database**
19:16 20:9
22:21 143:18
**databases**
22:6
**date**
9:24 21:7
23:12,13
26:14 65:4
85:9,14
110:10 117:8
118:24
119:8,20,22
136:8 144:3
**dates**
21:6 88:20
89:3
**day**
7:12 32:12
107:15 119:9
**days**
32:14,15
**dealing**
37:11,12
**deals**
115:15
**declaration**
13:15 18:10
19:1 65:2,9
70:3,9,19
71:1 82:9,17
83:8,14
86:15 95:3,
18
**declare**
5:9
**deconverted**
132:25
**deemed**
28:22 63:4

**default**
30:15 47:25
48:7,14,20
49:12 93:11,
16,17
**defaulted**
48:25 49:15
94:2 103:3,4
112:12
**defaulting**
90:3
**defaults**
48:6,13,17
50:4 51:8,13
112:15
**Defendant**
6:20
**Defendants**
6:15,21 29:7
**deferment**
117:11
**deferred**
104:22
**defined**
7:18
**delete**
91:5,19
**deleted**
91:1
**delinquency**
36:4 44:23
89:21 90:2
**delinquent**
36:3
**delivered**
142:24
143:6,12,19
**department**
41:7 47:4
67:13 68:24
**departments**
46:6,7
**depending**
90:6 98:7
**depends**
22:17 24:20
94:8

**deposition**
5:3,5,6
8:17,18
9:13,14,19
10:16,18,23
15:7,10,13
16:4 17:17
18:14,25
34:21 43:3,
12 64:5
77:7,17
82:20 85:6
86:22 102:13
106:2,11
109:7 120:19
130:18,20
131:6,8,11,
14,16,20
141:22
144:2,4,6,9,
11
**depth**
81:10
**describing**
137:8,10
**designate**
64:11 100:16
**designated**
10:14,19
13:4 21:1
23:11 49:12
79:25 80:7,9
104:12
**designation**
13:20 14:7
**designee**
7:7
**destroy**
73:9,15
74:12 75:5
133:14
**destroyed**
27:20 28:1
133:6
**destroying**
73:7,23
74:23

Jennifer Wilbert   Confidential
February 24, 2023

| | | | |
|---|---|---|---|
| **destruction**<br>  70:14 71:13,<br>  16,20,23<br>  72:7,25<br>  73:4,5 74:21<br>  75:15 76:1,7<br>  81:20 91:5<br>  132:11<br>**detail**<br>  20:15 23:2<br>  117:22<br>  118:16<br>  119:13<br>**details**<br>  19:12 36:9<br>  96:19 107:25<br>  110:6,22<br>  126:4<br>**DF**<br>  104:21<br>**different**<br>  6:22 19:11,<br>  23 20:6<br>  21:24 22:5,6<br>  23:22,25<br>  24:24 28:2<br>  35:13 39:17<br>  68:1 77:12,<br>  24 88:14,20<br>  89:2,15 90:6<br>  101:6 104:24<br>**differentiate**<br>  105:8<br>**differentiate<br>d**<br>  105:14<br>**difficulty**<br>  128:21<br>  129:9,17<br>**direct**<br>  72:12 124:9<br>**direction**<br>  57:12 85:16<br>  86:3<br>**directly**<br>  32:4,7 63:2<br>  85:12 86:17<br>  113:8,17,18 | **director**<br>  32:1 70:6<br>**directors**<br>  31:21<br>**disagree**<br>  77:19 134:18<br>  141:25<br>**disbursed**<br>  51:4 52:14,<br>  20 88:23<br>  117:7 119:15<br>**disbursement**<br>  26:14 27:7<br>  50:22 51:1<br>  52:8,16<br>  62:11 88:20,<br>  22,25 89:3<br>  117:17<br>  119:6,8,20,<br>  22<br>**disclosure**<br>  43:9 49:22<br>  50:3 51:7,<br>  12,15 54:10,<br>  25 62:22<br>  135:8,9<br>**discuss**<br>  12:12 13:9<br>  14:13<br>**discussed**<br>  7:15 14:10<br>  17:19 125:2<br>  127:20,24<br>**discussing**<br>  135:2<br>**discussion**<br>  114:6 116:4,<br>  10 124:14<br>  134:13<br>**discussions**<br>  7:13 70:10,<br>  17,20 85:23<br>  86:2 134:4<br>**division**<br>  122:15,16<br>  123:19 | **document**<br>  7:11 9:5,10,<br>  11,20,22<br>  10:1 18:21<br>  27:16 28:24<br>  29:1 42:24<br>  45:8,14<br>  64:13,15,16,<br>  23 65:1,7<br>  66:9,10,22<br>  67:1,8,9<br>  68:9 69:7,8<br>  70:13 71:12,<br>  15,19 72:6<br>  75:25 76:6<br>  81:19 83:22<br>  95:17 96:8<br>  97:2,3,4<br>  98:4,5 99:16<br>  102:19<br>  103:1,2<br>  105:25<br>  109:6,9,11,<br>  18,23 133:25<br>  138:17<br>**documentation**<br>  19:18 26:9<br>  39:6,8,12,24<br>  40:9 63:10<br>  95:10 108:25<br>  119:11<br>  130:10,15<br>**documents**<br>  10:22 11:18,<br>  22,25 12:4,<br>  6,11,14,18,<br>  19,22 16:18<br>  17:24 18:2,<br>  3,8,20,23,25<br>  19:9,22<br>  20:8,19,22<br>  21:13,24<br>  26:18,22<br>  27:15,18<br>  28:25 30:1,<br>  9,14 37:22<br>  38:8,20<br>  39:1,10,21 | 41:1,14<br>  43:21 44:3,<br>  9,13 45:2<br>  47:5,18,21<br>  49:19 52:25<br>  54:3,4,5,11,<br>  15,24 58:19<br>  59:3,6,12,<br>  13,18,22<br>  60:5,8,11<br>  61:18,21,24<br>  62:10,17<br>  63:1,7,18<br>  67:13 68:25<br>  72:22 78:4<br>  79:5 81:21<br>  82:3 86:16<br>  94:12 95:11,<br>  19 96:9 98:8<br>  99:17 102:9<br>  114:18<br>  116:1,19,24<br>  118:11<br>  120:7,10,11,<br>  24 130:19<br>  131:7,10,13,<br>  18 132:12,<br>  14,20,23<br>  133:1,4,5,7,<br>  15 134:7<br>  135:4,5<br>  136:5<br>  142:16,23<br>  143:5<br>**doing**<br>  129:17<br>**door**<br>  124:12<br>**DP**<br>  104:21<br>**drive**<br>  104:25<br>**Due**<br>  35:1<br>**duly**<br>  6:7<br>**duties**<br>  31:25 87:13 |

Jennifer Wilbert  Confidential
February 24, 2023

89:12

**E**

**earlier**
60:14 70:16
112:12
133:23 136:3
**easy**
129:20
**education**
7:8 8:19,21,
23,24 30:23
55:24 56:2
70:7 108:6
141:7
**Educational**
141:10
**efficiently**
86:25
**either**
95:18 115:17
**electronic**
46:23 63:3,
5,25 66:17
69:9 93:3
116:14
**electronically**
28:22 63:21
65:21
**elements**
26:11
**emergency**
120:3
**employees**
16:7,11
45:10 70:11,
18,20 71:5
78:3,6 79:4,
8 80:18
121:20 122:4
**end**
57:2
**endeavor**
6:24

**ensure**
26:14 36:24
37:13
**entire**
65:1 119:17
**entities**
56:8,11
58:17 108:4
**entity**
48:21 49:4
60:23 92:12
97:3 101:24
**essentially**
93:16 107:25
**established**
63:6
**et**
29:18
**everybody**
9:8 64:9
**everyone**
9:9 68:3
**evidence**
101:3 120:21
**exact**
12:17 126:2,
14
**exactly**
22:4 41:9
46:7 98:1
123:2
**EXAMINATION**
6:9 132:7
133:18
134:23
137:19
**examined**
6:7
**excuse**
50:20 67:25
81:9 104:14
108:17 110:8
**execute**
100:22
**executed**
100:25

**exhibit**
7:19 9:11,
13,14,17,18
10:9,20
64:4,5,8,11,
14 83:8,14
86:16 99:23
102:11,13
106:1,2
119:25 121:4
**Exhibits**
106:10
**exist**
28:10 56:8
135:10
**existed**
116:12
**expand**
20:2
**expected**
68:20
**experience**
22:8 71:18,
22 72:2
**explain**
25:22 48:16
111:1 118:7
**explained**
134:7
**explaining**
74:16
**explains**
104:7,8
**extent**
29:8 133:3
144:6
**external**
122:14
123:21
139:13
**extra**
11:25

**F**

**fact**
68:21 134:17

**facts**
120:21
**Fair**
140:25
**familiar**
10:11 136:10
**far**
8:14 41:5,8
56:24 57:2
72:2 113:14
130:5,24
**faxed**
67:8
**feed**
93:4
**feedback**
85:24
**feeling**
39:15
**field**
23:11,15
24:3,10,13,
18,23 136:23
**file**
18:8,22,23
19:13 20:7
26:4,6 46:2
48:23 53:6
60:19 63:5,
11 79:1
109:10
111:9,11,21
135:4
**filed**
19:24 20:3
56:6,22
64:16 65:10
82:17 93:21
**Filenet**
19:19 20:19
26:23,24
27:16,17
28:25 30:6
45:25 47:7,
17,20 49:18
50:10 67:17
96:1,5,9

Jennifer Wilbert  Confidential
February 24, 2023

97:8 117:14

**files**
19:17 20:9,
25 45:8,15,
23 46:11,23
47:2,12
50:18 52:23
53:10 54:13
61:4,9,12,13
68:19,20
69:2 109:10
110:8,23
128:22,23
129:10,14,
19,23,25

**filing**
64:14

**final**
7:11 111:21

**financial**
48:18

**find**
20:12 22:20
39:12 84:7,8

**fine**
29:10 98:18

**finish**
131:22

**first**
6:7 7:3 9:5
10:4 22:11,
23 49:6,9
56:2 57:8
64:25 82:11
83:4 108:2,
5,6,7,9,10,
15,19,22
110:21 111:4
137:21
141:3,6

**five**
32:11 33:14,
17 132:23

**five-minute**
53:24 114:2

**FMC**
108:20

**FMDR**
108:7

**FMDS**
57:4,7 58:5,
10 108:17,18

**FMER**
55:23 56:1
59:10 60:2,6
63:7 92:18,
21 93:8
108:16,17
113:2,10,12,
19,23

**focus**
132:13

**following**
7:13

**follows**
6:8

**followup**
132:5

**forbearance**
117:11

**forgot**
137:21

**form**
29:17 46:24
56:9 63:20
65:21 66:7
69:8,9
79:18,21,22
80:1,4
100:23

**format**
22:6

**formats**
22:5

**forms**
117:11

**forth**
118:5

**forward**
29:8 30:24
103:4 119:9
126:1,5

**four**
86:22

**front**
65:16

**full**
8:2 132:24

**fully**
104:22

**function**
35:8

**funds**
52:16

___

**G**

___

**gain**
79:11

**Gateway**
79:1

**gather**
22:9

**gave**
75:6 95:19
102:9

**general**
81:7

**generated**
136:15

**generosity**
34:24

**getting**
52:9,19
126:4

**give**
14:21 30:20
47:9,10
57:12 85:16
111:13

**given**
6:22 78:3
140:3

**giving**
14:17

**goes**
47:25 48:5
82:13

**going**
6:16,24 8:17
9:1,10,17,21

15:17 23:18
30:20,23
34:22,23,24
39:2 45:21
48:12 53:17,
21 55:7
57:15,16
58:7 64:9,
10,12 65:14,
18,24 69:13,
14 70:2,3
74:16,17
77:19 82:8
86:22 87:7,
8,11 91:25
98:19 100:7
101:6 102:8
105:24
106:1,25
111:16 112:4
114:1 115:17
116:8,10,22
118:6 123:1
125:19 129:2
131:9,10,15

**good**
6:11,12
53:20 102:3,
4 133:21,22

**Gosse**
11:7 64:17
90:14 106:9

**Gosse's**
17:2,20
18:22 27:10
40:2 60:15
63:19 65:15
88:22 93:11
96:14 97:5
103:3 106:23
116:1,13,24

**govern**
15:21

**governs**
132:15

**graduated**
31:2

Jennifer Wilbert   Confidential
February 24, 2023

granted
  135:21
grants
  35:15
group
  6:2 25:20
  79:17 103:15
  115:14
guaranteed
  100:15
  112:20
guarantor
  56:5 93:20
  108:19
  112:14
guess
  38:11 123:1
guidelines
  40:20 89:16,
  17 90:7 98:9

---

H

half
  31:3
hand
  117:13
handle
  32:18
handled
  6:16
handles
  34:11,15
happen
  49:8 87:8
  119:5,9
hard
  86:13,21
  87:2 135:4
  139:17
Harrisburg
  8:13,14
head
  34:3 45:5
  80:10 95:6
  109:2

headquarter
  8:12
headquarters
  123:17
  124:23
hear
  27:3 74:7
  107:18 143:2
held
  114:6 124:14
Hello
  135:1
Henry
  5:20 6:10,13
  7:1,2,24,25
  9:16,22
  10:6,7 11:1,
  5,16 12:3,13
  13:3,10,16,
  24 14:5,12
  15:3,24 16:2
  17:1,7,15
  18:19 19:8
  20:4 22:7,19
  23:17 24:1,
  15 25:9,23
  26:16 28:5
  29:10,13,19,
  20,25 30:7,
  19 32:24
  33:5,13
  35:7,19
  36:18 37:3,
  20 38:6,13,
  18 39:13
  40:5,7,13,24
  41:10,22
  42:4,11,25
  43:1,20
  44:2,14
  45:6,11,20
  46:21 47:8,
  22 49:24
  51:2,19
  52:1,7 53:7,
  23 54:1,14
  55:1,8,13,
  17,25 56:18

57:6,23
58:3,9,16,25
59:16,24
60:13,22
61:3,10,20
62:8,20
63:9,16
64:3,7 65:13
66:1,19
67:6,18
68:5,7,16
69:12,21,25
70:1,24 71:9
72:3,15,24
73:2,13,21
74:1,14,19
75:12,13,19,
23 76:8,13,
20 77:5,11,
18,25 78:11,
17 79:10,19
80:6,22
81:17,25
82:7,16,23
83:2,21
84:6,15
85:2,15,21
86:14 87:1,
6,10 88:17
89:5 90:9
91:3,10,17,
24 92:10,20
93:7 94:11,
20 95:23
96:6,12,23
97:11,15
98:2,17
99:13 101:8,
14,25 102:15
103:10,11
105:19,24
106:4,14,16
107:9 108:3,
23 109:15,
21,25
110:12,16
111:6 112:3,
17,24 113:5,
15,25 114:9

115:12,22
116:6,21
117:15
120:13,15,25
121:10,19
122:6 123:8
124:11,16
125:13,21
126:10,19
127:2,7,22
128:3,12,19
129:5,18,24
130:8,17
131:23 136:2
137:14,17,20
138:4,14,21
139:7,15
140:25
141:2,24
142:1,6,11,
12,21 143:3,
10,16,21,25
high
  30:23,25
  31:1
Higher
  7:8 8:19
  70:7
highlight
  107:1
highlighted
  112:5 118:19
highly
  52:20
history
  31:6 79:2
  90:20 115:1,
  10 117:6,25
  119:16
holding
  89:20
holds
  91:2
holes
  58:8
home
  8:15 124:24

hour
  53:22 57:20
hours
  86:23
housed
  42:16 67:16
houses
  20:14
hybrid
  32:16

---

I

ID
  105:16
  136:24
idea
  126:16
identificatio
n
  9:15 26:4
  64:6 93:1
  102:14 106:3
identified
  20:23 24:22
  130:7
identifier
  23:16
identifies
  23:4
identify
  20:20 39:8
IM
  104:16
imaged
  26:25 28:23
  47:2,20
  130:25
images
  47:7
imaging
  68:22
immediate
  104:15,18
implemented
  133:12,13

important
  36:19,22
  37:6 43:11
impression
  74:10
in-school
  44:22 89:24
include
  53:2 70:12
  72:5,11,12,
  18 87:21
included
  23:5 50:10
  52:23 54:12
  71:11 87:13
  108:1
  111:16,17
incorrectly
  117:23
index
  68:24
indexed
  20:12,21,24
indicate
  5:14 28:3
  44:11 67:15
indicated
  44:19
indicates
  110:4,7
individual
  79:25 80:3,
  8,10,14,15
  95:25 96:4
  108:21,24
  110:1,6,21
  131:1 142:9
individual's
  109:19
individually
  14:18
individuals
  46:4 47:3,
  10,11 67:12
  80:4,12,24
  84:12
  113:12,14

122:9,12,15
  124:5
information
  14:21 15:1,
  23 22:9,10,
  18,24 25:25
  26:6 33:3
  43:10 50:21
  51:3,5,10,
  14,20 53:3
  54:18 64:2,
  15 69:3
  92:3,22
  105:21
  106:18,22
  107:4,16,20
  108:12,14
  109:23 111:9
  113:1,7,17,
  18,23 117:2
  127:13
  128:22
  129:10
  130:24 134:8
  139:8,18,23
  140:2,4,8,18
  143:18
initially
  13:14 93:19
  132:18
inputted
  113:1
inquire
  39:2
inquired
  7:17 115:11
inquiries
  34:12,15
  35:2
inquiry
  35:5
instance
  52:24
Institute
  55:24 141:10
instruct
  15:18 43:15
  55:7 75:11,

18 125:19
  129:3 138:2
instructed
  75:3,21
instructing
  15:25 29:14
  33:3 55:14
  58:1,3,13
  69:23 86:9
  142:4,6
instruction
  55:12 75:6
interest
  37:14 44:21
  87:23 90:1
  104:23
internal
  27:25 103:19
  109:18
interruption
  42:5
Invokes
  75:10
involved
  84:21 85:4,
  9,10 86:1
  113:12,13
  122:10
  124:7,10
involvement
  57:3
IO
  104:22
IRS
  94:4,10
issue
  7:16,18
  15:20 23:6,
  7,15,19
  24:4,13,22
  25:6 34:20
  57:17 58:7,
  10 82:19
  105:14
  107:1,12,14
  116:20
  117:13

Jennifer Wilbert  Confidential
February 24, 2023

128:24

**issues**
  32:7 33:23
  122:1 125:2
  132:11
**ITD**
  117:24
  118:16,18
**item**
  24:21 35:14
**items**
  85:24

---

**J**

**James**
  13:14
**Jarecki**
  13:13,14,17
**Jen**
  38:3 43:15
**Jennifer**
  6:6 8:3,6,8
**Jim**
  13:13
**job**
  31:25
**joining**
  16:6
**JPMORGAN**
  89:1 99:3
  137:12
  141:12,19
  142:15
**judgment**
  82:18
**July**
  31:16
**June**
  31:17
**Justin**
  6:3

---

**K**

**Katrina**

34:1,2

**keep**
  29:5 34:23
  37:21 38:7,
  20,25 39:20
  65:24 67:25
  100:7 101:5
  114:23
**keeping**
  26:20
**Ken**
  124:6,17,20
  125:1,11,22
**kept**
  19:9 26:22
  50:16,17
  51:21 52:3
  117:18
  129:20,25
  142:16
**kind**
  72:18 104:6
  135:19
**knew**
  140:16,18
**knocking**
  124:12
**know**
  12:17 22:1,4
  23:9,19
  24:3,6,7
  25:3,5,7
  27:9,11
  28:15,17,18
  33:10,11
  35:11,14
  41:7 45:18
  46:6,7 55:3,
  18 56:7,10,
  19 57:1
  59:2,9,15
  60:11 61:2
  66:21,24,25
  67:4,19,23
  68:8,10
  75:2,8
  76:17,21
  77:3,22

79:3,7,11
  80:9,23 81:3
  82:14 83:16,
  19,20 84:3,
  16,19,22
  85:3,8,10,13
  91:18,22
  94:7,21 95:9
  96:3,17,20
  97:16,21
  99:16
  108:16,24
  114:3 115:1,
  3,5,8,9,17,
  18,24,25
  121:7,11,15,
  17,20 122:2,
  9,17 123:2,
  12,22 124:3,
  8 126:1,2,
  11,12 127:3
  128:8,17,18
  129:12
  130:1,13,14
  131:2
  135:22,25
  139:8 140:3,
  24 142:19,22
  143:4,11,17
**knowing**
  63:19 67:7
  69:7
**knowledge**
  25:13 53:1
  60:4,10
  70:9,12
  72:11,13,19,
  21 73:3
  75:15,25
  76:5,9,17,22
  77:3 87:3
  133:3,8
**knowledgeable**
  10:20
**known**
  8:20

---

**L**

**L-I-N-I-N-G-
E-R**
  123:3
**labeled**
  12:15
**labels**
  12:24
**language**
  42:13 43:7
  94:16,24
  95:6,9 97:9
  99:8 101:21
  132:23
**late**
  7:12
**lawsuit**
  16:21 17:22
  64:18 65:10
**lawsuits**
  134:6,11
**lawyers**
  16:11 17:18
**left**
  31:9 126:12
**legal**
  13:8,11
  19:16 20:8
  21:12 62:3
**lender**
  20:24 21:3
  23:2 25:17
  31:15 32:5
  33:21 34:8
  35:2 50:20
  78:25 89:1,
  19,20 90:2
  94:18 100:13
  101:23
  104:10
  111:13,14
**lender's**
  20:23
**lenders**
  24:20 99:12

100:14
101:12,19
lending
   87:15,18
   88:1 89:10
letter
   45:1 90:14,
   17,18,19,23
   91:1,19
   96:18
   100:22,24
   118:25
   119:11
   134:14
   136:8,20,22
   137:1,8,10
   138:6,16
letters
   36:4 90:10
   91:2,5,22
   104:13
level
   20:21
lieu
   5:8
life
   117:11
limited
   57:17 121:25
Lininger
   122:24
list
   80:4
listed
   98:9 104:17
   105:15,16
   136:22
little
   15:15 17:14
   30:21,22
   81:10 106:9
   117:16
live
   8:7,9
load
   63:7

loaded
   68:22
loan
   6:5 7:20,21
   11:7,15
   17:2,4,20
   18:4,7,21,
   22,23 19:7,
   12,13 20:6,
   15 21:5
   22:21 25:16
   26:15,18,21
   27:10 30:1,
   9,14 35:8,
   21,22,23,24
   36:2,3,12,23
   37:2,7,11,
   13,18,21
   38:7,19 39:3
   40:2 44:12,
   24 45:3,8,14
   46:1 47:12,
   25 48:1,4,5,
   9,11,17,19
   49:19 50:4
   51:4,8,13
   52:16,20
   53:5,10
   54:22 60:15
   63:19 65:16,
   19,20 67:20
   87:24 88:13,
   21,22,24
   89:17,20,22,
   23,24 90:3,
   5,6,15
   93:11,13
   94:2,3 95:25
   96:8,14 97:6
   103:3
   104:17,22
   105:6 106:23
   107:8,11
   112:11,14,
   15,19 115:19
   116:1,13,24
   117:6,7,12
   118:25
   119:8,10,14,

20 126:9
132:24 135:4
136:19,20,21
137:10,11
142:17 143:5
loans
   25:20 28:7,
   10 30:15
   32:18,22
   36:14 37:22
   40:18 43:22
   44:4 48:25
   49:5,15
   50:14 55:4,
   10,19,22
   56:5,12,20
   62:12 83:25
   85:4,17
   86:5,11
   87:13 88:5,9
   89:1 90:11
   93:17,18,19
   94:16 97:10
   98:21 99:3
   100:4,11,15,
   20 101:20
   103:3 111:17
   112:20
   121:2,8,12,
   16,18,22
   122:1,8
   127:11,12,15
   128:5,9
   129:6,8
   130:6 133:4
   135:3,6,24
   139:1,9,17,
   21 143:22
located
   34:4 42:1
   109:9 124:22
location
   123:12
locations
   29:21 30:2
log
   20:15 46:17

log-in
   46:14
logged
   20:25
long
   88:8,9
   119:15
longer
   48:1,11 56:8
   58:17 73:23
   80:25 84:13
   86:23 93:24
   122:21
   124:6,20
look
   12:18 22:22
   26:13 27:13
   43:2,4,5
   64:13,21
   69:6 82:8
   95:7 99:15
   102:8 111:16
   112:4 132:18
looked
   19:3 27:15
looking
   22:18,20
   26:9,12,17
   39:9 46:22,
   23 47:2,6
   65:19 66:12
   74:20 95:2
   118:12
looks
   9:23 66:2,4,
   16
Lori
   34:10
lot
   53:16 132:9
Luke
   134:10,15

_____

M

made
   6:19 29:4

Jennifer Wilbert  Confidential
February 24, 2023

118:1 142:23
143:4,11,17
maiden
123:4
mailbox
21:2,4,5
mailed
66:23 118:2
mailing
51:15,21
main
35:8,14,16
maintain
27:8 28:3,17
36:13 39:6
41:15 54:11,
16,19,21,23
141:19
maintained
30:6 41:6,21
134:8 142:16
maintaining
62:17 132:19
maintenance
70:12 71:11
76:22 82:2
majority
47:1,5
make
7:5 36:2,9
64:3,8 68:2,
5 79:21
131:3,17,19
138:12 144:9
makes
100:6
making
37:15 74:10
100:15
manage
32:3
management
41:7 47:3
67:12
manager
31:18,20
33:20,24

79:16
managers
32:3
manages
33:20
manner
5:13
Marblehead
49:6,9 56:2
57:8 82:11
83:4 108:2,
5,6,7,9,11,
15,19,22
110:22 111:4
141:4,7
marked
9:15,18 64:6
102:14 106:3
Marysville
31:12
Masso
34:10
match
26:3,11
matches
136:25
matching
128:21 129:9
matter
5:10 6:16
13:9 15:14
matters
15:20 134:5
mean
17:6 22:3
24:17 27:24
41:19 45:10
61:11 66:20
68:4,17
72:17 93:15
96:18 98:3
101:6
104:14,17,
19,21,23
107:7 109:17
118:21 134:9
136:25

Meaning
46:22
means
40:20 48:16
96:4 97:16
100:9,13,19
126:5 136:16
137:4
meant
18:7
meet
16:3,7,10
meetings
16:16
mention
70:16
mentioned
21:8 25:10,
24 41:23
98:19 108:4,
5
mine
123:15
minute
53:18 130:22
minutes
8:16 57:21
mischaracteri
zes
74:4,9
140:21
mission
35:16
moment
42:2
money
113:6
monthly
44:20
morning
6:11,12
12:1,21 13:5
move
58:2,14
86:10
moving
29:8

multiple
25:19 68:1
97:24

---

N

---

name
5:14 7:25
8:2 20:15,
18,23 26:1,
14 33:25
34:8 49:16
107:25
109:1,20
122:13,22,23
123:5
names
92:25 109:6
122:11
narrow
7:16 34:20
116:20
National
6:4 7:20
25:18 100:14
104:11 105:6
137:12
142:17
NCO
49:15 80:21
81:1,9
114:20,24
NCSLT
98:23 127:15
133:5
NCT
24:23 25:7
105:16
107:1,12,14,
15
NCT-RELATED
133:15
necessarily
87:7 90:2
need
20:15 36:24
37:12 39:5,

6,7,10,11
40:21 41:14
54:11,24
80:3 86:10
95:7 102:24
115:10,11
126:11

**needed**
51:10 86:23

**needs**
37:19

**never**
9:24 76:6
77:2 141:3,6

**night**
11:25

**nodded**
34:3

**non-cash**
93:25

**notation**
136:6,11,13,
14,17,18
137:7

**notations**
67:14 84:20
117:6,17
118:1,17
119:4,7,16,
18,21

**note**
50:19

**notice**
111:15

**notices**
44:21 87:23
89:21 90:1

**November**
31:13

**number**
20:17 26:1,5
29:4,5 35:2
45:1 63:17
64:17 68:20
79:8 84:25
92:3,22
97:22

103:22,25
104:1 112:25
138:24

**numbered**
138:17

**numbers**
12:20
103:17,18

---

**O**

**oath**
5:8

**object**
6:23 9:22
57:16 131:19

**objecting**
10:1 74:8

**objection**
6:19,20
10:25 11:9,
23 13:6,22
14:23 16:22
17:5 18:15
19:4,25
21:25 22:12
23:8,21 24:5
25:1,2,12
26:7 27:21
28:11 29:22
30:3,11
32:19 33:1
34:17,18
35:10 36:15,
20 37:8,24,
25 38:9,17,
22 40:1,11,
15 41:2,18
43:13,14,24
44:6,17
45:9,16
46:19,25
47:13,15
49:20 50:23
51:17,23
52:4,17
53:11 54:7,
20 55:5,11

56:14,21
57:14 58:21
59:7,8,20
60:7,17,21,
25 61:1,6,7,
15 62:1,2,
14,24 63:13,
22 65:12,22
66:14 67:3,
10,21 68:14
69:10,17
70:21,23
71:7,24
72:9,20
73:1,10,16,
17,25 75:9,
17 76:2,3,4,
11,12,15,24,
25 77:10
78:8,14
79:6,13,23
80:19 81:5,
22 82:4,12
83:18 84:1,
10,18 85:5,
18 86:6,8
88:11,12
89:13 90:24
91:7,8,16,20
92:6,15,17
93:5 94:6,14
95:20 96:2,
10,15 97:7,
14,19 98:13,
14 99:4
101:4 105:10
107:6,22
108:13
109:24
110:2,14
111:2,3,25
112:10,23
113:4,9,20
115:6,7,21
116:3 117:4
120:8,20
121:3,13,23
124:1 125:4,
6,18 126:6,

17,25 127:4,
16,17,25
128:10,15,25
129:1,11,21,
22 130:3,4,
12 137:14
138:1,11,18
139:5,10
140:20,22
141:21
142:18,25
143:7,8,14,
20,24

**objections**
5:13 6:15
29:5,7

**objects**
29:8

**obligation**
36:13 40:18
62:18

**obligations**
15:21 39:4
56:20 89:8,
15,17 132:19
144:8

**obviously**
50:10 89:16

**occasion**
15:13

**occur**
99:11 134:17

**occurred**
25:17 134:4,
13

**occurring**
37:17 57:1

**occurs**
119:1

**offer**
35:15 36:7

**office**
32:13,15
34:5,7 53:17
123:14

**offline**
16:17

Jennifer Wilbert   Confidential
February 24, 2023

**okay**
9:5 10:14
11:14,17,21
12:14 14:13
15:6 20:5,13
21:23 22:8,
20 23:7,18
24:16,24
25:10,24
26:17,24
27:19 31:5
32:17 35:20
36:12 39:14,
19,23 41:11,
16 42:25
43:5 45:7,21
46:10,14,17
47:23 48:12,
24 50:15,21
52:11 53:8
55:2 56:7,11
59:17,25
60:3,14,23
61:11,21
62:21 64:21
65:9,16,18
66:3,20,25
68:11 69:25
70:15 71:4,
10 72:4,16,
25 73:22
75:1,12
76:21 78:1
79:3,20
80:11,17,23
82:25 85:3
86:3 88:4
89:6 91:18,
25 93:10
94:3 95:24
96:7 97:12
98:11,18,24
99:14,18
100:1,8
102:1,6,7,19
103:10 104:2
105:5,20
106:22
108:10

109:5,22
110:19 111:7
112:22
113:6,25
115:13
116:22
118:10,14
119:4,23
120:6
124:11,25
125:10
126:11
127:11,23
128:4,20
129:19
130:18
135:12,16,
18,22 137:6
138:24
139:16
140:14
**older**
21:20
**on-site**
135:7,11,15
140:8
**once**
30:16 48:5,9
89:17,18,22
111:20
**one**
6:19,23 8:4
11:25 15:11
25:6 31:21
33:19 34:14
41:20 45:5
53:14 65:5
68:24 84:16
97:2 100:13
102:8 108:11
109:3 117:19
124:11,13
126:8 136:5
**open**
9:4
**opinion**
38:25

**opposed**
46:20 77:13
89:10
**order**
37:23 38:8,
12
**organized**
38:14,15,16,
21 39:1,11,
21
**original**
23:2 25:17
28:23,24
29:1 47:4
50:20 63:1,4
66:5,7,9,10,
11,13 67:15,
20,24 68:1,4
73:8,14,19
74:12 87:15,
18 88:25
90:2 94:17,
18 99:10,12
101:12,19,23
111:14
132:12,20,22
133:6
**originals**
27:2,5,6,8,
10,12,18,20
28:1,9,17,19
63:2 68:23
**originated**
55:19,23
62:11
**originating**
89:19 92:12
98:22 99:2
**origination**
51:6 52:23,
25 53:6
54:12,23
55:3,10
58:19 59:3,
6,11,18,23
60:19 61:4,
12,13 92:9,
11 113:7

132:13
143:12
**originator**
35:24
108:16,18
**outline**
86:18
**outlined**
84:23
**outlines**
80:4 105:3
**output**
110:10
111:8,11
**outside**
16:12,20,24
17:6,9,11,
16,18 19:7
24:6 29:17
32:22 35:3
45:10 47:10,
11 50:12
53:17 57:2
75:14 77:16
108:16
114:11
117:12 129:8
130:13
140:13,19
**outsourced**
36:3 44:24
**outstanding**
58:14
**oversee**
32:2,5,22
**owner**
7:18,21 23:3
100:9 104:2,
7,9,10,11
105:15
107:13
111:14
**ownership**
22:24 69:19
86:11 90:11,
15 117:13
122:1 125:1

127:15,21

**owns**
22:21

---

**P**

---

**p.m.**
144:11

**PA**
125:25 126:5

**packets**
131:2

**page**
9:12,24 21:4
64:25 65:6
99:19 118:13

**Pagecenter**
19:14 20:7,
25 48:23
78:22 110:11

**pages**
10:5 64:13

**paid**
93:19,20,24
94:1 112:6,
9,16,20
132:24

**paper**
28:19 29:2
40:3 46:24
63:18,20
65:21 69:8

**Paragraph**
70:5 71:6
82:9 83:7
87:12

**Parrish**
124:7,18,19
126:12

**part**
35:18 42:18
86:15 109:14

**participating**
5:3

**particular**
132:10 134:5

**parties**
5:11 6:18
95:12 100:16

**passed**
50:9,13 51:6
54:24 61:9,
13,18,22
62:17,19,22
92:8,11

**passing**
92:21,24

**password**
20:16

**past**
54:22

**path**
34:23

**pause**
42:3

**paying**
37:15

**payments**
36:6,9
37:11,15
56:24

**payoff**
112:13

**penalty**
5:10

**Pennsylvania**
7:8 8:10,13,
15,19 31:12
70:7 123:16
126:24

**people**
16:11 32:10
33:14,17
45:7,13,18,
22 59:9
75:15 114:11

**percentage**
33:7,12

**perform**
81:1

**period**
27:20 73:20

**perjury**
5:10

**permitted**
75:4 100:4,
10,12

**Perry**
31:1

**person**
5:8 10:19
34:14 48:13
109:3,6
129:8 136:18

**personal**
38:24 39:15
70:9 92:25

**personally**
25:14 120:23

**perspective**
56:16

**pertaining**
73:19

**Petsu**
16:5

**PHEAA**
7:3,10,14
8:12,20
10:15,19
11:22 12:6
13:5,17
14:17,22
15:2,22
16:8,12 17:3
19:10 24:25
27:2,5 31:13
34:14 35:12
36:13 39:16,
24 43:21
44:3 45:10,
14 47:9,10,
11,25 48:4
54:2 57:13
59:17 61:4,
22 62:10,23
63:6 65:21
69:9 70:8,
10,11,20
71:3,15
74:11 75:7

76:14 77:8,
13,15 78:20
79:12 80:11
81:20 82:3,
11 83:4,24
84:16 85:17
86:4 87:17
88:4,9 90:10
92:2 97:18
103:19
107:17,21
113:16,17
114:11,12,
15,23 116:1,
12,24 121:1
122:4 123:10
124:18,19,23
126:13
132:17 133:3
135:3 139:4
140:12
142:14
143:6,13,19
144:7

**PHEAA's**
7:16 35:8
70:12 75:25
76:22 86:12
87:13
114:21,25
126:9

**PHEAA-GOSSE**
12:15 106:10
137:7

**PHEAA-GOSSE-**
**00017**
102:21

**PHEAA-GOSSE-**
**000305**
136:6

**phone**
36:2,7 37:17
46:5 87:22
119:10

**phonetic**
34:10

**physical**
26:21 136:18

Jennifer Wilbert  Confidential
February 24, 2023

physically
5:4 8:11
41:20
piece
40:3
Pittsburgh
31:3,4,7
place
21:8,17,19
35:4 37:1
103:23
112:13
places
19:11 20:6,
10 21:24
Plaintiff
8:1 11:8
Plaintiff's
7:14,21
Plaintiffs
5:21
play
89:18
please
5:13 11:12
57:19 65:25
142:2
point
28:20 35:23
47:25 48:4,9
51:10 59:3,6
61:5 63:15
74:11
policies
44:25 63:11
70:14 71:13,
16,23 72:7
73:4 75:16
76:1,14,19
81:20 91:5,
19
policy
27:25 71:20
73:6 74:21
76:7 91:23
133:11 134:1

pool
91:2 100:20
pools
100:4
portal
36:8 78:25
portfolio
33:20 84:13
120:3 125:2
127:14 139:2
portfolios
32:4
position
31:23 32:17
74:12 123:22
possession
116:2
possible
53:13 134:3,
9,13
post
48:18 93:22
post-default
30:18
posted
93:17
potentially
39:2 44:21
pounding
53:17
prelim
110:7,8
prelims
110:9 111:12
preparation
16:20 17:25
78:2 120:7
130:20
131:8,14
prepare
16:4,14
18:13
prepared
7:22 12:7,11
16:17 69:20
144:5

preparing
16:20 17:17
present
5:4 12:7
president
123:23
125:25 126:3
127:6,8
previous
42:9
previously
44:18 49:3,5
64:2 114:24
primary
137:1
print
117:20
prior
80:21 106:11
133:13 135:7
privacy
44:25
private
126:9
privilege
75:10 125:20
138:3
probably
34:23 69:14
115:17
procedures
40:25 41:6
63:11 69:15
76:19
proceed
111:19,20
process
28:21 46:5
55:4 63:6,12
68:21 107:11
109:19
110:13
112:13
136:19
processed
119:11

processing
118:2
processors
46:9
produce
11:22 42:19
47:18 120:11
130:10,11
131:9
produced
11:17 12:4,6
18:9,24
42:17 43:9
109:12,14,16
111:11
120:10
production
102:20
program
50:20 126:1
programs
99:10 126:9
prom
50:19
proof
52:16
proprietary
33:2
provide
15:22 23:23,
25 47:18
51:6 80:11,
14 111:8,18
115:25
116:12,17,18
117:24
138:10
provided
7:12 12:10
50:3 59:22,
25 61:25
63:25 66:11
80:18,21
81:15,18
82:1 85:24
90:21 107:20
108:15

110:6,10,21
111:5,22
113:2 114:18
116:23
117:3,10,20
118:11
119:23
120:2,17
121:2 128:17
129:7,15
130:10,15,25
135:11,13,
14,18 140:7,
9
provides
   21:6 107:16
providing
   76:18 80:1
   116:14
pull
   25:25 50:5
   63:24 95:15
   103:16
pulled
   103:14
pulling
   50:11
purchase
   100:20
purchased
   89:24
purchases
   100:10
purchasing
   101:24
   111:14
purpose
   24:11,19
pursuant
   7:10 15:21
   100:5 120:11
put
   6:17 9:1,7
   23:14 25:25
   64:9 65:6
   70:4 118:6
   136:2,4

putting
   102:11
   131:23
   136:18

_____

          Q

_____

QC
   104:18
QT
   104:18
quarterly
   104:15,19
query
   103:15,17
question
   11:24 12:1
   14:2,4 15:19
   20:3 23:19
   26:15 27:4,
   23 29:24
   34:25 38:2,
   5,12 42:8,10
   44:1,7,9,16
   46:3 52:12
   57:22,25
   58:4,13,14
   59:17 62:4
   65:19 69:24
   70:15 71:21,
   25 73:12
   74:2,5,9,18
   77:20 82:22,
   24 91:12
   97:25 102:2
   107:19
   115:4,16
   116:9,23
   121:24
   129:3,14
   130:22 134:1
   142:2,5
questioning
   86:18
questions
   34:19 69:18
   77:16 87:9
   132:6

133:17,21
134:2 135:1
137:16,18
138:25
quickly
   118:7 125:22
   126:5
quite
   98:20 134:12

_____

          R

_____

rabbit
   58:8
raise
   58:7
raised
   58:4,10
ran
   110:8
Ratchford
   6:1
rate
   37:14
reached
   13:9,14
read
   42:9 43:17
   70:5 136:7
read-only
   78:16,18
   135:14 140:7
reading
   7:4 99:25
real-time
   78:7 79:4,8
   114:20 134:3
reason
   39:19 60:5
   84:4 109:11,
   16 129:16
   134:18
reasons
   84:22 85:1
recall
   53:12,15
   76:18 80:24

88:23 95:13
109:1 117:21
120:4,5
134:12
receive
   48:23 54:4
   63:7 67:13
   68:21 108:12
   113:6,7,17,
   19
received
   9:25 12:22
   27:6 53:6
   67:16 68:23
   102:20
   107:23
   108:21
   113:16,22
   118:4 119:11
receives
   54:3 62:10
recess
   53:25 114:8
recipient
   136:9,22,23,
   24 137:4
record
   5:15 6:17
   7:6 8:2 23:2
   34:18 36:6
   72:13 90:20
   114:7 115:1
   116:12
   117:25
   124:15
   131:16,24
   144:1
record-
keeping
   70:13 71:12
   72:6 76:10,
   14 81:19
records
   36:14 41:7
   47:3 54:22
   67:12 68:12
   79:12 109:22
   114:12,16,

21,23,25
115:19
120:2,17,18
135:22
140:17,24
141:20
**refer**
136:13
**reference**
7:17 46:1
98:6 99:16
100:6
**referenced**
83:7 99:17
109:19
111:12
138:16
**references**
99:9 100:3,
9,24 101:22
**referencing**
138:8
**referred**
7:9 130:19
131:7
**referring**
41:13,25
44:10,13
45:13 50:25
71:5 94:22,
25 96:20,25
97:1 101:2
119:5
**refers**
7:19 96:8
137:8
**reflect**
107:14
**reflected**
86:12 119:12
**reflecting**
37:13
**reflects**
112:16
**regarding**
13:15 17:4
51:20 78:3

85:17 86:4
87:20 120:1,
3 121:7,21
125:19
127:14,20,24
132:18
**regular**
81:15
**regulatory**
15:14,21
83:23
**related**
57:22 69:19
74:13 86:11
98:8 116:13
141:23
**relating**
43:22 44:4
122:1 134:2,
11
**relation**
16:21 17:2
**relations**
31:18,22
32:1 70:7
124:5,6
125:23
**relationship**
31:18,20
32:3 33:20
79:15
**relayed**
127:13
**relevant**
86:17 116:19
**remember**
26:21 94:24
95:5 114:10
126:14
**remit**
36:6
**remitting**
56:25
**remote**
32:14 123:14
124:24

**remotely**
5:6
**rep**
34:9
**repay**
104:15
**repayment**
104:18
**repeat**
17:16 29:24
38:5 42:7
**rephrase**
33:6 82:23
**reporter**
5:2 42:7,9
64:11
**reporting**
5:6,13 79:2
**reports**
94:10 110:8
**repositories**
67:15
**repository**
63:8
**represent**
10:15
**representatio
n**
134:19
**representativ
e**
13:20 14:8
31:15,16
33:22 134:7
142:14
**representativ
es**
32:6 39:11
45:25 46:8
118:1 134:5
**request**
79:15,18,20,
22 80:1,2,13
109:14 110:4
115:15 117:9
120:1,5
124:8

131:18,24
138:12
**requested**
11:18 76:6
120:17
121:18
136:20
**requester**
136:8,15
**requesting**
80:5
**requests**
7:11 42:24
80:15 81:16
**require**
22:5
**required**
51:8,12
54:3,6,16,19
**requirement**
53:2
**requirements**
83:24 110:7,
23
**requires**
37:1
**reserve**
7:4
**resigned**
49:9
**Resource**
108:6,8
141:7,10
**Resources**
55:24 56:3
**respect**
7:22 40:2,3
77:15
132:16,19
133:1,24
**respectfully**
77:18
**responsibilit
ies**
70:11 71:11
72:5,11,12,
18 87:14,17,

Jennifer Wilbert  Confidential
February 24, 2023

19
responsible
 79:25
responsive
 42:23 116:19
restated
 83:13 84:5,
 9,24 95:2
retaining
 72:22
retention
 70:14 71:13,
 16,19,23
 72:6,13,14
 73:5,20
 74:21 75:16,
 25 76:7
 81:20 91:1,
 4,22 133:11,
 25
review
 16:17 17:24
 18:2 43:10
 109:5 111:18
 117:10
 120:6,18,23
 121:1 122:10
 128:4 129:8
 131:13
reviewed
 9:20 18:3
 106:11
 130:20
 131:7,13
right
 9:9 10:6
 26:18 29:19
 46:15 65:14
 68:13 69:2,4
 75:24 99:20,
 23 101:3
 102:16
 103:25 104:3
 105:9,22
 106:5,23,25
 108:8
 111:10,23
 113:2,16

114:16,21
115:16
118:15,18
119:2,18,25
125:15 128:6
131:12 136:4
138:17
139:4,19
Roganish
 122:13 123:5
role
 57:9 125:24
 127:3
room
 5:5
rooms
 114:4
Rota
 5:18 6:17,18
 10:25 22:12
 25:1 26:7
 28:11 29:3,
 12,16,22
 37:25 38:17
 40:11 41:2,
 18 43:13
 44:17 46:25
 47:15 49:20
 56:14,21
 57:14 58:21
 59:7 60:17
 61:1,6 62:1,
 24 63:22
 65:12,22
 66:14 67:25
 68:14 69:10
 70:23 72:9
 73:1,10,16
 76:2 81:22
 85:18 86:8
 88:12 89:13
 91:8,16
 92:17 96:10
 97:14 98:14
 101:11 111:3
 115:7 125:6
 127:16
 129:1,11,21

130:4
134:24,25
137:15
140:22 143:8
run
 110:9,23,24
 111:12
runs
 107:11
 111:21
 136:19

---

**S**

---

sale
 18:4,7,8,21
 19:13 21:5
 107:11,15
 108:1 109:19
 110:5,9,20,
 24,25 111:5,
 9,13,16,19,
 21 119:1,20
 136:20,22
 137:10
sales
 25:16
sample
 121:12,16,
 17,18 127:12
 128:18 129:7
sampled
 121:9
Sara
 124:7,17,19
 125:1,11
 126:12
satisfied
 144:7
saying
 87:2,4 99:20
 117:23
 118:8,23
 119:7 133:9
says
 64:14,16
 71:10 72:4,8

100:6 102:21
107:1 112:5
136:7
scenario
 93:25
schedule
 32:16 97:21
 98:4,9
 100:23
schedules
 97:12,13,17,
 23,24 98:3
school
 30:23,25
 31:1
Schwartz
 5:25 6:1
scope
 22:2 24:6
 27:22 29:17
 33:2 34:19
 55:6 57:17
 69:18 75:18
 77:17 82:13
 85:6,20 86:7
 94:7 121:4,
 14,24 124:2
 126:7 129:4
 130:13
 141:22
 142:19
screen
 64:10 70:4
 106:6
 117:20,22
 118:6,16
 119:13
screens
 81:8,13
screenshot
 117:24
screenshots
 116:18
 117:19 136:2
Scrivani
 5:16,17 7:2
 9:21 11:3,9,

Jennifer Wilbert  Confidential
February 24, 2023

13,23 12:9,
24 13:6,12,
22 14:3,9,23
15:17 16:1,
22 17:5,8,11
18:15 19:4,
25 21:25
22:13,16
23:8,21 24:5
25:2,12
27:21 28:14
29:4,23
30:3,11
32:19 33:1,9
34:17 35:10
36:15,20
37:8,24
38:1,9,22
40:1,15
41:3,19
42:22 43:14,
24 44:6
45:9,16
46:19 47:13
50:23 51:17,
23 52:4,17
53:11,20
54:7,20
55:5,11,15,
20 57:15
58:1,6,12,22
59:8,20
60:7,21,25
61:7,15
62:2,14
63:13 67:3,
10,21 69:17,
23 70:21
71:7,24
72:20 73:11,
17,25 74:3,8
75:9,17,21
76:4,12,25
77:10,14,21
78:8,14
79:6,13,23
80:19 81:5
82:4,12,21,
25 83:18

84:1,10,18
85:5,19
86:6,9,20
87:4 88:11,
13 90:24
91:7,13,20
92:6,15 93:5
94:6,14
95:20 96:2,
15 97:7,19
98:13 99:4
101:4 103:8
105:10,12
106:12
107:6,22
108:13
109:13,24
110:2,14
111:2,25
112:10,23
113:4,9,20
115:6,21
116:3,8
117:4 120:8,
20 121:3,13,
23 123:4
124:1 125:4,
9,18 126:6,
17,25 127:4,
17,25
128:10,15,25
129:2,22
130:3,12
131:17
132:4,8
133:16
138:1,11,18
139:5,10
140:20,23
141:21
142:4,8,18,
25 143:7,14,
20,24 144:3
**scroll**
  65:23 102:24
**search**
  20:16 21:7

**second**
  7:4 69:6
  124:12,13
**section**
  95:13,16
  100:5
**securitizatio
n**
  23:5,12
  24:9,22
  25:8,10,11
  43:19 95:11
  100:19,25
  101:22
  105:17 108:2
**securitizatio
ns**
  25:16
**securitize**
  25:20
**securitized**
  98:23
**Security**
  25:25 26:5
  92:3,22
  112:25
**see**
  9:2,5,8,9
  18:21,22
  53:5 60:19
  63:25 64:19
  65:4,16
  66:20 97:5
  102:17,22
  104:5,13,16
  105:15
  106:5,8
  107:2 112:6
  136:15
**seeing**
  9:23 53:13
**sees**
  9:8
**segregated**
  130:1
**selected**
  21:5 128:5

**selection**
  121:8
**send**
  36:1,4 39:7
  44:11,19,21,
  23,24,25
  45:2 80:3
  90:10 94:4
  135:4,7
**sending**
  36:24 87:21,
  22 89:25
**senior**
  31:19 32:2
  33:19,24
**separate**
  21:19 99:1,6
  103:25
**September**
  65:3 83:12
**service**
  31:14 36:14
  37:2,6 38:8,
  20 39:21
  40:18 45:24
  46:4,8 48:11
  80:25 99:7
**serviced**
  24:25 40:23
  100:15
**servicer**
  35:9 36:12
  37:21 38:7,
  20 39:20
  49:10 56:17
  85:11
  100:16,21,
  22,24
**servicers**
  57:5
**services**
  8:23,24
  35:13 49:6
  57:8 108:9,
  10
**servicing**
  18:9 19:13,

Jennifer Wilbert   Confidential
February 24, 2023

15 20:8,13
28:2 35:15,
17,20,21,22
36:23 39:5
40:20 42:14
43:7 44:12
48:1,4,7,8,
10 49:11
64:24 82:10
83:3,16,24
86:4 87:13,
14,23 88:4,
9,21,24
89:8,9,15,16
90:5,7,20
94:23 95:1,
4,14,22
96:21 97:23
98:21 99:1,
3,6,9 132:21
set
79:17 144:3
sets
21:4
several
7:13 19:11
20:6 25:19
32:2 95:11
101:6 108:4
130:19 131:7
share
10:2 102:7
sharing
69:13 92:1
Shartle
5:22,23
76:3,11,15,
24 133:19
134:21
sheet
107:24
shifted
101:13
short
53:25 114:8
show
96:19 110:23
118:24

showed
117:20
showing
90:19 103:2
shows
108:25
118:15
Shutter
124:7,17,20
125:22
sic
122:18,19
sign
28:22
signature
27:16 63:5
64:1 66:5,
13,17,18,22
67:1,8 68:4,
9 132:12,13,
17,20,22
133:4,6
144:12
signed
65:3,5 95:11
97:4
signing
7:4
simplify
62:9
single
45:4 50:19
57:21
situation
93:25
situations
104:25
Social
25:25 26:5
92:3,21
112:25
sold
88:2,6,10
89:11,18,22
98:23 137:11
SPE
100:20

speak
13:5 41:9
125:11,15
132:22
137:22,25
speaking
24:9 72:23
77:7
special
48:7 49:10,
11 57:5
67:14 85:11
specific
17:21,22
19:7 21:21
24:21 25:7
26:9 41:8
43:8 53:4
69:15 71:1,4
75:4 76:18
79:2 80:12
84:4,22
85:9,14,25
94:24 96:8
97:2,9 99:8
101:19,20
105:17 117:9
120:23 128:1
specifically
7:17 28:16,
18 50:25
53:15 60:10,
11 75:3 77:2
81:6 85:8
86:1 114:14
118:24
120:16
121:16
122:15
127:20
134:12
135:25
spell
122:25
spelling
123:2
spoke
121:6 125:14

137:24
139:13,14
spoken
17:18 122:16
SSN
20:17,20,21
21:7 26:13
103:22,23,24
136:25 137:3
Stacey
5:16 11:12
12:11 16:5
17:10 22:15
28:13 74:6
105:11 125:7
140:15
stage
90:6
stands
55:12
start
64:25 99:22
started
6:14 31:12,
14 88:5
starting
30:23 31:9
starts
104:21
state
8:2 35:15
stated
46:12 47:24
87:20 112:12
140:6 144:1
statement
7:5,23 43:9
49:22 51:7,
15 54:10
135:8,9
statements
36:2 44:19,
23 62:22
87:23 90:1,3
stating
5:14

Jennifer Wilbert   Confidential
February 24, 2023

status
  44:22 89:24
  112:6,16
step
  35:5 53:18
stop
  34:24 48:4
  53:19 69:13
  74:17 86:13,
  21 87:2
  91:25 102:7
stopped
  56:19
storage
  70:13 71:12
  76:22 82:2
store
  23:12 31:11
  68:25 118:17
  126:22
stored
  19:14,15,18
  20:6,7,8,10
  21:1,13,15,
  19,20 22:25
  117:14
stores
  117:25
strike
  40:6 140:25
student
  6:4 7:20
  36:14 100:4,
  10,20 105:6
  142:17
subject
  132:2
submit
  79:18
submitted
  18:4 109:18
  110:4
Subpoena
  7:10,19
  9:11,18 10:9
  11:19 12:8
  17:21 42:18,

24 57:20
82:19 86:15
102:21 120:1
144:8
substantially
  100:23
suffixes
  104:13,24
suggesting
  86:24
summary
  82:18
supplement
  100:18
supplied
  95:18
support
  79:17 82:18
  115:14
supporting
  19:18
supposed
  120:10
sure
  11:24 12:1
  14:1 29:19
  43:25 46:6,8
  52:9 64:8
  94:9 97:20,
  25 100:1
  118:9
Susan
  8:3,6
Susquenita
  31:1
sworn
  6:7
system
  8:21 19:13,
  19 20:14
  23:11,15
  24:3,14
  30:8,16 36:5
  47:17,20
  48:10 50:22
  68:22 78:13
  86:12 90:20

93:23
103:12,15
104:12 105:1
106:17
107:10
114:15 115:2
116:16 118:3
133:25
135:15,16,
19,21 136:3,
11,21 140:7
system-
generated
  136:17
systems
  5:24 19:23
  41:20 49:1
  51:21 78:7,
  19 135:13

―――――――――――

          T

―――――――――――

take
  8:17 36:6
  46:5 53:23
  64:21 105:24
  114:1
taken
  15:7,10
  53:25 114:8
taking
  87:22
talk
  10:21 11:6,
  15 139:3
talked
  17:3 18:20
  70:16 98:21
  114:10,14
talking
  24:21 29:17
  37:19 68:3
  96:17 98:7
  119:21
task
  103:15

team
  32:5 35:3,4
  45:23 68:12
  134:14
tell
  15:12,15
  22:4 30:22
  31:5 41:24
  45:4 49:7
  54:5 55:2,3,
  9 56:1 64:22
  65:20 66:12
  82:10 87:16
  90:22 92:2
  102:16,25
  103:12,18
  104:6 106:17
  112:8 113:13
  116:10
  117:16
  122:11 126:5
  128:23
telling
  24:12
tells
  66:13
template
  138:5,10
ten
  8:16 91:2,6
TERI
  55:23 56:4,
  5,19 57:4
  59:11 60:2
  92:19 93:20,
  21 112:14,19
  113:8,11,12,
  18,24 141:10
term
  68:1 97:13
  107:24
terminology
  94:2
terms
  49:25 50:5,
  8,12,13,15,
  18

Jennifer Wilbert   Confidential
February 24, 2023

testified
  6:8 60:14,18
  133:23
  139:16
testify
  7:22 57:18
  69:20 77:15
  134:16 144:6
testifying
  39:16
testimony
  5:9 13:21
  16:4,15,21
  17:25 27:14
  74:4,10 78:2
  101:10
  140:21
Thank
  7:1 8:7,24
  18:17 29:12
  102:4 106:15
  111:23
  113:25 123:9
  131:5 137:16
  142:22
  143:25
things
  70:2 90:3
  97:22 104:14
think
  18:6 21:9
  22:2 29:15
  39:20 65:6
  100:5 101:11
  107:24 112:1
  118:13
thought
  60:1 123:7
three
  16:16
thumb
  64:22
tie
  42:15 43:6,
  11
tied
  24:8 43:18

time
  6:24 8:5
  9:24 15:11
  16:14 27:20
  28:1,4,20
  49:2 50:5
  53:21 57:4
  59:4,6 63:15
  75:5 81:9,11
  84:13,21
  86:19,24
  88:25 95:12
  113:13
  114:24
  117:17
  119:10
  122:10,14
  124:5 129:16
  144:4
timeframe
  89:3 126:15
times
  15:9
title
  126:2 127:9
titles
  12:17
today
  7:10 10:15
  11:6,18,21
  12:7 13:21
  14:8,17
  16:3,6 27:14
  34:6 56:13
  57:18 108:5
  131:22 132:3
  144:7
today's
  9:19,24
  16:15,20
  17:17 18:14
  43:2,11 77:7
  78:2 106:11
  109:7 120:18
told
  116:17
  133:14

top
  45:5 64:14,
  15 80:10
  95:5 109:2
topic
  7:11 98:18
  120:7,16
topics
  7:23 9:13
  10:4,12,20,
  22 13:21
  14:8 15:4
  55:6 57:19,
  22 82:13
  86:11
  120:12,14
  121:4 124:2
total
  111:15
tracking
  69:19
training
  78:3 80:12,
  15,17,20
  81:2,3,7,10,
  15,18 82:1
  133:24
  141:18
  142:15
transaction
  48:18 93:24
  94:10 100:19
transactions
  93:17,23
transfer
  45:1 48:6,22
  49:21 50:6,
  21 63:5,12
  68:21 96:18,
  19 118:25
  136:7 137:8
  138:6,16
transferred
  30:15,16
  48:25 49:6
  57:3 59:11,
  13 65:20

transferring
  49:14
transfers
  48:20
transmission
  109:23 139:3
transmitted
  139:1
Transworld
  5:23 30:8
  49:1 50:22
  114:15,24
trigger
  136:21
trouble
  17:14
true
  27:19 78:6
  83:22
trust
  6:5 7:20
  22:21 23:4
  25:18,21
  28:18 30:2,
  10 32:18,23
  33:8,15,18,
  22,23 34:16
  35:3,6 40:9
  41:1,8,15
  42:15 43:23
  44:5 51:22
  52:3 54:6
  56:12 57:10
  58:18,20
  59:19 69:16
  73:6,7,15,
  19,24 74:22,
  23 75:4,16
  76:23 78:4
  81:21 82:3
  87:20 88:3,
  6,10 89:2,
  11,25 92:13
  94:13,19
  96:22 97:10,
  17 98:24
  99:12 101:1
  103:5 104:11

Jennifer Wilbert   Confidential
February 24, 2023

105:18
107:12
114:25
127:15
132:17 133:5
137:12
142:17 143:6
trusts
  24:25 25:5
  53:8 85:25
  98:10 101:21
  105:6,9
try
  6:24 9:4
  22:2 48:12
  74:17
trying
  94:24 101:9
  107:24
TS
  81:9
TSI
  30:17 47:19
  48:7 49:12,
  15,17 75:24
  76:9,17,21
  77:3 78:3,6
  79:4 80:18,
  21 114:19
  133:24
  134:4,16
TSX
  136:8
twice
  55:16
two
  12:22 31:3
  54:10 56:7,
  11 124:4
TX
  136:16
type
  136:10
Typically
  104:20

---

**U**

U.S.
  5:19 49:10
  85:3,16,23
  86:1 134:25
Uh-huh
  98:25
unable
  15:18,22
understand
  11:24 14:1,
  4,16,20
  24:17 27:22
  38:2,10
  44:1,9,16
  48:13,15
  52:12 62:4,
  15 74:5
  99:19 101:9
  129:4
understanding
  7:16 63:17
  127:13
  128:20
Understood
  72:16
university
  31:2,4,6,7,
  10
unredacted
  69:3
unrelated
  15:19
update
  36:5
updated
  9:12,23,25
  83:23 107:13
user
  20:15

---

**V**

validate
  64:1 66:9

67:14 68:17,
18
validates
  68:12
various
  21:4 104:12
vary
  88:16,21
  89:4 98:6
  105:3
vault
  67:2
veracity
  61:23
verbally
  5:9
verify
  62:12,18
version
  9:25
versus
  29:1 63:4
  66:17 67:17
  81:15 93:19
  104:18
vice
  123:23
  125:25 126:2
Vicky
  122:13,18
  124:10
  125:1,12,14,
  15 139:13
view
  36:8
viewing
  47:20

---

**W**

waive
  5:12
waived
  144:12
want
  10:2 38:25
  63:23 99:21

102:7 131:3
132:12
warehouse
  67:16 69:1
way
  46:12 63:19
  67:7 68:2
  69:7 86:23
  129:20 130:1
ways
  68:2
Weber
  6:3
website
  36:8
week
  32:15
weeks
  7:13 124:21
went
  30:25 31:2,
  17 56:25
  81:1 126:16
wet
  66:22,25
  67:8 68:4,8
  132:12,13,
  16,20,22
  133:3,6
Wilbert
  6:6 7:7,22
  8:3,6 10:8
  11:2 13:25
  42:12 50:1
  54:2 55:9,18
  57:18,24
  64:12 69:22
  70:25 75:20
  85:22 88:18
  110:17,25
  116:7,22
  125:17
  131:19 132:5
  133:21
  137:23
  138:22 140:4
  142:3 144:9

Jennifer Wilbert  Confidential
February 24, 2023

**witness**
5:9,17 6:6
11:4,11,14
12:10 13:1,
8,13 14:10,
25 15:18
16:24 17:9,
13 18:17
19:6 20:2
22:3,14,17
23:10,24
24:7 25:4,15
26:8 27:24
28:12,16
30:5,13
32:21 33:11
34:3 35:1,12
36:17,22
37:10 38:4,
11,24 40:12,
17 41:4
43:17,25
44:8,18
45:17 47:1,
16 49:21
50:24 51:18,
24 52:5,19
53:12 54:9,
21 55:22
56:15,22
58:23 59:10,
21 60:8,18
61:2,8,17
62:6,16,25
63:14,23
65:23 66:15
67:4,11,23
68:15 69:11
71:8 72:1,
10,21 73:18
74:6,16
76:5,16
77:1,23
78:10,15
79:7,14,24
80:20 81:6,
23 82:5
83:20 84:3,
11,19 85:7

86:19 88:15,
19 89:14
90:25 91:9,
15,21 92:8,
18 94:8,15
95:21 96:3,
11,16 97:8,
20 98:15
99:5 101:5,
17 105:11,13
107:7,23
108:14
109:17
110:3,15
111:4 112:1,
11 113:10,22
115:8 117:5
120:22
121:6,15
122:3 123:6
124:4 125:7,
10 126:8,18
127:1,5,19
128:1,11,16
129:12
130:5,14
138:20
139:6,12
142:20
143:1,9,15
144:5
**words**
130:9
**work**
13:17 25:4
28:6 31:6
32:6,10
33:14,15,18
67:12 123:10
124:18,19,24
140:11
**worked**
31:11 84:12
141:3,6,9,
12,15
**workflow**
20:22 21:9,
10,11,21,22

42:16 84:21
**working**
31:13 32:12
71:19,22
85:12
113:10,23
**works**
33:22 79:16
123:13
**wrapped**
87:5
**written**
100:17

---

**Y**

**yeah**
53:23 55:16
125:9
**year**
25:19 50:20
119:17,19
133:12
**years**
25:19 31:4
91:2,6
132:24
134:11
**yesterday**
7:12 12:5
18:24 95:19
102:9

---

**Z**

**zero**
30:17 35:24
48:5,14,15,
19
**zeroed**
48:10